*United States of America*
No. 25-1068


In The
*First Circuit Court Of Appeals*


DISTRICT OF MASSACHUETTS
TRIAL COURT DEPARTMENT

---
---

SHARON RADFAR

Plaintiff-
Appellant

v.

CITY OF REVERE, AND JOSEPH COVINO, AND JAMES GUIDO CHIEF OF
POLICE, AND BRIAN ARRIGO, MAYOR ; AND OTHER AS YET UNNAMED
OFFICERS OF THE REVERE POLICE DEPARTMENT; INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITIES AS CHIEF OF POLICE, MAYOR AND POLICE
OFFICERS OF THE CITY OF REVERE

Defendants-
Appellees

---
---

**BRIEF FOR THE APELLANT**


Elizabeth M. Clague
Court of Appeals No. 87705
The Franklin Building
1106 Main Street
 Brockton, MA 02301
(508) 587-1191
Attyeclague@gmail.com

TABLE OF CONTENTS

**<u>I. Statement of Issues</u>**                                1

**<u>II. Statement of the Case</u>**                        2

**<u>III. Statement of Facts</u>**                          4

**<u>IV. Standard of Review</u>**                           8

**<u>V. Summary of the Argument</u>**                       8

**<u>VI. Argument</u>**                                     9

i    <u>The District Court Erred In Its Assessment of</u>    9
     <u>Material Facts</u>

                                                          9
A.    THE COURT FAILED TO CONSIDER, CREDIT AND VIEW
      IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF
      THE MATERIAL FACTS,DEPRIVING PLAINTIFF OF HER
      RIGHT TO PLACE THEM BEFORE A JURY.


                                                          15
B.  THE COURT ERRED IN GRANTING MUNICIPAL
DEFENDANTS' MOTION.

                                                          19
C.  THE PLAINTIFF WAS ENTITLED TO THE RELIEF SHE
    SOUGHT


                                                          22
ii.  <u>The Trial Court Applied the Law Incorrectly</u>
     <u>to the Facts.</u>


                                                          22
A. THE COURT'S RELIANCE ON LACK OF COMPARATORS
WAS INCORRECT.


B. THE COURT ERRED AS TO THE REQUIRED LEGAL        25
STANDARDS

**VII.    Conclusion**                                    29

*United States of America*
No. 25-1068

In The
*First Circuit Court Of Appeals*

DISTRICT OF MASSACHUETTS
TRIAL COURT DEPARTMENT

---
---

SHARON RADFAR

Plaintiff-
Appellant

v.

CITY OF REVERE, AND JOSEPH COVINO, AND JAMES GUIDO CHIEF OF
POLICE, AND BRIAN ARRIGO, MAYOR ; AND OTHER AS YET UNNAMED
OFFICERS OF THE REVERE POLICE DEPARTMENT; INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITIES AS CHIEF OF POLICE, MAYOR AND POLICE
OFFICERS OF THE CITY OF REVERE

Defendants-
Appellees

---
---

**TABLE OF AUTHORITIES**

Elizabeth M. Clague
Court of Appeals No. 87705
The Franklin Building
1106 Main Street
 Brockton, MA 02301
(508) 587-1191
Attyeclague@gmail.com

| | |
|---|---|
| *Amadao v. Zant,* 486 U.S. 214(1988) | 23 |
| *Amsden v. Moran,* 904 F.2d 748(1st Cir. 1990) | 27 |
| *Anderson v. Liberty Lobby, Inc.,* 477 U.S.242(1986) | 14 |
| *Ballou v. McElvain*, 39 F.4th 413 (9th Cir.2022) | 23 |
| *Bomar v. City of Pontiac*, 643 F.3d 458,(6th Cir. 2011). | 15 |
| *Calderon-Ortiz,et al v. Laboy-Alvarado, et al* 300 F.3d 60, (1st Cir. 2002) | 17 |
| *Camilo-Robles v. Zapata*, 175 F.3rd 41, (1st Cir. 1999) | 18 |
| *Celotex Corp. v. Catrett,* 477 U.S. 317(1986) | 14 |
| *Cosenza v. Worcester*, 120 F.4th 30(1st Cir. 2024) | 19 |
| *County of Sacremento v. Lewis,* 523 U.S. 833(1998) | 14 |
| *Cruz-Erazo v. Rivera-Montanez,* 212 F.3d 617(1st Cir. 2000) | 27 |
| *Doe v. Princeton Univ.,* 30 F.4th 335(3rd Cir.2022) | 16 |
| *Doyle v. Dukakis*, 634 F.Supp.1441,1444(D.Mass 1986) | 26 |
| *Gibson v. Foltz,* 963 F.2d 851, 854(6th Cir. 1992) | 18 |
| *Haley v. City of Boston,* 657 F.3d 39(1st Cir. 2011) | 19 |
| *Hannon v. Beard,* 645 F.3d 45 (1st Cir. 2011) | 21 |
| *Lima v. City of East Providence*, 17 F.4th. 202,206(1st Cir. 2021) | 15 |
| *Manuel v. City of Joilet,* 580 U.S.357(2017) | 27 |
| *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12(2011) | 18 |
| *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 587(1986) | 14 |
| *McDonough v. Smith, 588 U.S. ____, 139 S. Ct. 2149, 204 L. Ed. 2d 506(2019)* | 13 |

| | |
|---|---|
| *Martinez v. Cracker Barrel,Inc.*, 703 F.ed. 911, 916(6th Cir. 2013) | *15* |
| *Mount Health City Sch.Dist.Bd.of Ed. v. Doyle*, 429 U.S. 274, 287(1997) | *18* |
| *Mullane v. U.S. Dep't of Just.*, 113 F.4th 123, 130 (1st Cir. 2024) | *14* |
| *Paul v. Murphy*, 948 F.3rd 42,49 (1st Cir. 2020) | *13* |
| *Taite v. Bridgewater State Univ. Bd.of. Trs.*, 999 F.3d 86, 93(1st Cir. 2021) | *23* |
| *Tysinger v. Police Dept. of Zanesville*, 463 F.3d 569,572(6th Cir. 2006) | *26* |
| *Universal Trading and Inv.Co. v. Bureau for Representing Ukranian Ints. In Int'l & Foreign Cts.*, 87 F.4th 62, 65-66(1st Cir.2023) | *8* |
| *Village of Arlington Heights v. Metro Housing Development Corp.*, 429 U.S. 252,265-266 (1977) | *12* |
| *Wadsworth v. MSAD 40/RSU 40*, No. 23-1463 (1st Cir. 2025) | *15* |
| *Young v. Providence*, 404 F.3rd 4, 28(1st Cir. 2005) | *18* |
| *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico*, 999 F.3rd 37,55(1st Cir. 2021) | *14* |
| FRE 801(d)(2), 803( c ) | *22* |
| F.R.Civ.P. 56 | *21* |
| Jones, *Untested and Neglected: Clarifying the Comparator Requirement in Equal Protection Claims Based on Untested Rape Kits*, 115 NWU L.Rev.6, 1801-02(2021 | *24* |
| | *21* |

*Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, 999 F.3rd 37,55(1st Cir. 2021)*

## I. Statement of Issues

Did the trial court err where while conceding disputes of material facts determining what the jury would or should find against plaintiff and crediting defendant's version of facts over plaintiff's in summary judgment? Was it error for the trial court to allow municipal defendants' motion to dismiss?

Did the trial court erroneously determine plaintiff had waived her rights to relief for defendant's discovery, orders and rules violations and was it error to ignore her F.R.Civ.P. 56(d)-(f) request?

Did the court incorrectly apply a comparator requirement as a bar to recovery to an abuse of power civil civil rights claim and should the requirement of comparator evidence in this circuit's selective prosecution and class of one civil rights causes of action be altered?

## II. Statement of the Case

It began with a very bad breakup, where two people made nasty, vituperative comments to each other, then reconciled, then insulted and mistreated one another again. When plaintiff called out defendant for being racist and for holding her Iranian heritage against her, he retaliated by using the court and his police power to trump up false charges against her while withholding his role in their communications and disputes from a judge and criminal investigators even going as far as falsely

1

alleging sexual assault and creating out of whole cloth a trip she made from Virginia to Massachusetts that never occurred in order to counter a court's skepticism about the timing of his request for a restraining order, an order he decided to obtain because "now she's saying I'm racist".(Record Appendix 949: Defendant txt to GMU Lt. Ganley).

This is a civil rights and tort lawsuit filed against police officers, their chief and the Mayor of Revere over misconduct targeting Plaintiff by an officer with a disciplinary history involving abuses of power known to the named municipal defendants, who used his colleagues, the resources of the police department, police and judicial contacts and deference and his authority as a police officer to falsely accuse plaintiff of criminal acts and with false and misleading testimony in an *ex parte* proceeding obtain an Abuse Prevention Order pursuant to M.G.L. 209A against her, causing her humiliation, temporary issuance of an order against her in Massachusetts, interference with her property interests in her home state of Virginia, and interference with her employment as a veteran police officer when she was summarily taken off the job and subjected to a five-month criminal investigation based on the false claims.

Asserting the facts alleged by Plaintiff in the complaint were not true the municipal defendants moved to dismiss and their motion was allowed.

2

The remaining defendant police officer wrongly withheld from plaintiff until after the close of discovery and in violation of a court order details of internal affairs proceedings against him involving the Mayor and the Chief of Police, text messages he exchanged with one of plaintiff's colleagues in Virginia who was instrumental in the investigation of her and her removal from duty, and other evidence sought in discovery.

Though the District Court made a specific finding that documents created after the period of harm alleged by plaintiff in her litigation with her employer purporting to be "fitness for duty evaluations" whose admissibility was challenged by plaintiff on relevance, hearsay and prejudice and privilege grounds were not relevant and were not to be relied on in summary judgment proceedings, defendant did so anyway and the Court did as well.

Notwithstanding plaintiff's strong case for relief in the form of leave to amend at the motion to dismiss stage and from defendant's repeated discovery, court order and rules violations prior to and in summary judgment the Court found plaintiff had waived her right to relief. The court considered the factual constellation in a light strongly favoring the defendant, made several errors in review of the factual record and errors of law, and granted the defendant summary judgment on all remaining counts. Plaintiff has timely appealed the judgment.

3

### III. Statement of Facts

Defendant, a Revere Police Sergeant, drafted a police report in which he was the alleged "victim", falsely and maliciously claiming Plaintiff had committed crimes against him, and wrongly listing himself as the reporting officer and the supervisor, while stating the identity of the victim was "confidential.", though he listed himself as the victim. He included a police department "Incident Report" naming plaintiff as the suspect who had committed the crime of "criminal harassment" prohibited by G.L. c. 265 §43A at the Revere Police Station in January 28, 2017.(Virginia State Police Record, Doc.No.70-11 p.34).[1]

Defendant then appeared in the Lynn District Court *ex parte* and by making false, misleading and scurrilous claims against plaintiff while omitting information he knew to be essential to the court's proper evaluation of his claims he convinced a judge to grant him an Abuse Prevention Order pursuant to M.G.L. c. 209A against Plaintiff, using his status as a police officer and his relationship with the court to wrongly credit his false claims. (Transcript of Ex Parte Hearing, Doc.78-22,

---

[1]All of the items attached as "Doc 70" are defense summary judgment exhibits found at Record Appendix pp.441-934. All items attached as "Doc 79" are plaintiff summary judgment exhibits found Record Appendix pp.935-964. The come immediately after the parties Statements of Material Facts and Disputed Fact pleadings in the Record Appendix.

pp.1-11).

Though he alleged in the Lynn District Court *ex parte* proceeding hundreds of text messages and emails  and thousands of calls from Plaintiff,  he wrongfully and misleadingly omitted the text messages, voicemails he had sent to Plaintiff and the hundreds of phone calls he made to her, dozens of which he made after he told her not to contact him.  He omitted the fact that the communications spanned the period of the parties' involvement dating back to the summer of 2015.  He intentionally withheld that information also from Virginia  investigators in his campaign to subject Plaintiff to criminal  charges in that state, and he also omitted that information in his correspondence with her employer.

Defendant told the Lynn District Court on January 31, 2017 that plaintiff had traveled to Massachusetts to show up at his workplace and otherwise harass him as recently as December 2016–a claim he also made to plaintiff's employers and Virginia criminal investigators–which was untrue and in fact plaintiff had not been in Massachusetts since a trip in which she visited a relative and did not see defendant in July 2016. (Transcript of 209A Hearing Doc.78-1, p.2; Ex. 5 Plaintiff's deposition, Doc.70-5 p10).In the same _ex-parte_ proceeding after which the court reluctantly granted him an Abuse Prevention Order (Transcript of 209A Hearing Doc. 78-1, p7) defendant told the court plaintiff

5

had sexually assaulted him even as he portrayed their intimate relationship as consensual to plaintiff's employer and Virginia State Police S.A. Kinnard. Abuse Prevention Order Affidavit Doc. 70-7).

Defendant edited the 212 pages of text message and social media screen shots he provided to VA authorities to exclude all but two of his texts: The version he provided at pp 147-148 that includes an exchange with his friend was omitted to delete the rest of his communication with his friend near the time of the restraining order, leaving out his "And?....that must have garnered a reaction...lol.."quips. Defendant also edited the dates out of all 212 messages. (Doc.70-17, pp.147-148; Doc. 78-2, pp.1-3,).Despite defendant's editing of the texts, after review of his submission of the documents that included 120 texts and 46 voicemails over a one-and-a-half year period they could ascertain were from plaintiff investigators and prosecutors determined there were no threats; and that while in that period plaintiff had made 575 calls to defendant, 162 after he told her not to call him in March 2016, omitted from defendant's submission but unearthed when his phone records were subpoenaed was the fact that he had called plaintiff 256 times in that period, 32 times after he told her not to contact him. (Doc.70-11 pp. 20,45, 48-49)

Defendant's interest in plaintiff's life and career

continued long after he last heard from her in January 2017, his
Abuse Prevention Order was vacated on February 15, 2017 the first
time she appeared for a hearing whereupon he declined to go
forward, and the prosecution of plaintiff was finally abandoned
by Virginia authorities in a letter dated May 14, 2017: two days
later he texted Lt. Ganley telling him he had seen plaintiff at
Police Week in Washington D.C., his opinion about the race and
other characteristics in commentary about her companions, and
asking about her employment–and in addition these texts provided
not during discovery as sought from defendant and not in any of
his discovery supplementation but instead by George Mason
University demonstrated he texted Ganley even months later, in
December of 2017. (Doc. 78-3 -May 16, 2017 and Dec. 3, 2017 Text
messages from Covino to Lt. Ganley provided by GMU.)  In December
2017 Covino told Ganley that Jason Ford either was going to or
had obtained restraining order against plaintiff. (Ganley
Deposition, Doc.70-8,p.19). On February 15, 2017, the day
defendant's restraining  order was vacated, Virginia State Police
Detective William Kinnard received items provided by defendant
from the Revere Police Department, including his police report.
There is no indication that they were told the order was vacated
that day, nor is there any indication in the record that
notwithstanding Covino's multiple contacts with them that he ever
informed them throughout the duration of the investigation that

his restraining order was vacated back on February 15, 2017. (Virginia State Police Report dated February 15, 2017, Doc.No.78-4).

The factual allegations evidenced above were included in Plaintiff's statement of material facts in opposition to defendant Covino's second motion for summary judgment, and Defendant simply said each of them were "Disputed.", without specifying how and with no record support, other than to reiterate counsel's conclusory statements such as "all of Defendant's statements were made in good faith" in response to the evidence supported material facts about his testimony and statement asserted by plaintiff.  (Record Appendix, pp398-403.) Defendant Covino's failure to challenge the evidentiary basis for or adequately dispute the factual statements, bereft as they were of adequate citation to evidence in the record required that they be deemed admitted and relied upon by the court rather than substantially ignored.

## IV. Standard of Review

In Motion to Dismiss practice the plausible facts asserted are to be credited and inferences are to be drawn in the light most favorable to the non-movant.  In summary judgment practice the facts are to be viewed in the light "most congenial" to the non-movant, _Mullane v. U.S. Dep't of Just.,_ 113 F.4th 123, 130 (1st Cir. 2024), and the court is not permitted to make

8

determinations about the weight and credibility of the evidence Review of judgments upon motions to dismiss and motions for summary judgment are *de novo*.

### V. Summary of the Argument

    1.  Plaintiff adequately pled her claims against the municipal defendants and as to the individual defendant after allowance of a motion to dismiss municipal defendants proffered facts supported by evidence that, at a minimum, established a genuine dispute of material facts that should have been placed before the jury, so neither the motion to dismiss nor the motion for summary judgment should have been allowed. pp. 9-19.

    2. Plaintiff did not waive her right to relief in seeking to compel defendant's compliance with the court's discovery order or her request the defendant be sanctioned for that and repeated violations of the court's orders. pp.19-22.

    3.  The court erroneously erected a "comparator evidence" bar to recovery and strict comparator evidence requirements in this Circuit should be rethought. pp.22-24.

    4.  The court made a variety of errors of law. pp. 24-30.

### VI. Argument.

i    The District Court Erred In Its Assessment of Material Facts At Summary Judgment and Claims in Motion to Dismiss.

A.   THE COURT FAILED TO CONSIDER, CREDIT AND VIEW IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF THE MATERIAL FACTS,DEPRIVING

PLAINTIFF OF HER RIGHT TO PLACE THEM BEFORE A JURY.

In this case the trial court trained an all too limited focus on the flawed behavior by the plaintiff in a rancorous breakup which caused the judge to be distracted from and completely miss the false statements by defendant that plaintiff had committed crimes made to a judge, to investigators who targeted her for five months with a criminal probe based on the misrepresentations that included a search warrant based substantially on false statements, and to her employer causing her to immediately be taken off the job and have her property seized during a raid on her home with multiple armed officers, all of whom she knew.  In their relationship both police officers had mistreated each other but as plaintiff counsel argued at the summary judgment hearing "only one of them used his [police] powers to lie and take everything away from her.". (Record Appendix 1057-1058: Summary Judgment hearing transcript.).

In this circuit summary judgment was reversed after the appellate analysis of analogous errors in trial court review of a factual record. In _Wadsworth v. MSAD 40/RSU 40_, No. 23-1463 (1st Cir. 2025) the trial court focused so heavily on the lack of touching of a child by an adult sexual harasser that it could not recognize the conscience-shocking nature of the barrage of sexualized and coercive statements from a school principal to a 16 year old girl—completely missing the power imbalance in the

relationship and erroneously dismissing the equal protection claim.  Here the Court was so focused on the admitted poor judgment of the plaintiff in sending angry text messages and voicemails that the judge ignored all the evidence of his conscience-shocking threat to her in saying,"I hope you get shot in the face with your own gun you fat Iranian f***"; the evidence of his abuse of police power and wrongful reliance on his status as a police officer to report she had committed crimes and obtain a 209A and spark a five-month criminal probe of her based on obvious lies, and his admission in the form of his text message to her colleague that it was because "she is now saying" he was racist and discriminatory against her Iranian heritage that made him decide to take the action of obtaining a restraining order against her...telling the lie that she had traveled to Massachusetts from her home in Virginia just weeks before to stalk him which never happened in response to the judge asking him why he was seeking the order at that time. The evidence also established Covino enlisted and obtained the help of a Revere police department detective with whom he was friends–who sent the police report, his carefully edited collection of messages he claimed were from plaintiff omitting his messages along with his false claim she made thousands of phone calls to him from where he had placed them in the Revere Police Department evidence room to the Virginia Police Detective assigned to investigate

11

plaintiff because of defendant's claims about her prior to entry of the restraining order.(Record Appendix pp.591-592). In addition one of plaintiff's Virgina colleagues indicated to he that defendant Covino never did inform her employer and Virginia criminal investigators that the ex parte restraining order he obtained was vacated and her weapons ordered returned as soon as she appeared for a hearing, on February 15, 2017. (Record Appendix p. 507: Plaintiff's Deposition Transcript p.107). These facts supported by evidence in the record are direct evidence of discrimination that belong in front of a jury, and "that a jury would not be compelled to find a statement was direct evidence of discrimination does not make it inherently ambiguous so long as the jury could conclude that it was.". _Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico_, 999 F.3rd 37,55(1st Cir. 2021)(Summary judgment reversed.). Plaintiff's submissions easily cleared the bar that a "non-moving party may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, a trial-worthy issue persists.". _Paul v. Murphy_, 948 F.3rd 42,49 (1st Cir. 2020). While the court erroneously found the defendant went to court to obtain a restraining order as a private citizen, the transcript of the hearing establishes he did nothing of the kind and that in fact the judge in that proceeding not only knew him but indicated he would order the plaintiff not to appear at his workplace, the

police station, and when defendant told the judge "we miss you over in Chelsea" asked the defendant to pass along his greetings to his friends in that other court.(Record Appendix 943-944: Ex parte Abuse Prevention Order hearing transcript).

Plaintiff has a substantive due process right not to be deprived of liberty and property interests by a police officer's false accusations she committed crimes and efforts to advance those accusations. _McDonough v. Smith_, 588 U.S. ____, 139 S. Ct. 2149, 204 L. Ed. 2d 506(2019)("McDonough's claim... seeks to vindicate a "'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer.'" Ibid. (quoting Zahrey v. Coffey, 221 F. 3d 342, 349 (CA2 2000)); see also, e.g., Napue v. Illinois, 360 U. S. 264, 269 (1959). We assume without deciding that the Second Circuit's articulations of the right at issue and its contours are sound..."). She has alleged the kind of intentional rather than negligent conduct targeting and intending to injure her that is "most likely to rise to the conscience-shocking level" as required to establish a constitutional violation. _County of Sacremento v. Lewis,_ 523 U.S. 833,849(1998).

Here the trial court viewed the facts entirely in a light most favorable to the movant, ignoring appellant's facts supported by the record as well as the defendant's deposition admissions and documents supporting appellant's positions, opting

instead to emphasize several irrelevant and in some cases errant "facts" or facts from inadmissible sources. (Record Appendix pp.1068-1080:Memorandum of Decision on motion for summary judgment). All inferences favored the movant, directly contravening the requirements of the law which is "We take facts in the light most favorable to [plaintiff] and draw all inferences therefrom in her favor" on a motion for summary judgment. *Universal Trading and Inv.Co. v. Bureau for Representing Ukranian Ints. In Int'l & Foreign Cts.*, 87 F.4th 62, 65-66(1st Cir.2023). All that is required is that non-movant demonstrate a "genuine issue of material fact" in order to prevail in a summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317,323-324(1986); F.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,250(1986). The Court is required to view all evidence in the light most favorable to the non-moving party, and factual disputes "properly can be resolved only by a fact finder because they may reasonably be resolved in favor of either party.". *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 587(1986). Further, the requirement that "facts as alleged by plaintiff are not simply facts that can be gleaned from the plaintiff's deposition, but rather facts in the entire record, interpreted in the light most favorable to the plaintiff" *Anderson*, at 250  rendered summary judgment inappropriate here, where the court ignored entirely the strong

14

evidence of intentional dishonest acts by the defendant intended to harm plaintiff. *Bomar v. City of Pontiac*, 643 F.3d 458, 462(6th Cir. 2011).

It is the full record that the court was required to view in the light most favorable to the plaintiff here. *Lima v. City of East Providence*, 17 F.4th. 202,206(1st Cir. 2021). A factual dispute is considered genuine when "the evidence is such that a reasonable jury could resolve the point in favor of the non-moving party". *Taite v. Bridgewater State Univ. Bd.of. Trs.*, 999 F.3d 86, 93(1st Cir. 2021). At the summary judgment hearing the court acknowledged the jury could find in favor of plaintiff, but overstepped by predicting that she would be required to enter a judgment of directed verdict, a clear illustration of the court's error in assessing the factual record at the summary judgment stage. (Record Appendix p.1011,1038: Summary judgment hearing.).

B. THE COURT ERRED IN GRANTING MUNICIPAL DEFENDANTS' MOTION.

The municipal defendants in their motion to dismiss argued that the court should not believe the allegations in the complaint. The court either agreed or at a minimum ignored the facts alleged by plaintiff in the errant decision to dismiss all the claims against the chief of police and the mayor as well as unnamed officers.

15

Plaintiff had alleged and the decision dismissing the complaint ignored the involvement of other officers who "endeavored to assist" Covino in his misconduct(Complaint, ¶27), which included his "repeated false statements to Virginia authorities in an attempt to get her charged but failed and refused to let them know that his restraining order against her had been vacated"(Complaint,¶17), that they "engaged in a custom and policy of protecting members of the law enforcement fraternity from the consequenses of violating the law"(Complaint, ¶22), and that they "all engaged in a custom and policy of failing to train and discipline officers in providing proper responses to domestic abuse and protection of constitutional rights"(Complaint, ¶21)and "showed a deliberate indifference to the need for training, supervision, or discipline of Defendant Covino and Other Unnamed Officers".(Complaint, ¶23). Significantly plaintiff's specific allegations included that defendants chief of police and mayor "also knew of his lengthy history of misconduct and failed to train, discipline or in any manner properly supervise him."(Complaint,¶13). Every one of these allegations was ignored by the court in deciding the motion to dismiss.(Record Appendix pp.186-188: Memorandum of Decision on Motion to Dismiss).

The next year during discovery in defendant's deposition plaintiff learned some of the specifics of the

16

disciplinary history: that the chief of police investigated
Covino for abusing a traffic enforcement officer and recommended
a suspension without pay, the and that Covino appealed it to the
Mayor who upheld the suspension, and then a hearing before an
arbitrator held and during the hearing the parties negotiated a
deal whereby that complaint would be removed from his file after
a year if there were no further incidents.(Record Appendix pp.
592-594). "Defendants argue that under Judge v. City of Lowell,
160 F.3d 67, 72 (1st Cir. 1998), the plaintiffs were required to
have alleged illegal motive with specificity. They argue that the
liberal pleading requirement of Rule 8(a)(2) of the Federal
Rules of Civil Procedure does not govern;3  rather, plaintiffs
should have pled deliberate indifference with "specific,
non-conclusory facts from which such a motive may reasonably be
inferred, not merely by generalized asseveration alone." Id. at
72. They argue that plaintiffs should have alleged facts specific
to Calderón that defendants knew, or from which they could have
inferred, that Calderón could be subject to sexual assaults by
other inmates. We need not decide whether a heightened standard
applies here because we find that the complaint survives the
motion to dismiss even under a heightened pleading standard; that
is, it alleges specific facts from which deliberate indifference
could be inferred". _Calderon-Ortiz,et al v. Laboy-Alvarado, et al_
300 F.3d 60, (1st Cir. 2002)(Allowance of motion to dismiss

17

vacated.). Appellate review is de novo and its consideration of the record is independent. *Tysinger v. Police Dept. of Zanesville*, 463 F.3d 569,572(6th Cir. 2006). In a motion to dismiss courts accept the factual allegations as true and view them in the light most favorable to the plaintiff. *Doe v. Princeton Univ.*, 30 F.4th 335,340(3rd Cir.2022). A plaintiff prevails in a motion to dismiss when they "allege enough facts to state a claim for relief that is plausible on its face". *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12(2011). Here the court found no liability for the municipal and supervisory defendants as plaintiff had not alleged direct action by them against her. Though she alleged their awareness of Covino's disciplinary history established liability for failure to train and supervise him the court wrongly rejected those claims, even though an offending employee's conduct that was foreseeable or predictable can trigger supervisory liability in a civil rights action. *Gibson v. Foltz*, 963 F.2d 851, 854(6th Cir. 1992). As here, "a supervisor may be brought to book even though [their] actions have not directly abridged someone's rights; it is enough that [they have] created or overlooked a clear risk of future unlawful action by a lower echelon actor over whom [they] had some degree of control". *Camilo-Robles v. Zapata*, 175 F.3rd 41,44 (1st Cir. 1999). Plaintiff had asserted failure to train and deficient policy claims for an underlying constitutional

18

violation where "municipal decision makers either knew or should have known that training was inadequate, nevertheless demonstrated deliberate indifference to the unconstitutional effects of those inadequacies.". _Haley v. City of Boston_, 657 F.3d 39, 51(1st Cir. 2011). Her assertions and establishment of direct knowledge of and involvement in Covino's disciplinary issues, and the misuse of police reporting, evidence gathering and transmitting processes for personal vendettas as well as misconduct by officers on duty stated claims where the municipal defendants were responsible for preventing the misuse of police procedures and tools to advance personal agendas. The failure to train/deliberate indifference claim "requires a showing that municipal decision makers either knew or should have known that training was inadequate...". _Cosenza v. Worcester_, 120 F.4th 30, 38(1st Cir. 2024). The violations of plaintiff's federal rights was "a highly predictable consequence of a failure to equip [government actors] with specific tools to handle recurring situations.". _Young v. Providence_, 404 F.3rd 4, 28(1st Cir. 2005).

C.  THE PLAINTIFF WAS ENTITLED TO THE RELIEF SHE SOUGHT

        In March 2022 the Court set a deadline of May 2 for plaintiff to bring a motion to compel discovery.  On May 22 the court held a hearing on plaintiff's timely filed motion and ordered defendant Covino to supplement his discovery responses by

19

May 27, 2022. (Record Appendix pp.1-15: Docket).  Defendant
provided supplementation that persisted in omitting the documents
about his internal affairs investigations and hearings involving
the chief of police and the mayor that he disclosed the existence
of at his deposition.

      Plaintiff pursuant to Rule 37 once again demanded
supplementation, asked to confer, and indicated an intention to
file further discovery motions after she returned from surgery in
the fall of 2022–whereupon defendant instead of complying with a
discovery order and a motion for summary judgment deadline with
no warning asked the court for leave to submit subject to a
temporary impoundment order alleged "fitness for duty"
evaluations of plaintiff undertaken after the criminal probe of
her was closed during litigation between her and her employer.
In response, plaintiff objected detailing and seeking relief for
the continuing withholding of discovery in violation of the
court's order and argued the documents were not relevant or
admissible and were confidential and privileged.(Record Appendix
pp.296-326: plaintiff's October 25 pleadings with attached
exhibits). The Court agreed, impounding the documents and
ordering the defendant to specify their relevance to summary
judgment proceedings.  When the defendant did not, the court
issued an order denying defendant's motion and ordering the
summary judgment motion to not include the information as it was

not relevant to summary judgment proceedings, referencing plaintiff's concerns about defense disobedience of the discovery order and the rules of the court.(Record Appendix pp. 297-336).

As plaintiff addressed defendant's continued interference with her discovery rights in violation of a court order in the October 25, 2022 pleadings and exhibits she did not waive her discovery concerns, they were squarely before the court. Defendant filed his summary judgment motion papers using the forbidden materials anyway, and despite the court's finding they were not relevant to summary judgment proceedings the court later wrongly considered them in ruling in Defendant's favor on the summary judgment motion, despite the court's *sua sponte* orders striking defendant's pleadings and ordering him to refile his summary judgment materials as he did so in violation of her standing order. This was error. Plaintiff had established the inadmissibility of the materials relied on by the defendant and ultimately the Court, and where "a party may object that ...[evidence] to support or dispute a fact cannot be presented in an admissible form"[2]. The court relied on inadmissible hearsay, even though in summary judgment proceedings it cannot be considered for the truth of the matter asserted. _Hannon v. Beard_, 645 F.3d. 45, 49(1st Cir. 2011). The Federal Rules of Evidence rendered the material inadmissible at 801(d)(2), 803( c ) and

---

[2]Fed.R.Civ.P. 56(c)(2).

803(8).  The court was correct in its determination that
the so-called "fitness for duty" reports were not material at the
summary judgment stage and therefore they were not to be used in
March 2024, and defendant's violation of that order should not
have been rewarded with summary judgment.

## ii.  The Trial Court Applied the Law Incorrectly to the Causes of Action.

A.   THE COURT'S RELIANCE ON LACK OF COMPARATORS WAS INCORRECT.

In this case Plaintiff was able to establish civil
rights violations without the use of comparators as she had
direct evidence of defense abuses of power and discriminatory
intent. The court below however relied incorrectly on the absence
of comparators in dismissing her counts alleging equal protection
violations.

The are several categories of evidence a plaintiff may
rely upon to establish discrimination including direct evidence
of discriminatory animus and intent to harm. *Village of Arlington
Heights v. Metro Housing Development Corp.*, 429 U.S. 252,265-266
(1977). Here, evidence of discriminatory statements both offered
in plaintiff's testimony and in text messages defendant wrote,
evidence of retaliatory motive for plaintiff telling defendant he
was prejudiced in the form of defendant's text to plaintiff's
colleague that he would have to take action since she called him
a racist are all direct evidence of discriminatory animus and

intent toward plaintiff.  _Amadao v. Zant_, 486 U.S. 214,
226(1988). Rather than relying on inferences or interpretation,
"Direct evidence explains itself.". _Martinez v. Cracker
Barrel,Inc._, 703 F.ed. 911, 916(6th Cir. 2013). Inasmuch as
appellant offered direct evidence in support of her claims the
court erred in dismissing them for lack of comparator evidence.

        As to appellant's selective prosecution and class of
one equal protection claims the court's dismissal for lack of
comparator evidence was more in line with the practice in the
frst and several other circuits, but should be reconsidered on
appeal.  Even in the employment law context where the use of
comparators has been thought essential to establishing
discrimination there has been a recognition of the arbitrary
application of definitions of similarly situated others to whom
plaintiffs are compared. _Ballou v. McElvain_, 39 F.4th 413 (9th
Cir.2022)(Use of comparators not an element, only one way of
establishing a disparate treatment claim even in employment
discrimination context.). Recent scholarship and decisional law
have been examining the increased requirement of comparators
which first arose in employment discrimination cases:

              "Courts have increasingly relied on the
              comparator standard to prove discriminatory
              intent...While some courts use a 'strict'
              standard and others take a more 'flexible'
              approach, the comparator requirement is often
              still relatively stringent in the equal
              protection context. As the use of comparators
              has grown, what began as merely a helpful

                          23

heuristic for establishing discrimination
claims has since become almost a 'threshold
requirement'. However, some courts have
held that comparators, while helpful, are
not the only way to establish discriminatory
intent and are unnecessary to establish a
valid claim".[3]

Recently this court has determined that comparators are not

necessary to establish an equal protection claim where there is

other evidence of "severe or pervasive" discrimination. In

_Wadsworth v. MSAD 40/RSU 40_, No. 23-1463 (1st Cir. 2025) the

court found an equal protection violation in absence of

comparators by evaluating several factors in the evidence of

behavior in a sexual harassment case involving a student,

indicating "numerous factors (to which we assign no particular

determinative weight)' including 'severity of the discriminatory

conduct, its frequency, the extent to which the behavior is

physically threatening or humiliating as opposed to a mere

offensive utterance, and the extent to which it unreasonably

interferes with an employee's work performance." (citations

omitted). A concurring opinion observed the requirement of

comparators remains strict in selective prosecution and class of

one cases--even as it itemized the difficulties in finding

comparators that can create an arbitrary bar for plaintiffs and

---

[3]Jones, _Untested and Neglected: Clarifying the Comparator
Requirement in Equal Protection Claims Based on Untested Rape
Kits_, 115 NWU L.Rev.6, 1801-02(2021).

the abrogation of comparator requirements in other circuits,
calling for further clarification that comparators are not a
requirement to establish equal protection claims and further
stating the "severe and pervasive" requirement sets a higher bar
for plaintiffs than the law allows: "The Equal Protection Clause
requires only proof of actual harm and intentional discrimination
for a claim to proceed. See, e.g., Arlington Heights, 429 U.S. at
264-65; Heckler v. Mathews, 465 U.S. 728, 738-39 (1984)."[4]

B.    THE TRIAL COURT ERRED AS TO THE REQUIRED LEGAL STANDARDS

Plaintiff alleged in the complaint and marshalled
evidence supporting her position that in his abuse of his police
powers, authority and connections defendant Covino, with the
assistance of and acquiescence of other officers and municipal
defendants who were or should have been aware of the risk it
would happen, over and over again targeted plaintiff with false
claims intended to result in court orders and criminal complaints
against her, depriving her of her property, position and
dignitary as well as constitutionally protected interests.  "Thus
§1983 will reach those acting 'under color of law', that is,
those who carry a badge of authority of a [city] and represent it
in some capacity whether they act in accordance with their
authority or misuse it. Monroe v. Pape,365 U.S. 167,172(1961).

---

[4]*Wadsworth v. MSAD 40/RSU 40*, No. 23-1463 (1st Cir. 2025)
(Rikelman, J, concurring).

25

This includes municipal corporations or state and local officials exercising the authority of the state, although private parties may also be sued." _Doyle v. Dukakis_, 634 F.Supp.1441,1444(D.Mass 1986).

Plaintiff alleged her rights were violated when defendant acted under color of law to falsely accuse her of crimes leading to entry of a restraining order against her in Massachusetts and a five-month criminal investigation including execution of a search warrant in Virginia. She offered admissible evidence his actions were taken in retaliation for her exercise of her First Amendment right to complain that he was prejudiced against her Iranian heritage, and since her evidence establishes this was a "substantial or motivating factor" in the acts of retaliation against her by defendant she has stated a constitutional violation. _Mount Health City Sch.Dist.Bd.of Ed. v. Doyle_, 429 U.S. 274, 287(1997). The lower court's determination she failed to establish a constitutional violation was error. By adducing evidence that an angry ex boyfriend used his police power and authority and connections to falsely report she had committed crimes and that probable cause had been established, trump up claims and collection of "evidence" that included only her alleged calls and messages, heavily edited, and none of his, and false accusations of recent travel to Massachusetts and sexual assault in order to effect entry of a restraining order,

26

removal from her position as a police officer and a lengthy criminal probe surely qualifies as misconduct that "shocks the conscience" in violation of the equal protection clause of the 14th Amendment. Her proof of this conscience-shocking conduct establishes a substantive due process claim. _Cruz-Erazo v. Rivera Montanez_, 212 F.3d 617,622(1st Cir. 2000). Defendant's powerful campaign against plaintiff was "more than a humdrum legal error". _Amsden v. Moran_, 904 F.2d 748,754 n.5(1st Cir. 1990).

The court also erred in dismissing her malicious prosecution claim against the defendant. See _Manuel v. City of Joilet_, 580 U.S.357(2017)(Elements are a seizure, without probable cause, and termination of criminal proceedings in plaintiff's favor). Here not only was plaintiff's property seized but she was also subjected to a search warrant, only to have the criminal process defendant had initiated and involved himself in terminated in her favor when the decision was made not to charge her.

The abuse of process claim asserted and evidenced in record satisfied the requisites of that claim, where "An action for abuse of process lies when an officer uses a lawful criminal process to accomplish an unlawful purpose. Powers v. Leno, 24 Mass. App. Ct. 381, 509 N.E.2d 46 (1987). It is a distinct claim from false arrest and malicious prosecution to the extent that it can be held to lie regardless of whether there was probable cause

27

or whether the proceedings terminated in favor of the charged party. Quaranto v. Silverman, 345 Mass. 423, 426, 187 N.E.2d 859 (1963)." _Carol v. Gillespie_, 14 Mass. App. Ct. 12, 436 N.E.2d 431 (1982). Plaintiff also in offering evidence of defendant's coercive and abusive interference with her rights clearly establishes her claim for violation of the Massachusetts Civil Rights Act, which does not require membership in any "protected class" but instead apply to "any person". Massachusetts Civil Rights Act, G.L. c. 12 §s 11H and 11I. An MCRA plaintiff is not required to prove specific intent to threaten, intimidate or coerce for the purpose of interfering with a secured right. _Redgrave v. Boston Symphony Orchestra,_ 399 Mass. 93, 99-100 (1987). As a remedial statute the Massachusetts Civil Rights Act is entitled to liberal construction of its terms. _Sarvis et al v. Boston Safe Deposit & Trust Co.,_ 47 Mass.App.Ct. 86, 97 (Mass.App.Ct.1999). See also _Ayasli v. Armstrong_, 56 Mass.App.Ct. 740 (Mass.App. Ct.2002)(Judge properly instructed jury that while defendants' enforcement of easement did not violate plaintiffs' civil rights their enforcement actions could be used as evidence of their state of mind in order to establish MCRA elements. Even acts that do not by themselves violate the law can be evidence of a defendant's state of mind in order to establish elements of an MCRA violation.).

   Where plaintiff offered evidence in her interrogatory

responses and deposition testimony of the devastating effects
upon her of the defendants' misconduct she has established her
claim for intentional infliction of emotional distress, as it was
obvious to Covino and betrayed in the text messages he exchanged
with Lt. Ganley and with his friend at the time he obtained the
restraining order that he well knew or should have known his
actions would be and were extremely harmful to plaintiff.
_Polay v. McMahon_, 10 N.E.2d. 1122, 1128(Mass.2018).  The Court
erred in dismissing both the constitutional claims and the
dignitary torts plaintiff asserted and supported with evidence in
the record, where she placed very much in dispute defendant
Covino's claims to care about her welfare.

### **VII. Conclusion.**

In light of the foregoing and the entirety of the
record in the within matter, this Honorable Court should reverse
and vacate the judgment of the trial court.


Respectfully submitted,
Sharon Radfar
By her attorney,

Dated: May 12, 2025          _/s Elizabeth M. Clague_
Elizabeth M. Clague
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508)587-1191
First Circuit Court of
Appeals # 87705
BBO # 632341

29

**CERTIFICATE OF SERVICE**

I, Elizabeth M. Clague, counsel for the Appellant, hereby certify that I have this day made service of the foregoing document by ECF/CMF to counsel of record for all the Appellees, and further by electronic mail where applicable.

**CERTFICATE OF COMPLIANCE**

I hereby certify the document is filed and served in compliance with FRAP 28-31 and the accompanying Local Rules of this Court.

Dated:    May 12, 2025                    */s Elizabeth M. Clague*
                                          Elizabeth M. Clague

*United States of America*
No. 25-1068

In The
*First Circuit Court Of Appeals*

DISTRICT OF MASSACHUETTS
TRIAL COURT DEPARTMENT

---

SHARON RADFAR

Plaintiff-
Appellant

v.

CITY OF REVERE, AND JOSEPH COVINO, AND JAMES GUIDO CHIEF OF
POLICE, AND BRIAN ARRIGO, MAYOR ; AND OTHER AS YET UNNAMED
OFFICERS OF THE REVERE POLICE DEPARTMENT; INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITIES AS CHIEF OF POLICE, MAYOR AND POLICE
OFFICERS OF THE CITY OF REVERE

Defendants-
Appellees

---

**ADDENDUM TO
BRIEF FOR THE APELLANT**

Elizabeth M. Clague
Court of Appeals No. 87705
The Franklin Building
1106 Main Street
 Brockton, MA 02301
(508) 587-1191
Attyeclague@gmail.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHARON RADFAR,                                        *
                                                     *
        Plaintiff,                                   *
                                                     *
        v.                                           *
                                                     *
CITY OF REVERE, BRIAN M. ARRIGO,                     *
individually and in his official capacity as         *
Mayor, JAMES GUIDO, individually and in              *
his official capacity as Chief of Police,            *      Civil Action No. 1:20-cv-10178-IT
JOSEPH I. COVINO, individually and in his            *
official capacity as Police Sergeant, and            *
OTHER AS YET UNNAMED OFFICERS                        *
OF THE REVERE POLICE                                 *
DEPARTMENT, individually and in their                *
official capacity as police officers,                *
                                                     *
        Defendants.                                  *

<u>JUDGMENT</u>

December 6, 2024

TALWANI, D.J.

        Plaintiffs Sharon Radfar brought claims against Defendants City of Revere, Brian M.

Arrigo, James Guido, and Joseph I. Covino.[1] Pursuant to the court's <u>Memorandum and Order</u>

[Doc. No. 21], all claims against Defendants other than Joseph I. Covino were dismissed for

failure to state a claim. Pursuant to the court's <u>Memorandum and Order</u> [Doc. No. 88], judgment

is entered in favor of Defendant Covino against Plaintiff on all remaining claims. This case is

CLOSED.

        IT IS SO ORDERED.

                                                     /s/Indira Talwani
                                                     United States District Judge

---

[1] The Complaint also asserted claims against "other unnamed officers of the Revere Police
Department," but no such officers were subsequently named or served with process.

**EXHIBIT A**

| COMPLAINT FOR PROTECTION FROM ABUSE (G.L. c. 209A) Page 1 of 2 | COURT USE ONLY – DOCKET NO. 2017 1 3 R 0 1 0 4 | TRIAL COURT OF MASS |

**A** ☐ BOSTON MUNICIPAL COURT   ☒ DISTRICT COURT   ☐ PROBATE & FAMILY COURT   ☐ SUPERIOR COURT   DIVISION

**B**
Name of Plaintiff *(person seeking protection)*
Joseph Covino
~~[redacted]~~
Saugus MA 01906

**F**
Name of Defendant *(person accused of abuse)*
Sharon Radfar
~~[redacted]~~
Sterling VA, 20166

Defendant's Alias, if any

Sex: ☐ M ☒ F

**C**
☒ I am 18 or older.
☐ I am under the age of 18, and
_____
my _____ *(relationship to Plaintiff)* has filed this complaint for me.
☒ The Defendant is 18 or older.

**G**
The Defendant and Plaintiff:
☐ are currently married to each other
☐ were formerly married to each other
☐ are not married but we are related to each other by blood or marriage; specifically, the Defendant is my
☐ are the parents of one or more children
☐ are not related but live in the same household
☐ were formerly members of the same household
☒ are or were in a dating or engagement relationship.

**D**
To my knowledge, the Defendant possesses the following guns, ammunition, firearms identification card, and/or license to carry: LEO, at least a pistol

**E**
Are there any prior or pending court actions in any state or country involving the Plaintiff and the Defendant for divorce, annulment, separate support, legal separation or abuse prevention? ☒ No ☐ Yes  If Yes, give Court, type of case, date, and (if available) docket no.

**H**
Does the Plaintiff have any children under the age of 18? ☐ No ☒ Yes
If Yes, the Plaintiff shall complete the appropriate parts of Page 2.

**I**
On or about (dates) 1/23/17, 1/28/17  7/6/16  ~ 3/15/16 ___ I suffered abuse when the Defendant:
☐ attempted to cause me physical harm   ☒ placed me in fear of imminent serious physical harm
☒ caused me physical harm   ☒ caused me to engage in sexual relations by force, threat or duress

**J**
THEREFORE, I ASK THE COURT:
☒ 1. to order the Defendant to stop abusing me by harming, threatening or attempting to harm me physically, or placing me in fear of imminent serious physical harm, or by using force, threat or duress to make me engage in sexual relations.
☒ 2. to order the Defendant not to contact me, unless authorized to do so by the Court.
☒ 3a. to order the Defendant to leave and remain away from my residence: *See Plaintiff Confidential Information Form.*
    *If this is an apartment building or other multiple family dwelling, check here* ☐
☒ 3b. to order the Defendant to leave and remain away from my workplace: *See Plaintiff Confidential Information Form.*
☐ 3c. to order the Defendant to leave and remain away from my school: *See Plaintiff Confidential Information Form.*
☒ 4a. to order that my residential address not appear on the order.
☒ 4b. to order that my workplace address not appear on the order.
☐ 4c. to order that my school address not appear on the order.
☐ 5. to order the Defendant to pay me $_____ in compensation for the following losses suffered as a direct result of the abuse: _____
☐ 6. to order the Defendant, who has a legal obligation to do so, to pay temporary support to me.
☐ 7. to order the relief requested on Page 2 of this Complaint pertaining to my minor child or children.
☒ 8. to order the following: Abuse thru 3rd party, Social media, Not to Follow, Friend Social my
☒ 9. to order the relief I have requested, except for temporary support for me and/or my child(ren) and for compensation for losses suffered, without advance notice to the Defendant because there is a substantial likelihood of immediate danger of abuse. I understand that if the Court issues such a temporary Order, the Court will schedule a hearing within 10 court business days to determine whether such a temporary Order should be continued, and I must appear in Court on that day if I wish the Order to be continued.

DATE
01/31/17

PLAINTIFF'S SIGNATURE
X [signature]

Please complete affidavit on reverse of this page

This is a request for a civil order to protect the Plaintiff from future abuse. The actions of the Defendant may also constitute a crime subject to criminal penalties. For information about filing a criminal complaint, you can talk with the District Attorney's Office for the location where the alleged abuse occurred.

FA-1 (05/15)

COURT COPY

52

| **AFFIDAVIT** | Describe in detail the most recent incidents of abuse. The Judge requires as much information possible, such as what happened, each person's actions, the dates, locations, any injuries, and any medical or other services sought. Also describe any history of abuse, with as much of the above detail as possible. Note: Unless the Court allows a motion to impound, this affidavit will be public record, including any names or specific addresses included in the affidavit. |

On or about 01/14/16 – 01/30/2017 ; the Defendant Has repeatedly attempted to contact me by any means necessary, to wit telephone, text, written letters, social media, driving from VA to MA and showing up in my neighborhood or at my place of work. Radfar has use threats to force me into sexual relations with her on multiple occasions being successful on one attempt while in Boston. She has called/texted over 400x on MLK weekend and called over 100x on 01/28/17. I have blocked over 100 phone numbers in the past year to avoid her. She uses an app that shows other #'s.

She has shown up in my neighborhood uninvited or announced and demanded I come see her. She has threatend me with ruining my life and has stated, "If I can't have you, no one will!".

Radfar has assumed the identities of several people on line in an attempt to follow/contact me. She splices pictures of herself to pics she finds online of me. Radfar has befriended several LEO's who are friends of mine and is harassing them to get info about me. She verbally abuses me 100's of times per day, accusing me of not acknowledging her because I am racist due to her middle eastern descent. Her messages have become increasingly threatening and unstable as of the last week. Because of her repeated actions/threats, I am in absolute fear of grave danger from Radfar that I continuously carry a firearm for fear she will appear unannounced and armed.

If more space is needed, attach additional pages and check this box: ☐

I declare under penalty of perjury that all statements of fact made above, including those provided on P.1, Section E and P.2, Sections A and B of the Complaint form regarding prior and pending court actions, and in any additional pages attached, are true to the best of my knowledge.

| DATE SIGNED | PLAINTIFF'S SIGNATURE |
| 1/31/17 | x _____ |

| WITNESSED BY | PRINTED NAME OF WITNESS | TITLE OF WITNESS |
| x _____ | | |

I have transcribed the above affidavit for the Plaintiff

| Signature _____ | Print Name _____ | ☐ Court Certified Interpreter<br>☐ Court Screened Interpreter<br>☐ Other _____<br>☐ Remote Translation Via Telephone/Video |

53

```
                                         Volume:    I
                                         Pages:     1-11
                                         Exhibits:  0

                    COMMONWEALTH OF MASSACHUSETTS

ESSEX COUNTY                                 DISTRICT COURT

* * * * * * * * * * * * * * *
                              *
JOSEPH COVINO,                *        ORIGINAL
                              *
           Plaintiff,         *
                              *
v.                            *
                              *   Docket No.  1713RO000104
SHARON RADFAR,                *
                              *
           Defendant.         *
                              *
* * * * * * * * * * * * * * *
```

                    EX-PARTE HEARING
                JUDGE LAMOTHE, Presiding
                    January 31, 2017

APPEARANCES:

For the Plaintiff, Joseph Covino:
NO INFORMATION PROVIDED


BY:  NO INFORMATION PROVIDED


For the Defendant, Sharon Radfar:
NO INFORMATION PROVIDED


BY:  NO INFORMATION PROVIDED


                         Lynn, Massachusetts
                         Courtroom 3
                         January 31, 2017


            Sherri L. Breach, Approved Court Transcriber

23

```
 1    (Court called to order.)
      (Parties present.)
 2    (Starting time:  3:53 p.m.)

 3              THE CLERK:  First is Sharon Radfar.

 4          Raise your right hand,

 5              JOSEPH COVINO, PETITIONER, SWORN

 6              THE COURT:  I'm noticing that the address of Ms.

 7    Radfar is Virginia.

 8              MR. COVINO:  Correct, sir.  She's a George Mason

 9    University Police Officer.

10              THE COURT:  Okay.  So how is it that she presents

11    a danger to you?

12              MR. COVINO:  On at least three occasions she's

13    driven here unannounced and uninvited.  She has shown up in

14    my neighborhood, threatening me to come see her.  She has

15    shown up at my police station dropping off letters of

16    enamorment.  She has threatened to do so again.  And it's

17    been -- I've been putting up with it for over a year and a

18    half and it's been progress --

19              THE COURT:  How do you know this woman?

20              MR. COVINO:  We met at the World Police Fire game.

21    She was a volunteer.  She was a goodwill ambassador.  The

22    World Police Fire games were in Northern Virginia, Fairfax

23    County, in 2015.  We met on a train platform as she was

24    helping my hockey team get to RFK Stadium to -- for the

25    opening ceremonies.
```

```
1              She befriended us, me in particular.  She started
2    showing up at the bars we were at.  About the fourth or
3    fifth night into my eleven-day stay we had a consensual
4    sexual relationship.  Following that she started to become
5    extremely, what's the word, connected to me, I guess.  She
6    showed up to Boston a few weeks after that against my
7    wishes.  She had started saying she was going to ruin my
8    life unless I continued a relationship with her.
9              I just blocked all her numbers.  She has a phone
10   app that allows her to still contact me through a random
11   number --
12             THE COURT:  Right.
13             MR. COVINO:  -- and she's -- for instance, just on
14   Martin Luther King weekend she called me over 430 times,
15   this past Friday.  I never -- I rarely respond to her calls.
16   I've been in contact with her chief and her XO down at GMU.
17   They apologized.  They said this isn't the first time this
18   has happened with her, that she has, I don't know if it's a
19   condition or what it is, but they have tried to get her help
20   before.  I guess the previous administration didn't take it
21   as seriously as it is now.  They were a little shocked to
22   find out the distance she has traveled this time.
23             THE COURT:  So when did she last come up here?
24             MR. COVINO:  I want to say it was on or about
25   December.
```

26

```
 1                THE COURT:  So why did you pick today to come in
 2      here?
 3                MR. COVINO:  I've been putting it off because I --
 4      I know what a restraining order entails and I haven't been
 5      in fear of my safety until the most recent threats she --
 6      she leaves several voice mails.  She calls two to three
 7      times a minute.  It has now affected my life in as far as I
 8      can't even sleep anymore.  The phone just rings all night.
 9      And --
10                THE COURT:  So what -- so she's threatened you
11      recently?
12                MR. COVINO:  Correct.
13                THE COURT:  What did she -- how did she do it, by
14      phone, by text?
15                MR. COVINO:  By voice --
16                THE COURT:  I thought you said you blocked her
17      calls?
18                MR. COVINO:  They still come in.  I can't block a
19      restricted number.  So I get the restricted number and it's
20      a voice mail from her.  And one of the voice mails that I
21      have saved that I just sent to the Virginia State Police
22      that's conducting an investigation because she found -- they
23      think she found my address through running me through NCIC
24      VJIS they call it.
25                THE COURT:  Uh-huh.
```

1-6

```
 1          MR. COVINO:  That's how she showed up in my
 2     neighborhood.
 3          She -- one of the voice mails -- the voice mails
 4     went from apologetic to angry to borderline sociopathic
 5     where she just makes stuff up in her head.  She is -- she
 6     has -- she has took over identities of people I know that
 7     she doesn't know to try to contact me.  I mean, she's under
 8     the belief -- she digs up pictures of me on the internet and
 9     she sends them to me.  She goes this is the person you --
10     excuse the expression -- fucking now.  One of them was my
11     sister.
12          THE COURT:  Right.  But what's -- what has she
13     done that's scary?  I mean, I get that that's harassing and
14     there's all sorts of laws against that.  But if you want to
15     a restraining order there has to be some danger she's going
16     to hurt you.  Did she threaten to harm you?  Is she going to
17     harm -- you think she's going to --
18          MR. COVINO:  She says veils threats -- veiled
19     threats.  One of the things that she stated was if I can't
20     have you, no one will.  She's appeared in my neighborhood
21     from Virginia.  She has access to a firearm.  I can only
22     remember that story from the astronaut who drove to Florida
23     wearing a diaper.
24          THE COURT:  Do you know of any other times when
25     she's been violent with anyone?
```

28

1-7

```
 1              MR. COVINO:  I don't.  The only thing that
 2    Lieutenant Ganley, her XO, said that this isn't the first
 3    time.  He apologized.  They tried to get her help and he,
 4    along with Special Agent Kinnard (ph) from the Virginia
 5    State Police advocated for a restraining order because it's
 6    the last thing I wanted to do.
 7              THE COURT:  So the campus police down in Virginia
 8    get to carry guns?
 9              MR. COVINO:  Correct.
10              THE COURT:  Because they don't here
11              MR. COVINO:  Correct.  As a matter of fact I asked
12    -- I just texted him while I was in the waiting room and
13    said if the order comes through, do you want it sent to you
14    or to the local township and he said we would much rather
15    have it here so we can coordinate and we can get the firearm
16    back.
17              THE COURT:  Well, I mean, I -- I order surrender
18    weapons.  Technically, that's not enforceable out of state.
19              MR. COVINO:  Right.
20              THE COURT:  If they want to enforce it, they can
21    --
22              MR. COVINO:  The whole idea, Your Honor, is to try
23    to --
24              THE COURT:  It's up to Virginia.
25              MR. COVINO:  -- get her help.
```

29

```
 1              THE COURT:  It's up to Virginia to do that.  In
 2   other words, I'll do it.  I always put Number 12 on there.
 3              MR. COVINO:  Okay.
 4              THE COURT:  But I just need you to understand, you
 5   know, any order -- any order we make in Massachusetts that
 6   is an affirmative thing, we order somebody to do something
 7   affirmatively like surrender their guns --
 8              MR. COVINO:  Is only in Massachusetts.
 9              THE COURT:  -- is really only enforceable here.
10              MR. COVINO:  Sure.
11              THE COURT:  Sometimes -- I know for a fact that
12   New Hampshire most of the time will follow them.  You know,
13   they'll go and do it, but they don't have to.  And I don't
14   know what Virginia -- you know, I don't know anything about
15   Virginia.
16              But I'll make the order based on what you're
17   telling me and what you've written here.
18              MR. COVINO:  Thank you, Your Honor.
19              THE COURT:  Now you say she has your address so
20   it's not going to do any good to -- well --
21              MR. COVINO:  I didn't fill out the original
22   confidentiality sheet, but --
23              THE COURT:  So in other words, she -- I can order
24   her to stay away from 313 Lincoln Ave. or I can order her to
25   stay away from you wherever located.  But if she already
```

30

1-9

```
 1    knows you live at 313 Lincoln Ave., it's better to have the
 2    address on there.  It's easier to enforce.
 3           MR. COVINO:  That's why I left that part open.
 4    The office said that I should check it off in the
 5    confidentiality anyway.  I just followed the directions.  I
 6    agree with you.
 7           THE COURT:  It's up to you.  If you want it on
 8    there, I'm going to put your address --
 9           MR. COVINO:  I would like it on there.  Yes, sir.
10           THE COURT:  Yeah.  I think it's easier --
11    personally, I think it's -- if she already knows it, there's
12    no point.  It's easier to enforce.  That way if she drives
13    by 313 Lincoln Ave., you know --
14           MR. COVINO:  Correct.
15           THE COURT:  I'm not sure if she knows where the
16    police station is.
17           MR. COVINO:  Well, she showed up there.
18           THE COURT:  Okay.
19           MR. COVINO:  Twice at least.
20           THE COURT:  So any contact, including social
21    media, is prohibited, and any third-party contact.
22           MR. COVINO:  Thank you.
23       (Pause)
24           THE COURT:  And what's the ten-day date?
25           THE CLERK:  February 14th or you can use February
```

31

943

1-10

```
 1    15th.
 2              THE COURT:  That would be ironic.
 3              Do you want -- you pick the -- let's see.  The
 4    15th is a Wednesday.  You want to go the Wednesday?  You can
 5    have it the 14th or the 15th, Tuesday or a Wednesday.
 6              MR. COVINO:  The 15th please.
 7              THE COURT:  Okay, 02/15.  So most likely she won't
 8    appear, but the -- what we do is we issue a temporary order.
 9              MR. COVINO:  Uh-huh.
10              THE COURT:  On 02/15 there'll be a hearing at
11    which time then the order can be extended for up to a year.
12              MR. COVINO:  Thank you.
13        (Pause)
14              THE COURT:  All right.  Maybe this will be
15    helpful.
16              MR. COVINO:  I appreciate it.  We miss you over in
17    Chelsea.
18              THE COURT:  Say hi to my friends over there.
19    Thank you.
20        (Hearing adjourned at 4:02 p.m.)
21
22
23
24
25
```

32

1-11

```
 1                    C E R T I F I C A T I O N

 2

 3        I, SHERRI L. BREACH, COURT-APPROVED TRANSCRIBER, DO

 4   HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE

 5   TRANSCRIPT FROM THE RECORD OF THE COURT PROCEEDINGS IN THE

 6   ABOVE-ENTITLED MATTER.

 7        I, SHERRI L. BREACH, FURTHER CERTIFY THAT THE FOREGOING

 8   IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF THE TRIAL

 9   COURT DIRECTIVE ON TRANSCRIPT FORMAT.

10        I, SHERRI L. BREACH, FURTHER CERTIFY THAT I NEITHER AM

11   COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES

12   TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER

13   THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE

14   OUTCOME OF THE ACTION.

15

16

17      Sherri L. Breach

18   _____         10/17/19_____

19   SHERRI L. BREACH                        DATE

20

21   HUNT REPORTING COMPANY
     12 CRAIN HIGHWAY, #2
22   GLEN BURNIE, MD 21061
     410-766-4868
23

24

25
```

33

945

She just called me. She said it doesn't say anything about third party on the order.

9:11 PM

How did the conversion go????

9:12 PM





I told her to leave me the fuck out of it and that's it's between you too. I said that if you subpoena me and take me to court that I have all of the text messages that you sent me saying the things that you did to me and I will show them if I need to. I said that I don't want to I

I said that I don't want to I want nothing to do with this situation but if you insist upon going the route that you're going to that I'm going to do what I have to do

9:13 PM

And.....???

9:13 PM



That must have garnered a reaction

9:14 PM




Lol

9:14 PM

She was like it sounds like you are threatening me and



you are threatening me and I said no I'm not threatening you I'm telling you that if you drag me into this I am going to be forced to defend myself and my position. And I said to her again I do not want anything to do with this situation into please leave me out of it. And then the line went dead I think she must have ran out of time on her calling card or the phone she was using was dead because I don't think she hung up on me. She was actually, speaking to me

9:15 PM



+1 (617) 538-3434 ›

Are you working tonight?

Ok, I'll touch base tomorrow.
I'm off but will try to have it faxed to you when you're available. I really need to do something (i.e. restraining order)... She called me over 100 times between 1600-0400 last night. Now she's saying I'm racist and posting same to her social media. Thoughts?

   Text Message

949



.ıl Verizon  LTE                    10:52 AM

<                        +1 (617) 538-3434  >

Okay thank you so much. I'm sorry it was all jumbled and all over the place but I wanted to get out to you enough to get you going

Jan 26, 2017, 7:24 AM

   Text Message

952



.ıll Verizon LTE                    10:52 AM

+1 (617) 538-3434 ›

Jan 26, 2017, 11:29 AM

I got stuck or at court today so I'll write it up tonight on my <u>midnight to 8 a.m.</u> shift and fax it over tomorrow morning when you get in? I'm assuming you get it at 8



Text Message



+1 (617) 538-3434 >

Okay, that's perfect. I'll send you a text in the afternoon before i send it. I'm back in at 4:00 pm tomorrow as well

Jan 26, 2017, 1:41 PM

Honestly I had your fucking back , was loyal to you and would have stayed loyal to you . you fucking want to play games , be hateful, and you want that fucking ho bag  Lorna , then FINE. I no longer have any obligations to stay loyal. I  ll no longer stay loyal . you are a child! A



  

954



+1 (617) 538-3434 ›

REPORT SPAM
UNBLOCK

**Got these late last night**

**Ok, does the police report need to be as detailed as the statement I sent to you or can it just be superficial and that she has attempted to contact me this many times over this amount of time and they have become increasingly hostile and concerning**

  Text Message

956



+1 (617) 538-3434 ›

picture. Apparently she took a picture of her computer screen of me on a newsfeed at a double murder scene and spliced it in with a picture of her and put the card over it

Jan 27, 2017, 12:09 PM

Jan 29, 2017, 7:56 PM

I have that report complete.
Are you working

  

959

Case: 25-1068 Case 1:20-cv-10078-DPC Document 79-2 Filed 05/07/25 Page 512 of 15 Entry ID: 6720411



**+1 (617) 538-3434** ›

May 14, 2017, 5:46 PM

Hey brother.. just saw our friend.. if there's a drive by and i get randomly hit (46 times),, you know where to look!! Ha.. Cheers, mate!

I'm at police week.. chief made me bring honor guard.. had no desire to come.. I'm at tent city.. she with an asian chick and a dude.. cop.. thin guy.. kind of rednecky looking

  Text Message

960



+1 (617) 538-3434 ›

guy.. kind of rednecky looking

We didn't make eye contact but i know she saw me.. she kept her back to me at a tent while "shopping", while the asian looked over

Body armor!! Lmfao

No worries at all brother.. just letting you know you called it correctly!!

She back to duty?

  Text Message

961

Case: 25-106 Case 1:20-cv-10078-3784536cument 762 Filed 05/07/24 12/22/2514 Entry ID: 6720411



+1 (617) 538-3434 >

She back to duty?

Ooooh.... Ok then.. she going to resign?

No shit!! Ooh i got ya..

May 16, 2017, 11:16 AM

  

Text Message



+1 (617) 538-3434 >

Thanks so much Lt!!
That means a lot to me
Brother!!

Dec 5, 2017, 11:47 AM

  

963

## VIRGINIA STATE POLICE ACTIVITY REPORT

CONFIDENTIAL This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**File Number:** 17-1956

**File Manager:** Kinnard, William E SAGT

**Activity Number:** 17-32705A

**Activity Title:** Package from Revere Police Department

**Activity Date/Time:** 02/15/2017 08:30

**Activity Lead Employee:** Kinnard, William E SAGT

SA Kinnard retrieved a large envelope from his office mailbox upon arriving at the Division 7 Headquarters. The postmark on the package was February 3, 2017. It was sent by Detective Kephart, Revere Police Department. The envelope contained two smaller envelopes. Inside one was a police complaint report filed by Sergeant Covino and a 32GB thumb drive. Inside the other envelope are documents and records related to the case.

**Available Attachments:**

Covino Report from Revere PD.pdf  Report from Revere Police Department.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARON RADFAR, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| CITY OF REVERE, BRIAN M. ARRIGO, | * |
| individually and in his official capacity as | * |
| Mayor, JAMES GUIDO, individually and in | * |
| his official capacity as Chief of Police, | *    Civil Action No. 1:20-cv-10178-IT |
| JOSEPH I. COVINO, individually and in his | * |
| official capacity as Police Sergeant, and | * |
| OTHER AS YET UNNAMED OFFICERS | * |
| OF THE REVERE POLICE | * |
| DEPARTMENT, individually and in their | * |
| official capacity as police officers, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

December 5, 2024

TALWANI, D.J.

Plaintiff Sharon Radfar alleges that Defendant Joseph Covino used his position as a law enforcement officer with the City of Revere to spread false and malicious claims about her and, in doing so, interfered with her job with the George Mason University Police Department and caused her emotional distress in violation of federal and state law. Before the court is Defendant Joseph Covino's Motion for Summary Judgment [Doc. No. 68]. For the following reasons, the motion is GRANTED.

## I.  Procedural Background

Plaintiff's Complaint [Doc. No. 1] named the City of Revere, its Mayor, Brian M. Arrigo, and Chief of Police, James Guido (collectively, the "Revere Defendants"), and Joseph I.

Covino.[1] The Revere Defendants moved to dismiss the counts directed against them pursuant to Fed. R. Civ. P. 12(b)(6), Revere Defs.' Mot. to Dismiss [Doc. No. 18], and the court granted their motion. Mem. & Order [Doc. No. 21].

Covino moved to dismiss the Complaint pursuant to Massachusetts' anti-SLAPP law, M.G.L. c. 231, § 59H, Fed. R. Civ. P. 12(b)(6), and Fed. R. Civ. P. 56. Covino's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Mot. to Dismiss and Mot. for Costs and Atty's Fees Pursuant to M.G.L. c. 231, § 59H [Doc. No. 9]. The court denied Covino's anti-SLAPP motion because he had not demonstrated that Radfar's action was brought to chill his protected petitioning activity, denied his 12(b)(6) motion because it relied on matters outside of the pleadings, and denied his summary judgment motion without prejudice. Mem. & Order [Doc. No. 21].[2]

Once discovery closed, Covino filed the pending renewed Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("Motion for Summary Judgment") [Doc. No. 68] seeking summary judgment on all counts in the Complaint. Radfar opposes the motion. Opp'n in Resp. to 2nd Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 81].[3]

---

[1] The Complaint also asserted claims against "as yet unnamed officers," who four years later remain unnamed.

[2] The court recognized that some of the legal arguments raised successfully by the Revere Defendants also potentially applied to Covino, but where Covino did not raise these arguments and Plaintiff did not address the arguments as they may apply to Covino, the court did not extend the rulings to Covino. Id. at 24, n.9. The court provided, however, that after filing an answer and conferring with counsel, Covino could file a motion for judgment on the pleading under Fed. R. Civ. P. 12(c) raising those arguments that may apply to him. Id. Covino did not file a 12(c) motion.

[3] At the hearing on the summary judgment motion, Radfar's counsel contended that there are open discovery disputes in this matter, including an unresolved motion to compel, that prevented Radfar from having all necessary discovery to dispute Covino's summary judgment motion. Federal Rule 56(d) provides that, when facts are unavailable to a non-movant, and the non-movant shows by affidavit or declaration that, for specified reasons, the non-movant cannot present facts essential to justify an opposition to a summary judgment motion, the court may

1066

## II.      Standard of Review – Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323-324.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S.

---

provide certain relief. Radfar did not file a Rule 56(d) affidavit. Nor is there an unresolved motion to compel on the docket. To the extent that Radfar's objection is that Covino failed to comply with the court's Electronic Order [Doc. No. 53] granting in part Radfar's Motion to Compel [Doc. No. 39], she could have filed a motion regarding that alleged failure under Fed. R. Civ. P. 37(b). In the absence of a Rule 56(d) affidavit, an open motion to compel, or a Rule 37(b) motion, the court finds that any argument that discovery was incomplete has been waived.

at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

### III. Factual Background Viewed in the Light Most Favorable to Radfar

    A.    *Radfar's Employment Record with George Mason University Prior to Her Relationship with Covino*

Plaintiff Sharon Radfar began her employment with the George Mason University Police Department in January 2001. Pl.'s Resp. to Def. Covino's First Interrogatories 6 [Doc. No. 70-2]. Lieutenant David Ganley, who started his employment shortly after Radfar and worked with her consistently from 2003 to 2010 (during 2008 and 2010, as a sergeant and her supervisor) and, once promoted to the rank of lieutenant in 2016, supervised all patrol operations including those on which Radfar worked, considered Radfar an officer with "good instincts" who "did good work." Tr. of Ganley Dep. 15, 17, 24 [Doc. No. 70-8]. Lt. Ganley once nominated Radfar for George Mason's officer of the year. Id. at 23-24.

Radfar's employment record with George Mason was not entirely unblemished. In August 2001, roughly 6 months after Radfar started working at George Mason, she was issued a "Written Notice" for "engag[ing] in conduct unbecoming a police officer[.]" Id. at 19. The Notice specified that Radfar was accused of a criminal violation, which led the Commonwealth Attorney for Fairfax County to withhold her appointment as a sworn police officer, such that her

1068

conduct "placed the department in disrepute and adversely affected the efficiency of the department." Id. at 20. As a result of the incident, Radfar's swearing in was delayed for about a year. Id. at 21.

In June 2005, Radfar received another Written Notice from George Mason. Id. at 24. That incident involved Radfar using the George Mason Police's access to the Virginia Criminal Information Network ("VCIN") "improperly for noncriminal justice purposes." Id. As a result of the VCIN incident, Radfar's VCIN access was suspended for six months. Id. at 27.

B.    *Lt. Ganley's Knowledge of Radfar's Difficult Romantic Relationships*

Lt. Ganley observed a pattern of behavior by Radfar regarding her romantic relationships with other officers. Lt. Ganley had knowledge of the 2001 incident resulting in the delayed swearing in, and that it involved a relationship between Radfar and a Fairfax County sheriff's deputy. Id. at 21. Radfar had been accused of breaking into the deputy's house and stealing some photos and other items, but she was never charged. Id. at 20.

Lt. Ganley was also aware of Radfar's relationship with Office Tom Bacigalupi from their department, who Radfar started dating soon after she graduated from the police academy. Id. at 32-33. From Lt. Ganley's observations, Radfar's relationship with Bacigalupi was "tumultuous" and "volatile from the beginning." Id. at 31, 33. Lt. Ganley was aware that the 2005 incident with the VCIN terminal involved Radfar looking up information on Bacigalupi, who Radar was dating at the time, and confronting Bacigalupi with that information. Id. at 25-27.

Lt. Ganley also recalled:

> lots of instances where [Bacigalupi and Radfar] would break up, she would call him time and time and time – I mean, literally back to back to back.
>
> I was in the car with him one time traveling from a training in Virginia Beach back to northern Virginia and she called his phone. He wasn't answering. She called his phone probably about a hundred times just back to back to back. Every time it would stop ringing, she would dial again and ring again.

1069

I saw this from both sides. When I was on her squad, I'd seen her sit in a conference room with a phone and just dial the number repeatedly. I'm assuming it was [Bacigalupi's] number at the time. I'm not 100 percent sure, but that was probably who she was calling, and he wasn't answering. This happened a lot.

Id. at 33-34.

Lt. Ganley recalled that Radfar would confront Bacigalupi at work and "they would have some pretty big arguments" and he often observed them screaming at each other on the phone. Id. at 34. According to Lt. Ganley, there were a few instances between Radfar and Bacigalupi that resulted in internal investigations because they "created such disruption," including a hearing with the Department of Human Resource Management circa 2007 that was not documented in Radfar's personnel file. Id. at 36. At some point, Lt. Ganley met with the associate director of Human Resources and urged her to "get [Radfar] in counseling [and] have her sit down with someone," but he was not sure if any actions were actually taken. Id. at 36-37.

Lt. Ganley also recalled another relationship that Radfar had after Bacigalupi with a trainer at her gym and that "something happened between them and there was [an] instance where the Loudoun County Sheriff's Office was called to the gym because of her conduct." Id. at 35.

C.     *Radfar and Covino's Relationship between June 2015 and July 2016*

In June 2015, Radfar met Joseph Covino, a sergeant with the Revere Police Department in Revere, Massachusetts, Compl. ¶ 4 [Doc. No. 1], at the World Police and Fire Games hockey tournament in Fairfax, Virginia. Pl.'s Statement of Undisputed Facts in Opp'n to Def. Second Mot. for Summ. J. ("Pl.'s SUF") ¶¶ 1-2 [Doc. No. 80]. During that event, Radfar and Covino had a brief, consensual affair. Id.

After Covino returned to Massachusetts, he and Radfar remained in contact via text messages and phone calls. Def.'s Answers to Pl.'s First Set of Interrogatories 2 [Doc. No. 70-3].

Later that summer, Radfar visited Covino in Boston. Id. at 2-3. The two had lunch and then dinner, after which Covino brought Radfar to her hotel and told her he no longer wished to continue their relationship. Id. at 3. The pair reconciled, however, and Radfar visited Boston again in the fall of 2015 with a friend. Id. During that trip, Covino met up with Radfar and her companion, but later become frustrated with Radfar's behavior and decided to take Radfar to her hotel and leave. Id.; Pl.'s SUF ¶ 2 [Doc. No. 80]. After leaving Radfar at her hotel, Covino told her via a phone call that he did not wish to have any type of relationship with her and that he wanted her to stop contacting him. Pl.'s SUF ¶ 3 [Doc. No. 80]. After making this statement, Covino continued to text and call her. Id.

In May of 2016, Covino received a series of text messages. The messages included:

I'm here in ur state! Making few minutes to [expletive] see me face to face! I'm NOT asking u! So make it happen

I'm here in ur state!!!! Make few minutes to see me face to face! I'm NOT asking u ! Make it happen!!!!!!!!!!!!!!

Don't make me come to ur place!!!

Keep ignoring that I'm here…I [expletive] will show up…and will make a scene !

May 2016 Text Messages 1-2 [Doc. No. 70-4]. Covino responded to the messages, which he believed were from Radfar, stating: "Leave me alone. I don't want any contact with you.. I do not want to and will not see you." Id. In response, he received a text threatening to "show up at ur house !" with Covino's street address. Id. Covino reiterated that he did not want to see Radfar, objected that she'd called him over 20 times in the past few hours, and asked that she stop contacting him, to which he received the response: "I don't give a [expletive] what you wish! Talk to me and I will stop !!! Or don't.. And I have [to] show up! You[r] choice!" Id. at 3. Covino again reiterated that he wanted the contact to stop. Id. at 4.

7

On or about July 2016, Radfar drove eight hours from her home in Virginia to the Boston area. Pl.'s SUF ¶¶ 5, 9 [Doc. No. 80]. During that trip, Radfar showed up at the Revere Police Department, where Covino worked, without warning and without knowing whether Covino was working at the time, and left a letter for him. Id. ¶ 13; Tr. of Radfar Dep. 72 [Doc. No. 70-5]. The primary purpose of Radfar's trip to Boston was to visit a cousin in Plymouth County, with whom she had dinner while in town. Pl.'s SUF ¶¶ 10-11 [Doc. No. 80].

D.    *Chief Carl Rowan, Jr.'s Initial Interactions with Radfar*

Carl Rowan, Jr. began as a consultant for the George Mason University Police Department in July 2016 and became Interim Chief of Police shortly thereafter. Tr. of Rowan Dep. 12 [Doc. No. 70-10].[4] It was important to Chief Rowan that the officers "would have a clean slate" with him and that "whatever personality problems existed in the past or what people had done or said" were not his concern. Id. at 13-14. He was aware that Radfar "had been a difficult individual to manage and that there were a number of prior incidents, disciplinary issues, and performance issues," but that was the extent of his information about her. Id. at 14. Chief Rowan recalled that the personality issues and conflicts were not unique to Radfar, and that "[i]t was a department that had a problem with [cliques] . . . just groups of officers that were at loggerheads with each other, a lot of petty personal stuff." Id.

Radfar met with Chief Rowan, who told her that he was not interested in refereeing past problems and that he was "starting fresh." Id. Following that conversation, Chief Rowan received a few complaints about Radfar being rude to people on campus, so he called her into his office "to remind her of the benefit that she was being given by giving her a clean slate." Id. at

---

[4] Rowan served as Interim Chief until November 2017, when he became Chief of Police. Id. The court refers to him throughout as Chief Rowan.

8

15. Chief Rowan described that Radfar began the meeting matter-of-fact, requesting more detail about the allegations and "kind of having a normal conversation." <u>Id.</u> at 15-16.

> Then that stopped. And we went into what I'll call the waterworks phase, it was crying and basically being the victim and "why are people always attacking me" and kind of sobbing. And then that stopped on a dime. And then came statements like—I mean just glaring—"They've tried to beat me before, and I've beaten them every time, and I'm going to beat you too." It was like three different personalities in the course of this short period of time. I found that to be disturbing. And I spoke with the employee relations department about it because I was just, I was disturbed by the experience.
>
> So that was my introduction to difficult Sharon. I mean, during that same time period, I mean I actually wrote her a commendation letter for something that she had recommended, and we wound up implementing her idea. But there was a continuing problem with the manner in which she treated people, and I found her behavior in that meeting to be disturbing.

<u>Id.</u> at 16.

  E.  *Radfar's Contact with Covino Following the July 2016 Visit to Boston*

  Following her July 2016 visit to Boston, Radfar continued to contact Covino through numerous telephone calls, texts, written letters, and social media. Pl.'s SUF ¶ 16 [Doc. No. 80].

  During this period, Radfar also left Covino dozens of profanity-laden voicemails, accusing Covino of ignoring her, sleeping with other woman, particularly with an Irish hockey player named Lorna Hoey with whom Radfar was convinced Covino was having an affair, and being racist toward Radfar because of her Iranian heritage. Ex. 19, Disc of Voicemail Records Submitted to the Ct. [Doc. No. 70-19].

  In January 2017, Radfar called Covino hundreds of times.[5] Covino also blocked over 100 different phone numbers which he believes to be calls from Radfar. Pl.'s SUF ¶ 17 [Doc. No.

---

[5] The parties dispute the exact number of calls. Covino asserts that over Martin Luther King Weekend, January 14-16, 2017, Radfar called him over 400 times, and that, a couple of weeks later, Radfar called him over 100 times on January 28, 2017, alone. Pl.'s SUF ¶ 17 [Doc. No. 80]. Radfar states that those specific numbers "were not credited by the investigation of plaintiff[,]" <u>id.</u>, but does not deny that she made a large number of calls.

80]. Radfar also spliced pictures of herself with photos of Covino she found on social media and sent them to Covino. Id.

F.   *Covino's Initial Contact with the George Mason Police Department*

At some point following MLK weekend in 2017, Covino called the George Mason University Police Department and asked to speak to the on-duty supervisor. Id. ¶ 21. The on-duty supervisor that day was Lt. Ganley. Id. ¶ 22. Covino told Lt. Ganley "that he had a problem with one of our officers that he was dating" and mentioned Officer Radfar by name. Tr. of Ganley Dep. 29 [Doc. No. 70-8]. Covino asked for Lt. Ganley's assistance in getting Radfar to stop contacting him and told Lt. Ganley that Covino "wanted a clean break from her" and "[d]id not want her contacting him, coming up there, or interfering with his work or his family." Id. at 30. Lt. Ganley told Covino that his complaints were "consistent with Officer Radfar in past relationships that [he] had heard of." Id. at 31. Lt. Ganley told Covino "there's really nothing you can do until she latches on to the next guy, because that's what she's been doing down here." Pl.'s SUF ¶ 32 [Doc. No. 80].

G.   *George Mason's Initiation of a State Police Investigation*

After receiving Covino's phone call, Lt. Ganley reached out to Chief Rowan. Id. ¶ 34. Chief Rowan was not surprised by the allegations. Id. ¶ 46. Lt. Ganley told Chief Rowan that "with the department's history with Officer Radfar," Covino's allegations "obviously needed to be investigated," but that it would be more proper for an agency other than George Mason University to conduct the investigation because of the officers' personal relationships with Radfar. Id. ¶ 35.

Following his conversation with Lt. Ganley, Chief Rowan set up a meeting with the Virginia State Police. Id. ¶ 47. At that meeting, Chief Rowan asked the Virginia State Police to conduct a criminal investigation into Radfar. Id. ¶ 48. Chief Rowan has no memory of ever

speaking directly with Covino and made that request even though, to his knowledge, Covino never requested any criminal investigation be made into his allegations. Id. ¶¶ 49-50.

On January 25, 2017, Lt. Ganley emailed Covino to inform him that George Mason University was looking into Radfar's conduct and use of police resources. Id. ¶ 54. In the email, Lt. Ganley wrote to Covino: "My Chief wanted me to ask if you would be willing to file a police report with your local department? I know that's a big ask but he wants to have something to back up our investigation." Id.

On January 26, 2017, Lt. Ganley and Chief Rowan met with Special Agent William Kinnard of the Virginia State Police. Id. ¶ 52. The state police record of the investigation contains a synopsis of the meeting written by Agent Kinnard which recounts that "Chief Rowan state[d] he was requesting a criminal investigation and stated the suspect, one of his officers, MPO Sharon Radfar, did not need to be a police officer." Id. George Mason's complaint, as summarized by Kinnard, was that Radfar had been harassing and possibly threatening a Boston police officer since summer 2015. Id. According to Agent Kinnard's summary, "[a]ll of [t]he command group in attendance concurred that Radfar was volatile and possibly manic in her relationships." Id.

In a January 27, 2017 communication with Covino, Agent Kinnard stated that he had been assigned to investigate Covino's complaint against a member of the George Mason University Police Department. Id. ¶ 55. Agent Kinnard stated further that his investigation would require "a high degree of accurate documentation[]" and asked Covino to provide Kinnard "any and all records, documents, messages, or transmissions" as well as information about his phone service carriers. Id.

1075

Both Lt. Ganley and Agent Kinnard also advocated to Covino that he obtain a restraining order. Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

H.      *Covino's "To File" and Incident Reports and the Abuse Prevention Petition, Order, and Expiration*

On January 29, 2017, in response to Lt. Ganley's request, Covino authored a "To File" report with the Revere Police Department outlining his relationship with Radfar. Id. ¶ 56. He also authored an "Incident Report," which listed himself as the Reporting Officer and the Victim and Radfar as the "Suspect" for an offense of criminal harassment. Id.

On January 31, 2017, Covino applied for an Abuse Prevention (or "209A") Order in the Lynn District Court in Massachusetts. In his affidavit in support of his application, Covino wrote that Radfar had "repeatedly attempted to contact [him] by any means necessary" including "telephone, text, written letters, social media, driving from [Virginia] to [Massachusetts] and showing up in my neighborhood or at my place of work." Abuse Prevention Order Aff. [Doc. No. 70-7]. He also wrote that "Radfar [had] used threats to force him into sexual relations with her on multiple occasions being successful on one attempt while in Boston." Id. Covino stated that Radfar had called or texted him over 400 times on MLK weekend and had called him over 100 times on January 28, 2017. Id. He also accused Radfar of assuming the identities of people online in an attempt to contact him and befriending and harassing other law enforcement officers that Covino knew. Id. Covino stated that "[b]ecause of her repeated actions/threats," he was "in absolute fear of grave danger from Radfar[.]" Id.

While waiting to appear before the judge, Covino asked Lt. Ganley whether, if an order requiring the surrender of firearms came through, it should be sent to the George Mason University Police Department or to the local township, and Ganley responded that he "would

much rather have it here [at George Mason] so we can coordinate and we can get the firearm

back." Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

At the hearing on the Abuse Prevention petition, Covino testified that "on at least three

occasions" Radfar had driven to Massachusetts and shown up in his neighborhood threatening

Covino to come see her, and that he believed the last time she had visited Massachusetts to be

December 2016. Tr. of Abuse Prevention Order Hr'g 3-4 [Doc. No. 79-1]. When the judge asked

why Covino had "pick[ed] today to come in," Covino said that he had "been putting it off

because I . . . know what a restraining order entails and . . . [hadn't] been in fear of [his] safety

until the most recent threats" but that he now "can't even sleep anymore [because] [t]he phone

just rings all night." Id. at 5. Covino testified further that Radfar had made veiled threats by

voicemail, had appeared in his neighborhood, and had access to a firearm, and that as a result he

was concerned for his safety. Id. at 6.

The judge reminded Covino that any order he issued regarding the surrender of firearms

would not be enforceable in Virginia and that enforcement of the order would be up to law

enforcement in Virginia. Id. at 7. At the end of the hearing, the judge issued a temporary Abuse

Prevention Order that would expire on February 15, 2017, unless extended. Id. at 9.

Covino did not seek to extend the Abuse Prevention Order against Radfar and it therefore

expired on February 15, 2017. Pl.'s [Additional] Material Facts ¶¶ 7, 8 [Doc. No. 80]. There is

no indication in the record that Covino ever told either George Mason or the Virginia State

Police that the order had expired. Id. ¶ 10.

I.     *George Mason University Serves the Abuse Prevention Order, Seizes Radfar's*
       *Gun, and Places Her on Leave*

The same evening that Covino obtained the Abuse Prevention Order, George Mason

University Police Officers and Loudoun County Sheriff Deputies served it on Radfar at her home

13

and seized her firearms. Pl.'s SUF ¶ 63 [Doc. No. 80]. Radfar was also given a letter from George Mason placing her on administrative leave per Virginia state personnel policy and advising her that a confidential investigation conducted by an external investigator would be conducted and a no trespass order directing her to stay away from Covino and George Mason University property. Id. ¶ 64; see also, Ex. 15, Administrative Leave Letter [Doc. No. 70-15]; No Trespass Letter [Doc. No. 70-16]; Virginia State Police Investigation R. 9 [Doc. No. 70-11].

      J.     *Virginia Prosecutor's Review of the State Police Investigation*

The Virginia State Police investigation record indicates that the Revere Police Department and Covino provided to Agent Kinnard documentation, including "a package with copies of voicemails and text messages from Radfar" and "Covino Report from Revere PD." Virginia State Police Investigation R. 9 [Doc. No. 70-11]; see also Virginia State Police R. Investigation 41-43 (Incident Report and To File Report) [Doc. No. 70-11]. In February 2017, Agent Kinnard sought and obtained a search warrant for the phone records of both Covino and Radfar. Id. at 10.

On March 27, 2017, Agent Kinnard gave his investigation notes to Assistant Commonwealth Attorney Alex Rueda "for review and prosecutorial guidance." Pl.'s SUF ¶ 74 [Doc. No. 80]. With the materials, Agent Kinnard wrote: "Analysis of the suspect phone records show: Suspect called victim at least 575 times over the affected period and at least 162 times since I can prove that the victim said 'do not call me anymore' (See text message of March 12, 2016). Victim called suspect at least 256 times and 32 times since he told her to stop calling him." Id. Agent Kinnard asked Attorney Rueda if she would prosecute the case and if there was enough to charge Radfar under Virginia's statute prohibiting "[u]se of profane, threatening or

14

indecent language over public airways or by other methods," a Class 1 misdemeanor. Id. ¶¶ 74-75; see also Ex. 18, Code of Virginia § 18.2-427 [Doc. No. 70-18].

Attorney Rueda emailed Agent Kinnard on March 28, 2017:

> Just finished reviewing all the materials. We do not have enough for telephone threats charges because I don't really see her making actual threats, it's all veiled. And the profanity doesn't fall under the legal definition of obscene under the Virginia Code or case law. Honestly, our best bet would be to potentially charge her with stalking, but it would be a real stretch, because he would have to be able to stay(sic) he has a reasonable fear of bodily injury or death to himself or a family member. Also, most of this behavior is occurring in Massachusetts. She is traveling up there to stalk him, has shown up at his work, says she is near his house and demands he meet her, and is receiving all the phone calls and text messages there. Has he sought a protection order in the Massachusetts courts or sought charges up there? If we get a misdemeanor warrant down here, there is no provision for the court to pay for him to fly down here at the General District Court level. Massachusetts has jurisdiction so it seems a much better plan to have her charged up there.

Pl.'s SUF ¶ 76 [Doc. No. 80]. In another email to Agent Kinnard, Attorney Rueda stated that she probably had enough to charge Radfar under Virginia's statute for "causing a telephone . . . or other device to ring or signal with intent to annoy," but that there was not much purpose in charging her with only a class 3 misdemeanor when Covino would have to travel to Virginia. Id. ¶ 77. She reiterated that Covino should pursue charges in Massachusetts, where the conduct was occurring. Id.

On May 5, 2017, Agent Kinnard met with Attorney Rueda who reported that she and the Commonwealth Attorney agreed that prosecution should not go forward and that Covino could try to apply for a permanent protective order against Radfar in Virginia. Id. ¶ 80. Agent Kinnard notified Lt. Ganley that the Commonwealth was not going to prosecute. Id.

K.     *Jason Ford's Abuse Prevention Order Against Radfar*

On December 3, 2017, Brockton, Massachusetts, police officer Jason Ford applied for an obtained an Abuse Prevention Order against Radfar in the Brockton District Court. Id. ¶ 104.

1079

Like Covino, Ford also contacted the George Mason University Police Department about

Radfar's conduct. Id. ¶ 106.[6]

## IV.    Discussion

Radfar's Complaint asserts nine counts against Covino: equal protection violations for

abuse of authority (Count I), selective prosecution (Count II), defamation (Count III), violations

of the Massachusetts Civil Rights Act (Count IV), intentional infliction of emotional distress

(Count V), conspiracy to violate civil rights (Count VII), refusal to prevent wrongs committed

against Plaintiff (Count VIII), abuse of process (Count IX) and malicious prosecution (Count X).

Covino seeks summary judgment as to all counts.

### A.  Uncontested Causes of Action

#### 1.  Selective Prosecution (Count II)

Radfar alleges that Covino's "repeated selective enforcement of the law . . . violated [her]

rights to equal protection of the laws and the privileges and immunities of citizenship"

enumerated in the Fifth and Fourteenth Amendments. Compl. ¶¶ 30 [Doc. No. 1]. Radfar did not

address this count in her opposition to the summary judgment motion and, at the hearing on the

---

[6] Radfar alleges that Ford's Abuse Prevention Order, like Covino's, was based on false and
misleading statements about her and that Ford's conduct also contributed to the loss of her job.
Id. ¶¶ 105, 107. On January 6, 2021, Radfar submitted a letter of resignation to the George
Mason University Police Department effective on that date. Id. ¶ 114. The details of Radfar's
resignation from George Mason University's Police Department are subject to a Non-Disclosure
Agreement she entered into which has not been made available to Defendants or this court.
Further, at the summary judgment hearing, Radfar clarified that she is only seeking damages
against Covino with regard to his role in the loss of her employment for the period between
Covino's initial call to Lt. Ganley in January 2017 and December 3, 2017, the date of the Ford
Abuse Prevention Order, though she also seeks ongoing damages against Covino for emotional
and psychological distress. Because Radfar has conceded that she does not seek to recover for
any loss of her employment after December 2017, and because she entered into an agreement to
keep the details of her resignation confidential, the court does not consider any events between
Radfar and the George Mason University Police Department that transpired after Officer Ford
obtained his Abuse Prevention Order against Radfar.

motion, her counsel conceded that Radfar is no longer asserting a selective prosecution claim

against Covino. Summary judgment as to Count II is therefore granted.

        2.  Section 1985 Conspiracy to Commit Wrongs (Count VII)

The court dismissed the conspiracy claim as to the other Defendants at the motion to

dismiss stage, finding that "Plaintiff has failed to allege any facts tending to show the existence

of a conspiracy among Covino, Arrigo, and Guido (or any configuration of two Defendants)."

Mem. & Order 22 [Doc. No. 21]. Because Covino is the only remaining party discussed in Count

VI, and because Radfar does not address the conspiracy claim in her opposition to Covino's

pending summary judgment motion, the court grants summary judgment as to Count VI.

        3.  Section 1986 Refusal to Prevent Wrongs Committed Against Plaintiff (Count VII)

A claim under 42 U.S.C. § 1986 depends on the existence of a conspiracy under § 1985.

See Hahn v. Sargent, 523 F.2d 461, 470 (1st Cir. 1975) ("[T]he dismissal of appellant's claim

under § 1986 falls upon the rejection of his § 1985 claims."). Because the court has dismissed the

§ 1985 conspiracy claim for failure to demonstrate any facts tending to show a conspiracy

between the Defendants, and because Radfar does not address this claim in her opposition to

Covino's summary judgment motion, the court grants Covino summary judgment as to Count

VIII.

    B.  *Contested Claims*

        1.  Section 1983 Equal Protection (Count I)

Plaintiff alleges under § 1983 that Covino violated the guarantees of equal protection

under the Fifth and Fourteenth Amendments of the Constitution by (a) acting under the color of

law to (b) initiate malicious proceedings against Radfar. Compl. ¶¶ 26-27 [Doc. No. 1].

Section 1983 creates a civil cause of action against an individual acting under color of state law

who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). Covino seeks summary judgment on the grounds that, at all times relevant to the Complaint, he acted not in his capacity as a Revere Police Officer, but as a private citizen. Def.'s Mem. 8 [Doc. No. 69]. Covino also contends that, regardless of whether he acted under color of law, there is no evidence that Radfar was denied a constitutional right by Covino. Id.

Plaintiff has offered no evidence from which a jury could find that Covino was acting under color of law rather than as a private citizen when he obtained the abuse prevention order. Covino's affidavit in support of his abuse prevention order complaint does not identify him as a law enforcement officer and mentions only that Radfar has visited his "place of work," without specifying that he worked at the Revere Police Department. Abuse Prevention Order Aff. [Doc. No. 70-7]. Further, he appeared at the abuse prevention order hearing while he was off-duty and out of uniform. During the hearing, Covino did reference "[his] police department" and stated that he and Radfar met at a police event, and after receiving the Order told the judge "[w]e miss you over in Chelsea," see Tr. of Abuse Prevention Order Hr'g [Doc. No. 79-1], but these statements do not suggest that Covino was acting under color of law rather than as a private citizen while obtaining the abuse prevention order. Accordingly, the court need not reach Radfar's claim that she was deprived of her constitutional rights to equal protection by Covino seeking (and obtaining) the Abuse Prevention Order.

Radfar also asserts that Covino "used his police power and department resources" in drafting his internal to file and incident report with the Revere Police Department and "made

1082

much use of his use of police evidence gathering procedures," including "placing materials in the Revere Police Department evidence room and then having a detective who was his friend transmit them to Virginia State Police in an effort to establish the impression that the use of regular police procedures, professionalism and objectivity would lend credibility" to his allegations made in an effort to charge Radfar with a crime. Pl.'s Opp'n 12-13 [Doc. No. 81]. The court agrees that the evidence supports Radfar's claim that Covino was acting under color of law in writing up the internal to file and incident report. But Radfar can show no constitutional violation in connection with George Mason's investigation of her and its impact on her job.

Plaintiff has attempted to frame Covino's contact with George Mason University Police, the investigation, and her placement on administrative leave as an equal protection claim. But to succeed on an equal protection claim, a plaintiff must show that, as compared to others similarly situated, she was selectively treated and that such selective treatment was based on impermissible considerations. Latimore v. Trotman, 651 F.Supp.3d 366, 375 (D. Mass. 2023) (citing Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013)). "Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim[.]" Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32 (1st Cir. 2012) (citing Estate of Bennett v. Wainwright, 548 F.3d 155, 166 (1st Cir. 2008)).

There is no evidence in this record of any comparator against whom to judge Covino's treatment of Radfar and thus no evidence of actual disparate treatment. Radfar complains that Covino instigated a malicious and false campaign against her, but makes no allegation, nor is any supported by the record, that he singled her out in this treatment as compared to other similarly situated individuals. "An equal protection claimant may not prevail . . . simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a

discriminatory animus." <u>Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mortg. Fin. Corp.</u>, 246 F.3d 1, 10 (1st Cir. 2001) (internal citations omitted). Accordingly, the equal protection claim fails and summary judgment as to Count I is granted.

    2.   Violations of Massachusetts Civil Rights Act (Count IV)

Radfar asserts that Covino deprived her of rights under the Massachusetts Declaration of Rights, M.G.L. c. 12, § 11H, by means of intimidation and coercion. Compl. ¶ 37 [Doc. No. 1]. She claims that Covino "endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy." <u>Id.</u> She seeks relief under M.G.L. c. 12, § 11H "because [he] engaged in said threats, coercion and intimidation under color of law in violation of said statute" and § 1983. <u>Id.</u> ¶ 38.

"[U]nder the MCRA, . . . the plaintiff must identify a federal or state right that has been 'interfered with by threats, intimidation, or coercion.'" <u>Barbosa v. Conlon</u>, 962 F.Supp.2d 316, 332 (D. Mass. 2013) (quoting <u>Flesner v. Technical Commc'ns Corp.</u>, 410 Mas. 805, 818, 575 N.E.2d 1107 (1991)).

> A "[t]hreat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct.... ["Coercion" involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.

<u>Farrah ex rel Estate of Santana v. Gondella</u>, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (quoting <u>Planned Parenthood League of Mass., Inc. v. Blake</u>, 417 Mass. 467, 474, 631 N.E.2d 985 (1994)). Here, though Radfar asserts that Covino made "abusive threats" toward her, <u>see</u> Pl.'s Opp'n 2 [Doc. No. 81], she has offered no evidence that Covino's communications with her were intended to make her fearful or constrain her from doing what she was otherwise lawfully entitled to do. Without such evidence, no reasonable jury could find that Covino's behavior was

threatening, intimidating, or coercive as required for an MCRA claim. Accordingly, summary judgment as to Count VIII is granted.

### 3.   Defamation (Count III)

Radfar claims Covino defamed her by making statements he knew to be false to her employer and others that she committed criminal acts. Compl. ¶¶ 32-34 [Doc. No. 1]. Radfar alleges that Covino's statements caused her to suffer grievous injury to her reputation and the loss of her ability to earn a living. Id. ¶ 35. Covino contends that summary judgment on Radfar's defamation claim is appropriate because (a) Covino's statements were protected petitioning behavior, and (b) protected or not, the statements were true. Def.'s Mem. 14 [Doc. No. 69].

Radfar's opposition does not address Covino's request for summary judgment on Count III for defamation other than to state generally that some of Covino's statements to George Mason University about Radfar were "false[,] misleading, humiliating and otherwise defamatory[.]" Pl.'s Opp'n 8 [Doc. No. 81]. At the hearing, however, Radfar's counsel took issue with two statements in particular: (1) Covino's statement in his affidavit in support of the complaint for an Abuse Prevention Order that Radfar forced him to have sex; and (2) Covino's statement in the Incident Report that Radfar committed the crime of criminal harassment under M.G.L. c. 265, § 43A. Radfar contends that both statements, because they are assertions that she committed a crime, are actionable as defamation per se.[7]

---

[7] During the hearing, Radfar's counsel also took issue with Covino's statements to the Lynn District Court that Radfar had called him thousands of times, when the Virginia State Police investigation concluded she called him 575 times. The court, reviewing the transcript of the abuse prevention hearing [Doc. No. 79-1] and Covino's affidavit in support of the Abuse Prevention Order complaint, could not find any allegation made by Covino that Radfar called him "thousands" of times. Nonetheless, even if Covino had told the judge that Radfar called him thousands of times, this discrepancy would not be material when it is undisputed that Radfar called Covino at least 575 times.

Under Massachusetts law, to survive a motion for summary judgment for defamation, a plaintiff must establish that "(1) the defendant published a false statement regarding the plaintiff—that is, the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss." Flagg v. AliMed, Inc., 466 Mass. 23, 37, 992 N.E.2d 354 (2013); see also Brauer v. Globe Newspaper Co., 351 Mass. 53, 55-56, 217 N.E.2d 736 (1966) (quoting Muchnick v. Post Pub. Co., 332 Mass. 304, 306, 125 N.E.2d 137 (1955)) ("A publication is defamatory when it tends to injure one's reputation in the community and to expose him to hatred, ridicule, and contempt"). A false statement that an individual has committed a crime is defamatory per se and is actionable without proof of economic loss. See Shafir v. Steele, 431 Mass. 365, 373, 727 N.E.2d 1140 (2000).

a.     Statements Made in Pursuit of Abuse Prevention Order

Radfar contends that Covino's statement that she forced him to have sex is defamatory per se because it is an accusation of sexual assault. It is undisputed that Covino wrote that Radfar had used threats to force him into sexual relations in his affidavit in support of his Abuse Prevention Order Complaint and that, if false, such an allegation is defamatory per se so long as it is actionable. But the only place that the allegation of sexual assault appears in the record is in the affidavit Covino submitted to the Lynn District Court, and Massachusetts law provides an absolute privilege against defamation for statements made by a witness or party in judicial proceedings. See Correllas v. Viveiros, 410 Mass. 314, 321, 572 N.E.2d 7 (1991); see also Sriberg v. Raymond, 370 Mass. 105, 108, 345 N.E.2d 882 (1976). Because Covino only made the statement about sexual assault in the affidavit submitted to the Lynn Dsitrict Court, that

22

statement is not actionable. Accordingly, to the extent Radfar's defamation claim depends on that statement, summary judgment on Count III is granted.

b.      Statements made in Covino's Incident Report

Radfar also contends that the Incident Report authored by Covino that lists Radfar as the suspect for an offense of criminal harassment under M.G.L. c. 265, § 43A, is defamatory per se because it falsely accuses Radfar of committing a crime. Section 43A criminalizes whoever willfully and malicious engages in a "knowing pattern of conduct or series of acts" over a period of time and directed at a specific person, "which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress." M.G.L. c. 265, § 43A. The conduct covered by § 43A includes, but is not limited to, conduct or acts conducted via telephone or the internet. Id.

Generally speaking, "defamatory statements are not punishable unless they are capable of being proved true or false." Pan Am Sys., Inc. v. Atlantic Northeast Rails and Ports, Inc., 804 F.3d 59, 65 (1st Cir. 2015). Radfar has offered no evidence that the statement in Covino's Incident Report that she criminally harassed him is untrue, nor were her counsel's arguments regarding criminal harassment at the motion hearing persuasive. For example, Radfar's counsel contended at the hearing that culpability under M.G.L. c. 265, § 43A, requires that the acts directed at a victim are threats of physical or bodily harm. But while the statute is directed to conduct "which seriously alarms" the victim and is of such a nature that would cause a reasonable person "to suffer substantial emotional distress," id., a threat of physical or bodily harm is not a requirement of criminal harassment under § 43A.[8] Counsel also argued that

---

[8] Criminal stalking, M.G.L. c. 43, in contrast, does require a threat with intent to place a person in imminent fear of death or bodily injury, but Covino did not allege criminal stalking.

23

Covino's statement that Radfar criminally harassed him was defamatory because the criminal investigation based on that accusation cleared Radfar. This is not accurate. The Virginia State Police investigation, which did consider as part of its record Covino's Incident Report, resulted in a decision not to press charges against Radfar in Virginia. It did not, however, conclude that Radfar had committed no wrongdoing. The fact that the investigation did not result in criminal charges does not mean that Radfar's conduct did not meet the requirements of § 43A. Accordingly, summary judgment for Covino is granted on Count III in its entirety.

4.   Intentional Infliction of Emotional Distress (Count V)

Radfar alleges that Covino's "acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon [her]." Compl. ¶ 40 [Doc. No. 1]. She further alleges that that misconduct caused her to experience stomach problems, weight loss, nightmares, anxiety, and fear of police officers. Id. ¶ 41.

"Massachusetts law imposes liability for intentional infliction of emotional distress when the defendant has engaged in extreme and outrageous conduct, without privilege, causing the plaintiff severe emotional distress." Gill v. United States, 588 F. Supp. 3d 134, 139 (D. Mass. 2022) (citing Limone v. United States, 579 F.3d 79, 91 (1st Cir. 2009)). Finding extreme and outrageous conduct requires the conduct be "beyond all bounds of decency and . . . utterly intolerable in a civilized community." Sena v. Commonwealth, 417 Mass. 250, 263, 629 N.E.2d 986 (1994).

Though Radfar does not identify the particular conduct of Covino's she believes rises to the level of "extreme and outrageous," the court considers the combination of Covino allegedly omitting certain evidence from materials provided to George Mason University and Virginia State Police during their investigation and making false or exaggerated statements about Radfar

to her employer, the Lynn District Court, and Virginia State Police. But even if Radfar proves these allegations, no reasonable jury could find that that conduct rises to the level of "extreme and outrageous" in light of the undisputed evidence that Radfar relentlessly called and texted Covino and Covino sought the abuse prevention order and contacted Radfar's employer only after she refused his requests to stop.

Accordingly, summary judgment in favor of Covino on Radfar's intentional infliction of emotional distress claim (Count V) is granted.

    5.   Abuse of Process (Count IX)

Radfar alleges that Covino was not entitled to an Abuse Prevention Order against her and that, nonetheless, Covino maliciously sought such an order to exact revenge against Radfar. Compl. ¶ 53 [Doc. No. 1]. She contends that this conduct constituted an abuse of process that caused her humiliation, embarrassment, anguish, loss of reputation in her community, and loss of her career. Id. ¶ 54-55.

In Massachusetts, a party claiming abuse of process must show (1) that "process" was used against him, (2) for an "ulterior or illegitimate purpose," and (3) that he was damaged as a result. Psy-Ed Corp. v. Klein, 459 Mass. 697, 713, 947 N.E.2d 520 (2011). "[I]n the context of abuse of process, 'process' refers to the papers issued by a court to bring a party or property within its jurisdiction." Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389-390, 340 N.E.2d 484 (1975) (finding process was that used by the defendant to institute its suit seeking a preliminary injunction, and not the injunction prohibiting picketing subsequently issued by the court). "To sustain the claim, 'the fact finder must find that process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Psy-Ed Corp., 459 Mass. at 713. "More

specifically, abuse of process has been described as a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'" Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406, 30 N.E.2d 325 (2000) (quoting Cohen v. Hurley, 20 Mass. App. Ct. 439, 442, 480 N.E.2d 658 (1985)).

Radfar claims that Covino pursued the Abuse Prevention Order "with the ulterior motive of exacting revenge against [her] and destroying her career and her life." Compl. ¶ 54 [Doc. No. 1]. She contends that Covino "was [] never fearful of her" as required for a 209A order and that the petition was "calculated," "target[ed,]" and based on false statements to the judge. Pl.'s Opp'n 16 [Doc. No. 81]. She also argues that Covino "us[ed] [] the Massachusetts order to ruin her career and seek out of state criminal charges against her." Id. Taking the facts in the light most favorable to Radfar, the court finds these assertions as to Covino's motivation unsupported by the evidentiary record.

First, even accepting Plaintiff's argument that Covino may have exaggerated any fear of physical harm that he may have had, Covino's deposition testimony that his "only concern" in taking action against Radfar's harassment "was having her stay away from [him]," Tr. of Covino Dep. 31 [Doc. No. 70-9], is uncontradicted.

Second, there is ample, uncontradicted evidence in the record that Covino did *not* intend to destroy Radfar's life or her career by seeking to stop her harassment. In his affidavit, Covino asserts that at no point did he seek to have the defendant charged with criminal activity. Id. At his deposition, Covino testified that, when he contacted Lt. Ganley about Radfar's conduct, "I only wanted to—I didn't want to cause her to lose her job. I certainly didn't want to have a restraining order against her, and I did everything I could not—so that wouldn't happen." Tr. of Covino Dep. 20 [Doc. No. 70-9]. Further, it is undisputed that Covino let the Abuse Prevention

Order lapse after two weeks. Covino testified that he allowed the Order to lapse "so that the plaintiff's employment was not negatively impacted by her inability to possess a firearm." Covino Aff. ¶ 19 [Doc. No. 70-14]. While the record suggests that Chief Rowan and George Mason University Police may have used the Abuse Prevention Order for their own purposes, nothing in the record suggests that this was Covino's motivation.

Despite her assertions that Covino had an ulterior motive in seeking an Abuse Prevention Order against her, Radfar proffers no evidence to support those claims. Though the court is required to view the facts in the light most favorable to the non-movant on a summary judgment motion, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings," Anderson, 477 U.S. at 256, but most "go beyond the pleadings" and present her own evidence to demonstrate a genuine dispute of material fact for trial. Celotex, 477 U.S. at 324. The court finds that Radfar has not met that burden here and that, based on the admissible evidence in the record, no jury could find that Covino sought an Abuse Prevention Order for a purpose for which it was not designed or intended. Accordingly, summary judgment on the abuse of process claim (Count VIII) is granted in Covino's favor.

### 6. Malicious Prosecution (Count X)

Radfar's malicious prosecution allegations are based on two categories of conduct. The first is Covino's actions related to and in support of George Mason University's and the Virginia State Police investigations into Radfar's conduct. The second is Covino's actions in pursuit of the Abuse Prevention Order he obtained in Massachusetts. The court addresses each in turn.

#### a. Virginia Investigations

27

Radfar brings her malicious prosecution claim under federal law via § 1983 based on Covino's actions taken under color of law as a police officer in filing an Incident Report against Radfar[9] and providing information to Virginia authorities, which resulted in the unreasonable seizure of her firearms in violation of the Fourth Amendment.[10]

Central to a successful malicious prosecution claim is establishing that legal process was initiated against the claimant. See Nieves, 241 F.3d at 54 (an arrest without an arrest warrant is without "legal process" and therefore insufficient for malicious prosecution claim). "The common-law cause of action for malicious prosecution . . . permits damages for confinement imposed pursuant to legal process." Heck v. Humphrey, 512 U.S. 477, 484 (1994). "The interest at stake in a malicious prosecution claim is the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir 1995); see also Chervin v. Travelers Ins. Co., 448 Mass. 95, 102-03, 858 N.E.2d 746 (2006) ("The tort [of malicious prosecution] 'is not confined to the wrongful initiation of criminal proceeding; it may be maintained for the unjustifiable initiation of a civil action.'"). Here, Radfar has not been subject to civil or criminal legal process and has thus not stated a cognizable claim for malicious prosecution.

---

[9] To succeed on a § 1983 malicious prosecution claim, a plaintiff must show both a "garden variety claim of malicious prosecution," Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996), plus "a deprivation of a federally-protected right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). The elements of a common law action for malicious prosecution are: (1) commencement or continuation of a criminal proceeding against the plaintiff at the behest of the defendant; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the charges; and (4) actual malice. Id.

[10] To state a claim for malicious prosecution resulting in unreasonable seizure, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupportable by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

1092

It is undisputed that Virginia declined to prosecute Radfar following its investigation into her conduct and that no criminal charges were ever brought against Radfar in Virginia or Massachusetts. The court has found no Massachusetts or federal case, and Radfar cites to none, where a malicious prosecution claim was sustained based solely on an investigation that did not result in a criminal complaint or charges. To the contrary, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." Correllas, 410 Mass. at 318. Accordingly, summary judgment is granted on Count X to the extent it depends on Covino's actions related to the Virginia State Police investigation.

b.    Abuse Prevention Order

Radfar also alleges that Covino maliciously prosecuted her by abusing his position as a police officer to obtain an Abuse Prevention Order against her. A successful § 1983 claim requires a claimant to demonstrate that the defendant was acting "under color of law" by acting in an official capacity or exercising official responsibilities pursuant to state law. See Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995) ("[W]hether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."). As discussed above, Covino did not appear at the Abuse Prevention Hearing in uniform, was off-duty at the time, and did not go out of his way to identify himself as a police officer or make reference to his law enforcement position. Plaintiff has not offered evidence to support her claim that Covino was acting under color of state law, so his actions with regard to the Abuse Prevention Order hearing are not actionable under § 1983.

1093

Accordingly, Covino's motion for summary judgment as to Radfar's malicious prosecution claim (Count X) is granted.

## V.    Conclusion

For the foregoing reasons, Defendant Joseph I. Covino's <u>Motion for Summary Judgment</u> [Doc. No. 68] is GRANTED.

IT IS SO ORDERED.

December 5, 2024                           /s/Indira Talwani
                                          United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARON RADFAR, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| CITY OF REVERE, BRIAN M. ARRIGO, | * |
| individually and in his official capacity as | * |
| Mayor, JAMES GUIDO, individually and in | * |
| his official capacity as Chief of Police, | * Civil Action No. 1:20-cv-10178-IT |
| JOSEPH I. COVINO, individually and in his | * |
| official capacity as Police Sergeant, and | * |
| OTHER AS YET UNNAMED OFFICERS | * |
| OF THE REVERE POLICE | * |
| DEPARTMENT, individually and in their | * |
| official capacity as police officers, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

December 5, 2024

TALWANI, D.J.

Plaintiff Sharon Radfar alleges that Defendant Joseph Covino used his position as a law

enforcement officer with the City of Revere to spread false and malicious claims about her and,

in doing so, interfered with her job with the George Mason University Police Department and

caused her emotional distress in violation of federal and state law. Before the court is Defendant

Joseph Covino's Motion for Summary Judgment [Doc. No. 68]. For the following reasons, the

motion is GRANTED.

**I.    Procedural Background**

Plaintiff's Complaint [Doc. No. 1] named the City of Revere, its Mayor, Brian M. Arrigo,

and Chief of Police, James Guido (collectively, the "Revere Defendants"), and Joseph I.

Covino.[1] The Revere Defendants moved to dismiss the counts directed against them pursuant to Fed. R. Civ. P. 12(b)(6), Revere Defs.' Mot. to Dismiss [Doc. No. 18], and the court granted their motion. Mem. & Order [Doc. No. 21].

Covino moved to dismiss the Complaint pursuant to Massachusetts' anti-SLAPP law, M.G.L. c. 231, § 59H, Fed. R. Civ. P. 12(b)(6), and Fed. R. Civ. P. 56. Covino's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Mot. to Dismiss and Mot. for Costs and Atty's Fees Pursuant to M.G.L. c. 231, § 59H [Doc. No. 9]. The court denied Covino's anti-SLAPP motion because he had not demonstrated that Radfar's action was brought to chill his protected petitioning activity, denied his 12(b)(6) motion because it relied on matters outside of the pleadings, and denied his summary judgment motion without prejudice. Mem. & Order [Doc. No. 21].[2]

Once discovery closed, Covino filed the pending renewed <u>Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56</u> ("Motion for Summary Judgment") [Doc. No. 68] seeking summary judgment on all counts in the Complaint. Radfar opposes the motion. Opp'n in Resp. to 2nd Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 81].[3]

---

[1] The Complaint also asserted claims against "as yet unnamed officers," who four years later remain unnamed.

[2] The court recognized that some of the legal arguments raised successfully by the Revere Defendants also potentially applied to Covino, but where Covino did not raise these arguments and Plaintiff did not address the arguments as they may apply to Covino, the court did not extend the rulings to Covino. <u>Id.</u> at 24, n.9. The court provided, however, that after filing an answer and conferring with counsel, Covino could file a motion for judgment on the pleading under Fed. R. Civ. P. 12(c) raising those arguments that may apply to him. <u>Id.</u> Covino did not file a 12(c) motion.

[3] At the hearing on the summary judgment motion, Radfar's counsel contended that there are open discovery disputes in this matter, including an unresolved motion to compel, that prevented Radfar from having all necessary discovery to dispute Covino's summary judgment motion. Federal Rule 56(d) provides that, when facts are unavailable to a non-movant, and the non-movant shows by affidavit or declaration that, for specified reasons, the non-movant cannot present facts essential to justify an opposition to a summary judgment motion, the court may

## II.     Standard of Review – Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323-324.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S.

---

provide certain relief. Radfar did not file a Rule 56(d) affidavit. Nor is there an unresolved motion to compel on the docket. To the extent that Radfar's objection is that Covino failed to comply with the court's Electronic Order [Doc. No. 53] granting in part Radfar's Motion to Compel [Doc. No. 39], she could have filed a motion regarding that alleged failure under Fed. R. Civ. P. 37(b). In the absence of a Rule 56(d) affidavit, an open motion to compel, or a Rule 37(b) motion, the court finds that any argument that discovery was incomplete has been waived.

at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

III.    **Factual Background Viewed in the Light Most Favorable to Radfar**

   A.    *Radfar's Employment Record with George Mason University Prior to Her Relationship with Covino*

Plaintiff Sharon Radfar began her employment with the George Mason University Police Department in January 2001. Pl.'s Resp. to Def. Covino's First Interrogatories 6 [Doc. No. 70-2]. Lieutenant David Ganley, who started his employment shortly after Radfar and worked with her consistently from 2003 to 2010 (during 2008 and 2010, as a sergeant and her supervisor) and, once promoted to the rank of lieutenant in 2016, supervised all patrol operations including those on which Radfar worked, considered Radfar an officer with "good instincts" who "did good work." Tr. of Ganley Dep. 15, 17, 24 [Doc. No. 70-8]. Lt. Ganley once nominated Radfar for George Mason's officer of the year. Id. at 23-24.

Radfar's employment record with George Mason was not entirely unblemished. In August 2001, roughly 6 months after Radfar started working at George Mason, she was issued a "Written Notice" for "engag[ing] in conduct unbecoming a police officer[.]" Id. at 19. The Notice specified that Radfar was accused of a criminal violation, which led the Commonwealth Attorney for Fairfax County to withhold her appointment as a sworn police officer, such that her

1068

conduct "placed the department in disrepute and adversely affected the efficiency of the department." Id. at 20. As a result of the incident, Radfar's swearing in was delayed for about a year. Id. at 21.

In June 2005, Radfar received another Written Notice from George Mason. Id. at 24. That incident involved Radfar using the George Mason Police's access to the Virginia Criminal Information Network ("VCIN") "improperly for noncriminal justice purposes." Id. As a result of the VCIN incident, Radfar's VCIN access was suspended for six months. Id. at 27.

B.    *Lt. Ganley's Knowledge of Radfar's Difficult Romantic Relationships*

Lt. Ganley observed a pattern of behavior by Radfar regarding her romantic relationships with other officers. Lt. Ganley had knowledge of the 2001 incident resulting in the delayed swearing in, and that it involved a relationship between Radfar and a Fairfax County sheriff's deputy. Id. at 21. Radfar had been accused of breaking into the deputy's house and stealing some photos and other items, but she was never charged. Id. at 20.

Lt. Ganley was also aware of Radfar's relationship with Office Tom Bacigalupi from their department, who Radfar started dating soon after she graduated from the police academy. Id. at 32-33. From Lt. Ganley's observations, Radfar's relationship with Bacigalupi was "tumultuous" and "volatile from the beginning." Id. at 31, 33. Lt. Ganley was aware that the 2005 incident with the VCIN terminal involved Radfar looking up information on Bacigalupi, who Radar was dating at the time, and confronting Bacigalupi with that information. Id. at 25-27.

Lt. Ganley also recalled:

> lots of instances where [Bacigalupi and Radfar] would break up, she would call him time and time and time – I mean, literally back to back to back.
>
> I was in the car with him one time traveling from a training in Virginia Beach back to northern Virginia and she called his phone. He wasn't answering. She called his phone probably about a hundred times just back to back to back. Every time it would stop ringing, she would dial again and ring again.

5

1069

> I saw this from both sides. When I was on her squad, I'd seen her sit in a conference room with a phone and just dial the number repeatedly. I'm assuming it was [Bacigalupi's] number at the time. I'm not 100 percent sure, but that was probably who she was calling, and he wasn't answering. This happened a lot.

Id. at 33-34.

Lt. Ganley recalled that Radfar would confront Bacigalupi at work and "they would have some pretty big arguments" and he often observed them screaming at each other on the phone. Id. at 34. According to Lt. Ganley, there were a few instances between Radfar and Bacigalupi that resulted in internal investigations because they "created such disruption," including a hearing with the Department of Human Resource Management circa 2007 that was not documented in Radfar's personnel file. Id. at 36. At some point, Lt. Ganley met with the associate director of Human Resources and urged her to "get [Radfar] in counseling [and] have her sit down with someone," but he was not sure if any actions were actually taken. Id. at 36-37.

Lt. Ganley also recalled another relationship that Radfar had after Bacigalupi with a trainer at her gym and that "something happened between them and there was [an] instance where the Loudoun County Sheriff's Office was called to the gym because of her conduct." Id. at 35.

C.    *Radfar and Covino's Relationship between June 2015 and July 2016*

In June 2015, Radfar met Joseph Covino, a sergeant with the Revere Police Department in Revere, Massachusetts, Compl. ¶ 4 [Doc. No. 1], at the World Police and Fire Games hockey tournament in Fairfax, Virginia. Pl.'s Statement of Undisputed Facts in Opp'n to Def. Second Mot. for Summ. J. ("Pl.'s SUF") ¶¶ 1-2 [Doc. No. 80]. During that event, Radfar and Covino had a brief, consensual affair. Id.

After Covino returned to Massachusetts, he and Radfar remained in contact via text messages and phone calls. Def.'s Answers to Pl.'s First Set of Interrogatories 2 [Doc. No. 70-3].

6

1070

Later that summer, Radfar visited Covino in Boston. Id. at 2-3. The two had lunch and then

dinner, after which Covino brought Radfar to her hotel and told her he no longer wished to

continue their relationship. Id. at 3. The pair reconciled, however, and Radfar visited Boston

again in the fall of 2015 with a friend. Id. During that trip, Covino met up with Radfar and her

companion, but later become frustrated with Radfar's behavior and decided to take Radfar to her

hotel and leave. Id.; Pl.'s SUF ¶ 2 [Doc. No. 80]. After leaving Radfar at her hotel, Covino told

her via a phone call that he did not wish to have any type of relationship with her and that he

wanted her to stop contacting him. Pl.'s SUF ¶ 3 [Doc. No. 80]. After making this statement,

Covino continued to text and call her. Id.

> In May of 2016, Covino received a series of text messages. The messages included:
>
> I'm here in ur state! Making few minutes to [expletive] see me face to face! I'm
> NOT asking u! So make it happen
>
> I'm here in ur state!!!! Make few minutes to see me face to face! I'm NOT asking
> u ! Make it happen!!!!!!!!!!!!!!
>
> Don't make me come to ur place!!!
>
> Keep ignoring that I'm here…I [expletive] will show up…and will make a scene !

May 2016 Text Messages 1-2 [Doc. No. 70-4]. Covino responded to the messages, which he

believed were from Radfar, stating: "Leave me alone. I don't want any contact with you.. I do

not want to and will not see you." Id. In response, he received a text threatening to "show up at

ur house !" with Covino's street address. Id. Covino reiterated that he did not want to see Radfar,

objected that she'd called him over 20 times in the past few hours, and asked that she stop

contacting him, to which he received the response: "I don't give a [expletive] what you wish!

Talk to me and I will stop !!! Or don't.. And I have [to] show up! You[r] choice!" Id. at 3.

Covino again reiterated that he wanted the contact to stop. Id. at 4.

1071

On or about July 2016, Radfar drove eight hours from her home in Virginia to the Boston area. Pl.'s SUF ¶¶ 5, 9 [Doc. No. 80]. During that trip, Radfar showed up at the Revere Police Department, where Covino worked, without warning and without knowing whether Covino was working at the time, and left a letter for him. Id. ¶ 13; Tr. of Radfar Dep. 72 [Doc. No. 70-5]. The primary purpose of Radfar's trip to Boston was to visit a cousin in Plymouth County, with whom she had dinner while in town. Pl.'s SUF ¶¶ 10-11 [Doc. No. 80].

D.    *Chief Carl Rowan, Jr.'s Initial Interactions with Radfar*

Carl Rowan, Jr. began as a consultant for the George Mason University Police Department in July 2016 and became Interim Chief of Police shortly thereafter. Tr. of Rowan Dep. 12 [Doc. No. 70-10].[4] It was important to Chief Rowan that the officers "would have a clean slate" with him and that "whatever personality problems existed in the past or what people had done or said" were not his concern. Id. at 13-14. He was aware that Radfar "had been a difficult individual to manage and that there were a number of prior incidents, disciplinary issues, and performance issues," but that was the extent of his information about her. Id. at 14. Chief Rowan recalled that the personality issues and conflicts were not unique to Radfar, and that "[i]t was a department that had a problem with [cliques] . . . just groups of officers that were at loggerheads with each other, a lot of petty personal stuff." Id.

Radfar met with Chief Rowan, who told her that he was not interested in refereeing past problems and that he was "starting fresh." Id. Following that conversation, Chief Rowan received a few complaints about Radfar being rude to people on campus, so he called her into his office "to remind her of the benefit that she was being given by giving her a clean slate." Id. at

---

[4] Rowan served as Interim Chief until November 2017, when he became Chief of Police. Id. The court refers to him throughout as Chief Rowan.

8

15. Chief Rowan described that Radfar began the meeting matter-of-fact, requesting more detail about the allegations and "kind of having a normal conversation." Id. at 15-16.

> Then that stopped. And we went into what I'll call the waterworks phase, it was crying and basically being the victim and "why are people always attacking me" and kind of sobbing. And then that stopped on a dime. And then came statements like—I mean just glaring—"They've tried to beat me before, and I've beaten them every time, and I'm going to beat you too." It was like three different personalities in the course of this short period of time. I found that to be disturbing. And I spoke with the employee relations department about it because I was just, I was disturbed by the experience.
>
> So that was my introduction to difficult Sharon. I mean, during that same time period, I mean I actually wrote her a commendation letter for something that she had recommended, and we wound up implementing her idea. But there was a continuing problem with the manner in which she treated people, and I found her behavior in that meeting to be disturbing.

Id. at 16.

      E.    *Radfar's Contact with Covino Following the July 2016 Visit to Boston*

Following her July 2016 visit to Boston, Radfar continued to contact Covino through numerous telephone calls, texts, written letters, and social media. Pl.'s SUF ¶ 16 [Doc. No. 80].

During this period, Radfar also left Covino dozens of profanity-laden voicemails, accusing Covino of ignoring her, sleeping with other woman, particularly with an Irish hockey player named Lorna Hoey with whom Radfar was convinced Covino was having an affair, and being racist toward Radfar because of her Iranian heritage. Ex. 19, Disc of Voicemail Records Submitted to the Ct. [Doc. No. 70-19].

In January 2017, Radfar called Covino hundreds of times.[5] Covino also blocked over 100 different phone numbers which he believes to be calls from Radfar. Pl.'s SUF ¶ 17 [Doc. No.

---

[5] The parties dispute the exact number of calls. Covino asserts that over Martin Luther King Weekend, January 14-16, 2017, Radfar called him over 400 times, and that, a couple of weeks later, Radfar called him over 100 times on January 28, 2017, alone. Pl.'s SUF ¶ 17 [Doc. No. 80]. Radfar states that those specific numbers "were not credited by the investigation of plaintiff[,]" id., but does not deny that she made a large number of calls.

80]. Radfar also spliced pictures of herself with photos of Covino she found on social media and sent them to Covino. Id.

F. *Covino's Initial Contact with the George Mason Police Department*

At some point following MLK weekend in 2017, Covino called the George Mason University Police Department and asked to speak to the on-duty supervisor. Id. ¶ 21. The on-duty supervisor that day was Lt. Ganley. Id. ¶ 22. Covino told Lt. Ganley "that he had a problem with one of our officers that he was dating" and mentioned Officer Radfar by name. Tr. of Ganley Dep. 29 [Doc. No. 70-8]. Covino asked for Lt. Ganley's assistance in getting Radfar to stop contacting him and told Lt. Ganley that Covino "wanted a clean break from her" and "[d]id not want her contacting him, coming up there, or interfering his work or his family." Id. at 30. Lt. Ganley told Covino that his complaints were "consistent with Officer Radfar in past relationships that [he] had heard of." Id. at 31. Lt. Ganley told Covino "there's really nothing you can do until she latches on to the next guy, because that's what she's been doing down here." Pl.'s SUF ¶ 32 [Doc. No. 80].

G. *George Mason's Initiation of a State Police Investigation*

After receiving Covino's phone call, Lt. Ganley reached out to Chief Rowan. Id. ¶ 34. Chief Rowan was not surprised by the allegations. Id. ¶ 46. Lt. Ganley told Chief Rowan that "with the department's history with Officer Radfar," Covino's allegations "obviously needed to be investigated," but that it would be more proper for an agency other than George Mason University to conduct the investigation because of the officers' personal relationships with Radfar. Id. ¶ 35.

Following his conversation with Lt. Ganley, Chief Rowan set up a meeting with the Virginia State Police. Id. ¶ 47. At that meeting, Chief Rowan asked the Virginia State Police to conduct a criminal investigation into Radfar. Id. ¶ 48. Chief Rowan has no memory of ever

10

speaking directly with Covino and made that request even though, to his knowledge, Covino never requested any criminal investigation be made into his allegations. Id. ¶¶ 49-50.

On January 25, 2017, Lt. Ganley emailed Covino to inform him that George Mason University was looking into Radfar's conduct and use of police resources. Id. ¶ 54. In the email, Lt. Ganley wrote to Covino: "My Chief wanted me to ask if you would be willing to file a police report with your local department? I know that's a big ask but he wants to have something to back up our investigation." Id.

On January 26, 2017, Lt. Ganley and Chief Rowan met with Special Agent William Kinnard of the Virginia State Police. Id. ¶ 52. The state police record of the investigation contains a synopsis of the meeting written by Agent Kinnard which recounts that "Chief Rowan state[d] he was requesting a criminal investigation and stated the suspect, one of his officers, MPO Sharon Radfar, did not need to be a police officer." Id. George Mason's complaint, as summarized by Kinnard, was that Radfar had been harassing and possibly threatening a Boston police officer since summer 2015. Id. According to Agent Kinnard's summary, "[a]ll of [t]he command group in attendance concurred that Radfar was volatile and possibly manic in her relationships." Id.

In a January 27, 2017 communication with Covino, Agent Kinnard stated that he had been assigned to investigate Covino's complaint against a member of the George Mason University Police Department. Id. ¶ 55. Agent Kinnard stated further that his investigation would require "a high degree of accurate documentation[]" and asked Covino to provide Kinnard "any and all records, documents, messages, or transmissions" as well as information about his phone service carriers. Id.

Both Lt. Ganley and Agent Kinnard also advocated to Covino that he obtain a restraining order. Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

H.    *Covino's "To File" and Incident Reports and the Abuse Prevention Petition, Order, and Expiration*

On January 29, 2017, in response to Lt. Ganley's request, Covino authored a "To File" report with the Revere Police Department outlining his relationship with Radfar. Id. ¶ 56. He also authored an "Incident Report," which listed himself as the Reporting Officer and the Victim and Radfar as the "Suspect" for an offense of criminal harassment. Id.

On January 31, 2017, Covino applied for an Abuse Prevention (or "209A") Order in the Lynn District Court in Massachusetts. In his affidavit in support of his application, Covino wrote that Radfar had "repeatedly attempted to contact [him] by any means necessary" including "telephone, text, written letters, social media, driving from [Virginia] to [Massachusetts] and showing up in my neighborhood or at my place of work." Abuse Prevention Order Aff. [Doc. No. 70-7]. He also wrote that "Radfar [had] used threats to force him into sexual relations with her on multiple occasions being successful on one attempt while in Boston." Id. Covino stated that Radfar had called or texted him over 400 times on MLK weekend and had called him over 100 times on January 28, 2017. Id. He also accused Radfar of assuming the identities of people online in an attempt to contact him and befriending and harassing other law enforcement officers that Covino knew. Id. Covino stated that "[b]ecause of her repeated actions/threats," he was "in absolute fear of grave danger from Radfar[.]" Id.

While waiting to appear before the judge, Covino asked Lt. Ganley whether, if an order requiring the surrender of firearms came through, it should be sent to the George Mason University Police Department or to the local township, and Ganley responded that he "would

much rather have it here [at George Mason] so we can coordinate and we can get the firearm back." Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

At the hearing on the Abuse Prevention petition, Covino testified that "on at least three occasions" Radfar had driven to Massachusetts and shown up in his neighborhood threatening Covino to come see her, and that he believed the last time she had visited Massachusetts to be December 2016. Tr. of Abuse Prevention Order Hr'g 3-4 [Doc. No. 79-1]. When the judge asked why Covino had "pick[ed] today to come in," Covino said that he had "been putting it off because I . . . know what a restraining order entails and . . . [hadn't] been in fear of [his] safety until the most recent threats" but that he now "can't even sleep anymore [because] [t]he phone just rings all night." Id. at 5. Covino testified further that Radfar had made veiled threats by voicemail, had appeared in his neighborhood, and had access to a firearm, and that as a result he was concerned for his safety. Id. at 6.

The judge reminded Covino that any order he issued regarding the surrender of firearms would not be enforceable in Virginia and that enforcement of the order would be up to law enforcement in Virginia. Id. at 7. At the end of the hearing, the judge issued a temporary Abuse Prevention Order that would expire on February 15, 2017, unless extended. Id. at 9.

Covino did not seek to extend the Abuse Prevention Order against Radfar and it therefore expired on February 15, 2017. Pl.'s [Additional] Material Facts ¶¶ 7, 8 [Doc. No. 80]. There is no indication in the record that Covino ever told either George Mason or the Virginia State Police that the order had expired. Id. ¶ 10.

I.    *George Mason University Serves the Abuse Prevention Order, Seizes Radfar's Gun, and Places Her on Leave*

The same evening that Covino obtained the Abuse Prevention Order, George Mason University Police Officers and Loudoun County Sheriff Deputies served it on Radfar at her home

13

and seized her firearms. Pl.'s SUF ¶ 63 [Doc. No. 80]. Radfar was also given a letter from George Mason placing her on administrative leave per Virginia state personnel policy and advising her that a confidential investigation conducted by an external investigator would be conducted and a no trespass order directing her to stay away from Covino and George Mason University property. Id. ¶ 64; see also, Ex. 15, Administrative Leave Letter [Doc. No. 70-15]; No Trespass Letter [Doc. No. 70-16]; Virginia State Police Investigation R. 9 [Doc. No. 70-11].

J.    *Virginia Prosecutor's Review of the State Police Investigation*

The Virginia State Police investigation record indicates that the Revere Police Department and Covino provided to Agent Kinnard documentation, including "a package with copies of voicemails and text messages from Radfar" and "Covino Report from Revere PD." Virginia State Police Investigation R. 9 [Doc. No. 70-11]; see also Virginia State Police R. Investigation 41-43 (Incident Report and To File Report) [Doc. No. 70-11]. In February 2017, Agent Kinnard sought and obtained a search warrant for the phone records of both Covino and Radfar. Id. at 10.

On March 27, 2017, Agent Kinnard gave his investigation notes to Assistant Commonwealth Attorney Alex Rueda "for review and prosecutorial guidance." Pl.'s SUF ¶ 74 [Doc. No. 80]. With the materials, Agent Kinnard wrote: "Analysis of the suspect phone records show: Suspect called victim at least 575 times over the affected period and at least 162 times since I can prove that the victim said 'do not call me anymore' (See text message of March 12, 2016). Victim called suspect at least 256 times and 32 times since he told her to stop calling him." Id. Agent Kinnard asked Attorney Rueda if she would prosecute the case and if there was enough to charge Radfar under Virginia's statute prohibiting "[u]se of profane, threatening or

14

indecent language over public airways or by other methods," a Class 1 misdemeanor. Id. ¶¶ 74-75; see also Ex. 18, Code of Virginia § 18.2-427 [Doc. No. 70-18].

Attorney Rueda emailed Agent Kinnard on March 28, 2017:

> Just finished reviewing all the materials. We do not have enough for telephone threats charges because I don't really see her making actual threats, it's all veiled. And the profanity doesn't fall under the legal definition of obscene under the Virginia Code or case law. Honestly, our best bet would be to potentially charge her with stalking, but it would be a real stretch, because he would have to be able to stay(sic) he has a reasonable fear of bodily injury or death to himself or a family member. Also, most of this behavior is occurring in Massachusetts. She is traveling up there to stalk him, has shown up at his work, says she is near his house and demands he meet her, and is receiving all the phone calls and text messages there. Has he sought a protection order in the Massachusetts courts or sought charges up there? If we get a misdemeanor warrant down here, there is no provision for the court to pay for him to fly down here at the General District Court level. Massachusetts has jurisdiction so it seems a much better plan to have her charged up there.

Pl.'s SUF ¶ 76 [Doc. No. 80]. In another email to Agent Kinnard, Attorney Rueda stated that she probably had enough to charge Radfar under Virginia's statute for "causing a telephone . . . or other device to ring or signal with intent to annoy," but that there was not much purpose in charging her with only a class 3 misdemeanor when Covino would have to travel to Virginia. Id. ¶ 77. She reiterated that Covino should pursue charges in Massachusetts, where the conduct was occurring. Id.

On May 5, 2017, Agent Kinnard met with Attorney Rueda who reported that she and the Commonwealth Attorney agreed that prosecution should not go forward and that Covino could try to apply for a permanent protective order against Radfar in Virginia. Id. ¶ 80. Agent Kinnard notified Lt. Ganley that the Commonwealth was not going to prosecute. Id.

K.    *Jason Ford's Abuse Prevention Order Against Radfar*

On December 3, 2017, Brockton, Massachusetts, police officer Jason Ford applied for an obtained an Abuse Prevention Order against Radfar in the Brockton District Court. Id. ¶ 104.

Like Covino, Ford also contacted the George Mason University Police Department about Radfar's conduct. Id. ¶ 106.[6]

## IV. Discussion

Radfar's Complaint asserts nine counts against Covino: equal protection violations for abuse of authority (Count I), selective prosecution (Count II), defamation (Count III), violations of the Massachusetts Civil Rights Act (Count IV), intentional infliction of emotional distress (Count V), conspiracy to violate civil rights (Count VII), refusal to prevent wrongs committed against Plaintiff (Count VIII), abuse of process (Count IX) and malicious prosecution (Count X). Covino seeks summary judgment as to all counts.

### A. Uncontested Causes of Action

#### 1. Selective Prosecution (Count II)

Radfar alleges that Covino's "repeated selective enforcement of the law . . . violated [her] rights to equal protection of the laws and the privileges and immunities of citizenship" enumerated in the Fifth and Fourteenth Amendments. Compl. ¶¶ 30 [Doc. No. 1]. Radfar did not address this count in her opposition to the summary judgment motion and, at the hearing on the

---

[6] Radfar alleges that Ford's Abuse Prevention Order, like Covino's, was based on false and misleading statements about her and that Ford's conduct also contributed to the loss of her job. Id. ¶¶ 105, 107. On January 6, 2021, Radfar submitted a letter of resignation to the George Mason University Police Department effective on that date. Id. ¶ 114. The details of Radfar's resignation from George Mason University's Police Department are subject to a Non-Disclosure Agreement she entered into which has not been made available to Defendants or this court. Further, at the summary judgment hearing, Radfar clarified that she is only seeking damages against Covino with regard to his role in the loss of her employment for the period between Covino's initial call to Lt. Ganley in January 2017 and December 3, 2017, the date of the Ford Abuse Prevention Order, though she also seeks ongoing damages against Covino for emotional and psychological distress. Because Radfar has conceded that she does not seek to recover for any loss of her employment after December 2017, and because she entered into an agreement to keep the details of her resignation confidential, the court does not consider any events between Radfar and the George Mason University Police Department that transpired after Officer Ford obtained his Abuse Prevention Order against Radfar.

16

motion, her counsel conceded that Radfar is no longer asserting a selective prosecution claim against Covino. Summary judgment as to Count II is therefore granted.

2. Section 1985 Conspiracy to Commit Wrongs (Count VII)

The court dismissed the conspiracy claim as to the other Defendants at the motion to dismiss stage, finding that "Plaintiff has failed to allege any facts tending to show the existence of a conspiracy among Covino, Arrigo, and Guido (or any configuration of two Defendants)." Mem. & Order 22 [Doc. No. 21]. Because Covino is the only remaining party discussed in Count VI, and because Radfar does not address the conspiracy claim in her opposition to Covino's pending summary judgment motion, the court grants summary judgment as to Count VI.

3. Section 1986 Refusal to Prevent Wrongs Committed Against Plaintiff (Count VII)

A claim under 42 U.S.C. § 1986 depends on the existence of a conspiracy under § 1985. See Hahn v. Sargent, 523 F.2d 461, 470 (1st Cir. 1975) ("[T]he dismissal of appellant's claim under § 1986 falls upon the rejection of his § 1985 claims."). Because the court has dismissed the § 1985 conspiracy claim for failure to demonstrate any facts tending to show a conspiracy between the Defendants, and because Radfar does not address this claim in her opposition to Covino's summary judgment motion, the court grants Covino summary judgment as to Count VIII.

B. *Contested Claims*

1. Section 1983 Equal Protection (Count I)

Plaintiff alleges under § 1983 that Covino violated the guarantees of equal protection under the Fifth and Fourteenth Amendments of the Constitution by (a) acting under the color of law to (b) initiate malicious proceedings against Radfar. Compl. ¶¶ 26-27 [Doc. No. 1]. Section 1983 creates a civil cause of action against an individual acting under color of state law

17

who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). Covino seeks summary judgment on the grounds that, at all times relevant to the Complaint, he acted not in his capacity as a Revere Police Officer, but as a private citizen. Def.'s Mem. 8 [Doc. No. 69]. Covino also contends that, regardless of whether he acted under color of law, there is no evidence that Radfar was denied a constitutional right by Covino. Id.

Plaintiff has offered no evidence from which a jury could find that Covino was acting under color of law rather than as a private citizen when he obtained the abuse prevention order. Covino's affidavit in support of his abuse prevention order complaint does not identify him as a law enforcement officer and mentions only that Radfar has visited his "place of work," without specifying that he worked at the Revere Police Department. Abuse Prevention Order Aff. [Doc. No. 70-7]. Further, he appeared at the abuse prevention order hearing while he was off-duty and out of uniform. During the hearing, Covino did reference "[his] police department" and stated that he and Radfar met at a police event, and after receiving the Order told the judge "[w]e miss you over in Chelsea," see Tr. of Abuse Prevention Order Hr'g [Doc. No. 79-1], but these statements do not suggest that Covino was acting under color of law rather than as a private citizen while obtaining the abuse prevention order. Accordingly, the court need not reach Radfar's claim that she was deprived of her constitutional rights to equal protection by Covino seeking (and obtaining) the Abuse Prevention Order.

Radfar also asserts that Covino "used his police power and department resources" in drafting his internal to file and incident report with the Revere Police Department and "made

18

much use of his use of police evidence gathering procedures," including "placing materials in the Revere Police Department evidence room and then having a detective who was his friend transmit them to Virginia State Police in an effort to establish the impression that the use of regular police procedures, professionalism and objectivity would lend credibility" to his allegations made in an effort to charge Radfar with a crime. Pl.'s Opp'n 12-13 [Doc. No. 81]. The court agrees that the evidence supports Radfar's claim that Covino was acting under color of law in writing up the internal to file and incident report. But Radfar can show no constitutional violation in connection with George Mason's investigation of her and its impact on her job.

Plaintiff has attempted to frame Covino's contact with George Mason University Police, the investigation, and her placement on administrative leave as an equal protection claim. But to succeed on an equal protection claim, a plaintiff must show that, as compared to others similarly situated, she was selectively treated and that such selective treatment was based on impermissible considerations. Latimore v. Trotman, 651 F.Supp.3d 366, 375 (D. Mass. 2023) (citing Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013)). "Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim[.]" Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32 (1st Cir. 2012) (citing Estate of Bennett v. Wainwright, 548 F.3d 155, 166 (1st Cir. 2008)).

There is no evidence in this record of any comparator against whom to judge Covino's treatment of Radfar and thus no evidence of actual disparate treatment. Radfar complains that Covino instigated a malicious and false campaign against her, but makes no allegation, nor is any supported by the record, that he singled her out in this treatment as compared to other similarly situated individuals. "An equal protection claimant may not prevail . . . simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a

discriminatory animus." <u>Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mortg.</u> <u>Fin. Corp.</u>, 246 F.3d 1, 10 (1st Cir. 2001) (internal citations omitted). Accordingly, the equal protection claim fails and summary judgment as to Count I is granted.

### 2. Violations of Massachusetts Civil Rights Act (Count IV)

Radfar asserts that Covino deprived her of rights under the Massachusetts Declaration of Rights, M.G.L. c. 12, § 11H, by means of intimidation and coercion. Compl. ¶ 37 [Doc. No. 1]. She claims that Covino "endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy." <u>Id.</u> She seeks relief under M.G.L. c. 12, § 11H "because [he] engaged in said threats, coercion and intimidation under color of law in violation of said statute" and § 1983. <u>Id.</u> ¶ 38.

"[U]nder the MCRA, . . . the plaintiff must identify a federal or state right that has been 'interfered with by threats, intimidation, or coercion.'" <u>Barbosa v. Conlon</u>, 962 F.Supp.2d 316, 332 (D. Mass. 2013) (quoting <u>Flesner v. Technical Commc'ns Corp.</u>, 410 Mas. 805, 818, 575 N.E.2d 1107 (1991)).

> A "[t]hreat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct.... ["Coercion" involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.

<u>Farrah ex rel Estate of Santana v. Gondella</u>, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (quoting <u>Planned Parenthood League of Mass., Inc. v. Blake</u>, 417 Mass. 467, 474, 631 N.E.2d 985 (1994)). Here, though Radfar asserts that Covino made "abusive threats" toward her, <u>see</u> Pl.'s Opp'n 2 [Doc. No. 81], she has offered no evidence that Covino's communications with her were intended to make her fearful or constrain her from doing what she was otherwise lawfully entitled to do. Without such evidence, no reasonable jury could find that Covino's behavior was

threatening, intimidating, or coercive as required for an MCRA claim. Accordingly, summary judgment as to Count VIII is granted.

### 3. Defamation (Count III)

Radfar claims Covino defamed her by making statements he knew to be false to her employer and others that she committed criminal acts. Compl. ¶¶ 32-34 [Doc. No. 1]. Radfar alleges that Covino's statements caused her to suffer grievous injury to her reputation and the loss of her ability to earn a living. Id. ¶ 35. Covino contends that summary judgment on Radfar's defamation claim is appropriate because (a) Covino's statements were protected petitioning behavior, and (b) protected or not, the statements were true. Def.'s Mem. 14 [Doc. No. 69].

Radfar's opposition does not address Covino's request for summary judgment on Count III for defamation other than to state generally that some of Covino's statements to George Mason University about Radfar were "false[,] misleading, humiliating and otherwise defamatory[.]" Pl.'s Opp'n 8 [Doc. No. 81]. At the hearing, however, Radfar's counsel took issue with two statements in particular: (1) Covino's statement in his affidavit in support of the complaint for an Abuse Prevention Order that Radfar forced him to have sex; and (2) Covino's statement in the Incident Report that Radfar committed the crime of criminal harassment under M.G.L. c. 265, § 43A. Radfar contends that both statements, because they are assertions that she committed a crime, are actionable as defamation per se.[7]

---

[7] During the hearing, Radfar's counsel also took issue with Covino's statements to the Lynn District Court that Radfar had called him thousands of times, when the Virginia State Police investigation concluded she called him 575 times. The court, reviewing the transcript of the abuse prevention hearing [Doc. No. 79-1] and Covino's affidavit in support of the Abuse Prevention Order complaint, could not find any allegation made by Covino that Radfar called him "thousands" of times. Nonetheless, even if Covino had told the judge that Radfar called him thousands of times, this discrepancy would not be material when it is undisputed that Radfar called Covino at least 575 times.

Under Massachusetts law, to survive a motion for summary judgment for defamation, a plaintiff must establish that "(1) the defendant published a false statement regarding the plaintiff—that is, the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss." Flagg v. AliMed, Inc., 466 Mass. 23, 37, 992 N.E.2d 354 (2013); see also Brauer v. Globe Newspaper Co., 351 Mass. 53, 55-56, 217 N.E.2d 736 (1966) (quoting Muchnick v. Post Pub. Co., 332 Mass. 304, 306, 125 N.E.2d 137 (1955)) ("A publication is defamatory when it tends to injure one's reputation in the community and to expose him to hatred, ridicule, and contempt"). A false statement that an individual has committed a crime is defamatory per se and is actionable without proof of economic loss. See Shafir v. Steele, 431 Mass. 365, 373, 727 N.E.2d 1140 (2000).

### a. Statements Made in Pursuit of Abuse Prevention Order

Radfar contends that Covino's statement that she forced him to have sex is defamatory per se because it is an accusation of sexual assault. It is undisputed that Covino wrote that Radfar had used threats to force him into sexual relations in his affidavit in support of his Abuse Prevention Order Complaint and that, if false, such an allegation is defamatory per se so long as it is actionable. But the only place that the allegation of sexual assault appears in the record is in the affidavit Covino submitted to the Lynn District Court, and Massachusetts law provides an absolute privilege against defamation for statements made by a witness or party in judicial proceedings. See Correllas v. Viveiros, 410 Mass. 314, 321, 572 N.E.2d 7 (1991); see also Sriberg v. Raymond, 370 Mass. 105, 108, 345 N.E.2d 882 (1976). Because Covino only made the statement about sexual assault in the affidavit submitted to the Lynn Dsitrict Court, that

statement is not actionable. Accordingly, to the extent Radfar's defamation claim depends on that statement, summary judgment on Count III is granted.

> b.    Statements made in Covino's Incident Report

Radfar also contends that the Incident Report authored by Covino that lists Radfar as the suspect for an offense of criminal harassment under M.G.L. c. 265, § 43A, is defamatory per se because it falsely accuses Radfar of committing a crime. Section 43A criminalizes whoever willfully and malicious engages in a "knowing pattern of conduct or series of acts" over a period of time and directed at a specific person, "which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress." M.G.L. c. 265, § 43A. The conduct covered by § 43A includes, but is not limited to, conduct or acts conducted via telephone or the internet. Id.

Generally speaking, "defamatory statements are not punishable unless they are capable of being proved true or false." Pan Am Sys., Inc. v. Atlantic Northeast Rails and Ports, Inc., 804 F.3d 59, 65 (1st Cir. 2015). Radfar has offered no evidence that the statement in Covino's Incident Report that she criminally harassed him is untrue, nor were her counsel's arguments regarding criminal harassment at the motion hearing persuasive. For example, Radfar's counsel contended at the hearing that culpability under M.G.L. c. 265, § 43A, requires that the acts directed at a victim are threats of physical or bodily harm. But while the statute is directed to conduct "which seriously alarms" the victim and is of such a nature that would cause a reasonable person "to suffer substantial emotional distress," id., a threat of physical or bodily harm is not a requirement of criminal harassment under § 43A.[8] Counsel also argued that

---

[8] Criminal stalking, M.G.L. c. 43, in contrast, does require a threat with intent to place a person in imminent fear of death or bodily injury, but Covino did not allege criminal stalking.

Covino's statement that Radfar criminally harassed him was defamatory because the criminal investigation based on that accusation cleared Radfar. This is not accurate. The Virginia State Police investigation, which did consider as part of its record Covino's Incident Report, resulted in a decision not to press charges against Radfar in Virginia. It did not, however, conclude that Radfar had committed no wrongdoing. The fact that the investigation did not result in criminal charges does not mean that Radfar's conduct did not meet the requirements of § 43A. Accordingly, summary judgment for Covino is granted on Count III in its entirety.

4.   Intentional Infliction of Emotional Distress (Count V)

Radfar alleges that Covino's "acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon [her]." Compl. ¶ 40 [Doc. No. 1]. She further alleges that that misconduct caused her to experience stomach problems, weight loss, nightmares, anxiety, and fear of police officers. Id. ¶ 41.

"Massachusetts law imposes liability for intentional infliction of emotional distress when the defendant has engaged in extreme and outrageous conduct, without privilege, causing the plaintiff severe emotional distress." Gill v. United States, 588 F. Supp. 3d 134, 139 (D. Mass. 2022) (citing Limone v. United States, 579 F.3d 79, 91 (1st Cir. 2009)). Finding extreme and outrageous conduct requires the conduct be "beyond all bounds of decency and . . . utterly intolerable in a civilized community." Sena v. Commonwealth, 417 Mass. 250, 263, 629 N.E.2d 986 (1994).

Though Radfar does not identify the particular conduct of Covino's she believes rises to the level of "extreme and outrageous," the court considers the combination of Covino allegedly omitting certain evidence from materials provided to George Mason University and Virginia State Police during their investigation and making false or exaggerated statements about Radfar

24

to her employer, the Lynn District Court, and Virginia State Police. But even if Radfar proves

these allegations, no reasonable jury could find that that conduct rises to the level of "extreme

and outrageous" in light of the undisputed evidence that Radfar relentlessly called and texted

Covino and Covino sought the abuse prevention order and contacted Radfar's employer only

after she refused his requests to stop.

Accordingly, summary judgment in favor of Covino on Radfar's intentional infliction of

emotional distress claim (Count V) is granted.

### 5.  Abuse of Process (Count IX)

Radfar alleges that Covino was not entitled to an Abuse Prevention Order against her and

that, nonetheless, Covino maliciously sought such an order to exact revenge against Radfar.

Compl. ¶ 53 [Doc. No. 1]. She contends that this conduct constituted an abuse of process that

caused her humiliation, embarrassment, anguish, loss of reputation in her community, and loss of

her career. Id. ¶ 54-55.

In Massachusetts, a party claiming abuse of process must show (1) that "process" was

used against him, (2) for an "ulterior or illegitimate purpose," and (3) that he was damaged as a

result. Psy-Ed Corp. v. Klein, 459 Mass. 697, 713, 947 N.E.2d 520 (2011). "[I]n the context of

abuse of process, 'process' refers to the papers issued by a court to bring a party or property

within its jurisdiction." Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389-390, 340

N.E.2d 484 (1975) (finding process was that used by the defendant to institute its suit seeking a

preliminary injunction, and not the injunction prohibiting picketing subsequently issued by the

court). "To sustain the claim, 'the fact finder must find that process was used to accomplish some

ulterior purpose for which it was not designed or intended, or which was not the legitimate

purpose of the particular process employed." Psy-Ed Corp., 459 Mass. at 713. "More

specifically, abuse of process has been described as a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'" Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406, 30 N.E.2d 325 (2000) (quoting Cohen v. Hurley, 20 Mass. App. Ct. 439, 442, 480 N.E.2d 658 (1985)).

Radfar claims that Covino pursued the Abuse Prevention Order "with the ulterior motive of exacting revenge against [her] and destroying her career and her life." Compl. ¶ 54 [Doc. No. 1]. She contends that Covino "was [] never fearful of her" as required for a 209A order and that the petition was "calculated," "target[ed,]" and based on false statements to the judge. Pl.'s Opp'n 16 [Doc. No. 81]. She also argues that Covino "us[ed] [] the Massachusetts order to ruin her career and seek out of state criminal charges against her." Id. Taking the facts in the light most favorable to Radfar, the court finds these assertions as to Covino's motivation unsupported by the evidentiary record.

First, even accepting Plaintiff's argument that Covino may have exaggerated any fear of physical harm that he may have had, Covino's deposition testimony that his "only concern" in taking action against Radfar's harassment "was having her stay away from [him]," Tr. of Covino Dep. 31 [Doc. No. 70-9], is uncontradicted.

Second, there is ample, uncontradicted evidence in the record that Covino did *not* intend to destroy Radfar's life or her career by seeking to stop her harassment. In his affidavit, Covino asserts that at no point did he seek to have the defendant charged with criminal activity. Id. At his deposition, Covino testified that, when he contacted Lt. Ganley about Radfar's conduct, "I only wanted to—I didn't want to cause her to lose her job. I certainly didn't want to have a restraining order against her, and I did everything I could not—so that wouldn't happen." Tr. of Covino Dep. 20 [Doc. No. 70-9]. Further, it is undisputed that Covino let the Abuse Prevention

26

Order lapse after two weeks. Covino testified that he allowed the Order to lapse "so that the plaintiff's employment was not negatively impacted by her inability to possess a firearm." Covino Aff. ¶ 19 [Doc. No. 70-14]. While the record suggests that Chief Rowan and George Mason University Police may have used the Abuse Prevention Order for their own purposes, nothing in the record suggests that this was Covino's motivation.

Despite her assertions that Covino had an ulterior motive in seeking an Abuse Prevention Order against her, Radfar proffers no evidence to support those claims. Though the court is required to view the facts in the light most favorable to the non-movant on a summary judgment motion, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings," Anderson, 477 U.S. at 256, but most "go beyond the pleadings" and present her own evidence to demonstrate a genuine dispute of material fact for trial. Celotex, 477 U.S. at 324. The court finds that Radfar has not met that burden here and that, based on the admissible evidence in the record, no jury could find that Covino sought an Abuse Prevention Order for a purpose for which it was not designed or intended. Accordingly, summary judgment on the abuse of process claim (Count VIII) is granted in Covino's favor.

      6.  Malicious Prosecution (Count X)

Radfar's malicious prosecution allegations are based on two categories of conduct. The first is Covino's actions related to and in support of George Mason University's and the Virginia State Police investigations into Radfar's conduct. The second is Covino's actions in pursuit of the Abuse Prevention Order he obtained in Massachusetts. The court addresses each in turn.

      a.  Virginia Investigations

Radfar brings her malicious prosecution claim under federal law via § 1983 based on Covino's actions taken under color of law as a police officer in filing an Incident Report against Radfar[9] and providing information to Virginia authorities, which resulted in the unreasonable seizure of her firearms in violation of the Fourth Amendment.[10]

Central to a successful malicious prosecution claim is establishing that legal process was initiated against the claimant. See Nieves, 241 F.3d at 54 (an arrest without an arrest warrant is without "legal process" and therefore insufficient for malicious prosecution claim). "The common-law cause of action for malicious prosecution . . . permits damages for confinement imposed pursuant to legal process." Heck v. Humphrey, 512 U.S. 477, 484 (1994). "The interest at stake in a malicious prosecution claim is the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir 1995); see also Chervin v. Travelers Ins. Co., 448 Mass. 95, 102-03, 858 N.E.2d 746 (2006) ("The tort [of malicious prosecution] 'is not confined to the wrongful initiation of criminal proceeding; it may be maintained for the unjustifiable initiation of a civil action.'"). Here, Radfar has not been subject to civil or criminal legal process and has thus not stated a cognizable claim for malicious prosecution.

---

[9] To succeed on a § 1983 malicious prosecution claim, a plaintiff must show both a "garden variety claim of malicious prosecution," Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996), plus "a deprivation of a federally-protected right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). The elements of a common law action for malicious prosecution are: (1) commencement or continuation of a criminal proceeding against the plaintiff at the behest of the defendant; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the charges; and (4) actual malice. Id.

[10] To state a claim for malicious prosecution resulting in unreasonable seizure, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupportable by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

28

It is undisputed that Virginia declined to prosecute Radfar following its investigation into her conduct and that no criminal charges were ever brought against Radfar in Virginia or Massachusetts. The court has found no Massachusetts or federal case, and Radfar cites to none, where a malicious prosecution claim was sustained based solely on an investigation that did not result in a criminal complaint or charges. To the contrary, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." Correllas, 410 Mass. at 318. Accordingly, summary judgment is granted on Count X to the extent it depends on Covino's actions related to the Virginia State Police investigation.

              b.      Abuse Prevention Order

Radfar also alleges that Covino maliciously prosecuted her by abusing his position as a police officer to obtain an Abuse Prevention Order against her. A successful § 1983 claim requires a claimant to demonstrate that the defendant was acting "under color of law" by acting in an official capacity or exercising official responsibilities pursuant to state law. See Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995) ("[W]hether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."). As discussed above, Covino did not appear at the Abuse Prevention Hearing in uniform, was off-duty at the time, and did not go out of his way to identify himself as a police officer or make reference to his law enforcement position. Plaintiff has not offered evidence to support her claim that Covino was acting under color of state law, so his actions with regard to the Abuse Prevention Order hearing are not actionable under § 1983.

29

Accordingly, Covino's motion for summary judgment as to Radfar's malicious prosecution claim (Count X) is granted.

## V.      Conclusion

For the foregoing reasons, Defendant Joseph I. Covino's <u>Motion for Summary Judgment</u> [Doc. No. 68] is GRANTED.

IT IS SO ORDERED.

December 5, 2024                              /s/Indira Talwani
                                              United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHARON RADFAR,                          *
                                        *
          Plaintiff,                    *
                                        *
     v.                                 *          Civil Action No. 1:20-cv-10178-IT
                                        *
CITY OF REVERE, BRIAN M. ARRIGO,        *
individually and in his official capacity as *
Mayor, JAMES GUIDO, individually and    *
in his official capacity as Chief of Police, *
JOSEPH I. COVINO, individually and in   *
his official capacity as Police Sergeant, and *
OTHER AS YET UNNAMED OFFICERS           *
OF THE REVERE POLICE                    *
DEPARTMENT, individually and in their   *
official capacities as police officers, *
                                        *
          Defendants.                   *

MEMORANDUM AND ORDER

September 9, 2021

TALWANI, D.J.

In this action, Plaintiff Sharon Radfar brings civil rights and tort claims against

Defendant Police Officer Joseph Covino, the City of Revere, Revere Mayor Brian M. Arrigo,

former Revere Police Chief James Guido, and other unnamed officers of the Revere Police

Department. Complaint ("Compl.") [#1].[1] Before the court are Covino's omnibus Motion and

Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint in its Entirety

Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Motion and

Memorandum of Law in Support of Motion to Dismiss and Motion for Costs and Reasonable

Attorney's Fees Pursuant to Massachusetts General Laws c. 231 [#9] ("Covino's Mot.") and City

of Revere, Brian M. Arrigo, and James Guido's (the "Revere Defendants") Motion to Dismiss

---

[1] Covino, Arrigo, and Guido are sued individually and in their official capacities.

[#18]. For the reasons that follow, Covino's <u>Motion</u> [#9] is DENIED and the Revere Defendants' <u>Motion</u> [#18] is ALLOWED.

I. <u>Background</u>

   A. <u>Facts as Alleged</u>

    The following facts are drawn from the <u>Complaint</u> [#1], the well-pleaded allegations of which are taken as true for the purposes of evaluating a motion to dismiss. <u>See</u> <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).

    Plaintiff Sharon Radfar is a former George Mason University police officer. Compl. ¶¶ 6, 19 [#1].

    Defendant Brian M. Arrigo is the Mayor of the City of Revere. <u>Id.</u> at ¶ 2.

    Defendant James Guido was Chief of the Revere Police Department at the time of the alleged events. <u>Id.</u> at ¶ 3.

    Defendant City of Revere is a government entity organized under the laws of the Commonwealth of Massachusetts. <u>Id.</u> at ¶ 5.

    Defendant Joseph Covino is a police officer with the Revere Police Department in Revere, Massachusetts, and, during the events alleged in the <u>Complaint</u> [#1], was a sergeant. <u>Id.</u> at ¶ 4.

    In January 2017, Covino created an incident report in the Revere Police Department system which included false allegations concerning Plaintiff's behavior towards him and others. <u>Id.</u> at ¶¶ 12, 57. In this incident report, Covino identified himself as the victim, the reporting officer, and the supervising officer approving the report. <u>Id.</u> at ¶ 12.

Also in January 2017, Covino filed a false and misleading Complaint for Protection from Abuse in Lynn District Court in Massachusetts and appeared for a hearing before a Lynn District Court judge. Id. at ¶¶ 7, 8. Covino falsely told the Lynn District Court judge that Plaintiff had threatened him and placed him in imminent fear of physical harm when she had done nothing of the kind; Covino also misrepresented messages and calls exchanged between Plaintiff and Covino and failed to disclose other pertinent information to the Lynn District Court judge. Id. at ¶ 7. Following this hearing, the Lynn District Court judge issued an Abuse Prevention Order. Id. at ¶¶ 6, 7.

Around the same time, Covino contacted Plaintiff's employer and falsely alleged Plaintiff had engaged/was engaging in criminal conduct. Id. at ¶¶ 6, 9.

On January 31, 2017, four uniformed officers seized Plaintiff's service weapons and gave her the Abuse Prevention Order and a letter from her employer informing her she was suspended pending an investigation of Covino's allegations of criminal conduct. Id.

Later, following a hearing attended by Plaintiff and Covino, the Lynn District Court judge vacated the Abuse Prevention Order and ordered Plaintiff's weapons returned. Id. at ¶¶ 11, 16.

Covino also contacted Virginia law enforcement entities and falsely alleged that Plaintiff had engaged in criminal conduct, id. at ¶¶ 10, 16; Defendant did not inform Virginia investigators that the Abuse Prevention Order was vacated. Id. at ¶ 17. As a result of these investigations, Plaintiff's private telephone records were the subject of a search warrant. Id. at ¶ 15.

Plaintiff later lost her job as a George Mason University police officer. Id. at ¶ 11.

3

Plaintiff was not charged with any crimes in Virginia or Massachusetts related to Covino's allegations. Id. at ¶ 16.

B. Procedural Background

Plaintiff's Complaint [#1] concerns events she alleges occurred in 2017. On January 29, 2020, Plaintiff filed her Complaint [#1] asserting claims of abuse of process (Count IX) and malicious prosecution (Count X) against Defendant Covino only, id. at ¶¶ 52-59; deliberate indifference to the need for training (Count VI) against the Revere Defendants only, id. at ¶¶ 42-43; and claims against all Defendants for: (1) violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution to equal protection under law (Count I); (2) violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution by selective prosecution and enforcement based on gender and national origin bias (Count II); (3) defamation (Count III); (4) deprivation of civil rights through intimidation and coercion in violation of the Massachusetts Civil Rights Act (Count IV); (5) intentional infliction of emotional distress (Count V); (6) conspiracy to violate Plaintiff's civil rights under 42 U.S.C. §§ 1985(2) & (3) (Count VII); and (7) refusal to prevent wrongs committed against Plaintiff under 42 U.S.C. § 1986 (Count VIII), id. at 7-12.

The Revere Defendants moved to dismiss the counts directed towards them pursuant to Fed. R. Civ. P. 12(b)(6). Revere Defs.' Mot. Dismiss [#18].

Covino moved to dismiss the Complaint [#1] and for costs and attorney's fees pursuant to Mass. Gen. Laws ch. 231 § 59H (the "Massachusetts anti-SLAPP law") and also moved to dismiss the Complaint [#1] pursuant to Fed. R. Civ. P. 12(b)(6) and for summary judgment pursuant to Fed. R. Civ. P. 56. Covino's Mot. [#9]. Covino's Attachment A [#9-1] includes:

4

Covino's Complaint for Protection from Abuse; Covino's affidavit describing the facts he alleges

led him to file the Complaint for Protection from Abuse; the Abuse Prevention Order; and the

Order terminating the Abuse Prevention Order. Attachment B [#9-2] is an affidavit detailing

Covino's account of the relationship between Covino and Plaintiff; the actions Covino took in

Lynn District Court and in contacting law enforcement and Plaintiff's employer; and Covino's

reasons for taking those actions.

Plaintiff opposed both motions, see Opposition [#10], [#19], and filed a Statement of

Undisputed Facts [#11], her Affidavit [#13], and additional evidentiary material with her

Opposition [#10] to Covino's Motion [#9].

The court begins with Covino's anti-SLAPP suit motion, then turns to the motions to

dismiss under Federal Rule of Civil Procedure 12(b)(6), and finally to Covino's motion for

summary judgment under Federal Rule of Civil Procedure 56.

## II.  Covino's anti-SLAPP Suit Motion

Covino argues his "conduct in seeking relief from abuse from the court system, in

contacting [Plaintiff's] employer, and then later speaking with a member of the Virginia State

Police, were all protected petitioning under [Massachusetts'] anti-SLAPP statute." Covino's

Mot. 12 [#9]. He contends that because a reasonable person could conclude he had a legal basis

for his petitioning activity, his activity is protected by Massachusetts' anti-SLAPP law, and

Plaintiff's Complaint [#1] should be dismissed in its entirety. Id. at 14.

Plaintiff argues that the Massachusetts anti-SLAPP statute does not apply in federal court

because it is a procedural rule, Opp'n to Covino's Mot. 6 [#10], and that in any event, Covino is

not entitled to the anti-SLAPP statute's protection because Plaintiff's action was not brought to chill his protected petitioning activity, id. at 7-9.

A. <u>Massachusetts Anti-SLAPP Statute Applies to Massachusetts Claims in Federal Court</u>

In <u>Godin v. Schencks</u>, the First Circuit concluded that the burden of proof allocation in Maine's anti-SLAPP statute was a substantive provision, and thus applicable to pendant state claims in federal court. 629 F.3d 79, 88-89 (1st Cir. 2010). The Court also found Maine's anti-SLAPP statute "is only addressed to special procedures for state claims based on a defendant's petitioning activity" and not "general federal procedures governing all categories of cases" and is not covered by Federal Rules of Civil Procedure 12(b)(6) or 56. Id. at 88. The Court then found that because the Maine anti-SLAPP statute is "'so intertwined with a state right or remedy [ ] it functions to define the scope of the state-created right[,]' it cannot be displaced by Rule 12(b)(6) or Rule 56." Id. at 89 (quoting <u>Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 423 (2010) (Stevens, J. concurring)).

Massachusetts' anti-SLAPP statute is "in all relevant respects the same as the Maine anti-SLAPP statute." <u>Steinmetz v. Coyle & Caron, Inc.</u>, Civ. No. 15-13594-DJC, 2016 WL 4073135, at *3 (D. Mass. July 29, 2016); <u>see also</u> <u>de Lench v. Archie</u>, 406 F. Supp. 3d 154, 157-58 (D. Mass. 2019). Accordingly, Massachusetts' anti-SLAPP statute applies to Plaintiff's Massachusetts claims.

B. <u>Standard</u>

Following state law, the court "'first [ ] decide[s] . . . whether to grant' the anti-SLAPP motion before deciding other grounds for dismissal." <u>De Lench</u>, 406 F. Supp. 3d at 158 (quoting <u>Kobrin v. Gastfriend</u>, 443 Mass. 327, 340-41, 821 N.E.2d 60 (2005)).

"The anti-SLAPP statute, which is intended to protect the constitutional right to petition from the burden of meritless lawsuits, provides for a special motion to dismiss so that courts can 'dispose expeditiously of meritless lawsuits that may chill petitioning activity.'" Id. (quoting Town of Hanover v. New England Reg'l Council of Carpenters, 467 Mass. 587, 594, 6 N.E.3d 522 (2014)).

> Once the defendant "make[s] a threshold showing through the pleadings and affidavits that the claims against it are based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities," "the burden shifts to [plaintiff] to demonstrate by a preponderance of the evidence that [defendant's] petitioning activity was devoid of any reasonable factual support or any arguable basis in law."

Id. (quoting first Duracraft Corp. v. Holmes Prod. Corp., 427 Mass. 156, 167, 691 N.E.2d 935 (1998) and then Fabre v. Walton, 436 Mass. 517, 520, 766 N.E.2d 780 (2002)).

> The anti-SLAPP statute defines a party's exercise of its right to petition broadly to include: "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 147-48, 75 N.E.3d 21 (2017) (quoting Mass. Gen. Laws ch. 213, § 59H).

If the nonmoving party "can establish that its claim was not 'brought primarily to chill' the special movant's legitimate exercise of its right to petition[,]" the special motion to dismiss will be denied. Id. at 144-45 (quoting Duracraft, 427 Mass. at 161).

C. Analysis

1. Are Plaintiff's State Law Claims Based Only on Petitioning Activity?

Counts III, IV, and V (defamation, Massachusetts Civil Rights Act ("MCRA"), and intentional infliction of emotional distress claims) are all based at least in part on statements Covino allegedly made to Plaintiff's employer. See Compl. ¶¶ 32, 37, 40 [#1]. Statements made to Plaintiff's employer are not constitutionally protected petitioning activity and, thus, Counts III, IV, and V are not based solely on petitioning activity.

Count IX alleges Covino abused process in seeking an Abuse Prevention Order because he knew "he was not entitled to" one, id. at ¶ 53, and Count X alleges Covino "acting under color of law drafted and pursued criminal reports and paperwork consisting of his knowingly false statements accusing Plaintiff of criminal acts," id. at ¶ 57. Because these counts arose from Covino's petitioning activities before the Lynn District Court, Covino has met his initial burden as to Count IX and Count X.[2]

2. Has Plaintiff Met Her Burden?

In Blanchard, the Supreme Judicial Court, concerned that a special movant could prevail where his "legitimate petitioning activity forms the basis of a meritorious adverse claim that is not primarily geared toward chilling such petitioning," added a means for a non-movant to defeat an anti-SLAPP motion by showing that "each claim was not primarily brought to chill the special movant's legitimate petitioning activity." 447 Mass. at 157, 160. To do so, a plaintiff

> must establish, such that the motion judge can conclude with fair assurance, that
> [the plaintiff's] primary motivating goal in bringing its claim[s] . . . was not to
> interfere with and burden defendants' . . . petition rights, but to seek damages for

_____

[2] Counts I, II, VII, and VIII are federal claims, and accordingly, are not subject to Massachusetts Anti-SLAPP statute. Count VI is brought against the Revere Defendants only.

the personal harm to [plaintiff] from [the] defendants' alleged [legally transgressive] acts.

Id. at 160 (internal citation and quotation omitted). Accordingly, the court turns to whether Plaintiff can satisfy her burden as to Counts IX and X.

Plaintiff asserts that Covino's activity was improper and amounted to an abuse of process and malicious prosecution, where Covino's statements were false and where Covino knew Plaintiff did not commit the crimes he accused her of committing. A person subject to false and malicious petitioning activity is not precluded from seeking damages for personal harm caused by such activity. Because Plaintiff waited until the conclusion of the actions undertaken by the government as a result of Covino's petitioning activity, Plaintiff's Complaint [#1] did not interfere with Covino's petitioning activity. In assessing the totality of the circumstances "pertinent to the [Plaintiff's] asserted primary purpose in bringing [her] claim[s]," the court finds Plaintiff has demonstrated that she brought these claims to vindicate her own rights, not to infringe on Covino's petitioning rights, and moreover, has offered some reasonable possibility of a favorable result. Id. Accordingly, Defendant Covino's Special Motion is denied.

III. Motions to Dismiss

A. Legal Standard

To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009).

Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," do not suffice to state a cause of action. <u>Id.</u> at 678. Accordingly, a complaint does

not state a claim for relief where the well-pleaded facts fail to warrant an inference of anything

more than the mere possibility of misconduct. <u>Id.</u> at 679.

　　　In evaluating a motion to dismiss, the court assumes "the truth of all well-pleaded facts"

and draws "all reasonable inferences in the plaintiff's favor." <u>Nisselson v. Lernout</u>, 469 F.3d

143, 150 (1st Cir. 2006). "[A] judge can mull over 'documents incorporated by reference in [the

complaint], matters of public record, and other matters susceptible to judicial notice,'" <u>Lydon v.</u>

<u>Local 103, Int'l Bhd. Of Elec. Workers</u>, 770 F.3d 48, 53 (1st Cir. 2014) (quoting <u>Giragosian v.</u>

<u>Ryan</u>, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original), but may not consider other

materials beyond the pleadings. "If, on a motion under Rule 12(b)(6) . . . , matters outside the

pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment." Fed. R. Civ. P. 12(d).

　　B. <u>Revere Defendants' Motion to Dismiss</u>

　　　1.　Claims under 42 U.S.C. § 1983

　　　Section 1983 creates a civil cause of action against an individual acting under color of

state law who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under

section 1983 has two essential elements. First, the challenged conduct must be attributable to a

person acting under color of state law" and "second, the conduct must have worked a denial of

rights secured by the Constitution or by federal law." <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st

Cir. 1997).

A municipality will only be held liable under § 1983 "where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original).[3] In order to find a municipality liable, the court must find that: (1) the plaintiff's harm was caused by a constitutional violation, and (2) the city was responsible for that harm. Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005). Under Monell v. Department of Social Services of City of New York, a municipality may be held liable under section 1983 where an "action pursuant to official municipal policy of some nature causes a constitutional tort." 436 U.S. 658, 691 (1978). Only where a policy or custom of a municipality evinces a "deliberate policy indifference" to individuals constitutional rights is it actionable under § 1983. City of Canton, 489 U.S. at 389.

"Public officials may be held liable under § 1983 for a constitutional violation only if a plaintiff can establish that his or her constitutional injury 'resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.'" Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting Rodríguez–García v. Miranda–Marín, 610 F.3d 756, 768 (1st Cir. 2010)). Section 1983 liability

---

[3] To the extent the individual Defendants are sued in their official capacities, these claims are the same as the claims against the City of Revere. See Saldivar v. Pridgen, 91 F. Supp. 3d 134, 137 (D. Mass. 2015) ("Under both Massachusetts and federal law, a claim against the chief of a municipal department in his official capacity is a claim against the municipality itself." (citing Murphy v. Town of Natick, 516 F. Supp. 2d 153, 158 (D. Mass. 2007)).

cannot rest solely on a defendant's position of authority. See Ayala-Rodriguez v. Rullán, 511 F.3d 232, 236 (1st Cir. 2007).

    a.  Equal Protection (Counts I and II)

Plaintiff alleges in Counts I and II that the Revere Defendants violated a duty under the Fifth and Fourteenth Amendments of the United States Constitution to "enforce the protection of the laws equally" when "Defendants endeavored to assist Covino in obtaining an advantage over [Plaintiff] in his civil proceedings[.]" Compl. ¶¶ 26-27 [#1]. Plaintiff also alleges "Defendants' repeated selective enforcement of the law for the benefit of Covino and as his agents violated Plaintiff's right to equal protection of the laws and the privileges and immunities of citizenship[.]" Id. at ¶ 30.

The Revere Defendants argue the equal protection counts should be dismissed for three reasons: (1) the Complaint [#1] lacks any facts "supporting the assertion" that a municipal policy caused her to be treated differently from similarly situated people "in connection with the abuse prevention proceedings" or that the municipality "was in any way the moving force behind any such constitutional violation"; (2) Plaintiff failed to identify instances where similarly situated persons were treated differently; and (3) Plaintiff failed to allege any facts "explaining Arrigo or Guido's role in the alleged constitutional violation sufficient to make them plausible defendants." Revere Defs.' Mot. Dismiss 8 [#18].

Plaintiff contends she has adequately alleged a Monell violation and that the Revere Defendants' actions represented official policy. Opp'n to Revere Defs.' Mot. Dismiss 11-14 [#19]. She asserts further that she is a female of Iranian descent and that the Revere Defendants

"violated her rights by treating her differently than similarly situated male and non-Iranian persons." Id. at 3.

The Equal Protection Clause "contemplates that similarly situated persons are to receive substantially similar treatment from their government." Tapalian v. Tuniso, 377 F.3d 1, 5 (1st Cir. 2004) (citation omitted).

> An equal protection claim requires "proof that (1) the person, compared with other similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995)). Whether individuals are similarly situated for equal protection purposes is not "always susceptible to precise demarcation" but turns on "whether a prudent person, looking objectively at the instances, would think them roughly equivalent and the protagonists similarly situated." Tapalian, 377 F.3d at 6 (quoting Barrington Cove Ltd. P'ship v. Rhode Island Housing and Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).

Plaintiff fails to identify any similarly situated individuals. Without identifying similarly situated individuals, Plaintiff also fails to plausibly allege she was treated differently in violation of her right to equal protection. Plaintiff's conclusion that, "[a]ll Defendants treated this woman of Iranian descent differently than they would have a man and a person of European descent due to their gender and national origin animus," Compl. ¶ 18 [#1], is unsupported by factual allegations and is insufficient to state an equal protection claim under Section 1983. "An equal protection claimant may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by

13

discriminatory animus." Barrington Cove, 246 F.3d at 10 (alteration in original) (citation

omitted); see also Schofield v. Clarke, 769 F. Supp. 2d 42, 48 (D. Mass 2011) (dismissing equal

protection claim where the plaintiff "fail[ed] to set forth any facts showing that he was treated

differently from others who were similarly situated").[4] For these reasons, the equal protection

claims against the Revere Defendants are dismissed.

      b.  Deliberate Indifference to Need for Training (Count VI)

Count VI alleges the Revere Defendants acted with deliberate indifference to the

unconstitutional inadequacies in their training, supervision, and discipline of Covino and other

unnamed officers. Compl. ¶¶ 42-43 [#1].

The Revere Defendants argue this claim against the City of Revere should be dismissed

because (1) there are no allegations the City knew, or should have known, the relevant training

was inadequate and was still deliberately indifferent to the consequences and (2) Plaintiff alleged

Covino acted intentionally and, thus, any failure by the City of Revere to properly train Covino

cannot be the "moving force behind the alleged violation of Plaintiff's rights." Revere Defs.'

Mot. Dismiss 11 [#18] (citing Connick v. Thompson, 563 U.S. 51, 59 n.5 (2011); Hayden v.

Grayson, 134 F.3d 449, 457 n.14 (1st Cir. 1998)). As to Arrigo and Guido, the Revere

Defendants argue Plaintiff failed to show a causal link between Arrigo or Guido's conduct and

Covino's violative act or omission. Id. at 11-12.

---

[4] To the extent Plaintiff is alleging a class of one claim, the claim is still foreclosed where the Complaint [#1] fails to identify peers with whom to compare Plaintiff. Freeman, 714 F.3d at 38 (reiterating that "class-of-one claims require an extremely high degree of similarity between [the plaintiff] and the person to whom they compare themselves") (quotation and citation omitted).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61. "Only if the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact, and is closely related to, or the moving force behind, the constitutional injury, can the claim against the municipality prevail." Hayden, 134 F.3d at 456 (emphasis in original) (internal quotations and citations omitted).

Plaintiff argues that the Revere Defendants "knew well [Covino's] history of misconduct and that they failed to train and discipline him with regard to that." Opp'n to Revere Defs.' Mot. Dismiss 3 [#19]. While the Complaint [#1] does allege the Revere Defendants knew of Covino's conduct and failed to discipline and train him, Plaintiff includes no factual allegations supporting this conclusion. Plaintiff also failed to allege any facts concerning whether Arrigo or Guido even knew of Covino's alleged conduct at issue here. Plaintiff's allegations that the Revere Defendants failed to adequately train, or supervise Covino fail to plausibly allege a claim upon which relief can be granted and the court dismisses this count.

2. Tort Claims

Plaintiff brings tort claims for defamation and intentional infliction of emotional distress against the Revere Defendants.

In the defamation count, Plaintiff alleges Defendants (she does not specify which Defendants) "indicated to Plaintiff's employer and others that she had committed criminal acts," while knowing she had "not violated any laws nor committed any crime." Compl. ¶¶ 32-33 [#1]. In the intentional infliction of emotional distress count, Plaintiff alleges "Defendants' acts and

15

omissions constituted outrageous conduct and intentionally inflicted emotional distress upon Plaintiff." Id. at ¶ 40.

The Revere Defendants argue Plaintiff's claims for defamation and intentional infliction of emotional distress fall under the Massachusetts Tort Claims Act ("Tort Claims Act") and, due to lack of presentment and the City's immunity from liability for intentional torts, both claims should be dismissed as to the City. Also, because Plaintiff has alleged no facts upon which these claims can be plausibly inferred as to Arrigo and Guido, the claims should also be dismissed as to them.

In response, Plaintiff argues that her tort claims are not subject to the presentment requirements of the Tort Claims Act. Opp'n to Revere Defs.' Mot Dismiss 6-7 [#19] (citing Robinson v. Commonwealth, 32 Mass. App. Ct. 6, 584 N.E.2d 636 (Mass. App. Ct. 1992); Richardson v. Dailey, 424 Mass. 258, 259, 675 N.E.2d 787 (1997)). Plaintiff also contends that even if her claims required presentment, the Revere Defendants do not have immunity for intentional torts. Id. at 9.

a.   Claim Against the City of Revere

The Tort Claims Act, Mass. Gen Laws ch. 258 § 2, "created a cause of action against public employers for the negligent or wrongful acts or omissions of their employees acting within the scope of their employment, thus abrogating the doctrine of governmental immunity." Nelson v. Salem State Coll., 446 Mass. 525, 537, 845 N.E.2d 338 (2006). However, "a municipality enjoys governmental immunity for intentional torts under the Massachusetts Tort Claims Act." Kelley v. LaForce, 288 F.3d 1, 12-13 (1st Cir. 2002) (citing Mass. Gen. Laws ch. 258, §10(c) (governmental immunity is retained for 'any claim arising out of an intentional tort .

16

. .')); see also Nelson, 446 Mass. at 537 ("Intentional torts are expressly exempted from the [Tort Claims] Act, and therefore a public employer cannot be sued for its employee's intentionally tortious conduct.").

Defamation and intentional infliction of emotional distress are both intentional torts, as Plaintiff notes in arguing against a presentment requirement. Opp'n to Revere Defs.' Mot Dismiss 5-8 [#19]. As intentional torts, the claims are barred against the City of Revere even if they are not specifically mentioned in Mass. Gen. Laws ch. 258, §10(c). See Kelley, 288 F.3d at 13 (citing Rezendes-Walsh v. City of Bos., No. Civ. A. 95-3707-E, 1996 WL 679673, at *2 (Mass. Super. Nov. 25, 1996) (noting that the Supreme Judicial Court of Massachusetts has found § 10(c)'s list of intentional torts illustrative, rather than exhaustive)). Thus, Counts III and V are dismissed as to the City of Revere.

     b.  Claims Against Arrigo and Guido

Plaintiff has not alleged any facts concerning Arrigo or Guido's behavior much less the "extreme or outrageous" conduct necessary for liability for an intentional infliction of emotional distress claim. Accordingly, she has not stated a plausible claim and the intentional infliction of emotional distress claim is dismissed as to Arrigo and Guido. See Doe v. Bradshaw, Civ. Action No. 11-11593-DPW, 2013 WL 5236110, at *13 (D. Mass. Sept. 16, 2013) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 143, 335 N.E.2d 315 (Mass. 1976)).

Plaintiff also has not alleged any facts as to the defamation claim that plausibly show Arrigo or Guido knew about Covino's relationship with Plaintiff or Covino's alleged misconduct in seeking an abuse protection order. Plaintiff has also failed to plead any facts connecting

17

Arrigo or Guido with any allegedly defamatory statements. Accordingly, Plaintiffs' defamation claims against Arrigo and Guido must also be dismissed.

3.  Massachusetts Civil Rights Act Claim (Count IV)

Plaintiff alleges Defendants used "intimidation and coercion" to interfere with her rights under the Massachusetts Declaration of Rights, specifically, that "Defendants endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy." Compl. ¶ 37 [#1].

The Revere Defendants argue the MCRA claim against the City of Revere should be dismissed because "a municipality is not considered a person under the Act," Revere Defs.' Mot. Dismiss 16 [#18] (citing Saldivar, 91 F. Supp. 3d at 139), and the claim against Arrigo and Guido should be dismissed because Plaintiff failed to allege facts that support a plausible inference Arrigo or Guido knew of Covino's relationship with Plaintiff or of Covino's alleged wrongful conduct towards Plaintiff, "let alone threatened, coerced, or intimidated [Plaintiff] in any way." Id. at 17.

In response, Plaintiff states "[t]he facts pled by plaintiff against the defendants form the basis of Counts I-VIII of the Complaint where plaintiff alleged defendants owed her various constitutional and legal duties and breached them to her detriment constituting . . . violations of the Massachusetts Civil Rights Act . . . ." Opp'n to Revere Defs. Mot. Dismiss 5 [#19].

A claim brought under the MCRA, Mass. Gen. Laws ch. 12, § 11I, requires a plaintiff to demonstrate that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats,

intimidation, or coercion.'" Bally v. Northeastern Univ., 403 Mass. 713, 717, 532 N.E.2d 49

(1989). "The purpose of the MCRA is to provide under state law a remedy 'coextensive with 42

U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart

does not.'" Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass.

2010) (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E.2d 1120

(1985)). "The MCRA is remedial in nature. It creates no substantive rights." Id. (citing

Mouradian v. Gen. Elec. Co., 23 Mass. App. Ct. 538, 543, 503 N.E.2d 1318 (1987)). "Thus, in

order 'to seek redress through [MCRA as under its Federal analog, 42 U.S.C.] § 1983 . . . a

plaintiff must assert the violation of a federal [or State] *right*, not merely a violation of federal

[or State] *law*." Id. (citing Perkins v. Com., 52 Mass. App. Ct. 175, 1818, 752 N.E.2d 761 (2001)

(emphasis in original) (citing Blessing v. Freestone, 520 U.S. 329, 340 (1997))).

Moreover, the MCRA is "explicitly limited" to situations "where the derogation of

secured rights occurs by threats, intimidation or coercion" involving a specific threat of harm

"directed toward a particular individual or class of persons." Bally, 403 Mass. at 718-19.

> For purposes of the MCRA, "[a] [t]hreat . . . involves the intentional exertion of
> pressure to make another fearful or apprehensive of injury or harm. Intimidation
> involves putting in fear for the purpose of compelling or deterring conduct . . . .
> [Coercion involves] the application to another of such force, either physical or
> moral, as to constrain [a person] to do against his will something he would not
> otherwise have done."

Farrah, 725 F. Supp. 2d at 247 (citing Planned Parenthood League of Mass., Inc. v. Blake, 417

Mass. 467, 474, 631 N.E.2d 985 (1994) (citations and quotations omitted)).[5]

---

[5] "The elements of 'threats' and 'intimidation' under the MCRA usually require actual or
threatened physical force." Spencer v. Roche, 755 F. Supp. 2d 250, 265 (D. Mass. 2010), aff'd,
659 F.3d 142 (1st Cir. 2011) (citation omitted).

Thus, to survive a motion to dismiss, an MCRA claim must allege a defendant threatened, intimidated, or coerced the plaintiff into "giv[ing] up something [he had] the constitutional right to do." Pimentel v. City of Methuen, 313 F. Supp. 3d 255, 272 (D. Mass. 2018) (quoting Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009)) (internal quotation marks omitted).

    a.  City of Revere

In Howcroft v. City of Peabody, the Massachusetts Appeals Court concluded "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act (MCRA)." 51 Mass. App. Ct. 573, 591-92, 747 N.E.2d 729 (2001). In reaching this conclusion, the Appeals Court examined the legislative history of the MCRA and Section 1983 and found that a municipality *is* a person under Section 1983 as a result of the legislative history "immediately preceding the passage by Congress of the Civil Rights Act of 1871, a precursor to § 1983" but that this has no "bearing on the MCRA . . . [which] only defines person to include 'corporations, societies, associations and partnerships.'" Id. at 592 (citation omitted). Because the City of Revere is not a proper defendant for an MCRA claim, this claim is dismissed.[6]

    b.  Arrigo and Guido

There are no allegations in the Complaint [#1] that Arrigo or Guido took any actions to interfere with Plaintiff's rights secured by the Constitution or the laws of the United States or the Commonwealth, much less that Arrigo and Guido interfered with such rights by threats,

---

[6] MCRA liability also does not extend to municipal employees acting in their official capacities. See O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 141 n.13, 612 N.E.2d 641 (1993) ("[T]o avoid a State's sovereign immunity to a damages suit, a plaintiff must sue the State official in his individual and not his official capacity.").

20

intimidation, or coercion. See Lund v. Henderson, 22 F. Supp. 3d 94, 106 (D. Mass. 2014). Thus, this count is subject to dismissal.[7]

4.  Conspiracy Under 42 U.S.C. § 1985

Plaintiff alleges "two or more Defendants" "intimidated, threatened and coerced" her "not to offer testimony or assert her position in a case" and "conspired for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice in the Commonwealth of Massachusetts, with intent to deny to Plaintiff the equal protection of the law." Compl. ¶ 45 [#1].

The Revere Defendants argue Plaintiff's allegation under the first clause of 42 U.S.C. § 1985(2) fails to state a plausible claim because Plaintiff alleges conspiratorial interference with the abuse protection proceedings in Massachusetts state court and alleged interference with state court proceedings cannot be brought under the first clause of § 1985(2). Revere Defs.' Mot. Dismiss 17-18 [#18]. The Revere Defendants also argue the § 1985 claim should be dismissed in its entirety because Plaintiff failed to allege "any racial or otherwise class-based invidiously discriminatory animus underlying the alleged conspiratorial conduct[.]" Id. at 19.

In response, Plaintiff argues she adequately pleaded a claim under § 1985, specifically that the Revere Defendants "acted in concert to interfere with [Plaintiff's] rights by selecting her for targeting of civil and criminal sanctions and deprivation of her property because she was of a

---

[7] In Pimentel, the MCRA count survived a motion to dismiss even though none of the individual defendants were personally alleged to have used threats, intimidation, or coercion to make the plaintiff take a breathalyzer test; however, in Pimentel all the individual defendants interacted with the plaintiff at the police station and thus the question remained whether the individual defendants knew plaintiff was given an incorrect form such that their conduct could be "coercive" under the MCRA. 323 F. Supp. 3d at 273. Here there are no allegations Arrigo or Guido were involved in any coercive, threatening, or intimidating actions.

particular gender and national origin" and because she complained to Covino about his
mistreatment of her for those same reasons. Opp'n to Revere Defs.' Mot. Dismiss 16-17 [#19].

"Section 1985 provides a remedy for acts of civil conspiracy in which two or more
individuals conspire for the purpose of depriving another of rights or privileges accorded to them
by law." Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021) (citing 42 U.S.C. § 1985(3)).

> To plead an actionable claim under this statute, [a plaintiff] must allege the
> existence of a conspiracy, allege that the purpose of the conspiracy is "to deprive
> the plaintiff of the equal protection of the laws," describe at least one overt act in
> furtherance of the conspiracy, and "show either injury to person or property, or a
> deprivation of a constitutionally protected right."

Id. (quoting Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)).

Plaintiff argues Defendants, conspired, *inter alia*, to deprive her of her property "because
she was of a particular gender and national origin." Opp'n to Revere Defs.' Mot. Dismiss 17
[#19]. However, Plaintiff has failed to adequately plead any such conspiracy existed. "Refined to
bare essence, a conspiracy is a 'combination of two or more persons acting in concert to commit
an unlawful act." Alston, 988 F.3d at 577 (quoting Earle v. Benoit, 850 F.2d 836, 844 (1st Cir.
1988)). To plead a civil rights conspiracy, a plaintiff "must plausibly allege facts indicating an
agreement among the conspirators to deprive the plaintiff of her civil rights." Parker v. Landry,
935 F.3d 9, 18 (1st Cir. 2019). Plaintiff has failed to allege any facts tending to show the
existence of a conspiracy among Covino, Arrigo, and Guido (or any configuration of two
Defendants); the Complaint [#1] does not include any allegations that Arrigo and Guido
conspired or even that Arrigo and Guido knew anything of the conduct alleged in Plaintiff's
Complaint [#1]. Because Plaintiff has failed to allege any facts from which to infer that the
Arrigo and Guido reached a "common understanding of what they were hoping to achieve" this

count is dismissed. Alston, 988 F.3d at 578; see also Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980) ("[A]llegations of conspiracy must [ ] be supported by material facts, not merely conclusory statements.").

    5.   Refusal to Prevent Wrongs Under 42 U.S.C. § 1986

    Plaintiff alleges Defendants knew of the "wrongs they each and severally were committing against Plaintiff," had the power to "prevent or aid in the prevention of said wrongs," and failed to do so. Compl. ¶¶ 49-50 [#1].

    The Revere Defendants argue there is a one-year statute of limitations for actions brought under § 1986. Revere Defs.' Mot. Dismiss 20 [#18]. Covino obtained the Abuse Prevention order in January 2017, and Plaintiff did not file her Complaint [#1] until January 29, 2020, more than a year after the claim accrued. Id.

    Plaintiff argues her claims are not time barred because she alleged ongoing misconduct which means the January 29, 2019 date is not significant for assessing this claim's timeliness. Opp'n to Revere Defs.' Mot. Dismiss 18 [#19].

    Section 1986 "'creates a right of action against a party who, having knowledge that any of the wrongs in furtherance of a conspiracy prohibited by § 1985 are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" Humphrey v. Comoletti, Civ. Action No. 15-cv-14170-ADB, 2016 WL 4132205, at *4 (D. Mass. Aug. 3, 2016) (citing Salcedo v. Town of Dudley, 629 F. Supp. 2d 86, 99 (D. Mass. 2009) (quoting 42 U.S.C. § 1986)). Section 1986 claims are subject to a one-year limitation period. See 42 U.S.C. § 1986 ("[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.").

The court finds Plaintiff has not alleged ongoing conduct by the Revere Defendants, but instead, that her allegations concern conduct that happened in 2017. Thus, because she filed the Complaint [#1] in 2020, her § 1986 claim is barred by the statute of limitations. See Salcedo, 629 F. Supp. at 99.[8]

### C. Covino's Motion to Dismiss

Although Covino acknowledges the appropriate standard for a motion to dismiss, his Motion [#9] relies on his version of the facts rather than those alleged in Plaintiff's Complaint [#1], including the nature of Covino and Plaintiff's relationship, actions Plaintiff allegedly took towards Covino, and actions Covino claims led up to obtaining the Abuse Prevention Order. Covino also presents matters outside of the pleadings. Covino's Mot. 3-6 [#9]. Because Covino's arguments rely on his version of the facts, rather than assuming the truth of Plaintiff's well-pleaded facts, and include matters outside the pleadings, the Rule 12(b)(6) motion is denied.[9]

## IV. Covino's Motion for Summary Judgment

### A. Legal Standard

Under Rule 56, the court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[8] This count would also be subject to dismissal because the court has found Plaintiff failed to allege a plausible conspiracy under 42 U.S.C. § 1985 and, thus, Plaintiff has failed to plausibly allege a conspiracy that the Revere Defendants could have had knowledge of and failed to prevent.

[9] The court recognizes that some of the legal arguments raised by the Revere Defendants and accepted by the court may also apply to Covino. The court declines to extend the rulings as to the Revere Defendants' to Covino, where he did not so move and where Plaintiff has not had an opportunity to address the arguments as they apply to Covino. After filing an answer and conferring with counsel, however, Covino may file a motion for judgment on the pleading under Rule 12(c) raising those arguments that may apply to him.

law." Fed. R. Civ. P. 56. A fact is material when, under the governing substantive law, it could

affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a

reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

Under Local Rule 56.1, a party seeking summary judgment must include "a concise statement of

the material facts of record as to which the moving party contends there is no genuine issue to be

tried, with page references to affidavits, depositions and other documentation. Failure to include

such a statement constitutes grounds for denial of the motion."

The opposing party must present evidence in order to defeat a properly supported motion,

and "[t]his is true even where the evidence is likely to be within the possession of the defendant,

as long as the plaintiff has had a full opportunity to conduct discovery." Id. at 257. The opposing

party must also include a Local Rule 56.1 statement.

Generally, a Rule 56 motion is brought after the parties have completed discovery. See

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, unless a local rule or court order

provides otherwise, a movant may file a summary judgment motion before discovery is complete

or before it has even commenced. See Fed. R. Civ. P. 56(a) ("a party may file a motion for

summary judgment at any time until 30 days after the close of all discovery"). Should a party

move for summary judgment early, Federal Rule of Civil Procedure 56(d) permits a nonmovant

to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to

justify its opposition" and allows the court to (1) defer considering the motion or deny it; (2)

allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other

appropriate order. Fed. R. Civ. P. 56(d). "[A]lthough a request for Rule 56(f)[10] relief need not be

expressly labeled as such, the party invoking the rule at a minimum must ask the court to refrain

from acting on the summary judgment request until additional discovery can be conducted." C.B.

Trucking, Inc. v. Waste Management Inc., 137 F.3d, 41, 44 (1st Cir. 1998) (citing Ayala-Gerena

v. Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996); Dow v. United Bhd. of Carpenters,

1 F.3d 56, 61 (1st Cir. 1993)).

"Rule 56(d) serves a valuable purpose. It protects a litigant who justifiably needs

additional time to respond in an effective manner to a summary judgment motion." Rivera-

Almodóvar v. Instituto Socioeconómico Comunitario, Inc., et al., 730 F.3d 23, 28 (1st Cir. 2013).

(citing Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 3 (1st Cir 2004)). It "provides a

safety valve for claimants genuinely in need of further time to marshal 'facts, essential to justify

[their] opposition . . . to a summary judgment motion.'" Reid v. New Hampshire, 56 F.3d 332,

341 (1st Cir. 1995) (alteration in original) (quoting Mattoon v. City of Pittsfield, 980 F.2d 1, 7

(1st Cir. 1992)). "'Consistent with the salutary purposes underlying Rule 56(f), district courts

should construe motions that invoke the rule generously, holding parties to the rule's spirit rather

than its letter.'" In re PHC Inc. Shareholder Litig., 762 F.3d 138, 143 (1st Cir. 2014) (quoting

Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994)).

The plaintiff bears the burden under Rule 56(d) of specifically identifying relevant

information and demonstrating that the evidence sought actually exists and would prevent

---

[10] "Rule 56(d) was formerly Rule 56(f)," and "the textual differences between current Rule 56(d) and former rule 56(f) are purely stylistic." Nieves-Romero v. United States, 715 F.3d 375, 381 n.3 (1st Cir. 2013). Therefore, "case law developed under former Rule 56(f) remains controlling, and [the First Circuit] cite[s] to it where applicable." Id.

summary judgment. Id. ("the party opposing summary judgment must make a sufficient proffer: 'the proffer should be authoritative; it should be advanced in a timely manner; and it should explain why the party is unable currently to adduce the facts essential to opposing summary judgment'") (quoting Resolution Trust Corp., 22 F.3d at 1203). The Rule 56 Affidavit "'should indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" Id. at 145 (quoting Resolution Trust Corp., 22 F.3d at 1203). "Because '[e]valuating the potential significance of unknown facts in regard to unadjudicated issues is something of a metaphysical exercise . . . . [T]he threshold of materiality at this stage of the case is necessarily low.'" Id. (quoting Resolution Trust Corp., 22 F.3d at 1207) (alteration in original).

A plaintiff must also show that she sought the requested information, or that there is good reason she has not been able to obtain the information. Id. "[I]n a case involving incomplete discovery, the Rule 56(d) proffer requirements can be categorized as: 'authoritativeness, timeliness, good cause, utility, and materiality.'" Id. at 143-44 (quoting Resolution Trust Corp., 22 F.3d at 1203). "[T]hese requirements are not inflexible and . . . one or more of the requirements may be relaxed or even excused, to address to exigencies of a given case.'" Id. at 144 (citing Resolution Trust Corp., 22 F.3d at 1203). If a plaintiff satisfies the requirements, "a strong presumption arises in favor of relief." Id. (quoting Resolution Trust Corp., 22 F.3d at 1203).

B. Discussion

Here, Covino has failed to support his request for relief under Rule 56 with the required statement of undisputed material facts, and the motion may be denied on this ground alone. In addition, comparing Covino's version of events with Plaintiff's Statement of Material Facts

[#11], the relevant facts appear to be very much in dispute.

In any event, Plaintiff has submitted her Affidavit [#13], stating she has "not had the opportunity to gather the necessary evidence," including records from the Revere Police Department and the George Mason Police Department, nor had the opportunity to question Defendant Covino under oath. At the time the summary judgment motion was filed, discovery had not commenced, no depositions had been taken, and the parties had not yet exchanged initial disclosures. See Elec. Clerk's Notes [#16].

The court finds Plaintiff has shown good cause for her inability to marshal the facts set out in the Radfar Affidavit [#13], where the discovery Plaintiff states she seeks is not in her custody, but in the custody of the City of Revere, the George Mason Police Department, and Virginia state law enforcement agencies, and where she has not yet deposed Covino. Radfar Aff. [#13]; see also In re PHC, 762 F.3d at 144 ("[A] party seeking discovery expeditiously is not obligated to take heroic measures to enforce his rights against a recalcitrant opponent.") (internal citation and quotation omitted).

Plaintiff also has shown "a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time." Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007). The Radfar Affidavit [#13] satisfies the utility requirement where Plaintiff states her belief that various law enforcement agencies possess documents that are relevant to her claims. The court finds it is plausible additional facts needed to oppose Covino's motion for summary judgment exist and can be retrieved in a reasonable time from the sources identified.

Finally, Plaintiff enumerates specific disputes with facts asserted in Covino's Motion [#9]. For example, Plaintiff states she "categorically and specifically" denies she "made any

28

212

threats to Joey Covino from 2015 to 2017" and identifies sources who might have information relevant to this disputed fact. Radfar Aff. [#13]. At this stage, the court is satisfied that the facts Plaintiff asserted in her Affidavit [#13] are material to the resolution of Covino's pending summary judgment Motion [#9].

In sum, the court finds summary judgment at this stage unwarranted. The motion is denied without prejudice to the filing of summary judgment motions at the close of discovery. Any such motions shall comply with Local Rule 56.1.

V.  Conclusion

For the aforementioned reasons, the Revere Defendants' Motion to Dismiss [#18] is ALLOWED and Defendant Covino's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 [#9] is DENIED.

IT IS SO ORDERED.

/s/ Indira Talwani
September 9, 2021                                    United States District Judge

29

213