*United States of America*
No. 25-1068

In The
*First Circuit Court Of Appeals*

DISTRICT OF MASSACHUETTS
TRIAL COURT DEPARTMENT

---

SHARON RADFAR

Plaintiff-
Appellant

v.

CITY OF REVERE, AND JOSEPH COVINO, AND JAMES GUIDO CHIEF OF
POLICE, AND BRIAN ARRIGO, MAYOR ; AND OTHER AS YET UNNAMED
OFFICERS OF THE REVERE POLICE DEPARTMENT; INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITIES AS CHIEF OF POLICE, MAYOR AND POLICE
OFFICERS OF THE CITY OF REVERE

Defendants-
Appellees

---

**RECORD APPENDIX**

Elizabeth M. Clague
Court of Appeals No. 87705
The Franklin Building
1106 Main Street
 Brockton, MA 02301
(508) 587-1191
Attyeclague@gmail.com

1.      District Court Docket                                                          1

2.      Complaint                                                                      16

3.      Defendant Covino's Motion to Dismiss, For Summary Judgment
        And Special Anti-SLAPP Motion to Dismiss w/ Exhibits                           31

4.      Plaintiff's Opposition w/ Statement of Undisputed Facts
        and Exhibits                                                                   60

5.      Transcript of Scheduling Conference dated 02/22/2021                          111

6.      Municipal Defendants' Motion to Dismiss                                       142

7.      Plaintiff's Opposition                                                        163

8.      Memorandum of Decision on Motions to Dismiss                                  185

9.      Transcript of Status Conference dated 10/04/2021                              214

10.     Transcript of Status Conference dated 03/21/2022                              227

11.     Plaintiff's Motion to Compel Discovery                                        245

12.     Transcript of Status Conference dated 05/20/2022                              267

13.     Defendant's Motion to Temporarily Impound and for
        Relief from Order of 02/22/22                                                 292

14.     Plaintiff's Opposition Seeking Sanctions for Violations of
        Discovery Order, Court Orders and Rules with attached
        Affidavit and Exhibits                                                        295

15.     Memorandum and Order dated June 22, 2023 Allowing in Part and Denying in
        Part Defendant's Motion and Issuing Further Order                             327

16.     Memorandum and Order dated March 21, 2024 Denying
        Defendant's Motion                                                            334

17.     Defendant's Revised Motion for Summary Judgment with
        Memorandum of Law                                                             337

18.  Plaintiff's Statement of Undisputed Material Facts (Including Disputes of Defendant's Material Facts          363

19.  Defendant's Response to Plaintiff's Material Facts          413

20.  Plaintiff's Response in Opposition to Motion for Summary Judgment          419

21.  Defendant's Summary Judgment Exhibits          441

22.  Plaintiff's Summary Judgment Exhibits          935

23.  Transcript of Summary Judgment Motion Hearing dated 11/22/2024          992

24.  Court's Memorandum and Order dated 12/06/2024          1064

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:20-cv-10178-IT

Radfar v. Covino et al

Assigned to: Judge Indira Talwani

Demand: $550,000

Case in other court: USCA - First Circuit, 25-01068

Cause: 42:1983 Civil Rights Act

Date Filed: 01/29/2020

Date Terminated: 12/06/2024

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Sharon Radfar**

represented by **Elizabeth M. Clague**
Elizabeth M. Clague, Attorney At Law
Suite 304
1106 Main Street
Brockton, MA 02301
508-587-1191
Fax: 508-587-0992
Email: eclague@msn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Joseph I Covino**
*Sergeant of Police for the City of Revere,*
*Individually and in their official capacities*

represented by **Kenneth H. Anderson**
Anderson, Goldman, Tobin & Pasciucco
Suite 201
50 Redfield Street
Dorchester, MA 02122
617-265-3900
Fax: 617-265-3627
Email: kanderson@andersongoldman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brian M Arrigo**
*Mayor for the City of Revere, Individually*
*and in their official capacities*

represented by **Daniel E. Doherty**
City of Revere
Office of the City Solicitor
281 Broadway
Revere, MA 02151
784-254-0262
Email: ddoherty@revere.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Capizzi**
Office of the City Solicitor

1

City of Revere
City Hall
281 Broadway
Revere, MA 02151
781-286-8166
Fax: 781-286-8205
Email: pcapizzi@revere.org
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Guido**                                       represented by     **Daniel E. Doherty**
*Chief of Police for the City of Revere,*                                (See above for address)
*Individually and in their official capacities*                          *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Paul Capizzi**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Revere Police Officers Unnamed**

**Defendant**

**City of Revere**                                    represented by     **Daniel E. Doherty**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Paul Capizzi**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

**Deponent**

**Nonparty Keeper of Records for the**                represented by     **Nicholas J. Schneider**
**George Mason University Police**                                       Eckert Seamans Cherin & Mellott LLC
**Department**                                                           Two International Place
                                                                         Ste 16th Floor
                                                                         Boston, MA 02110
                                                                         617-342-6886
                                                                         Email: nschneider@eckertseamans.com
                                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/29/2020 | 1 | COMPLAINT *of Sharon Radfar* against All Defendants Filing fee: $ 400, receipt number 0101-8079511 (Fee Status: Filing Fee paid), filed by Sharon Radfar. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Clague, Elizabeth) (Entered: 01/29/2020) |
| 01/30/2020 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Finn, Mary) (Entered: 01/30/2020) |

| | | |
|---|---|---|
| 01/30/2020 | 3 | Summons Issued as to Brian M Arrigo, Joseph I Covino, James Guido, City of Revere, Revere Police Officers Unnamed. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Jones, Sherry) (Entered: 01/30/2020) |
| 04/30/2020 | 4 | Judge Indira Talwani: ORDER entered. **ORDER TO SHOW CAUSE.** Show Cause Response due by 5/14/2020. (Attachments: # 1 FRCP 4m) (Kelly, Danielle) (Entered: 04/30/2020) |
| 05/14/2020 | 5 | First MOTION for Extension of Time to June 15, 2020 to Serve process *pursuant to FRCP 4(m)*, Proposed MOTION for Order to Show Cause *and Finding of Good Cause Pursuant to L.R.4.1(b)* ( Responses due by 5/28/2020) by Sharon Radfar. (Attachments: # 1 Affidavit)(Clague, Elizabeth) (Entered: 05/14/2020) |
| 05/15/2020 | 6 | Judge Indira Talwani: ELECTRONIC ORDER **ALLOWING** 5 First Motion for Extension of Time to June 15, 2020 to Serve process *pursuant to FRCP 4(m)*, Proposed Motion for Order to Show Cause *and Finding of Good Cause Pursuant to L.R.4.1(b)*. (Kelly, Danielle) (Entered: 05/15/2020) |
| 06/23/2020 | 7 | SUMMONS Returned Executed All Defendants served on 6/15/2020, answer due 7/6/2020. (Clague, Elizabeth) Modified on 6/24/2020: Corrected parties served (Kelly, Danielle). (Entered: 06/23/2020) |
| 07/15/2020 | 8 | ANSWER to 1 Complaint with Jury Demand by Joseph I Covino.(Anderson, Kenneth) (Entered: 07/15/2020) |
| 10/28/2020 | 9 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND SPECIAL MOTION TO DISMISS PURSUANT TO MASS. GEN. LAWS c.231, sec.59H* by Joseph I Covino. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Anderson, Kenneth) (Entered: 10/28/2020) |
| 11/23/2020 | 10 | First Opposition re 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND SPECIAL MOTION TO DISMISS PURSUANT TO MASS. GEN. LAWS c.231, sec.59H And for Summary Judgment* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 11/23/2020) |
| 11/23/2020 | 11 | First Statement of Material Facts L.R. 56.1 re 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND SPECIAL MOTION TO DISMISS PURSUANT TO MASS. GEN. LAWS c.231, sec.59H And for Summary Judgment* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 11/23/2020) |
| 11/23/2020 | 12 | First AFFIDAVIT in Opposition re 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND SPECIAL MOTION TO DISMISS PURSUANT TO MASS. GEN. LAWS c.231, sec.59H With Exhibits C-G* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 11/23/2020) |
| 11/25/2020 | 13 | Second AFFIDAVIT in Opposition re 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND SPECIAL MOTION TO DISMISS PURSUANT TO MASS. GEN. LAWS c.231, sec.59H And for Summary Judgment Pursuant to Fed.R.Civ.P. 56(d) & (e)* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 11/25/2020) |
| 01/26/2021 | 14 | NOTICE of Scheduling Conference. Telephonic Scheduling Conference set for 2/22/2021 03:45 PM in Remote Proceeding : Boston before Judge Indira Talwani. (Teleconference # 888-808-6929 access code: 8523158.) Counsel for the plaintiff is responsible for ensuring that all parties and/or their attorneys who have not filed an answer or appearance with the court are notified of the date of the scheduling conference.(MacDonald, Gail) (Entered: 01/26/2021) |

| | | |
|---|---|---|
| 02/22/2021 | 15 | First JOINT STATEMENT re scheduling conference *by Plaintiff and Defendant Joseph I. Covino*. (Clague, Elizabeth) (Entered: 02/22/2021) |
| 02/22/2021 | 16 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Scheduling Conference held on 2/22/2021. Case called. Court had colloquy with counsel. Daniel Doherty agreed to waive service and enter an appearance on behalf of City of Revere; Brian Arrigo, Mayor of the City of Revere; and Defendant James Guido, Chief of Police. Plaintiff waived right to move for default. Defts. represented by Doherty: Response to Complaint due 21 days from today. The Motion to Dismiss 9 by Joseph Covino to be resolved on the papers. Initial disclosures due 3/29/2021. Court adopted proposed dates: 7/16/2021 for written discovery, nonexpert depositions 9/30/2021; close of fact discovery is 9/30/2021. Parties to jointly report to clerk any request for ADR. Status Conference set for 10/4/2021 02:30 PM in Remote Proceeding : Boston before Judge Indira Talwani. Scheduling Order to follow.<br><br>This hearing/conference will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Elizabeth M. Clague, Kenneth H. Anderson, Daniel E. Doherty to enter appearance for City of Revere; Brian Arrigo, Mayor of the City of Revere; Defendant James Guido, Chief of Police) (MacDonald, Gail) (Entered: 02/28/2021) |
| 03/01/2021 | 17 | NOTICE of Appearance by Daniel E. Doherty, Paul Capizzi on behalf of Brian M Arrigo, James Guido, City of Revere. (MacDonald, Gail) (Entered: 03/01/2021) |
| 03/15/2021 | 18 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Brian M Arrigo, James Guido, City of Revere.(Doherty, Daniel) (Entered: 03/15/2021) |
| 03/29/2021 | 19 | First Opposition re 18 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 03/29/2021) |
| 06/23/2021 | 20 | Judge Indira Talwani: SCHEDULING ORDER entered. Please see attached.<br><br>**SCHEDULING ORDER DEADLINES:**<br>Initial disclosures due March 29, 2021.<br>Amendments to pleadings due May 31, 2021.<br>Fact discovery to be completed by September 30, 2021.<br>Plaintiffs' trial experts designated by November 5, 2021 and deposed by February 1, 2022.<br>Defendants' trial experts designated by December 3, 2021 and deposed by February 1, 2022.<br>Dispositive Motions due March 15, 2022.<br><br>**NOTICE OF HEARING:**<br>Status Conference set for October 4, 2021 at 2:30 p.m. in Remote Proceeding : Boston |

| | | |
|---|---|---|
| | | before Judge Indira Talwani. (Kelly, Danielle) (Entered: 06/23/2021) |
| 09/09/2021 | 21 | Judge Indira Talwani: ORDER entered. MEMORANDUM AND ORDER. Defendant Joseph Covino's <u>Motion and Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint in its Entirety Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Motion and Memorandum of Law in Support of Motion to Dismiss and Motion for Costs and Reasonable Attorney's Fees Pursuant to Massachusetts General Laws c. 231 9</u> is DENIED and Defendants City of Revere, Mayor Brian M. Arrigo, and former Chief of Police James Guido's <u>Motion to Dismiss 18</u> is ALLOWED. Please see attached. (Kelly, Danielle) (Entered: 09/09/2021) |
| 10/04/2021 | 22 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Status Conference held on 10/4/2021. Case called. Counsel report discovery is ongoing although the deadline was 9/30/2021; Counsel jointly requested a 3 month extension of the discovery deadline; granted. Discovery to be completed by 12/31/2021. Any motions to compel must be filed by 1/10/2022. Other set dates, including summary judgment motion deadline, moved by 90 days. Counsel reports a similar case is before Judge Rya Zobel. Parties to jointly report to clerk any request for ADR. Status Conference set for 1/11/2022 02:30 PM in Remote Proceeding : Boston before Judge Indira Talwani.

This hearing/conference will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Elizabeth M. Clague, Kenneth H. Anderson) (MacDonald, Gail) (Entered: 10/04/2021) |
| 11/19/2021 | 23 | NOTICE of Change of Address or Firm Name by Elizabeth M. Clague (Clague, Elizabeth) (Entered: 11/19/2021) |
| 12/20/2021 | 24 | Assented to MOTION for Extension of Time to January 31, 2022 to Complete Discovery by Joseph I Covino.(Anderson, Kenneth) (Entered: 12/20/2021) |
| 12/21/2021 | 25 | Judge Indira Talwani: ELECTRONIC ORDER allowing 24 Motion for Extension of Time to Complete Discovery. (Dore, Samantha) (Entered: 12/21/2021) |
| 12/21/2021 | 26 | NOTICE Resetting a Hearing.

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |

| | | |
|---|---|---|
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Status Conference set for 1/7/2022 is RESET for 1/31/2022 02:15 PM in Courtroom 9 (Remote only) before Judge Indira Talwani. (MacDonald, Gail) (Entered: 12/21/2021) |
| 01/27/2022 | 27 | Joint MOTION for Extension of Time to February 28, 2022 to Complete Discovery by Joseph I Covino.(Anderson, Kenneth) (Entered: 01/27/2022) |
| 01/27/2022 | 28 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 27 Joint MOTION for Extension of Time to February 28, 2022 to Complete Discovery filed by Joseph I Covino. Discovery to be completed by 2/28/2022. Status Conference set for 1/31/2022 is RESET for 3/4/2022 02:30 PM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(MacDonald, Gail) (Entered: 01/27/2022) |
| 02/11/2022 | 29 | First MOTION to Quash *KOR Subpoena* by Sharon Radfar.(Clague, Elizabeth) (Entered: 02/11/2022) |
| 02/16/2022 | 30 | Opposition re 29 First MOTION to Quash *KOR Subpoena and Defendant's Request for Costs and Fees Associated with the Filing of This Opposition* filed by Joseph I Covino. (Attachments: # 1 Affidavit Declaration of Exhibits, # 2 Exhibit Ex. A - Plaintiff's Complaint, # 3 Exhibit Ex. B - Aff. of Covino, # 4 Exhibit Ex. C. - Depo of Ganley, # 5 Exhibit Ex. D - Ford Complaint, # 6 Exhibit Ex. E - Plaintiff's Resp to Ints, # 7 Exhibit Ex. F - VA State Police pg. 16, # 8 Exhibit Ex. G - VA State Police pg. 11, # 9 Exhibit Ex. H - Depo of Rowan, # 10 Exhibit Ex. I - GMU HR KOR, # 11 Exhibit Ex. J - email exchange)(Anderson, Kenneth) (Entered: 02/16/2022) |
| 02/22/2022 | 31 | Judge Indira Talwani: ELECTRONIC ORDER denying Plaintiff's Motion for a Protective Order to Quash a Subpoena 29 but directing that the documents be maintained by Defendant Covino and his counsel as confidential documents that may not be disclosed pending further order of the court. The clerk shall set a status conference for mid to late March where this matter may be addressed further.<br><br>In reaching this decision, the court finds as follows:<br><br>First, while Plaintiff asserts that "the only purpose for Defendant's effort to obtain privileged and confidential documents not capable of leading to relevant information given the factual constellation is to subject Plaintiff to and cause her annoyance, embarrassment and oppression such that she will abandon her claims and this litigation," Pl.'s Mot. 2 29 , Plaintiff has not included a copy of the subpoena with her motion to allow the court to evaluate this assertion. |

6

Second, while Plaintiff provides as a further reason "[c]orrespondence detailing Plaintiff's objections written from her counsel to counsel for the Keeper of Records, attached and incorporated by reference as if fully set forth herein as Exhibit A," id., Attachment A states only "[a]s I indicated we do object and intend to move to quash." This statement does not provide any additional grounds for the requested relief. Id. at 6.

Defendant's Opposition 30 does make clear that the documents at issue include Plaintiff's medical information. To ensure that the information is not disseminated more broadly than is necessary for resolution of this dispute, the court is directing the parties and their counsel to not disclose the information in the subpoenaed documents pending further order of the court.(Dore, Samantha) (Entered: 02/22/2022)

| | | |
|---|---|---|
| 02/23/2022 | 32 | ELECTRONIC NOTICE OF RESCHEDULING. Status Conference set for 3/4/2022 is RESET for 3/21/2022 02:30 PM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(MacDonald, Gail) (Entered: 02/23/2022) |
| 02/28/2022 | 33 | Joint MOTION for Extension of Time to April 1, 2022 to Complete Discovery by Joseph I Covino.(Anderson, Kenneth) (Entered: 02/28/2022) |
| 03/01/2022 | 34 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 33 Motion for Extension of Time to Complete Discovery. Discovery to be completed by 4/1/2022. (MacDonald, Gail) (Entered: 03/01/2022) |
| 03/21/2022 | 35 | ELECTRONIC NOTICE OF RESCHEDULING. Status Conference set for 3/21/2022 02:15 PM in Courtroom 9 (Remote only) before Judge Indira Talwani. PLEASE NOTE change to earlier time.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(MacDonald, Gail) (Entered: 03/21/2022) |

| 03/21/2022 | 36 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Status Conference held on 3/21/2022. Case called. Court had colloquy with counsel. Discovery closes 4/1/2022. Counsel to confer and by 4/15/2022 file a proposal as to how the case should proceed. Parties to jointly report to clerk any request for ADR. Status Conference set for 5/9/2022 02:45 PM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Elizabeth M. Clague, Kenneth H. Anderson) (MacDonald, Gail) (Entered: 03/24/2022) |
| 04/15/2022 | 37 | First JOINT STATEMENT of counsel *Pursuant to Order dated March 24, 2022(Talwani,J.)*. (Clague, Elizabeth) (Entered: 04/15/2022) |
| 04/20/2022 | 38 | Judge Indira Talwani: ELECTRONIC ORDER: after review of the parties' Joint Statement 37 , the court further amends the Scheduling Order 20 , see Elec. Order 25 , 28 , 34 , as follows: any motions to compel fact discovery shall be filed no later than May 2, 2022; any motion to reopen fact discovery to take the deposition of the third party witness identified at par. 2 of the Joint Statement 37 shall include a certification pursuant to Local Rule 7.1, shall be filed at earliest time practicable, and shall be supported by good cause; Plaintiff's trial experts must be designated and information contemplated by Fed. R. Civ. P. 26(a)(2) must be disclosed by June 3, 2022; Defendant's trial experts must be designated and information contemplated by Fed. R. Civ. P. 26(a)(2) must be disclosed by July 1, 2022; Expert depositions must be completed by August 30, 2022; dispositive motions must be filed no later than October 11, 2022. The scheduling order is not amended as to May 31, 2021 deadline for filing motions under the Rule 15(a)(2) "freely given" standard. Accordingly, any motion to amend shall be supported by good cause shown as required under Fed. R. Civ. P. 16(b)(4). (Kelly, Danielle) (Entered: 04/20/2022) |
| 05/02/2022 | 39 | First MOTION to Compel *Defendant to Provide Discovery* by Sharon Radfar. (Attachments: # 1 Exhibit Covino Deposition Transcript1, # 2 Exhibit Covino Deposition Transcript 2, # 3 Exhibit Covino Deposition Transcript 3, # 4 Exhibit Covino Deposition Notice)(Clague, Elizabeth) (Entered: 05/02/2022) |
| 05/02/2022 | 40 | MEMORANDUM in Support re 39 First MOTION to Compel *Defendant to Provide Discovery* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 05/02/2022) |
| 05/02/2022 | 41 | First MOTION to Compel *Compliance with KOR Subpoena* by Sharon Radfar. (Attachments: # 1 Exhibit Rowan Transcript 1, # 2 Exhibit Keeper of Records Subpoena, # 3 Exhibit Correspondence to Counsel for Keeper of Records)(Clague, Elizabeth) (Entered: 05/02/2022) |
| 05/04/2022 | 42 | MOTION to Continue Status Conference by Joseph I Covino.(Anderson, Kenneth) (Entered: 05/04/2022) |

| | | |
|---|---|---|
| 05/06/2022 | 43 | Judge Indira Talwani: ELECTRONIC ORDER **granting** 42 Motion to Continue Status Conference. The Status Conference set for 5/9/2022 is canceled and will be reset by the clerk. (Kelly, Danielle) (Entered: 05/06/2022) |
| 05/09/2022 | 44 | ELECTRONIC NOTICE of Hearing. Status Conference set for 5/20/2022 02:30 PM in Courtroom 9 (Remote only) before Judge Indira Talwani. |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | (MacDonald, Gail) (Entered: 05/09/2022) |
| 05/16/2022 | 45 | NOTICE of Appearance by Nicholas J. Schneider on behalf of Nonparty Keeper of Records for the George Mason University Police Department (Schneider, Nicholas) (Entered: 05/16/2022) |
| 05/16/2022 | 46 | Opposition re 41 First MOTION to Compel *Compliance with KOR Subpoena* filed by Nonparty Keeper of Records for the George Mason University Police Department. (Schneider, Nicholas) (Entered: 05/16/2022) |
| 05/16/2022 | 47 | AFFIDAVIT in Opposition re 41 First MOTION to Compel *Compliance with KOR Subpoena Declaration of Carl Rowan, Jr.* filed by Nonparty Keeper of Records for the George Mason University Police Department. (Schneider, Nicholas) (Entered: 05/16/2022) |
| 05/16/2022 | 48 | AFFIDAVIT in Opposition re 41 First MOTION to Compel *Compliance with KOR Subpoena Declaration of Eli S. Schlam, Esq.* filed by Nonparty Keeper of Records for the George Mason University Police Department. (Attachments: # 1 Exhibit Attachment 1, # 2 Exhibit Attachment 2)(Schneider, Nicholas) (Entered: 05/16/2022) |
| 05/18/2022 | 49 | First MOTION for Leave to File *Reply to Opposition to Motion to Compel Compliance with a Subpoena* by Sharon Radfar.(Clague, Elizabeth) (Entered: 05/18/2022) |
| 05/18/2022 | 50 | Opposition re 39 First MOTION to Compel *Defendant to Provide Discovery* filed by Joseph I Covino. (Attachments: # 1 Exhibit Ex. A Covino Transcript, # 2 Exhibit Ex. B Covino Transcript)(Anderson, Kenneth) (Entered: 05/18/2022) |
| 05/19/2022 | 51 | Judge Indira Talwani: ELECTRONIC ORDER: Defendant's Opposition 50 to Plaintiff's First Motion to Compel 39 is untimely. See Local Rule 7.1(b)(2). Although the court will not strike the late filing, counsel is reminded of his obligation to respond timely or, in advance of the due date, to seek an extension of time. (Kelly, Danielle) (Entered: 05/19/2022) |
| 05/20/2022 | 54 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Status Conference held on 5/20/2022. Case called. Court had colloquy with counsel. Fact discovery is closed. Plaintiff stated there may be a motion to depose a witness who has been unavailable. Defendant's trial experts, if any, must be designated by 7/1/22; any rebuttal by Plaintiff shall be designated by 8/1/22; all experts must be deposed by |

| | | |
|---|---|---|
| | | 8/30/22. Dispositive motions due 10/11/22. Motion to compel at document 41 denied. By 5/27/22, Defendant shall serve an amended response that details all docs that have been produced. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Elizabeth M. Clague, Kenneth H. Anderson, Nicholas J. Schneider) (MacDonald, Gail) (Entered: 05/24/2022) |
| 05/23/2022 | 52 | Judge Indira Talwani: ELECTRONIC ORDER denying Plaintiff's Motion to Compel 41 a nonparty university located in Fairfax, Virginia, where "a motion for an order to a nonparty must be made in the court where discovery is or will be taken." Fed. R. Civ. P. 37(a)(2). Plaintiff's Motion for Leave to File Reply 49 is denied as moot. (Kelly, Danielle) (Entered: 05/23/2022) |
| 05/23/2022 | 53 | Judge Indira Talwani: ELECTRONIC ORDER granting in part Plaintiff's Motion to Compel 39 . Defendant shall serve a supplemental response no later than May 27, 2022, to Requests 1 - 4 of Plaintiff's First Request for Production of Documents. If all responsive documents in Defendant's possession or control have been produced, the supplemental response shall so state. The motion is otherwise denied. (Kelly, Danielle) (Entered: 05/23/2022) |
| 10/04/2022 | 55 | Assented to MOTION for Extension of Time to October 14, 2022 to File Motion for Summary Judgment by Joseph I Covino.(Anderson, Kenneth) (Entered: 10/04/2022) |
| 10/04/2022 | 56 | Judge Indira Talwani: ELECTRONIC ORDER **granting** 55 Assented to Motion for Extension of Time to October 14, 2022 to File Motion for Summary Judgment. (Kelly, Danielle) (Entered: 10/04/2022) |
| 10/14/2022 | 57 | MOTION to Seal *Pursuant to Local Rule 7.2 to Temporarily Impound (1) Defendants Motion For Relief From And/Or Modification to This Courts February 22, 2022 Order Restricting Use Of Plaintiffs Fitness-For-Duty Evaluations And (2) Defendant Joseph I. Covinos Motion And Memorandum Of Law In Support Of Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56* by Joseph I Covino.(Anderson, Kenneth) (Entered: 10/14/2022) |
| 10/18/2022 | 58 | Judge Indira Talwani: ELECTRONIC ORDER: staying the deadline to file a motion for summary judgment pending further court order and denying without prejudice in part and seeking a response in part Defendant Joseph I. Covino's Motion to Temporarily Impound 57 . Defendant's Motion to Temporarily Impound 57 is denied without prejudice as to filing under seal his (i) motion for summary judgment with memorandum of law in support and (ii) related Local Rule 56.1 statement of material facts. With respect to Defendant's request to temporarily impound his motion for relief from and/or modification to the court's February 22, 2022 Order 31 , Plaintiff's response is due by October 25, 2022. Defendant's counsel is reminded of the obligation to include a Local Rule 7.1 certificate with any motion filed in this session. (Kelly, Danielle) (Entered: 10/18/2022) |
| 10/25/2022 | 59 | First Opposition re 57 MOTION to Seal *Pursuant to Local Rule 7.2 to Temporarily Impound (1) Defendants Motion For Relief From And/Or Modification to This Courts February 22, 2022 Order Restricting Use Of Plaintiffs Fitness-For-Duty Evaluations And (2) Defendant Joseph I. Pursuant to Order dated October 18, 2022 filed by Sharon Radfar. (Attachments: # 1 Affidavit Affidavit in Support of Opposition with Attached Exhibits, # 2 Exhibit Exhibit 1 in Support Opposition, # 3 Exhibit Exhibit 2 in Support of Opposition, # 4 Exhibit Exhibit 3 in Support of Opposition)(Clague, Elizabeth) (Entered: 10/25/2022)* |
| 06/22/2023 | 60 | Judge Indira Talwani: ORDER entered. MEMORANDUM AND ORDER. Defendant Covino's Motion Pursuant to Local Rule 7.2 to Temporarily Impound the (1) Defendant's Motion for Relief from and/or Modification to this Court's February 22, 2022 Order |

| | | |
|---|---|---|
| | | Restricting Use of Plaintiff's Fitness-For-Duty Evaluations and (2) Defendant Joseph L. Covino's Motion and Memorandum of Law in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Doc. No. 57 ] is GRANTED in part and DENIED in part.<br><br>**IT IS SO ORDERED.** Please see attached. (Kelly, Danielle) (Entered: 06/22/2023) |
| 06/26/2023 | 61 | MOTION to Seal Document 60 Memorandum & ORDER,, *Defendant, Joseph Covino's*, MOTION to Modify Order restricting use of Fitness For Duty evaluations *of Plaintiff* ( Responses due by 7/10/2023) by Joseph I Covino. (Attachments: # 1 Exhibit Dr. Shugarman Report, # 2 Exhibit Dr. Smith Report, # 3 Exhibit Dr. Halper Report) (Anderson, Kenneth) (Entered: 06/26/2023) |
| 06/27/2023 | 62 | Judge Indira Talwani: ELECTRONIC ORDER: Defendant's counsel is warned that filing a document on the public docket with the words "Filed Under Seal" does not cause a document to be filed under seal. After leave has been granted for a document to be filed under seal, the filer will receive instructions from the Docket Clerk as to the sealing procedure. See Electronic Case Filing CM/ECF guidance on the court's website. Any further violations of sealing protocol by Defendant's counsel will be sanctioned by the court. (MacDonald, Gail) (Entered: 06/27/2023) |
| 07/19/2023 | 63 | Opposition re 61 MOTION to Seal Document 60 Memorandum & ORDER,, *Defendant, Joseph Covino's* MOTION to Modify Order restricting use of Fitness For Duty evaluations *of Plaintiff With Attached Exhibits 1-3 Timely Filed Pursuant to Order of June 22, 2023(Talwani,J.)* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 07/19/2023) |
| 12/13/2023 | 64 | **This document has been STRICKEN from the record pursuant to Electronic Order [#66].** ~~Opposition re 61 MOTION to Seal Document 60 Memorandum & ORDER,, *Defendant, Joseph Covino's* MOTION to Modify Order restricting use of Fitness For Duty evaluations *of Plaintiff and re 63 Plaintiff's Opposition thereto* filed by Nonparty Keeper of Records for the George Mason University Police Department.~~ (Schneider, Nicholas) Modified on 3/21/2024 (Kelly, Danielle). (Entered: 12/13/2023) |
| 03/21/2024 | 65 | Judge Indira Talwani: ORDER entered. MEMORANDUM AND ORDER. Please see attached.<br><br>Defendant Joseph Covino's Motion for Relief from and/or Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness for Duty Evaluations [Doc. No. 61 ] is DENIED.<br><br>**IT IS SO ORDERED.** (Kelly, Danielle) (Main Document 65 replaced on 3/21/2024) (Kelly, Danielle). (Entered: 03/21/2024) |
| 03/21/2024 | 66 | Judge Indira Talwani: ELECTRONIC ORDER striking Nonparty George Mason University's ("George Mason") Opposition to Plaintiff Sharon Radfar's Request for Relief 64 . George Mason asserts that it "appears only for [a] limited purpose..., without conceding this Court's jurisdiction over it, and to spare [George] Mason the further inconvenience and expense of moving to transfer Radfar's request for relief to [a different] venue." Id. at 1, n.1. Where George Mason is not a party to this litigation, the filing without first seeking leave to intervene is improper.(Kelly, Danielle) (Entered: 03/21/2024) |
| 03/26/2024 | 67 | Set/Reset Deadlines: Cross Motions due by 4/10/2024. (MacDonald, Gail) (Entered: 03/26/2024) |
| 04/09/2024 | 68 | MOTION for Summary Judgment by Joseph I Covino.(Anderson, Kenneth) (Entered: 04/09/2024) |

| 04/09/2024 | 69 | MEMORANDUM in Support re 68 MOTION for Summary Judgment filed by Joseph I Covino. (Anderson, Kenneth) (Entered: 04/09/2024) |
|---|---|---|
| 04/09/2024 | 70 | Statement of Material Facts L.R. 56.1 re 68 MOTION for Summary Judgment filed by Joseph I Covino. (Attachments: # 1 1 - Plaintiff's Complaint, # 2 2 - Plaintiff's Answers to Interrogatories, # 3 3 -Covino's Answers to Interrogatories, # 4 4 - March 12 Text Messages from Radfar, # 5 5 - Plaintiff's Deposition, # 6 6 - Abuse Prevention Order, # 7 7 - Abuse Prevention Order Affidavit, # 8 8 - Lt. Ganley Deposition, # 9 9 - Covino Deposition, # 10 10 - Chief Rowan Deposition, # 11 11 - Virginia State Police Record, # 12 12 - 1-25-17 Email From Lt. Ganley to Covino, # 13 13 - 1-27-17 Email from S.A. Kinnard to Covino, # 14 14 - 10-26-20 Affidavit of Covino, # 15 15 - 1-31-17 Administrative Leave Letter, # 16 16 - 1-31-17 Cease & Desist Trespass Order, # 17 17 - Screen shots of text messages, # 18 18 - Code of Virginia sec. 18.2-427, # 19 19 - Copy disc to be provided to court and counsel via mail, # 20 20 - Radfar v. Crowley, et al, # 21 21 - Letter of Resignation)(Anderson, Kenneth) (Entered: 04/09/2024) |
| 04/09/2024 | 71 | CERTIFICATE OF CONSULTATION pursuant to LR 7.1 re 69 Memorandum in Support of Motion, 70 Statement of Material Facts L.R. 56.1,,,, 68 MOTION for Summary Judgment by Kenneth H. Anderson on behalf of Joseph I Covino. (Anderson, Kenneth) (Entered: 04/09/2024) |
| 04/10/2024 | 72 | Judge Indira Talwani: ELECTRONIC ORDER directing Defendant Covino to file a Corrected Memorandum of Law in Support of Motion for Summary Judgment and a Corrected Statement of Material Facts (without refiling the attachments) in compliance with this sessions Standing Order Regarding Motion Practice and this electronic order.<br><br>This session's Standing Order Regarding Motion Practice requires that "[t]he font used in all filings shall be at least 12-point for all text, including footnotes," "[a]ny memorandum exceeding ten pages shall include a table of contents and table of authorities (which need not be counted towards the page length)," "[m]emoranda in support of or opposition to a motion shall be filed after evidentiary material is docketed," and "[c]itations to the evidentiary material or other material on the docket shall include the CM/ECF generated document number and page number. The following citation convention shall be used to allow hyperlinking and consistent pagination: Document Title (including Exhibit Number), Doc. No. __ at __." Standing Order ¶¶ 1, 2, 3. The Memorandum of Law fails to comply with these requirements. In addition, while paragraph 3 of the standing order includes the citation requirement only for memoranda, the court would be greatly assisted in reviewing the evidentiary record if Defendant provided the same citation form as to the evidentiary support identified in the Statement of Material Facts. (Kelly, Danielle) (Entered: 04/10/2024) |
| 04/11/2024 | 73 | **This document has been STRICKEN from the record pursuant to Electronic Order [#75].** ~~MEMORANDUM in Support re 68 MOTION for Summary Judgment filed by Joseph I Covino.~~ (Anderson, Kenneth) Modified on 4/11/2024 (Kelly, Danielle). (Entered: 04/11/2024) |
| 04/11/2024 | 74 | **This document has been STRICKEN from the record pursuant to Electronic Order [#75].** ~~Statement of Material Facts L.R. 56.1 re 68 MOTION for Summary Judgment filed by Joseph I Covino.~~ (Anderson, Kenneth) Modified on 4/11/2024 (Kelly, Danielle). (Entered: 04/11/2024) |
| 04/11/2024 | 75 | Judge Indira Talwani: ELECTRONIC ORDER striking 73 and 74 for failing to comply with the court's directive that "'[c]itations to the evidentiary material or other material on the docket shall include the CM/ECF generated document number and page number. The following citation convention shall be used to allow hyperlinking and consistent pagination: Document Title (including Exhibit Number), Doc. No. __ at __.' Standing |

| | | |
|---|---|---|
| | | Order ¶¶ 1, 2, 3. The Memorandum of Law fails to comply with these requirements. In addition, while paragraph 3 of the standing order includes the citation requirement only for memoranda, the court would be greatly assisted in reviewing the evidentiary record if Defendant provided the same citation form as to the evidentiary support identified in the Statement of Material Facts." See Elec. Order 72 .

Counsel for Defendant Covino is ordered to refile his Memorandum of Law and Statement of Material Facts providing citations as directed by the court's electronic order and standing order. To avoid burdening the court, the filings shall be searchable pdfs and not scanned documents. (Kelly, Danielle) (Entered: 04/11/2024) |
| 04/15/2024 | 76 | Judge Indira Talwani: ELECTRONIC ORDER Plaintiff's time to respond to Defendant's Motion for Summary Judgment 68 is extended to 21 days following Defendant's filing of a corrected Memorandum and Statement of Facts as directed by the court. See Elec. Order 75 . (Kelly, Danielle) (Entered: 04/15/2024) |
| 04/16/2024 | 77 | Amended Statement of Material Facts L.R. 56.1 re 68 MOTION for Summary Judgment filed by Joseph I Covino. (Anderson, Kenneth) (Entered: 04/16/2024) |
| 04/16/2024 | 78 | Amended MEMORANDUM in Support re 68 MOTION for Summary Judgment filed by Joseph I Covino. (Anderson, Kenneth) (Entered: 04/16/2024) |
| 05/07/2024 | 79 | First Opposition re 68 MOTION for Summary Judgment *Affidavit of Contents and Exhibits* filed by Sharon Radfar. (Attachments: # 1 Exhibit Hearing Transcript, # 2 Exhibit DefTxtw/friend, # 3 Exhibit DeftxttoGMUPD, # 4 Exhibit VASPReport)(Clague, Elizabeth) (Entered: 05/07/2024) |
| 05/07/2024 | 80 | First Statement of Material Facts L.R. 56.1 re 68 MOTION for Summary Judgment *Opposition w/Table of Contents* filed by Sharon Radfar. (Clague, Elizabeth) (Entered: 05/07/2024) |
| 05/07/2024 | 81 | First MEMORANDUM in Opposition re 68 MOTION for Summary Judgment *w/Table of Contents and Table of Authorities* filed by Sharon Radfar. (Attachments: # 1 Table of Contents, # 2 Table of Authorities)(Clague, Elizabeth) (Entered: 05/07/2024) |
| 05/14/2024 | 82 | Final Statement of Material Facts L.R. 56.1 re 68 MOTION for Summary Judgment *in Response to Plaintiff's Statement of Material Facts* filed by Joseph I Covino. (Anderson, Kenneth) (Entered: 05/14/2024) |
| 09/11/2024 | 83 | ELECTRONIC NOTICE Setting Hearing on Motion 68 MOTION for Summary Judgment : Motion Hearing set for 10/10/2024 11:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (MacDonald, Gail) (Entered: 09/11/2024) |
| 10/07/2024 | 84 | Assented to MOTION to Continue Hearing on Pending Motions to 11/22/2024 by Sharon Radfar.(Clague, Elizabeth) (Entered: 10/07/2024) |
| 10/08/2024 | 85 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 84 Assented to MOTION to Continue Hearing on Pending Motions to 11/22/2024 filed by Sharon Radfar.

Motion Hearing re 68 MOTION for Summary Judgment filed by Joseph I Covino set for 10/10/2024 is RESET for 11/22/2024 11:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani.

(MacDonald, Gail) (Entered: 10/08/2024) |
| 11/22/2024 | 87 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Motion Hearing held on 11/22/2024 re 68 MOTION for Summary Judgment filed by Joseph I Covino. Case called. Court heard argument from counsel. Motion taken under advisement. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (Attorneys |

| | | present: Elizabeth M. Clague, Kenneth H. Anderson) (MacDonald, Gail) (Entered: 11/25/2024) |
|---|---|---|
| 12/05/2024 | 88 | Judge Indira Talwani: ORDER entered. MEMORANDUM AND ORDER. For the foregoing reasons, Defendant Joseph I. Covino's Motion for Summary Judgment [Doc. No. 68 ] is GRANTED.<br><br>**IT IS SO ORDERED.** (Cook, Savannah) (Entered: 12/05/2024) |
| 12/06/2024 | 89 | Judge Indira Talwani: ORDER entered. JUDGMENT. (Cook, Savannah) (Entered: 12/06/2024) |
| 01/02/2025 | 90 | ~~NOTICE OF APPEAL to the Federal Circuit as to 89 Judgment by Sharon Radfar Filing fee: $ 605, receipt number CMADC-10769495 Fee Status: Filing Fee paid. US District Court Clerk to deliver official record to Court of Appeals by 1/22/2025.~~ (Clague, Elizabeth) Modified on 1/16/2025 (MAP). (Entered: 01/02/2025) |
| 01/02/2025 | 91 | NOTICE OF APPEAL as to 89 Judgment. Filing fee: $ 605, receipt number CMADC-10769495 Fee Status: Filing Fee paid. by Sharon Radfar NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 1/22/2025. (Cook, Savannah) Modified on 1/16/2025 (MAP). Modified on 1/16/2025 (MAP). (Entered: 01/03/2025)** |
| 01/03/2025 | 92 | Notice of correction to docket made by Court staff. Correction: Docket Entry 90 Notice of Appeal Corrected Because: The Notice of Appeal Was Filed Under the Wrong Event in CM/ECF. The Notice of Appeal was Re-Docketed Under the Correct Appellate Event in CM/ECF. See Docket Entry 91 . (Cook, Savannah) (Entered: 01/03/2025) |
| 01/16/2025 | 93 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 91 Notice of Appeal. (MAP) (Entered: 01/16/2025) |
| 01/16/2025 | 94 | USCA Case Number 25-1068 for 91 Notice of Appeal, filed by Sharon Radfar. (MAP) (Entered: 01/16/2025) |
| 01/17/2025 | 95 | TRANSCRIPT ORDER FORM *Timely filed* by Sharon Radfar for proceedings held on Hearings on 02/22/01;10/04/01;03/21/22;05/20/22;11/22/24 Judge Judge Indira Talwani.. (Clague, Elizabeth) (Entered: 01/17/2025) |
| 03/31/2025 | 96 | Transcript of Telephonic Scheduling Conference held on February 22, 2021, before Judge Indira Talwani. COA Case No. 25-1068. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 97 | Transcript of Status Videoconference held on October 4, 2021, before Judge Indira Talwani. COA Case No. 25-1068. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |

| 03/31/2025 | 98 | Transcript of Status Videoconference held on March 21, 2022, before Judge Indira Talwani. COA Case No. 25-1068. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 99 | Transcript of Status Videoconference held on May 20, 2022, before Judge Indira Talwani. COA Case No. 25-1068. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 100 | Transcript of Motion Hearing held on November 22, 2024, before Judge Indira Talwani. COA Case No. 25-1068. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 101 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/31/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/05/2025 14:33:47 | | |
| **PACER Login:** | Newcv0016 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-10178-IT |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER

_____
SHARON RADFAR,                     )
          Plaintiff                )
                                   )
V.                                 )
                                   )
CITY OF REVERE,and                 )
BRIAN M. ARRIGO,                   )
     MAYOR; and                    )
JAMES GUIDO,                       )          **COMPLAINT**
     CHIEF OF POLICE; and          )
SERGEANT JOSEPH I.COVINO; and      )
OTHER AS YET UNNAMED               )
OFFICERS OF THE                    )
REVERE POLICE DEPARTMENT;          )
INDIVIDUALLY AND IN THEIR          )
OFFICIAL CAPACITIES AS MAYOR       )
CHIEF OF POLICE AND                )
POLICE SERGEANT AND OFFICERS       )
OF THE CITY OF REVERE,             )
          Defendants               )
_____)

## **Parties**

1.    Sharon Radfar is a citizen of the United States.

2.    Brian M. Arrigo was at the time of the
transactions and occurrences alleged the Mayor of the City of
Revere.

3.    James Guido was at the time of the
transactions and occurrences alleged the Chief of the

1

Revere Police Department.

4.    Joseph I. Covino was time of the transactions and occurrences alleged a sergeant on the Revere Police Department who had a past involvement with the Plaintiff.

5.    The City of Revere is a municipal corporation; being a government entity organized under the laws of the Commonwealth of Massachusetts and subject to the duties and requirements imposed by the U.S. Constitution and applicable federal law.

## Facts

6.    On the evening of January 31, 2017 Plaintiff, a veteran George Mason University Master Police Officer in Virginia, had four uniformed officers seize her service weapons and hand her an Abuse Prevention Order obtained *ex parte* by Defendant Covino in the Lynn Massachusetts District Court and a letter from her employer suspending her pending an investigation of criminal charges alleged against her by Defendant Covino.

7.    Covino obtained the order by appearing in front of a judge and misrepresenting calls and messages the two had exchanged, failing to disclose pertinent information and making false and misleading claims alleging that Plaintiff had threatened him and placed him in imminent fear of physical harm

2

17

when she had in fact done nothing of the kind. He felt he deserved the order because she did not obey him when he ordered her not to come to the Commonwealth of Massachusetts.

8.    Covino, acting in concert and with the advice of unnamed Revere Police officers, filed a Complaint for Protection from Abuse and an affidavit both of which contained false and misleading claims about the Plaintiff.

9.    Covino called Plaintiff's employer, making the same false and misleading claims against her, and causing her employer to suspend her, open an investigation and seek criminal charges against Plaintiff.

10.    Covino relentlessly pursued criminal charges against Plaintiff though he knew she had committed no crime and those charges and claims were false.

11.    Covino's pursuit of the Plaintiff and his efforts to have her criminally charged and cause her to lose her job continued for months after the Lynn District Court vacated the Abuse Prevention Order against Plaintiff and ordered return of her weapons on the first date Plaintiff was given to be heard just two weeks after entry of the order *ex parte*.

12.    Covino falsely and maliciously accused Plaintiff of a crime he knew she did not commit. Acting under color of

3

18

law, he drafted a Revere Police Department incident report making his false claims, listing himself as the victim, the reporting officer and the supervisor approving the report.

13.   Defendants knew well that Covino was wrongly engaged in efforts to have Plaintiff criminally charged, to cause the loss of her career and to destroy her life, and all knew Plaintiff was not the perpetrator of domestic violence or abuse of Covino. Defendants also knew of his lengthy history of misconduct and failed to train, discipline or in any manner properly supervise him.

14.   Defendants' misconduct toward Plaintiff caused her the loss of her job.

15.   Due to the misconduct by the Defendants Plaintiff's private telephone records were the subject of a search warrant in which a court within the jurisdiction where she was employed as a police officer received the smears that had been leveled against her.

16.   Months later and despite Defendant Covino's best efforts, Virginia authorities declined to charge Plaintiff with any crime.  She was not charged with any crime in the Commonwealth of Massachusetts.  When she appeared for her first hearing on the restraining order, it was vacated.

17.   Defendant Covino's campaign to destroy Plaintiff continued for months after the restraining order was vacated, and he made repeated false statements to Virginia investigators in an attempt to get her charged but failed and refused to let them know that his restraining order had been vacated.

18.   Defendants treated Plaintiff differently from other similarly situated persons for impermissible reasons. Covino weaponized his official status as a police sergeant to exact revenge because Plaintiff had told him he was racist and due to his fury and bitterness that she would dare criticize him for his behavior toward her. All Defendants treated this woman of Iranian descent differently than they would have a man and a person of European descent due to their gender and national origin animus.

19.   As a result of the Defendants' misconduct and violations of her Constitutional rights, Plaintiff has suffered severe injuries and losses including but not to limited trauma, loss of her position and her career as a police officer, humiliation and oppobrium in the law enforcement community, and great pain of body and mind that persists and interferes with her ability to carry on her regular activities to this day.

20.   In addition, Plaintiff has suffered damage to her

ability to maximize her potential earnings, and has
suffered substantial financial losses.

     21.  Defendants City of Revere, Arrigo, Guido and as
yet unnamed officers all engaged in a custom and policy of
failing to train and discipline officers in providing proper
responses to domestic abuse and protection of constitutional
rights.

     22.  Defendants City of Revere, Arrigo, Guido and as
yet unnamed officers engaged in a custom and policy of
protecting men who are members of the law enforcement fraternity
from the consequences of violating the law.

     23.  Defendants City of Revere, Arrigo, Guido and as
yet unnamed officers showed a deliberate indifference to
the need for training, supervision, or discipline of Defendant
Covino and Other Unnamed Officers.

## **Jurisdiction**

     24.  This action arises under U.S.C.A. Const.Amend. 1,
U.S.C.A. Const.Amend. 4, U.S.C.A. Const.Amend. 5,U.S.C.A.
Const.Amen. 8, U.S.C.A. Const.Amend. 14, 42 U.S.C.A. s. 1983,
42 U.S.C.A. s. 1985(2) and (3), 42 U.S.C.A. 1986, the
Massachusetts Declaration of Rights, M.G.L.A. c. 12 s.11H-I, and

6

21

where a person alleges violations of her federal constitutional rights in transactions and occurrences taking place within this District.

## **Claims for Relief**

COUNT I.-EQUAL PROTECTION VIOLATIONS-Abuse of Authority Under Color of Law

25.   Plaintiff hereby realleges paragraphs 1–24 and and incorporate the same by reference as if fully set forth in this Count.

26.   Defendants owed Plaintiff a duty to enforce the protection of the laws equally pursuant to U.S.C.A. Const. Amend.5 and U.S.C.A. Const.Amend.14 guaranteeing persons equal protection of the laws and equal enjoyment of the privileges and immunities of citizenship.

27.   Defendants Covino and unnamed officers breached said duty by acting as agents to secure the vengeful private interests of Covino and all wrongfully acted under color of law.  Defendants endeavored to assist Covino in obtaining an advantage over her in his civil proceedings initiated maliciously and as an abuse of process.  As a result of Defendants' intentional, reckless and willful violations of Plaintiff's rights under the Constitution of the United States and the Massachusetts Declaration of Rights,

Plaintiff has sustained emotional distress due to the ordeal of being wrongly targeted and unlawfully harassed and falsely and maliciously accused of crimes she did not commit   As a result thereof Plaintiff continues to suffer great pain of body and mind. Plaintiff has been deprived of her lengthy career, has been deprived of her opportunity to assert her constitutional rights and deprived the enjoyment of her substantive constitutional rights, and Plaintiff has been and continues to be unable to carry on her normal activities.

COUNT II.–SELECTIVE PROSECUTION–Gender and National Origin

28.  Plaintiff hereby realleges paragraphs 1–27 and and incorporates the same by reference as if fully set forth in this Count.

29.  Covino and Other Unnamed Officers intentionally, wilfully, and recklessly and repeatedly wrongly accused Plaintiff of crimes, maliciously defamed her and abused process in a campaign to humiliate Plaintiff although they knew she committed no crime for the impermissible reasons of gender bias and national origin bias.

30.  Defendants' repeated selective enforcement of the law for the benefit of Covino and as his agents violated Plaintiff's rights to equal protection of the laws and the

8

privileges and immunities of citizenship enumerated in U.S.C.A. Const.Amend. 5 and U.S.C.A.Const.Amend.14.

### COUNT III.-DEFAMATION

31.  Plaintiff hereby realleges paragraphs 1-20 and 29 and incorporates the same by reference as if fully set forth in this Count.

32.  Defendants indicated to Plaintiff's employer and others that she had committed criminal acts.

33.  Defendants knew Plaintiff had not violated any laws nor committed any crime.

34.  Said conduct was defamatory per se.

35.  Plaintiff suffered grievous injury to her reputation and loss of her ability to earn a living and great pain of mind and body that continues to this day as a result of Defendants' conduct. As a result Plaintiff has been unable to carry on her normal activities.

### COUNT IV.-MASSACHUSETTS CIVIL RIGHTS ACT

36.  Plaintiff hereby realleges paragraphs 1-30 and and incorporates the same by reference as if fully set forth in this Count.

37.  Defendants by their conduct deprived Plaintiff of her rights under the Massachusetts Declaration of Rights and

the United States constitution by means of intimidation and coercion. Defendants endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy.

38.  Plaintiff is entitled to injunctive relief, damages, attorneys fees and other relief pursuant to M.G.L.A. c. 12 s.11H-I because Defendants engaged in said threats, coercion and intimidation under color of law in violation of said statute and 42 U.S.C.A.§ 1983.

COUNT V.-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

39.  Plaintiff hereby realleges paragraphs 1-27 and and incorporates the same by reference as if fully set forth in this Count.

40.  Defendants' acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon Plaintiff.

41.  As a direct and proximate cause of said misconduct, Plaintiff suffered at the time and continues to suffer stomach disturbances, weight loss, nightmares, anxiety and a fear of police officers.

COUNT VI.-DELIBERATE INDIFFERENCE TO NEED FOR TRAINING

10

25

42. Plaintiff hereby realleges paragraphs 1, 8, 12-41 and incorporates the same by reference as if fully set forth in this Count.

43. Defendants City of Revere's, Arrigo's, Guido's and other unnamed officer's deliberate indifference to the need for training, supervision and discipline of Defendants Covino and Other Unnamed Officers caused the Plaintiff to suffer the grievous injuries described in this Complaint when said officers engaged in the misconduct alleged throughout this Complaint.

COUNT VII-CONSPIRACY TO VIOLATE CIVIL RIGHTS

44. Plaintiff hereby realleges paragraphs 1-43 and and incorporates the same by reference as if fully set forth in this Count.

45. Plaintiff was intimidated, threatened and coerced not to offer testimony or assert her position in a case in which she was a witness and a party by the misconduct of two or more of the Defendants, and further two or more of the Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice in the Commonwealth of Massachusetts, with intent to deny to Plaintiff the equal protection of the laws.

46. Defendants thereby conspired to deprive Plaintiff

11

of her constitutional rights in violation of 42 U.S.C.A. §1985(2) and (3).

47.  Plaintiff has suffered lasting emotional and physical harm and a continuing deprivation and damage to of her financial interests as a result.

COUNT VIII--REFUSAL TO PREVENT WRONGS COMMITTED AGAINST PLAINTIFF

48.  Plaintiff hereby realleges paragraphs 1-47 and and incorporates the same by reference as if fully set forth in this Count.

49. Defendants knew of the wrongs they each and severally were committing against Plaintiff.

50.  Said Defendants, knowing of and having the power to prevent or aid in the prevention of said wrongs, refused to do so.

51.  As a result of their refusal to prevent said wrongs, incurred liability pursuant to 42 U.S.C. §1986.

COUNT IX.-ABUSE OF PROCESS

52.  Plaintiff hereby realleges paragraphs 1-27 and incorporates them as if fully set forth herein.

53. Defendant Covino knew he was not entitled to an Abuse Prevention Order against Plaintiff and despite his

12

27

knowledge, falsely and maliciously filed a Complaint for
Protection from Abuse seeking such an order.

54.    Defendant advanced his knowingly false claims
with the ulterior motive of exacting revenge against Plaintiff
and destroying her career and her life.

55.    Said misconduct by Defendant Covino
caused Plaintiff incur legal fees and to suffer
humiliation, embarrassment, anguish and to cause her reputation
in the community and with her employer to suffer such that she
lost her job and her career.

## COUNT X-MALICIOUS PROSECUTION

56.    Plaintiff hereby realleges paragraphs 1-27; and
52-55 and incorporates them as if fully set forth herein.

57.    Defendant Covino acting under color of law drafted
and pursued criminal reports and paperwork consisting of his
knowingly false statements accusing Plaintiff of criminal acts.

58.    Defendant advanced said knowingly false claims
against Plaintiff with the ulterior motive of obtaining revenge
and destroying her career and her life.

59.    Said misconduct by Defendant Covino caused
Plaintiff to incur legal fees before Defendant's claims against

13

28

Plaintiff were rejected for lack of evidence. Further Plaintiff suffered humiliation, embarrassment, anguish that persists to this day.

## **Demands for Judgment**

Plaintiff respectfully demands a trial by jury on all issues to the full extent provided by law.

WHEREFORE Plaintiff, Sharon Radfar, prays  for judgment:

1.    Granting Injunctive and Declaratory Relief;

2.    Awarding Plaintiff compensatory damages, with interest;

3.    Awarding Plaintiff punitive damages;

4.    Awarding Plaintiff her costs, including reasonable attorneys fees, pursuant to 42 U.S.C.A. s. 1983 and M.G.L.A. c.12 s.11I.

5.    Granting such other and further relief as the Court may deem just and proper.


Respectfully submitted,


14

Dated: January 29, 2020

Sharon Radfar
By her attorney

S/Elizabeth M. Clague

_____
Elizabeth M. Clague
Attorney for the Plaintiff
The Kennedy Building
142 Main Street, Suite 304
Brockton, MA 02301
(508) 587-1191
BBO# 632341

15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR )
    Plaintiff )
)
v. )
)
)
CITY OF REVERE, and )
BRIAN M. ARRIGO, MAYOR; and )
JAMES GUIDO, CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED OFFICERS )
OF THE REVERE POLICE )
DEPARTMENT; INDIVIDUALLY AND )
IN THEIR OFFICIAL CAPACITIES AS )
MAYOR, CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
    Defendants )

DEFENDANT JOSEPH I. COVINO'S MOTION AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN ITS ENTIRETY
PURSUANT TO FED.R.CIV.P. 12(b)(6) AND FED.R.CIV.P. 56

AND

DEFENDANT'S SPECIAL MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS AND MOTION FOR COSTS AND REASONABLE ATTORNEY'S
FEES PURSUANT TO MASSACHUSETTS GENERAL LAWS c. 231, § 59H

      Now comes defendant Joseph I. Covino, and hereby moves his Honorable Court pursuant

to Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 56, and M.G.L. c. 231, §59H (the Massachusetts anti-

SLAPP statute) to dismiss the plaintiff's complaint in its entirety.  As reason herefor, at all times

set forth in the plaintiff's complaint, defendant Covino was acting as a private citizen engaged in

the privileged act of petitioning the court system from relief from long standing harassment and

abuse committed by the plaintiff.  As such, the defendant was not engaged in any state action

that would give rise to a federal civil rights claim.  As defendant Covino was engaged in the act

of petitioning the court for relief from abuse, his actions were privileged.  In the instant case, a

justice of the Lynn District Court granted the defendant's request for relief from abuse, a ruling

that this court cannot revisit under the *Rooker-Feldman* doctrine.  Therefore, the doctrines of

issue preclusion and collateral estoppel prevent this court from revisiting the issuance of the

Abuse Prevention Order.  Additionally, at no time did any of defendant Covino's actions deprive

the plaintiff of any rights protected under law, nor did he act based upon the plaintiff's gender or

origin, nor did Covino at any time employ "threats, intimidation or coercion" against the

plaintiff, nor was there every any prosecution or process issued against the defendant, let alone a

prosecution or process not supported by probable cause.  As such, all of the plaintiff's claims

must fail.  Finally, as all of the defendant's actions were protected acts of petitioning a court for

assistance, the defendant is entitled to "costs and reasonable attorney's fees" pursuant to G.L. c.

231, § 59H.

<u>BACKGROUND</u>

Plaintiff Sharon Radfar had brought a ten count complaint against defendant (Sergeant)

Joseph I. Covino, a police officer with the City of Revere.[1]  In addition to suing Covino, the

plaintiff has also sued the City of Revere, the Mayor of Revere, the Revere Police Chief, and

other unknown Lynn police officers.[2]  The plaintiff's complaint contains counts for federal equal

protection violations under color of law (Count I), selective prosecution based on gender and

origin (Count II), defamation (Count III), violation of Massachusetts of Civil Rights Act (Count

IV), intentional infliction of emotional distress (Count V), deliberate indifference to need for

---

[1] Defendant Covino right now holds the rank of Lieutenant with the Revere police department.  He held the rank of sergeant during the times at issue.  During the time that the defendant was involved with the plaintiff as alleged in the plaintiff's complaint, defendant Covino was acting in his capacity as a private citizen and not as a law enforcement officer.
[2] It is unclear if these parties have been served with the plaintiff's Complaint.  None of these parties have answered the Complaint.

training (Count VI – against municipal defendants only), conspiracy to violate civil rights (Count VII), refusal to prevent wrongs committed against plaintiff (Count VIII), abuse of process (Count IX), and malicious prosecution (Count X).

## ALLEGATIONS IN THE PLAINTIFF'S COMPLAINT

1. From a factual standpoint, the plaintiff alleges in her complaint that on January 31, 2017, four uniformed police officers seized her service weapons from her home in Northern Virginia where the plaintiff worked as a George Mason University Master Police Officer after defendant Covino obtained an Abuse Prevention Order against the plaintiff. (Plaintiff complaint, ¶¶6-8).

2. The plaintiff asserts that in petitioning the court for the Abuse Prevention Order, that defendant Covino acted in concert with and upon the advice of unnamed Revere police officers. (Complaint, ¶8).

3. The plaintiff alleges that Covino called plaintiff's employer and made false and misleading claims against the plaintiff, causing the plaintiff to be suspended from work and subject to an investigation. (Complaint, ¶9).

4. The plaintiff further alleges, with no specificity, that thereafter defendant Covino pursued criminal charges against the plaintiff which Covino knew to be false. (Complaint, ¶¶10-17).

5. Covino drafted an internal Revere police report that documented the plaintiff's actions between the summer of 2015 and January 29, 2017. (Complaint ¶12).[3]

6. Without any factual authority, the plaintiff also claims that she was treated differently by all the defendants based upon her Iranian descent (Complaint ¶18).

___

[3] As set forth in Exhibit B, ¶16, the Affidavit of Joseph I. Covino, this report was in internal report captioned "To: File." It was not sent to any Massachusetts law enforcement agencies and was not written for law enforcement purposes.

7. The plaintiff asserts that as a result of the conduct of all the defendants, she lost her position and her career as a police officer. (Complaint, ¶19).

<u>MATERIAL FACTS FROM THE DEFENDANT</u>

1. From a factual standpoint, paragraphs 6-9 of the plaintiff's complaint relate to a "Complaint for Protection from Abuse" that defendant Covino filed against the plaintiff Radfar in the Lynn District Court on January 31, 2017.[4]

2. The Affidavit filed in support of the Abuse Prevention Order lists Ms. Radfar as having an address of Sterling, Virginia. The Affidavit attests to Ms. Radfar "repeatedly attempt[ing] to contact [Covino] by any means necessary, to wit, telephone, text, written letters, social media, driving from VA to MA and showing up in my neighborhood or at my place of work." See Exhibit A, pg 2.

3. Among other allegations it states that Radfar:

"has called/texted over 400x on MLK weekend and called over 100X on 01/28/18. I have blocked over 100 phone numbers in the past year to avoid her. She uses an app that shows other numbers as just the #'s. She has shown up at my neighborhood uninvited or unannounced and demanded I come see her. She has threatened me with ruining my life and has stated 'if I can't have you, no one will!'" See Exhibit A, pg 2.

4. Defendant Convino's affidavit in support of the Abuse Prevention Order further states that Radfar had:

". . . assumed the identities of several people online in an attempt to follow/contact me. She splices pictures of herself to pics she finds online of me. Radfar has befriended several LEO's [law enforcement officers] who are friends of mine and are harassing them to get info about me. She verbally abuses me 100's of times per day accusing me of not acknowledging her due to her middle eastern descent. Her messages have become increasingly threatening and unstable as of last week. Because of her repeated Actions/threats, I am in

---

[4] A true and accurate copy of the Complaint for Protection from Abuse and a copy of the Abuse Prevention Order are attached hereto as Exhibit A. The Material Facts set forth herein are from the documents in Exhibit A and the attached Affidavit of Joseph I. Covino, attached hereto as Exhibit B. The documents in Exhibit A have been redacted of all personal information.

4

      absolute fear of grave danger from Radfar that I continuously carry a firearm for fear she will appear unannounced or armed." See Exhibit A., pg 2

5. Two days before petitioning the court for the Abuse Prevention Order, Covino documented the plaintiff's actions since the summer of 2015 in an internal Revere police report that was captioned "To: File." This report was not written for law enforcement purposes. See Exhibit B, ¶16.

6. After a hearing on January 31, 2017, a judge in the Lynn District Court issued the Abuse Prevention Order (Lynn District Court Docket Number 201713RO104) while checking the first box in Section A and issuing the Order "without advance notice because the Court determined there was a substantial likelihood of immediate danger of abuse." See Exhibit A, Order ¶A, pg 3. The Order was granted until February 15, 2017, at which time a two-party hearing was to be held. See Exhibit A, pg 4.

7. On February 15, 2017, the plaintiff and her attorney were present. See Exhibit A, pg 4. According to Section E of the Abuse Prevention Order, the Order was terminated at Plaintiff's [Covino's] request. See Exhibit A, pg 4. The handwritten notations from the court states: "Both parties present. Defendant may have the return of all weapons she surrendered." See Exhibit A, pg 4.

8. As noted in the attached Affidavit of Joseph Covino, the defendant in the instant action (plaintiff in the restraining order action) agreed to dismiss the Abuse Prevention Order because Radfar's attorney had impressed upon him that the Order had been a "wake-up call" to Radfar and because he did not want her inability to carry a firearm in Virginia to be an impediment to her employment. See Covino Affidavit, Ex. B, ¶18.

9. As set forth in the Affidavit of Joseph Covino, which authenticates the Complaint for Protection from Abuse, Covino met Radfar in late June of 2015 while Covino was

playing on a hockey team at "World Police and Fire Games" in Fairfax, Virginia. Exhibit B, ¶2. The plaintiff was allegedly a "volunteer/goodwill representative" at these games. Ex. B, ¶2.

10. Covino and Radfar started a romantic relationship at that time that followed an up-and-down-course from late June 2015 to the early fall of 2015. Ex. B, ¶¶4-8. The plaintiff visited Covino in the Boston area once on her own, with Covino ending the relationship during that visit. Exhibit B, ¶4. The plaintiff then visited the Boston area at a later date with a female friend in the early fall of 2015, after which Covino told the plaintiff he did not want to have any type of relationship with her. Ex. B, ¶¶6-7.

11. Following that time, the plaintiff began a disturbing pattern of stalking and harassing Covino that included the plaintiff twice driving from Virginia to Massachusetts unannounced, on one occasion showing up at Covino's place of work and on another occasion appearing in his neighborhood.[5] Ex. A, pg 2 and Ex. B, ¶¶8-18. Radfar appearance in Covino's neighborhood, coupled with the fact that Covino had blocked over 100 phone numbers to prevent the plaintiff from contacting him, resulted in Covino calling the plaintiff's place of employment. Ex. B, ¶¶13-14.

12. Ultimately, the plaintiff's erratic behavior and her incessant phone calls including over 400 calls or text messages over Martin Luther King weekend and 100 text messages or phone calls on January 28, 2017 prompted Covino to write an internal police report to document the situation, as well as prompting him going to the Lynn District Court on January 31, to petition the court for a Protection from Abuse Order. Ex. A, pgs 1-2 and Ex. B, ¶¶16-17.

---

[5] Paragraph 7 of the plaintiff's Complaint states, in part, that Covino "felt he deserved the order because she did not obey him when he ordered her not to come to the Commonwealth of Massachusetts," essentially admitting that the plaintiff came to Massachusetts from Virginia against Covino's wishes.

## ARGUMENT

The standard for dismissal under Fed.R.Civ.P. 12(b)(6) is clear: a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder* v. *Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957).  The Court must accept as true all of the allegations made in the complaint and draw all reasonable inferences in the plaintiff's favor. *Coyne* v. *City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992).  "If, on a motion under Rule 12(b)(6) or 12(c), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed.R.Civ.P.12(d).  On a motion to dismiss, civil rights claims are not subject to heightened standards of pleading. *Leatherman* v. *Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163 (1993) ("We think that it is impossible to square [a] 'heightened pleading standard' ... with the liberal system of 'notice pleading' set up by the Federal Rules.").  While detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi* v. *Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)(internal quotations and citations omitted).  The allegations set forth in the plaintiff's complaint fail to support any valid legal theories of recovery.

## CIVIL RIGHTS CLAIM

The plaintiff's claim for "Abuse of Authority Under Color of Law" in Count I of the plaintiff's complaint fails because at all material times, defendant Covino was acting in his

capacity as a private citizen.  It also fails because at no time did defendant Covino deprive the plaintiff of any rights guaranteed under the Constitution.  "To sustain an action under 42 U.S.C. § 1983," Radfar must prove both: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Collins* v. *Nuzzo*, 24 F.3d 246, 250 (1st Cir.2001).  Radfar can prove neither of these elements.

As set forth above, Covino petitioned the Lynn District Court as private citizen, seeking relief from the court after a long period of harassment and abuse by the plaintiff.  Covino was off-duty at the time of his court appearance. Ex B, ¶18.  He was not in uniform. *Ibid*. He did not wield any law enforcement powers and, in fact, was outside of Revere, the jurisdiction where he has law enforcement powers. *Ibid*.  Covino took the same actions any citizen would take when someone had endured what Covino set forth under oath in his Affidavit in support of the Abuse Prevention Order.  As noted, the plaintiff had called him four hundred times a weekend, had called him over a hundred times in one day, had created fake social media personas in order to stalk Covino and befriend his friends, and had showed up at his place of employment and then later in his neighborhood unannounced and uninvited, threating to cause a scene if Covino refused to visit her.  See Ex. A, pg 2.  Covino's petitioning the court for relief from abuse was the act of a private citizen, and was not done in Covino's capacity of a law enforcement officer or in conjunction with anyone employed by the Revere police department.

Generally, a private party's conduct will not subject him to liability under Section 1983. *Roche* v. *John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996).  A private party's conduct will be attributable to the state when the state "'has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the

challenged activity.'" *Camilo–Robles* v. *Hoyos*, 151 F.3d 1, 10 (1st Cir. 1998), quoting *Barrios–Velazquez* v. *Asociacion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 494 (1st Cir. 1996).  To distinguish private action from state action, "the general inquiry is whether 'a state actor's conduct occurs in the course of performing an actual or apparent duty of his office or ... is such that the actor could not have behaved in that way but for the authority of his office.'" *Zambrana–Marrero* v. *Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir. 1999), citing *Martinez* v. *Colon*, 54 F.3d 980, 986 (1st Cir. 1995).  Although this concept can be "particularly elusive when applied to police conduct," it is not so in this case. *Zambrana–Marrero*, 172 F.3d at 125. Covino's conduct did not occur in the course of his official duties, either actual or apparent.

The determination of whether a police officer was acting under color of state law requires a court to assess the totality of the circumstances and consider "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Zambrana–Marrero*, 172 F.3d at 125, quoting *Barreto–Rivera* v. *Medina-Vargas*, 168 F.3d 42, 46 (1st Cir. 1999).  The general inquiry is whether the officer's actions occurred while he was performing an actual or apparent duty or whether the officer could not have behaved the way he did "'but for the authority of his office.'" *Zambrana–Marrero*, 172 F.3d at 125, quoting *Martinez*, 54 F.3d at 986.  A defendant acts under color of state law when he exercises power that is "'possessed by virtue of state law'" and made possible because the defendant is clothed in the authority of state law.  *Martinez,* 54 F.3d at 986, quoting *West* v. *Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255 (1988).

There are certain discrete factors which a court may consider including the officer's clothing, their duty status and the existence of a regulation providing that officers are on duty twenty-four hours a day, the use of a police cruiser and police radio, and the use of police

equipment such as a service weapon, handcuffs or other traditional law-enforcement tools, whether the officer detained, interrogated, or searched a citizen, and the location of the incident. *See Zambrana–Marrero*, 172 F.3d at 128; *Barreto–Rivera*, 168 F.3d at 45, 48; *Parrilla–Burgos*, 108 F.3d at 449; *Martinez*, 54 F.3d at 985–86.  These factors, however, should not be applied in a simplistic or mechanical formula.  No single factor will be dispositive in a determination of whether an officer was acting under color of state law.  *Zambrana–Marrero*, 172 F.3d at 125; *Barreto–Rivera*, 168 F.3d at 45.  Here, it is clear that Covino was acting solely in his capacity as a private citizen.  He was on personal business on his own personal time in civilian clothes.  No law enforcement powers were employed.  As there was no state action, the plaintiff's civil rights claim fails.

Additionally, the plaintiff cannot establish the second element of a civil rights claim as she was never deprived of any right guaranteed under the Constitution.  A judge in the Lynn District Court considered the merits of what Covino set forth in his Affidavit in support of the order and granted Covino relief.  As such, the *Rooker–Feldman* doctrine and the full faith and credit statute, 28 U.S.C. § 1738, preclude this court's ability to revisit this issue.  The *Rooker–Feldman* doctrine provides that no federal district or appellate court has jurisdiction to review state court judgments.  *Sheehan* v. *Marr,* 207 F.3d 35, 39–40 (1st Cir. 2000); see *District of Columbia Ct. of Appeals* v. *Feldman*, 460 U.S. 462, 103 S.Ct. 1303 (1983); I, 263 U.S. 413, 44 S.Ct. 149 (1923).  For federal claims not presented in state court, *Rooker–Feldman* "forecloses lower federal court jurisdiction over claims that are 'inextricably intertwined' with the claims adjudicated in a state court." *Sheehan*, 207 F.3d at 39–40.  A federal claim is "inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it."  *Hill* v. *Conway*, 193 F.3d 33, 39 (1st Cir.

1999). The logic of this rule stems from the proposition that if a federal court were able to grant relief from the state-court judgment, it would be "difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Hill*, 193 F.3d at 39. Moreover, 28 U.S.C. § 1738 requires this court to give "the same preclusive effect to state court judgments—both as to claims and issues previously adjudicated—as would be given in the state court system in which the federal court sits." *Keystone Shipping Co.* v. *New England Power Co.*, 109 F.3d 46 (1st Cir. 1997), citing *Kyricopolous* v. *Town of Orleans*, 967 F.2d 14 (1st Cir. 1992). A state-court issued judgment has the same preclusive effect in § 1983 suits as in other federal suits. See *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 83–85, 104 S.Ct. 892 (1984).

With a judge in the Lynn District Court issuing a restraining order against Radfar pursuant to Mass. Gen. Laws chapter 209A, the doctrines of issue preclusion and collateral estoppel bar Radfar from relitigating in federal court whether the issuance of the restraining order was unconstitutional. Under Massachusetts law, for an issue to have preclusive effect in a subsequent proceeding, four elements must be present: "(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment." *Keystone Shipping Co.* v. *New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997), citing *Grella* v. *Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir. 1994). An issue may be "actually decided" where it "constituted, logically or practically, a necessary component of the decision reached in the prior litigation." *Grella*, 42 F.3d at 30–31; see *Keystone Shipping*, 109 F.3d at 51 (applying Massachusetts law). Here, the plaintiff's claims that Covino misrepresented phone calls and

11

messages between himself and the plaintiff, that he failed to disclose pertinent information to the court, or that he made misleading claims to the court cannot be relitigated here.

Even though the Abuse Prevention Order was subsequently dismissed at the request of defendant Covino at the two-party hearing on February 15, 2017, Covino's conduct in seeking relief from abuse from the court system, in contacting Radfar's employer, and then later speaking with a member of the Virginia State Police, were all protected petitioning activities under the anti-SLAPP statute and, in the circumstances of this case, the instant retaliatory civil suit filed against Covino was based entirely on his petitioning activity.

Massachusetts General Laws c. 231, § 59H, inserted by St.1994, c. 283, § 1, is popularly known as the "anti-SLAPP" law.  In *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 161 (1998), the Massachusetts Supreme Judicial Court recognized that "SLAPP suits have been characterized as 'generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.' *Wilcox* v. *Superior Court*, 27 Cal.App.4th 809, 816–817 [33 Cal.Rptr.2d 446] (1994).  Massachusetts's anti-SLAPP statute provides that "[i]n any case in which a party asserts that the [claims] against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss." Mass. Gen. Laws c. 231, § 59H. While the statute is said to provide a "procedural" remedy, it is arguably "substantive" state law and may be applied to state law claims filed in federal court. See *Godin* v. *Schencks*, 629 F.3d 79, 89-92 (1st Cir. 2010).

Under G.L. c. 231, § 59H, "'a party's exercise of its right to petition' shall mean any written or oral statements made before or submitted to a legislative, executive, *or judicial body*" [emphasis added].  As the Massachusetts Supreme Judicial Court held in *McLarnon* v. *Jokisch*,

431 Mass. 343, 347 (2000), the act of filing for an Abuse Protection Order and submitting supporting affidavits falls within the protected activities of petitioning under G.L. c. 231, sec. 59H.  As the *McLarnon* court wrote, "we note that the statute defines "a party's exercise of its right of petition" as including "any written or oral statement made before or submitted to a ... judicial body." G.L. c. 231, § 59H.  This phrase is broad enough to include filing for abuse protection orders and supporting affidavits as Jokisch and Douglas did here." *McLarnon*, 431 Mass. at 347.  As such, the court in *McLarnon* held that there was no error in the court granting the defendant's special motion to dismiss.  *Id.* at 349.

Similarly, when a person reports suspected criminal activity to the police, they are engaging in constitutionally-based petitioning activity for purposes of G.L. c. 231, § 59H. See *Keegan* v. *Pellerin*, 76 Mass.App.Ct. 186, 190 (2010)(alerting police of suspected crime is conduct that is "firmly protected" by § 59H). See also *Wenger* v. *Aceto*, 451 Mass. 1, 5-6 (2008)(filing criminal complaint is protected petitioning activity); *Benoit* v. *Frederickson*, 454 Mass. 148, 153 (2009)(report of rape to police is petitioning activity); *McLarnon*, 431 Mass. at 347 (request made of court to issue c. 209A protection order is exercise of petition right).  The question is not whether Covino was motivated by hostility toward Radfar, as an inquiry into the moving party's state of mind or motive is not a part of § 59H's threshold inquiry. See *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 122 (2002) ("motive behind the petitioning activity is irrelevant at this initial stage");  *Hanover* v. *New England Regional Council of Carpenters*, 467 Mass. 587, 590 n.6 (2014).  It suffices to say that "[w]e care not whether a [party] seeking dismissal under the anti-SLAPP statute is 'sincere' in his or her statements; rather, our only concern, as required by the statute, is that the [moving party] be truly 'petitioning' the government in the constitutional sense." *Kobrin* v. *Gastfriend*, 443 Mass. 327, 338 n.14 (2005).

If the defendant establishes that he was engaged in petitioning activity, the question then becomes whether "no reasonable person could conclude" that Covino's actions "were supported either in fact or in the law." *O'Gara* v. *St. Germaine*, 91 Mass.App.Ct. 490, 498 (2017), quoting *North Am. Expositions Co. Ltd. Partnership* v. *Corcoran*, 452 Mass. 852, 865-866 (2009). "[A]s long as a reasonable person could conclude that there was a legal basis for the petitioning activity, the party opposing the motion to dismiss has failed to meet [her] legal burden to demonstrate that the petitioning activity lacked any basis in law." *O'Gara* at 879. An examination of Radfar's lawsuit reveals that, despite the fact that she alleged multiple causes of action and harm to him personally and professionally, her allegations all stem from Covino's petitioning activity. No reasonable person could conclude that the petitioning lacked any basis in the law, and those issues are precluded by the doctrines of collateral estoppel and issue preclusion. As such, all such claims fail.

## EQUAL PROTECTION

Count II of the plaintiff's complaint alleges selective prosecution based on gender and national origin. This claim is defective for the reasons set forth above: that Covino never exercised any law enforcement powers, that was engaged in protected petitioning acts solely a private citizen, and that his actions never deprived the plaintiff of any rights protected by the Constitution, but they also fail as there is not a shred of evidence that any of Covino's actions were based upon the plaintiff's race or national origin. The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, a plaintiff must allege that he or she "was treated differently from others similarly situated ... based on impermissible considerations." *Clark* v. *Boscher*, 514 F.3d 107, 114 (1st Cir. 2008)(quotation marks and

citation omitted). "The Supreme Court has held that differential treatment based on suspect classifications (race, national origin, religion, or alienage) is subject to strict scrutiny; differential treatment based on quasi-suspect classifications (gender or illegitimacy) is subject to intermediate scrutiny; and differential treatment based on all other classifications simply must survive a rational basis inquiry." *Pineiro* v. *Gemme*, 937 F. Supp. 2d 161, 176 (D. Mass. 2013). "This showing of disparate treatment is a 'threshold requirement' of any equal protection claim." *Lu* v. *Smith*, No. 15-cv-14081-DJC, 2016 WL 4595206, at *3 (D. Mass. Sept. 2, 2016), quoting *Ayala-Sepulveda* v. *Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012). A violation of equal protection has occurred only where there has been a "'gross abuse of power, invidious discrimination, or fundamentally unfair procedures' or some sort of unjustified disparate treatment with respect to similarly situated" persons. *Collins* v. *Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001), citing *Creative Environments, Inc*. v. *Estabrook*, 680 F.2d 822, 832 n.9 (1st Cir. 1982). In the instant case, the plaintiff cannot show that Covino treated her any differently than he would have treated a woman of any other race who called him over four hundred times over Martin Luther King weekend, called a hundred times in one day, who forced him to block hundreds of phone numbers on his cell phone, and who twice drove from Virginia and showed up at his workplace and neighborhood and threatened to cause a scene, and who created multiple social media accounts to stalk Covino. The plaintiff's selective prosecution claim fails for myriad reasons.

## DEFAMATION

Count III of the plaintiff's complaint alleges defamation, essentially asserting that Covino told the plaintiff's employer that she had committed criminal acts when he knew that she hadn't committed criminal acts. This claim also fails, as Covino's actions of contacting the plaintiff's

employer when the plaintiff showed up in his neighborhood and called him was protected petitioning behavior as demonstrated above.  Moreover, all or it was true.

As a starting point, summary disposition of defamation claims is "especially favored" in Massachusetts because meritless cases put "an unjustified and serious damper on freedom of expression" and "the costs of litigation may induce an unnecessary and undesirable self-censorship." *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987).  Although it is not necessary for a plaintiff to plead defamation under the requirements of Rule 9(b), the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond.  See *McGeorge* v. *Continental Airlines, Inc.*, 871 F.2d 952, 955–956 (10th Cir. 1989);  *Kelly* v. *Schmidberger,* 806 F.2d 44, 45–6 (2d Cir. 1986), citing *Liguori* v. *Alexander*, 495 F.Supp. 641, 647 (S.D.N.Y. 1980) (providing that the complaint must at least give the defendant sufficient notice of the statements complained of to enable the defendant to mount a defense);  *Cohlmia* v. *Ardent Health Services, LLC*, 448 F.Supp.2d 1253, 1268 (N.D. Okla .2006);  *Linker* v. *Custom–Bilt Machinery, Inc.*, 594 F.Supp. 894, 902 (E.D. Pa. 1984). Here, the plaintiff does not plead facts sufficiently detailed enough to enable the defendant to respond, but even if she did, no facts would support a valid claim here.  The plaintiff's employer conducted whatever investigation they felt was necessary given the allegations contained in the Complaint for Protection of Abuse.  Apparently at the end of that investigation, the plaintiff's employer saw fit to terminate her employment.  (Complaint, paragraph 19.)  The defendant's actions were protected petitioning activity, his statements were true, and therefore the plaintiff's defamation claim fails.

## MASSACHUSETTS CIVIL RIGHTS CLAIM

Count IV of the plaintiff's complaint alleges violation of the Massachusetts Civil Right

Statute. The plaintiff's claim under the Massachusetts Civil Rights Statute, Mass. Gen. Laws c. 12, § 11I, must also be dismissed. "The MCRA is the state 'counterpart' to Section 1983 and, in general, is coextensive therewith." *Mangual* v. *City of Worcester*, 285 F.Supp. 3d 465, 471 (D.Mass. 2018). "The primary difference is that to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred 'by threats, intimidation or coercion.'" *Id.*, quoting *Bally* v. *Northeastern Univ.*, 404 Mass. 713, 718 (1989). "To establish a claim under the Massachusetts Civil Rights Act, 'a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion.'" *Glovsky* v. *Roche Bros. Supermarkets*, 469 Mass. 752, 762 (2014), quoting *Currier* v. *Nat'l Bd. of Med. Exam'rs*, 462 Mass. 1, 12 (2012). For purposes of the act, "threats, intimidation or coercion" are defined as follows:

> a 'threat' consists of 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm;' 'intimidation' involves 'putting in fear for the purpose of compelling or deterring conduct;' and 'coercion' is 'the application to another of such force, either physical or moral, as to constrain him [or her] to do against his [or her] will something he [or she] would not otherwise have done.

*Glovsky*, 469 Mass. at 762-763, quoting *Haufler* v. *Zotos*, 466 Mass. 489, 505 (2006).

Here, there is nothing in the plaintiff's complaint that remotely established a claim of loss of a constitutional right, but more so, there is nothing remotely akin to the necessary element of a threat, intimidation, or coercion. As such, Count IV must be dismissed.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Count V of the plaintiff's complaint alleges intentional infliction of emotional distress. This count too must be dismissed. As a starting point, "[a] failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress." *Shay* v. *Walters*, 702 F.3d 76, 83 (1st Cir. 2012), citing *Hustler Magaxzine, Inc.* v. *Falwell*, 485 U.S. 46,

56-57, 108 S.Ct. 876 (1988); see also *Scholz* v. *Delp*, 473 Mass. 242 (2015). In addition, "Massachusetts law sets a high bar of proof for severity." *Sindi* v. *El-Moslimamy*, 896 F.3d 1, 22 (1st Cir. 2018).    See also *Kennedy* v. *Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010)(explaining that "mere emotional responses including anger, sadness, anxiety, and distress ... are not often legally compensable").   A motion to dismiss is appropriate when the alleged conduct is not sufficiently severe. See *Beecy* v. *Pucciarelli*, 387 Mass. 589, 596 (1982).   Here no matter how one views it, the plaintiff's conduct cannot be viewed at "conduct [that] was 'extreme and outrageous,' and was 'beyond all possible bounds of decency' and that was 'utterly intolerable in a civilized community.'"   *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976), quoting Restatement (Second) of Torts, § 46 comment d (1965).

<u>PLAINTIFF'S REMAINING CLAIMS</u>

The plaintiff's remaining claims can be summarily dispensed with.   Count VI (alleging deliberate indifference to need for training) does not pertain to the plaintiff, Count VII alleges -- without a shred of evidence -- Conspiracy to Violate Civil Rights.   Since the plaintiff's civil rights claims fail on their own lack or merit, and since there is no evidence of conspiracy, this claim must be dismissed.   Count VIII alleges Refusal to Prevent Wrongs Against Plaintiff, Count IX alleges Abuse of Process, and Count X alleges Malicious Prosecution.   Clearly, all of these claims also fail.   Since the plaintiff's civil rights were not violated, there can be no claim for a conspiracy to violate rights that were not violated.   No wrongs were committed against the plaintiff, so Count VIII fails.   And the plaintiff was never subjected to court process, nor she ever prosecuted for any offenses in Massachusetts – let alone offenses for which there was no probable cause, see *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593-594 (1982), citing *Nelson* v. *Miller*, 227 Kan. 271, 282-283, 607 P.2d 438 (1980), so Counts IX and X also fail.

JURISDICTIONAL ISSUES

The defendant has moved herein to dismiss all of the plaintiff's claims.  If the court does not dismiss all of the plaintiff's claims, yet dismisses the plaintiff's federal claims, the plaintiff's other state claims must be dismissed from this court as the plaintiff did not plead diversity of citizenship under 28 U.S.C. § 1332 in her Complaint.

MOTION FOR COSTS AND REASONABLE ATTORNEY'S FEES

Pursuant to M.G.L. c. 231, § 59H, the defendant moves this Honorable Court to award the defendant costs and reasonable attorney's fees  as this is a baseless, retaliatory lawsuit against the defendant based upon his lawful and privileged petitioning activity seeking valid redress from the Lynn District Court in applying for an Abuse Prevention Order.  G.L. c. 231, § 59H reads that "If the court grants such special motion to dismiss, the court shall award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters."

Respectfully submitted,
Defendant,
Joseph I. Covino,
By his Attorney,

/s/ Kenneth H. Anderson
Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA  02122
(617) 265-3900
kanderson@andersongoldman.com

Dated:  October 28, 2020

## COUNSEL'S LOCAL RULE 7.1 CERTIFICATION

The undersigned counsel certifies under Local Rule 7.1(a)(2) that he has conferred with plaintiff's counsel on Monday, October 26, 2020, and attempted in good faith to resolve or narrow the issues set forth in this motion.

/s/ Kenneth H. Anderson
Kenneth H. Anderson, Esq.

Case 1:20-cv-10178-FP  Document 9  Filed 10/28/20  Page 21 of 21

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document, **Defendant Joseph I. Covino's Motion And Memorandum Of Law In Support Of Motion To Dismiss Plaintiff's Complaint In Its Entirety Pursuant To Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 56** AND **Defendant's Special Motion And Memorandum Of Law In Support Of Motion To Dismiss And Motion For Costs And Reasonable Attorney's Fees Pursuant To Massachusetts General Laws c. 231, § 59H**, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 28, 2020.


                    */s/ Kenneth H. Anderson, Esq.*
                    Kenneth H. Anderson, Esq.

**EXHIBIT A**

| COMPLAINT FOR PROTECTION FROM ABUSE (G.L. c. 209A) Page 1 of 2 | COURT USE ONLY – DOCKET NO. 2017 13R0 104 | TRIAL COURT OF MASS |
|---|---|---|

**A** ☐ BOSTON MUNICIPAL COURT   ☒ DISTRICT COURT   ☐ PROBATE & FAMILY COURT   ☐ SUPERIOR COURT   DIVISION

**B**
Name of Plaintiff *(person seeking protection)*
Joseph Covino
~~[redacted]~~
Saugus MA 01906

**F**
Name of Defendant *(person accused of abuse)*
Sharon Radfar
~~[redacted]~~
Sterling VA, 20166

Defendant's Alias, if any

Sex: ☐ M ☒ F

**C**
☒ I am 18 or older.
☐ I am under the age of 18, and
_____
my _____ *(relationship to Plaintiff)*
has filed this complaint for me.
☒ The Defendant is 18 or older.

**G**
The Defendant and Plaintiff:
☐ are currently married to each other
☐ were formerly married to each other
☐ are not married but we are related to each other by blood or marriage; specifically, the Defendant is my
☐ are the parents of one or more children
☐ are not related but live in the same household
☐ were formerly members of the same household
☒ are or were in a dating or engagement relationship.

**D**
To my knowledge, the Defendant possesses the following guns, ammunition, firearms identification card, and/or license to carry: LEO. at least a pistol

**E**
Are there any prior or pending court actions in any state or country involving the Plaintiff and the Defendant for divorce, annulment, separate support, legal separation or abuse prevention? ☒ No ☐ Yes If Yes, give Court, type of case, date, and (if available) docket no.

**H**
Does the Plaintiff have any children under the age of 18? ☐ No ☒ Yes
If Yes, the Plaintiff shall complete the appropriate parts of Page 2.

**I**
On or about (dates) 1/23/17, 1/28/17  7/6/16  ~ 3/15/16 ___ I suffered abuse when the Defendant:
☐ attempted to cause me physical harm   ☒ placed me in fear of imminent serious physical harm
☒ caused me physical harm   ☒ caused me to engage in sexual relations by force, threat or duress

**J**
**THEREFORE, I ASK THE COURT:**
☒ 1. to order the Defendant to stop abusing me by harming, threatening or attempting to harm me physically, or placing me in fear of imminent serious physical harm, or by using force, threat or duress to make me engage in sexual relations.
☒ 2. to order the Defendant not to contact me, unless authorized to do so by the Court.
☒ 3a. to order the Defendant to leave and remain away from my residence: *See Plaintiff Confidential Information Form.*
    If this is an apartment building or other multiple family dwelling, check here ☐
☒ 3b. to order the Defendant to leave and remain away from my workplace: *See Plaintiff Confidential Information Form.*
☐ 3c. to order the Defendant to leave and remain away from my school: *See Plaintiff Confidential Information Form.*
☒ 4a. to order that my residential address not appear on the order.
☒ 4b. to order that my workplace address not appear on the order.
☐ 4c. to order that my school address not appear on the order.
☐ 5. to order the Defendant to pay me $_____ in compensation for the following losses suffered as a direct result of the abuse: _____
☐ 6. to order the Defendant, who has a legal obligation to do so, to pay temporary support to me.
☐ 7. to order the relief requested on Page 2 of this Complaint pertaining to my minor child or children.
☒ 8. to order the following: Abuse thru 3rd party, Social media, Not to Follow, Friend Social my
☒ 9. to order the relief I have requested, except for temporary support for me and/or my child(ren) and for compensation for losses suffered, without advance notice to the Defendant because there is a substantial likelihood of immediate danger of abuse. I understand that if the Court issues such a temporary Order, the Court will schedule a hearing within 10 court business days to determine whether such a temporary Order should be continued, and I must appear in Court on that day if I wish the Order to be continued.

| DATE 01/3/17 | PLAINTIFF'S SIGNATURE X _____ | Please complete affidavit on reverse of this page |
|---|---|---|

This is a request for a civil order to protect the Plaintiff from future abuse. The actions of the Defendant may also constitute a crime subject to criminal penalties. For information about filing a criminal complaint, you can talk with the District Attorney's Office for the location where the alleged abuse occurred.

FA-1 (05/15)

COURT COPY

52

| **AFFIDAVIT** | Describe in detail the most recent incidents of abuse. The Judge requires as much information possible, such as what happened, each person's actions, the dates, locations, any injuries, and any medical or other services sought. Also describe any history of abuse, with as much of the above detail as possible. Note: Unless the Court allows a motion to impound, this affidavit will be public record, including any names or specific addresses included in the affidavit. |
|---|---|

On or about 01/14/16 - 01/30/2017, the Defendant Has repeatedly attempted to contact me by any means necessary, to wit telephone, text, written letters, social media, driving from VA to MA and showing up in my neighborhood or at my place of work. Radfar has used threats to force me into sexual relations with her on multiple occasions being successful on one attempt while in Boston. She has called/texted over 400x on MLK weekend and called over 100x on 01/28/17. I have blocked over 200 phone numbers in the past year to avoid her. She uses an app that shows other #'s.

She has shown up in my neighborhood uninvited or announced and demanded I come see her. She has threatened me with ruining my life and has stated, "If I can't have you, no one will!".

Radfar has assumed the identities of several people online in an attempt to follow/contact me. She splices pictures of herself to pics she finds online of me. Radfar has befriended several LEO's who are friends of mine and is harassing them to get info about me. She verbally abuses me 100's of times per day, accusing me of not acknowledging her because I am racist due to her middle eastern descent. Her messages have become increasingly threatening and unstable as of the last week. Because of her repeated actions/threats, I am in absolute fear of grave danger from Radfar that I continuously carry a firearm for fear she will appear unannounced and armed. If more space is needed, attach additional pages and check this box: ☐

I declare under penalty of perjury that all statements of fact made above, including those provided on P.1, Section E and P.2, Sections A and B of the Complaint form regarding prior and pending court actions, and in any additional pages attached, are true to the best of my knowledge.

| DATE SIGNED | PLAINTIFF'S SIGNATURE |
|---|---|
| 1/31/17 | x _____ |

| WITNESSED BY | PRINTED NAME OF WITNESS | TITLE OF WITNESS |
|---|---|---|
| x | | |

I have transcribed the above affidavit for the Plaintiff

| Signature | Print Name | ☐ Court Certified Interpreter<br>☐ Court Screened Interpreter<br>☐ Other<br>☐ Remote Translation Via Telephone/Video |
|---|---|---|

| ABUSE PREVENTION ORDER (G.L. c. 209A) Page 1 of 2 | DOCKET NO. 201713R0104 | TRIAL COURT OF MASSACHUSETTS |
|---|---|---|

Plaintiff's Name  Joseph Covino

Name & Address Of Court
Lynn District Court
580 Essex Street
Lynn, MA 01901

**D E F T. I N F O.**

Defendant's Name & Address
Sharon Radfar

~~[redacted]~~

Sterling, VA-20166

Alias, if any

Date of Birth ~~[redacted]~~

Sex □ M  ☑ F

Place of Birth

SS # (Last four digits only)  XXX-XX-

Daytime Ph # (    )

Cell Phone # (    )

## VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE punishable by imprisonment or fine or both.

**A. THE COURT HAS ISSUED THE FOLLOWING ORDERS TO THE DEFENDANT:** (only those items checked shall apply)

☑ This Order was issued without advance notice because the Court determined that there is a substantial likelihood of immediate danger of abuse.

□ This Order was communicated by telephone by the Judge named below to: Police Dept. _____ Police Officer _____

☑ 1. **YOU ARE ORDERED NOT TO ABUSE THE PLAINTIFF** by harming, threatening or attempting to harm the Plaintiff physically or by placing the Plaintiff in fear of imminent serious physical harm, or by using force, threat or duress to make the Plaintiff engage in sexual relations.

☑ 2. **YOU ARE ORDERED NOT TO CONTACT THE PLAINTIFF,** in person, by telephone, in writing, electronically or otherwise, either directly or through someone else, and to stay at least _100_ yards from the Plaintiff even if the Plaintiff seems to allow or request contact. The only exceptions to this order are: a) contact as permitted in Sections 8, 9, 10 and 11 below; or b) by sending the Plaintiff, by mail, by sheriff or by other authorized officer, copies of papers filed with the court when that is required by statute or court rule.  including social media & third party contact

☑ 3. **YOU ARE ORDERED TO IMMEDIATELY LEAVE AND STAY AWAY FROM THE PLAINTIFF'S RESIDENCE,** except as permitted in Sections 8 and 10 below, located at _____ Saugus, MA _____ or wherever else you may have reason to know the Plaintiff may reside. The Court also ORDERS you (a) to surrender any keys to that residence to the Police; (b) not to damage any belongings of the Plaintiff or any other occupant; (c) not to shut off or cause to be shut off any utilities or mail delivery to the Plaintiff; and (d) not to interfere in any way with the Plaintiff's right to possess that residence, except by appropriate legal proceedings.

□ **If this box is checked, the Court also ORDERS** you to immediately leave and remain away from the entire apartment building or other multiple family dwelling in which the Plaintiff's residence is located.

☑ 4a. **YOU ARE ORDERED TO STAY AWAY FROM THE PLAINTIFF'S WORKPLACE** located at _Revere Police_

□ 4b. **YOU ARE ORDERED TO STAY AWAY FROM THE PLAINTIFF'S SCHOOL** located at _____

□ 5a. THE COURT ORDERS that the Plaintiff's residential address not appear on the order.

□ 5b. THE COURT ORDERS that the Plaintiff's workplace address not appear on the order.

□ 5c. THE COURT ORDERS that the Plaintiff's school address not appear on the order.

□ 6. **CUSTODY OF THE FOLLOWING CHILDREN IS AWARDED TO THE PLAINTIFF:**

| N A M E | | A G E | | N A M E | | A G E |
|---|---|---|---|---|---|---|
| | | | | | | |

□ 7. **YOU ARE ORDERED NOT TO CONTACT THE CHILDREN LISTED ABOVE OR ANY CHILDREN IN THE PLAINTIFF'S CUSTODY LISTED BELOW,** either in person, by telephone, in writing, electronically or otherwise, either directly or through someone else, and to stay at least _____ yards away from them unless you receive written permission from the Court to do otherwise.

□ You are also ordered to stay away from the following school(s), day care(s), other: _____

| N A M E | | A G E | | N A M E | | A G E |
|---|---|---|---|---|---|---|
| | | | | | | |

□ 8. **VISITATION WITH THE CHILDREN LISTED IN SECTION 6 IS PERMITTED ONLY AS FOLLOWS** (may be ordered by Probate and Family Court only):

_____

□ Visitation is only allowed if supervised and in the presence of _____ (name) at the following times _____ to be paid for by _____ (name)

□ Transportation of children to and from this visitation is to be done by _____ (name) (third party), and not by you.

□ You may only contact the Plaintiff to arrange this visitation. Contact may be made only by □ phone, □ e-mail, □ text, □ other _____

□ 9. **YOU ARE ORDERED TO PAY SUPPORT IN THE FOLLOWING MANNER:**

□ $_____ child support per _____ [week/month] by income withholding through the Department of Revenue. Defendant shall send payments to DOR at P.O. Box 55144, Boston, MA 02205-5144 until employer deductions begin.

□ $_____ child support per _____ [week/month] directly to the Plaintiff by mailing payments to _____

□ $_____ support for the Plaintiff per _____ [week/month] directly to the Plaintiff by mailing payments to _____

□ Other orders: _____

□ 10. **YOU MAY PICK UP YOUR PERSONAL BELONGINGS** in the company of police at a time agreed to by the Plaintiff.

□ 11. **YOU ARE ORDERED TO COMPENSATE THE PLAINTIFF** for $_____ in losses suffered as a direct result of the abuse, to be paid in full on or before _____, 20 _____ □ by mailing directly to the Plaintiff □ through the Probation Office of this Court.

☑ 12. **THERE IS A SUBSTANTIAL LIKELIHOOD OF IMMEDIATE DANGER OF ABUSE. YOU ARE ORDERED TO IMMEDIATELY SURRENDER** to the _Loudon County, VA_ Police Department or to the police officer serving this order all guns, ammunition, gun licenses and FID cards. Your license to carry a gun, if any, and your FID card, if any, are suspended immediately.

• You must immediately surrender the items listed above, and also comply with all other Orders in this case.

• Subject to certain exceptions, purchase and/or possession of a firearm and/or ammunition while this order is in effect is a federal crime. 18 U.S.C. §§ 922(g)(8) and 925.

□ 13. **ON THE NEXT SCHEDULED HEARING DATE,** the Court will hear testimony and other evidence regarding Section 9 of this order, which involves support for the Plaintiff and/or the minor children. You are ordered to bring with you to the next scheduled hearing date any financial records in your possession (including your most recent tax return and your last four paystubs) that provide evidence of your current income.

□ 14. **YOU ARE ALSO ORDERED** _____

The Plaintiff, unless already represented at this Order may appear with or without an attorney by extension or modification of this order. The Defendant does not appear, and this Order may be extended or modified as determined by the Judge. For details, either the Plaintiff or the Defendant may request that Court to modify this Order before its scheduled expiration date.

FA-2 (1/12)

**COURT COPY**

54

| ABUSE PREVENTION ORDER (G.L. c. 209A) Page 2 of 2 | DOCKET NO. 2017 13RO 104 | TRIAL COURT OF MASSACHUSETTS |
|---|---|---|

☐ **15.** Police reports are on file at the _____ Police Department.

☐ **16.** OUTSTANDING WARRANTS FOR THE DEFENDANT'S ARREST:
(DOCKET #s) _____ (PCF #)
to _____

☐ **17.** An imminent threat of bodily injury exists to the Plaintiff. Notice issued to _____ Police
Department(s) by ☐ telephone ☐ other _____

**B. NOTICE TO LAW ENFORCEMENT**

☑ **1.** An appropriate law enforcement officer shall serve upon the Defendant in hand a copy of the Complaint and a certified copy of this Order (and Summons), and make return of service to this Court. If this box is checked ☐, the following alternative service may instead be made, but only if the officer is unable to deliver such copies in hand to the Defendant: _____

☑ **2.** Defendant Information Form accompanies this Order.

☐ **3.** Defendant has been served in hand by the Court's designee: Name _____ Date _____

| DATE OF ORDER 1-31-17 | TIME OF ORDER 358 ☐A.M. ☑P.M. | EXPIRATION DATE OF ORDER 2-15-17 at 4 P.M. | SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE _(signature)_ |

The above and any subsequent Orders expire on the expiration dates indicated. Hearings on whether to continue and/or modify Orders will be held on dates and times indicated. In the event the Court is closed on the date the Order is to expire, the Order shall remain in full force and effect and the Hearing shall be continued until the next Court business date.

NEXT HEARING DATE: 2-15-17
at 9 ☑A.M. ☐P.M. Courtroom _____

---

☐ **C. MODIFICATION/EXTENSION**

☐ This order was issued after a hearing at which the Plaintiff ☐ appeared ☐ did not appear and the Defendant ☐ appeared ☐ did not appear.
The Court has **ORDERED** that the prior order issued _____, 20___ be **MODIFIED** as follows:

_____
_____
_____
_____
_____

☐ The expiration date of this order has been **EXTENDED** (See Below) ☐ **OTHER MODIFICATION(S)** _____

☐ **Firearm** surrender order continued. The items surrendered under paragraph 12 will NOT be returned since doing so would present a likelihood of abuse to the Plaintiff.

| DATE OF THIS MODIFICATION: | EXPIRATION DATE OF ORDER: at 4 P.M. | SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE |
| TIME OF MODIFICATION: _____ ☐A.M. ☐P.M. | NEXT HEARING DATE: _____ at _____ ☐ A.M. ☐ P.M. Courtroom _____ | |

---

☐ **D. MODIFICATION/EXTENSION**

☐ This order was issued after a hearing at which the Plaintiff ☐ appeared ☐ did not appear and the Defendant ☐ appeared ☐ did not appear.
The Court has **ORDERED** that the prior order issued _____, 20___ be **MODIFIED** as follows::

_____
_____
_____
_____
_____

☐ The expiration date of this order has been **EXTENDED** (See Below) ☐ **OTHER MODIFICATION(S)** _____

☐ **Firearm** surrender order continued. The items surrendered under paragraph 12 will NOT be returned since doing so would present a likelihood of abuse to the Plaintiff.

| DATE OF THIS MODIFICATION: _(struck through)_ | EXPIRATION DATE OF ORDER: at 4 P.M. | SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE |
| TIME OF MODIFICATION: _____ ☐A.M. ☐P.M. | NEXT HEARING DATE: _____ at _____ ☐ A.M. ☐ P.M. Courtroom _____ | |

---

☑ **E. PRIOR COURT ORDER TERMINATED** _Both parties present. Defendant_
This Court's prior Order is terminated. Law enforcement agencies shall destroy all records of such Order. _may have the return of all weapons she surrendered_
☑ TERMINATED AT PLAINTIFF'S REQUEST.

| SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE ELLEN FLATLEY | DATE OF ORDER 2/16/17 | TIME OF ORDER 9:22 ☑A.M. ☐P.M. |
| WITNESS - FIRST OR CHIEF JUSTICE | A true copy, attest (Asst.) Clerk-Magistrate/ (Asst.) Register of Probate | |

FA-2A (5/15)



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR )
    Plaintiff )
     )
     )
v. )
     )
CITY OF REVERE, and )
BRIAN M. ARRIGO, MAYOR; and )
JAMES GUIDO, CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED OFFICERS )
OF THE REVERE POLICE )
DEPARTMENT; INDIVIDUALLY AND )
IN THEIR OFFICIAL CAPACITIES AS )
MAYOR, CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
    Defendants )
     )

## AFFIDAVIT OF DEFENDANT JOSEPH I. COVINO

I, Joseph I. Covino, do hereby depose and state the following under the pains and penalties of perjury.

1. My name is Joseph Covino. I am one of the defendants in the above-captioned lawsuit. I am fifty years old and am employed as a lieutenant with the Revere police department.

2. I met the plaintiff, Sharon Radfar, in late June of 2015 while I was competing with an ice hockey team at the World Police and Fire Games in Fairfax, Virginia. At the time, the plaintiff was employed as police officer at George Mason University. The plaintiff claimed to be a volunteer "Goodwill Representative" for the World Police and Fire Games. During this time, the plaintiff and I engaged in a romantic relationship.

3. After returning back to the Boston area after the World Police and Fire Games, the plaintiff and I communicated for several weeks via text messages and phone calls. During this time, the plaintiff became increasingly overbearing when I did not promptly return a text message or a phone call.

4. Later that summer, the plaintiff flew from her home in Northern Virginia to Boston to visit me. I picked her up at the airport and we went to Charlestown for lunch. Later that day while at dinner, the plaintiff became accusatory and inflammatory to the point where

1

I returned her to her hotel and left. I ended our relationship that evening due to her behavior.

5. The plaintiff contacted me and apologized. The plaintiff said she was upset because she didn't get to see Boston, a city that she said she wanted to visit with one of her female friends. I agreed that if the plaintiff ever came back to Boston, I would show the plaintiff and her friend around.

6. On one occasion thereafter, the plaintiff came to Boston with a female friend. The plaintiff again became rude, belligerent, with unprovoked accusations such that both myself and the plaintiff's female friend left the plaintiff at a hotel and went our separate ways. This occurred in the early fall of 2015, and this was the last time that I saw the plaintiff in person other than at a restraining order hearing in the Lynn District Court on February 15, 2017.

7. After leaving the plaintiff at her hotel in the early fall of 2015, I told the plaintiff in a phone conversation that I did not want to have any type of relationship with her and that I wanted her to stop contacting me.

8. From the fall of 2015 until I applied for a restraining order in the Lynn District Court on January 31, 2017, the plaintiff relentlessly pursued me and threatened myself and my family if I would not see her.

9. I blocked the plaintiff's phone number on my phone. The plaintiff thereafter repeatedly used an app that allowed her to text and call me from other phone numbers. At one point I had hundreds of blocked phone numbers on my cell phone because of the manner in which the plaintiff repeatedly called me using various phone numbers.

10. I also blocked the plaintiff on social media. The plaintiff made fake a social media accounts to follow me on social media.

11. At one point, the plaintiff drove unannounced from her home in Northern Virginia to my place of employment at the Revere Police Department and dropped of a note and pictures in a card for me at the front desk. I was not working and was not in the police station.

12. On a different occasion, the plaintiff again drove to the Boston area unannounced and uninvited. The plaintiff texted me, stating that she was up the street from my house and that she saw me outside mowing my lawn. The plaintiff also commented on how sweet my family looked. The plaintiff told me that if I did not come meet her up the street, that she would come to my home and "create a scene."

13. I called the plaintiff and told her I was going to call her police chief as I was gravely concerned about her mental well-being. Several times in the past I had told the plaintiff that I would call her employer if she did not stop contacting me, although I did not do so until she appeared at my place of work and in my neighborhood. I told the plaintiff never to contact me again. I called the George Mason University Police and spoke with



2

Lieutenant David Ganley, the executive officer for the George Mason University Police Department. Lt. Ganley informed me that this was not the first time that the department had received complaints regarding the plaintiff's issues with infatuation that resulted in her stalking other men. Lieutenant Ganley told me that the department would attempt to speak with the plaintiff about her situation and would ask her to leave me alone.

14. After contacting the plaintiff's employer, the plaintiff called me over 100 times in a weekend. I began carrying my firearm off-duty out of fear for my safety as I was afraid the plaintiff would show up where I was and would attack me.

15. On January 28, 2017 the plaintiff called or texted me over a hundred times.

16. On January 29, 2017, I wrote an internal police report in the Revere police computer system to document the plaintiff's action since the summer of 2015. This internal police report was written "to file." It was not written for any law enforcement purposes and was not sent to any Massachusetts law enforcement agencies.

17. On January 31, 2017, I petitioned to the Lynn District Court for the issuance of an Abuse Prevention Order under Mass. General Law chapter 209A against the plaintiff. The attached Complaint For Protection From Abuse (with Affidavit) form and the attached Abuse Prevention Order are true and authentic copies of what was filed with the Lynn District Court. (Lynn District Court Docket No. 2017RO0104.) The affidavit was and is true and accurate. A judge in the Lynn District Court approved of the Abuse Prevention Order and issued it through February 15, 2017, when a two-party hearing was to be held.

18. While petitioning the Lynn District Court on January 31, 2017, I was off-duty and in civilian clothes. I did not exercise any police powers in applying for the Abuse Prevention Order.

19. On February 15, 2017, I attended the two-party hearing on the restraining order in the Lynn District Court. The plaintiff appeared with an attorney. After conversing with the plaintiffs' attorney, I was assured that the Abuse Prevention Order was "a definite wake-up call" to the plaintiff and I agreed to the Order being vacated on the condition that the plaintiff would no longer contact me. I agreed to vacate the Abuse Prevention Order so that the plaintiff's employment was not negatively impacted by her inability to possess a firearm.

20. Sometime around the end of January of 2017, I was contacted by somebody from the Virginia State Police who asked me questions regarding the plaintiff. At the request of the Virginia State Police, I forwarded them a flash drive that contained phone message recordings, text messages, emails, as well as screen shots of doctored photographs sent to me by the plaintiff. I also provided them with the card/letter that the plaintiff delivered to the front desk of the Revere Police Department.

21. At no time did it take any law enforcement action against the plaintiff. At no time did I seek to get the plaintiff charged with any criminal activity.



Signed by me under the pains and penalties or perjury this _____ of October, 2020.

JOSEPH I. COVINO

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

_____
SHARON RADFAR,                      )
          Plaintiff                 )
                                    )
V.                                  )
                                    )
CITY OF REVERE,and                  )
BRIAN M. ARRIGO,                    )
     MAYOR; and                     )
JAMES GUIDO,                        )     **OPPOSITION IN**
     CHIEF OF POLICE; and           )     **RESPONSE TO DEFENSE MOTION**
SERGEANT JOSEPH I.COVINO; and )           **TO DISMISS/SUMMARY JUDGMENT**
OTHER AS YET UNNAMED                )
OFFICERS OF THE                     )
REVERE POLICE DEPARTMENT;           )
INDIVIDUALLY AND IN THEIR           )
OFFICIAL CAPACITIES AS MAYOR        )
CHIEF OF POLICE AND                 )
POLICE SERGEANT AND OFFICERS        )
OF THE CITY OF REVERE,              )
          Defendants                )
_____)

### i. Introduction and Procedural Posture

Plaintiff has sued alleging civil rights violations
as well as a variety of common law intentional torts. One of the
Defendants, sued individually and in his official capacity, has
filed a single pleading styled a Motion to Dismiss with an
attached Affidavit from Defendant and a copy of a temporary court
restraining order, listed as Exhibits A and B.  In his pleading

1

he includes requests for relief under G.L. c. 231 §59H[1],
dismissal pursuant to Fed.R.Civ.P. 12(b)(6) and summary judgment
pursuant to Fed.R.Civ.P. 56, his statement of facts and his
memoranda of law.

Plaintiff herewith attaches her Uncontested Statement
of Material Facts which includes her disputes of Defendant's
Facts, and her Affidavit of Counsel with attached Exhibits C-G.

## ii. Facts

Defendant, a Revere Police Sergeant, drafted a police
report in which he claimed to be alleged "victim", falsely
and maliciously stating Plaintiff had committed crimes against
him, and wrongly listing himself as the reporting officer and the
supervisor, while stating the identity of the victim was
"confidential.". He then appeared in the Lynn District Court *ex
parte* and by making false, misleading and scurrilous claims
against plaintiff while omitting information he knew to be
essential to the court's proper evaluation of his claims he
convinced a judge to grant him an Abuse Prevention Order
pursuant to M.G.L. c. 209A against Plaintiff, using his status
as a police officer and his relationship with the court to

---

[1]The Massachusetts Anti-SLAPP statute, one of thirty such
statutes in the country.

wrongly credit his false claims.[2]

A full week prior to his *ex parte* court appearance he emailed Plaintiff's employer, making false, misleading, humiliating and otherwise defamatory claims against her in an effort to deprive her of her job as a university police officer.[3]

In an effort to get her criminally charged outside of Massachusetts as part of his campaign to destroy her career and her life he tried mightily to convince investigators and prosecutors to charge her with a crime by making false statements, omitting key information and providing misleading and incomplete documents.

Though he alleged in the Lynn District Court *ex parte* proceeding hundreds of text messages and emails from Plaintiff, he wrongfully and misleadingly omitted the hundreds of text messages he had sent to Plaintiff. He intentionally withheld that information also from Virginia investigators in his campaign to subject Plaintiff to criminal charges in that state, and he also omitted that information in his correspondence with her employer—part of his deliberate scheme perpetrated to destroy her

---

[2] Complaint ¶¶6-12; Plaintiff's Statement of Uncontested Facts ##2 & 3.

[3] Complaint ¶¶6-12; Plaintiff's Statement of Uncontested Facts #4.

life nearly a week before his *ex parte*, "emergency" court appearance.[4]

The statements he made to the Lynn District Court are starkly discrepant from the ones he made to Plaintiff's employer, and both differ from his claims to Virginia investigators. Plaintiff denies his allegations, which differ in major and self-serving respects depending upon his audience.

### iii. Argument

Defendant Covino has attempted to characterize Plaintiff's claims as Strategic Litigation Against Public Participation and obtain their dismissal under the statute applicable to Massachusetts courts known as the Anti-SLAPP statute, G.L. c. 231 §59H.

He also argues her claims are barred by the *Rooker-Feldman* doctrine's jurisdictional bar against causes of action alleging an injury caused by a state court judgment and reversal of such final judgments in state court proceedings.

Further, he asks this court to find facts in his favor while seeking dismissal under Fed.R.Civ. P. 12(b)(6). In

---

[4] Plaintiff's Statement of Uncontested Facts ##5 & 6.

4

addition, he asks the Court to credit his witness testimony and version of the factual constellation over the disputed testimony and evidence alleged and offered by Plaintiff, though there has been no discovery, in seeking summary judgment.

Finally, Defendant has filed pleadings which blatantly violate and ignore this Court's rules.

For those reasons and the additional reasons stated within Defendant's Motion should be denied and he should be ordered to comply with the rules of this court and his discovery obligations.

### (A) Defendant's Pleading Violates the Rules of This Court

As a threshold matter, Defendant has failed to comply with the rules of this court governing the filing of pleadings. He has without excuse failed to file separately his Motion and Memorandum of Law, and as a result undersigned counsel is unable to determine what he is asking the Court to do and the grounds for which he asks the Court to do it.

He seeks summary judgment though his motion violates the requirement of Local Rule 56.1 requiring separate filing of a motion, a statement of uncontested facts, and a memorandum of law. Instead he files one pleading, which exceeds the page number

5

limit for pleadings in the local rules.  Defendant's pleading is

wholly non-conforming with the rules governing pleadings though

he has not only refused to seek leave of court therefor, but

further has not and can not provide any justification as to why

he should not be required to conform to the rules of this Court.

### (B) The Massachusetts Anti-SLAPP Statute Is Not Applicable In Federal Court

The Massachusetts Anti-SLAPP Statute, Chapter 231 §59H

appears in the section of the Massachusetts General Laws

governing the Commonwealth's procedural rules for Court

proceedings. The Chapter is entitled "Massachusetts Pleading and

Practice." It includes evidentiary, gate-keeping and other

procedural provisions unique and idiosyncratic to the operations

of Massachusetts Courts such as the requirements of a malpractice

tribunal and pre-suit demand in Chapter 231 §60, and the §6F

process sanctioning frivolous pleading unique to Massachusetts

practice rules in Massachusetts Court. Accordingly

this Court has ruled that inasmuch as the Anti-SLAPP statute is a

procedural rule it is not applicable in federal court.

_Stuborn Ltd. P'ship v. Bernstein_, 245 F. Supp. 2d 312, 316

(D.Mass. 2003). It is true this District and Circuit later opened

the door to the use of the Massachusetts Anti-SLAPP statute in

this court, but in doing so was forced to seek guidance in its

applicability from the Massachusetts Supreme Judicial Court.[5] The following year the Tenth Circuit was the most recent to reach the question and determined that Nevada's Anti-SLAPP statute was a procedural state provision rather than a substantive one and therefore not applicable in federal court. The Defendants who were seeking Anti-SLAPP relief appealed noting the split among circuits including here in the First Circuit where state Anti-SLAPP provisions have in some instances been applied in federal cases. The Supreme Court's denial of certiorari should be read as the endorsement it is of the Tenth Circuit's approach. *Americulture v. Los Lobosenewable Power, LLC, et al,* 139 S.Ct. 591(2018)(cert.denied.).

### (C) Even If Applicable in Federal Court, Defendant is Not Entitled to Relief in this Action Under the Massachusetts Anti-SLAPP Statute

If this Defendant's court machinations are protected by Anti-SLAPP protections it is difficult to imagine any factual constellation that would permit an abuse of process or malicious prosecution cause of action.

Defendant is hopeful that the Court accepts his

---

[5] *Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128 (1st Cir. 2017)

fact allegations over Plaintiff's and despite evidence
contradicting them in the record and further that the
Court ignores the very paragraphs of Plaintiff's complaint
specifying non-petitioning activity–because this Court would
have to do so in order to allow his Motion to Dismiss.

G.L. c. 231 §59H requires the Court to advance and hear
"as expeditiously as possible" a party's special motion to dismiss
filed thereunder if that party "asserts" that a claim has been
filed against him "based on said party's exercise of its right of
petition under the constitution of the United States or of the
commonwealth". The Supreme Judicial Court further defined SLAPP
suits as actions which "target people for 'reporting violations of
law, writing to government officials, attending public hearings,
testifying before government bodies, circulating petitions for
signature, lobbying for legislation, campaigning in initiatives
or referendum elections, filing agency protests or appeals, being
parties in law-reform lawsuits, and engaging in peaceful boycotts
or demonstrations.'". _Duracraft Corporation v.Holmes Products
Corporation_, 427 Mass. 156, 161-162, N.E.2d 935,940 (1998).
There is nothing about Plaintiff's complaint that could place it
into the category of strategic litigation again public
participation–for which the acronym SLAPP stands.  Here, the

8

67

Defendant has failed utterly to meet the requirement that

the motion establishes that the suit against him was brought

entirely due to his protected petitioning activity.  See *SMS*

*Financial LLP v. Robert Conti*, 68 Mass.Ap..Ct. 738, 745-746

(2007):

> "The special movant must show that the claims against it are
> based on its petitioning activities alone, "and have no
> substantial  basis other than or in addition to the petitioning
> activities." Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. at
> 167-168. Petitioning activities include statements submitted to a
> judicial body. See G. L. c. 231, § 59H; McLarnon v. Jokisch, 431
> Mass. 343, 347 (2000). See also Kobrin v. Gastfriend, 443 Mass.
> 327, 331-340 (2005), for a discussion of the scope of petitioning
> activities under the anti-SLAPP statute. Once the moving party
> establishes that the claims arise out of its petitioning
> activities, the burden  shifts to the adverse party to show that
> the activity complained of was  "devoid of any reasonable factual
> support or any arguable basis in law." Fabre v. Walton, 436 Mass.
> 517, 524"

With regard to any conduct by the Defendant that was

connected to his obtaining an *ex parte* order in the Lynn District

Court against Plaintiff, she has demonstrated that not only was

he never fearful of her as required under G.L. c. 209A but the

calculated nature of his entreaty, planned for over a week and

targeting her although she was outside the Commonwealth, and his

discrepant statements and use of the Massachusetts order to ruin

her career and seek out of state criminal charges against her was

a perversion of a process that was designed to protect survivors

of domestic violence–much like the Anti-SLAPP motion to dismiss

was written and passed to protect powerless parties exercising their constitutional rights from well-financed powerful interests capable of endlessly vexatious and destructive litigation. Clearly, this misconduct evidences that any and all petitioning by the Defendant has been "devoid of reasonable factual support".  Inasmuch as the G.L. c. 231 §59H does not bar entire categories of claims for malicious prosecution, defamation or countless other intentional torts involving statements to government, it cannot possibly frustrate Plaintiff's claims here, where a judge has observed on the record the deficiencies in Defendant's showing and at the first sign that Plaintiff may have a chance to be heard he withdrew and the order was vacated.

Plaintiff specifically alleged interference with civil rights, dignitary and property interests and other misconduct that preceded by a full week and continued for months after Defendant's alleged petitioning activity.  Further, the reliance on the fact statements by the Defendant which are disputed by the Plaintiff place this case well outside the ambit of a Motion to Dismiss of any kind.

### (D) The Rooker-Feldman Doctrine is Not Applicable to This Action

The *Rooker-Feldman* doctrine precludes federal court

10

69

reversal of judgments entered in state courts, and as such it is wholly inapplicable here.  Plaintiff is not seeking any review of a state court proceeding.  The *Rooker-Feldman* doctrine applies only sparingly to a very few cases. *Exxon Mobil Corp v. Saudi Basic Industries Corp.*, 544 U.S. 280(2005).

Under the doctrine, a litigant is barred from appealing in federal court a judgment entered in state court as it is the Supreme Court that has sole jurisdiction over such appeal. *D. C. Court of Appeals v. Feldman*, 460 U.S. 462(1983); *Rooker v. Fidelity Trust*,263 U.S. 413(1923). It does not mean a party is jurisdictionally barred from suing where any issues in the litigation were raised in a state court, it narrowly applies only where all their federal and other claims were heard, a judgment has entered in state court and a party contends that judgment has caused injury and should be reversed by the federal court.  *Exxon Mobil* 283-284. Plaintiff is alleging and seeking nothing of the kind here. This case does not fall into the narrow set of cases where a Plaintiff is alleging injury caused by a state court judgment and asking the federal court to reverse that judgment. *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 24(1stCir.2005).

The Abuse Prevention Proceeding in the Lynn District Court ended with a determination favorable to Plaintiff.

11

12

Defendant is wrongly attempting to hamstring this Court by
somehow claiming that Plaintiff is seeking a different result
than the initial order in the Lynn District Court, but even if
that was a prior court determination for purposes of the _Rooker-
Feldman_ analysis it would still not be applicable, since it was
an _ex parte_ proceeding where by definition Plaintiff did not have
an opportunity to be heard.  Further, Plaintiff's claims were not
and could not be adjudicated in such a proceeding. _Federacion_, at
22.

### (E) Defendant is Not Entitled to Dismissal Under Fed.R.Civ.P. 12(b)(6)

Plaintiff has more than adequately detailed and stated
her claims for relief in her Complaint.

The complaint amply meets the updated requirements
of the Rules of Civil Procedure which incorporate the command,
and through common law the standards requiring Plaintiff's
factual basis to be stated generally and inferences drawn
therefrom to be  plausible as a matter of law. There has been no
abandonment of language or spirit of Fed.R.Civ.P.8(a)(2) that the
Complaint "shall contain a short and plain statement of the claim
showing the pleader is entitled to relief."  The rules require

12

13

notice pleading, and the Defendants are hopeful that this Court will rule that _Bell Atlantic v. Twombly_ 550 U.S. 544(2007) and _Ashcroft v. Iqbal_ 129 S.Ct. 1937 (2009)have rewritten the Rules of Civil Procedure but as precedent in this circuit explains, they did not. _Ocasio-Hernandez et al v. Fortuno-Burset et al_ 640 F3d 1,11(1st Cir. 2011).("The court explained that the propriety of dismissal under R 12(b)(6) turns on the complaint's compliance with Fed.R.Civ.P. 8(a)(2). Id. at 555. It further explained that a 'short and plain statement' does not need detailed factual allegations. Id. at 555. That aspect of the rule merely requires sufficient detail in the Complaint to give a defendant fair notice of a claim and the ground upon which it rests. Id.(citing _Conley v. Gibson_, 355 U.S.41,57(1957)).")

While Defendant asks this court to ignore and even misstates facts alleged by the Plaintiff, the rule requires this court to accept the Plaintiff's facts and to determine the plausibility of inferences and conclusions. Non-conclusory facts are to be treated as true, even if incredible and even if the court is skeptical that Plaintiff will be able to marshal the evidence necessary to prove them. _Ocasio-Hernandez_, at 12.

Not only do the Federal Rules of Civil Procedure

13

72

14

require that "all pleadings shall be construed so as to do substantial justice"[6] but indeed, this is one of those instances wherein the Plaintiff should be given leave to amend her Complaint.  Plaintiff is entitled to an opportunity to correct any unintended vulnerabilities in the Complaint, especially since the Defendant refused to seek a more definite statement of the claims pursuant to F.R.C.P. 12(e).  Simply put, while Defendant had plenty of notice of the cause of action asserted,  Plaintiff had no notice at all that the statement of any of her claims may have been rendered deficient.

Because F.R.C.P. 15(a) directs that "leave shall be freely given when justice so requires", Plaintiff is entitled to an opportunity to amend her Complaint.

## (F) Defendant is Not Entitled to Summary Judgment

In attaching documents outside the Complaint Defendant has in fact filed a summary judgment motion, but he has done so prematurely and before discovery has even begun much less concluded.  Even the limited evidentiary record before the court discloses the unavailability of summary judgment to Defendant, demonstrating as it does that every one of the facts he asserts

---

[6]    F.R.C.P. 8(f).

14

15

is disputed.  Since the evidentiary record has not been
sufficiently established for any purpose, Plaintiff is entitled
to discovery pursuant to Rule 59f.

> To the extent that Defendant omitted material facts,
there is a dispute and therefore several genuine issues to be
tried with respect to the material facts. *Celotex Corp. v.
Catrett* 477 U.S. 317, 325 (1986). Further, the Defendant has
failed to point out to the Court any portions of the record that
demonstrate the absence of a triable issue of material fact or
indeed of the basis for his motion. *Rivera Colon v. Mills*, 635
F.3d 9, 12 (1st Cir. 2011).  The evidence of the non-moving party
--here the Plaintiff--must be believed at the summary judgment
stage and all reasonable inferences must be drawn in the
non-moving party's favor. An issue of fact is "genuine" if the
evidence is such that a reasonable fact finder could find in
Favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317,
322-23 (1986): *Oliver v. Digital Equip. Corp.*, 846 F.2d 103. 105
(1st Cir. 1988).

> Plaintiff has filed the attached Statement of
Facts, incorporated with an attached affidavit of counsel and
other Exhibits C-G as if fully set forth herein, wherein she
enumerates material facts which have been omitted by defendant in

15

16

his improperly pled Statement of Facts. Defendant has failed

to establish the lack of any genuine issue of material fact.

_Wynne v. Tufts Univ.Sch.of Med._, 976 F.2d 791,794(1st Cir.1992).

A review of the record in this matter,"in the light most

favorable to the plaintiff, 'indulging all reasonable inferences

in that party's favor'." requires denial of defendants' motion.

Even if this Court were to overlook defendant's failure to

include evidence in defendant's possession, the Court must

require defendant to explain his omissions.  Further if the Court

were to employ the burden-shifting requiring the Plaintiff to

assert a genuine issue for trial pursuant to _Anderson v. Liberty_

_Lobby, Inc_.,477 U.S. 242,256, 91 L.Ed.2d 202, 106 S.Ct.2505

(1986), the Court still cannot grant judgment for the Defendant

as  a matter of law.

The roundly discredited statements by offered by

Defendant along with the inadmissible heresay and other non-

evidentiary offerings permeating his submission suggest

if there is any entitlement to summary judgment it belongs to

Plaintiff.

16

17

## iv. Conclusion

For the foregoing reasons Defendants' Motion should be denied.

### Request for Oral Argument

Pursuant to Federal Rule of Civil Procedure 56(d) Plaintiff respectfully asserts oral argument is necessary to assist the Court in this matter and asks therefore that a hearing be scheduled.

Respectfully submitted,

Sharon Radfar
By her attorney

Dated: November 23, 2020

s/Elizabeth M. Clague
_____
Elizabeth M. Clague
Attorney for the
Plaintiff
The Kennedy Building
142 Main Street,
Suite 304
Brockton, MA 02301
(508) 587-1191
BBO# 632341

### CERTIFICATE OF SERVICE

I, Elizabeth M. Clague hereby certify that I have served the within document to Defendant by causing a copy to be sent

17

18

through the electronic filing system to his counsel of record, to
wit:


Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com



                                    /s Elizabeth M. Claque

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

SHARON RADFAR,                          )
          Plaintiff                     )
                                        )
V.                                      )
                                        )
CITY OF REVERE,and                      )
BRIAN M. ARRIGO,                        )   **AFFIDAVIT OF COUNSEL**
     MAYOR; and                         )   **SUPPORTING PLAINTIFF'S**
JAMES GUIDO,                            )   **OPPOSITION IN**
     CHIEF OF POLICE; and               )   **RESPONSE TO DEFENSE MOTION**
SERGEANT JOSEPH I.COVINO; and )
OTHER AS YET UNNAMED                    )
OFFICERS OF THE                         )
REVERE POLICE DEPARTMENT;               )
INDIVIDUALLY AND IN THEIR               )
OFFICIAL CAPACITIES AS MAYOR            )
CHIEF OF POLICE AND                     )
POLICE SERGEANT AND OFFICERS            )
OF THE CITY OF REVERE,                  )
          Defendants                    )
_____)

     I, Elizabeth M. Clague, undersigned counsel in the

above-entitled matter hereby aver the following statements are

true to the best of my knowledge, information and belief and

where the within statements rely on information they rely on

information I believe to be true:

               1. I have attached herewith as Exhibit C a true
               and accurate copy of an email exchange between a
               Virginia law enforcement officer and a Virginia
               prosecutor regarding the parties in the Spring of

1

78

2017.

2. I have attached herewith as Exhibit D a true and accurate copy of January 25, 2017 email correspondence from Defendant to Plaintiff's employer.

3. I have attached herewith as Exhibit E a true and accurate copy of a January 28, 2017 police report drafted by the Defendant.

4. I have attached herewith as Exhibit F a true and accurate copy of Plaintiff's Affidavit regarding the hearing she appeared at in the Lynn District Court.

5. I have attached herewith as Exhibit G a transcription of the ex parte hearing in which Defendant obtained his order against Plaintiff.

Signed this twenty-second day of November, 2020 under pain and penalties of perjury.

Dated: November 22, 2020

s/Elizabeth M. Clague

_____


## CERTIFICATE OF SERVICE

I, Elizabeth M. Clague hereby certify that I have served the within document to Defendant by causing a copy to be sent through the electronic filing system to his counsel of record.

/s Elizabeth M. Clague

2

79

# Exhibit C

3

Sent: Monday, March 27, 2017 2:14 PM
To: Rueda, Alex <Alex.Rueda@loudoun.gov>
Subject: RE: Out today

A consensual sexual relationship began in July 2015. It ended and the suspect was
not happy and the harassment began. It was ongoing until January 2017 when I got
the case and she (suspect) was suspended by her department (GMU) pending the
investigation.
His explanation letter is pretty good summary (at least from his perspective).
Suspect has not been interviewed yet.

-bill

-----Original Message-----
From: Rueda, Alex [mailto:Alex.Rueda@loudoun.gov]
Sent: Monday, March 27, 2017 2:11 PM
To: Kinnard, Jr., William E., SA
Subject: RE: Out today

Thanks for dropping these off. When did the behavior occur exactly?

-----Original Message-----
From: Kinnard, Jr., William E., SA [mailto:William.Kinnard@vsp.virginia.gov]
Sent: Monday, March 27, 2017 2:05 PM
To: Rueda, Alex <Alex.Rueda@loudoun.gov>
Subject: RE: Out today

Ms. Rueda,

I dropped off one manila envelope at the front desk. The documents are copies for
you. The thumb drive contains more texts and voicemails but I will need that
thumb drive back.

Analysis of the suspect phone records show:
Suspect called victim at least 575 times over the affected period and at least
162 times since I can prove that the victim said 'do not call me anymore' (See
text message on March 12, 2016).

Victim called the suspect at least 256 times and 32 times since he told her to
stop calling him.

I am interested if you would prosecute this case and if I have enough to charge
her under 18.2-427.

4

# Exhibit D

5

## Brian R Cozby

**From:** Carl Rowan
**Sent:** Wednesday, January 25, 2017 1:00 PM
**To:** Brian R Cozby
**Subject:** FW: Statement of facts

FYI

Carl Rowan, Jr.
Chief of Police
George Mason University
Department of Police and Public Safety
4400 University Drive, MS 303
Fairfax, Virginia 22030
703-993-3840 (office)
202-438-2062 (cell)



**From:** David S Ganley
**Sent:** Wednesday, January 25, 2017 11:44 AM
**To:** Carl Rowan
**Subject:** Fwd: Statement of facts

Sent from my iPhone

Begin forwarded message:

> **From:** joeycovino@comcast.net
> **Date:** January 25, 2017 at 1:45:25 AM EST
> **To:** dganley@gmu.edu
> **Cc:** <joeycovino@yahoo.com>
> **Subject: Statement of facts**
>
> Greetings Lt. Ganley,
>
> Thank you to you and your Chief for taking the time to assist me with this ongoing and escalating condition. I feel it necessary and prudent to make this statement in an going harassment/stalking issue with an Officer assigned to your department, Sharon Radfar. It is with deepest regret that I feel compelled to take this action, but there is no other foreseeable outcome that would be in the best interest of all involved.

1

6

From that point on she has spiraled out of control and is getting progressively worse.

I am submitting several screen shots of old texts from her phone from 2015 thru today, January 25th 2017 (as I am writing this at 0030 hrs, she has called twice and sent a text).

I asked her time and time again to please stop calling me.

At first she stated she only wanted closure or answers to her questions. I ignored her for months until she showed up at my police station unannounced, on two separate occasions, and then starting leaving voice-mails and texts that if I did not stop ignoring her and talking to her, that she would show up at my house and PD and, "make a scene". I felt threatened and coerced into calling her and trying to give her the closure that she needed. After a 2-hour phone conversation that was going in circles, I told her I could no longer stay on the phone because I had to pick up my 5 year old son from school and I needed to be there because he has special needs (sensory processing disorder/food aversion/fine motor skill and balance disorder).

She demanded and threatened me not to hang up the phone and continue the conversation with her. I, very angrily and forcefully, told her to never ever call me again and I would never be her friend, acquaintance or otherwise. I threatened to call her Chief if she did not leave me alone. She agreed and did not call me for several months.

During those months she stalked me on facebook, Twitter and now Instagram. She has befriended several friends of mine of facebook, Old army buddies, other hockey players from England, Ireland and the States. She has focused her aggressions, blame and anger on a female hockey player from Ireland, who I have never, ever had a private conversation with and have never spoken to outside of an ice rink or pub with our teammates, named Lorna Hoey.

Most worrisome is that she made up several twitter and facebook accounts, using Lorna's name and pictures from her real account, to try to follow me or become friends with me. I immediately noticed the discrepancy because I only have 15 followers on twitter and "Lorna73Hoey" was one. She started messaging me and, as stated, I never had any contact with the real Lorna so I thought it was suspect. Also, all her tweets were less than 18 hours old (over 60) and the number "73" is a play off Lorna's jersey number 7, and mine, 3.

I tried to make contact with as many people as I could to let them know that Sharon was posing as someone else and people have been taking steps to block her.

Sharon then befriended one of my life long friends and Army buddies. He is a Special Agent in Charge of an office of Manchester , NH for the Department of Homeland Security.

After getting his trust thru LE chatter, she immediately turned on him for information in me. It got so bad that he had to block her as well. She describes him as racist to middle easterners (he's Syrian-American!) and a liar and cover up artist for me.

She has been relentless as of late. I blocked her number through Verizon and she turned to an App that can change her number to random numbers in either her area code or mine.

3

There are another dozen or so that just rip Lorna apart. I did finally start talking to Lorna about all this and she's petrified over the situation. She found several more accounts with her name and had to do considerable damage control. She lives outside of Dublin and had never experienced anything like this. She asked me why it was her that she's doing this to. I said that Sharon became friends with your teammates because you all visited Boston last year and she follows your team facebook site. There is one picture of me sitting next to you on there. That's all it took.

As far as text messages go; I have 30 of them saved and another few dozen screen shots. She has taken pictures of me off the internet and spliced either her or Lorna or other people in my life with them. She wants to point out how good we look together and how awful I look with everyone else. I will just attach some of the more concerning ones here.

She took a photo of a picture on the internet of a sketch of two people hugging with their faces buried, said it reminded her of us, blew it up to poster size, framed it and put it next to her bed.

I can't reiterate enough I spent a total of 4-5 days total around her, counting her two trips to Boston where I would not stay over in her hotel with her.

There is just so much information to process it can be overwhelming. I just want this to stop. I hope she gets help and am trying not to jam up a fellow officer but the safety of my family is coming more and more concerning to me. As you will see in the screen shots, she has driven to my neighborhood and demanded that I come meet her. You can see my obvious concern for safety of anyone who is close to me, including my own safety. I never gave her my home address, yet she has it.

She has stated that if she can't have me, the no one will. And she will take steps to make sure that happens.

I just forwarded a bunch of screen shots for you. Most likely they're read last to first but aren't that hard to decipher.
Those are only a small fraction of what I have but that should be enough. The ones in red font are from my friends phone to him, from her. He got a bit sarcastic with her as they have never actually met and he doesn't know the emotional level we're dealing with here.

Lt, as we discussed briefly; with the airing of a very popular Reality Show that I am featured on this spring, this will most likely get A LOT worse. I did not tell her at all I filmed it last year nor I was ever on it. But she Googles me to no end and has sent me dozens of pictures of me off the internet, so there may be a good chance she already knows.

If you do manage to get her phone, there is a picture of me that only she has. It is me in a black t-shirt and underwear in the locker room during the games. She is the only person that has it. If that can be deleted it may save her from really fantasizing about who knows what

5

8

85

# Exhibit E

9

**Revere Police Department**
**Incident Report**

Page: 1
02/03/2017

Incident #: 17REV-3715-OF
Call #: 17-3715

Date/Time Reported: 01/29/2017 1600
Report Date/Time: 01/29/2017 1755
Occurred Between: 09/01/2015 1200-01/29/2017 1600
Status: Incident Open

Reporting Officer: Police Sergeant Joseph Cavino
Approving Officer: Police Sergeant Joseph Cavino

Signature: _____

Signature: _____

| # SUSPECT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|
| 1  RADFAR, SHARON<br>4393 UNIVERSITY DR<br>FAIRFAX VA 22032 | F | W | 3040 | NOT AVAIL | 703-993-2800 |

Military Active Duty: N
BODY: NOT AVAIL.                    COMPLEXION: NOT AVAIL.
DOB: NOT AVAIL                      PLACE OF BIRTH: NOT AVAIL.
LICENSE NUMBER: NOT AVAIL.         ETHNICITY: NOT HISPANIC

[CONTACT INFORMATION]

Home Phone        (Primary)        703-993-2800

| # OFFENSE(S) | | ATTEMPTED | TYPE | |
|---|---|---|---|---|

LOCATION TYPE: Government/Public Building    Zone: Sector 3
NEW REVERE POLICE STATION
400 REVERE BEACH PKWY
REVERE MA 02151

| 1  Criminal Harassment | | N | | Misdemeanor |
|---|---|---|---|---|
| 265 43A | 265 | 43A | | |

OCCURRED: 01/28/2017  1800

| # VICTIM(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|
| 1  CONFIDENTIAL | | | | | |

| # OTHER PROPERTIES | PROPERTY # | STATUS |
|---|---|---|
| 1  SCANDISK THUMB DRIVE<br>QUANTITY: 1<br>SERIAL #: NOT AVAIL<br>DATE: 01/23/2017 | 17REV-139-PR<br>VALUE: $20.00 | Evidence (Not Nibrs Reportable) |
| 2  LETTERS/DOCUMENTS<br>QUANTITY: 1<br>SERIAL #: NOT AVAIL<br>DATE: 02/03/2017 | 17REV-146-PR<br>VALUE: | Evidence (Not Nibrs Reportable) |

10

87



**Revere Police Department**                                              Page: 1
NARRATIVE FOR POLICE SERGEANT JOSEPH COVINO
Ref: 17REV-3715-OF

To:    File

Revere Police Sgt Joseph Covino reports the following:

-That he met George Mason University Police Officer Sharon Radfar in the summer of 2015 while participating in the World Police and Fire Games.
-That Officer Radfar was a Volunteer for the Games and befriended Sgt Covino.
-That their friendship ended quickly when Ofc Radfar became increasingly hostile and confrontational to Sgt Covino.
-That Ofc Radfar called, texted and wrote Sgt Covino several times, apologizing for her behavior, blaming it on intoxication and being emotional over a bad recent breakup.
-That Ofc Radfar came to Boston, Ma, where Sgt Covino resides, to, "Visit the city".
-That Ofc Radfar asked to see Sgt Covino and, "have another chance to be just friends".
-That Sgt Covino agreed to see Ofc Radfar when she came to visit the city.
-That Sgt Covino, while at dinner on the first night of her stay, decided again to abandon the friendship because of Ofc Radfar's immediate return to her confrontational and belligerent behavior, and he took her back to her hotel.
-That despite several requests and demands by Ofc Radfar, Sgt Covino would not go up and spend the night in her hotel and needed to use a ruse of speaking with her friend, who drove up separately from Radfar, in the parking lot to leave without incident.
-That there has been ongoing harassment by Ofc Radfar to include 1000's of text messages, phone calls and voice mails accusing Sgt Covino of being racist, or in love with a female hockey player from Ireland, once seen in a photo by Ofc Radfar. (Note: Sgt Covino has never had contact with with the female, Lorna Hoey of Dublin Ireland, until it became apparent Ofc Radfar was using Hoey's identity on several social media websites to gain access to Sgt Covino.)
-That Sgt Covino's limited contact with Ofc Radfar had been only to beg her not to contact him.
(Note: Any contact by Sgt Covino was always in response to a threat by Radfar, (showing up) or a continuous round of texts/phone calls, as much as 3-4 per minute from 1600 hrs to 0400 hrs on 01-28-17.)
-That Ofc Radfar had driven to Massachusetts, several times and unannounced, and threatened Sgt Covino to go meet him or she would, "show up and make a scene".
-That Ofc Radfar texted Sgt Covino his home address and stated she was on her way there to confront him.
(Note: Sgt Covino never gave Ofc Radfar his home address and felt extremely threatened for his safety and that of his family that she knew where he lived.)
-That Ofc Radfar did enter the Revere Police Station and ask to see Sgt Covino and when she could not, she left a letter at the front desk for him.
-That Ofc Radfar has taken the identities of several people online, or contacted/friended acquaintances of Sgt Covino in order to gain information or contact with Sgt Covino.
-That as the texts, calls and voicemails began to amount to over 100 per day and became threatening to Sgt Covino's family and friends, that he called her Superior Officers at George Mason University where she works.
-That a Scandisk was created showing screen shots and voice mail recordings of Sharon Radfar and turned over to Virginia State Police.

Respectfully Submitted,

Sgt Joseph Covino, S-60

# Exhibit F

13

**AFFIDAVIT**

I, **Sharon Radfar**, do hereby affirm that the following statement(s) true and accurate to the best of my knowledge:


On February 15, 2017, at approximately 0830i hours, Attorney Arnel, Atoosa Radfar (niece) and I, met in person at Lynn District Court, MA.

Attorney Arnel asked us to proceed to the court room and wait for him inside the courtroom until he spoke to Joey Covino.

Shortly after, Attorney Arnel and Joey Covino walked in the court. Presiding Judge Flatley called my case.  All involved parties stepped forward and the judge confirmed identities of each party.


Presiding Judge reviewed the Order and asked Covino several questions. One of the questions was if he voluntarily was vacating this order and he replied "yes".  Judge Flatley vacated the ordered.   Joey Covino left the court room first and then attorney Arnel, Atoosa Radfar and I exited the courtroom.

Attorney Arnel, Atoosa Radfar and I walked to the clerk's office to obtain certified copies of the docket report and order that the RO was vacated.

According to attorney Arnel, "Joey chose not to go forward with the hearing".


I hereby state that the information above is true, to the best of my knowledge. I also confirm that the information here is both accurate and complete, and relevant information has not been omitted.


Sharon Radfar

14

# Exhibit G

15

Joey Covino Testimony in Lynn District Court.

Jan 31, 2017  3:53:13 PM to  4:02:28 pm os Testimony in Lynn District Court

Clerk: Swears Joey Covino in court to tell the truth under OATH before the Judge.

Joey:  Yes sir

Judge: I am noticing the address of Ms. Radfar is Va.

Joey: Correct Sir, She is a George Mason University Police Officer

Judge: So, how is that she present danger to you?

Joey: On at least three occasions she has driven here unannouced, uninvited, she has shown

up in my neighborhood, threaten me to see her she showed up at my police station

dropping off letters of ............. she has threaten to do so again. I have been putting up

with it for a year and half.

Judge: How do you know this woman?

Joey: We met at the world police and fire games. She was a volunteer. Good will ambassodor

at the world police and fire gamesin NOVA, fairfax county in 2015. we met on the train

plat form and she was helping my hockey team to get to RFK stadium for the opening

cermonies. she be friended us, me "in particular", she started showing up at the bars we

were at. Um, about 4th or 5th night during my living stay there we had a consenual

sexual relationship following that she started to become extremely "um, whats the word"

connected to me "I guess". she showed up to the Boston few weeks after that against my

wishes. She had started saying she is going to ruin my life unless I continue relationship

16

93

with her, um, I just blocked off her number. she has a phone app that allows her to still contact me through a random number. For instance, just marthin further weekend she called me 430 times. I never I rarely respond to her calls. I have been in contact with her Chief and her XO down in GMU. They apologized and stated This is not the first time this has happened with her. she has a condition I don't what it is that they tried to get her help before. I guess the previous didn't take it seriously as it is now. They were little shocked to find out the distance she has traveled this time.

Judge: So when did she last come up here?

Joey: I want to say it was on or about Dec.

Judge: So why did you pick today to come in?

Joey: I have been putting it off because I know what the Restraining Order entiltis. And I have not been in fear of my safety until the most recent threat. she leaves several voicemails, she calls two to three times a minute. It has now effected my life as far as I cant sleep anymore. The phone rings all night.

Judge: So she has threanting you recently?

Joey: Correct.

Judge: How did she do it? By phone, text? I thought you blocked her calls?

Joey: They still coming. I can't block a restricted number. So I get the restricted number and it is a voicemail from her. And one of the voicemails that I have saved and sent to VA State Police is conducting an investigation because she they think she found my address through running it through NCIC thats how she showed up in my neighborhood. um, she, one of the voicemails, the voicemail it went from apologietic to angry to border line socipathgetic where she just makes stuff up in her head. um, she has took over the identities of people that I know that she does not know and tried to contact me. She is

17

under the belief, she digs up pictures of me on the internet and she sends them to me

saying this is the person you are fucking now. one of them was my sister

Judge: what has she done to scare. I mean that is harrassing. But, if you want a restraining

order there has to be something that she is going to hurt you. Has she threatening to harm

you?

Joey: she says vails threats. One of the things she stated was "If I can't have you, no one will" um, she appeard in my neighborhood from VA. She access to a fire arm. Um, I can only remember that story from the Astronut who drove to florida wearing a diaper.

Judge: Do you know of any other times that she has been violent with anyone?

Joey: I don't . The only thing that Lt. Ganley her XO said was "this isn't her first time" he apologized and has tried to get her help. He and along with special agent Kinnard with the VSP advocated for a Restraining Order because this is the last thing I wanted to do. .

Judge: So the campus police down in VA get to carry gun?

Joey: Correct

Judge: because they don't here.

Joey: Correct. As a matter of fact I asked, just texted him while in the waiting room if the

order comes through, Do you want it send to you or the local township. He said we

would much rather have it here so we could coordinate it to get the firearm back.

Judge: well, I order to surround the weapon... technically that is not enforceable, it is out of

state. If they want to enforce it, they can.

Joey: The whole idea your honor is to try to get her help.

Judge: It is up to Virginia to do that. I ll do it. I always put #12 on there. But, I need you to

understand . you know, any order we make in Mass that is an affirmate thing only in

Mass. Sometimes, I know for a fact that New Hampshire will follow it but they don't

have to. I don't VA anything about VA. I will make the order based on what you are

18

telling me and written here. Now, you said, she has your address. It doesn't do any good

Joey: I didn't fill out the confidentily form but

Judge: I can order her to stay away from 313 lincoln ave or I can order her to stay away from

you whereever you are located. If she already knows you 313 lincoln ave it s better to

have the address on it. It is easier to enforce.

Joey: that is why i left. The office said I should check it in the confidentialit form. I agree, I

would like to have it on.

Judge: If she already knows where you live there is no point. I am not sure if she knows

where the police station is.

Joey: Oh she has shown up there twice at least.

Judge: um, any contact including social media is prohbitied, 3d party contact

Joey: Thank you

Judge: what is the term date?

Clerk: Feb 14 or Feb 15.

Judge: you pick the date, Do you want Feb 15? Most likely she won't appear. what we do is

we issu temporary order. On 2/15 there will be hearing at which the order could be

extended for up to a year.

Joey: thank you

Judge: Maybe this will be helpful.

Joey: I appericated it. Maybe she will show up in Chelesey .... He laughs

Judge: Say Hi to my Friends OVER there.

Joey: I will.

19

20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

_____
SHARON RADFAR,                    )
          Plaintiff               )
                                  )
V.                                )
CITY OF REVERE, and               )
BRIAN M. ARRIGO,                  )    **PLAINTIFF'S STATEMENT OF**
     MAYOR; and                   )    **UNDISPUTED FACTS**
JAMES GUIDO,                      )    **IN SUPPORT OF OPPOSITION IN**
     CHIEF OF POLICE; and         )    **RESPONSE TO DEFENSE MOTION**
SERGEANT JOSEPH I.COVINO; and )        **TO DISMISS/SUMMARY JUDGMENT**
OTHER AS YET UNNAMED              )
OFFICERS OF THE                   )
REVERE POLICE DEPARTMENT;         )
INDIVIDUALLY AND IN THEIR         )
OFFICIAL CAPACITIES AS MAYOR      )
CHIEF OF POLICE AND               )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE,            )
          Defendants              )
_____)


1.      Plaintiff has sued alleging civil rights violations

as well as a variety of common law intentional torts.  Defendant

Covino has attempted to characterize her claims as Strategic

Litigation Against Public Participation and obtain their

dismissal under the statute applicable to Massachusetts courts

known as the Anti-SLAPP statute, G.L. c. 231 §59H. Complaint

¶¶25-59; Defendant's Motion dated 10/28/2020.

1

2.        Defendant, a Revere Police Sergeant, drafted a police report in which he was the alleged "victim", falsely and maliciously claiming Plaintiff had committed crimes against him, and wrongly listing himself as the reporting officer and the supervisor, while stating the identity of the victim was "confidential.", though he listed himself as the victim. Plaintiff's Exhibit E-Defendant's Police Report dated 1/28/2017 filed separately and incorporated by reference as if set forth herein.

3.        He then appeared in the Lynn District Court *ex parte* and by making false, misleading and scurrilous claims against plaintiff while omitting information he knew to be essential to the court's proper evaluation of his claims he convinced a judge to grant him an Abuse Prevention Order pursuant to M.G.L. c. 209A against Plaintiff, using his status as a police officer and his relationship with the court to wrongly credit his false claims.  Plaintiff's Exhibit G-Transcript of Defendant's *Ex Parte* Appearance on 1/31/2017.

4.        A full week prior to his *ex parte* court appearance he emailed Plaintiff's employer, making false, misleading, humiliating and otherwise defamatory claims against her in an effort to deprive her of her job as a university police officer.

2

Plaintiff's Exhibit D-Email from Defendant to Plaintiff's employer dated 1/25/17  filed separately and incorporated by reference as if fully set forth herein.

5.      In an effort to get her criminally charged outside of Massachusetts as part of his campaign to destroy her career and her life he tried mightily to convince investigators and prosecutors to charge her with a crime by making false statements, omitting key information and providing misleading and incomplete documents in a personal vendetta campaign that lasted at least into the spring of 2017. Plaintiff's Exhibit C-Email between Virginia investigator and prosecutor in spring 2017 filed separately and incorporated by reference as if fully set forth herein.

6.      Though he alleged in the Lynn District Court *ex parte* proceeding hundreds of text messages and emails from Plaintiff, he wrongfully and misleadingly omitted the hundreds of text messages he had sent to Plaintiff.  He omitted the fact that during the parties' involvement dating back to the summer of 2015 hundreds of messages between the two were exchanged between them. He intentionally withheld that information also from Virginia investigators in his campaign to subject Plaintiff to criminal charges in that state, and he also omitted that information in

3

100

his correspondence with her employer-part of his deliberate

scheme perpetrated to destroy her life a week before his

*ex parte*, "emergency" court appearance. Plaintiff's Exhibits C

and D.

**Defendant's Statements of Facts are Disputed as Follows:**

<u>MATERIAL FACTS FROM THE DEFENDANT</u>

1. From a factual standpoint, paragraphs 6-9 of the plaintiff's complaint relate to a

   "Complaint for Protection from Abuse" that defendant Covino filed against the plaintiff

   Radfar in the Lynn District Court on January 31, 2017.[1]

Disputed.  Plaintiff's factual allegations against Defendant

Covino are detailed in paragraphs 4, 6-12 and 17-18 of the

Complaint where she complains of his wrongful drafting of police

report containing false and misleading claims and wrongly listing

himself as victim, reporting officer and supervisor[2], his

outreach several days prior to her employer[3] and his contacts for

months afterward to Virginia investigators with false and

---

[1] A true and accurate copy of the Complaint for Protection from Abuse and a copy of the Abuse Prevention Order are attached hereto as Exhibit A.  The Material Facts set forth herein are from the documents in Exhibit A and the attached Affidavit of Joseph I. Covino, attached hereto as Exhibit B.  The documents in Exhibit A have been redacted of all personal information.

[2] Plaintiff's Exhibit E-police report drafted by Defendant dated January 28, 2017 filed separately and incorporated by reference as if fully set forth herein.

[3] Plaintiff's Exhibit D-Defendant's email to Plaintiff's employer filed separately and incorporated by reference as if fully set forth herein.

4

misleading claims[4] seeking to have her charged criminally and cause the loss of her employment in an ongoing campaign to destroy her life. Plaintiff's Complaint, ¶6-12,16-17.

2. The Affidavit filed in support of the Abuse Prevention Order lists Ms. Radfar as having an address of Sterling, Virginia.  The Affidavit attests to Ms. Radfar "repeatedly attempt[ing] to contact [Covino] by any means necessary, to wit, telephone, text, written letters, social media, driving from VA to MA and showing up in my neighborhood or at my place of work."  See Exhibit A, pg 2.

Disputed as to veracity of claims, which are wholly inconsistent with the facts and other statements by Defendant and evidence offered herein, but undisputed those statements appear in the affidavit.

3. Among other allegations it states that Radfar:

"has called/texted over 400x on MLK weekend and called over 100X on 01/28/18.  I have blocked over 100 phone numbers in the past year to avoid her.  She uses an app that shows other numbers as just the #'s.  She has shown up at my neighborhood uninvited or unannounced and demanded I come see her.  She has threatened me with ruining my life and has stated 'if I can't have you, no one will!'"   See Exhibit A, pg 2.

Disputed as to veracity of claims, which are wholly inconsistent with the facts and other statements by Defendant and evidence offered herein, but undisputed those statements appear in the affidavit.

---

[4]Plaintiff's Exhibit C-Spring 2017 email between Virgina investigator and prosecutor regarding parties filed separately and incorporated by reference as if fully set forth herein.

4. Defendant Convino's affidavit in support of the Abuse Prevention Order further states that

Radfar had:

> ". . . assumed the identities of several people online in an attempt to follow/contact me.  She splices pictures of herself to pics she finds online of me. Radfar has befriended several LEO's [law enforcement officers] who are friends of mine and are harassing them to get info about me.  She verbally abuses me 100's of times per day accusing me of not acknowledging her due to her middle eastern descent.  Her messages have become increasingly threatening and unstable as of last week.  Because of her repeated Actions/threats, I am in absolute fear of grave danger from Radfar that I continuously carry a firearm for fear she will appear unannounced or armed."  See Exhibit A., pg 2

```
Disputed as to veracity of claims, which are wholly inconsistent
with the facts and other statements by Defendant and evidence
offered herein, but undisputed those statements appear in the
affidavit.
```

5. Two days before petitioning the court for the Abuse Prevention Order, Covino

documented the plaintiff's actions since the summer of 2015 in an internal Revere

police report that was captioned "To:  File."  This report was not written for law

enforcement purposes.  See Exhibit B, ¶16.

```
Disputed.  Defendant drafted a Revere Police Department police
report three days before the hearing, listing himself as
reporting officer, supervisor and victim, and wrongfully claiming
```

6

Plaintiff had committed a crime, which he provided to the Lynn
District Court.  Plaintiff's Exhibit E-Police Report Drafted by
Defendant-filed separately and incorporated by reference as if
fully set forth herein.

6. After a hearing on January 31, 2017, a judge in the Lynn District Court issued the

Abuse Prevention Order (Lynn District Court Docket Number 201713RO104) while

checking the first box in Section A and issuing the Order "without advance notice

because the Court determined there was a substantial likelihood of immediate danger of

abuse." See Exhibit A, Order ¶A, pg 3.  The Order was granted until February 15, 2017,

at which time a two-party hearing was to be held.  See Exhibit A, pg 4.

Disputed as it is incomplete.  The judge explained to Defendant
he did not have the authority to order limitations on Plaintiff
outside the Commonwealth of Massachusetts, which the Defendant
failed to tell the various officials he sent the order to in
Virginia.  Plaintiff's Exhibit G-Transcript of Defendant's ex
parte hearing, filed separately and incorporated by reference as
if fully set forth herein.

7. On February 15, 2017, the plaintiff and her attorney were present.  See Exhibit A, pg 4.

According to Section E of the Abuse Prevention Order, the Order was terminated at

Plaintiff's [Covino's] request.  See Exhibit A, pg 4.  The handwritten notations from the

court states: "Both parties present.  Defendant may have the return of all weapons she

surrendered."  See Exhibit A, pg 4.

Disputed as it is incomplete.  The hearing convened with both
parties and Plaintiff's counsel present and the judge asked a
series of questions. Defendant stated he did not wish to extend
the order, which is what Plaintiff counsel indicated afterward.
Plaintiff's Exhibit F-Affidavit of Plaintiff regarding the
2/15/17 hearing, filed separately and incorporated by reference
as if fully set forth herein.

8. As noted in the attached Affidavit of Joseph Covino, the defendant in the instant action

(plaintiff in the restraining order action) agreed to dismiss the Abuse Prevention Order

because Radfar's attorney had impressed upon him that the Order had been a "wake-up

call" to Radfar and because he did not want her inability to carry a firearm in Virginia to

be an impediment to her employment.  See Covino Affidavit, Ex. B, ¶18.

Disputed. Defendant's approach to Plaintiff's employer[5], his
failure to inform the Lynn District
Court, VA investigators he approached and Plaintiff's employer
that he had sent hundreds of messages to Plaintiff including more
than two dozen after he allegedly asked that she not contact

_____

[5]Plaintiff's Exhibit D-Email from Defendant dated January
25, 2017 to Plaintiff's employer.

8

105

him[6], and his campaign extending for months in an attempt to get her charged with a crime in Virginia indicate that he wanted to see her wrongly deprived of her employment and charged with a crime.  He did not go forward with the hearing that day because he knew that Plaintiff would present evidence of his false and misleading claims and his misconduct toward her, in a proceeding in which the court was already skeptical of his claims and the propriety of issuance of the order when he appeared ex parte.[7]

9. As set forth in the Affidavit of Joseph Covino, which authenticates the Complaint for Protection from Abuse, Covino met Radfar in late June of 2015 while Covino was playing on a hockey team at "World Police and Fire Games" in Fairfax, Virginia.  Exhibit B, ¶2.  The plaintiff was allegedly a "volunteer/goodwill representative" at these games. Ex. B, ¶2.

Disputed as to the characterizations in Defendant's affidavit and Complaint, inasmuch as his claims are discredited by the evidence and Plaintiff denies his claims.

---

[6]Plaintiff's Exhibit C-Email from VA Investigator to Prosecutor in Spring 2017.
[7]Plaintiff's Exhibit G.

10. Covino and Radfar started a romantic relationship at that time that followed an up-and-down-course from late June 2015 to the early fall of 2015.  Ex. B, ¶¶4-8.  The plaintiff visited Covino in the Boston area once on her own, with Covino ending the relationship during that visit.  Exhibit B, ¶4.  The plaintiff then visited the Boston area at a later date with a female friend in the early fall of 2015, after which Covino told the plaintiff he did not want to have any type of relationship with her.  Ex. B, ¶¶6-7.

Disputed as to the characterizations in Defendant's affidavit and Complaint, inasmuch as his claims are discredited by the evidence and Plaintiff denies his claims.[8]

11. Following that time, the plaintiff began a disturbing pattern of stalking and harassing Covino that included the plaintiff twice driving from Virginia to Massachusetts unannounced, on one occasion showing up at Covino's place of work and on another occasion appearing in his neighborhood.[9]  Ex. A, pg 2 and Ex. B, ¶¶8-18.  Radfar appearance in Covino's neighborhood, coupled with the fact that Covino had blocked over 100 phone numbers to prevent the plaintiff from contacting him, resulted in Covino calling the plaintiff's place of employment.  Ex. B, ¶¶13-14.

---

[8] Plaintiff's Exhibit E.

[9] Paragraph 7 of the plaintiff's Complaint states, in part, that Covino "felt he deserved the order because she did not obey him when he ordered her not to come to the Commonwealth of Massachusetts," essentially admitting that the plaintiff came to Massachusetts from Virginia against Covino's wishes.

Disputed as to the characterizations in Defendant's affidavit and
Complaint, inasmuch as his claims are discredited by the evidence
and Plaintiff denies his claims.  Although he made similar false
and misleading claims to Virginia authorities, their
investigation demonstrated that he made hundreds of contacts by
telephone and text message including more than two dozen after he
allegedly told her not to contact him.[10]

> 12. Ultimately, the plaintiff's erratic behavior and her incessant phone calls including
>
> over 400 calls or text messages over Martin Luther King weekend and 100 text messages
>
> or phone calls on January 28, 2017 prompted Covino to write an internal police report to
>
> document the situation, as well as prompting him going to the Lynn District Court on
>
> January 31, to petition the court for a Protection from Abuse Order.  Ex. A, pgs 1-2  and
>
> Ex. B, ¶¶16-17.

Disputed.  Defendant's false, misleading and scurrilous claims
leveled against Plaintiff which she denies and which are disputed
by the evidence were a well-thought out campaign that began long
before he appeared ex parte before the court.  He wrote to her
employer in his attempt to destroy her reputation and career a
full week before that appearance[11] and all though he did not

---

[10] Plaintiff's Exhibits D and E.
[11] Plaintiff's Exhibit D.

11

follow through with his restraining order hearing in February[12]

his campaign to ruin her life by getting her charged with a crime

in Virginia continued at least into the spring of 2017.[13]

 

                                 Respectfully submitted,

                                 Sharon Radfar
                                 By her attorney

Dated: November 23, 2020

                                 s/Elizabeth M. Clague
                                 _____
                                 Elizabeth M. Clague
                                 Attorney for the Plaintiff
                                 The Kennedy Building
                                 142 Main Street, Suite 304
                                 Brockton, MA 02301
                                 (508) 587-1191
                                 BBO# 632341

**CERTIFICATE OF SERVICE**

    I, Elizabeth M. Clague hereby certify that I have served the
within document to Defendant by causing a copy to be sent through
the electronic filing system to his counsel of record, to wit:

------------------------

[12]Plaintiff's Exhibit F.
[13]Plaintiff's Exhibit C.

12

Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com


                              /s Elizabeth M. Clague


13

UN T  ST T S  STR T OURT
STR T O  M SS  US TTS

S  RON R    R

P

N
T

T  O  R V R

OR  T    ONOR    N  R  T   N    STR  T  U

T    P ON   S    U  N    ON  R N

M

M    N    U      S
N
O
M

R        P      RMR  RR
O              R

T    PUT    R    U    S

                                                    T

T            N                    R


MS        U

                        S        R

T    OURT

MR   N   RSON


T    OURT

MR   OV NO


MR   O   RT

R

T    OURT


MR   O   RT


                    R

T    OURT    S

R

MR    O    RT

T    OURT    O

MR    O    RT

T    OURT

MR    O    RT

R        M

T    OURT

MR    O    RT

M

M

R

R

P

R    P

T

S

T

S

MR  O  RT

R                R

MS      U                M  R

T    OURT    S
MS      U

T

M

M

T    OURT    S
MS      U    S
T    OURT
T

R

T

M

R

MR   O   RT

R

T   OURT   O

MS     U

T   OURT

MS     U

MR   O   RT   T

T   OURT   O     S

T                               M
R                               P
          R
M
     MR   O   RT
     T    OURT                        R


     MS        U    T
     T    OURT    S
                   R




     MR   O   RT
          T
                    R      P
          R      P
                    R
          R

T    OURT    S

MR    O   RT

T    OURT

M

O

M

R

MR    O   RT                    T

MS      U




T      OURT




MS      U      S

T      OURT




MS      U

T      OURT                                        R




MR   O  RT    T




T      OURT

MR   O  RT    T

T      OURT    P

MR   O  RT    O

T      OURT   O      T

T        S  PP

T

S  PP

S

S  PP

S        S  PP

S  PP                              S  PP

T                    R

                                    R

            T                    R

                                            S

            MR    N  RSON

M

O

T                              T

S

T     OURT

MR    N  RSON

T     OURT

S

T

M

M

M

S

MR    N    RSON

T    OURT    T

MR    N    RSON

T

T    OURT

O

M

MR   N  RSON

T     OURT

MR   N  RSON   R

T

T     OURT

T

S

MR   N  RSON   S

T    OURT

MR   N  RSON   O
T    OURT

MR   N  RSON   N

T    OURT

MR    N  RSON

T    OURT    O                           S

                                    M

MS        U

T    OURT    O        T

                            M
MR    N  RSON

MS        U      R

T    OURT    O        S

M

M

MS        U      S


T     OURT

MS        U      T


T     OURT    T

MS        U      T              O

T     OURT


                              S

          S


T     PUT      R

                              O


T     OURT    O

MS        U


T     OURT

MS       U

T     OURT          N

O       T

S

T

T

MS      U

V

T      OURT

MS      U      S

T      OURT

MR   N  RSON

S

                                                                    T

T    OURT          M

MS       U

T    OURT    S

S

MR    OV NO                                        M

T     OURT

MR    OV NO    O        T
MS         U    U

T     OURT

                    M

M

        O

                    M
                S   PP

MR   N RSON

T    OURT

O

T

V

T

MR   N  RSON

S  PP

T    OURT    O

S    PP

T

MR    N    RSON

T    OURT

T

MR    N    RSON

T      OURT

MR    N   RSON

T

T      OURT

MR    N   RSON    N

T      OURT                                    T
MR    N   RSON
T      OURT    T
MR    OV NO    N
T      OURT

T
MR    N   RSON

T

T    OURT    T

MR    N  RSON

T    OURT    N                        S  PP
T

MR    N  RSON    O
T    OURT    O

MS      U

T    OURT

MS      U

S

T    OURT    N


MS      U                    T

MR    N    RSON    N

T    OURT    O        T

R    P    R    M    R
R    R            U    S
M
S        T    U    S

U    S

M

R        P

RO  RT    P S    RMR   RR
O            R

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. NO. 1:20-CV-10178-IT

SHARON RADFAR,
      Plaintiff,

v.

CITY OF REVERE; BRIAN M. ARRIGO,
MAYOR; JAMES GUIDO, CHIEF OF
POLICE; SERGEANT JOSEPH I. COVINO;
and OTHER YET UNNAMED OFFICERS
OF THE REVERE POLICE DEPARTMENT,
individually and in their capacities as Mayor,
Chief of Police, Police Sergeant, and Officers
of the City of Revere,
      Defendants.

### DEFENDANTS, CITY OF REVERE, BRIAN M. ARRIGO,
### AND JAMES GUIDO'S, MOTION TO DISMISS

The Defendants, City of Revere ("City"), Mayor Brian M. Arrigo ("Arrigo"), and former Chief of Police James Guido ("Guido") (collectively "Municipal Defendants"), respectfully request, pursuant to Fed. R. Civ. P. 12(b)(6), that the Court dismiss so much of Plaintiff's Complaint as is directed to them, including the claims against Arrigo and Guido in their individual capacities, for the reasons set forth below.

### I. OVERVIEW OF THE COMPLAINT

In her Complaint, filed on January 29, 2020, Plaintiff alleges the following: On January 31, 2017, Plaintiff was served with an Abuse Prevention Order obtained *ex parte* by Covino in the Lynn District Court, and was also given a letter from her employer suspending her pending an investigation of criminal charges alleged against her by Covino. Her service weapons were

142

also seized.[1]  (Complaint, ¶ 6).  In obtaining the order Covino misrepresented calls and messages he and Plaintiff had exchanged, failed to disclose pertinent information, and made false and misleading claims that Plaintiff had threatened him and placed him in imminent fear of physical harm when in fact she had done nothing of the kind.  (*Id.* ¶ 7).  In filing the Complaint for Protection from Abuse and supporting affidavit, both of which contained false and misleading claims about Plaintiff, Covino acted in concert and with the advice of unnamed Revere Police officers.  (*Id.* ¶ 8).  Covino called Plaintiff's employer, making the same false and misleading claims, causing Plaintiff's employer to suspend her, open an investigation, and seek criminal charges against her.  (*Id.* ¶ 9).  Covino relentlessly pursued criminal charges against Plaintiff though he knew she had committed no crime and that the charges and claims were false, and continued those efforts for months after the Lynn District Court vacated the Abuse Prevention Order and ordered the return of Plaintiff's service weapons two weeks after the Order was issued.  (*Id.* ¶¶ 10-11).  Covino falsely and maliciously accused Plaintiff of a crime he knew she did not commit and, acting under color of law, drafted a Revere Police Department incident report making his false claims, listing himself as victim, reporting officer, and supervisor approving the report.  (*Id.* ¶ 12).  His efforts to have Plaintiff charged criminally included making false statements to Virginia investigators and failing to inform them that the restraining order had been vacated.  (*Id.* ¶ 17).  Despite these efforts, Plaintiff was not charged with any crime in Virginia or Massachusetts.  (*Id.* ¶ 16).[2]

---

[1] It is undisputed that at the time Covino sought the Abuse Prevention Order against her Plaintiff was employed as a police officer with the George Mason University Police Department in which capacity she was issued and possessed at least one firearm.

[2] Plaintiff does not allege that Covino committed any domestic abuse against her, but only that Covino falsely accused her of abusing him.

Broadening her allegations to include the City, Arrigo, and Guido, Plaintiff claims that those parties knew that Plaintiff was not the perpetrator of domestic abuse against Covino and that he was thus wrongfully trying to have Plaintiff criminally charged and cause the loss of her career and destroy her life. (*Id.* ¶ 13). They also knew of Covino's lengthy history of misconduct and failed to train, discipline, or properly supervise him. (*Id.*). Plaintiff alleges that the Defendants' misconduct caused Plaintiff the loss of her job and her private telephone records to be the subject of a search warrant in which a court in the jurisdiction where she worked as a police officer received the "smears" that had been leveled against her. (*Id.* ¶¶ 14-15). Plaintiff claims that all of the Defendants treated her differently from others similarly situated due to her gender and national origin. (*Id.* ¶ 18). Finally, Plaintiff alleges that the City, Arrigo, Guido, and unnamed officers all engaged in a custom and policy of failing to train and discipline officers in providing proper responses to domestic abuse and protection of constitutional rights, and of protecting men who are members of the law enforcement fraternity from the consequences of violating the law, and showed deliberate indifference to the need for training, supervision, or discipline of Covino and other unnamed officers. (*Id.* ¶¶ 21-23).

On the basis of these allegations, Plaintiff asserts ten counts in her Complaint: (1) violation of her rights to equal protection under the Fifth and Fourteenth Amendments of the United States Constitution; (2) selective prosecution and enforcement of the law due to gender and national origin bias; (3) defamation; (4) deprivation of her rights under the Massachusetts Civil Rights Act; (5) intentional infliction of emotional distress; (6) "deliberate indifference to the need for training;" (7) conspiracy to violate her civil rights under 42 U.S.C. § 1985(2)&(3); (8) "refusal to prevent wrongs committed against Plaintiff" under 42 U.S.C. § 1986; (9) abuse of process; and (10) malicious prosecution. Though it is unclear, the Municipal Defendants treat all

3

144

but the last two counts (abuse of process and malicious prosecution) as being directed against them.[3]

The Defendants Arrigo and Guido are sued both individually and in their official capacities. (Complaint at ¶ 1 - Caption). To the extent they are sued in their official capacities, Plaintiff's claims against them are tantamount to claims against the City itself. *Brandon v. Holt*, 469 U.S. 464, 472 (1985); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Saldivar v. Pridgen*, 91 F. Supp. 3d 134, 137 (D. Mass. 2015) ("Under both Massachusetts and federal law, a claim against a chief of a municipal police department in his official capacity is a claim against the municipality itself."). Thus, the arguments set forth below on behalf of the City apply equally to Arrigo and Guido in their official capacities.

## II. ARGUMENT

Plaintiff's Complaint fails to state claims upon which relief can be granted against the City of Revere and Arrigo and Guido, both in their official and individual capacities, for multiple reasons as discussed below.

### A.    Plaintiff Fails to State Claims Under 42 U.S.C. § 1983

Plaintiff asserts three federal civil rights claims against the Municipal Defendants: (1) violation of her rights to equal protection (Count I); (2) selective prosecution and enforcement due to gender and national origin bias (Count II); and (3) deliberate indifference to the need for

---

[3] This is one of two known cases in which a male police officer who had been involved in a personal relationship with Plaintiff sought an abuse prevention order against her for protection from her alleged stalking and harassing behavior, as a result of which Plaintiff sued him and his employer for violation of her civil rights. In the other case, *Radfar v. Crowley et al.* (D. Mass. No. 1:20-cv-12151-RWZ), filed on December 2, 2020, and in which Plaintiff is represented by the same attorney as in the instant case, Plaintiff makes similar allegations and largely identical claims against Brockton police officers, the Brockton Chief of Police, and the City of Brockton.

training, supervision, and discipline (Count VI). All three claims rest on nothing more than conclusory statements adorned with constitutional labels, which are not entitled to be accepted as true when evaluating the sufficiency of the allegations on a motion to dismiss for failure to state a claim.

### 1. Standard for Reviewing Adequacy of Complaint on a Rule 12(b)(6) Motion

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court revisited the requirement of Fed. R. Civ. P. 8(a)(2) that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Reiterating what it had recently stated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court explained that while the pleading standard of Rule 8 does not require detailed factual allegations, it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation[,] [and a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft*, 556 U.S. at 678 (internal citations and quotation marks omitted). In other words, the factual allegations of the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Gagliardi v. Sullivan*, 513 F. 3d 301, 305 (1st Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The Court explained that two "working principles" underlied its decision in *Twombly*. The first was that the tenet that a court must accept as true all of the allegations in a complaint does not extend to legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. The second was that, in evaluating whether a complaint states a plausible claim for relief, a reviewing court must undertake a "context-specific" task, drawing on its judicial experience and common sense. Where the well-pleaded facts permit the court to infer no more than the mere

possibility of misconduct, the complaint has failed to show that "the pleader is entitled to relief," and the complaint is subject to dismissal. *Id.* at 679; *Saldivar v. Pridgen*, 91 F. Supp. 3d at 137.

The Court then invited courts considering a motion to dismiss to implement the "two-pronged approach" illustrated in *Twombly* by first identifying the allegations in the complaint that are no more than conclusions, and thus not entitled to be accepted as true, and then determining whether, assuming the truth of any remaining well-pleaded factual allegations, they give rise to a plausible claim for relief. *Ashcroft*, 556 U.S. at 679; *Richmond v. Peraino*, 128 F. Supp. 3d 415, 417 (D. Mass. 2015) (To survive a motion to dismiss under Rule 12(b)(6) . . . "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Moreover, *each* defendant's role [in the alleged constitutional violation] must be sufficiently alleged to make him or her a plausible defendant. After all, 'we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F. 3d 1, 16 (1st Cir. 2011) (emphasis in original) (quoting *Sanchez v. Pereira-Castillo*, 590 F. 3d 31, 48 (2009) (emphasis in original)). Also, "§ 1983 liability cannot rest solely on a defendant's position of authority." *Ocasio-Hernandez*, 640 F. 3d at 16.

Applying these principles to the instant case, it is obvious that the Complaint fails to state viable claims against the Municipal Defendants for violation of rights under 42 U.S.C. § 1983.

## 2.   *Equal Protection (Counts I & II)*

Plaintiff alleges in Counts I and II of her Complaint, respectively, that the Defendants (1) violated her right to the equal protection of the laws by "endeavor[ing] to assist Covino in obtaining an advantage over her in his civil proceedings initiated maliciously and as an abuse of

6

process" (Complaint, ¶ 27) and (2) "repeated selective enforcement of the law for the benefit of Covino and as his agents violated Plaintiff's rights to equal protection of the laws."

To establish an equal protection claim, a plaintiff must adduce sufficient evidence from which a rational jury reasonably could conclude that, "compared to others similarly situated, [he] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Tapalian v. Tuniso*, 377 F. 3d 1, 5 (1st Cir. 2004) (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortgage Fin. Corp*, 246 F. 3d 1, 7 (1st Cir. 2001)). To the extent Plaintiff's claim rests on the malicious or bad faith prong, she "must establish more than that the government official's actions were arbitrary or erroneous; instead, the plaintiff must establish that the defendant's actions constituted a 'gross abuse of power.'" *Tapalian*, 377 F. 3d at 5-6 (quoting *Baker v. Coxe*, 230 F. 3d 470, 474 (1st Cir. 2000)). A selective prosecution claim under § 1983 is a species of equal protection violation, *Wentworth Precious Metals, LLC v. City of Everett*, No. 11-10909-DPW, 2013 WL 441094, at *8 (D. Mass. Feb. 4, 2013). To establish the selective treatment, a plaintiff "must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, [and] which have the capacity to demonstrate that [plaintiffs] were singled . . . for unlawful oppression." *Id.* (quoting *Rubinovitz v. Rogato*, 60 F. 3d 906, 909-10 (1st Cir. 1995)).

It is well settled that a municipality cannot be held liable under § 1983 based solely on a respondeat superior theory. *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978). In announcing that a local government cannot be sued under § 1983 for alleged wrongdoing inflicted solely by employees or agents, the Supreme Court in *Monell* concluded that a municipality can be liable under § 1983 only where the plaintiff proves that an official

7

government policy or custom directly caused the alleged constitutional violation. *Id.* at 694. A plaintiff who brings a § 1983 action against a municipality bears the burden of showing that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Haley v. City of Boston*, 657 F. 3d 39, 51 (1st Cir. 2011) (quoting *Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original)). A § 1983 claim against a municipality based on a theory of municipal policy is viable only where the alleged unconstitutional action "implements or executes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers." *Chapman v. Finnegan*, 950 F. Supp. 2d 285, 293 (D. Mass. 2013) (quoting *Monell*, 436 U.S. at 690). Similarly, to establish a § 1983 claim against a municipality on a theory of municipal custom, a plaintiff must demonstrate a practice by city officials that is so "well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. *Id.* (citing *Bordanaro v. McLeod*, 871 F. 2d 1151, 1156 (1st Cir. 1989)).

Here, Plaintiff's Complaint is devoid of any facts supporting the assertion that any municipal policy or custom caused her to be treated differently from other similarly situated persons in connection with the abuse prevention proceedings initiated against her by Covino or his other alleged misconduct, or that by its deliberate conduct the City was in any way the moving force behind any such constitutional violations. Likewise, the Complaint fails to identify specific instances where persons similarly situated to Plaintiff were treated differently, thus demonstrating that Plaintiff was singled out. Also absent are any facts explaining Arrigo or Guido's role in the alleged constitutional violation sufficient to make them plausible defendants. Plaintiff's allegations that "Defendants treated Plaintiff differently from others similarly situated

8

for impermissible reasons" (Complaint, ¶ 18), and that the City, Arrigo, Guido, and unnamed

officers "engaged in a custom and policy of failing to train and discipline officers in providing

proper responses to domestic abuse and protection of constitutional rights . . . and of protecting

men who are members of the law enforcement fraternity from the consequences of violating the

law . . . and showed a deliberate indifference to the need for training, supervision, or discipline of

Defendant Covino and Other Unnamed Officers" (Complaint ¶¶ 21-23) are merely formulaic

recitations of the elements of a cause of action that are not entitled to be accepted as true in

evaluating the sufficiency of this claim on a Rule 12(b)(6) motion.  Implementing the "two-

pronged" approach set out in *Twombly* and disregarding these conclusory assertions, the

remaining allegations of the Complaint fail to give rise to a plausible claim for relief against the

City of Revere or Arrigo and Guido in their individual capacities for violation of Plaintiff's right

to equal protection.

### 3.  Deliberate Indifference to Need for Training (Count VI)

#### a.  *Against the City*

In Count VI of her Complaint, Plaintiff alleges that the injuries she suffered as a result of

Covino and Other Unnamed Officers' misconduct was caused by the Municipal Defendants'

"deliberate indifference to the need for training, supervision and discipline of Defendants Covino

and Other Unnamed Officers." (Complaint, ¶ 43).

"The liability criteria for 'failure to train' claims are exceptionally stringent." *Hayden v.*

*Grayson*, 134 F. 3d 449, 456 (1st Cir. 1998).  Municipal liability on a claim of failure to train

requires a showing that the municipal decisionmakers "knew or should have known that training

was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects

of those inadequacies." *Aldrich v. Town of Milton*, 881 F. Supp. 2d 158, 171 (D. Mass. 2012).  A

9

municipality can be held liable for a failure to train police officers only when the failure amounts to deliberate indifference to the rights of persons with whom the police come into contact, and is closely related to, i.e., the moving force behind, the constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Thus, a plaintiff asserting a claim of failure to train must prove both (1) that the municipality was deliberately indifferent to the need to train and (2) that the lack of training actually caused the constitutional violation in question. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). Addressing the parameters of a failure to train claim in *Connick*, the Supreme Court explained:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.
>
> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in de facto respondeat superior liability on municipalities.
>
> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.

*Connick*, 563 U.S. at 61-62 (2011) (internal citations and quotation marks omitted); *Aldrich*, 881 F. Supp. 2d at 171.

Apart from a dearth of facts suggesting that the City knew or should have known that relevant training was inadequate, yet was deliberately indifferent to the consequences of those inadequacies, since Plaintiff alleges that Covino acted intentionally in falsely accusing her of abusing him in obtaining the Abuse Prevention Order against her, the City's failure to train Covino with respect to responding to domestic abuse cannot be considered the moving force behind the alleged violation of Plaintiff's rights. See *Connick*, 563 U.S. at 59 n.5 (questioning whether causation could be proved where the misconduct that was claimed could have been avoided by proper training was done intentionally); *Hayden v. Grayson*, 134 F. 3d at 457 n.14 (1st Cir. 1998) (no showing that whatever training was not provided to Grayson could have thwarted purposeful discrimination). Moreover, Plaintiff fails to allege the requisite pattern of constitutional violations. *Swain v. Spinney*, 117 F. 3d 1, 11 (1st Cir. 1997) (lack of notice of prior constitutional violations defeats failure-to-train claim).

### b.   *Against Arrigo and Guido*

Absent participation in the alleged conduct, a supervisor may be held liable for constitutional violations only when "(1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was affirmative[ly] link[ed] to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence [of the supervisor] amounting to deliberate indifference." *Chapman v. Finnegan*, 950 F. Supp. 2d 285, 294 (D. Mass. 2013) (quoting *Pineda v. Toomey*, 533 F. 3d 50, 54 (1st Cir. 2008)). A plaintiff must show a causal link between the supervisor's conduct and the subordinate's violative act or omission. *Chapman*, 950

11

F. Supp. 2d at 294. Causation may be satisfied if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct, and may also be satisfied by a showing of a long history of widespread abuse sufficient to alert a supervisor to ongoing problems, and the supervisor fails to take corrective action. *Id.*

Here, Plaintiff points to no facts linking Arrigo or Guido to Covino's alleged misconduct towards Plaintiff in any way, shape, or form. No facts are alleged suggesting that either Arrigo or Guido knew anything about Plaintiff or Covino's relationship with her, let alone any action or inaction on their parts affirmatively linking them to Covino's behavior in the sense of encouragement, condonation, acquiescence, or gross negligence.

## B.    Plaintiff Fails to State Claims under the Massachusetts Tort Claims Act, G.L. c. 258

### 1.    *Against the City*

Plaintiff's claims for defamation and intentional infliction of emotional distress (Counts III and V, respectively) constitute claims for damages under the Massachusetts Tort Claims Act, G.L. c. 258,[4] and are thus subject to the provisions of the Act, including the presentment requirements of § 4 and the specific exemptions enumerated in § 10. These claims fail to state claims against the City of Revere due to lack of presentment as well as the City's immunity from liability for intentional torts under G.L. c. 258, § 10(c).

#### a.    *Failure of Presentment*

G.L. c. 258, § 4 requires that a "civil action shall not be instituted against a public employer on a claim for damages under this chapter unless the claimant shall have first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose." *Harrington v. City of Attleboro*, 172 F. Supp. 3d

---

[4] The Massachusetts Tort Claims Act provides "a comprehensive statutory scheme . . . govern[ing] the liability of public employers in tort actions." *Morrissey v. New England Deaconess Ass'n – Abundant Life Communities, Inc.*, 458 Mass. 580, 590 (2010).

12

153

337, 347 (D. Mass. 2016) ("All MTCA actions are subject to the presentment requirement unless specifically exempted by statute.").

> Presentment is . . . a statutory condition precedent to recovery under G. L. c. 258[,] [and] [i]n cases in which the issue is not raised until the time has elapsed during which presentment properly could have been made, the plaintiff's complaint is subject to dismissal on a motion made under Mass. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

*Vasys v. Metropolitan Dist. Com.*, 387 Mass. 51, 55-56 (1982). "If proper presentment is not made within the time allotted, the plaintiff's complaint is subject to dismissal[,] [and] [t]he public employer need not show prejudice to rely upon the plaintiff's failure of presentment." *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 283 (1985) (citation omitted).

Here, Plaintiff failed to make presentment of her c. 258 claims within two years of the date upon which the alleged causes of action arose, or at any time, and thus these claims must be dismissed for this reason alone.

### b.   *Immunity Under G.L. c. 258, § 10(c)*

Under the Massachusetts Tort Claims Act, G.L. c. 258, the City of Revere is immune from suit for any claim arising out of an intentional tort. Under § 10 of the Act,

> [t]he provisions of sections one to eight, inclusive, shall not apply to: . . . (c) any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations[.]

G.L. c. 258, § 10(c). *Consolo v. George*, 835 F. Supp. 49, 52 (D. Mass. 1993) ("It is well settled law that pursuant to the Massachusetts Tort Claims Act, a public employer is immune from liability for the intentional torts of its public employees."). *See Nelson v. Salem State College*, 446 Mass. 525, 537 (2006) ("Intentional torts are expressly exempted from the [Massachusetts

Tort Claims] Act, and therefore a public employer cannot be sued for its employee's intentionally tortious conduct."). Also, the use of the word "including" immediately preceding the listing of intentional torts in § 10(c) indicates that the "list is representative, not all-inclusive, and that any intentional tort is covered by § 10(c)." *Barrows v. Wareham Fire Dist.*, 82 Mass. App. Ct. 623, 626 (2012).

Here, Plaintiff's claims for defamation[5] and intentional infliction of emotional distress are explicitly identified in § 10(c) as intentional torts for which the City of Revere is exempt from liability, and therefore fail to state claims against the City and must be dismissed.

### 2.   *Against Arrigo and Guido*

#### a.   *Defamation*

Plaintiff asserts a claim for defamation in Count III, alleging that while "Defendants knew Plaintiff had not violated any laws nor committed any crime" they "indicated to Plaintiff's employer and others that she had committed criminal acts."

Here, Plaintiff relies on imagined facts, wildly claiming without any factual support whatsoever that the "Defendants knew well that Covino was wrongly engaged in efforts to have Plaintiff criminally charged, to cause the loss of her career and to destroy her life, and all knew Plaintiff was not the perpetrator of domestic violence or abuse of Covino."[6] (Complaint, ¶13). No facts are alleged as to how or why Mayor Arrigo or former Chief of Police Guido could

---

[5] Defamation encompasses the torts of libel and slander. *Boyle v. Barnstable Police Dep't*, 818 F. Supp. 2d 284, 307 (D. Mass. 2011) (quoting *Draghetti v. Chmielewski*, 416 Mass. 808, 812 n.4 (1994)).

[6] It is difficult to square these unsubstantiated accusations with Rule 11's admonition that by submitting a pleading counsel certifies that to the best of his or her knowledge, information, and belief the factual contentions contained therein have, or will likely have, evidentiary support. Plaintiff's counsel was cautioned about her unsubstantiated rhetoric by Judge Stearns in his Memorandum and Order in *Beasley v. Lowe's Home Centers, Inc.*, No. 15-12665-RGS, 2017 WL 1739172, at *6 (D. Mass. May 3, 2017) ("Plaintiff's counsel, however, should take mind of her duty under Rule 11 to support her rhetoric and allegations with competent evidence or actionable wrongdoing.").

14

possibly have had any knowledge of Covino's personal relationship with Plaintiff or his alleged misconduct towards her, or how they could know whether Plaintiff or Covino, if either of them, was abusive towards the other. The allegation that Covino drafted a Revere Police Department incident report in which he allegedly made false claims against Plaintiff is far from sufficient, standing alone, to impute such knowledge to Arrigo or Guido.[7] Apart from these conclusory assertions, the Complaint lacks any facts that City of Revere officials had any knowledge of or conspired or were complicit in any of Covino's alleged misconduct towards Plaintiff, and thus fails to give rise to plausible claims against these parties for defamation.

### b.  Intentional Infliction of Emotional Distress

Plaintiff alleges in Count V that the "Defendants' acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon Plaintiff." To set forth a sufficient claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendants intended to inflict emotional distress or should have know that emotional distress was the probable effect of their conduct, (2) the defendants' conduct was extreme and outrageous, (3) the defendants' actions caused the plaintiff's distress, and (4) the plaintiff's distress was so severe "that no reasonable person could be expected to endure it." *Baxter v. Conte*, 190 F. Supp. 2d 123, 130 (D. Mass. 2001) (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997). "Extreme and outrageous" conduct is conduct that goes "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Therrien v. Hamilton*, 849 F. Supp. 110, 116 (D. Mass. 1994) (quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976).

---

[7] That the report was authored by Covino naming himself as victim, reporting officer, and supervisor approving the report (Complaint, ¶ 12) strongly suggests that the report was created for his own personal reasons – more akin to a "memo to file" than an official police report - and was not intended to be available to other police personnel or city officials.

Plaintiff's vague assertions of misconduct and unspecified acts and omissions on the part

of the municipal officials obviously fall well short of this high standard and fail to state claims

against Arrigo or Guido as a matter of law.

## C.    Plaintiff Fails to State Claims Under G.L. c. 12, §§ 11H & 11I

### 1.    *Against the City*

Plaintiff fails to state a claim against the City of Revere for violation of her rights under

the Massachusetts Civil Rights Act (MCRA), G.L. c. 12, §§ 11H & 11I, because a municipality

is not considered a person under the Act. *Saldivar v. Pridgen*, 91 F. Supp. 3d 134, 139 (D. Mass.

2015); *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 591-592 (2001) ("[A] municipality

is not a 'person' covered by the Massachusetts Civil Rights Act (MCRA), G.L. c. 12, §§ 11H,

11I.").

### 2.    *Against Arrigo and Guido*

To state a claim under the MCRA against the municipal officials, Plaintiff must show that

(1) her exercise or enjoyment of rights secured by the Constitution or laws of either the United

States or the Commonwealth (2) were interfered with, or attempted to be interfered with, and (3)

that the interference or attempted interference was by threats, intimidation, or coercion. *Farrah*

*ex rel. Estate of Santana v. Gondella*, 725 F. Supp. 2d 238, 247 (D. Mass. 2010). "In deference

to a legislative concern that the MCRA not be interpreted to create 'a vast constitutional tort,' the

Act is 'explicitly limited' to situations 'where the derogation of secured rights occurs by threats,

intimidation or coercion' involving a specific threat of harm 'directed toward a particular

individual or class of persons.'" *Id.* (quoting *Bally v. Northeastern Univ.* 403 Mass. 713, 718-

719 (1989)). In this context, "[a] '[t]hreat' . . . involves the intentional exertion of pressure to

make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear

16

for the purpose of compelling or deterring conduct. . . . ['Coercion' involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done." *Farrah ex rel. Estate of Santana v. Gondella*, 725 F. Supp. 2d at 247 (quoting *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994)).

Here again, apart from conclusory assertions and the reference to the "threats," "intimidation," and "coercion" buzzwords amidst her various claims, the Complaint provides no factual support that Mayor Arrigo or former Chief of Police Guido had any knowledge whatsoever of Covino's relationship with Plaintiff or his alleged wrongful conduct towards her, let alone threatened, coerced, or intimidated her in any way.

## D.    Conspiracy Under 42 U.S.C. § 1985

In Count VII of her Complaint, Plaintiff claims that she was the victim of a conspiracy to deprive her of her constitutional rights under 42 U.S.C. § 1985(2)&(3). Plaintiff alleges that (1) she was "intimidated, threatened, and coerced not to offer testimony or assert her position in a case in which she was a witness and a party by the misconduct of two or more of the Defendants," and (2) that "two or more of the Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice in the Commonwealth of Massachusetts, with intent to deny to Plaintiff the equal protection of the laws." (Complaint, ¶ 45).

The first part of Plaintiff's allegation falls under the first clause of § 1985(2) which "imposes liability on persons who conspire to deter, intimidate, or otherwise interfere with parties, witnesses, and jurors in any 'court *of the United States*.'" *Unitt v. Helsel*, No. 13-11926-JLT, 2013 WL 5437338, at *3 (D. Mass. Sept. 24, 2013) (emphasis in original); *Knowlton v.*

17

158

*Shaw*, 704 F. 3d 1, 11 n.15 (1st Cir. 2013) ("The first clause of 1985(2) covers conspiracies to interfere with justice in the federal courts."). Since Plaintiff's alleged conspiratorial interference has to do with proceedings in a Massachusetts state court, she fails to state a claim under the first clause of § 1985(2). In any event, the Complaint fails to allege how she or any witness was interfered with or how the alleged conspirators accomplished such interference.

The second clause of § 1985(2), as well as § 1985(3), covers conspiracies to interfere with justice in the state courts "with intent to deny any citizen the equal protection of the laws."

> To state a claim under §1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege.

*Aulson v. Blanchard*, 83 F. 3d 1, 3 (1st Cir. 1996) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 103 (1971)). A plaintiff may recover under this section "only when the conspiratorial conduct of which he complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Griffin*, 403 U.S. at 102). Regarding this last requirement, the plaintiff "must allege facts showing that (1) the defendants conspired against [him] because of [his] membership in a class, and (2) the criteria defining the class are invidious." *Id.* at 4. Because the language of this part of the statute is directed toward the equal protection of the laws, a plaintiff must allege a "class-based, invidiously discriminatory animus" to state a plausible § 1985(2) claim. *Knowlton v. Shaw*, 704 F. 3d at 11-12 (quoting *Griffin*, 403 U.S. at 102). Stating a claim under § 1985 requires "plausible allegations of an agreement among the conspirators to violate a plaintiff's rights (or factual allegations that allow the reasonable inference of such an agreement)." *Hudson v. MacEachern*, 94 F. Supp. 3d 59, 70 (D. Mass. 2015). Further, "allegations of conspiracy must . . . be supported by material facts, not merely

18

conclusory statements" and such claims of conspiracy are subject to dismissal where the allegations "neither elaborate [ ] nor substantiate[ ][the] bald claims that certain defendants 'conspired' with one another." *Id.* (quoting *Slotnick v. Garfinkle*, 632 F.2d 163, 165-66 (1st Cir. 1980)).

Here, Plaintiff fails to allege any racial or otherwise class-based invidiously discriminatory animus underlying the alleged conspiratorial conduct of City officials, the only reference to her gender or ethnicity being in the context of her equal protection claim (Complaint, ¶¶ 18, 29). Moreover, other than simply reciting that she was conspired against, the Complaint is devoid of any facts tending to show the existence of a conspiracy among Covino, Arrigo, and Guido.

Accordingly, Plaintiff's 42 U.S.C. §1985 conspiracy claims against the Municipal Defendants fail to state a claim as a matter of law and must be dismissed.

## E.    Refusal to Prevent Wrongs Under 42 U.S.C. § 1986

Plaintiff asserts in Count VIII a claim under 42 U.S.C. § 1986, which creates a right of action against a party who, "having knowledge that any of the wrongs" in furtherance of a conspiracy prohibited by § 1985 "are about to be committed," and "having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so." This claim was dead on arrival, as the statute provides for a one-year limitations period, stating that "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." Since the Complaint in this action was filed on January 29, 2020, any claim under § 1986 must have accrued at some point on or after January 29, 2019, to be timely. *See Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 97, 99 (D. Mass. 2009). According to the allegations in the Complaint, Covino's conduct in obtaining the Abuse

Prevention Order against Plaintiff and making false and misleading claims about her to her employer and Virginia investigators causing her to lose her job, and necessarily any alleged conduct on the part of the other Defendants in assisting or conspiring with Covino, all occurred well before January 29, 2019. Thus, any claim against the Defendants under § 1986 is time-barred.[8]

### III.    CONCLUSION

WHEREFORE, for the reasons set forth above, the Municipal Defendants respectfully request that the Court enter an order dismissing all of the claims against them on the grounds that they fail to state claims upon which relief can be granted.

> CITY OF REVERE, BRIAN M. ARRIGO, and
> JAMES GUIDO,
> By their attorneys,
>
> /s/ Daniel E. Doherty
> Paul Capizzi, City Solicitor
> BBO# 646296
> pcapizzi@revere.org
> Daniel E. Doherty, Assistant City Solicitor
> BBO# 127010
> ddoherty@revere.org
> City Hall, 281 Broadway
> Revere, MA 02151
> (781) 286-8166

---

[8] Plaintiff's counsel saw her § 1986 dismissed due to the one-year limitation period in *Salcedo*.

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1

I, Daniel E. Doherty, Assistant City Solicitor and counsel of record for the Defendants, City of Revere, Brian M. Arrigo, and James Guido, hereby certify that, pursuant to L.R. 7.1(a)(2), I conferred with Plaintiff's counsel by telephone on Friday, March 12, 2012, and attempted in good faith to resolve or narrow the issues set forth in the accompanying motion.

/s/ Daniel E. Doherty
Daniel E. Doherty

## CERTIFICATE OF SERVICE

I, Daniel E. Doherty, Assistant City Solicitor and counsel of record for the Defendants, City of Revere, Brian M. Arrigo, and James Guido, hereby certify that I have this day electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and that copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Daniel E. Doherty
Daniel E. Doherty

Dated: March 15, 2021

162

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

```
_____
SHARON RADFAR,                  )
          Plaintiff             )
                                )
V.                              )
                                )
CITY OF REVERE,and              )
BRIAN M. ARRIGO,                )
     MAYOR; and                 )
JAMES GUIDO,                    )        OPPOSITION IN
     CHIEF OF POLICE; and       )        RESPONSE TO MUNICIPAL
SERGEANT JOSEPH I.COVINO; and   )        DEFENDANTS' MOTION
OTHER AS YET UNNAMED            )        TO DISMISS
OFFICERS OF THE                 )
REVERE POLICE DEPARTMENT;       )
INDIVIDUALLY AND IN THEIR       )
OFFICIAL CAPACITIES AS MAYOR    )
CHIEF OF POLICE AND             )
POLICE SERGEANT AND OFFICERS    )
OF THE CITY OF REVERE,          )
          Defendants            )
_____)
```

## i. Introduction and Procedural Posture

The municipal defendants in the above-entitled matter including those sued in their individual capacities have moved to dismiss for failure to state a claim pursuant to FRCP 12(b)(6). The court has indicated it will deny defendant Covino's motion for dismissal/summary judgment, filed previously in his official and individual capacity and opposed by plaintiff. Plaintiff

1

herewith opposes dismissal of the individual and official capacity claims of the municipal defendants.

## ii. Facts

Municipal defendants were well aware of defendant Covino's history of misconduct[1] when defendants Guido and Unnamed Revere Police Officers assisted, encouraged and permitted Sergeant Covino to draft a police report in which he claimed to be alleged "victim", falsely and maliciously stating Plaintiff had committed crimes against him, and wrongly listing himself as the reporting officer and the supervisor, while stating the identity of the victim was "confidential.". With their instruction, encouragement, knowledge and permission he then appeared in the Lynn District Court *ex parte* and by making false, misleading and scurrilous claims against plaintiff while omitting information he knew to be essential to the court's proper evaluation of his claims Covino convinced a judge to grant him an Abuse Prevention Order pursuant to M.G.L. c. 209A against plaintiff, using his status as a police officer and his relationship with the court to wrongly credit his false claims.[2]

---

[1] Complaint ¶13.

[2] Complaint ¶¶6-12.

2

Plaintiff in her Complaint has alleged defendants were aware of, instructed, encouraged, and conspired with defendant Covino to use his police powers in order to advance his personal goals in his relationship with the plaintiff.[3]  Plaintiff has also alleged they knew well his history of misconduct and that they failed to train and discipline him with regard to that, to the detriment of plaintiff.  This Iranian woman has also alleged they violated her rights by treating her differently than similarly situated male and non-Iranian persons, and by and through their actions they not only assisted in the wrongful drafting of the police report by defendant Covino listing him as the author, the supervisor and the "victim" but though they were aware of it they failed to act to prevent the harms to plaintiff. She has alleged these defendants knew Covino was wrongly engaged in the use of his status to have her criminally charged, to cause the loss of her career and to destroy her life, and they all knew she was not the perpetrator of domestic violence or abuse of Covino, and that "Defendants also knew of his lengthy history of misconduct and failed to train, discipline or in any manner

---

[3] Plaintiff's factual allegations against Defendant Covino are more fully detailed in her Opposition to Motion to Dismiss by Defendant Covino, ECF Document 10 pp.2-4. She has asserted the other Defendants' knowledge, encouragement and participation in all of his acts of misconduct.

3

properly supervise him."[4] She has alleged their misconduct cost
plaintiff her job, and that defendants treated plaintiff
differently than other similarly situated persons for
impermissible reasons in their support of his campaign of revenge
against plaintiff for plaintiff telling Covino he was racist and
"would dare to criticize him for his behavior toward her".[5]
Plaintiff alleged defendants thereby treated her "differently
than they would have a man and a person of European descent due
to their gender and national origin animus.".[6]

   Plaintiff specifically alleged these municipal
defendants engaged in customs and policies of failing to train
and discipline officers in providing proper responses to domestic
abuse and protection of constitutional rights, that they also
engaged in a custom and policy of protecting men who are members
of the law enforcement fraternity from the consequences of
violating the law.  Plaintiff also alleged the municipal
defendants by their actions showed a deliberate indifference to
the need for training, supervision or discipline of defendants

---

[4] Complaint, ¶¶12,13.

[5] Complaint, ¶18.

[6] *Id.*

4

Covino and Unnamed Officers.[7]

The facts pled by plaintiff against the defendants
form the basis of Counts I-VIII of the Complaint where
plaintiff alleged defendants owed her various constitutional and
legal duties and breached them to her detriment constituting
Abuse of Authority and Selective Prosecution in violation of the
Equal Protection Clause of Amendment IVX, Defamation,
violations of the Massachusetts Civil Rights Act, Intentional
Infliction of Emotional Distress and constitutional violations in
the form of deliberate indifference to the need for training and
supervision, conspiracy to violate the Plaintiff's civil rights
and failure to prevent wrongs committed against Plaintiff in
violation of her civil rights, in violation of Amendments V and
IVX.[8] Plaintiff has sought declaratory and injunctive relief,
damages and trial by jury on all counts.

### iii. Argument

Defendants seek dismissal arguing that presentment
and immunity provisions of the Massachusetts Tort Claims Act
which are inapplicable to intentional torts and civil rights

---

[7] Complaint, ¶¶23-25.

[8] Complaint, Counts I-VIII.

claims asserted here should shield them and that in every respect the Court should construe the factual allegations by Plaintiff against her and in favor of Defendants.  That these egregious misstatements of fact and law inform the entirety of their arguments they should and must be soundly rejected.[9]

### (A) Defendants Are Not Entitled to Dismissal Under the Massachusetts Tort Claims Act (MTCA).

The Defense argues at such length about plaintiff's alleged failure to comply with the presentment requirement of G.L. c. 258 §4 it would be hard not to discern an attempt to suggest to this Court that the Complaint sounds in negligence, but all of plaintiff's claims, forming the basis for each and every count, are intentional torts and civil rights violations. It is axiomatic that these Claims are not subject to the

---

[9] When undersigned counsel conferred for thirty minutes with Attorney Doherty on March 12, 2021 the offer was made to go through the Complaint count by count to determine if any could be dismissed by agreement which was rejected by defense counsel who asserted there was not enough time to do so, but did not disclose the MTCA grounds. Parties did confirm the earlier mutual waivers: Plaintiff's waiver of attempts to obtain judgment for failure to timely answer despite no contact prior to the scheduling conference and defense counsel's waiver of any inadequate service claim and acceptance of service, and also agreed to liberal granting of courtesies with regard to deadlines whenever practicable.

presentment requirements of the Massachusetts Tort
Claims Act. _Robinson v. Commonwealth_ 32 Mass. App. Ct. 6
(Mass.App.Ct 1992); _Richardson v. Dailey_, 424 Mass. 258, 259
(1997).

        The MTCA expressly exempts itself from the intentional
torts alleged here in §10, and it does not apply "to any claim
arising out of an intentional tort, including, assault, battery,
false imprisonment, false arrest . . . malicious prosecution. . .
and malicious abuse of process." M.G.L. c. 258, § 10.  _Lopes v._
_Riendeau,_ 177 F. Supp. 3d 634, 662 (D. Mass. 2016)("Conversely,
section 10 [of the MTCA] exempts public employees from the
immunity in section two for claims arising out of intentional
torts thus rendering them potentially liable for an intentional
tort."). The law will not permit dismissal under G.L. c. 258 of
any of Plaintiff's claims of intentional misconduct by individual
actors whether named or not. _Mellinger v. Town of West_
_Springfield_,  401 Mass. 188, 196 (1987). (In a civil rights and
intentional tort case, claim by the administrator of a decedent's
estate seeking recovery for intentional infliction of emotional
distress was brought against an undetermined number of a town's
police officers, the plaintiff was not required to comply with
the requirements of G. L. c. 258, the Massachusetts Tort Claims

Act.). The MTCA will not shield defendants from liability for

the civil rights violations that Plaintiff has alleged. "Chapter

258 addresses itself to governmental liability for torts not for

constitutional deprivations". *Mellinger*, at 196. As a

matter of law, both damages and injunctive relief against

defendants are remedies available to this Plaintiff:

> "Although the basic provisions of the Massachu-
> setts Tort Claims Act are not applicable to
> intentional torts by State employees (G. L.
> c. 258, Section 10 [c]), and "normally
> [a public employer] cannot be held liable for
> intentional torts" (Mellinger v. West
> Springfield, ante 188, 196 [1987]), the
> enactment of G. L. c. 258 did not bar the
> development and application of common
> law principles governing the liability
> of public employers in areas to which G. L.
> c. 258 does not apply. **Thus the common law
> may impose liability on a government employer
> for certain wrongs, even intentional wrongs,
> by one of its employees. We can think of
> no basis for recognizing some form of
> governmental immunity that would prevent
> issuance of an injunction against an ongoing
> wrong committed systematically and intentionally
> by a governmental agency for the continuing
> benefit of the Commonwealth.** Cf. Ex parte Young,
> 209 U.S. 123, 159-160 (1908) (injunction
> against State official seeking to enforce
> unconstitutional law).
>
> > *Lane v. Commonwealth*, 401 Mass.
> > 549, 551-552 (1988)(emphasis
> > added).

All counts of Plaintiff's complaint state causes of

action sounding in intentional torts and civil rights law and

8

170

therefore none fall under the ambit of the Massachusetts
Tort Claims Act, c. 258, in any respect.  "The MTCA, however, is
inapplicable to intentional torts. Mass. Gen. L. c. 258, §§10(c).
It, therefore, does not shield the Defendants from liability on
the remaining tort claims". _Ward v. Bellotti_ C.A. # 13-12054
(D.Mass.2014) (Casper,J.).

       Defendants can claim none of the statutory and public
policy-based immunities even if Plaintiff's claims required
presentment under the Commonwealth's Tort Claims Act, which as
intentional acts they do not[10]. The MTCA is inapplicable to
discrimination claims such as those plaintiff has alleged here.
_Jancey v. School Committee of Everett,_ 421 Mass. 482.500-
501(1995) ("acts of discrimination-whether intentional-do not
thereby become torts.").

## (B) Defendants Are Not Entitled to Dismissal Under Fed.R.Civ.P. 12(b)(6)

       Plaintiff has asserted a municipal police department in
the Commonwealth has practices, policies, procedures, rules and
training around the use of police power in personal relations,

---

[10]General Laws c. 258, §§ 10(c), as inserted by St. 1978, c.
512, §§ 15, states that G. L. c. 258 shall not apply to "any
claim arising out of an intentional tort".

civil rights, and domestic violence that ensure the requisite

acts and omissions by the defendants trigger their liability.

These defendants meanwhile suggest the Court substitute an

implausible factual constellation wherein Covino used police

reports and other tools of his trade as some unsupervised "bad

apple" acting alone. In an environment as reliant on chain of

command as a police department municipal defendants can not

create out of whole cloth an alternate reality portraying

Defendant Covino as acting on his own with no knowledge from the

supervisors and no policies and practices engaged in by them.

In the world they conjure there is no records division of the

police department and no knowledge of when a police officer

pursues criminal charges or appears in court, and knowledge of an

officer's troubled history is a thing to be ignored.

Defense attempts to miscast the plaintiff's facts

in a failed attempt to avoid accountability venture into extreme

territory in parroting Defendant Covino's claim that his police

report was actually just a "memo"—even after the Court rejected

that out of hand at the initial conference. This is but one of

several instances in which defendants insist the facts and

reasonable inferences be construed against the plaintiff rather

than, as the law has long required, in her favor. *Gilbert v. City*

10

172

*of Chicopee*, 915 F.3d 74, 80 (1st Cir. 2019). Ignoring the well-settled principle that the Court is to accept the plaintiff's factual statements as true, defendants are asking the Court to substitute their skewed reading of the complaint which substitutes their facts for plaintiff's and ignores her actual allegations.

Defendants' misconduct as alleged in violation of Plaintiff's rights made the city, mayor and chief of police liable for their misconduct. Their campaign against Plaintiff as alleged states a claim for liability of the municipality pursuant to *Monell v. Department of Social Services*, 436 U.S. 658(1978).

In *Monell*, the U.S. Supreme Court overruled earlier precedent[11] to hold that a municipality is a person subject to suit under 42 U.S.C. §1983 *et seq*. but also that a city could not be held vicariously liable for the torts of its employees. The Court required that in order to trigger municipal liability the Plaintiff has to prove unconstitutional acts by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy". *Monell* at 694. It is beyond genuine dispute the government actors identified by Plaintiff, in addition to acting in their individual capacities, were the top decision-

---

[11] *Monroe v. Pape* 365 U.S. 167, 184 (1961)

makers in their areas of government such that their actions
"may be said to represent official policy".[12]  Their acts and
omissions constituted the misconduct of final policymakers
triggering liability pursuant to *Monell v. NY Dept. of Social
Services* 436 U.S. 658,694 (1978). Clearly this is one of those
instances wherein even one such act can establish the liability
of the city for the misconduct of these officials. The law holds
municipalities accountable "for a single decision by municipal
policymakers under appropriate circumstances" *Welch v. Ciampa,*543
F.3d 927,942(1st Cir. 2008) quoting *Pembaur v. City of
Cincinnati*, 475 U.S. 469,480(1986).  There is no disputing the
deliberate nature of the acts and omissions alleged against the
defendants. *Pembaur*, 475 U.S. at 483.

        Acts and omissions by the movants in their individual
capacity are subject to personal immunity defenses which
require the Plaintiff to show a higher level of culpability than
is required for the acts and omissions alleged against the
movants in their official capacity. *Kentucky v, Graham* 473

_____

        [12]  A court must "identify those officials or governmental
        bodies who speak with final policymaking authority for
        the local governmental actor concerning the action
        alleged to have caused the particular constitutional or
        statutory violation at issue." *Jett v. Dallas Independent
        School Dist.,* 491 U.S. 701,737(1989).

U.S. 159, 166-167,105 S.Ct. 3099, 3105-3106, 87 L.Ed.2d. 114
(1985), on remand 791 F.2d. 932(6th Cir. 1986).  If a Defendant
can show (s)he placed an "objectively reasonable reliance on
existing law", (s)he may be immune from liability. Such
immunity is unavailable to Defendants who are sued for acts and
omissions which have occurred  while they operated in their
official capacity. *Owen v. City of Independence* 445 U.S. 622,
637, 100 S.Ct. 1398, 1408, 63 L.Ed.2d. 673(1980), rehearing
denied 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d. 850(1980). In
fact it is well-settled that "it is not impossible for a
municipality to be held liable for the actions of lower-level
officers who are themselves entitled to qualified immunity".[13]

　　Plaintiff has sought preliminary relief against all
Defendants as she is specifically permitted to do where an
"official in his or her official capacity, when sued for
injunctive relief, would be a person" *Will v.Michigan Dept. of
State Police*, 491 U.S. 58,71 n.10 (1989) quoting *Kentucky v.
Graham*, 473 U.S. 159, 167, n.14 (1985). Here, despite official
capacity Defendants' arguments that neither they nor state actors
in their official capacity are "persons", Plaintiff sought

---

[13]*Joyce v. Town of Tewksbury, et al* No. 95-1814 en banc.
(1st Cir. 1997).

specifically declaratory and injunctive relief.

Plaintiff has clearly alleged officials'
abuse of power and asserted liability for their violations of
her constitutional rights. Where Plaintiff has shown interference
with constitutionally protected interests, she has established
the essential requisite for civil rights claims.  The Mayor has
not denied defendants were acting under his authority, and "when
a public official "misuses" or "abuses" the authority given him
by the State (i.e.,if he acts outside the scope of his
employment) he nevertheless acts under color of State law where
he is "clothed with the authority of [S]tate law." *Monroe v.
Pape*, 365 U.S. 167, 184 (1961), overruled in part by *Monell v.
Department of Social Servs of the City of N.Y.*, 436 U.S. 658, 663
(1978) (overruling Monroe case "insofar as it holds that local
governments are wholly immune from suit under §§ 1983")."[14]
Here, the abuse of power to deny plaintiff her rights is the
gravamen of her claims, and triggers government liability.

The Complaint more than satisfies requirements of the
federal rules which mandate plaintiff's factual basis to be
stated generally and inferences drawn therefrom to be  plausible
as a matter of law. There has been no abandonment of language or

---

[14] *Maimaron v. Commonwealth*, 449 Mass. 167, 178 (2007).

spirit of Fed.R.Civ.P.8(a)(2) that the Complaint "shall contain a short and plain statement of the claim showing the pleader is entitled to relief."  The federal rules require notice pleading, and the Defendants are hopeful that this Court will rule that *Bell Atlantic v. Twombly* 550 U.S. 544(2007) and *Ashcroft v. Iqbal* 129 S.Ct. 1937 (2009)have rewritten the Rules of Civil Procedure but as precedent in this very circuit explains, they did not. *Ocasio-Hernandez et al v. Fortuno-Burset* et al 640 F3d 1,11(1st Cir.2011).("The court explained that the propriety of dismissal under R 12(b)(6) turns on the complaint's compliance with Fed.R.Civ.P. 8(a)(2). Id. at 555. It further explained that a 'short and plain statement' does not need detailed factual allegations. Id. at 555. That aspect of the rule merely requires sufficient detail in the Complaint to give a defendant fair notice of a claim and the ground upon which it rests. Id.(citing *Conley v. Gibson*, 355 U.S. 41,57(1957))."). The Supreme Court has affirmed that notice pleading remains the law, and the purpose of the Complaint is "informing the city of the factual basis for their complaint." *Johnson v. City of Shelby*,135 S.Ct. 346,347(2014). Non-conclusory facts are to be treated as true, even if incredible and even if the court is skeptical that Plaintiff will be able to marshal the evidence necessary to prove

16

them. *Ocasio-Hernandez,* at 12. Further the Complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible . . . ." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013). Plaintiff has more than adequately detailed and stated her claims for relief in her Complaint.

## (C) Defendants are Not Entitled to Dismissal of §1985 Claims

Plaintiff has properly pled the municipal defendants' conspiracy to violate her civil rights under 42 U.S.C.A. §1985(2) and(3) triggered by specific acts and omissions. *Kush v. Rutledge,* 460 U.S. 719,725(1983).The defendants continue to insist that the Court ignore and disbelieve the facts pled by the Plaintiff and instead substitute their version thereof for hers.

The assistance, encouragement, and permission to punish plaintiff for accusing Covino of racism and misconduct and the gender and national origin animus on the part of defendants underpinning their selective enforcement and other violations of her civil rights state a claim under the statute. See *Hahn v. Sargeant*, 523 F2d 461,469(1stCir. 1975). Plaintiff here alleged that the Defendant's acted in concert to interfere with her

16

178

17

rights by selecting her for targeting of civil and criminal

sanctions and deprivation of her property because she was of a

particular gender and national origin, and because of her

complaints to Covino about his mistreatment of her for those

reasons.  See _Maymi v. Puerto Rico Ports Authority_, 515 F.3d 20,

31 (1st Cir. 2008).

## (D) Defendants Are Not Entitled to Dismissal Under 42 U.S.C.A. §1986

Where Plaintiff has detailed specific acts of

misconduct and despite their awareness of and involvement in

breaches of their duty to prevent harm that continued for months

after her first notice that an Abuse Prevention Order pursuant to

G.L. c. 209A had entered against her within three years of filing

the Complaint but has been unable to even learn the identities of

all the Defendants involved it would be unfair to foreclose

liability under 42 U.S.C.A §1986 at this juncture. Defendants who

incorrectly assert that claims accruing prior to January 29, 2019

are time-barred under the statute wrongly ask the court to limit

their misconduct to a date certain where the facts she alleges do

no such thing and in fact establish much later occurring

misconduct. Indeed, defendants themselves assert that similar

conduct against plaintiff by an officer in another municipality a

18

year later is relevant,[15] and surely that establishes a more than reasonable inference of culpability on the part of these defendants for conduct constituting conspiracy pursuant to 42 U.S.C.A. §1985 as well as failure to prevent harm pursuant to 42 U.S.C.A. §1986 within its two-year statute of limitations. Where, as here, the defense relies on summary judgment cases and wrongly attempts to impose a disputed fact standard rather than the correct one requiring acceptance of plaintiff's facts it cannot prevail.

Defendants have repeatedly passed on opportunities to prevent and remedy continuing harm to Plaintiff to this day. Plaintiff has amply detailed the allegations underpinning her civil rights conspiracy and failure to prevent harms claims under applicable law. Defendants' numerous denials and protestations of the facts alleged by plaintiff are unavailing here, where her factual allegations must be taken as true by this Court.

### (E).   Any Imposition by this Court Upon Plaintiffs of a Heightened Pleading Requirement in this Civil Rights Action Would be Unconstitutional.

Movants wrongly seek this Court's entry of a heightened

---

[15] See ECF Document 18-Motion to Dismiss, FN3.

19

pleading requirement as to the civil rights claims against the defendants in this case. _Johnson v. City of Shelby_, 135 S.Ct. 346 (2014). Inasmuch as the United States Supreme Court has made clear that heightened pleading requirements imposed on civil rights claims are impermissible in _Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit_, 507 U.S. 163 (1993) the allowance of the 12(b)(6) motion in the instant case effects a denial of Plaintiff's due process rights to a "meaningful" opportunity to be heard. In _Leatherman_, the Rhenquist Court reversed a 12(b)(6) dismissal in a civil rights case against the police, observing:

> We think that it is impossible to square the "heightened pleading standard" applied by the Fifth Circuit in this case with the liberal system of "notice pleading" set up by the Federal Rules. Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

> _Leatherman,_ paragraph 19-20.

The unanimous _Leatherman_ barring of heightened pleading requirements was been extended to employment discrimination[16]

---

13 _Swierkiewicz v. Sorema_, 122 S.Ct. 992, 70 USLW 4152, 88 Fair Empl.Prac.Cas. (BNA)(2002).

19

and to prisoner's rights litigation [17] and remains in full force today. _Johnson_, at 347. If the Court is skeptical that the Plaintiffs can offer proof to sustain their allegations, the Complaint still must be allowed to move forward as the law requires the Court to accept the allegations in the Complaint as true.

### (F)   Justice Requires That This Court Grant Plaintiff Leave to Amend The Complaint.

Not only do the Rules of Civil Procedure require that "all pleadings shall be construed so as to do substantial justice"[18] but this is one of those instances wherein the Plaintiff should be given leave to amend the Complaint. She is entitled to an opportunity to correct any vulnerabilities in the Complaint, especially since the Defendants refused to specify which counts they found deficient upon what grounds when the parties conferred and failed to seek a more definite statement of the claims pursuant to F.R.C.P. 12(e).

Because F.R.C.P. 15(a) directs that "leave shall be

---

[17]    _Crawford-El v. Britton_, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

[15]    M.R.C.P. 8(f).

freely given when justice so requires", Plaintiff is entitled to an opportunity to amend her Complaint.

### iv. Conclusion

For the foregoing reasons Defendants' Motion should be denied.

### Request for Oral Argument

Plaintiff respectfully asserts oral argument is necessary to assist the Court in this matter and asks therefore that a hearing be scheduled.

Respectfully submitted,

Sharon Radfar
By her attorney

Dated: March 29, 2021

s/Elizabeth M. Clague
_____
Elizabeth M. Clague
Attorney for the Plaintiff
The Kennedy Building
142 Main Street,
Suite 304
Brockton, MA 02301
(508) 587-1191
BBO# 632341

21

**CERTIFICATE OF SERVICE**

    I, Elizabeth M. Clague hereby certify that I have served the within document to Defendants by causing a copy to be sent through the electronic filing system to their counsel of record, to wit:

Paul Capizzi
City Solicitor
BBO#646296
Daniel E. Doherty
Assistant City Solicitor
BBO#127010
City Hall
281 Broadway
Revere, MA 02151


Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com


              /s Elizabeth M. Clague

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHARON RADFAR,                              *
                                            *
            Plaintiff,                      *
                                            *
      v.                                    *        Civil Action No. 1:20-cv-10178-IT
                                            *
CITY OF REVERE, BRIAN M. ARRIGO,            *
individually and in his official capacity as *
Mayor, JAMES GUIDO, individually and        *
in his official capacity as Chief of Police, *
JOSEPH I. COVINO, individually and in       *
his official capacity as Police Sergeant, and *
OTHER AS YET UNNAMED OFFICERS               *
OF THE REVERE POLICE                        *
DEPARTMENT, individually and in their       *
official capacities as police officers,     *
                                            *
            Defendants.                     *

MEMORANDUM AND ORDER

September 9, 2021

TALWANI, D.J.

In this action, Plaintiff Sharon Radfar brings civil rights and tort claims against

Defendant Police Officer Joseph Covino, the City of Revere, Revere Mayor Brian M. Arrigo,

former Revere Police Chief James Guido, and other unnamed officers of the Revere Police

Department. Complaint ("Compl.") [#1].[1] Before the court are Covino's omnibus Motion and

Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint in its Entirety

Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Motion and

Memorandum of Law in Support of Motion to Dismiss and Motion for Costs and Reasonable

Attorney's Fees Pursuant to Massachusetts General Laws c. 231 [#9] ("Covino's Mot.") and City

of Revere, Brian M. Arrigo, and James Guido's (the "Revere Defendants") Motion to Dismiss

---

[1] Covino, Arrigo, and Guido are sued individually and in their official capacities.

[#18]. For the reasons that follow, Covino's <u>Motion</u> [#9] is DENIED and the Revere Defendants' <u>Motion</u> [#18] is ALLOWED.

I. <u>Background</u>

    A. <u>Facts as Alleged</u>

    The following facts are drawn from the <u>Complaint</u> [#1], the well-pleaded allegations of which are taken as true for the purposes of evaluating a motion to dismiss. <u>See</u> <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).

    Plaintiff Sharon Radfar is a former George Mason University police officer. Compl. ¶¶ 6, 19 [#1].

    Defendant Brian M. Arrigo is the Mayor of the City of Revere. <u>Id.</u> at ¶ 2.

    Defendant James Guido was Chief of the Revere Police Department at the time of the alleged events. <u>Id.</u> at ¶ 3.

    Defendant City of Revere is a government entity organized under the laws of the Commonwealth of Massachusetts. <u>Id.</u> at ¶ 5.

    Defendant Joseph Covino is a police officer with the Revere Police Department in Revere, Massachusetts, and, during the events alleged in the <u>Complaint</u> [#1], was a sergeant. <u>Id.</u> at ¶ 4.

    In January 2017, Covino created an incident report in the Revere Police Department system which included false allegations concerning Plaintiff's behavior towards him and others. <u>Id.</u> at ¶¶ 12, 57. In this incident report, Covino identified himself as the victim, the reporting officer, and the supervising officer approving the report. <u>Id.</u> at ¶ 12.

Also in January 2017, Covino filed a false and misleading Complaint for Protection from Abuse in Lynn District Court in Massachusetts and appeared for a hearing before a Lynn District Court judge. Id. at ¶¶ 7, 8. Covino falsely told the Lynn District Court judge that Plaintiff had threatened him and placed him in imminent fear of physical harm when she had done nothing of the kind; Covino also misrepresented messages and calls exchanged between Plaintiff and Covino and failed to disclose other pertinent information to the Lynn District Court judge. Id. at ¶ 7. Following this hearing, the Lynn District Court judge issued an Abuse Prevention Order. Id. at ¶¶ 6, 7.

Around the same time, Covino contacted Plaintiff's employer and falsely alleged Plaintiff had engaged/was engaging in criminal conduct. Id. at ¶¶ 6, 9.

On January 31, 2017, four uniformed officers seized Plaintiff's service weapons and gave her the Abuse Prevention Order and a letter from her employer informing her she was suspended pending an investigation of Covino's allegations of criminal conduct. Id.

Later, following a hearing attended by Plaintiff and Covino, the Lynn District Court judge vacated the Abuse Prevention Order and ordered Plaintiff's weapons returned. Id. at ¶¶ 11, 16.

Covino also contacted Virginia law enforcement entities and falsely alleged that Plaintiff had engaged in criminal conduct, id. at ¶¶ 10, 16; Defendant did not inform Virginia investigators that the Abuse Prevention Order was vacated. Id. at ¶ 17. As a result of these investigations, Plaintiff's private telephone records were the subject of a search warrant. Id. at ¶ 15.

Plaintiff later lost her job as a George Mason University police officer. Id. at ¶ 11.

Plaintiff was not charged with any crimes in Virginia or Massachusetts related to Covino's allegations. Id. at ¶ 16.

B. Procedural Background

Plaintiff's Complaint [#1] concerns events she alleges occurred in 2017. On January 29, 2020, Plaintiff filed her Complaint [#1] asserting claims of abuse of process (Count IX) and malicious prosecution (Count X) against Defendant Covino only, id. at ¶¶ 52-59; deliberate indifference to the need for training (Count VI) against the Revere Defendants only, id. at ¶¶ 42-43; and claims against all Defendants for: (1) violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution to equal protection under law (Count I); (2) violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution by selective prosecution and enforcement based on gender and national origin bias (Count II); (3) defamation (Count III); (4) deprivation of civil rights through intimidation and coercion in violation of the Massachusetts Civil Rights Act (Count IV); (5) intentional infliction of emotional distress (Count V); (6) conspiracy to violate Plaintiff's civil rights under 42 U.S.C. §§ 1985(2) & (3) (Count VII); and (7) refusal to prevent wrongs committed against Plaintiff under 42 U.S.C. § 1986 (Count VIII), id. at 7-12.

The Revere Defendants moved to dismiss the counts directed towards them pursuant to Fed. R. Civ. P. 12(b)(6). Revere Defs.' Mot. Dismiss [#18].

Covino moved to dismiss the Complaint [#1] and for costs and attorney's fees pursuant to Mass. Gen. Laws ch. 231 § 59H (the "Massachusetts anti-SLAPP law") and also moved to dismiss the Complaint [#1] pursuant to Fed. R. Civ. P. 12(b)(6) and for summary judgment pursuant to Fed. R. Civ. P. 56. Covino's Mot. [#9]. Covino's Attachment A [#9-1] includes:

4

Covino's Complaint for Protection from Abuse; Covino's affidavit describing the facts he alleges

led him to file the Complaint for Protection from Abuse; the Abuse Prevention Order; and the

Order terminating the Abuse Prevention Order. Attachment B [#9-2] is an affidavit detailing

Covino's account of the relationship between Covino and Plaintiff; the actions Covino took in

Lynn District Court and in contacting law enforcement and Plaintiff's employer; and Covino's

reasons for taking those actions.

    Plaintiff opposed both motions, see Opposition [#10], [#19], and filed a Statement of

Undisputed Facts [#11], her Affidavit [#13], and additional evidentiary material with her

Opposition [#10] to Covino's Motion [#9].

    The court begins with Covino's anti-SLAPP suit motion, then turns to the motions to

dismiss under Federal Rule of Civil Procedure 12(b)(6), and finally to Covino's motion for

summary judgment under Federal Rule of Civil Procedure 56.

## II. Covino's anti-SLAPP Suit Motion

    Covino argues his "conduct in seeking relief from abuse from the court system, in

contacting [Plaintiff's] employer, and then later speaking with a member of the Virginia State

Police, were all protected petitioning under [Massachusetts'] anti-SLAPP statute." Covino's

Mot. 12 [#9]. He contends that because a reasonable person could conclude he had a legal basis

for his petitioning activity, his activity is protected by Massachusetts' anti-SLAPP law, and

Plaintiff's Complaint [#1] should be dismissed in its entirety. Id. at 14.

    Plaintiff argues that the Massachusetts anti-SLAPP statute does not apply in federal court

because it is a procedural rule, Opp'n to Covino's Mot. 6 [#10], and that in any event, Covino is

5

not entitled to the anti-SLAPP statute's protection because Plaintiff's action was not brought to chill his protected petitioning activity, id. at 7-9.

A. <u>Massachusetts Anti-SLAPP Statute Applies to Massachusetts Claims in Federal Court</u>

In <u>Godin v. Schencks</u>, the First Circuit concluded that the burden of proof allocation in Maine's anti-SLAPP statute was a substantive provision, and thus applicable to pendant state claims in federal court. 629 F.3d 79, 88-89 (1st Cir. 2010). The Court also found Maine's anti-SLAPP statute "is only addressed to special procedures for state claims based on a defendant's petitioning activity" and not "general federal procedures governing all categories of cases" and is not covered by Federal Rules of Civil Procedure 12(b)(6) or 56. <u>Id.</u> at 88. The Court then found that because the Maine anti-SLAPP statute is "'so intertwined with a state right or remedy [ ] it functions to define the scope of the state-created right[,]' it cannot be displaced by Rule 12(b)(6) or Rule 56." <u>Id.</u> at 89 (quoting <u>Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 423 (2010) (Stevens, J. concurring)).

Massachusetts' anti-SLAPP statute is "in all relevant respects the same as the Maine anti-SLAPP statute." <u>Steinmetz v. Coyle & Caron, Inc.</u>, Civ. No. 15-13594-DJC, 2016 WL 4073135, at *3 (D. Mass. July 29, 2016); <u>see also</u> <u>de Lench v. Archie</u>, 406 F. Supp. 3d 154, 157-58 (D. Mass. 2019). Accordingly, Massachusetts' anti-SLAPP statute applies to Plaintiff's Massachusetts claims.

B. <u>Standard</u>

Following state law, the court "'first [ ] decide[s] . . . whether to grant' the anti-SLAPP motion before deciding other grounds for dismissal." <u>De Lench</u>, 406 F. Supp. 3d at 158 (quoting <u>Kobrin v. Gastfriend</u>, 443 Mass. 327, 340-41, 821 N.E.2d 60 (2005)).

"The anti-SLAPP statute, which is intended to protect the constitutional right to petition from the burden of meritless lawsuits, provides for a special motion to dismiss so that courts can 'dispose expeditiously of meritless lawsuits that may chill petitioning activity.'" Id. (quoting Town of Hanover v. New England Reg'l Council of Carpenters, 467 Mass. 587, 594, 6 N.E.3d 522 (2014)).

> Once the defendant "make[s] a threshold showing through the pleadings and affidavits that the claims against it are based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities," "the burden shifts to [plaintiff] to demonstrate by a preponderance of the evidence that [defendant's] petitioning activity was devoid of any reasonable factual support or any arguable basis in law."

Id. (quoting first Duracraft Corp. v. Holmes Prod. Corp., 427 Mass. 156, 167, 691 N.E.2d 935 (1998) and then Fabre v. Walton, 436 Mass. 517, 520, 766 N.E.2d 780 (2002)).

> The anti-SLAPP statute defines a party's exercise of its right to petition broadly to include: "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 147-48, 75 N.E.3d 21 (2017) (quoting Mass. Gen. Laws ch. 213, § 59H).

If the nonmoving party "can establish that its claim was not 'brought primarily to chill' the special movant's legitimate exercise of its right to petition[,]" the special motion to dismiss will be denied. Id. at 144-45 (quoting Duracraft, 427 Mass. at 161).

7

191

C. Analysis

1. Are Plaintiff's State Law Claims Based Only on Petitioning Activity?

Counts III, IV, and V (defamation, Massachusetts Civil Rights Act ("MCRA"), and intentional infliction of emotional distress claims) are all based at least in part on statements Covino allegedly made to Plaintiff's employer. See Compl. ¶¶ 32, 37, 40 [#1]. Statements made to Plaintiff's employer are not constitutionally protected petitioning activity and, thus, Counts III, IV, and V are not based solely on petitioning activity.

Count IX alleges Covino abused process in seeking an Abuse Prevention Order because he knew "he was not entitled to" one, id. at ¶ 53, and Count X alleges Covino "acting under color of law drafted and pursued criminal reports and paperwork consisting of his knowingly false statements accusing Plaintiff of criminal acts," id. at ¶ 57. Because these counts arose from Covino's petitioning activities before the Lynn District Court, Covino has met his initial burden as to Count IX and Count X.[2]

2. Has Plaintiff Met Her Burden?

In Blanchard, the Supreme Judicial Court, concerned that a special movant could prevail where his "legitimate petitioning activity forms the basis of a meritorious adverse claim that is not primarily geared toward chilling such petitioning," added a means for a non-movant to defeat an anti-SLAPP motion by showing that "each claim was not primarily brought to chill the special movant's legitimate petitioning activity." 447 Mass. at 157, 160. To do so, a plaintiff

> must establish, such that the motion judge can conclude with fair assurance, that [the plaintiff's] primary motivating goal in bringing its claim[s] . . . was not to interfere with and burden defendants' . . . petition rights, but to seek damages for

---

[2] Counts I, II, VII, and VIII are federal claims, and accordingly, are not subject to Massachusetts Anti-SLAPP statute. Count VI is brought against the Revere Defendants only.

the personal harm to [plaintiff] from [the] defendants' alleged [legally transgressive] acts.

Id. at 160 (internal citation and quotation omitted). Accordingly, the court turns to whether Plaintiff can satisfy her burden as to Counts IX and X.

Plaintiff asserts that Covino's activity was improper and amounted to an abuse of process and malicious prosecution, where Covino's statements were false and where Covino knew Plaintiff did not commit the crimes he accused her of committing. A person subject to false and malicious petitioning activity is not precluded from seeking damages for personal harm caused by such activity. Because Plaintiff waited until the conclusion of the actions undertaken by the government as a result of Covino's petitioning activity, Plaintiff's Complaint [#1] did not interfere with Covino's petitioning activity. In assessing the totality of the circumstances "pertinent to the [Plaintiff's] asserted primary purpose in bringing [her] claim[s]," the court finds Plaintiff has demonstrated that she brought these claims to vindicate her own rights, not to infringe on Covino's petitioning rights, and moreover, has offered some reasonable possibility of a favorable result. Id. Accordingly, Defendant Covino's Special Motion is denied.

III. Motions to Dismiss

    A. Legal Standard

To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the

9

defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009).

Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," do not suffice to state a cause of action. <u>Id.</u> at 678. Accordingly, a complaint does

not state a claim for relief where the well-pleaded facts fail to warrant an inference of anything

more than the mere possibility of misconduct. <u>Id.</u> at 679.

   In evaluating a motion to dismiss, the court assumes "the truth of all well-pleaded facts"

and draws "all reasonable inferences in the plaintiff's favor." <u>Nisselson v. Lernout</u>, 469 F.3d

143, 150 (1st Cir. 2006). "[A] judge can mull over 'documents incorporated by reference in [the

complaint], matters of public record, and other matters susceptible to judicial notice,'" <u>Lydon v.

Local 103, Int'l Bhd. Of Elec. Workers</u>, 770 F.3d 48, 53 (1st Cir. 2014) (quoting <u>Giragosian v.

Ryan</u>, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original), but may not consider other

materials beyond the pleadings. "If, on a motion under Rule 12(b)(6) . . . , matters outside the

pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment." Fed. R. Civ. P. 12(d).

   B.  <u>Revere Defendants' Motion to Dismiss</u>

      1.  Claims under 42 U.S.C. § 1983

   Section 1983 creates a civil cause of action against an individual acting under color of

state law who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under

section 1983 has two essential elements. First, the challenged conduct must be attributable to a

person acting under color of state law" and "second, the conduct must have worked a denial of

rights secured by the Constitution or by federal law." <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st

Cir. 1997).

A municipality will only be held liable under § 1983 "where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original).[3] In order to find a municipality liable, the court must find that: (1) the plaintiff's harm was caused by a constitutional violation, and (2) the city was responsible for that harm. Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005). Under Monell v. Department of Social Services of City of New York, a municipality may be held liable under section 1983 where an "action pursuant to official municipal policy of some nature causes a constitutional tort." 436 U.S. 658, 691 (1978). Only where a policy or custom of a municipality evinces a "deliberate policy indifference" to individuals constitutional rights is it actionable under § 1983. City of Canton, 489 U.S. at 389.

"Public officials may be held liable under § 1983 for a constitutional violation only if a plaintiff can establish that his or her constitutional injury 'resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.'" Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting Rodríguez–García v. Miranda–Marín, 610 F.3d 756, 768 (1st Cir. 2010)). Section 1983 liability

---

[3] To the extent the individual Defendants are sued in their official capacities, these claims are the same as the claims against the City of Revere. See Saldivar v. Pridgen, 91 F. Supp. 3d 134, 137 (D. Mass. 2015) ("Under both Massachusetts and federal law, a claim against the chief of a municipal department in his official capacity is a claim against the municipality itself." (citing Murphy v. Town of Natick, 516 F. Supp. 2d 153, 158 (D. Mass. 2007)).

cannot rest solely on a defendant's position of authority. See Ayala-Rodriguez v. Rullán, 511 F.3d 232, 236 (1st Cir. 2007).

    a. Equal Protection (Counts I and II)

Plaintiff alleges in Counts I and II that the Revere Defendants violated a duty under the Fifth and Fourteenth Amendments of the United States Constitution to "enforce the protection of the laws equally" when "Defendants endeavored to assist Covino in obtaining an advantage over [Plaintiff] in his civil proceedings[.]" Compl. ¶¶ 26-27 [#1]. Plaintiff also alleges "Defendants' repeated selective enforcement of the law for the benefit of Covino and as his agents violated Plaintiff's right to equal protection of the laws and the privileges and immunities of citizenship[.]" Id. at ¶ 30.

The Revere Defendants argue the equal protection counts should be dismissed for three reasons: (1) the Complaint [#1] lacks any facts "supporting the assertion" that a municipal policy caused her to be treated differently from similarly situated people "in connection with the abuse prevention proceedings" or that the municipality "was in any way the moving force behind any such constitutional violation"; (2) Plaintiff failed to identify instances where similarly situated persons were treated differently; and (3) Plaintiff failed to allege any facts "explaining Arrigo or Guido's role in the alleged constitutional violation sufficient to make them plausible defendants." Revere Defs.' Mot. Dismiss 8 [#18].

Plaintiff contends she has adequately alleged a Monell violation and that the Revere Defendants' actions represented official policy. Opp'n to Revere Defs.' Mot. Dismiss 11-14 [#19]. She asserts further that she is a female of Iranian descent and that the Revere Defendants

"violated her rights by treating her differently than similarly situated male and non-Iranian persons." Id. at 3.

The Equal Protection Clause "contemplates that similarly situated persons are to receive substantially similar treatment from their government." Tapalian v. Tuniso, 377 F.3d 1, 5 (1st Cir. 2004) (citation omitted).

> An equal protection claim requires "proof that (1) the person, compared with other similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995)). Whether individuals are similarly situated for equal protection purposes is not "always susceptible to precise demarcation" but turns on "whether a prudent person, looking objectively at the instances, would think them roughly equivalent and the protagonists similarly situated." Tapalian, 377 F.3d at 6 (quoting Barrington Cove Ltd. P'ship v. Rhode Island Housing and Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).

Plaintiff fails to identify any similarly situated individuals. Without identifying similarly situated individuals, Plaintiff also fails to plausibly allege she was treated differently in violation of her right to equal protection. Plaintiff's conclusion that, "[a]ll Defendants treated this woman of Iranian descent differently than they would have a man and a person of European descent due to their gender and national origin animus," Compl. ¶ 18 [#1], is unsupported by factual allegations and is insufficient to state an equal protection claim under Section 1983. "An equal protection claimant may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by

discriminatory animus." Barrington Cove, 246 F.3d at 10 (alteration in original) (citation omitted); see also Schofield v. Clarke, 769 F. Supp. 2d 42, 48 (D. Mass 2011) (dismissing equal protection claim where the plaintiff "fail[ed] to set forth any facts showing that he was treated differently from others who were similarly situated").[4] For these reasons, the equal protection claims against the Revere Defendants are dismissed.

### b.   Deliberate Indifference to Need for Training (Count VI)

Count VI alleges the Revere Defendants acted with deliberate indifference to the unconstitutional inadequacies in their training, supervision, and discipline of Covino and other unnamed officers. Compl. ¶¶ 42-43 [#1].

The Revere Defendants argue this claim against the City of Revere should be dismissed because (1) there are no allegations the City knew, or should have known, the relevant training was inadequate and was still deliberately indifferent to the consequences and (2) Plaintiff alleged Covino acted intentionally and, thus, any failure by the City of Revere to properly train Covino cannot be the "moving force behind the alleged violation of Plaintiff's rights." Revere Defs.' Mot. Dismiss 11 [#18] (citing Connick v. Thompson, 563 U.S. 51, 59 n.5 (2011); Hayden v. Grayson, 134 F.3d 449, 457 n.14 (1st Cir. 1998)). As to Arrigo and Guido, the Revere Defendants argue Plaintiff failed to show a causal link between Arrigo or Guido's conduct and Covino's violative act or omission. Id. at 11-12.

---

[4] To the extent Plaintiff is alleging a class of one claim, the claim is still foreclosed where the Complaint [#1] fails to identify peers with whom to compare Plaintiff. Freeman, 714 F.3d at 38 (reiterating that "class-of-one claims require an extremely high degree of similarity between [the plaintiff] and the person to whom they compare themselves") (quotation and citation omitted).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick</u>, 563 U.S. at 61. "Only if the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact, and is closely related to, or the moving force behind, the constitutional injury, can the claim against the municipality prevail." <u>Hayden</u>, 134 F.3d at 456 (emphasis in original) (internal quotations and citations omitted).

Plaintiff argues that the Revere Defendants "knew well [Covino's] history of misconduct and that they failed to train and discipline him with regard to that." Opp'n to Revere Defs.' Mot. Dismiss 3 [#19]. While the <u>Complaint</u> [#1] does allege the Revere Defendants knew of Covino's conduct and failed to discipline and train him, Plaintiff includes no factual allegations supporting this conclusion. Plaintiff also failed to allege any facts concerning whether Arrigo or Guido even knew of Covino's alleged conduct at issue here. Plaintiff's allegations that the Revere Defendants failed to adequately train, or supervise Covino fail to plausibly allege a claim upon which relief can be granted and the court dismisses this count.

2.  Tort Claims

Plaintiff brings tort claims for defamation and intentional infliction of emotional distress against the Revere Defendants.

In the defamation count, Plaintiff alleges Defendants (she does not specify which Defendants) "indicated to Plaintiff's employer and others that she had committed criminal acts," while knowing she had "not violated any laws nor committed any crime." Compl. ¶¶ 32-33 [#1]. In the intentional infliction of emotional distress count, Plaintiff alleges "Defendants' acts and

omissions constituted outrageous conduct and intentionally inflicted emotional distress upon Plaintiff." Id. at ¶ 40.

The Revere Defendants argue Plaintiff's claims for defamation and intentional infliction of emotional distress fall under the Massachusetts Tort Claims Act ("Tort Claims Act") and, due to lack of presentment and the City's immunity from liability for intentional torts, both claims should be dismissed as to the City. Also, because Plaintiff has alleged no facts upon which these claims can be plausibly inferred as to Arrigo and Guido, the claims should also be dismissed as to them.

In response, Plaintiff argues that her tort claims are not subject to the presentment requirements of the Tort Claims Act. Opp'n to Revere Defs.' Mot Dismiss 6-7 [#19] (citing Robinson v. Commonwealth, 32 Mass. App. Ct. 6, 584 N.E.2d 636 (Mass. App. Ct. 1992); Richardson v. Dailey, 424 Mass. 258, 259, 675 N.E.2d 787 (1997)). Plaintiff also contends that even if her claims required presentment, the Revere Defendants do not have immunity for intentional torts. Id. at 9.

a.   Claim Against the City of Revere

The Tort Claims Act, Mass. Gen Laws ch. 258 § 2, "created a cause of action against public employers for the negligent or wrongful acts or omissions of their employees acting within the scope of their employment, thus abrogating the doctrine of governmental immunity." Nelson v. Salem State Coll., 446 Mass. 525, 537, 845 N.E.2d 338 (2006). However, "a municipality enjoys governmental immunity for intentional torts under the Massachusetts Tort Claims Act." Kelley v. LaForce, 288 F.3d 1, 12-13 (1st Cir. 2002) (citing Mass. Gen. Laws ch. 258, §10(c) (governmental immunity is retained for 'any claim arising out of an intentional tort .

16

200

. .')); see also Nelson, 446 Mass. at 537 ("Intentional torts are expressly exempted from the [Tort Claims] Act, and therefore a public employer cannot be sued for its employee's intentionally tortious conduct.").

Defamation and intentional infliction of emotional distress are both intentional torts, as Plaintiff notes in arguing against a presentment requirement. Opp'n to Revere Defs.' Mot Dismiss 5-8 [#19]. As intentional torts, the claims are barred against the City of Revere even if they are not specifically mentioned in Mass. Gen. Laws ch. 258, §10(c). See Kelley, 288 F.3d at 13 (citing Rezendes-Walsh v. City of Bos., No. Civ. A. 95-3707-E, 1996 WL 679673, at *2 (Mass. Super. Nov. 25, 1996) (noting that the Supreme Judicial Court of Massachusetts has found § 10(c)'s list of intentional torts illustrative, rather than exhaustive)). Thus, Counts III and V are dismissed as to the City of Revere.

   b.  Claims Against Arrigo and Guido

Plaintiff has not alleged any facts concerning Arrigo or Guido's behavior much less the "extreme or outrageous" conduct necessary for liability for an intentional infliction of emotional distress claim. Accordingly, she has not stated a plausible claim and the intentional infliction of emotional distress claim is dismissed as to Arrigo and Guido. See Doe v. Bradshaw, Civ. Action No. 11-11593-DPW, 2013 WL 5236110, at *13 (D. Mass. Sept. 16, 2013) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 143, 335 N.E.2d 315 (Mass. 1976)).

Plaintiff also has not alleged any facts as to the defamation claim that plausibly show Arrigo or Guido knew about Covino's relationship with Plaintiff or Covino's alleged misconduct in seeking an abuse protection order. Plaintiff has also failed to plead any facts connecting

17

Arrigo or Guido with any allegedly defamatory statements. Accordingly, Plaintiffs' defamation claims against Arrigo and Guido must also be dismissed.

3. Massachusetts Civil Rights Act Claim (Count IV)

Plaintiff alleges Defendants used "intimidation and coercion" to interfere with her rights under the Massachusetts Declaration of Rights, specifically, that "Defendants endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy." Compl. ¶ 37 [#1].

The Revere Defendants argue the MCRA claim against the City of Revere should be dismissed because "a municipality is not considered a person under the Act," Revere Defs.' Mot. Dismiss 16 [#18] (citing Saldivar, 91 F. Supp. 3d at 139), and the claim against Arrigo and Guido should be dismissed because Plaintiff failed to allege facts that support a plausible inference Arrigo or Guido knew of Covino's relationship with Plaintiff or of Covino's alleged wrongful conduct towards Plaintiff, "let alone threatened, coerced, or intimidated [Plaintiff] in any way." Id. at 17.

In response, Plaintiff states "[t]he facts pled by plaintiff against the defendants form the basis of Counts I-VIII of the Complaint where plaintiff alleged defendants owed her various constitutional and legal duties and breached them to her detriment constituting . . . violations of the Massachusetts Civil Rights Act . . . ." Opp'n to Revere Defs. Mot. Dismiss 5 [#19].

A claim brought under the MCRA, Mass. Gen. Laws ch. 12, § 11I, requires a plaintiff to demonstrate that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats,

intimidation, or coercion.'" <u>Bally v. Northeastern Univ.</u>, 403 Mass. 713, 717, 532 N.E.2d 49

(1989). "The purpose of the MCRA is to provide under state law a remedy 'coextensive with 42

U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart

does not.'" <u>Farrah ex rel. Estate of Santana v. Gondella</u>, 725 F. Supp. 2d 238, 247 (D. Mass.

2010) (quoting <u>Batchelder v. Allied Stores Corp.</u>, 393 Mass. 819, 822-23, 473 N.E.2d 1120

(1985)). "The MCRA is remedial in nature. It creates no substantive rights." <u>Id.</u> (citing

<u>Mouradian v. Gen. Elec. Co.</u>, 23 Mass. App. Ct. 538, 543, 503 N.E.2d 1318 (1987)). "Thus, in

order 'to seek redress through [MCRA as under its Federal analog, 42 U.S.C.] § 1983 . . . a

plaintiff must assert the violation of a federal [or State] *right*, not merely a violation of federal

[or State] *law*." <u>Id.</u> (citing <u>Perkins v. Com.</u>, 52 Mass. App. Ct. 175, 1818, 752 N.E.2d 761 (2001)

(emphasis in original) (citing <u>Blessing v. Freestone</u>, 520 U.S. 329, 340 (1997))).

Moreover, the MCRA is "explicitly limited" to situations "where the derogation of

secured rights occurs by threats, intimidation or coercion" involving a specific threat of harm

"directed toward a particular individual or class of persons." <u>Bally</u>, 403 Mass. at 718-19.

> For purposes of the MCRA, "[a] [t]hreat . . . involves the intentional exertion of
> pressure to make another fearful or apprehensive of injury or harm. Intimidation
> involves putting in fear for the purpose of compelling or deterring conduct . . . .
> [Coercion involves] the application to another of such force, either physical or
> moral, as to constrain [a person] to do against his will something he would not
> otherwise have done."

<u>Farrah</u>, 725 F. Supp. 2d at 247 (citing <u>Planned Parenthood League of Mass., Inc. v. Blake</u>, 417

Mass. 467, 474, 631 N.E.2d 985 (1994) (citations and quotations omitted)).[5]

---

[5] "The elements of 'threats' and 'intimidation' under the MCRA usually require actual or
threatened physical force." <u>Spencer v. Roche</u>, 755 F. Supp. 2d 250, 265 (D. Mass. 2010), <u>aff'd</u>,
659 F.3d 142 (1st Cir. 2011) (citation omitted).

Thus, to survive a motion to dismiss, an MCRA claim must allege a defendant threatened, intimidated, or coerced the plaintiff into "giv[ing] up something [he had] the constitutional right to do." Pimentel v. City of Methuen, 313 F. Supp. 3d 255, 272 (D. Mass. 2018) (quoting Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009)) (internal quotation marks omitted).

      a.  City of Revere

In Howcroft v. City of Peabody, the Massachusetts Appeals Court concluded "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act (MCRA)." 51 Mass. App. Ct. 573, 591-92, 747 N.E.2d 729 (2001). In reaching this conclusion, the Appeals Court examined the legislative history of the MCRA and Section 1983 and found that a municipality *is* a person under Section 1983 as a result of the legislative history "immediately preceding the passage by Congress of the Civil Rights Act of 1871, a precursor to § 1983" but that this has no "bearing on the MCRA . . . [which] only defines person to include 'corporations, societies, associations and partnerships.'" Id. at 592 (citation omitted). Because the City of Revere is not a proper defendant for an MCRA claim, this claim is dismissed.[6]

      b.  Arrigo and Guido

There are no allegations in the Complaint [#1] that Arrigo or Guido took any actions to interfere with Plaintiff's rights secured by the Constitution or the laws of the United States or the Commonwealth, much less that Arrigo and Guido interfered with such rights by threats,

---

[6] MCRA liability also does not extend to municipal employees acting in their official capacities. See O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 141 n.13, 612 N.E.2d 641 (1993) ("[T]o avoid a State's sovereign immunity to a damages suit, a plaintiff must sue the State official in his individual and not his official capacity.").

intimidation, or coercion. See Lund v. Henderson, 22 F. Supp. 3d 94, 106 (D. Mass. 2014). Thus, this count is subject to dismissal.[7]

### 4. Conspiracy Under 42 U.S.C. § 1985

Plaintiff alleges "two or more Defendants" "intimidated, threatened and coerced" her "not to offer testimony or assert her position in a case" and "conspired for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice in the Commonwealth of Massachusetts, with intent to deny to Plaintiff the equal protection of the law." Compl. ¶ 45 [#1].

The Revere Defendants argue Plaintiff's allegation under the first clause of 42 U.S.C. § 1985(2) fails to state a plausible claim because Plaintiff alleges conspiratorial interference with the abuse protection proceedings in Massachusetts state court and alleged interference with state court proceedings cannot be brought under the first clause of § 1985(2). Revere Defs.' Mot. Dismiss 17-18 [#18]. The Revere Defendants also argue the § 1985 claim should be dismissed in its entirety because Plaintiff failed to allege "any racial or otherwise class-based invidiously discriminatory animus underlying the alleged conspiratorial conduct[.]" Id. at 19.

In response, Plaintiff argues she adequately pleaded a claim under § 1985, specifically that the Revere Defendants "acted in concert to interfere with [Plaintiff's] rights by selecting her for targeting of civil and criminal sanctions and deprivation of her property because she was of a

---

[7] In Pimentel, the MCRA count survived a motion to dismiss even though none of the individual defendants were personally alleged to have used threats, intimidation, or coercion to make the plaintiff take a breathalyzer test; however, in Pimentel all the individual defendants interacted with the plaintiff at the police station and thus the question remained whether the individual defendants knew plaintiff was given an incorrect form such that their conduct could be "coercive" under the MCRA. 323 F. Supp. 3d at 273. Here there are no allegations Arrigo or Guido were involved in any coercive, threatening, or intimidating actions.

particular gender and national origin" and because she complained to Covino about his mistreatment of her for those same reasons. Opp'n to Revere Defs.' Mot. Dismiss 16-17 [#19].

"Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to them by law." Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021) (citing 42 U.S.C. § 1985(3)).

> To plead an actionable claim under this statute, [a plaintiff] must allege the existence of a conspiracy, allege that the purpose of the conspiracy is "to deprive the plaintiff of the equal protection of the laws," describe at least one overt act in furtherance of the conspiracy, and "show either injury to person or property, or a deprivation of a constitutionally protected right."

Id. (quoting Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)).

Plaintiff argues Defendants, conspired, *inter alia*, to deprive her of her property "because she was of a particular gender and national origin." Opp'n to Revere Defs.' Mot. Dismiss 17 [#19]. However, Plaintiff has failed to adequately plead any such conspiracy existed. "Refined to bare essence, a conspiracy is a 'combination of two or more persons acting in concert to commit an unlawful act." Alston, 988 F.3d at 577 (quoting Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988)). To plead a civil rights conspiracy, a plaintiff "must plausibly allege facts indicating an agreement among the conspirators to deprive the plaintiff of her civil rights." Parker v. Landry, 935 F.3d 9, 18 (1st Cir. 2019). Plaintiff has failed to allege any facts tending to show the existence of a conspiracy among Covino, Arrigo, and Guido (or any configuration of two Defendants); the Complaint [#1] does not include any allegations that Arrigo and Guido conspired or even that Arrigo and Guido knew anything of the conduct alleged in Plaintiff's Complaint [#1]. Because Plaintiff has failed to allege any facts from which to infer that the Arrigo and Guido reached a "common understanding of what they were hoping to achieve" this

count is dismissed. Alston, 988 F.3d at 578; see also Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980) ("[A]llegations of conspiracy must [ ] be supported by material facts, not merely conclusory statements.").

5.   Refusal to Prevent Wrongs Under 42 U.S.C. § 1986

Plaintiff alleges Defendants knew of the "wrongs they each and severally were committing against Plaintiff," had the power to "prevent or aid in the prevention of said wrongs," and failed to do so. Compl. ¶¶ 49-50 [#1].

The Revere Defendants argue there is a one-year statute of limitations for actions brought under § 1986. Revere Defs.' Mot. Dismiss 20 [#18]. Covino obtained the Abuse Prevention order in January 2017, and Plaintiff did not file her Complaint [#1] until January 29, 2020, more than a year after the claim accrued. Id.

Plaintiff argues her claims are not time barred because she alleged ongoing misconduct which means the January 29, 2019 date is not significant for assessing this claim's timeliness. Opp'n to Revere Defs.' Mot. Dismiss 18 [#19].

Section 1986 "'creates a right of action against a party who, having knowledge that any of the wrongs in furtherance of a conspiracy prohibited by § 1985 are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" Humphrey v. Comoletti, Civ. Action No. 15-cv-14170-ADB, 2016 WL 4132205, at *4 (D. Mass. Aug. 3, 2016) (citing Salcedo v. Town of Dudley, 629 F. Supp. 2d 86, 99 (D. Mass. 2009) (quoting 42 U.S.C. § 1986)). Section 1986 claims are subject to a one-year limitation period. See 42 U.S.C. § 1986 ("[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.").

23

207

The court finds Plaintiff has not alleged ongoing conduct by the Revere Defendants, but instead, that her allegations concern conduct that happened in 2017. Thus, because she filed the Complaint [#1] in 2020, her § 1986 claim is barred by the statute of limitations. See Salcedo, 629 F. Supp. at 99.[8]

### C. Covino's Motion to Dismiss

Although Covino acknowledges the appropriate standard for a motion to dismiss, his Motion [#9] relies on his version of the facts rather than those alleged in Plaintiff's Complaint [#1], including the nature of Covino and Plaintiff's relationship, actions Plaintiff allegedly took towards Covino, and actions Covino claims led up to obtaining the Abuse Prevention Order. Covino also presents matters outside of the pleadings. Covino's Mot. 3-6 [#9]. Because Covino's arguments rely on his version of the facts, rather than assuming the truth of Plaintiff's well-pleaded facts, and include matters outside the pleadings, the Rule 12(b)(6) motion is denied.[9]

### IV. Covino's Motion for Summary Judgment

### A. Legal Standard

Under Rule 56, the court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[8] This count would also be subject to dismissal because the court has found Plaintiff failed to allege a plausible conspiracy under 42 U.S.C. § 1985 and, thus, Plaintiff has failed to plausibly allege a conspiracy that the Revere Defendants could have had knowledge of and failed to prevent.

[9] The court recognizes that some of the legal arguments raised by the Revere Defendants and accepted by the court may also apply to Covino. The court declines to extend the rulings as to the Revere Defendants' to Covino, where he did not so move and where Plaintiff has not had an opportunity to address the arguments as they apply to Covino. After filing an answer and conferring with counsel, however, Covino may file a motion for judgment on the pleading under Rule 12(c) raising those arguments that may apply to him.

law." Fed. R. Civ. P. 56. A fact is material when, under the governing substantive law, it could

affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a

reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

Under Local Rule 56.1, a party seeking summary judgment must include "a concise statement of

the material facts of record as to which the moving party contends there is no genuine issue to be

tried, with page references to affidavits, depositions and other documentation. Failure to include

such a statement constitutes grounds for denial of the motion."

The opposing party must present evidence in order to defeat a properly supported motion,

and "[t]his is true even where the evidence is likely to be within the possession of the defendant,

as long as the plaintiff has had a full opportunity to conduct discovery." Id. at 257. The opposing

party must also include a Local Rule 56.1 statement.

Generally, a Rule 56 motion is brought after the parties have completed discovery. See

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, unless a local rule or court order

provides otherwise, a movant may file a summary judgment motion before discovery is complete

or before it has even commenced. See Fed. R. Civ. P. 56(a) ("a party may file a motion for

summary judgment at any time until 30 days after the close of all discovery"). Should a party

move for summary judgment early, Federal Rule of Civil Procedure 56(d) permits a nonmovant

to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to

justify its opposition" and allows the court to (1) defer considering the motion or deny it; (2)

allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other

appropriate order. Fed. R. Civ. P. 56(d). "[A]lthough a request for Rule 56(f)[10] relief need not be

expressly labeled as such, the party invoking the rule at a minimum must ask the court to refrain

from acting on the summary judgment request until additional discovery can be conducted." C.B.

Trucking, Inc. v. Waste Management Inc., 137 F.3d, 41, 44 (1st Cir. 1998) (citing Ayala-Gerena

v. Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996); Dow v. United Bhd. of Carpenters,

1 F.3d 56, 61 (1st Cir. 1993)).

　　　"Rule 56(d) serves a valuable purpose. It protects a litigant who justifiably needs

additional time to respond in an effective manner to a summary judgment motion." Rivera-

Almodóvar v. Instituto Socioeconómico Comunitario, Inc., et al., 730 F.3d 23, 28 (1st Cir. 2013).

(citing Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 3 (1st Cir 2004)). It "provides a

safety valve for claimants genuinely in need of further time to marshal 'facts, essential to justify

[their] opposition . . . to a summary judgment motion.'" Reid v. New Hampshire, 56 F.3d 332,

341 (1st Cir. 1995) (alteration in original) (quoting Mattoon v. City of Pittsfield, 980 F.2d 1, 7

(1st Cir. 1992)). "'Consistent with the salutary purposes underlying Rule 56(f), district courts

should construe motions that invoke the rule generously, holding parties to the rule's spirit rather

than its letter.'" In re PHC Inc. Shareholder Litig., 762 F.3d 138, 143 (1st Cir. 2014) (quoting

Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994)).

　　　The plaintiff bears the burden under Rule 56(d) of specifically identifying relevant

information and demonstrating that the evidence sought actually exists and would prevent

---

[10] "Rule 56(d) was formerly Rule 56(f)," and "the textual differences between current Rule 56(d) and former rule 56(f) are purely stylistic." Nieves-Romero v. United States, 715 F.3d 375, 381 n.3 (1st Cir. 2013). Therefore, "case law developed under former Rule 56(f) remains controlling, and [the First Circuit] cite[s] to it where applicable." Id.

summary judgment. Id. ("the party opposing summary judgment must make a sufficient proffer: 'the proffer should be authoritative; it should be advanced in a timely manner; and it should explain why the party is unable currently to adduce the facts essential to opposing summary judgment'") (quoting Resolution Trust Corp., 22 F.3d at 1203). The Rule 56 Affidavit "'should indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" Id. at 145 (quoting Resolution Trust Corp., 22 F.3d at 1203). "Because '[e]valuating the potential significance of unknown facts in regard to unadjudicated issues is something of a metaphysical exercise . . . . [T]he threshold of materiality at this stage of the case is necessarily low.'" Id. (quoting Resolution Trust Corp., 22 F.3d at 1207) (alteration in original).

A plaintiff must also show that she sought the requested information, or that there is good reason she has not been able to obtain the information. Id. "[I]n a case involving incomplete discovery, the Rule 56(d) proffer requirements can be categorized as: 'authoritativeness, timeliness, good cause, utility, and materiality.'" Id. at 143-44 (quoting Resolution Trust Corp., 22 F.3d at 1203). "[T]hese requirements are not inflexible and . . . one or more of the requirements may be relaxed or even excused, to address to exigencies of a given case.'" Id. at 144 (citing Resolution Trust Corp., 22 F.3d at 1203). If a plaintiff satisfies the requirements, "a strong presumption arises in favor of relief." Id. (quoting Resolution Trust Corp., 22 F.3d at 1203).

B.  Discussion

Here, Covino has failed to support his request for relief under Rule 56 with the required statement of undisputed material facts, and the motion may be denied on this ground alone. In addition, comparing Covino's version of events with Plaintiff's Statement of Material Facts

27

[#11], the relevant facts appear to be very much in dispute.

In any event, Plaintiff has submitted her Affidavit [#13], stating she has "not had the opportunity to gather the necessary evidence," including records from the Revere Police Department and the George Mason Police Department, nor had the opportunity to question Defendant Covino under oath. At the time the summary judgment motion was filed, discovery had not commenced, no depositions had been taken, and the parties had not yet exchanged initial disclosures. See Elec. Clerk's Notes [#16].

The court finds Plaintiff has shown good cause for her inability to marshal the facts set out in the Radfar Affidavit [#13], where the discovery Plaintiff states she seeks is not in her custody, but in the custody of the City of Revere, the George Mason Police Department, and Virginia state law enforcement agencies, and where she has not yet deposed Covino. Radfar Aff. [#13]; see also In re PHC, 762 F.3d at 144 ("[A] party seeking discovery expeditiously is not obligated to take heroic measures to enforce his rights against a recalcitrant opponent.") (internal citation and quotation omitted).

Plaintiff also has shown "a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time." Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007). The Radfar Affidavit [#13] satisfies the utility requirement where Plaintiff states her belief that various law enforcement agencies possess documents that are relevant to her claims. The court finds it is plausible additional facts needed to oppose Covino's motion for summary judgment exist and can be retrieved in a reasonable time from the sources identified.

Finally, Plaintiff enumerates specific disputes with facts asserted in Covino's Motion [#9]. For example, Plaintiff states she "categorically and specifically" denies she "made any

threats to Joey Covino from 2015 to 2017" and identifies sources who might have information relevant to this disputed fact. Radfar Aff. [#13]. At this stage, the court is satisfied that the facts Plaintiff asserted in her Affidavit [#13] are material to the resolution of Covino's pending summary judgment Motion [#9].

In sum, the court finds summary judgment at this stage unwarranted. The motion is denied without prejudice to the filing of summary judgment motions at the close of discovery. Any such motions shall comply with Local Rule 56.1.

V. Conclusion

For the aforementioned reasons, the Revere Defendants' Motion to Dismiss [#18] is ALLOWED and Defendant Covino's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 [#9] is DENIED.

IT IS SO ORDERED.

/s/ Indira Talwani
September 9, 2021                                      United States District Judge

29

213

UN T  ST T S  STR T  OURT
STR T  O  M SS  US TTS

S  RON R   R

P

N
T

T  O  R V R

OR T   ONOR   N R T N   STR T U

ST TUS V  O ON R N

M       O

M   N   U     S
N
O
M

R       P     RMR   RR
O         R

O                    P

   TTORN        T
                  T   M        U
        M        S
   S
              M




O

      N   RSON    O   M N   TO  N    P  S   U   O     P
              NN  T        N   RSON
        R        S
              M

T      PUT      R      U        S

                                    T

T              N              R


MS      U

        M

        S      R

T      OURT

MR   N  RSON


T      OURT

S

MS      U

T

S

T    OURT    M

MR    N    RSON

T

MS    U    T

R

S

MR   N  RSON   O      S

V       S

P

V

T    OURT   O      S

T                           T

S

S

S

S

MS       U

MR   N  RSON

T    OURT   O     S

T

S

R

R

S    M

R

M

S

MS        U

T    OURT

MS        U

T    OURT

T    PUT    R              S

T    OURT    S

M

T    PUT      R

P

T    OURT    S

T    PUT    R

T    OURT    O

T    PUT    R
   O
T    OURT    T
T    PUT    R
MS    U

T    PUT    R                    T

T    OURT                T
T    PUT    R

T    OURT    T
T    PUT    R
T    OURT

S

MS    U

T    OURT

MR  N  RSON  N

T    OURT  S

MS    U   T        T

T    OURT

M

MR    N  RSON    O      N

                                        T

T    OURT    O

MR   N  RSON

T    OURT    O

                        S

MS       U

MR   N  RSON


T    OURT   O       S




T

MS        U      T

T      OURT    S


MS        U      N

MR    N    RSON


T      OURT    O        T

T

MR    N    RSON      O

MS        U      V                T

T      PUT      R

UN T  ST T S  STR  T  OURT
STR  T O  M SS   US TTS

S  RON R    R

P

N
T

T  O  R V R

OR  T   ONOR    N  R T  N   STR  T  U

ST TUS V   O ON  R N

M        M

M   N   U     S
N
O
M

R       P     RMR   RR
O          R

O                    P

TTORN        T
                T   M       U
         M      S
S
                M



O

    N   RSON    O   M N   TO  N    P  S   U  O     P
             NN  T        N   RSON
         R       S
             M

T     PUT     R    U      S

T

T           N                    R

MS        U

S         R

T     OURT    O

MR   N  RSON

T     OURT    O

MS        U

T

M     U

M                                                    T

T     OURT     O        S

MS        U

T     OURT     O

MR    N   RSON

M                              M

S

T    OURT

MR    N  RSON   O      S

                        M      U

                  M

            M      P

T    OURT   S

MR    N  RSON

T    OURT   O      S

T

MS      U

T     OURT

S

MR    N   RSON

M

MS      U

T     OURT

MS      U

MR    N   RSON

T    OURT    N

T

MR    N    RSON

T    OURT    O    S

MS    U

T    OURT    S    T

MR    N    RSON

T    OURT    O

MR    N    RSON    N

T    OURT

MR    N  RSON

N              O      N

M

T    OURT

T

MR    N  RSON    O

T    OURT    N

S

MS        U

MR    N  RSON

R

T

T    OURT    O    S                    R

R

S                            R

R

S

MR   N  RSON   O

N

T    OURT   O

MS       U

T    OURT

MS       U    U

T    OURT    S

O

MS       U    T

MR   N  RSON    O

T    OURT

MS      U    T

T    OURT   O      S

                                    T

          M
MS        U

                              T

T    OURT   O      O

      T

MS        U
T    OURT

MS      U    T

T    OURT   T

MS     U    T

T

T    OURT   O          M

MR   N  RSON

O

T

MS     U                              T

T    OURT   S

S

S

T

MS        U

T

S

MR    N    RSON

MS        U

T      OURT    O

MS        U    T

T      OURT

MS      U    T

T    OURT

MS      U

                              T

S

T    OURT

MS      U    O

MR    N  RSON    N

T    OURT   O    S

MS    U

T    OURT

MR   N  RSON

T    OURT

S

M    M

T    PUT    R

T    OURT   O    T

MS    U    T

T    OURT   O

MR   N  RSON

T    OURT    O        S

MS        U    T

T    OURT    O        T

MR    N  RSON    T

T    PUT        R    T

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

```
_____
SHARON RADFAR,                 )
        Plaintiff              )
                               )
V.                             )
                               )
CITY OF REVERE,and             )
BRIAN M. ARRIGO,               )
     MAYOR; and                )
JAMES GUIDO,                   )     MOTION TO COMPEL
     CHIEF OF POLICE; and      )     DEFENDANT TO PROVIDE
SERGEANT JOSEPH I.COVINO; and  )     DISCOVERY
OTHER AS YET UNNAMED           )
OFFICERS OF THE                )
REVERE POLICE DEPARTMENT;      )
INDIVIDUALLY AND IN THEIR      )
OFFICIAL CAPACITIES AS MAYOR   )
CHIEF OF POLICE AND            )
POLICE SERGEANT AND OFFICERS   )
OF THE CITY OF REVERE,         )
        Defendants             )
_____)
```

NOW COMES THE PLAINTIFF IN THE ABOVE-ENTITLED MATTER

and respectfully requests the following relief from this

Honorable Court:

      1.    An Order that Defendant Joseph I. Covino
forthwith provide her with the following documents
she requested in her Rule 34 Requests for
Production of Documents, shown here with entirely
inadequate responses by said Defendant:

DEFENDANT, SERGEANT JOSEPH I. COVINO'S, RESPONSES TO PLAINTIFF'S
FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS
PURSUANT TO F.R.CIV.P. RULE 34

The defendant, Sergeant Joseph I. Covino, states that the responses contained herein

conform with Rule 34 of the Federal Rules of Civil Procedure.

REQUEST NO. 1:

Any and all documents and things referred to or consulted by you in your preparation of and

responses to interrogatories.

RESPONSE NO. 1

The defendant produces a series of screen shots of text messages from the plaintiff using
various

phone numbers, as well as e-mails between himself and George Mason University Lt. David

Ganley and Virginia State Police Special Agent Kinnard that were previously produced as

defendant's initial disclosures.


REQUEST NO. 2:

Any and all notes, memoranda, reports, letters or correspondence of any kind including

electronic, recordings or posts on social media or listserves of any kind regarding, concerning or

in any way mentioning the Plaintiff; and additionally your marriage, your relationship with a

2

woman with whom you have child, and any other personal or intimate relationship you have

disclosed to or in any way discussed with the other Defendants in any manner.

RESPONSE NO. 2

Please see Response No. 1.

REQUEST NO. 3:

Any and all written City of Revere or Revere Police Department disciplinary notices you

have received.

RESPONSE NO. 3

None.

REQUEST NO. 4:

Any and all 209A orders, 258E orders, No Tresspass (sic) Orders, cease and desist orders,

contempt of court complaints, or notices to quit, eviction, default, indictments, summonses,

target letters, supported allegations of neglect or abuse issued against or naming you.

RESPONSE NO. 4

The defendant produces Complaint for Protection From Abuse, Docket No.: 201713R0104

entitled *Joseph Covino v. Sharon Radfar.*

> Respectfully
> Submitted, The
> defendant, Sergeant
> Joseph I. Covino,
> By his attorney,

November 29, 2021

----

Kenneth H. Anderson, Esq. / B.B.O. # 556844     ^Anderson,
Goldman, Tobin & Pasciucco 50 Redfield Street Boston, MA 02122 (617)
265-3900 kanderson@andersongoldman.corn

```
        2.   Entry of an Order that said Defendant
    forthwith provide full and complete Answers to
    Interrogatories and Requests for Production of
    Documents and Things Pursuant to R.34 that were
    served upon him.

        3.   Entry of an Order assessing sanctions against
    said Defendant for his abuse of discovery in
    wilfully refusing to comply with Plaintiff's lawful
    requests after indicating his intention to
    comply.


    IN SUPPORT WHEREOF PLAINTIFF AVERS AND OFFERS THE

FOLLOWING:
```

4

248

1.    Defendant initially indicated he intended to make the disclosures as evidenced by representations made in his deposition, relevant transcript portions attached and enclosed as CovinoTestExhib1, attached and incorporated by reference as if fully set forth herein.

2.    Defendant deliberately withheld responsive documents and things as disclosed in his testimony a transcript of which is attached and enclosed as CovinoTestExhib3, attached and incorporated by reference as if fully set forth herein, and he refused to provide documents he was required to bring to his deposition pursuant to the attached CovinoDepoNotExhib attached and incorporated by reference as If fully set forth herein.

3.    Defendant's misconduct in deliberately withholding documents for self-serving ends mirrors his failure and refusal to provide text messages he sent the Plaintiff to Virginia State Police such that they obtained the messages he sent her by subpoena, whereupon they determined she could not be criminally charged.

4.    Despite a request to confer from undersigned counsel pursuant to FRCP 37.1 and Local Rule 7.1 Defendant has persisted in his refusal to confer much less make the disclosures after agreeing to do so.

WHEREFORE PLAINTIFF avers the above-mentioned abuses of discovery by Defendant has prejudiced her ability to prosecute this action by denying her important evidence in support of her causes of action for civil rights violations perpetrated by the Defendant under color of law in a timely manner in order to avoid

the risk the evidence likely to be obtained through said

disclosures may be lost, destroyed or otherwise rendered

unavailable to her, the interests of justice require this

Honorable Court to allow the relief requested above.

Respectfully submitted,

Sharon Radfar
By her attorney

Dated: May 2, 2022

/s Elizabeth M. Clague
Elizabeth M. Clague
Attorney for the Plaintiff
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508) 587-1191
BBO# 632341

## CERTIFICATION

I, Elizabeth M. Clague, counsel for the Plaintiff, hereby
certify that I have discussed the subject of this Motion and
attempted to confer with Counsel for the Defendant with the goal of
narrowing the issues prior to filing pursuant to FRCP 37.1 and
Local Rule 7.1.

Dated: May 2, 2022                    /s Elizabeth M. Clague
                                      Elizabeth M. Clague

## CERTIFICATE OF SERVICE

I, Elizabeth M. Clague, hereby certify I have served the
within document through the EFC-EMF system.

/sElizabeth M. Clague

6

46

1    A.  I don't recall.  I may have a folder
2  somewhere.  I don't have an external drive, a 32-
3  gig thumb drive external -- an external one.  I may
4  have those somewhere.  I don't know.
5    Q.  You said a folder somewhere.  What else
6  would be in that folder?
7    A.  A folder on my computer, my home
8  computer, with this stuff in it.
9    Q.  Okay, and would you -- and you haven't
10  provided that to us, obviously.  You haven't
11  provided or forwarded that to us; correct?
12    A.  Correct.
13    MR. ANDERSON:  Objection.  Betsy, I think
14  it actually is all the stuff that was in the
15  disclosure, is all the text messages and pictures
16  and what not.
17    THE DEPONENT:  That's what it was.
18    MR. ANDERSON:  In the voicemails talking
19  about how we --
20    MS. CLAGUE:  Okay.
21    THE DEPONENT:  That's all that was.
22  BY MS. CLAGUE:
23    Q.  Would you be willing to review that to
24  ensure that all of the things that were in that
25  folder and thumb drive were provided to us in your

47

1  initial disclosures?
2    A.  Well, I don't have the thumb drive.  I
3  couldn't review that.
4    Q.  Okay.
5    A.  But everything --
6    Q.  But you're not -- you're not sure whether
7  you have a copy of it, is -- was my understanding;
8  is that right?
9    A.  That's correct.
10    Q.  Okay, so if you would look for a copy of
11  that, and if you would just do an examination of
12  that upon -- upon finding it and the folder that
13  you describe on your computer to ensure that
14  everything that you -- that you had provided
15  everything to us, and if not, supplement with
16  anything you hadn't provided us, would you be
17  willing to do that?
18    A.  Yes, certainly.  Absolutely.
19    Q.  Okay, all right.  All right, and I can
20  talk to your attorney about when we could
21  supplement that.
22    MR. ANDERSON:  I'm very certain that you
23  have everything, but we can double check.
24    MS. CLAGUE:  Thanks.  That's all I'm
25  asking you to do.

48

1    THE DEPONENT:  No problem.
2  BY MS. CLAGUE:
3    Q.  So, and if you look at this Exhibit 9,
4  the envelope was sent by Det. Kephart.  Is that
5  Det. Renee Kephart?
6    A.  Yes.
7    Q.  Okay, and when did she -- when was she
8  first aware of your police report?
9    A.  I don't know when she was first aware of
10  it.  What I usually do with my reports is I take
11  the report, gather the evidence, submit the report,
12  submit the evidence with a copy of the report in
13  the evidence locker.
14    She was in charge of evidence at the
15  time, whether she got the -- that day, the next
16  day, the following week, I don't know, but it was
17  within a reasonable amount of time.
18    Q.  So these materials were kept in the
19  Revere Police Department evidence locker?
20    A.  Yes.  To my knowledge, yeah.
21    Q.  When did you -- like, when did you place
22  these -- did you place these materials in the
23  Revere Police Department evidence locker?
24    A.  If I remember correctly, yes.
25    Q.  And when did you do that, sir?

49

1    A.  It was most likely with -- probably the
2  same day or within the day -- within like 48 hours
3  of filing the report.
4    Q.  And that report, as we've seen, was dated
5  January 29th.
6    A.  Correct.
7    Q.  And so all of the materials that are
8  described here would be included in what you placed
9  in the evidence room; is that correct?
10    A.  Yes, there was some extra things that
11  were hard copies that I didn't provide to you
12  during discovery because I didn't have them.  Two
13  of them were greeting cards.  I believe it was a
14  12- or 13-page letter written by Ms. Radfar.
15    Those were physically placed into
16  evidence and subsequently into that large envelope.
17    Q.  So he was provided with those, but you
18  didn't provide us to those in your initial
19  disclosures; am I to understand that correctly?
20    A.  That's correct because I don't have them.
21    Q.  Okay do you have access to them?
22    A.  I would assume Mr. Kinnard -- Special
23  Agent Kinnard has them in his --
24    Q.  I'm asking you, though.
25    A.  No, I don't --



50

1   Q.  You provided them.
2   A.  I physically took the actual physical
3 thing and sent it into evidence where it went to
4 Special Agent Kinnard.  I don't have a copy of it.
5 A picture of it.  I didn't scan her apology
6 letters, nothing like that.
7   Q.  So he had it -- he has it, we don't?
8   A.  Correct.
9   Q.  And you provided it.
10  A.  Yes.
11  Q.  Okay, and you -- at some point did you
12 instruct Det. Kephart to send the evidence from the
13 Revere Police Department evidence room down to
14 Virginia?
15  A.  Not to my knowledge, no.  I would assume
16 the proper way would be -- to get evidence would be
17 Special Agent Kinnard would send a request for
18 that, and then it would be sent.
19  Q.  I see.  So once you put this into the
20 evidence room, Det. Kephart was in charge of it?
21 At least at that time.
22  A.  Correct.
23  Q.  And that's Det. Renee Kephart?
24  A.  Correct.
25  Q.  And she is still with the Revere Police

51

1 Department; isn't she?
2   A.  She's -- she is an active member of the
3 department.  She's currently out on injury.  She
4 has a TBI, traumatic brain injury.
5   Q.  Okay, and what, if any, conversation did
6 you have with Det. Kephart about this -- these
7 items that you were placing into the evidence room?
8   A.  I don't remember having any conversations
9 with her.
10  Q.  What conversation did you have with her
11 about her sending all of these materials down to
12 Sgt. Kinnard?  I'm sorry, down to Special Agent
13 Kinnard?
14  A.  I don't recall having any conversations
15 with her.
16  Q.  Okay, so you didn't have any conversation
17 with her at all about this; is that your testimony?
18  A.  My testimony is I don't recall it.
19  Q.  Okay.
20  A.  I don't remember if she, in passing said,
21 hey someone asked for evidence.  I don't recall it
22 at all.
23  Q.  Is that something that would normally
24 happen?
25  A.  Renee and I are friends.  I mean, I -- if

52

1 someone asked for something, like in a passing
2 statement, like, oh, hey, you know, so and so asked
3 for this stuff, maybe.  Like, yeah.  I can't really
4 -- I can't really testify to that.  I don't
5 remember.
6   Q.  Did Renee know about your relationship
7 with Ms. Radfar?
8   A.  If she read the report, certainly.  But
9 did I talk to her about it, personally?  On any
10 sort of level?  No.
11  Q.  All right, I'm going to direct your
12 attention to the third page of Exhibit 3, please.
13 It's in your interrogatories.  Your answer to No.
14 1.
15  A.  Yes, I have it.
16  Q.  And we've been over these before that you
17 signed these under pain and penalty of perjury;
18 correct?
19  A.  Yes.
20  Q.  All right, so I'm going to direct your
21 attention to the only -- the last two-and-a-half
22 sentences in answer -- in your Answer No. 1
23 beginning with the only discipline you're aware of,
24 do you see that?
25  A.  Yes.

53

1   Q.  How did you become aware of that
2 complaint?
3   A.  Give me a minute.  The initial formal
4 complaint I believe my chief or XO may have
5 contacted me.  It's just through the department.
6   Q.  How would they have contacted you?
7   A.  Depends on the chief, really.  A phone
8 call?  "Hey, can you come in and talk about this
9 incident?"  That type of thing.
10  Q.  Now certainly you would have the right to
11 review that; wouldn't you?
12  A.  Right to review a complaint?
13  Q.  That's right.
14  A.  Yes.  Yes, it actually -- it went -- we
15 went to different stages of the grievance and
16 appeal process as far as that complaint went.
17  Q.  Okay so what was the first stage of the
18 process of that complaint?
19  A.  Someone makes a complaint to the
20 department.
21  Q.  And what happened next?
22  A.  The officer in charge will try to talk to
23 the person, get as much information, try to resolve
24 the issue with them, with the complainant, gather
25 as much information as possible to try to reach a



54

1  satisfactory conclusion.
2      Q.   And then what happens next?
3      A.   If -- the proper way would be if the
4  officer in charge can't remedy the situation, then
5  the complaining party would fill out a complaint
6  form, a department citizen complaint form.
7      Q.   And that happened in this case; didn't
8  it?
9      A.   I have no idea.
10     Q.   Who appealed?
11     Q.   Who appealed the decision?
12     Q.   Who appealed in this case?  You said that
13 there was an appeal?
14     A.   Yes, I appealed the decision of the chief
15 and then the mayor.
16     Q.   So the chief made a decision on the
17 complaint; correct?
18     A.   Correct.  Yes.
19     Q.   You received written notice and a copy of
20 that decision; correct?
21     A.   Correct.
22     Q.   The mayor then made a decision on that
23 complaint as well; correct?
24     A.   Yes.
25     Q.   And the mayor -- because you appealed --

55

1      A.   To an arbitrator.
2      Q.   -- to an arbitrator, you did that because
3  both the decision of the chief and the decision of
4  the mayor went against you; did they not?
5      A.   Correct.
6      Q.   And what kind of discipline did they
7  recommend in finding against you before you went to
8  the arbitrator?
9      A.   The chief recommended a suspension.  I
10 don't recall the time, whether it was -- I think it
11 was three days.
12         I appealed that to the mayor, and then
13 during the hearing, the chief got upset and blurted
14 out that he was doing this as a favor to the city
15 clerk, and it shouldn't have blown out of
16 proportion, and then everyone had to recuse
17 themselves, because they were now witnesses to
18 something that was going on that had absolutely
19 nothing to do with the actual complaint.
20     Q.   Did you get a transcript of this hearing?
21     A.   No.  No.
22     Q.   What was the outcome of this hearing?
23     A.   The mayor found that -- he rubber-stamped
24 the chief's decision, and then it went to an
25 arbitrator, and then the day before arbitration,

56

1  the chief and the mayor backed down and settled and
2  said that it would be expunged from my record.
3         They would accept that -- they would
4  accept it if extraordinary circumstances of the
5  case and it would be gone from my record within six
6  months and -- but they didn't want to have to pay
7  back the three days' pay that I lost.  I'm pretty
8  sure it was three days.
9      Q.   Okay, so you ended up serving the
10 suspension?
11     A.   You have to serve the suspension before
12 you can appeal.
13     Q.   Okay, so in your answer you indicated
14 that the resolution was no admission of wrongdoing,
15 expunged from your file after a year; correct?
16     A.   It was either six months or a year.  I
17 can't recall which one.
18     Q.   Was your recollection of that better at
19 the time you drafted your answers to these
20 interrogatories; do you think?
21     A.   Perhaps.
22     Q.   Okay, so it says that it was expunged
23 from your personnel file after a year; correct?
24     A.   Correct.
25     Q.   So --

57

1      A.   It should have been.  I don't know if it
2  did.
3      Q.   Okay, and what was the complaint?
4      A.   The complaint was I was rude and I -- I
5  believe she said I was rude and I told her to go
6  back to a parked car and remove the ticket, the
7  parking ticket.
8      Q.   All right, I'm going to direct your
9  attention to the 12th page of this same exhibit,
10 Exhibit 3.  Actually, the 11th page.
11         MR. ANDERSON:  What interrogatory is
12 that?
13         MS. CLAGUE:  That's the Answer No. 1 to
14 the interrogatories, I'm moving ahead in the same
15 exhibit, to the 11th page of the same exhibit.
16         THE DEPONENT:  What interrogatory number
17 are you at?
18         MS. CLAGUE:  We were just at
19 Interrogatory --
20         THE DEPONENT:  I know where we were.
21 Where are we -- where do you want to go?
22         MS. CLAGUE:  We're going to the --
23         MR. ANDERSON:  -- Number 9.
24         MS. CLAGUE:  -- responses to requests --
25         THE DEPONENT:  Number 9?



58

1      MS. CLAGUE:  No.  We're going to the
2  responses, the 11th page of Exhibit 3.  Responses
3  to requests for production of documents.  Do you
4  see where we are?
5      THE DEPONENT:  Okay.  Yes.  Response No.
6  1?  That one?  The top of the screen?
7      MS. CLAGUE:  I'm looking at Response No.
8  1.
9      THE DEPONENT:  Okay.
10  BY MS. CLAGUE:
11      Q.  Again, Request No. 1, any and all
12  documents that you reviewed in preparation for your
13  responses to interrogatories; correct?
14      A.  Correct.
15      Q.  You see that?  So what documents from
16  this suspension that you described from this
17  complaint process that you describe did you review?
18      A.  None.  It was all memory.
19      Q.  So this is all from your memory.
20      A.  Correct.
21      Q.  I'm going to direct your attention to the
22  next page, Request No. 3.  You see that?
23      A.  Yes.
24      Q.  Okay, and the request is pretty
25  straightforward, any and all written City of

59

1  Revere, Revere Police Department disciplinary
2  notices you've received.  You provided none.
3      A.  Correct.
4      Q.  Will you provide those -- will you
5  supplement your responses to request for production
6  and provide those?
7      MR. ANDERSON:  I'm sorry.  I missed the
8  question.  What are you looking for, Betsy?
9      MS. CLAGUE:  Oh, sure.  I'm looking for
10  him to supplement his response to Request No. 3.
11      MR. ANDERSON:  It's --
12      MS. CLAGUE:  You're breaking up.  I'm
13  sorry.  I can't hear you.
14      MR. ANDERSON:  The interrogatory answer
15  said that it was expunged from his file, so
16  therefore it would not exist.
17  BY MS. CLAGUE:
18      Q.  My question is, will you provide --
19      MR. ANDERSON:  Can you hear me?
20      MS. CLAGUE:  Yes.
21  BY MS. CLAGUE:
22      Q.  My question is, will you supplement your
23  Request No. 3?
24      MR. ANDERSON:  The document doesn't
25  exist.  The interrogatory answer indicates that it

60

1  was expunged from his personnel files, so therefore
2  there is no document to produce.
3      MS. CLAGUE:  So the answer is no?
4      MR. ANDERSON:  Can you hear me?
5      MS. CLAGUE:  Yes.  So the answer is no?
6      MR. ANDERSON:  Well, there's nothing to
7  produce, because it was -- yes, the answer is no,
8  because there is nothing to produce.
9      MS. CLAGUE:  If you discovered that there
10  is something to produce, will you produce it?
11      MR. ANDERSON:  I will, but his memory of
12  the interrogatory is that it was pulled from his
13  file after a year which was 2008, 2009, 2010, so I
14  can't give you a document that was destroyed 12
15  years ago.
16      MS. CLAGUE:  If that's the case, if
17  that's what -- if he is correct about expungement,
18  I understand.  Will you look into it and provide a
19  supplement to the response?
20      MR. ANDERSON:  Sure.
21      MS. CLAGUE:  All right.  And we'll talk
22  about dates and times by which we need to do that.
23  BY MS. CLAGUE:
24      Q.  Directing your attention now on this same
25  page to Request No. 4; do you see that?

61

1      A.  Yes.
2      Q.  Okay, so it's a request for some pretty
3  specific documentation and a response to that
4  document you provided only the complaint for
5  protection from abuse that you filed against Ms.
6  Radfar; do you see that, correct?
7      A.  Yes.
8      Q.  And so going back up, you see that we
9  asked for any and all 209A or 258E orders, no
10  trespass orders, cease-and-desist orders, contempt
11  of court complaints, notices to quit, eviction,
12  default, indictments, summonses, target letters, or
13  supported allegations of neglect or abuse issued
14  against or naming you.
15      Did you provide any documents other than
16  that restraining order that you filed against Ms.
17  Radfar?
18      A.  No.
19      Q.  So I'm going to direct your attention to
20  Exhibit 6.  You see where I am?
21      A.  Yes.
22      Q.  What's that?
23      A.  It's a complaint for contempt.
24      Q.  And you were served with that; weren't
25  you?



62

1    A.  Yes.
2    Q.  And are there any other complaints for
3  contempt, notices to quit, evictions, defaults, no
4  trespass orders, 258E or 209A orders that you --
5  that would respond to that request for documents?
6    A.  No, and that was pulled, this complaint.
7    Q.  When you say that was pulled, what do you
8  mean by that?
9    A.  That the attorney for the complainant
10  pulled the complaint because it had no basis.  It -
11  - she had received that money already.
12    Q.  I see, so -- so it wasn't that it was
13  dismissed by agreement six months later?
14    A.  No.
15    Q.  Okay.
16    A.  It was -- it was withdrawn.
17    Q.  And so that's why you didn't provide it?
18    A.  Correct.
19    MS. CLAGUE:  Well, you know what?  I'm
20  trying to control this.  Forgetting -- can you --
21  and I apologize, can you tilt down to the bottom of
22  the complaint?  Okay.
23  BY MS. CLAGUE:
24    Q.  So you see the date on that is June 4th
25  of 2020?  But again, you just decided not to

63

1  provide it because you say it was pulled; is that
2  right?
3    A.  Well, first of all, I completely forgot
4  about it, forgot it even existed, and yes, if I had
5  remembered it, I wouldn't consider that what you're
6  asking for because it never went forward -- there
7  was no appearance, there was no anything.
8    Q.  It wasn't -- it wasn't -- it wasn't
9  dismissed?
10    A.  I called her attorney the day I got that,
11  and said, "She has this."  She looked into it and
12  said, "Okay, I'll pull it.  Thanks."
13    Q.  You signed a stipulation of dismissal of
14  that complaint; didn't you?
15    A.  Probably.  If --
16    Q.  Okay, and in Exhibit 3, Page -- Page 9?
17  Response to Interrogatory No. -- No. 9; do you see
18  that?
19    A.  Yes.
20    Q.  Okay, and these are the interrogatories
21  that you signed under pain and penalties of
22  perjury.  You answer -- you mention two cases in
23  response --
24    A.  Yes.
25    Q.  -- to that interrogatory.

64

1    A.  Yes.
2    Q.  And you did not include Docket No.
3  ES17D1524DR in the Probate and Family Court; did
4  you?
5    A.  No.
6    Q.  What's the status of that case today?
7    MR. ANDERSON:  His divorce case?
8    THE DEPONENT:  My divorce?
9  BY MS. CLAGUE:
10    Q.  That's right.
11    A.  I'm divorced.
12    Q.  Okay, and -- and that's a civil action;
13  is it not?
14    MR. ANDERSON:  It's a probate action.
15    THE DEPONENT:  It's probated, isn't it?
16    MS. CLAGUE:  Okay.
17  BY MS. CLAGUE:
18    Q.  Are you suggesting that probate isn't it
19  a court?  Is that -- I mean --
20    A.  I'm not an attorney.
21    Q.  Okay, so did -- did you ever contemplate
22  listing that?
23    A.  No.
24    Q.  Okay, so a couple of things.
25    MS. CLAGUE:  I have no further questions.

65

1  Do you have any questions, counsel?
2    MR. ANDERSON:  I do have a couple of
3  quick questions, just to --
4    MS. CLAGUE:  Sure.
5    MR. ANDERSON:  Elizabeth, this was -- I
6  don't know which exhibit number it was.  The
7  Virginia Police investigation?  It was Page No. 11.
8  It was offered at the other -- around 11:22 today,
9  you asked a question to my client about text
10  messages that he had sent to the plaintiff?
11    MS. CLAGUE:  Right.
12    MR. ANDERSON:  And I just want to have
13  him clarify something.  This is an entry with
14  Special Agent Kinnard.  The date of this entry is
15  March 27, 2017.  I'm just going to read two
16  sentences here.
17    MS. CLAGUE:  Sure.  Is there any way we
18  could get a screenshot of it?  Or --
19    MR. ANDERSON:  I don't know how I would -
20  -
21    MS. CLAGUE:  Is this -- let me ask you
22  this:  Is it something that you've provided?
23    MR. ANDERSON:  Yes, it was used as an
24  exhibit at the Ganley and --
25    MS. CLAGUE:  Oh, okay, sure.



66

1    MR. ANDERSON: -- Cohen (phonetic)
2 deposition.
3    MS. CLAGUE: All right, that's fine.
4    MR. ANDERSON: It's a Virginia State
5 document.
6    MS. CLAGUE: Yep. And it was an exhibit
7 --
8    MR. ANDERSON: Yes.
9    MS. CLAGUE: I just want to ascertain
10 that it's something we have a copy of. That's all.
11    MR. ANDERSON: And this, just to give you
12 the context, this is when he's talking about the
13 case notes were delivered to assistant commonwealth
14 attorney Alex Rueda, which for the record, R-u-e-d-
15 a and halfway through this paragraph, slightly
16 above the middle of the page it says, "Analysis of
17 the suspect's phone records show:
18        Suspect called the victim at least 575
19 times over the affected period, and at least 162
20 times since, that we can prove that the victim said,
21 quote "Don't call me anymore," end quote.
22        And then in parenthesis (see text message
23 from March 12th, 2016). And then this is the
24 sentence I want to ask him about.
25 EXAMINATION

67

1 BY MR. ANDERSON:
2    Q.  The victim called the suspect at least
3 256 times and 32 times since he told him stop
4 calling him.
5    MS. CLAGUE: Thanks for clarifying the
6 numbers, counsel.
7    MR. ANDERSON: Okay.
8    MS. CLAGUE: I appreciate it.
9 BY MR. ANDERSON:
10    Q.  So this indicates that you contacted the
11 plaintiff in this case 32 times after you had told
12 her not to contact you.
13        In what context would you call her after
14 you told her not to call you?
15    A.  So every one of those calls was made
16 through duress and threat and she would either call
17 or text and she would repeatedly just blow up my
18 phone, leave a message, call me back, call me back,
19 call -- and while I was trying to work, and she
20 would say, "Just call me back. I want to talk to
21 you. Give me two minutes, and then I will never
22 call you again."
23        So I would call her, give her the benefit
24 of the doubt, try to quell the situation. It
25 always went horrible.

68

1    I had to hang up on her and every single
2 time was in response to her begging or saying, "If
3 you don't call me, I'm going to do," something
4 threatening or bad.
5    Q.  And you were asked, I believe, by
6 Attorney Clague, how you found out about that
7 number, and you said from your lawyer. Fair to say
8 it was when we obtained these documents from the
9 Virginia State Police?
10    A.  Correct. It was when I read this
11 document, that you got from --
12    Q.  Okay, and did you learn from the Virginia
13 State Police records that they felt that it was
14 inappropriate to charge Ms. Radfar in Virginia, but
15 they thought the proper jurisdiction would have
16 been Massachusetts?
17    A.  That is correct.
18    MS. CLAGUE: Objection. Go ahead and
19 answer.
20 BY MR. ANDERSON:
21    Q.  Did you ever take any steps to have Ms.
22 Radfar prosecuted in any court in Massachusetts?
23    A.  No, I never wanted to do that.
24    Q.  Did you ever talk to Det. Kephart about
25 bringing any charges against her in Revere, Lynn or

69

1 in Massachusetts?
2    A.  No.
3    MR. ANDERSON: I don't have any
4 questions.
5    MS. CLAGUE: Okay. Can we talk next week
6 or can you just like shoot me an email next week
7 about the supplementation of those documents?
8    MR. ANDERSON: I can look to see again if
9 that document that he believes was expunged from
10 his folder is there.
11    MS. CLAGUE: And also just to ensure the
12 other --
13    MR. ANDERSON: Oh, the documents that
14 were on the thumb drive that were sent?
15    MS. CLAGUE: Yes.
16    THE DEPONENT: I'll check. I'll check my
17 computer at home as well.
18    MS. CLAGUE: And just cross reference
19 them with what you've provided with your initial
20 disclosures and whatever time it takes to have you
21 do that.
22    MR. ANDERSON: There's a large number
23 that was produced.
24    MS. CLAGUE: No, I know. I've got them.
25 I just want to make sure that they're complete and



26

1        THE REPORTER:  I just want to make sure -
2 -
3        THE DEPONENT:  I sit quite still.
4        THE REPORTER:  Gotcha.
5 BY MS. CLAGUE:
6    Q.  Now, I'm going to direct you back to the
7 fourth page of the exhibit, a text at 11:29 in the
8 morning, January 26th of 2017; do you see that?
9        And it's up on the screen, too.
10    A.  Yes, I have it.
11    Q.  And you can see that's the little bubble
12 there, if I can -- for lack of a better word.  It
13 is -- the small point of it is in the same
14 direction as the other texts that you have
15 identified as you having sent to the lieutenant;
16 correct?
17    A.  Correct.
18    Q.  And in fact, this is a text that you also
19 sent to Lt. Ganley as well; isn't it?
20    A.  Yes.
21    Q.  Okay, and there you say you're gonna
22 write it up on -- while you're working on your
23 midnight to 8 shift; right?
24    A.  Yes.
25    Q.  All right, three pages beyond that, that

27

1 page.  Do you see where we are?
2    A.  Yes.
3    Q.  All right.
4        MS. CLAGUE:  And again, my apologies to
5 everybody for not Bates stamping this.
6        THE DEPONENT:  No worries.
7 BY MS. CLAGUE:
8    Q.  Now, you're asking the lieutenant here
9 about a police report that you're writing; aren't
10 you?
11    A.  Yes.
12    Q.  Okay, and that was sometime before the
13 26th; correct?
14    A.  I don't know.
15    Q.  Okay, well, I'm sorry.  Sometime after --
16 sometime between the 26th and the 29th, based on
17 the earlier testimony and that's my fault.  I
18 misspoke.
19    A.  Okay.
20    Q.  So sometime between the 26th and the 29th
21 you're talking about this police report; correct?
22    A.  That's fair to say, yes.
23    Q.  Okay, now I'm going to direct your
24 attention back to Exhibit -- I'm going to --
25 actually, it's going to be the first time we've

28

1 looked at it, to Exhibit 2.
2        MS. CLAGUE:  Thank you very much, Ryan.
3 I'm sorry.
4 BY MS. CLAGUE:
5    Q.  Are you there?
6    A.  Yes, ready when you are.
7    Q.  Okay, so this is the report, the police
8 report that you were talking about dated January
9 29th of 2017; correct?
10    A.  Yes.
11    Q.  Okay, and this is the police report that
12 you started talking -- or texting with Lt. Ganley
13 about -- as early as the 26th of January according
14 to what we've just reviewed; isn't that right?
15    A.  Correct.
16    Q.  Now, there's no reference in this report
17 that you were discussing the preparation of this
18 report with a colleague of the defendant in the
19 restraining order case; is there?
20    A.  No.
21    Q.  Now, I'm going to direct your attention
22 to Exhibit 5.
23    A.  I'm sorry.  Real quick.  There is a
24 reference that I did contact her superior officers
25 in the report.

29

1    Q.  There's a reference that you contacted
2 them.
3    A.  Okay.
4    Q.  That's not what the question was, but I -
5 - but -- so noted.  I'm not going to ask that that
6 be struck.  That's fair enough.
7        So now --
8    Q.  Okay, Exhibit 5, you said?  I'm sorry.
9    A.  That's right, Exhibit 5.
10    Q.  Okay.
11    Q.  Do you recall sending this text message
12 to Lt. Ganley?
13    A.  Yes.
14    Q.  Okay, tell me about your communication
15 with Lt. Ganley at this time regarding Ms. Radfar.
16 Did you talk to him on the telephone as well?
17    A.  No.
18    Q.  Did you send him any emails?
19    A.  No.
20    Q.  Did you send him any documents?
21    A.  No.
22    Q.  Did you do that in the summer of 2017
23 within a couple of months after this?
24    A.  Well, it looks like it was sent May 14th.
25 I don't know if that's summer or not, but late



30

1 spring.
2     Q.  But I'm asking you generally about your
3 communication with him before we get to these
4 specific text messages.
5     Do you recall talking to him in the fall
6 of 2017?
7     A.  I don't -- off the top of my head, I
8 don't -- I don't remember.
9     Q.  Have you reviewed Lt. Ganley's deposition
10 in this matter?
11     A.  I was present when he -- when it was
12 taken.
13     Q.  Okay.
14     A.  I don't believe I reviewed --
15     Q.  But have you reviewed the transcript?
16 No?
17     A.  No.
18     Q.  Okay, did Lt. Ganley tell you that Ms.
19 Radfar would likely commit suicide?
20     A.  Yes.  No, I'm sorry.  He was concerned
21 that she may possibly commit suicide.
22     Q.  When did he tell you that?
23     A.  It was after she was served the
24 restraining order, because I -- he at -- he told me
25 that she was served.  It was -- he said he was

31

1 concerned.
2     He had extra people there, and I -- I'm
3 sure I asked why, and he said that a lot of people
4 felt that she might -- I'm paraphrasing, "Go out
5 with a bang," or, "Come out shooting," or possibly
6 commit suicide.
7     Q.  And he told you this after she was served
8 with the restraining order.
9     A.  Correct.
10     Q.  Okay, and also at that time she was
11 served with a cease-and-desist letter; you're aware
12 of that, right?
13     A.  No, not that I remember.
14     Q.  You don't recall collaborating or talking
15 with Lt. Ganley about things that ought to go in
16 the cease-and-desist letter?
17     A.  It's not my function or policy.  Its
18 purpose to worry about what she's doing at work.
19 No, I -- my only concern was having her stay away
20 from me.  That was it.  And actually -- I want her
21 to keep her job and both Lt. Ganley and I wanted to
22 get her help.
23     In fact, that's why I discussed the
24 police report with him to say, it's, like, I don't
25 want to hammer her and it clearly says it in those

32

1 text messages.  Can it be just enough that doesn't
2 get her in trouble, that it gets her some help.
3     Q.  I had let you go on, because I don't want
4 to interrupt you, cause that --
5     A.  Thank you.
6     Q.  -- would be rude.  However, you didn't
7 answer my question.  My question is simply this:
8 What is your memory of any conversation that you
9 had with Lt. Ganley about what ought to go into the
10 cease-and-desist letter?  And by conversation, I
11 mean any contact at all.
12     A.  My memory is exhausted on any of that.
13     Q.  All right.  Lt. Ganley testified that you
14 told him there was going to be or was issued
15 another restraining order against Ms. Radfar by
16 another Massachusetts police officer.  Are you
17 surprised that that was his testimony?
18     MR. ANDERSON:  Objection.
19 BY MS. CLAGUE:
20     A.  Yes, I was.
21     Q.  Okay, did you know that before I asked
22 you about it?
23     A.  I heard him say that.
24     Q.  Okay.
25     A.  I was in this office when he took -- the

33

1 deposition was taken.
2     Q.  And you were surprised.
3     A.  I was surprised because that's not what
4 happened.
5     Q.  So going back to Exhibit 5, if we could
6 put that back up on the screen?
7     A.  I'm ready.
8     Q.  That's another text to Lt. Ganley;
9 correct?  In fact --
10     This is the same one we were just looking
11 at, yes.
12     Q.  Yes, okay.  And prior to your sending
13 this text, do you know when the -- approximately,
14 when the last time was you'd had any communication
15 with him?
16     A.  With Lt. Ganley, I -- I'm assuming it
17 would have been --
18     MR. ANDERSON:  You don't want to assume.
19 BY MS. CLAGUE:
20     A.  I'm pretty sure it was just after the --
21 he talked to me about the restraining order.
22     Q.  And so he talked to you about the
23 restraining order.
24     A.  He said it was served.
25     Q.  Mm-hmm.



34

```
1      A.   And I think the -- I think the only other
2   time we talked was -- and I might have it wrong as
3   far as timeline goes, but we discussed -- he talked
4   about that they -- it was an investigation open on
5   their end and I would probably be getting, most
6   likely be getting a call from the Virginia State
7   Police.
8      Q.   Okay, well you knew about that prior to
9   the restraining order; didn't you, sir?
10     A.   No.  One hundred percent no.
11     Q.   Okay, so you hadn't heard from Det.
12  Kinnard or heard from Lt. Ganley about any Virginia
13  State Police investigation before you got the
14  restraining order?  Is that your testimony?
15     A.   That's correct.
16     Q.   Okay.
17     A.   I don't know why they would tell me that.
18     Q.   Okay, and then you at some point, did you
19  talk to Lt. Ganley when the determination was made
20  not to criminally charge Ms. Radfar?
21     A.   If I remember correctly, there was a
22  conversation that they weren't going to go ahead
23  and I -- honestly, I don't remember who that was
24  from?
25          It most likely was from Lt. Ganley.  The
```

36

```
1      Q.   -- to this text message.  It was before
2   this, wasn't it?
3      A.   I don't know.
4      Q.   Okay, well --
5      A.   Actually, I can see asking if she's back
6   to duty, so clearly I had no idea what was going
7   on.
8      Q.   Again, focusing on that text message that
9   you sent.  Are you --
10     A.   Just the top one?
11     Q.   That's right.  Correct.  When you sent
12  that text message, did you know that she was not
13  going to be charged criminally?
14     A.   I had no idea.
15     Q.   Okay, when you sent that text message,
16  there -- you did not have a restraining order
17  against her; did you?
18     A.   There was not an active restraining order
19  against her; correct.
20     Q.   Okay.
21     A.   By me.
22     Q.   All right, and looking at that text
23  message, fair to say -- fair to describe that is
24  you kind of reaching out to Lt. Ganley out of the
25  blue?
```

35

```
1   only two people I've -- I've spoken to down there
2   was Lt. Ganley and Special Agent Kinnard.  I had
3   never spoken to anybody else.
4          I want to say it was Lt. Ganley who
5   called and said that they're not going forward with
6   it, and they were still trying to get her help.
7      Q.   I see.  And did he ask you for anything
8   in connection with this trying to get her help?
9      A.   I don't believe he did.  No.
10     Q.   Okay, now let's look at this -- and by
11  the way, when was the determination, approximately.
12  I don't need the exact day, but if you know, when
13  was the decision made that she wouldn't be charged
14  with a crime?
15     A.   Oh, I have no idea.
16     Q.   Okay, when did you find out about it,
17  approximately?
18     A.   I -- it was sometime between the time of
19  the restraining order was issued and probably the -
20  - actually, I can't say.  I just -- I don't --
21  sometime in 2017 he just sent me a call and said,
22  they're not going forward.  They're just going to
23  try and get her help and she was refusing the help.
24     Q.   Okay, so again, let's go back --
25     A.   Yes.
```

37

```
1      A.   That's fair to say, yeah.
2      Q.   Okay, and you were in Virginia; weren't
3   you?
4      A.   D.C.  Washington, D.C.
5      Q.   And so the event that you saw Ms. Radfar
6   at, that you describe in that and the next text
7   message was in D.C.; correct?
8      A.   Correct, at Police Week.
9      Q.   And if we can just kind of scroll down a
10  little bit on that text -- there we go.
11          You see here, description of the folks
12  that she was with?
13     A.   Yes.
14     Q.   Okay, and I notice that you don't -- have
15  any description of the race of the thin guy.
16  What's the reason for that?
17     A.   No reason.  It's just how -- if you're
18  going to describe two people, I think those are
19  pretty good descriptions.
20     Q.   Okay.
21     A.   A rednecky guy kind of puts a certain
22  person into context; doesn't it?  Almost like an
23  Asian woman.
24     Q.   I'm going to ask you to move over to the
25  next page.  Now, in his responses to these text
```



38

1   messages that you sent, did Lt. Ganley give you
2   information about Ms. Radfar's work status?
3       A.  I don't see them.  I can --
4       Q.  I'm asking --
5       A.  Clearly I'm asking.
6       Q.  I'm asking for your memory.
7       A.  Oh, I don't remember that.  No.
8       Q.  Okay, and do you remember if he -- if he
9   joined you in the LMFAO, meaning, laughing my
10  blankety-blank A off?  Did he join you in that
11  jovial approach?
12      A.  I don't recall.  Ma'am, I don't know if
13  you've ever experienced Police Week, but not
14  everyone is as sober as they can be, so --
15      Q.  Are you saying you weren't sober at this
16  time?
17      A.  I have no idea.  There's a lot of
18  ballyhoo going on, a lot of -- a lot of brothers
19  and sisters, for lack of a better word, ball
20  busting each other and there is definitely a lot of
21  drinking going on down at Police Week, yes.
22      Q.  Okay, so you see the next -- the bottom
23  text message that you sent on that page, "No
24  worries at all brother.  Just letting you know
25  called it correctly."  What's your memory of what

39

1   that's referring to?
2       MR. ANDERSON:  It's up on the screen.
3       THE DEPONENT:  Oh, okay.
4   BY MS. CLAGUE:
5       A.  If I remember correctly, when I
6   originally contacted him, I had said that it pains
7   me greatly to make this phone call.  It's the last
8   thing in the world I want to do, but I need to make
9   a complaint about one of your officers.
10      Q.  Okay, let's -- I'm going to stop you
11  right there and ask you when that was?  Your first
12  contact --
13      A.  That was -- that was my initial
14  conversation back after I asked Ms. Radfar, asked,
15  begged, demanded several times for her to stop
16  calling me, or I was going to contact her
17  department and ask for some assistance there, and
18  after her very negative responses --
19      Q.  And that's a detailed memory that you
20  have, sir.  I'm asking you when you did it.
21      A.  It was in -- I believe it was in late
22  2016, sometime.
23      Q.  Okay, all right.
24      A.  So when I -- when he heard what I was
25  saying, his response was, it was somewhat of a

40

1   sigh.  Like a -- and he said, "Can you tell me her
2   name."
3       And my response was, "Well, Lieutenant,
4   her name is Sharon Radfar, but by your response, it
5   tells me that this isn't the first time you've
6   heard a conversation like this."  And he said, "It
7   wasn't the first time.  It wasn't the second time.
8   It wasn't the fifth time."
9       And I said, "Well, how does it stop?  How
10  do I -- how do we get her to stop?  How do I get
11  her to stop?"  And he said, "There's really nothing
12  that you can do until she just latches onto the
13  next guy, because that's what she's been doing down
14  here."
15      And the "just letting you know you called
16  it correctly," knowing me, was probably a snide
17  comment at the guy that she was with at Police
18  Week.
19      Because she hadn't contacted me.  She
20  seemed to be with another gentleman, so that would
21  be the "calling it correctly," text.
22      Q.  Okay, now you hadn't heard from her;
23  isn't that right?  By this time, you hadn't heard
24  from her since before the restraining order
25  entered; is that right?

41

1       A.  Right around the time of the restraining
2   order, yes.
3       Q.  And you've already described the contact
4   that you've had with Det. Kinnard, some of the
5   contact you've had with Det. Kinnard and Lt.
6   Ganley; correct?
7       A.  Correct.
8       Q.  Okay, so why were you so curious about
9   whether she was back to duty in the middle of May
10  of 2017?
11      A.  Just a -- just a general question, like,
12  hey, maybe she got the help that she needs.  She's
13  in therapy.  She's moved on.  It's just a general
14  concern for another human being.
15      Q.  Let's -- let's go to the next page if we
16  could.  Okay, and again it's that -- looks like
17  that same day, the 17th, "Oooh, okay, then.  She
18  going to resign?"
19      A.  Yep.
20      Q.  Is that that same concern?
21      A.  Yes, that's a -- that's a concern.
22      Q.  Okay.
23      A.  If -- if the job -- if the job is one of
24  your stressors or gives you a certain -- gives
25  somebody PTSD, or whatever it is, this job's not



2

1              APPEARANCES BY VIDEOCONFERENCE
2
3   Appearing on behalf of the Plaintiff,
4   SHARON RADFAR:
5   ELIZABETH CLAGUE, ESQUIRE
6   Clague Law Offices
7   The Franklin Building, 1106 Main Street
8   Brockton, MA  02301
9   (508) 587-1191
10   attyeclague@gmail.com
11
12   Appearing on behalf of the Defendants:
13   Joseph Covino et al
14   KENNETH H. ANDERSON, ESQUIRE
15   Anderson Goldman Tobin & Pasciucco
16   50 Redfield Street
17   Boston, MA  02122
18   (617) 265-3900
19   (617) 265-3627 (Fax)
20   kanderson@andersongoldman.com
21
22   ALSO PRESENT:
23   Tom Hazelhurst, Videoconference Technician
24
25

4

1
2   9     Virginia State Police Activity       44
3         Report
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1                 INDEX
2                             Page
3
4   EXAMINATION BY MS. CLAGUE           6
5
6   EXAMINATION BY MR. ANDERSON              67
7
8
9                 EXHIBITS
10   Exhibit                     Page
11
12   3     Covinos Answers to Plaintiffs       8
13         First Set of Interrogatories
14
15   4     Text Messages Jan 24 2017       22
16
17   2     Revere Police Incident Report     28
18
19   5     Text Messages May 14 2017       28
20
21   6     Complaint for Contempt       61
22
23   7     Email Re Voice Mails       13
24
25   8     Text Message 10 54 AM       43

5

1        REMOTE DEPOSITION BY VIDEOCONFERENCE
2                 JOSEPH COVINO
3            TUESDAY, MARCH 22, 2022
4               10:59 A.M.
5
6        THE REPORTER:  Mr. Covino, will you
7   please raise your right hand.
8        Do you affirm under penalty of perjury
9   that you are Joseph Covino, and that the testimony
10   you're about to give will be the truth, the whole
11   truth and nothing but the truth?
12        THE DEPONENT:  Yes, sir.
13        THE REPORTER:  You may proceed.
14        MS. CLAGUE:  Thank you.  And as to just a
15   couple of brief preliminary matters.  The reading
16   and signing of an errata sheet for the deposition,
17   I'd like to get that done as soon as we can.  Could
18   you do that within 30 days, counsel?
19        MR. ANDERSON:  That's fine.  Yes.
20        MS. CLAGUE:  Okay, so reading and
21   signing, we won't require the presence of a notary
22   for the reading and signing of the deposition.
23   He'll review the transcript and provide that signed
24   errata sheet within 30 days.
25   JOSEPH COVINO, having been first duly sworn, was



6

1 examined, and testified as follows:
2 EXAMINATION
3 BY MS. CLAGUE:
4    Q.  Mr. Covino, as to a couple of other
5 preliminary matters, have you been deposed before?
6    A.  Yes.
7    Q.  And have you taken any medications or
8 substances that would interfere with your ability
9 to accurately describe, understand questions, or
10 remember answers to questions within the last 24
11 hours?
12    A.  No.
13    Q.  For purposes of this deposition, you may
14 hear your attorney object to a question.  You're
15 still expected to answer that question, unless you
16 are specifically instructed by him not to answer.
17    MS. CLAGUE:  Counsel, we stipulated that
18 all objections would be preserved with the
19 exception of objections to the form of the
20 questions; is that acceptable to you?
21    MR. ANDERSON:  Yes.
22    MS. CLAGUE:  Okay.
23 BY MS. CLAGUE:
24    Q.  And what that means, Mr. Covino, is that
25 as I indicated, when he objects to a question, I

7

1 expect to hear him object, unless you hear an
2 instruction not to answer, you're expected to
3 answer the question.
4    I'm never interested in anything that you
5 and -- by way of an answer, anything that you and
6 your lawyer has discussed that's protected by the
7 attorney/client privilege, but as far as anything
8 else is concerned, you would be expected to answer
9 the questions.
10    And if you don't understand a question,
11 please let me know before answering.  You --
12 obviously, you can take a break whenever you want
13 to.  All I ask is that you don't take a break while
14 there's a question pending.
15    So then just answer the question, and
16 again, I don't need to know why.  If you want to
17 talk to your lawyer or if you want to take lunch,
18 hopefully we won't be here long enough to require a
19 lunch break.
20    We'll do what we can to get this
21 completed as quickly as possible.  Do you have any
22 questions for me?
23    A.  No.
24    Q.  Okay, and in addition, let's try our best
25 not to be speaking at the same time.  I'll try my

8

1 best not to step on any answers to your questions
2 with a follow-up and wait until you complete the
3 question -- the answer, rather.  I would ask you
4 also to grant me the opportunity to finish asking a
5 question before you begin the answer to it.
6    This helps the reporter get all of the --
7 get everything that we're saying without trying to
8 transcribe things that people are saying at the
9 same time; understood?
10    A.  Yes.
11    Q.  Okay, did you bring any documents with
12 you today, Mr. Covino?
13    A.  No.
14    Q.  Mr. Covino, you responded to some written
15 discovery earlier in this case; did you not?
16    A.  Yes.
17    Q.  And by discovery, you understand that to
18 mean you provided this office with some answers to
19 interrogatories as well as responses to requests
20 for production of documents; did you not?
21    A.  Yes.
22    Q.  Okay, and I'm going to direct your
23 attention and I'm going to ask you to bring up on
24 the screen Exhibit 3, Page 2.  I'm sorry, page --
25 yeah, Page 2.  There it is.

9

1    Do you recognize that document that's up
2 on the screen, and hopefully you have a hard copy
3 you're looking at as well?
4    A.  Yes, I do have a hard copy.  The pages
5 aren't numbered, but I do have the correct one that
6 you have.
7    Q.  Okay.
8    A.  It is the second page, with the exception
9 of the Exhibit 3 cover page.
10    Q.  Right, right.  And I was saying to the
11 technician that I wished I'd Bates stamped these.
12 It's just that there are -- for most of them, there
13 are so few pages, but looking at them this morning,
14 so I apologize for not Bates stamping them in
15 advance.
16    I'm going to direct your -- well, can you
17 tell me, these are the answers to interrogatories
18 that you provided; is that correct?  Or at least
19 Page 1 of those answers?
20    A.  That is correct.
21    Q.  And as you look through Page 1 through
22 Page 8 of this, Page 8 -- I'm sorry, Page 10 of
23 this, Page 10 includes your signature on the --
24 dated the 29th of November of 2021; is that right?
25    A.  That is correct.



10

1    Q.   And that signature is under pain and
2  penalties of perjury; correct?
3    A.   That is correct.
4    Q.   And that includes the dates that you
5  signed that, November 29th of 2021; correct?
6    A.   Yes.
7    Q.   All right, so I'm going to direct you, if
8  I could, to -- back to Page 9, Interrogatory Answer
9  No. 5. Do you see where I am?
10   A.   One second. Yes.
11   Q.   Okay, and so in responding to
12  Interrogatory No. 5, you included both spoken and
13  electronic conversations when you said you had
14  between two and four conversations with Lt. Ganley
15  as well as a few email conversations; correct?
16   A.   That is incorrect.
17   Q.   Okay, well I'm reading the answer and it
18  says, "To the best of my memory, I had between two
19  and four conversations with Lt. David Ganley as
20  well as a few email conversations." Am I reading
21  that incorrectly?
22   A.   No, that's not what you asked me. You
23  asked me if -- I'm sorry, the way I understood your
24  question was, did I have two and four telephonic
25  and email conversations combined. If that's not

11

1  what you're asking, then I apologize.
2    Q.   I'm just asking if I'm correct about what
3  your answer was?
4    A.   My answer as written is correct, but you
5  did not ask that.
6    Q.   Okay, I'm sorry if I --
7    A.   If you could read the question, that
8  would be great.
9    Q.   Okay.
10   A.   To avoid any confusion.
11   Q.   Well, again, we can -- we can go back to
12  the court reporter, if you want to. I was just
13  trying to get at the answer.
14        If I misspoke, I apologize for that, but
15  so the answer is, to the best of your memory, you'd
16  had between four -- two and four conversations with
17  Lt. David Ganley as well as a few email
18  conversations; do I have that right?
19   A.   That is correct.
20   Q.   All right. And in fact, in response to
21  the request for the production of documents, which
22  is also part of this exhibit, you included some
23  email conversations or emails that you exchanged
24  with Lt. Ganley as well as Investigator Kinnard; is
25  that right?

12

1    A.   Yes.
2    Q.   Okay, also you included quite a few text
3  messages that you had received from the plaintiff
4  in this case in answer to No. 1 in the responses to
5  request for production; did you not?
6    A.   Yes.
7    Q.   Okay, and so I'm going to direct your
8  attention now, on Exhibit 3, to the 11th page of
9  that, and that would be the first page of your
10  responses to request for production; do you see
11  that?
12   A.   Yes.
13   Q.   Okay, and it was a general question
14  looking for all of the documents or things referred
15  to or consulted by you in preparation of your
16  answers to interrogatories, and you listed them as
17  the screenshots of the text messages from the
18  plaintiff and emails between yourself and George
19  Mason University, Lt. David Ganley and Virginia
20  State Police Special Agent Kinnard; correct?
21   A.   Yes.
22   Q.   And that's the entirety of the documents
23  that you provided in response to the requests for
24  production; is it not?
25        MR. ANDERSON:  Objection. Betsy, I'm

13

1  just -- they also talk about documents that were
2  produced in the defendants' initial disclosures.
3        MS. CLAGUE:  Understood.
4        MR. ANDERSON:  Okay.
5  BY MS. CLAGUE:
6    Q.   You can answer the question.
7    A.   Yes.
8    Q.   And in fact, in that package, you
9  included as part of Response No. 2, documents that
10  you described as being part of or being what you
11  provided in response to the initial disclosures;
12  correct?
13   A.   Yes.
14   Q.   Okay, and so I -- if we turn now to the -
15  - to Exhibit 7, Page 1 of Exhibit 7.
16        Now, if you -- do you see where we are?
17   A.   Yes, ma'am.
18   Q.   Now, if you go to the bottom of the page,
19  you'll notice that that's Page 3.
20   A.   Yes.
21   Q.   And the second -- the following page is
22  Page 2 and the third page is -- I'm sorry, is Page
23  2 and the third page is Page 1; do you see that?
24   A.   Yes.
25   Q.   And do you understand that to be the



14

```
 1  backwards chronological order of the emails that
 2  were provided?  So in other words, let me ask the
 3  question a better way.
 4        So if you go to the first page, which is
 5  Page 3, do you see that the bottom of that page is
 6  an email from you dated February 1st; do you see
 7  that?
 8     A.  The bottom of Page 1?  I have one that
 9  says Monday, February 27th at the bottom of the
10  page.
11        MR. ANDERSON:  On Page 3.
12        THE DEPONENT:  Oh, Page 3.  I'm sorry.
13  BY MS. CLAGUE:
14     A.  Yes, February 1st, Page 3.
15     Q.  Okay, does it give you -- if you tilt up
16  that or look at the email from Det. Kinnard, you
17  see that's dated February 3rd; correct?
18     A.  Yes.
19     Q.  And --
20     A.  I -- actually, I don't know.  Is it
21  February 3rd or March 2nd?
22     Q.  Well, you said the bottom one was
23  February 1st.
24     A.  Oh, if we could go to Page 2, I just --
25  the question is answered because it says 2/17,
```

15

```
 1  2/27, so --
 2     Q.  Okay.  So you --
 3     A.  Yes, okay.
 4     Q.  Okay, so the date that you received the
 5  response according to these emails that you
 6  provided in response to your request for production
 7  of documents was February 3rd; right?
 8     A.  Yes.
 9     Q.  And then if you go to the next page,
10  which is Page No. 2, you're back -- and again,
11  going back to the bottom of it, you see an email
12  from you on February 3rd; correct?
13     A.  Correct.
14     Q.  And fair to say that was your response
15  just after noontime to Lt. Kinnard's or Det.
16  Kinnard's email of February 3rd in the morning
17  relative to your text messages?
18     A.  February 3rd -- okay, where it says,
19  "I'll contact Verizon today and give it a go."?
20     Q.  That's right.
21     A.  Yeah, just -- just so we're clear on
22  these, these were not the actual email strings that
23  -- they were put together in order by me.  So I may
24  have messed up some of the dates.
25     Q.  Well, but certainly you can see the date
```

16

```
 1  of the email; correct?
 2     A.  Yes, yes, yes.
 3     Q.  Okay, all right.  And so if we go to the
 4  top of that page, you see an email from Lt. Kinnard
 5  in response dated February 27th; do you see that?
 6     A.  Yes.
 7     Q.  And do you see, in that email, he's
 8  asking you, "Have you obtained your own phone
 9  records?"  You see that; right?
10     A.  Yes.
11     Q.  And then if we go to the next page, and
12  again, the bottom and that February 27th email that
13  you sent at 11:00 in response to his email earlier
14  that morning answers his questions with regard to
15  the fact that Ms. Radfar had had no contact with
16  you since issuance of the restraining order; you
17  see that, correct?
18     A.  Yes.
19     Q.  And you see also that you say you're
20  getting passed around and told they can't do
21  anything over a month old unless it's subpoenaed.
22  You were told you could go to a Verizon store and
23  they could do it, but you're getting mixed results;
24  you see that?
25     A.  Yes, that's from the Verizon store.  Not
```

17

```
 1  any law enforcement agency.
 2     Q.  Sure.
 3     A.  Yeah.
 4     Q.  And this is with regard, again, to your
 5  text messages, the messages on your phone; correct?
 6  And the use of your phone?
 7     A.  Correct.
 8     Q.  Okay, so at that time, you didn't have
 9  any additional text message to give him; did you?
10     A.  I believe he was looking for any and all
11  --
12     Q.  Okay -- going back to before I had
13  started to save them, so he wanted to go -- I think
14  he wanted to go back, at least that's my
15  understanding -- that he wanted to go back and get
16  all of the records that he possibly could.
17        Well, Mr. Covino, I think -- I don't
18  disagree.  The fact is, you had provided Lt. Ganley
19  a manila envelope, a package, as well as forwarded
20  via email all kinds of text messages that you had
21  received on your phone; correct?
22     A.  That is incorrect.
23     Q.  That's not correct?
24     A.  I have -- I never gave Lt. Ganley a
25  manila envelope.  That was sent to Sgt. -- Det.
```



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
1:20-cv-10178-IT

SHARON RADFAR )
      Plaintiff )
)
V. )
)
)
)          **NOTICE OF DEPOSITION**
)
CITY OF REVERE, and )
BRIAN M. ARRIGO, )
    MAYOR; and )
JAMES GUIDO, )
    CHIEF OF POLICE; and )
SERGEANT JOSEPH I.COVINO; and )
OTHER AS YET UNNAMED )
OFFICERS OF THE )
REVERE POLICE DEPARTMENT; )
INDIVIDUALLY AND IN THEIR )
OFFICIAL CAPACITIES AS MAYOR )
CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
      Defendants )
)

## TO ALL COUNSEL OF RECORD:

    **Please take notice,** that pursuant to the applicable provisions of the Federal Rules of Civil Procedure, the deposition upon oral examination of a defendant, **Joseph I. Covino,** will take place on **Tuesday, March 22nd, 2022 at 11:00 A.M.** via video conference before a notary public or other officer authorized to administer oaths in accordance with the laws of the Commonwealth of Massachusetts. The deposition will continue from day to day until completed. You are invited to attend and cross-examine.

    You are further required to bring with you:
      1. Any and all restraining or harassment orders issued against you by any court; and
      2. Any notice of the initiation and outcome of police department disciplinary proceedings naming you.

1

Respectfully submitted,
Sharon Radfar
By her attorney:

s/Elizabeth M. Clague
Plaintiff's Attorney
Elizabeth M. Clague
Attorney for the Plaintiff
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508) 587-1191
BBO# 632341


## CERTIFICATE OF SERVICE

I, Elizabeth M. Clague, Counsel for the Plaintiff, hereby
certify that I have caused this document to
be served upon all Defendants by mailing postage prepaid to their
counsel of record.

Kenneth H. Anderson, Esq.
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122

March 3, 2022

s/RS

2

266

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SHARON RADFER

        Plaintiff

    v                                                    Civil Action No
                                                          cv        IT
CITY OF REVERE  et al

        Defendants

_____


        BEFORE THE HONORABLE INDIRA TALWANI DISTRICT JUDGE


                 STATUS VIDEOCONFERENCE


                    Friday   May
                              p m






John J Moakley United States Courthouse
Courtroom No
One Courthouse Way
 Boston  Massachusetts


Robert W Paschal  RMR  CRR
Official Court Reporter
rwp reporter gmail com

O  behalf of the Plai tiff

    TTORNE   T L W
       ELI   ET M  CL  UE
      Mai  Street
  Suite
  rockto   M

  eclague ms  com


O  behalf of the Defe da t Joseph I  Covi o

    NDERSON   OLDM N  TO IN   P SCIUCCO  LLP
      KENNET   NDERSON
   Redfield Street
  osto   M

  ka derso  a derso goldma  com


O  behalf of No part   eorge Maso  U iversit  Police
Departme t

    ECKERT SE M NS C ERIN   MELLOTT  LLC
     NIC OL S J  SC NEIDER
   I ter atio al Place
  Suite
  osto   M

  sch eider eckertseama s com

I  ope  court at      p m

T E DEPUT  CLERK   U ited States District Court is

ow i  sessio  the  o orable Judge I dira Talwa i presidi g

This is Case Number    cv      Radfar v  Covi o

et al   Will cou sel please ide tif  themselves for the

record

MS  CL  UE    ood after oo    our  o or   Eli abeth

Clague represe ti g the plai tiff  Sharo  Radfar

T E COURT    ood after oo

MR   NDERSON    ood after oo   Judge    ttor e

Ke  eth  derso  for Joseph Covi o

T E COURT    ood after oo

MR  SC NEIDER    ood after oo    our  o or   Nick

Sch eider for  o part  eorge Maso  U iversit  Police

Departme t

T E COURT    ood after oo

So this is a status co fere ce   I k ow there are

some pe di g motio s  but let s start with the status

co fere ce  The fact discover   other tha  the outsta di g

motio s to compel fact discover   is complete  correct?

MS  CL  UE  With the e ceptio  Judge  of the

wit ess who has bee  u available    d I had i dicated at a

earlier status co fere ce that  rather tha  tr i g to keep

discover  ope   if she becomes available  I ll separatel

move the Court for leave to depose her

That s a wit ess that I ve bee  tr i g to depose si ce Ja uar  a d lear ed i  March that  i  fact  she s bee out of commissio  due to a head i jur  because of a automobile accide t   That s  othi g a  bod  s had a co trol over   So if I ca  make a determi atio  that she becomes available  the  I ll move the Court for leave to depose her   It s  ot somethi g that I would e pect would take a  awful lot of time

ive  the posture of the evide ce i  the case  I I  eed some i formatio  from her or some further i formatio but I also would be seeki g leave for good cause to either ame d the complai t or have the Court reco sider its dismissal of the mu icipal defe da ts based o  the state of the evide ce right  ow

T E COURT   Oka    So I thi k m    the a swer is right  ow  fact discover  is closed  other tha  the pe di g motio s a d that  ou re a ticipati g that  ou might  eed to bri g a motio ?

MS  CL UE   That s   that s right    d I m sorr to get so wi d  about it

T E COURT   Oka    So u der our curre t schedule the parties had e pert wit ess desig atio s a d depositio s a d subseque t to that  dispositive motio s  correct?

MS  CL UE    es  Judge  I thi k  if I m  ot

mistake   dispositive motio s are scheduled for later this

summer   I had i dicated that I did  t e pect to be

desig ati g it  a   e perts  a d  i  fact  I m  ot

desig ati g a   e perts

        T E COURT   Oka    So plai tiff is  ot desig ati g

a  e perts   Is defe da t desig ati g a  e perts?

        MR   NDERSON   I thi k it s highl  u likel   Judge

It s just the last da  or so I ve bee  thi ki g about

possibl   like  a retired judge just to e plai  how

restrai i g orders are issued i  Massachusetts    ut I

have  t made a decisio  o  that    d I thi k it s

Ju e  rd is the deadli e to do that    oh  that s e pert

disclosure b  Jul   st  is it?

        T E COURT   So what I   what I t picall  ask at

the e d of fact discover  status co fere ce is whether the

either part  a ticipates a dispositive motio

        MR   NDERSON   I do a ticipate o e  Judge

        T E COURT   Does the dispositive motio  that  ou

a ticipate bri gi g require e pert discover ?

        MR   NDERSON   Most likel   ot

        T E COURT   Does the dispositive motio  that

defe da t a ticipates bri gi g require a respo se from

plai tiff with e pert discover ?

        MS  CL  UE   No  Judge

        T E COURT   Oka    The reaso  I ask the questio  is

271

that if  ou have a dispositive motio  that does  t  eed

e pert discover   the  I would suggest we switch the order

arou d a d do dispositive motio s first   If  ou do  t  if

 ou thi k  ou wa t to do  our    eed  our e pert for  our

dispositive motio   I wo  t move it arou d

            ut i  light of plai tiff  ot pla  i g to have a

e pert  I would move  our date up a mo th   It does  t seem

to    ot a mo th  but I guess move it up a bit   There s  o

reaso   ot to have a  e pert a mo th from  ow  is there?

         MR   NDERSON   If possible  Judge  I would prefer

to keep it as it is   I just  eed to make that decisio  with

m  clie t  a d he s out of state right  ow

         T E COURT   Oka    So defe da ts  trial e pert will

be desig ated b  Jul  st a d deposed b   ugust  th  a d

dispositive motio s are due b  October   th

         MS  CL  UE   Judge  I hate to i terrupt  but a

slight caveat here   I k ow I ve bee  sa i g o e pert   o

e pert  o pla s for a  e pert   Obviousl  if the defe da t

is goi g to call a  e pert  I m goi g to have to be thi ki g

about whether I would cou ter with a  e pert

         T E COURT   Well   ou have the burde  of proof  a d

so I

         MS  CL  UE   Right

         T E COURT   The wa  the scheduli g order is set  I

have    the plai tiff s e pert desig atio s are due

Ju e   th

      MS  CL  UE    Right

      T E COURT   So  ou re sa i g  ou wa t to have leave to file a rebuttal  to desig ate a rebuttal e pert  eve though  ou have  t desig ated a  ope i g e pert?

      MS  CL  UE    That s right

      T E COURT   Let me ask this questio  for defe se cou sel  Ca  ou just ma be help me u dersta d what  ou would  eed a  e pert wit ess for o  a motio  for summar judgme t here?

      MR   NDERSON   The e pert I m thi ki g about would be  ou k ow  a retired judge who has ha dled hu dreds or thousa ds of restrai i g orders i  the Commo wealth district courts that could e plai  the process for how the  re ha dli g them  what the  view  a d the likelihood of a restrai i g order bei g issued a d ki d of the thought process behi d that   It s probabl  more releva t for a jur tha  for

      T E COURT   Right   So I m tr i g to figure out wh  ou  eed that for me

      MR   NDERSON   I just    I just thought it might be helpful to the Court   I filed a motio  i itiall    I thi k I filed a   b    motio  with m  a swer  a d I guess it just did  t   m  se se is the Court did  t have a lot of familiarit  with how the district courts  the state district

courts  fu ctio  i  terms of restrai i g orders bei g issued

        T E COURT   So  ou re looki g to somethi g  ot

simpl   This is the rules  a d this is how it works   but to

sa    Well  as a matter of course  the judges just ki d of

like  let people off here a d the look the other wa  here

or     I m tr i g to figure out what it is  ou re tr i g

to   tr i g to get at

        MR   NDERSON   Just that whe  the  re prese ted

with a certai  set of facts  that ki d of the routi e refle

would be to issue the order for a te  da  date a d the  get

the parties together a d the  actuall  have a heari g o  it

o e    two sided heari g o  it

        T E COURT    ep

        MR   NDERSON     d that s what happe ed here  so

what    just ki d of a  eutral judge  how the  would view the

fact patter  i  this case

        T E COURT   Oka    To the e te t that  ou  eed

somebod  to tell me what the practice is i  district court

feel free to spe d  our mo e  o  it   I do  t thi k that I

te d to   i m  course of decisio  maki g  I do t    I m

 ot sure I ve reall  ever had someo e wa t to tell me

  ere s a other judge sitti g here telli g  ou how  ou should

be looki g at it

        So I thi k  ou re probabl  better off  if  ou wa t

to tell me about how these thi gs are do e  if  ou wa t to

poi t to treatises or practical guides or so forth    I m  ot

sure havi g a judge telli g me how I should be decidi g m

case is goi g to be particularl  helpful

       MR  NDERSON    d the wa    I did  t mea    the

wa  it came across  I did  t mea  to sou d co      I

u dersta d what  ou re sa i g  Judge

       T E COURT   Oka    Well I suppose if    it

certai l  was  t somethi g that I would have a ticipated a

e pert o   a d so I m  ot surprised plai tiff did  t

a ticipate a  e pert o  it   If  our e pert is desig ated b

Jul  st I   if plai tiff co te ds that the   eed a  e pert

as well  I m goi g to have  ou respo d right awa  a d let me

k ow that  ou   eed that

        d if  ou    if  ou are pla  i g to have a

e pert   ou would  eed to have that desig ated    well

either wa    Let s just add this date  which is that a

rebuttal e pert shall be desig ated b  ugust  st  a d both

e perts shall be deposed b   ugust   th

       MS  CL  UE    Judge  I m wo deri g if there s a

wa  we could have some ki d of a  *h*    a al sis i

adva ce of plai tiff desig ati g a rebuttal

       T E COURT   I m sorr   havi g what a al sis?

       MS  CL  UE   Some ki d of a qualificatio s a al sis

prior to

       T E COURT   I m goi g out o  a limb here to eve

give  ou a rebuttal    ou did  t    this    to some e te t

 ormall    ou would be havi g  our e pert    It s o l  because

the  re  ow putti g o e where we did  t e pect o e  ou re

goi g to have a rebuttal   I m  ot reall  sure I wa t to

prolo g this a   lo ger tha  we alread  have set up  so  o

 ugust  st  The  have o e   ou have  ugust  st to desig ate

a  e pert i  respo se    d dispositive motio s due  ugust

sorr     October   th

          Let me tur  quickl  to the motio s to compel  a d

let me start with the third part  o e si ce right  ow

third part  havi g to sit here through all of this

          So  Ms  Clague   ou have a motio  to file a repl

brief  but the subjects that  ou did  t me tio  that  ou

wa ted to talk about is what we re doi g i  this court for

this motio    I do  t have jurisdictio  to compel him to do

a  thi g

          MS  CL UE   I thi k the proper    f a al sis

   f  does  t require motio  practice i  order for this Court

to make a determi atio  that tra sfer i  this i sta ce is

appropriate  especiall  where

          T E COURT   The motio  gets made there   e does  t

have a   obligatio  to show up here   It s a jurisdictio

issue

          MS  CL UE   U derstood  Judge

          T E COURT   I mea   poi t me to where i  a rule  ou

ca  bri g a third part  i to the proceedi g here

MS  CL UE  Well  I mea  the advisor  committee
 otes to    f       list the  umber of factors that I thi k
are importa t here   This Court has alread  decided a d
de ied m  motio  to quash a virtuall  ide tical subpoe a  a d
so m  clie t s private i formatio  was disclosed

 d i  fact  this is wh  the third part  goes   ou
k ow  fairl

T E COURT  I have to just follow a rule here    d
I have a rule here which sa s that for a third part
subpoe a  the  have to   a motio  to compel should be filed
i  the court where the  re e pected to appear  which is the
Court  ear where the  are

MS  CL UE   le a dria

T E COURT  I do t u dersta d how  ou re bri gi g
him up here   It s a differe t thi g whe  somebod  s aski g
 ou to respo d   ou re the part  here a d it s i  fro t of
me  ut wh  do  ou get to   wh  is this i  fro t of me
i stead of i  the district where the  re located?

MS  CL UE  Well  agai  because our  o or
alread  e forced a subpoe a agai st them i  earlier
proceedi gs here

T E COURT  Well  the   ma be I probabl  should  t
have do e that  Wh  did I e force a subpoe a agai st them?
Ma be there was  o objectio  to it  a d I did t reali e it

MS  CL  UE   The  wa ted

T E COURT   The  did  t object to it  the  just

MS  CL  UE   No  the  wa ted to provide the docume t with regard to m  clie t   The  just do  t wa t to provide this o e docume t

T E COURT  Oka     ut

MS  CL  UE   The equities  Judge  stro gl  favor tra sfer to this Court

T E COURT   That ma  be so  but  ou make that pitch to the judge there to tra sfer it to me   I m  ot sa i g that it should  t be here  but I m just sa i g  as a practical matter  if the  re asserti g that the  should  t be here  I do  t see how I have authorit  u der the rules to sa  the  re here

MS  CL  UE   Well  the  waived that  Judge

T E COURT    ow?

MS  CL  UE   The

T E COURT    ow is that waived?  It s i  their oppositio

MS  CL  UE   It s i  their oppositio   but it was  t i  a  of our discussio s   It was  t i  a  of our co fere ces    d if  ou look at the attached depositio tra script attached to m  motio    ou ca  see that cou sel for  eorge Maso  agreed to the accepta ce of the subpoe a

T E COURT  So I m  ot    I m  ot ruli g i  their

favor based o  their sa i g the  did  t get a subpoe a     d
I do  t u dersta d them to have argued the  did  t get a
subpoe a   To have received a subpoe a does  t a swer the
questio  of where the docume ts  eed to be delivered a d what
court has jurisdictio  over it

        The wa     I mea   there was a time back i  the da
that  ou a d I will remember where the subpoe a had to issue
from that court

        MS  CL  UE   Right

        T E COURT   We do  t have to go through that
a  more  The subpoe a ca  issue u der the headi g here   ut
o  ce it issues  the retur  is still withi  that district
  d I do  t u dersta d how I    how I have jurisdictio  here

        MS  CL  UE   gai  it s the tra sfer a al sis
u der Rule   f  a d this

        T E COURT   ut who does that tra sfer a al sis?
Me or the judge who the  file i  fro t of?

        MS  CL  UE   Well  the  filed i  fro t of  ou

        T E COURT   No   ou filed i  fro t of me

        MS  CL  UE   I filed i  fro t of  ou  The
opposed   u derstood Judge    ut  ou ca  do the Rule   f
tra sfer a al sis without    without a motio  filed i  the
court i  le a dria  That s what the advisor  committee
  otes sa    That s what the cases sa

        Judge  a subpoe a is presumed to be reaso able

The recipie t bears the burde  of establishi g

u reaso able ess   We re  ot talki g about    we re talki g

about o e docume t that as soo  as cou sel agreed to accept

the subpoe a  he was able to pull this report a d review it

 d the  said to me

        T E COURT     d the  decided  ot to    a d there s

 othi g that s    there was  othi g i  the depositio  that

waived his right to provide the docume t    e said he would

accept the subpoe a a d he d look at it    e got the

subpoe a  a d he looked at it

        To the e te t he s argui g that service of the

subpoe a b  email was  t oka   that does  t move me    e

agreed to accept the subpoe a    ut to the e te t that he s

sa i g  I do  t wa t to give  ou this docume t   I do  t

thi k he waived that

        MS  CL UE   So m  clie t has to retai  cou sel

dow  i  Virgi ia to get e forceme t of a subpoe a i  this

i  this actio  i  Massachusetts  It     ou k ow  with regard

to    it does seem to be u fair a d a  u fair burde  o  m

clie t where these argume ts  ever came up i  our

co versatio  with each other   If the  did  we could have

made arra geme ts to do what we    cou sel is  ow claimi g we

 eed to do

        T E COURT   Mr  Sch eider  did  ou wa t to respo d?

        MR  SC NEIDER   Sure  our o or  happ  to

Regardi g the waiver issue  our  o or poi ted out the depositio  tra script that plai tiff relies o  U iversit  cou sel simpl  said  We will look at the subpoe a happil  a d respo d to it i  tur   which we have do e  We ve  oted our positio  i  our oppositio  regardi g the procedural deficie cies a d substa tive deficie cies of the motio  to compel a d the u derl i g subpoe a

our  o or has  oted Rule   is clear o  the motio  procedure to compel discover  from out of state wit esses which  eorge Maso  is  The proper procedure  as  our  o or has  oted  is to go through the court where the depo e t sits  That would be the Easter  District of Virgi ia i  this case    d as  our  o or  oted from our oppositio   that procedural deficie c  is o e of a lau dr  list of other procedural deficie cies that plai tiff ig ored i  fili g her motio

T E COURT   eah I   I mea   it s   I see this as ma dator  la guage     a        motio  for a  order to part  must be made i  the court where the actio  is pe di g   motio  for a  order to a  o part  must be made i  the court where the discover  is or will be taki g place   That s Rule

d the    f  that  ou keep poi ti g me to sa s whe  the Court where complia ce is required did  ot issue the subpoe a   i  other words i  this circumsta ce   if this

had bee  brought dow  there  it ma  tra sfer a motio  u der

this rule to the issui g court if it fi ds e ceptio al

circumsta ces

d   ou k ow  certai l   this ca  be tra sferred

up here   ut I thi k it s    I see this sort of as a

jurisdictio al issue   ou re hauli g out of state people

i to court    d while we re able to do this curre tl  b

 oom  that s  ot a special rule that cha ges the rules of

civil procedure   That s just a co ve ie ce that we have

here

I    I thi k that s   I do t   I do t see    I

do t see that I have authorit  to compel a  thi g

MS  CL  UE  O e fi al attempt to persuade  ou

Judge   The third part  submitted himself to the jurisdictio

of this Court b  sitti g for a depositio   b  providi g m

clie t s co fide tial docume ts whe  this Court de ied m

motio  to compel   I m sorr   de ied m  motio  to quash

also provided other docume ts to me i  respo se to a

ide tical subpoe a that cou sel sa s he has so ma   problems

with  a d provided a  thi g defe se cou sel i  this case

wa ted i  respo se to his ide tical  virtuall  ide tical

subpoe a that was fa ed a d emailed dow  there

So I would suggest that he has submitted himself to

the jurisdictio  of this Court pursua t to a Rule    f

a al sis

T E COURT   I ca  u dersta d  our frustratio  about that     d I k ow that  as a litigator  I have bee  i  the positio  where  ou are doi g somethi g  a d people are doi g thi gs volu taril      d  ou thi k to  ourself   Well the  re doi g it volu taril   I do  t  eed to go through that formal court process     d the problem is  eve  there  i  that depositio   if he had  t a swered a questio    ou would be    ou would  t have the authorit  to do a  thi g without   e cept there  versus here

I do  t thi k there s authorit  for the  otio  that he has submitted to m  jurisdictio    I thi k what  ou have is he has agreed to discover  up to some poi t  but to the e te t that  ou re looki g for a court to order him to do somethi g or order the u iversit  to do somethi g  I do  t have    I do  t see how I have authorit

 d the   I guess  fi all    I mea   I m a little bit loath to touch the merits of the dispute where I m fi di g I do  t have jurisdictio   but I do  t see how the outcome actuall  would be differe t o  the merits where this is perso  el records u related to  our clie t or the people i  this dispute as set forth here

MS  CL  UE   Well  Judge  si ce  ou are getti g to the merits  as the third part  has  the  have characteri ed these records  this o e report  e tirel  differe tl  tha  the wit ess who actuall  wrote the report characteri ed it  where

he said it was a co sulti g report havi g to do with    a d

it had recomme datio s  a d it talked about the fact that

there were too ma   cliques a d there were other problems

withi  the departme t

Now  all of a sudde   it s about o e officer a d

that o e officer s discipli e    d the  re ver

T E COURT  Oka   I do t   I do t k ow   ut

it s  our obligatio  whe   ou file a motio  to give me some

basis for wh  I am supposed to fi d that this falls withi

 our discover    d  basicall   what  ou ve said to me here

with  our motio  is simpl   The  agreed to give it to me  so

the  should give it to me

 d I look there  a d that s  ot what was said i

the tra script   The  said  Se d us a subpoe a  a d we ll

look at it   That s all the  said

MS  CL UE  Oka   I did t mea  to suggest that

the  said the  would give it to me   What I have suggested is

their argume t was alwa s substa tive

T E COURT   ut  our argume t was  ero    there was

 o argume t there   ou have give  me  o e pla atio

whatsoever as to wh  this docume t matters to a  thi g here

MS  CL UE   ecause   well  it has to

certai l  has to do with the credibilit  of the wit ess   It

has to do

T E COURT   I do t k ow that    ow am I supposed

to k ow that?

       MS  CL  UE    ecause the wit ess is the o e bei g deposed  because the tra script i dicates

       T E COURT   I do t    ou have  o argume t i  our    ou filed a motio  to compel aski g me to issue a order  a d  ou have give  me  othi g about the dispute    ou have t    I mea   I u dersta d that    I k ow the big picture of the dispute   I have  o idea what this report or these people are about   I do t k ow  a d  ou have t give it to me

        d the  respo d a d sa   well  here s a  argume t for wh  this has  othi g to do with a  thi g  a d  ou re  ow aski g for leave to file a repl    ut i  the first i sta ce that s  our obligatio

       MS  CL  UE   Judge  I m sorr  that I was  t clear to the Court about the fact that    that the depositio tra script a d his testimo   about the report that I submitted i  support of the motio  was

       T E COURT   Eve  there  I mea   are  ou reall e pecti g a judge   I mea  o  this o e  it s a short o e  I thi k   ma be it s the other o e    I mea   to sort of sa   ere s m  argume t   I have    pages of a depositio tra script  ou should read a d figure out wh  it is I wa t this ?

       MS  CL  UE   Well  Judge  that s   that s  ot what

I submitted  but I u dersta d  our    I u dersta d what

 ou re sa i g   our  o or

        T E COURT   Oka    So I am  ot getti g to    I m

just    I guess I m sig alli g that I m  ot sure that this

would be a valuable motio  had it bee  filed elsewhere   ut

I m  ot goi g to decide that o  the merits   I am de i g

 our motio  to compel because  ou are i  the wro g    ou are

i  the wro g forum here   I m decidi g it o  that grou ds   I

do  t have jurisdictio  to do a  thi g here   So

        MS  CL UE   U derstood  Judge

        T E COURT   Mr  Sch eider  a  thi g more o  that?

        MR  SC NEIDER   No   our  o or   Tha k  ou for the

opportu it  to be heard   I appreciate it

        T E COURT   Oka     d the  the last issue is the

motio  to compel  a d I  eed to actuall  leave i  a mi ute

a d a half  but the motio  to compel the defe da t to provide

some docume ts

        Mr   derso   I u dersta d the gist of  our papers

to be that  ou do  t thi k he has a  thi g else?

        MR   NDERSON   That s correct

        T E COURT   So  our problem here is that the

respo se that has bee  give    a d I see people doi g this

a d it makes it    it makes it frustrati g to tr  to figure

out   If someo e sa s to  ou    ive me all of pile X   a d

 ou respo d a d sa    I m givi g  ou sheets     a d C   it

could be that that s all of pile X  a d it might be that it s

 ot all of pile X     d what  ou re  ow sa i g is what  ou

gave i  respo se to those four i terrogatories was ever thi g

he has  but  ou re sa i g that i  a memo form

        So I thi k if that is  i  fact  factuall  the case

I thi k  ou do  eed to file a suppleme tal respo se to the

request for productio  of docume ts i  which  ou sa  e actl

that  if that is  i  fact  the case  right?

        It sa s the requests are    ou k ow  give a   a d

all docume ts  da  da  da  a d the a swer is all docume ts

are produced or were produced as part of the i itial

disclosures   I thi k that s what  ou re tr i g to sa  here

        MR    NDERSON   That s right     d I re se t the

docume ts twice

        T E COURT  Oka     ut m  poi t is  ot the

docume ts   M  poi t is the form of the docume ts     d

 ou re all goi g to get off this call a d thi k I m the most

formalistic perso   but it all works a whole lot better if we

follow the forms

        So  ou have a request i  a docume t form that sa s

 I wa t all of these docume ts     d I believe  our a swer

is   I ve give   ou all of these docume ts   a d that should

be i  the respo se  so it should be a  ame ded respo se that

sa s the doc     the defe da ts has produced all respo sive

docume ts as part of the i itial disclosures or whe ever it

is  ou gave it to them   ut  ou  eed to affirmativel  make a

stateme t so that whe   ou get to trial  if there are some

other docume ts that miraculousl  show up  the  ca  sa     ou

should have give  it to me earlier

Otherwise   ou re goi g to sa    Well  I told  ou

what I gave  ou  a d  ou did  t move to compel a  thi g

more   So  ou  eed to be    the a swer has to match what

 ou re sa i g i   our papers if that s  i  fact  the case

MR   NDERSON  Oka    I ca  do that for the first

respo se that had the e mails a d

T E COURT   What about the seco d respo se?

MR   NDERSON  I m  ot sure    I do  t k ow which

o e    o e pertai ed to somethi g from m  clie t s perso  el

file that has bee  purged from his perso  el file  like  te

 ears ago  so that does  t  ist  I have a law er    a

letter from his law er at the time   It was i  agreeme t that

it would be removed a  ear after the i  cide t

T E COURT   It s a real simple    it s a real

simple questio   Does the docume t e  ist or does it  ot

e ist? Not does it have legal    if it does  t e  ist  the

 ou should have a respo se from him sa i g   I ve give   ou

ever thi g  a d the thi g  ou re requesti g does  t e ist

MR   NDERSON  Oka

T E COURT   ut the problem is what  ou ve said i

each of these a swers  if  ou ve said   I ve give   ou

somethi g  but  ou have  t bee  clear i  the a swer itself

I thi k the o l  o e  ou did  a   a d all discipli ar   otice

 ou had received that are i   our possessio    ou ve

a swered   No e    So that o e I thi k    that o e s three

 ou ma  be fi e

         ut the o e that asked about the te t messages  or

whatever  each of these that    there were four that she

poi ted to    d I u derstood the gist of  our paper to be

 our oppositio  to be   I ve give  her what I have     d if

that s the case  the  that should be i  ame ded respo ses

         MR   NDERSON   Oka    I mea   I could do that  if

that s    o problem there   We ll do that

         T E COURT   Oka    Ms  Clague  a  thi g else?

         MS  CL  UE   Nothi g  Judge

         T E COURT   Oka    Mr   derso  a  thi g else?

         MR   NDERSON   Nothi g else  Judge

          ave a  ice weeke d  ever bod

         T E COURT   Oka     d I     ou ve bee  to

mediatio  alread   or  ou have  t?

         MS  CL  UE   No  we have  t

         T E COURT   Do  ou wa t a referral to mediatio ?

         MR   NDERSON   No  Judge

         T E COURT   Oka    The   I will see  ou    I ll see

 our papers o  the motio  for summar  judgme t   I thi k

that s the  e t thi g  ou have due with me     d let s get a

date   Let s have  our ame ded respo se to the request for productio  of docume ts i  a week   I do  t thi k there s a reaso  to dela  it be o d that  so o  the   th    d that s  ot fili g  that s servi g it

O  the motio s for summar  judgme t  I have revised m  sta di g order o  motio  practice   Please take a look at it   What I m tr i g to do is that    ECF allows li ki g of docume ts  So if  ou cite it correctl  a d  ou do it i  the right order  I ca  read what  ou re givi g me  a d the  I ca  click o  the li k  a d the  I ca  read the material  ou re wa ti g me to look at to support it   I ve tried to la  it out i  m  ame ded sta di g order o  motio s  a d I direct  ou to look at that carefull

MS  CL UE   Tha ks  Judge  for the heads up    I appreciate that

So  ou have  ot made the determi atio  that  ou re goi g to switch the order for summar  judgme t as opposed to vis à vis

T E COURT   No  because Mr   derso  sa s he s goi g to have a  e pert  a d he might  eed to use it with his summar  judgme t motio   So I m leavi g it as it is

MS  CL UE   Ver  good  Judge

T E COURT   Oka    Tha k  ou  We are i  recess

Case i  recess at    p m

I  Robert W  Paschal  Registered Merit Reporter a d
Certified Realtime Reporter  i  a d for the U ited States
District Court for the District of Massachusetts  do hereb
certif  that pursua t to Sectio      Title     U ited States
Code  the foregoi g pages are a true a d correct tra script
of the ste ographicall  reported proceedi gs held i  the
above e titled matter a d that the tra script page format is
i  co forma ce with the regulatio s of the Judicial
Co fere ce of the U ited States

Dated this   th da  of March


s  Robert W  Paschal
_____

RO ERT W  P SC  L  RMR  CRR
Official Court Reporter

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

)
SHARON RADFAR                              )
    Plaintiff                          )
                                           )
v.                                         )
                                           )
CITY OF REVERE, and                        )
BRIAN M. ARRIGO, MAYOR; and                )
JAMES GUIDO, CHIEF OF POLICE; and          )
SERGEANT JOSEPH I. COVINO; and             )
OTHER AS YET UNNAMED OFFICERS              )
OF THE REVERE POLICE                       )
DEPARTMENT; INDIVIDUALLY AND               )
IN THEIR OFFICIAL CAPACITIES AS            )
MAYOR, CHIEF OF POLICE AND                 )
POLICE SERGEANT AND OFFICERS               )
OF THE CITY OF REVERE,                     )
    Defendants                         )
                                           )

**DEFENDANT JOSEPH I. COVINO'S MOTION PURSUANT TO LOCAL RULE 7.2 TO
*TEMPORARILY* IMPOUND THE (1) DEFENDANT'S MOTION FOR RELIEF FROM
AND/OR MODIFICATION TO THIS COURT'S FEBRUARY 22, 2022 ORDER
RESTRICTING USE OF PLAINTIFF'S FITNESS-FOR-DUTY EVALUATIONS AND
(2) DEFENDANT JOSEPH I. COVINO'S MOTION AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

Now comes defendant Joseph I. Covino, pursuant to Local Rule 7.2, and hereby moves to

temporarily impound the following three pleadings that the defendant will be filing which

include (1) Defendant's Motion For Relief From and/or Modification to This Court's February

22, 2022 Order Restricting Use Of Plaintiff's Fitness-For-Duty Evaluations; (2) Defendant

Joseph I. Covino's Motion for Summary Judgment with Memorandum Of Law In Support; and

(3) Defendant Joseph I. Covino's Local Rule 56.1 Statement of Material Facts.  As reasons

herefore, these motions contain sensitive medical information related to three Fitness-For-Duty

Evaluations the plaintiff underwent at the request of her then employer, George Mason University Police Department, and consistent with this court's order of February 22, 2022, such information should not be put into the public realm until this court modifies its February 22, 2022 order.

On February 11, 2022 and February 16, 2022, the plaintiff sought to quash subpoenas related to these fitness-for-duty documents.  On February 22, 2022, the court denied the plaintiff's motion for a protective order and her motion to quash, but ruled that "[t]o ensure that the information is not disseminated more broadly than is necessary for resolution of this dispute, the court is directing the parties and their counsel not to disclose the information in the subpoenaed documents pending further order of the court."  As will be set forth in the following motions as well as the Local Rule 56.1 Statement of Material Facts and Memorandum of Law in Support of Motion for Summary Judgment filed by the defendant, this sensitive medical information is relevant, material, and indeed crucial for the defendant's defense of the plaintiff's claims and must be considered by this court in ruling on the defendant's motion for summary judgment.  The defendant's motion for relief from this court's February 20, 2022 order and the defendant's Local Rule 56.1 Statement in support of his motion for summary judgment cite to these Fitness-For-Duty Evaluation reports and the summary judgment motion contains them as exhibits.  In order to comply with this court's February 22, 2022 order, the defendant is moving

that these following pleadings be <u>temporarily</u> impounded until the court issues

clarification on its February 22, 2022 ruling in order to protect the plaintiff's privacy until

clarification is provided.

<div style="margin-left: 40%;">

Respectfully submitted,
Defendant,
Joseph I. Covino,
By his Attorney,

*/s/ Kenneth H. Anderson*
Kenneth H. Anderson, Esq. / B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA  02122
(617) 265-3900
kanderson@andersongoldman.com

</div>

Dated:  October 14, 2022

<div style="text-align: center;">3</div>

## CERTIFICATE OF SERVICE

      I hereby certify that this document, **Defendant Joseph I. Covino's Motion Pursuant To Local Rule 7.2 To _Temporarily_ Impound (1) Defendant's Motion For Relief From And/Or Modification to This Court's February 22, 2022 Order Restricting Use Of Plaintiff's Fitness-For-Duty Evaluations And (2) Defendant Joseph I. Covino's Motion And Memorandum Of Law In Support Of Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 14, 2022.


                                    _/s/ Kenneth H. Anderson, Esq._
                                      Kenneth H. Anderson, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

_____
SHARON RADFAR,                      )
          Plaintiff                 )
                                    )
V.                                  )
                                    )
CITY OF REVERE,and                  )
BRIAN M. ARRIGO,                    )
     MAYOR; and                     )
JAMES GUIDO,                        )
     CHIEF OF POLICE; and           )
SERGEANT JOSEPH I.COVINO; and )      **OPPOSITION TO MOTION TO**
OTHER AS YET UNNAMED                )  **TEMPORARILY IMPOUND DEFENSE**
OFFICERS OF THE                     )  **MOTION FOR RELIEF FROM**
REVERE POLICE DEPARTMENT;           )  **ORDER OF FEBRUARY 22, 2022**
INDIVIDUALLY AND IN THEIR           )  **AND MOTION AND MEMORANDUM**
OFFICIAL CAPACITIES AS MAYOR )        **FOR SUMMARY JUDGMENT**
CHIEF OF POLICE AND                 )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE,              )
          Defendants                )
_____)

## **Introduction and Prior Proceedings**

Defendant sought and obtained Plaintiff's assent to enlarge the time for filing his Motion for Summary Judgment without any hint of an intention to file other Motions, then without conferring with counsel or any notice at all filed at the enlarged deadline only a Motion to Temporarily Impound his putative Motion for Relief from February 22, 2022 Order and

1

296

Motion and Memorandum for Summary Judgment. Before Plaintiff was able to respond the Court stayed the deadline for Defendant's Motion for Summary Judgment and also ordered Defense counsel to comply with the obligation to confer with undersigned counsel; further the court gave undersigned counsel until October 25, 2022 to oppose Defendant's Motion.

To allow Defendant's Motion would deny Plaintiff's due process interests by placing her in the untenable position of being forced to choose between improper use in this proceeding and public disclosure of highly personal, confidential and privileged legal and allegedly medical information that has been manipulated and mis-characterized in order to cause her maximum humiliation and pursuit of her legal interests guaranteed by the constitution where Defendant can not establish even threshold admissibility of the material and further where he has persisted in abuse of Plaintiff's discovery rights. For those reasons as well as those within and in the attached affidavit of counsel Defendant's Motion should be denied and instead he should be determined in breach of this Court's discovery order of May 23, 2022 and sanctioned accordingly.

## **Argument**

It is not that Plaintiff objects to an order that

2

protects her privileges and privacy interests the way an impoundment under normal circumstances would, but rather to the attempts by Defense counsel to by chipping away at those protections irretrievably deprive her of her rights; as the "temporary" impoundment of the pleadings and documents would.

Defendant has repeatedly failed and refused to comply with the Federal Rules of Civil Procedure, the Local Rules of the Massachusetts District Court and the Court's (Talwani, J.) orders in this case resulting in the surprise filing of a Motion that fails entirely to comply with the rules including but not limited to his failure and refusal to confer as required by Local Rule 7.1,[1] his continuing failure to provide discovery in violation of not only the Rules but this Court's discovery order of May 23, 2022[2] and his filing a document that does not meet the minimum requisites of motion practice in this court. To Plaintiff these are not mere technical obstacles as each of these violations truncate Plaintiff's rights in the following ways:

---

[1] See Exhibit 2, attached to Plaintiff's accompanying affidavit of counsel, and this court's order of October 18, 2022.

[2] See this Court's Order of May 23, 2022 ECF 53, directing Defendant to serve a supplemental response to Plaintiff's Rule 34 requests by May 27. Defendant's first supplemental response again claimed there were no responsive documents, and only when Plaintiff sought an additional Rule 37 conference did Defendant finally provide some responsive documents on August 15, 2022.

3

To fail and refuse not only to confer with Plaintiff counsel but to give any notice at all he would be ignoring the deadline for his summary judgment motion and instead filing a motion for temporary impoundment is an obvious deprivation of a meaningful opportunity to be heard on the question of whether the documents, which would ultimately become public under Defense counsel's request, have any legitimate place at all in the matters before the court which center on the conduct of a Defendant who claims to have played no role in the controversies between Plaintiff and her non-party former employer.  Though Plaintiff vigorously disputes Defense characterizations of what the documents are and whether they are determinative of anything, it is undisputed they have been characterized as medical documents, they are legal documents, and they are privileged and confidential-yet Defendant's unsupported Motion contemplates their public release by seeking to "temporarily" impound them.

Defense attempts to intimidate Plaintiff by holding these documents over her head like some sword of Damocles come within the context of Defendant's bold abuse of Plaintiff's discovery rights, which should foreclose the availability of this court's consideration of summary judgment in his favor. Defendant not only failed and refused to disclose and provide his multiple text messages to a former supervisor of Plaintiff for months

4

after his alleged one-time outreach to her employer[3], but he wrongly claimed before this court and in response to a court order that he had no responsive documents about his own disciplinary history, finally disclosing them long after the close of discovery in an attempt to interfere with Plaintiff's ability to make use of this very relevant and dispositive information about the Defendant and his conduct.

Local Rule 7.1(b)(1) sets out the requirement that motions must be supported by a separate memorandum of reasons and arguments in support, and factual support must be sourced by affidavit. The single document containing a laundry list of conclusory claims with no affidavit or record support does not cannot meet the requirement of the rule that a movant "shall at the same time file a memorandum of reasons, including citation of supporting authorities, why the motion should be granted. Affidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion." The failure of counsel to comply with this basic requirement compels summary denial of his motion.

---

[3] See Exhibit 3 attached to Plaintiff's affidavit, deposition testimony of Joey Covino about text messages he sent to George Mason University Lt. Ganley disclosed not by him but by GMU.

## **Conclusion**

For the reasons stated herein and within the attached supporting documents this Court should deny Defendant's motion, preclude the use of the highly prejudicial documents sought to ultimately be used and disclosed by Defendant as they are not relevant or admissible under any analysis, and consider Plaintiff's request for sanctions for his abuse of her discovery rights in this litigation.

Respectfully submitted,

Sharon Radfar
By her attorney

Dated: October 25, 2022

S/Elizabeth M. Clague

_____
Elizabeth M. Clague
Attorney for the Plaintiff
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508) 587-1191
BBO# 632341

## **CERTIFICATE OF SERVICE**

I, Elizabeth M. Clague, Counsel for the Plaintiff, hereby certify that I have made service of the within document through the ECF-EMF system and further by email to counsel for the Defendant.

6

301

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

```
_____
SHARON RADFAR,                    )
           Plaintiff              )
                                  )
V.                                )
                                  )
CITY OF REVERE,and                )
BRIAN M. ARRIGO,                  )
     MAYOR; and                   )
JAMES GUIDO,                      )
     CHIEF OF POLICE; and         )
SERGEANT JOSEPH I.COVINO; and     )
OTHER AS YET UNNAMED              )
OFFICERS OF THE                   )
REVERE POLICE DEPARTMENT;         )
INDIVIDUALLY AND IN THEIR         )
OFFICIAL CAPACITIES AS MAYOR      )
CHIEF OF POLICE AND               )
POLICE SERGEANT AND OFFICERS      )
OF THE CITY OF REVERE,            )
           Defendants             )
_____  )
```

**AFFIDAVIT OF COUNSEL
SUPPORTING OPPOSITION TO
MOTION TO TEMPORARILY
IMPOUND DEFENDANT'S MOTION
FOR RELIEF FROM FEBRUARY
22,2022 ORDER AND MOTION
AND MEMORANDUM FOR SUMMARY
JUDGMENT**

I, Elizabeth M. Clague, undersigned counsel in the above-entitled matter hereby aver the following statements are true to the best of my knowledge, information and belief and where the within statements rely on information they rely on information I believe to be true:

    1.    Despite my specific request Defense counsel wilfully failed and refused to confer regarding what he indicated was his Motion for Summary Judgment even as I raised his failure to make

1

302

discovery as ordered by the Court on May 23, 2022.
See attached Exhibit 2.

2.    Defense counsel never sought in advance to
confer regarding or even mentioned he would
instead of timely filing his Motion for Summary
Judgment be filing a Motion for Relief from
this court's February 22, 2022 order and to
Temporarily Impound that and his Motion and
Memorandum for Summary Judgment.  Nor when seeking
the enlargement of time for filing I agreed to did
he mention to me or the court his intention to
file anything but his Motion for Summary Judgment.

3. Defendant and defense counsel initially claimed
they did not have custody, control of or access to
any documents regarding Defendant's history of
discipline within his department, initially
claiming there were no such documents, then
finally disclosing their existence and providing
partial documents on August 15, 2022 long after
the close of discovery and in violation of a
specific court order (ECF 53, dated May 23, 2022,
Talwani, J.).See attached Exhibit 1.

4. In his deposition, Defendant testified about
text messages provided not by him in response to
specific interrogatory and Rule 34 requests but
rather by non-party George Mason University, which
were sent by him about Plaintiff to GMU police Lt.
Ganley, in some instances months after he
initially contacted Plaintiff's employer and
despite his repeated representations to the
contrary. Exhibit 3 Deposition Testimony of Joseph
Covino attached.

    Signed this twenty-fifth of October, 2022 under pain

and penalties of perjury.

Dated: October 25, 2022
                              s/Elizabeth M. Clague


                    _____


                              2

303

Respectfully submitted,

Sharon Radfar
By her attorney

Dated: October 25, 2022

s/Elizabeth M. Clague

_____
Elizabeth M. Clague
Attorney for the Plaintiff
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508) 587-1191
BBO# 632341


**CERTIFICATE OF SERVICE**

I, Elizabeth M. Clague, Counsel for the Plaintiff, hereby
certify that I have made service of the within document and
attached Exhibits 1,2 and 3 through the ECF-EMF system and
further by email to counsel for the Defendant.

# Exhibit 1

# Anderson, Goldman, Tobin & Pasciucco, L.L.P.

Attorneys at Law

Kenneth H. Anderson
Eric S. Goldman
Jonathan E. Tobin

Of Counsel:
Peter D. Pasciucco

50 Redfield Street
Boston, Massachusetts 02122

www.AndersonGoldman.com

Telephone: (617) 265-3900
Telefax: (617) 265-3627

November 29, 2021

VIA EMAIL
AND REGULAR MAIL

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA  02301

RE:  Sharon Radfar
     VS:   Sergeant Joseph I. Covino
     United States District Court, Docket No. 1:20-CV-10178-IT
     Our File No. 20-11053

Dear Attorney Clague:

Enclosed please find with respect to the above-captioned matter, Defendant, Sergeant Joseph I. Covino's, Responses to Plaintiff's First Request for Production of Documents and Things Pursuant to F.R.Civ. P. Rule 34.

I have retained the original in my file.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Kenneth H. Anderson

KHA/sas
Enclosure

306

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR
    Plaintiff

v.

CITY OF REVERE, and
BRIAN M. ARRIGO, MAYOR; and
JAMES GUIDO, CHIEF OF POLICE; and
SERGEANT JOSEPH I. COVINO; and
OTHER AS YET UNNAMED OFFICERS
OF THE REVERE POLICE
DEPARTMENT; INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS
MAYOR, CHIEF OF POLICE AND
POLICE SERGEANT AND OFFICERS
OF THE CITY OF REVERE,
    Defendants

## DEFENDANT, SERGEANT JOSEPH I. COVINO'S, RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS PURSUANT TO F.R.CIV.P. RULE 34

The defendant, Sergeant Joseph I. Covino, states that the responses contained herein conform with Rule 34 of the Federal Rules of Civil Procedure.

### REQUEST NO. 1:

Any and all documents and things referred to or consulted by you in your preparation of and responses to interrogatories.

### RESPONSE NO. 1

The defendant produces a series of screen shots of text messages from the plaintiff using various phone numbers, as well as e-mails between himself and George Mason University Lt. David Ganley and Virginia State Police Special Agent Kinnard that were previously produced as defendant's initial disclosures.

REQUEST NO. 2:

Any and all notes, memoranda, reports, letters or correspondence of any kind including electronic, recordings or posts on social media or listserves of any kind regarding, concerning or in any way mentioning the Plaintiff; and additionally your marriage, your relationship with a woman with whom you have child, and any other personal or intimate relationship you have disclosed to or in any way discussed with the other Defendants in any manner.

RESPONSE NO. 2

Please see Response No. 1.

REQUEST NO. 3:

Any and all written City of Revere or Revere Police Department disciplinary notices you have received.

RESPONSE NO. 3

None.

REQUEST NO. 4:

Any and all 209A orders, 258E orders, No Tresspass (sic) Orders, cease and desist orders, contempt of court complaints, or notices to quit, eviction, default, indictments, summonses, target letters, supported allegations of neglect or abuse issued against or naming you.

308

RESPONSE NO. 4

The defendant produces Complaint for Protection From Abuse, Docket No.: 

entitled *Joseph Covino v. Sharon Radjar*.

<div style="margin-left: 40%;">

Respectfully Submitted,
The defendant,
Sergeant Joseph I. Covino,
By his attorney,

Kenneth H. Anderson, Esq. / B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com

</div>

Dated: November 29, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on 11/29/21, I served a copy of Defendant, Sergeant Joseph I. Covino's, Responses To Plaintiff's First Request For Production Of Documents And Things Pursuant To F.R.Civ.P. Rule 34 via email and regular mail upon:

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA  02301

Kenneth H. Anderson, Esq.

310

# Anderson, Goldman, Tobin & Pasciucco, L.L.P.

Attorneys at Law

Kenneth H. Anderson
Eric S. Goldman
Jonathan E. Tobin

Of Counsel:
Peter D. Pasciucco

50 Redfield Street
Boston, Massachusetts 02122

www.AndersonGoldman.com

Telephone: (617) 265-3900
Telefax: (617) 265-3627

May 26, 2022

Via Email: attyeclague@gmail.com
And Regular Mail

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA 02301

RE: Sharon Radfar
  VS: Sergeant Joseph I. Covino
  United States District Court, Docket No. 1:20-CV-10178-IT
  Our File No. 20-11053

Dear Attorney Clague:

  Enclosed please find with respect to the above-captioned matter, Defendant, Sergeant Joseph I. Covino's, Supplemental Responses to Plaintiff's First Request for Production of Documents and Things Pursuant to F.R.Civ. P. Rule 34.

  Should you have any questions, please do not hesitate to contact me.

        Very truly yours,

        Kenneth H. Anderson

KHA/sas
Enclosure

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR
    Plaintiff

v.

CITY OF REVERE, and
BRIAN M. ARRIGO, MAYOR; and
JAMES GUIDO, CHIEF OF POLICE; and
SERGEANT JOSEPH I. COVINO; and
OTHER AS YET UNNAMED OFFICERS
OF THE REVERE POLICE
DEPARTMENT; INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS
MAYOR, CHIEF OF POLICE AND
POLICE SERGEANT AND OFFICERS
OF THE CITY OF REVERE.
    Defendants

## DEFENDANT, SERGEANT JOSEPH I. COVINO'S, SUPPLEMENTAL RESPONSES TO PLAINTIFF'SFIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS PURSUANT TO F.R.CIV.P. RULE 34

The defendant, Sergeant Joseph I. Covino, states that these supplemental responses

contained herein conform with Rule 34 of the Federal Rules of Civil Procedure.

### REQUEST NO. 1

Any and all documents and things referred to or consulted by you in your preparation of and

responses to interrogatories.

### RESPONSE NO. 1

The defendant produces a series of screen shots of text messages from the plaintiff using various

phone numbers, as well as e-mails between himself and George Mason University Lt. David

Ganley and Virginia State Police Special Agent Kinnard that were previously produced as

defendant's initial disclosures.

## SUPPLEMENTAL RESPONSE NO. 1

The defendant previously produced a series of screen shots of text messages from the plaintiff using various phone numbers, as well as e-mails between himself and George Mason University Lt. David Ganley and Virginia State Police Special Agent Kinnard that were previously produced as defendant's initial disclosures. Those documents consisted of all of the responsive documents in the defendant's possession, custody or control.

## REQUEST NO. 2:

Any and all notes, memoranda, reports, letters or correspondence of any kind including electronic, recordings or posts on social media or listserves of any kind regarding, concerning or in any way mentioning the Plaintiff; and additionally your marriage, your relationship with a woman with whom you have child, and any other personal or intimate relationship you have disclosed to or in any way discussed with the other Defendants in any manner.

## RESPONSE NO. 2

Please see Response No. 1.

## REQUEST NO. 3:

Any and all written City of Revere or Revere Police Department disciplinary notices you have received.

## RESPONSE NO. 3

None.

## REQUEST NO. 4:

Any and all 209A orders, 258E orders, No Tresspass (sic) Orders, cease and desist orders, contempt of court complaints, or notices to quit, eviction, default, indictments, summonses, target letters, supported allegations of neglect or abuse issued against or naming you.

313

RESPONSE NO. 4

The defendant produces Complaint for Protection From Abuse, Docket No.: ███████████

entitled *Joseph Covino v. Sharon Radfar.*

SUPPLEMENTAL REPSONSE NO. 4

The defendant is not in possession, custody or control of any further responsive documents. Any

documents related to the defendant's divorce are equally accessible to either party through the

Massachusetts probate court.

Respectfully Submitted,
The defendant,
Sergeant Joseph I. Covino,
By his attorney,

Kenneth H. Anderson, Esq. / B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com

Dated: May 26, 2022

314

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2022, I served a copy of Defendant, Sergeant Joseph I. Covino's, Supplemental Responses To Plaintiff's First Request For Production Of Documents And Things Pursuant To Fed.R.Civ.P. Rule 34 via email and regular mail upon:

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA 02301

Kenneth H. Anderson, Esq.

*Elizabeth M. Clague*

*Attorney At Law*

THE FRANKLIN BUILDING
1106 MAIN STREET
BROCKTON, MASSACHUSETTS 02301

TEL: (508) 587-1191                FAX: (508) 587-0992

ATTYECLAGUE@GMAIL.COM

July 21, 2022

Kenneth H. Anderson, Esq.
Anderson, Goldman, Tobin & Pasciucco, L.L.P.
50 Redfield Street
Boston, MA 02122
RE:    *Radfar v. City of Revere et al*, USDC Docket #1:20-cv-10178-IT
Counsel,

        Last month I received your Supplemental Response to Plaintiff's Request for Production with no further documents provided. The response is inadequate and a continued abuse of my client's discovery rights. It seems when presented with documents your client earlier claimed were non-existent he has now decided to change his answer to "go and get them yourself". At the risk of stating the obvious: We are entitled to *his* disclosure of these documents clearly within *his* custody and control.

        A start would be for him to detail his efforts to obtain the internal affairs documents and assertion that he has not interfered with their disclosure by affidavit.

        I would like to schedule a Rule 37.1 conference on this in the next several weeks. I am undergoing surgery in ten days and will be recuperating a week or two after that, and then I have a previously scheduled and ticketed vacation the first two weeks of September. In the alternative, your client could just provide the further supplementation as described above by or before August 14, 2022. Given my medical and vacation schedule and the possibility you will have summer scheduling challenges as well I suggest we confer or I file a motion to compel compliance with a discovery order in the second half of September.

        As I have earlier indicated to you, we do intend to move to amend the complaint in light of your client's and other deposition testimony to add the municipal defendants dismissed last fall; and further we will be seeking to obtain Chief Rowan's report from George Mason's jurisdiction. Inasmuch as you apparently will not be designating an expert witness we have begun moving on those efforts.

        Thank you for your attention and anticipated cooperation in this matter.

Very truly yours,

Elizabeth M. Clague

# Anderson, Goldman, Tobin & Pasciucco, L.L.P.

Attorneys at Law

Kenneth H. Anderson
Eric S. Goldman
Jonathan E. Tobin

Of Counsel:
Peter D. Pasciucco

50 Redfield Street
Boston, Massachusetts 02122

www.AndersonGoldman.com

Telephone: (617) 265-3900
Telefax: (617) 265-3627

August 15, 2022

Via Email: attyeclague@gmail.com
And Regular Mail

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA 02301

RE:     Sharon Radfar
        VS:     Sergeant Joseph I. Covino
        United States District Court, Docket No. 1:20-CV-10178-IT
        Our File No. 20-11053

Dear Attorney Clague:

Enclosed please find with respect to the above-captioned matter, Defendant, Sergeant Joseph I. Covino's, Second Supplemental Responses to Plaintiff's First Request for Production of Documents and Things Pursuant to Fed.R.Civ. P. Rule 34.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Kenneth H. Anderson

KHA/sas
Enclosure

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR
 Plaintiff

v.

CITY OF REVERE, and
BRIAN M. ARRIGO, MAYOR; and
JAMES GUIDO, CHIEF OF POLICE; and
SERGEANT JOSEPH I. COVINO; and
OTHER AS YET UNNAMED OFFICERS
OF THE REVERE POLICE
DEPARTMENT; INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS
MAYOR, CHIEF OF POLICE AND
POLICE SERGEANT AND OFFICERS
OF THE CITY OF REVERE,
 Defendants

## DEFENDANT, SERGEANT JOSEPH I. COVINO'S, SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS PURSUANT TO FED.R.CIV.P. RULE 34

The defendant, Sergeant Joseph I. Covino, states that these supplemental responses

contained herein conform with Rule 34 of the Federal Rules of Civil Procedure.

REQUEST NO. 3:

Any and all written City of Revere or Revere Police Department disciplinary notices you have

received.

RESPONSE NO. 3

None.

SUPPLEMENTAL RESPONSE NO. 3

The defendant produces the following documents:

318

1. November 6, 20██ letter to Officer Joseph Covino from ████████, Chief, Revere Police Department;

2. November 12, 20██ Memorandum to Chief ████ from Officer Joseph Covino;

3. January █ 20██ letter from ████████, Chief of Police to Officer Joseph Covino;

4. Revere Police Personnel Order No.: P2009-1;

5. May 29, 20██ letter from Attorney Lawrence Christopher to Revere Police Chief ████████

6. June █ 20██ emails between Lawrence Christopher and Chief Reardon;

7. November █ 20██ memorandum from Officer Joseph Covino to Chief ████ appealing suspension; and

8. ████, 2017 letter from Attorney Lawrence Christopher to Chief ████████ following up regarding removal of discipline from Officer Covino's personnel file.

Respectfully Submitted,
The defendant,
Sergeant Joseph I. Covino,
By his attorney,

Kenneth H. Anderson, Esq. / B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com

Dated: August 15, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2022, I served a copy of Defendant, Sergeant Joseph I. Covino's, Second Supplemental Responses To Plaintiff's First Request For Production Of Documents And Things Pursuant To Fed.R.Civ.P. Rule 34 via email and regular mail upon:

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA 02301

Kenneth H. Anderson, Esq.

# Exhibit 2



elizabeth clague <attyeclague@gmail.com>

## Radfar v. Covino -- Local Rule conference

**elizabeth clague** <attyeclague@gmail.com>                                    Thu, Oct 13, 2022 at 12:45 PM
To: Ken Anderson <kanderson@andersongoldman.com>

Ken,

I think it important that we confer in light of your further supplementation which I was able to review a few days ago, but I am not able to do so until tomorrow.

I do not know if the omission was inadvertent, but the police report referenced by the letter to your client in the written notice he received of his violations from the department was not included even though he received that with the letter—I would ask that he provide that forthwith or I will need to file a motion to compel compliance with a discovery order.

Very truly yours,

Elizabeth M. Clague
Attorney At Law
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508)587-1191
Attyeclague@gmail.com
[Quoted text hidden]



elizabeth clague <attyeclague@gmail.com>

## Radfar v. Covino -- Local Rule conference

**Ken Anderson** <kanderson@andersongoldman.com>                              Thu, Oct 13, 2022 at 1:12 PM
To: elizabeth clague <attyeclague@gmail.com>

Elizabeth –

I am hoping to file my motion today as my secretary does not usually work on Fridays.

Is it fair to say that you will not voluntarily dismiss any of your client's claims?

I know that we've had various discussions regarding our divergent views of the claims and each of our client's actions over the past year or two that this case has been ongoing.

I may not be able to get the motion completed and filed today in any event, but if I can, I feel comfortable stating that we have discussed the issues and don't see eye-to-eye on them and that you won't agree to dismiss your client's claims.

Ken

[Quoted text hidden]

22

1    Q. When did you find that out?
2    A. I'm sorry. Could you repeat that?
3    Q. When did you find out that after the
4 search warrant was issued and served and the
5 records were obtained, Det. Kinnard discovered that
6 after you had asked Ms. Radfar not to contact you,
7 you sent her something like 162 text messages?
8         MR. ANDERSON: Objection. You can
9 answer.
10 BY MS. CLAGUE:
11    A. It wasn't -- it certainly wasn't around
12 the time of this investigation. It was definitely
13 -- I think I actually got that information through
14 my attorney.
15    Q. Well, without going into any
16 conversations you've had with your attorney, do you
17 know if it happened before or after you were served
18 in this case?
19    A. Well, it would certainly be after.
20    Q. Okay, so I'm going to direct your
21 attention now to Exhibit 4. And in fact, I'm going
22 to ask you to turn to the last page of that
23 exhibit.
24    A. I have it.
25    Q. Okay, and first of all, can you just

23

1 verify for me on that page, there is a phone number
2 listed at the top of the page? Is that your
3 telephone number?
4    A. Yes.
5    Q. And is this January 29th of 2017 at 7:56
6 p.m., at the bottom of the page, is that a text
7 message that you sent?
8    A. I have no idea.
9    Q. Well --
10    A. This kind of looks like it's -- it just
11 looks odd. I mean, it doesn't say who it's from.
12    Q. I'll turn you back to the first page of
13 the exhibit.
14    A. Okay, these are my -- these are my
15 screenshots; correct?
16    Q. These are text messages that you sent to
17 Lt. Ganley, sir --
18    A. Okay.
19    Q. -- that were produced by George Mason
20 University.
21    A. Okay, gotcha.
22    Q. The -- and again at the top of the page,
23 you see your telephone number indicated; correct?
24    A. Yes.
25    Q. Okay, and so this first page of the

24

1 exhibit, I'm going to ask you to review that
2 message, so the first into the middle of the second
3 page, and when you're finished reviewing that, you
4 can let me know by just looking at the screen.
5    A. Okay.
6    Q. Is that a text message you sent to Lt.
7 Ganley?
8    A. That is correct.
9    Q. And that was on the 24th of January after
10 speaking with him; correct?
11         MR. ANDERSON: Hold on. He's looking at
12 the wrong -- oh, you're talking about the first and
13 second pages of this exhibit?
14         MS. CLAGUE: That's right.
15         MR. ANDERSON: "Hey, Lt. I apologize for
16 the delay," okay.
17         MS. CLAGUE: That's right.
18         THE DEPONENT: My mistake. My mistake.
19 I'm still on the last page.
20         Just give me one second to review,
21 please?
22         MS. CLAGUE: Not a problem. Not a
23 problem. In fact, if you want to review the whole
24 exhibit, and then we can talk about it, that might
25 be more efficient. So why don't you do that and

25

1 then --
2         All set? You know what? You're frozen
3 there. Okay. I don't know if it's -- I don't know
4 if this is a glitch in my internet or someone
5 else's. Am I frozen or can you see and hear me
6 moving?
7         THE DEPONENT: You're moving and what
8 not.
9         MS. CLAGUE: Okay.
10         MR. ANDERSON: Yeah, we're all good.
11         MS. CLAGUE: All right, good.
12 BY MS. CLAGUE:
13    Q. So let's back then to that last page of
14 that exhibit. Bottom of the last page. That text
15 message dated January 29th of 2017 just before 8:00
16 at night; right?
17    A. Yes.
18    Q. You see what I'm talking about? Okay.
19 You say you had that report complete. That's what
20 you're telling Lt. Ganley at the time; right?
21    A. Yes.
22         THE REPORTER: I'm sorry. I've just got
23 to interrupt. It looks like he keeps freezing up.
24 Okay, it looks like we're good again.
25         MS. CLAGUE: Okay.

26

1       THE REPORTER:  I just want to make sure -
2  -
3       THE DEPONENT:  I sit quite still.
4       THE REPORTER:  Gotcha.
5  BY MS. CLAGUE:
6       Q.  Now, I'm going to direct you back to the
7  fourth page of the exhibit, a text at 11:29 in the
8  morning, January 26th of 2017; do you see that?
9       And it's up on the screen, too.
10      A.  Yes, I have it.
11      Q.  And you can see that's the little bubble
12  there, if I can -- for lack of a better word.  It
13  is -- the small point of it is in the same
14  direction as the other texts that you have
15  identified as you having sent to the lieutenant;
16  correct?
17      A.  Correct.
18      Q.  And in fact, this is a text that you also
19  sent to Lt. Ganley as well; isn't it?
20      A.  Yes.
21      Q.  Okay, and there you say you're gonna
22  write it up on -- while you're working on your
23  midnight to 8 shift; right?
24      A.  Yes.
25      Q.  All right, three pages beyond that, that

27

1  page.  Do you see where we are?
2       A.  Yes.
3       Q.  All right,
4       MS. CLAGUE:  And again, my apologies to
5  everybody for not Bates stamping this.
6       THE DEPONENT:  No worries.
7  BY MS. CLAGUE:
8       Q.  Now, you're asking the lieutenant here
9  about a police report that you're writing; aren't
10  you?
11      A.  Yes.
12      Q.  Okay, and that was sometime before the
13  26th; correct?
14      A.  I don't know.
15      Q.  Okay, well, I'm sorry.  Sometime after --
16  sometime between the 26th and the 29th, based on
17  the earlier testimony and that's my fault.  I
18  misspoke.
19      A.  Okay.
20      Q.  So sometime between the 26th and the 29th
21  you're talking about this police report; correct?
22      A.  That's fair to say, yes.
23      Q.  Okay, now I'm going to direct your
24  attention back to Exhibit -- I'm going to --
25  actually, it's going to be the first time we've

28

1  looked at it, to Exhibit 2.
2       MS. CLAGUE:  Thank you very much, Ryan.
3  I'm sorry.
4  BY MS. CLAGUE:
5       Q.  Are you there?
6       A.  Yes, ready when you are.
7       Q.  Okay, so this is the report, the police
8  report that you were talking about dated January
9  29th of 2017, correct?
10      A.  Yes.
11      Q.  Okay, and this is the police report that
12  you started talking -- or texting with Lt. Ganley
13  about -- as early as the 26th of January according
14  to what we've just reviewed; isn't that right?
15      A.  Correct.
16      Q.  Now, there's no reference in this report
17  that you were discussing the preparation of this
18  report with a colleague of the defendant in the
19  restraining order case; is there?
20      A.  No.
21      Q.  Now, I'm going to direct your attention
22  to Exhibit 5.
23      A.  I'm sorry.  Real quick.  There is a
24  reference that I did contact her superior officers
25  in the report.

29

1       Q.  There's a reference that you contacted
2  them.
3       A.  Okay.
4       Q.  That's not what the question was, but I -
5  - but -- so noted.  I'm not going to ask that that
6  be struck.  That's fair enough.
7            So now --
8       A.  Okay, Exhibit 5, you said?  I'm sorry.
9       Q.  That's right, Exhibit 5.
10      A.  Okay.
11      Q.  Do you recall sending this text message
12  to Lt. Ganley?
13      A.  Yes.
14      Q.  Okay, tell me about your communication
15  with Lt. Ganley at this time regarding Ms. Radfar.
16  Did you talk to him on the telephone as well?
17      A.  No.
18      Q.  Did you send him any emails?
19      A.  No.
20      Q.  Did you send him any documents?
21      A.  No.
22      Q.  Did you do that in the summer of 2017
23  within a couple of months after this?
24      A.  Well, it looks like it was sent May 14th.
25  I don't know if that's summer or not, but late



30

1 spring.
2    Q.  But I'm asking you generally about your
3 communication with him before we get to these
4 specific text messages.
5        Do you recall talking to him in the fall
6 of 2017?
7    A.  I don't -- off the top of my head, I
8 don't -- I don't remember.
9    Q.  Have you reviewed Lt. Ganley's deposition
10 in this matter?
11    A.  I was present when he -- when it was
12 taken.
13    Q.  Okay.
14    A.  I don't believe I reviewed --
15    Q.  But have you reviewed the transcript?
16 No?
17    A.  No.
18    Q.  Okay, did Lt. Ganley tell you that Ms.
19 Radfar would likely commit suicide?
20    A.  Yes.  No, I'm sorry.  He was concerned
21 that she may possibly commit suicide.
22    Q.  When did he tell you that?
23    A.  It was after she was served the
24 restraining order, because I -- he at -- he told me
25 that she was served.  It was -- he said he was

31

1 concerned.
2        He had extra people there, and I -- I'm
3 sure I asked why, and he said that a lot of people
4 felt that she might -- I'm paraphrasing, "Go out
5 with a bang," or, "Come out shooting," or possibly
6 commit suicide.
7    Q.  And he told you this after she was served
8 with the restraining order.
9    A.  Correct.
10    Q.  Okay, and also at that time she was
11 served with a cease-and-desist letter; you're aware
12 of that, right?
13    A.  No, not that I remember.
14    Q.  You don't recall collaborating or talking
15 with Lt. Ganley about things that ought to go in
16 the cease-and-desist letter?
17    A.  It's not my function or policy.  Its
18 purpose to worry about what she's doing at work.
19 No, I -- my only concern was having her stay away
20 from me.  That was it.  And actually -- I want her
21 to keep her job and both Lt. Ganley and I wanted to
22 get her help.
23        In fact, that's why I discussed the
24 police report with him to say, it's like, I don't
25 want to hammer her and it clearly says it in those

32

1 text messages.  Can it be just enough that doesn't
2 get her in trouble, that it gets her some help.
3    Q.  I had let you go on, because I don't want
4 to interrupt you, cause that --
5    A.  Thank you.
6    Q.  -- would be rude.  However, you didn't
7 answer my question.  My question is simply this:
8 What is your memory of any conversation that you
9 had with Lt. Ganley about what ought to go into the
10 cease-and-desist letter?  And by conversation, I
11 mean any contact at all.
12    A.  My memory is exhausted on any of that.
13    Q.  All right.  Lt. Ganley testified that you
14 told him there was going to be or was issued
15 another restraining order against Ms. Radfar by
16 another Massachusetts police officer.  Are you
17 surprised that that was his testimony?
18        MR. ANDERSON:  Objection.
19 BY MS. CLAGUE:
20    A.  Yes, I was.
21    Q.  Okay, did you know that before I asked
22 you about it?
23    A.  I heard him say that.
24    Q.  Okay.
25    A.  I was in this office when he took -- the

33

1 deposition was taken.
2    Q.  And you were surprised.
3    A.  I was surprised because that's not what
4 happened.
5    Q.  So going back to Exhibit 5, if we could
6 put that back up on the screen?
7    A.  I'm ready.
8    Q.  That's another text to Lt. Ganley;
9 correct?  In fact --
10    A.  This is the same one we were just looking
11 at, yes.
12    Q.  Yes, okay.  And prior to your sending
13 this text, do you know when the -- approximately,
14 when the last time was you'd had any communication
15 with him?
16    A.  With Lt. Ganley, I -- I'm assuming it
17 would have been --
18        MR. ANDERSON:  You don't want to assume.
19 BY MS. CLAGUE:
20    A.  I'm pretty sure it was just after the --
21 he talked to me about the restraining order.
22    Q.  And so he talked to you about the
23 restraining order.
24    A.  He said it was served.
25    Q.  Mm-hmm.



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHARON RADFAR, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-10178-IT |
| | * | |
| CITY OF REVERE, BRIAN M. ARRIGO, | * | |
| individually and in his official capacity as | * | |
| Mayor, JAMES GUIDO, individually and | * | |
| in his official capacity as Chief of Police, | * | |
| JOSEPH I. COVINO, individually and in | * | |
| his official capacity as Police Sergeant, and | * | |
| OTHER AS YET UNNAMED OFFICERS | * | |
| OF THE REVERE POLICE | * | |
| DEPARTMENT, individually and in their | * | |
| official capacity as police officers, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

June 22, 2023

TALWANI, D.J.

    Before the court is Defendant Joseph Covino's <u>Motion Pursuant to Local Rule 7.2 to</u>

<u>*Temporarily* Impound the (1) Defendant's Motion for Relief from and/or Modification to this</u>

<u>Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness-For-Duty Evaluations and</u>

<u>(2) Defendant Joseph L. Covino's Motion and Memorandum of Law in Support of Motion for</u>

<u>Summary Judgment Pursuant to Fed. R. Civ. P. 56</u> [Doc. No. 57] ("Mot. to Impound"). For the

reasons that follow, Covino's <u>Motion to Impound</u> [Doc. No. 57] is GRANTED in part and

DENIED in part.

    I.    <u>Background</u>

    Plaintiff Sharon Radfar alleges that she is a former George Mason University police

officer, Compl. ¶¶ 6, 19 [Doc. No. 1], who had a consensual sexual relationship with Defendant

Covino, a police officer with the Revere Police Department. Affidavit Supporting Plaintiff's

Opposition in Response to Defense Mot. ("Counsel's Aff."), Ex. G, Transcript of Lynn District

Court Proceedings, ECF p. 16 [Doc. No. 12]. Radfar alleges that after their relationship ended,

Covino submitted false incident reports concerning her behavior to the Revere Police

Department. Compl. ¶¶ 12, 57 [Doc. No. 1]. She further alleges that Covino filed a false and

misleading Complaint for Protection from Abuse in Lynn District Court in Massachusetts and

appeared for a hearing before a Lynn District Court judge where he repeated the false and

misleading claims. Id. at ¶¶ 7, 8. Additionally, Radfar contends that Covino contacted her

employer and falsely alleged she had engaged/was engaging in criminal conduct. Id. at ¶¶ 6, 9.

Radfar was subsequently suspended from her job at George Mason University pending an

investigation of Covino's allegations of criminal conduct. Id. at ¶¶ 6, 9. Ultimately, Radfar lost

her job, id. at ¶ 11, but was not charged with any crimes in Virginia or Massachusetts related to

Covino's allegations. Id. at ¶ 16. Radfar asserts nine claims against Covino: (1) violation of her

rights to equal protection; (2) selective prosecution and enforcement based on gender and

national origin bias; (3) defamation; (4) civil rights claims under the Massachusetts Civil Rights

Act; (5) intentional infliction of emotional distress; (6) conspiracy to violate Radfar's civil rights

under 42 U.S.C. § 1985(2) & (3); (7) refusal to prevent wrongs committed against Radfar under

42 U.S.C. § 1986; (8) abuse of process; and (9) malicious prosecution. Id. at 7-14.[1]

---

[1] Radfar also asserted claims against Defendants City of Revere, Brian M. Arrigo, James Guido, Covino, and other unnamed officers of the Revere Police Department (the "Revere Defendants") The court granted the Revere Defendants' Motion to Dismiss [Doc. No. 18]. Mem. & Order [Doc. No. 21].

Covino moved to dismiss the Complaint [Doc. No. 1] pursuant to Fed. R. Civ. P.

12(b)(6), moved for summary judgment pursuant to Fed. R. Civ. P. 56, and moved to dismiss the

complaint and for costs and attorney's fees pursuant to Mass. Gen. Laws c. 231 § 59H. Def. Mot.

to Dismiss [Doc. No. 9]. The court denied Covino's motion. Mem. & Order [Doc. No. 21].

Toward the end of the fact discovery period, Radfar filed a Motion for a Protective Order

to Quash a Subpoena Pursuant to FRCP 26 and FRCP 45 [Doc. No. 29] seeking to prevent her

former employer George Mason University from disclosing certain records, including medical

records, related to her employment. The Motion alleged that the documents had no relevance to

the case, and Covino sought only to "subject Plaintiff to and cause her annoyance,

embarrassment and oppression" by acquiring them. Mot. for a Prot. Order 2-3 [Doc. No. 29]. On

February 22, 2022, the court denied the motion but directed "that the documents be maintained

by Defendant Covino and his counsel as confidential documents that may not be disclosed

pending further order of the court." Elec. Order ("the February 22, 2022 Impoundment Order")

[Doc. No. 31].

Plaintiff then filed two Motions to Compel [Doc. Nos. 39, 41]. The first [Doc. No. 39]

sought to compel discovery production and accused Covino of inadequately responding to the

Plaintiff's interrogatories and refusing to confer about the dispute. Mem. in Supp. of Mot. to

Compel 1-2 [Doc. No. 40]. The court granted the motion in part and directed Covino to serve a

supplemental response to Plaintiff's Document Requests 1-4, see Mot. to Compel 1-4 [Doc. No.

39], by May 27, 2022. Elec. Order [Doc. No. 53]. The court denied the second motion [Doc. No.

41], which sought to compel George Mason University to produce testimony or reports related to

Radfar's employment. Elec. Order [Doc. No. 54].

3

Before moving for summary judgment, Covino filed the pending <u>Motion to Impound</u>

pursuant to Local Rule 7.2 [Doc. No. 57]. The <u>Motion</u> seeks to temporarily impound three

pleadings that Defendant intends to file: (1) Defendant's Motion for Relief From and/or

Modification to this Court's February 22, 2022 [Impoundment] Order; (2) Defendant Joseph I.

Covino's Motion for Summary Judgment with Memorandum of Law in Support; and (3)

Defendant Joseph I. Covino's Local Rule 56.1 Statement of Material Facts. <u>Mot. to Impound</u> 1

[Doc. No. 57]. The court stayed the deadline for filing summary judgment motions pending its

decision on Covino's <u>Motion to Impound</u> [Doc. No. 57]. Elec. Order [Doc. No. 58].

II.  <u>Discussion</u>

This court is guided in sealing documents by First Circuit precedent and Local Rule 7.2.

Because the public has a "presumptive" right of access to judicial documents, <u>United States v.</u>

<u>Kravetz</u>, 706 F.3d 47, 59 (1st Cir. 2013) (citing <u>Siedle v. Putnam Invs., Inc.</u>, 147 F.3d 7, 10 (1st

Cir. 1998)), "'only the most compelling reasons can justify non-disclosure of judicial records

that come within the scope of the common-law right of access.'" <u>Id.</u> (quoting <u>In re Providence</u>

<u>Journal Co.</u>, 293 F.3d 1, 10 (1st Cir. 2002)). The burden is thus on the impoundment-seeking

party to show that impoundment will not violate the public's presumptive right of access. <u>See</u>

<u>Foltz v. State Farm Mut. Auto. Ins.</u>, 331 F.3d 1122, 1130 (9th Cir. 2003) ("A party asserting

good cause bears the burden, for each particular document it seeks to protect, of showing that

specific prejudice or harm will result if no protective order is granted."). For that reason, when

seeking to file under seal any confidential information, a party must show this court good cause

for the impoundment. <u>See Kravetz</u>, 706 F.3d at 60. Specifically, the party seeking impoundment

must make "a particular factual demonstration of potential harm," <u>id.</u>, as to why the document

should be sealed. See Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986) ("A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements."). The court "will not enter blanket orders" for impoundment. Local Rule 7.2(d).

Here, Covino asks that three documents he intends to file—his motion for relief from and modification of the court's February 22, 2022 Impoundment Order [Doc. No. 31], his summary judgment motion, and his statement of material facts—be temporarily impounded to protect Radfar's privacy in order to comply with and until the court issues clarification on its February 22, 2022 Impoundment Order [Doc. No. 31]. Mot. to Impound 2-3 [Doc. No. 57]. He explains that the documents "contain sensitive medical information related to three Fitness-For-Duty evaluations the plaintiff underwent at the request of her then employer, George Mason University." Mot. to Impound, 1-2 [Doc. No. 57]. Covino has met his burden of demonstrating that the medical information should be impounded if he is permitted to file it. Though "the privacy interest in medical information is neither fundamental nor absolute," Kravetz, 706 F.3d at 63, "medical information is . . . universally presumed to be private, not public." Id. There is no indication that Radfar has waived her right to privacy in the medical information Covino seeks to include in his pleadings, nor is there evidence that Covino has previously published the information she seeks to protect. See Cox Broad. Corp. v. Cohn, 420 U.S. 469, 494-95 (1975) ("[T]he interests in privacy fade when the information involved already appears on the public record.").

The more difficult question is whether the medical information is relevant to this dispute. Covino contends that the information included in the Fitness-For-Duty evaluations is "relevant,

material, and indeed crucial for the defendant's defense" and should be considered on summary judgment. Mot. to Impound 2 [Doc. No. 57]. Radfar, in turn, "vigorously disputes" Covino's characterizations of the medical documents and their value. Pl. Opp'n 4 [Doc. No. 59].[2] The court is unable to evaluate either side's arguments based on the papers filed in support of and opposition to the pending motion.

Accordingly, the court will address the matter in steps. Covino may file under seal his motion requesting relief from and modification to this Court's February 22, 2022 Impoundment Order [Doc. No. 31]. In this sealed filing, Covino shall briefly identify the specific legal issues he intends to raise on summary judgment where he contends that the Fitness-For-Duty evaluations are material. Radfar may also file her response under seal, specifically addressing the relevance or materiality of the Fitness-for-Duty evaluations to the legal issues identified by Covino. The court anticipates that its decision on Covino's forthcoming motion requesting relief from and modification to this Court's February 22, 2022 Impoundment Order will not address the ultimate merits of the parties' dispute, but will provide guidance as to whether Covino may file any portions of his anticipated motion for summary judgment and statement of material facts under seal. Accordingly, the stay of the deadline to file motions for summary judgment, see Elec. Order [Doc. No. 58], remains in place pending the court's review of Covino's anticipated motion for relief from the February 22, 2022 Impoundment Order and Radfar's opposition thereto.

---

[2] Radfar asserts further that her objection is not addressed by impounding the sensitive material, where she objects "to the attempts by Defense counsel to by chipping away at those protections irretrievably deprive her of her rights." Pl. Opp'n 3 [Doc. No. 59]. She alleges that Covino has consistently violated her rights by failing to provide discovery and by filing motions that do not meet the motion practice requirements of the court. Id. at 3.

III. Conclusion

For the aforementioned reasons, Defendant Covino's <u>Motion Pursuant to Local Rule 7.2 to Temporarily Impound the (1) Defendant's Motion for Relief from and/or Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness-For-Duty Evaluations and (2) Defendant Joseph L. Covino's Motion and Memorandum of Law in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56</u> is GRANTED in part as set forth above, but is otherwise DENIED. Covino shall file his anticipated Motion for Relief from and/or Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness-For-Duty Evaluations under seal no later than July 5, 2023. Radfar shall file her opposition thereto no later than July 19, 2023, and may file the opposition under seal if it also contains medical information.

IT IS SO ORDERED.

/s/ Indira Talwani
United States District Judge

June 22, 2023

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHARON RADFAR,                          *
                                        *
              Plaintiff,                 *
                                        *
       v.                                *          Civil Action No. 1:20-cv-10178-IT
                                        *
CITY OF REVERE, BRIAN M. ARRIGO,         *
individually and in his official capacity as *
Mayor, JAMES GUIDO, individually and     *
in his official capacity as Chief of Police, *
JOSEPH I. COVINO, individually and in    *
his official capacity as Police Sergeant, and *
OTHER AS YET UNNAMED OFFICERS           *
OF THE REVERE POLICE                    *
DEPARTMENT, individually and in their    *
official capacity as police officers,        *
                                        *
              Defendants.                *

MEMORANDUM AND ORDER

March 21, 2023

TALWANI, D.J.

Before the court is Defendant Joseph Covino's Motion for Relief from and/or

Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness for

Duty Evaluations ("Mot. for Relief") [Doc. No. 61]. For the reasons that follow, Covino's

Motion for Relief [Doc. No. 61] is DENIED.

On February 22, 2022, the court directed Defendant Covino and his counsel to maintain

certain documents as "confidential documents that may not be disclosed pending further order of

the court." Elec. Order [Doc. No. 31]; see also Memorandum & Order 3 [Doc. No. 60] (setting

forth the events leading to this order). Defendant subsequently filed a Motion to Impound [Doc.

No. 57], which sought to temporarily impound until the court modified its February 22, 2022

Order three pleadings Defendant intended to file: (1) Defendant's Motion for Relief From and/or Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff's Fitness-For-Duty Evaluations; (2) Defendant Joseph I. Covino's Motion for Summary Judgment with Memorandum of Law in Support; and (3) Defendant Joseph I. Covino's Local Rule 56.1 Statement of Material Facts. Mot. to Impound 1 [Doc. No. 57]. The court granted the Motion to Impound in part and denied it in part, finding that Covino "met his burden of demonstrating that the medical information should be impounded if he is permitted to file it," but that the court was unable to evaluate the relevance of the documents at issue from the papers filed in connection with that motion. Mem. & Order 5-6 [Doc. No. 60]. Accordingly, the court allowed Defendant to file under seal a motion requesting relief from and modification to the February 22, 2022 Order, but directed that, in that filing, Defendant "shall briefly identify the specific legal issues he intends to raise on summary judgment where he contends that the Fitness-For-Duty evaluations are material." Id. at 6 (emphasis added).

In the pending motion, Covino asserts that the Fitness-For-Duty evaluations are relevant, material, and essential to his defense of the case because they establish "why [Radfar] is no longer employed as [a] George Mason Police Officer." Mot. for Relief 2 [Doc. No. 61]. Covino contends that because Radfar put her loss of employment at issue, her Fitness-for-Duty evaluations are relevant to her claim. Id. at 4. Radfar responds that Covino has failed to demonstrate the relevance and materiality of the reports.[1] Opposition to Motion [] for Relief from and/or Modification of Order of February 22, 2022 ("Opp. to Mot.") 2 [Doc. No. 63].

---

[1] Embedded in Radfar's Opposition is a request that she is "entitled to a finding and order by this Court that permits her to disclose the terms of her [settlement] agreement with George Mason." Opp. to Mot. 6 [Doc. No. 62]. The court has no authority, however, to set aside the provisions of Radfar's agreement with George Mason University where it is not a party to this action.

The court finds that Covino's general arguments as to the relevance and materiality of the reports fail to comply with the court's directive that he identify the relevance of the Fitness-For-Duty reports to the specific legal issues he intends to raise on summary judgment To reiterate, Covino's contention that the Fitness-For-Duty evaluations are relevant to the general dispute as to what ended Radfar's employment with George Mason does not elucidate their connection to any particular ground for summary judgment.

Accordingly, Covino's <u>Motion for Relief from and/or Modification to this Court's February 22, 2022 Order Restricting Use of Plaintiff' s Fitness for Duty Evaluations</u> [Doc. No. 61] is DENIED.[2] The stay of the parties' summary judgment deadlines is lifted, and the parties should file any summary judgment motions by April 10, 2024. All such motions and filings in support of or opposition to the motions shall not include information obtained from the Fitness-for-Duty evaluations.

IT IS SO ORDERED.

/s/ Indira Talwani
March 21, 2023                                      United States District Judge

---

2 This ruling has no bearing on whether the Fitness-For-Duty evaluations may be relevant and/or admissible should this case go to trial.

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR )
    Plaintiff )
 )
 )
v. )
 )
 )
CITY OF REVERE, and )
BRIAN M. ARRIGO, MAYOR; and )
JAMES GUIDO, CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED OFFICERS )
OF THE REVERE POLICE )
DEPARTMENT; INDIVIDUALLY AND )
IN THEIR OFFICIAL CAPACITIES AS )
MAYOR, CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
    Defendants )

TABLE OF CONTENTS RE: MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT,
JOSEPH I. COVINO'S, MOTION FOR SUMMARY JUDGMENT

TABLE OF AUTHORITIES ................................................................................ iii

BACKGROUND . ............................................................................................... 1

ALLEGATIONS IN THE PLAINTIFF'S COMPLAINT ................................... 2

ARGUMENT ...................................................................................................... 3

CIVIL RIGHTS CLAIM .................................................................................... 9

EQUAL PROTECTION ..................................................................................... 13

DEFAMATION ................................................................................................. 14

MASSACHUSETTS CIVIL RIGHTS CLAIM .................................................. 16

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .......................... 17

i

REFUSAL TO PREVENT WRONGS COMMITTED AGAINST PLAINTIFF, ABUSE OF

PROCESS AND MALICIOUS PROSECUTION ............................................................... 17

CONCLUSION .................................................................................................................... 18

ii

TABLE OF AUTHORITIES

<u>Cases</u>

*Agis* v. *Howard Johnson Co.*

    371 Mass. 140 (1976) ........................................................................ 17

*Anderson v. Liberty Lobby, Inc.*

    477 U.S. 242, (1986) .......................................................................... 3

*Ayala-Sepulveda* v. *Municipality of San German*

    671 F.3d 24 (1st Cir. 2012)................................................................ 14

*Baker v. St. Paul Travelers Ins. Co.*

    670 F.3d 119 (1st Cir. 2012) .............................................................. 3

*Bally* v. *Northeastern Univ.*

    404 Mass. 713 (1989) ........................................................................ 16

*Barreto–Rivera* v. *Medina-Vargas*

    168 F.3d 42 (1st Cir. 1999) ............................................................... 10

*Barrios–Velazquez* v. *Asociacion De Empleados Del Estado Libre Asociado*

    84 F.3d 487 (1st Cir. 1996) ............................................................... 10

*Beecy* v. *Pucciarelli*

    387 Mass. 589 (1982) ...................................................................... 17, 18

*Camilo–Robles* v. *Hoyos*

    151 F.3d 1  (1st Cir. 1998) ................................................................ 10

*Clark* v. *Boscher*

    514 F.3d 107 (1st Cir. 2008) ............................................................. 13

*Cohlmia* v. *Ardent Health Services, LLC*

    448 F.Supp.2d 1253 (N.D. Okla .2006) ............................................ 15

iii

*Collins* v. *Nuzzo*

    24 F.3d 246 (1st Cir.2001) ....................................................................... 9

*Creative Environments, Inc.* v. *Estabrook*

    680 F.2d 822 (1st Cir. 1982) ................................................................. 14

*Currier* v. *Nat'l Bd. of Med. Exam'rs*

    462 Mass. 1 (2012) ............................................................................... 16

*District of Columbia Ct. of Appeals* v. *Feldman*

    460 U.S. 462, 103 S.Ct. 1303 (1983) ...................................................... 11

*Glovsky* v. *Roche Bros. Supermarkets*

    469 Mass. 752 (2014) ............................................................................ 16

*Grella* v. *Salem Five Cent Savings Bank*

    42 F.3d 26 (1st Cir. 1994) ..................................................................... 13

*Haufler* v. *Zotos*

    466 Mass. 489 (2006) ............................................................................ 16

*Hill* v. *Conway*

    193 F.3d 33 (1st Cir. 1999) .................................................................... 12

*Hustler Magaxzine, Inc.* v. *Falwell*

    485 U.S. 46, 108 S.Ct. 876 (1988) ......................................................... 17

*Kelly* v. *Schmidberger*

    806 F.2d 44 (2d Cir. 1986) .................................................................... 15

*Kennedy* v. *Town of Billerica*

    617 F.3d 520 (1st Cir. 2010) ..................................................................17

iv

*Keystone Shipping Co.* v. *New England Power Co.*

    109 F.3d 46 (1st Cir. 1997) ...................................................................... 12, 13

*King* v. *Globe Newspaper Co.*

    400 Mass. 705 (1987) ............................................................................. 15

*Kyricopolous* v. *Town of Orleans*

    967 F.2d 14 (1st Cir. 1992) ..................................................................... 12

*Liguori* v. *Alexander*

    495 F.Supp. 641 (S.D.N.Y. 1980) ............................................................ 15

*Linker* v. *Custom–Bilt Machinery, Inc.*

    594 F.Supp. 894 (E.D. Pa. 1984) ............................................................ 15

*Lu* v. *Smith*

    No. 15-cv-14081-DJC, 2016 WL 4595206, at *3 (D. Mass. Sept. 2, 2016) ............. 14

*Mangual* v. *City of Worcester*

    285 F.Supp. 3d 465 (D.Mass. 2018) ......................................................... 16

*Martinez* v. *Colon*

    54 F.3d 980 (1st Cir. 1995) ..................................................................... 10, 11

*Mattoon v. City of Pittsfield*

    980 F.2d 1  (1st Cir. 1992 ....................................................................... 4

*McGeorge* v. *Continental Airlines, Inc.*

    871 F.2d 952 (10th Cir. 1989) ................................................................ 15

*Migra* v. *Warren City Sch. Dist. Bd. of Educ.*

    465 U.S. 75 104 S.Ct. 892 (1984) ........................................................... 12

*Nelson* v. *Miller*

     227 Kan. 271, 607 P.2d 438 (1980) ........................................................................ 18

*Parrilla–Burgos v. Hernandez-Rivera*

     108 F.3d 444 (1st Cir. 1997) ........................................................................ 11

*PHC Inc. Shareholder Litig.*

     762 F.3d 138 (1st Cir. 2014) ........................................................................ 4

*Pineiro* v. *Gemme*

     937 F. Supp. 2d 161 (D. Mass. 2013) ........................................................................ 14

*Reid v. New Hampshire*

     56 F.3d 332 (1st Cir. 1995) ........................................................................ 4

*Resolution Trust Corp. v. N. Bridge Assocs., Inc.*

     22 F.3d 1198 (1st Cir. 1994) ........................................................................ 4

*Rivera- Almodóvar v. Instituto Socioeconómico Comunitario, Inc., et al.*

     730 F.3d 23 (1st Cir. 2013) ........................................................................ 4

*Roche* v. *John Hancock Mut. Life Ins. Co.*

     81 F.3d 249 (1st Cir. 1996) ........................................................................ 10

*Scholz* v. *Delp*

     473 Mass. 242 (2015) ........................................................................ 17

*Sindi* v. *El-Moslimamy*

     896 F.3d 1 (1st Cir. 2018) ........................................................................ 17

*Shay* v. *Walters*

     702 F.3d 76 (1st Cir. 2012) ........................................................................ 17

*Sheehan* v. *Marr*

    207 F.3d 35 (1st Cir. 2000) ...................................................................... 12

*Vargas-Ruiz v. Golden Arch Dev., Inc.*

    368 F.3d 1 (1st Cir 2004) ........................................................................ 4

*West* v. *Atkins*

    487 U.S. 42 108 S.Ct. 2250 (1988) ......................................................... 11

*Zambrana–Marrero* v. *Suarez–Cruz*

    172 F.3d 122 (1st Cir. 1999) ............................................................. 10, 11


Statues And Court Rules

Fed. R. Civ. P. 56 .......................................................................... 3, 4, 8, 18

42 U.S.C. § 1983 ................................................................................... 9

28 U.S.C. § 1738 ............................................................................ 11, 12

Mass. Gen. Laws chapter 209A ................................................................. 12

Massachusetts Civil Rights Statute ........................................................... 16

Mass. Gen. Laws c. 12, § 11I ................................................................. 16

Restatement (Second) of Torts, § 46 comment d (1965) .................................... 17


Other

CM/EFC . <u>See</u>, Memorandum and Order, Document No. 21 ............................................. 2

*Rooker–Feldman* doctrine and the full faith and credit statute, 28 U.S.C. § 1738 ............... 11, 12

U.S. Const. amend. XIV, § 1 ............................................................... 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

| | |
|---|---|
| SHARON RADFAR<br>    Plaintiff<br><br>v.<br><br>CITY OF REVERE, and<br>BRIAN M. ARRIGO, MAYOR; and<br>JAMES GUIDO, CHIEF OF POLICE; and<br>SERGEANT JOSEPH I. COVINO; and<br>OTHER AS YET UNNAMED OFFICERS<br>OF THE REVERE POLICE<br>DEPARTMENT; INDIVIDUALLY AND<br>IN THEIR OFFICIAL CAPACITIES AS<br>MAYOR, CHIEF OF POLICE AND<br>POLICE SERGEANT AND OFFICERS<br>OF THE CITY OF REVERE,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEFENDANT JOSEPH I. COVINO'S *REVISED* MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

Now comes defendant Joseph I. Covino, and in support of his motion for summary

judgment states the following:

BACKGROUND

Plaintiff Sharon Radfar has brought a ten count complaint against defendant (Sergeant)

Joseph I. Covino, a police officer with the City of Revere.[1]  Complaint, Doc. No. 70-1.  In

addition to suing Covino, the plaintiff also sued the City of Revere, the Mayor of Revere, the

---

[1] Defendant Covino was subsequently promoted to the rank of Lieutenant with the Revere police
department.  He held the rank of sergeant during the times at issue.  During the time that the
defendant was involved with the plaintiff as alleged in the plaintiff's complaint, defendant
Covino was acting in his capacity as a private citizen and not as a law enforcement officer.  The
defendant is no longer employed by the City of Revere.

1

Revere Police Chief, and other unknown Lynn police officers.[2]  The plaintiff's complaint

contains counts for federal equal protection violations under color of law (Count I), selective

prosecution based on gender and origin (Count II), defamation (Count III), violation of

Massachusetts of Civil Rights Act (Count IV), intentional infliction of emotional distress (Count

V), deliberate indifference to need for training (Count VI – against municipal defendants only),

conspiracy to violate civil rights (Count VII), refusal to prevent wrongs committed against

plaintiff (Count VIII), abuse of process (Count IX), and malicious prosecution (Count X).

<u>ALLEGATIONS IN THE PLAINTIFF'S COMPLAINT</u>

1. From a factual standpoint, the plaintiff alleges in her Complaint that on January 31, 2017,

   four uniformed police officers seized her service weapons from her home in Northern

   Virginia where the plaintiff worked as a George Mason University Master Police Officer

   after defendant Covino obtained an Abuse Prevention Order against the plaintiff issued

   after a hearing by the Lynn District Court.  Ex. 1, Complaint, Doc. No. 70-1, pp. 2-3 at

   ¶¶6-8.

2. The plaintiff asserts that in petitioning the Lynn District Court for the Abuse Prevention

   Order, that defendant Covino misrepresented calls and messages they had exchanged,

   failed to disclose pertinent information, and made false and misleading claims. Ex. 1,

   Complaint, Doc. No. 70-1, pp. 2-3 at ¶7.

3. The plaintiff alleges that Covino called the plaintiff's employer and made false and

   misleading claims against the plaintiff, causing the plaintiff to be suspended from work

   and subject to an investigation. Ex. 1, Complaint, Doc. No. 70-1, p. 2-3 at  ¶9.

---

[2] All of the plaintiff's claims against the municipality and its employees were dismissed as of
September 9, 2021.  <u>See</u>, Memorandum and Order, Doc. No. 21.

4. The plaintiff further alleges, with no specificity, that thereafter defendant Covino pursued criminal charges against the plaintiff which Covino knew to be false. Ex. 1, Complaint, Doc. No. 70-1, pp. 3-5 at ¶¶10-17.

5. Covino drafted an internal Revere police report that documented the plaintiff's actions between the summer of 2015 and January 29, 2017. Ex. 1, Complaint, Doc. No. 70-1, pp. 3-4 at ¶12.

6. Without any factual support, the plaintiff also claims that she was treated differently by all the defendants based upon her Iranian descent. Ex. 1, Complaint, Doc. No. 70-1, p. 5 at ¶18.

7. The plaintiff asserts that as a result of the conduct of all the defendants, she lost her position and her career as a police officer with George Mason University Police Department. Ex. 1, Complaint, Doc. No. 70-1, pp. 4-7 at ¶¶11, 14, 19, 27.

<u>ARGUMENT</u>

Under Rule 56, the court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Baker v. St. Paul Travelers Ins. Co.*, 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. Under Local Rule 56.1 a party seeking summary judgment must include "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion."

3

"Rule 56(d) serves a valuable purpose. It protects a litigant who justifiably needs additional time to respond in an effective manner to a summary judgment motion." *Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc., et al.*, 730 F.3d 23, 28 (1st Cir. 2013). (citing *Vargas-Ruiz v. Golden Arch Dev., Inc.*, 368 F.3d 1, 3 (1st Cir 2004)). It "provides a safety valve for claimants genuinely in need of further time to marshal 'facts, essential to justify [their] opposition ... to a summary judgment motion.'" *Reid v. New Hampshire*, 56 F.3d 332, 341 (1st Cir. 1995) (alteration in original) (quoting *Mattoon v. City of Pittsfield*, 980 F.2d 1, 7 (1st Cir. 1992)). "'Consistent with the salutary purposes underlying Rule 56(f), district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter.'" In re *PHC Inc. Shareholder Litig.*, 762 F.3d 138, 143 (1st Cir. 2014) (quoting *Resolution Trust Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994)).

As noted above in the Local Rule 56.1 Statement of Material Facts of Record, all of the plaintiff's sweeping allegations in her Complaint lack factual support. From a chronological standpoint, Paragraph 9 of the plaintiff's Complaint alleges that the defendant called her employer and made false and misleading claims against her, causing her employer to suspend her, open an investigation, and to seek criminal charges against her. Ex. 1, Complaint, Doc. No. 70-1, p. 3 at ¶9. There is no evidence that the defendant made any false and/or misleading claims against the plaintiff to her employer. First and foremost, the plaintiff admitted at her deposition that she does not know what Covino said to her employer when he called them, so therefore she has no way to prove that anything that he said was false. Nor does she know what documents were provided to her employer. The testimony of Lt. Ganley was simply that Covino "wanted a clean break" from the plaintiff. See, Revised Statement Material Facts, Doc. No. 77 at ¶24. "He did not want her contacting him." Ibid But as found by the Virginia State Police

4

347

investigation, the plaintiff called the defendant at least 162 times since the police found that
Covino (referred to by the state police as the "victim") told her "don't call me anymore." The
record clearly establishes that Covino did not make false and misleading statements as the record
is replete with undeniable evidence of stalking, harassment, and unwanted phone calls, text
messages, and voicemails that would understandably and universally be considered harassing.

In addition to Covino not making false and misleading statements to the plaintiff's
employer, it was established through discovery that the plaintiff had a long history of similar
conduct against her former romantic interests. Lt. Ganley encountered several similar acts of
obsessive, stalking-like behavior admitted by the plaintiff ( Revised Statement Material Facts,
Doc. No. 77 at ¶¶27-31), Chief Rowan was told by Human Resources that the plaintiff had been
a difficult employee (Revised Statement Material Facts, Doc. No. 77 at ¶42), and Chief Rowan
had himself witnessed "disturbing" behavior on the part of the plaintiff (Revised Statement
Material Facts, Doc. No. 77 at ¶44). In fact, Chief Rowan stated that he was not surprised when
these allegations against the plaintiff surfaced (Revised Statement Material Facts, Doc. No. 77 at
¶46). Chief Rowan testified that he listened to dozens of phone messages the plaintiff had left on
the defendant's phone and had found them to be "disturbing, threatening" and unlike anything he
had a memory of hearing before. (Revised Statement Material Facts, Doc. No. 77at ¶¶84-91)

The record established that the plaintiff indeed called and texted the defendant's phone
multiple, multiple times from blocked phone numbers and from other varied phone numbers after
the defendant blocked the plaintiff's number. (Revised Statement Material Facts, Doc. No. 77 at
¶¶91-96 and Ex. 11, Virginia State Police Record, Doc. No. 70-11, pp. 14-15) The plaintiff
threatened the defendant that she was in his town and was going to come to his home, and later
drove eight hours to show up at his place of employment unannounced and unwanted. (Ex.4,

March 12 Text Messages from Radfar, Doc. No. 70-4 at ¶¶5-15)   The plaintiff's allegations that

the defendant made false and misleading claims against her to her employer are not just

unsupported, they were completely disproven through discovery.

      In Paragraph 10 of her Complaint, the plaintiff alleged that "Covino relentlessly pursued

criminal charges against Plaintiff though he knew she had committed no crime and those charges

and claims were false."  (See, Ex. 1, Complaint, Doc. No. 70-1, p.3 at ¶10) This claim is also

patently false.  Five days before the defendant applied for and received the Abuse Prevention

Order, there was a meeting that occurred between the George Mason University Police

Command Staff and the Virginia State Police which occurred on January 26, 2017.  The notes

from this meeting clearly establish that it was Chief Rowan who requested the criminal

investigation, telling the Virginia State Police that the plaintiff "did not need to be a police

officer."  (Ex. 11, Virginia State Police Record,  Doc. No. 70-11 at p. 16)  Chief Rowan himself

requested the criminal investigation, stressing that he wanted the Virginia State Police to know

that this request was coming from the "top of the department."  (Ex. 10, Chief Rowan

Deposition, Doc. No. 70-10 at p. 22)  Any documents the defendant provided to the Virginia

State Police were provided because they were requested of Covino by Virginia State Police

Special Agent Kinnard. (Ex. 13, 1-31-17 Administrative Leave Letter, Doc. No. 70-13 at ¶20)

Simply stated, defendant Covino did not request or "relentlessly pursue" any criminal

investigation against the plaintiff, and to the extent he cooperated with a police request to

provide them with text messages and phone records, that surely does not constitute a federal civil

rights violation.  Had Covino desired to seek criminal charges against the plaintiff, he could and

would have done so in Massachusetts where he had police authority.  That he did not and the fact

that he agreed to allow the Abuse Prevention Order to be vacated clearly shows that he did not "relentlessly" pursue criminal charges against the plaintiff.

Paragraph 12 of the plaintiff's Complaint alleges that "Covino falsely and maliciously accused Plaintiff of a crime he knew she did not commit" and that "[a]cting under color of law, he drafted a Revere Police Department incident report making false claims, listing himself as the victim, the reporting officer, and the supervisor approving the report." Ex. 1, Complaint, Doc. No. 70-1, pp. 3-4 at ¶12. First, as established by the Virginia State Police investigation, the text messages attached as Ex. 4, March 12 Text Messages from Radfar, Doc. No. 70-4 and Ex. 17, Screen shots of text messages, Doc. No. 70-17, the voicemails left on the defendant's phone produced as Ex. 19, Voicemail audio recordings, Doc. No. 70-19, none of what Covino wrote in his internal "To File" police report was untruthful. But more importantly, this report was not used for any Massachusetts law enforcement purposes. It was simply written at the request of Lt. Ganley who had emailed the defendant and requested such a report. (Ex. 12, 1-25-17 Email From Lt. Ganley to Covino, Doc. No. 70-12). Significantly, Chief Rowan testified that he had never even seen the defendant's internal "To File" police report until it was used as an exhibit at his deposition. As such, this police report had absolutely no bearing whatsoever on the ending of the plaintiff's law enforcement career.

It is also not accurate for the plaintiff to maintain that she did not commit a crime. There was ample evidence from which the Virginia authorities could have charged the plaintiff with a crime. The prosecutor who screened the case simply felt that (1) the crime committed by the plaintiff was not worth the expense of having the defendant fly to Virginia to testify on at his own expense, and (2) that the proper forum for any prosecution was in Massachusetts. See, Revised Statement Material Facts, Doc. No. 77 at ¶¶76-77

7

In Paragraph 15 of the plaintiff's Complaint, the plaintiff alleges that "[d]ue to the misconduct by the Defendants Plaintiff's private telephone records were the subject of a search warrant in which a court within the jurisdiction where she was employed as a police officer received the smears that had been leveled against her." Ex. 1, Complaint, Doc. No.70-1, p. 4, at ¶15. What the plaintiff fails to recognize in Paragraph 15 of her Complaint is first, that defendant Covino was not the person who sought out a search warrant, and second, that a Virginia court found probable cause to issue the search warrant based upon an affidavit from Virginia law enforcement. As a Virginia judge found probable cause to issue the search warrant, the defendant committed no wrongdoing.

Finally, Paragraph 14 of her Complaint, the plaintiff falsely alleges that "Defendants' misconduct toward Plaintiff caused her the loss of her job." Ex. 1, Complaint, Doc. No. 70-1, p. 4 at ¶14. As established by the Material Facts set forth in the Local Rule 56.1 statement, this statement could not be further from the truth. Indeed, it was the plaintiff's own misconduct, not just towards defendant Covino, but based on multiple past infractions, that caused her employer to refer this matter to the Virginia State Police. Knowing full well that she had failed two fitness for duty evaluations, the plaintiff nevertheless persisted in her lie that it was Covino's misconduct that caused her to lose her job, lying through omission in her answers to interrogatories by failing to even mention the two failed psychological evaluations of fitness for duty. (Revised Statement Material Facts, Doc. No. 77 at ¶¶98-100) On top of this, the plaintiff was also subject to an Abuse Prevention Order granted out of the Brockton District Court that further prevented her from carrying a firearm. (Revised Statement Material Facts, Doc. No. 77 at ¶¶ 106-110). Unlike Covino, who agreed to the dismissal of the order, Jason Ford asked the court to extend his order and the court granted his extension. From a factual standpoint, the

plaintiff cannot prove any of her grandiose allegations in her Complaint. From a legal standpoint, the plaintiff fares no better.

<u>CIVIL RIGHTS CLAIM</u>

The plaintiff's claim for "Abuse of Authority Under Color of Law" in Count I of the plaintiff's complaint fails because at all material times, defendant Covino was acting in his capacity as a private citizen. Additionally, he committed no wrongdoing. It also fails because at no time did defendant Covino deprive the plaintiff of any rights guaranteed under the Constitution. "To sustain an action under 42 U.S.C. § 1983," Radfar must prove both: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Collins* v. *Nuzzo*, 24 F.3d 246, 250 (1st Cir.2001). Radfar can prove neither of these elements.

Covino petitioned the Lynn District Court as private citizen, seeking relief from the court after a long period of harassment and abuse by the plaintiff. Covino was off-duty at the time of his court appearance. He was not in uniform. He did not wield any law enforcement powers and, in fact, was outside of Revere, the jurisdiction where he has law enforcement powers. Covino took the same actions any citizen would take when someone had endured what Covino set forth under oath in his Affidavit in support of the Abuse Prevention Order. As noted in Covino's Affidavit, the plaintiff had called him four hundred times on MLK (Martin Luther King) weekend, had called him over a hundred times in one day, had created fake social media personas in order to stalk Covino and befriend his friends, and had showed up at his place of employment and also previously threatened to come to his house unannounced and uninvited, threating to cause a scene if Covino refused to visit her. Revised Statement Material Facts, Doc. No. 77 at ¶¶4, 5-15. Covino's petitioning the court for relief from abuse was the act of a private

citizen, and was not done in Covino's capacity of a law enforcement officer or in conjunction with anyone employed by the Revere Police Department.

Generally, a private party's conduct will not subject them to liability under Section 1983. *Roche* v. *John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996). A private party's conduct will be attributable to the state when the state "'has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.'" *Camilo–Robles* v. *Hoyos*, 151 F.3d 1, 10 (1st Cir. 1998), quoting *Barrios– Velazquez* v. *Asociacion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 494 (1st Cir. 1996). To distinguish private action from state action, "the general inquiry is whether 'a state actor's conduct occurs in the course of performing an actual or apparent duty of his office or ... is such that the actor could not have behaved in that way but for the authority of his office.'" *Zambrana–Marrero* v. *Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir. 1999), citing *Martinez* v. *Colon*, 54 F.3d 980, 986 (1st Cir. 1995). Although this concept can be "particularly elusive when applied to police conduct," it is not so in this case. *Zambrana–Marrero*, 172 F.3d at 125. Covino's conduct did not occur in the course of his official duties, either actual or apparent.

The determination of whether a police officer was acting under color of state law requires a court to assess the totality of the circumstances and consider "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Zambrana–Marrero*, 172 F.3d at 125, quoting *Barreto–Rivera* v. *Medina-Vargas*, 168 F.3d 42, 46 (1st Cir. 1999). The general inquiry is whether the officer's actions occurred while he was performing an actual or apparent duty or whether the officer could not have behaved the way he did "'but for the authority of his office.'" *Zambrana–Marrero*, 172 F.3d at 125, quoting *Martinez*, 54 F.3d at 986. A defendant acts under color of state law when he exercises power

10

that is "'possessed by virtue of state law'" and made possible because the defendant is clothed in the authority of state law. *Martinez,* 54 F.3d at 986, quoting *West* v. *Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255 (1988).

There are certain discrete factors which a court may consider including the officer's clothing, their duty status and the existence of a regulation providing that officers are on duty twenty-four hours a day, the use of a police cruiser and police radio, and the use of police equipment such as a service weapon, handcuffs or other traditional law-enforcement tools, whether the officer detained, interrogated, or searched a citizen, and the location of the incident. *See Zambrana–Marrero*, 172 F.3d at 128; *Barreto–Rivera*, 168 F.3d at 45, 48; *Parrilla–Burgos*, 108 F.3d at 449; *Martinez*, 54 F.3d at 985–86. These factors, however, should not be applied in a simplistic or mechanical formula. No single factor will be dispositive in a determination of whether an officer was acting under color of state law. *Zambrana–Marrero*, 172 F.3d at 125; *Barreto–Rivera*, 168 F.3d at 45. Here, it is clear that Covino was acting solely in his capacity as a private citizen. He was on personal business on his own personal time in civilian clothes. No law enforcement powers were employed. As there was no state action, the plaintiff's federal civil rights claim fails.

Additionally, the plaintiff cannot establish the second element of a federal civil rights claim as she was never deprived of any right guaranteed under the Constitution. A judge in the Lynn District Court considered the merits of what Covino set forth in his Affidavit in support of the order and granted Covino relief. As such, the *Rooker–Feldman* doctrine and the full faith and credit statute, 28 U.S.C. § 1738, preclude revisiting this issue. The *Rooker–Feldman* doctrine provides that no federal district or appellate court has jurisdiction to review state court judgments. *Sheehan* v. *Marr*, 207 F.3d 35, 39–40 (1st Cir. 2000); see *District of Columbia Ct. of*

11

*Appeals* v. *Feldman*, 460 U.S. 462, 103 S.Ct. 1303 (1983). For federal claims not presented in state court, *Rooker–Feldman* "forecloses lower federal court jurisdiction over claims that are 'inextricably intertwined' with the claims adjudicated in a state court." *Sheehan*, 207 F.3d at 39–40. A federal claim is "inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Hill* v. *Conway*, 193 F.3d 33, 39 (1st Cir. 1999). The logic of this rule stems from the proposition that if a federal court were able to grant relief from the state-court judgment, it would be "difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Hill*, 193 F.3d at 39. Moreover, 28 U.S.C. § 1738 requires this court to give "the same preclusive effect to state court judgments—both as to claims and issues previously adjudicated—as would be given in the state court system in which the federal court sits." *Keystone Shipping Co.* v. *New England Power Co.*, 109 F.3d 46 (1st Cir. 1997), citing *Kyricopolous* v. *Town of Orleans*, 967 F.2d 14 (1st Cir. 1992). A state-court issued judgment has the same preclusive effect in § 1983 suits as in other federal suits. See *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 83–85, 104 S.Ct. 892 (1984).

With a judge in the Lynn District Court issuing a restraining order against Radfar pursuant to Mass. Gen. Laws chapter 209A, the doctrines of issue preclusion and collateral estoppel bar Radfar from relitigating in federal court whether the issuance of the restraining order was unconstitutional. Under Massachusetts law, for an issue to have preclusive effect in a subsequent proceeding, four elements must be present: "(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment." *Keystone Shipping Co.*

v. *New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997), citing *Grella* v. *Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir. 1994). An issue may be "actually decided" where it "constituted, logically or practically, a necessary component of the decision reached in the prior litigation." *Grella*, 42 F.3d at 30–31; see *Keystone Shipping*, 109 F.3d at 51 (applying Massachusetts law). Here, the plaintiff's claims that Covino misrepresented phone calls and messages between himself and the plaintiff, that he failed to disclose pertinent information to the court, or that he made misleading claims to the court cannot be relitigated here. And even if they were to be, the record shows that the plaintiff called Covino (the "victim") at least 162 times since he said "don't call me."

<u>EQUAL PROTECTION</u>

Count II of the plaintiff's Complaint alleges selective prosecution based on gender and national origin. Ex. 1, Complaint, Doc. No. 70-1, pp. 8-9 at ¶¶29-30. This claim is defective for the reasons set forth above: that Covino never exercised any law enforcement powers, that was engaged in protected petitioning acts solely a private citizen, and that his actions never deprived the plaintiff of any rights protected by the Constitution, but they also fail as there is not a shred of evidence that any of Covino's actions were based upon the plaintiff's race or national origin. The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, a plaintiff must allege that he or she "was treated differently from others similarly situated ... based on impermissible considerations." *Clark* v. *Boscher*, 514 F.3d 107, 114 (1st Cir. 2008)(quotation marks and citation omitted). "The Supreme Court has held that differential treatment based on suspect classifications (race, national origin, religion, or alienage) is subject to strict scrutiny; differential treatment based on quasi-suspect classifications (gender

13

or illegitimacy) is subject to intermediate scrutiny; and differential treatment based on all other classifications simply must survive a rational basis inquiry." *Pineiro* v. *Gemme*, 937 F. Supp. 2d 161, 176 (D. Mass. 2013). "This showing of disparate treatment is a 'threshold requirement' of any equal protection claim." *Lu* v. *Smith*, No. 15-cv-14081-DJC, 2016 WL 4595206, at *3 (D. Mass. Sept. 2, 2016), quoting *Ayala-Sepulveda* v. *Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012). A violation of equal protection has occurred only where there has been a "'gross abuse of power, invidious discrimination, or fundamentally unfair procedures' or some sort of unjustified disparate treatment with respect to similarly situated" persons. *Collins* v. *Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001), citing *Creative Environments, Inc*. v. *Estabrook*, 680 F.2d 822, 832 n.9 (1st Cir. 1982). In the instant case, the plaintiff cannot show that Covino treated her any differently than he would have treated a woman of any other race who called him over four hundred times over Martin Luther King weekend, called a hundred times in one day, who forced him to block hundreds of phone numbers on his cell phone, and who twice drove from Virginia and showed up at his workplace and neighborhood and threatened to cause a scene, and who created multiple social media accounts to stalk Covino. The plaintiff's selective prosecution claim fails for myriad reasons.

<u>DEFAMATION</u>

Count III of the plaintiff's Complaint alleges defamation, essentially asserting that Covino told the plaintiff's employer that she had committed criminal acts when he knew that she hadn't committed criminal acts. Ex. 1, Complaint, Doc. No. 70-1, p. 9 at ¶32-35. This claim also fails as Covino's actions of contacting the plaintiff's employer when the plaintiff showed up in his neighborhood and called him was protected petitioning behavior as demonstrated above. Moreover, all of it was true. As Lt. Ganley testified, the gist of the defendant's phone call was

that Covino "wanted a clean break from her. Did not want her contacting him, coming up there or interfering with his work or his family." (Revised Statement Material Facts, Doc. No. 77 at ¶24) Given the plaintiff's actions of threatening to come to Covino's home, driving eight hours to go to his place of employment, the repeated phone calls and text messages from dozens and dozens of multiple phone numbers, the dozens and dozens of voicemails that Chief Rowan found disturbing, and the plaintiff's past track record, nothing that Covino did or said was untrue or unwarranted.

As a starting point, summary disposition of defamation claims is "especially favored" in Massachusetts because meritless cases put "an unjustified and serious damper on freedom of expression" and "the costs of litigation may induce an unnecessary and undesirable self-censorship." *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987). Although it is not necessary for a plaintiff to plead defamation under the requirements of Rule 9(b), the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond. See *McGeorge* v. *Continental Airlines, Inc.*, 871 F.2d 952, 955–956 (10th Cir. 1989); *Kelly* v. *Schmidberger,* 806 F.2d 44, 45–6 (2d Cir. 1986), citing *Liguori* v. *Alexander*, 495 F.Supp. 641, 647 (S.D.N.Y. 1980) (providing that the complaint must at least give the defendant sufficient notice of the statements complained of to enable the defendant to mount a defense); *Cohlmia* v. *Ardent Health Services, LLC*, 448 F.Supp.2d 1253, 1268 (N.D. Okla .2006); *Linker* v. *Custom–Bilt Machinery, Inc.*, 594 F.Supp. 894, 902 (E.D. Pa. 1984). Here, the plaintiff does not even know what Covino said to her employer. The plaintiff's employer requested an investigation by the Virginia State Police that uncovered harassment and stalking behavior by the plaintiff, which was all consistent with her past history. The plaintiff

subsequently failed two fitness for duty evaluations and thereafter resigned. There was no defamation.

## MASSACHUSETTS CIVIL RIGHTS CLAIM

Count IV of the plaintiff's Complaint alleges violation of the Massachusetts Civil Right Statute. Ex. 1, Complaint, Doc. No. 70-1, pp. 9-10 at ¶¶37-38. The plaintiff's claim under the Massachusetts Civil Rights Statute, Mass. Gen. Laws c. 12, § 11I, must also be dismissed. "The MCRA is the state 'counterpart' to Section 1983 and, in general, is coextensive therewith." *Mangual* v. *City of Worcester*, 285 F.Supp. 3d 465, 471 (D.Mass. 2018). "The primary difference is that to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred 'by threats, intimidation or coercion.'" *Id.*, quoting *Bally* v. *Northeastern Univ.*, 404 Mass. 713, 718 (1989). "To establish a claim under the Massachusetts Civil Rights Act, 'a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion.'" *Glovsky* v. *Roche Bros. Supermarkets*, 469 Mass. 752, 762 (2014), quoting *Currier* v. *Nat'l Bd. of Med. Exam'rs*, 462 Mass. 1, 12 (2012). For purposes of the act, "threats, intimidation or coercion" are defined as follows:

> a 'threat' consists of 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm;' 'intimidation' involves 'putting in fear for the purpose of compelling or deterring conduct;' and 'coercion' is 'the application to another of such force, either physical or moral, as to constrain him [or her] to do against his [or her] will something he [or she] would not otherwise have done.

> *Glovsky*, 469 Mass. at 762-763, quoting *Haufler* v. *Zotos*, 466 Mass. 489, 505 (2006).

Here, there is nothing in the plaintiff's Complaint that remotely establishes a claim of loss of a constitutional right, but more so, there is nothing remotely akin to the necessary element of a threat, intimidation, or coercion. The plaintiff lost her law enforcement career as a result of

16

her own conduct and as a result of her own mental instability.  As such, Count IV must be dismissed.

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

Count V of the plaintiff's Complaint alleges intentional infliction of emotional distress. Ex. 1, Complaint, Doc. No. 70-1, p. 10 at ¶¶40-41. This count too must be dismissed.  As a starting point, "[a] failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress." *Shay* v. *Walters*, 702 F.3d 76, 83 (1st Cir. 2012), citing *Hustler Magaxzine, Inc.* v. *Falwell*, 485 U.S. 46, 56-57, 108 S.Ct. 876 (1988); see also *Scholz* v. *Delp*, 473 Mass. 242 (2015). In addition, "Massachusetts law sets a high bar of proof for severity." *Sindi* v. *El-Moslimamy*, 896 F.3d 1, 22 (1st Cir. 2018).  See also *Kennedy* v. *Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010)(explaining that "mere emotional responses including anger, sadness, anxiety, and distress ... are not often legally compensable").  A motion to dismiss is appropriate when the alleged conduct is not sufficiently severe.  See *Beecy* v. *Pucciarelli*, 387 Mass. 589, 596 (1982).  Here no matter how one views it, the defendant's conduct cannot be viewed as "conduct [that] was 'extreme and outrageous,' and was 'beyond all possible bounds of decency' and that was 'utterly intolerable in a civilized community.'" *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976), quoting Restatement (Second) of Torts, § 46 comment d (1965).  He was simply looking to have the plaintiff leave him alone and he followed the proper legal channels to do so.  He did nothing extreme or outrageous.

REFUSAL TO PREVENT WRONGS COMMITTED AGAINST PLAINTIFF, ABUSE OF
PROCESS AND MALICIOUS PROSECUTION

Count VIII of the plaintiff's Complaint alleges Refusal to Prevent Wrongs Against Plaintiff, Count IX of the plaintiff's Complaint alleges Abuse of Process, and Count X alleges Malicious Prosecution. Ex. 1, Complaint, Doc. No. 70-1., pp. 12-14 at ¶¶48-59.  Clearly, all of

these claims also fail.  Since the plaintiff's civil rights were not violated, there can be no claim for a conspiracy to violate rights that were not violated.  She was never prosecuted, but even if she had been, such decisions were made by Chief Rowan, the Virginia State Police, and the Virginia Prosecutor's Office. No wrongs were committed against the plaintiff, so Count VIII fails.  And the plaintiff was never subjected to court process, nor was she ever prosecuted for any offenses in Massachusetts – let alone offenses for which there was no probable cause, see *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593-594 (1982), citing *Nelson* v. *Miller*, 227 Kan. 271, 282-283, 607 P.2d 438 (1980), so Counts IX and X also fail.

<u>CONCLUSION</u>

For the foregoing reasons, the defendant respectfully moves that all counts of the plaintiff's Complaint be dismissed as there are no disputes of material facts and the defendant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

<div align="right">

Respectfully submitted,
Defendant,
Joseph I. Covino,
By his Attorney,

*/s/ Kenneth H. Anderson*
Kenneth H. Anderson, Esq. / B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA  02122
(617) 265-3900
kanderson@andersongoldman.com

</div>

Dated: April 16, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, **Defendant Joseph I. Covino's** *Revised* **Memorandum Of Law In Support Of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on April 16, 2024.


*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

_____

SHARON RADFAR,                    )
          Plaintiff               )
                                  )
                                  )
                                  )
CITY OF REVERE, and               )
BRIAN M. ARRIGO,                  )
     MAYOR; and                   )
JAMES GUIDO,                      )
     CHIEF OF POLICE; and         )
SERGEANT JOSEPH I.COVINO; and     )
OTHER AS YET UNNAMED              )
OFFICERS OF THE                   )
REVERE POLICE DEPARTMENT;         )
INDIVIDUALLY AND IN THEIR         )
OFFICIAL CAPACITIES AS MAYOR      )
CHIEF OF POLICE AND               )
POLICE SERGEANT AND OFFICERS      )
OF THE CITY OF REVERE,            )
          Defendants

**PLAINTIFF'S STATEMENT OF**
**UNDISPUTED FACTS**
**IN OPPOSITION**
**TO DEFENSE SECOND MOTION**
**FOR SUMMARY JUDGMENT**

## Table of Contents

**Claims of Joey Covino p.2**

**Claims of GMU Lt. David Ganley p.13**

**Claims of Carl Rowan, Jr. p.18**

**Impounded Material 1 p.44**

**Testimony from Plaintiff p.46**

1

363

**<u>Impounded Material II p.48</u>**

**<u>Plaintiff's Undisputed Material Facts p.51</u>**

**<u>Defendant's Statements of Facts are Disputed as</u>**
**<u>Follows:</u>**

**<u>Claims of Joey Covino</u>**

1. The plaintiff and the defendant met in late
June of 2015 at the World Police and Fire Games hockey
tournament in Fairfax, Virginia. (Ex. 2, Plaintiff's Answer
to Interrogatory, Doc. No. 70-2, at Number 3; Ex. 3,
Covino's Answer to Interrogatory, Doc. No. 70-3 at Number
2.)

2. The parties had a brief consensual
relationship in Virginia, after which the plaintiff visited
the defendant in the Boston area on or about August of 2015
and October of 2015.(Ex. 2, Plaintiff's Answer to
Interrogatory, Doc. No. 70-2 at Number 4; Ex. 3, Covino's
Answer to Interrogatory, Doc. No. 70-3 at Number 2).
**Disputed. Defendant acknowledges the relationship continued**
**into the two visits by plaintiff to the Boston area, during**
**which they were intimate and he participated in tourist**

2

**activities with plaintiff and a friend in the fall of 2015.(Ex.3, Covino Interrogatory Answers, Doc.No.70-3 pp.2-3).**

3. "After leaving the plaintiff at her hotel in the early fall of 2015, I told the plaintiff in a phone conversation I did not want to have any type of relationship with her and that I wanted her to stop contacting me." (Ex. 3, Defendant's Answer to Interrogatory, Doc. No. 70-3 at Number 2).

**Disputed.  Notwithstanding that claim, defendant continued to call and text plaintiff including calls he made to her at 2:00 AM, abusively yelling and screaming at her and calling her back to continue the diatribe after she hung up on him, during which he called her a "fat Iranian f\*\*\*" and said he hoped she would be shot in the face with her own service weapon.(Ex.5, Radfar Deposition, Doc.70-5 pp. 19,27).**

4. On May 12, 2016 the following exchange of text messages occurred between the plaintiff and the defendant:

> Plaintiff:    I'm here in ur state! Making a few minutes to fucking see me fact to face! I'm NOT asking u! Make it

3

happen!!!!!!!!!!

Plaintiff:    I'm here in ur state! Making a few
              minutes to fucking see me fact to
              face! I'm NOT asking u! Make it
              happen!!!!!!!!!!

Plaintiff:    Don't make me come to ur place!!!

Plaintiff:    Keep ignoring that I'm here...I
              fucking will show up...and will
              make a scene!

Defendant:    Leave me alone. I don't want any
              contact with you..I do not want to
              and will not see you.

Plaintiff:    Fine! I will show up at ur
              house![Defendant's address omitted
              for court filing]...See ya

Plaintiff:    Don't fucking say I didn't
              requested!

4

Plaintiff:      Call it a bluff! Guess...U ll see

Defendant:      You've called me 20 times in the
                past few hours. I am not going to
                answer. Please stop calling me and
                please delete my number as I do
                not wish to have contact with you.

Plaintiff:      I don't give a fuCK what you wish!
                Talk to me and I will stop!!! Or
                don't..And I have show up! You
                choice!

Plaintiff:      Ll"

Plaintiff:      I want my questions answered NOw

(See Ex. 4, March 12 text messages, Doc. No. 70-
4)

**Disputed.  The alleged texts are undated, the phone number
they came from is redacted, and given the defendants
editing and omissions in text message screen shots
identified with particularity infra, and the inability of
even Virginia state police investigators who subpoenaed**

**phone records and received these to verify them or even mention text messages in their probe, these cannot be said to have come from plaintiff.**

5. On or about July 2016, the plaintiff drove from her residence in Northern Virginia to the Boston area where she went to Covino's place of employment at the Revere Police Department uninvited and unannounced.(Ex.2, Plaintiff's Answer to Interrogatory, Doc.No.70-2 at Number 4;Ex.5,Plaintiff's deposition,  Doc.No.70-5 at pp.46-48)

6. According to plaintiff's Answer to Interrogatory Number 4, this trip in July of 2016 where she went to the Revere Police Station was a "short trip. This trip was not intended to see Joey Covino.  I have a family member who resides in Greater Boston." During this trip the plaintiff stayed at the Four Points by Sheraton Wakefield Boston Hotel and Conference Center.(Ex.2 Plaintiff's Answer to Interrogatory, Doc No.70-2 at Number 4)

7. As will be addressed below, defendant Covino later obtained an Abuse Prevention Order against the plaintiff.(Ex. 6, Abuse Prevention Order, Doc.No.70-6)

8. According the paragraph 7 of the plaintiff's Complaint, the plaintiff asserts "[Covino]felt he deserved the order because she did not obey him when he ordered her

6

not to come to the Commonwealth of Massachusetts."

(Ex.1,Complaint Doc.No.70-1,pp.2-3 at ¶7)

**Disputed in that it is incomplete. She also alleges he was
angry that she called out his abuse of her and bigotry. In
his words to George Mason Police Lt. David Ganley, "I
really need to do something (i.e. restraining order)she
called me 100 times last night...Now she's saying I'm
racist and posting same on her social media. Thoughts?"
(Ex.24,Covino txt to Ganley provided by GMU, Doc.78-3,p.1).**

9. At her deposition, the plaintiff testified that
this overnight trip to Boston entailed an eight-hour drive
from Northern Virginia to Boston(Ex.5, Plaintiff's
deposition, Doc.No.70-5 at p.48)

10. Plaintiff claims the purpose of this one-night
trip was to see her cousin who she had dinner with, but did
not stay with.(Ex.5, Plaintiff's deposition, Doc.No.70-5 at
p.47)

11. The plaintiff's counsin lives in Plymouth
County, and plaintiff does not know where she met her
cousin for dinner. (Ex.5, Plaintiff's deposition,
Doc.No.70-5 at pp.47-48)

12. The plaintiff claims not to have known that her
hotel in Wakefield was over forty miles away from Plymouth

County.(Ex.5, Plaintiff's deposition, Doc.No.70-5 atp.48)

13. On this trip, plaintiff admits that she stopped
in at the defendant's place of employment at the Revere
Police Station without knowing if the defendant was working
at the time. (Ex.5, Plaintiff's deposition, Doc.No.70-5 at
p.35)

14. When asked in her interrogatory answers why
the plaintiff went to defendant's place of employment at
the Revere Police Department, the plaintiff answered "a
police department is open to the public. While I was in
Boston in the summer of 2016 I stopped by once to visit the
station/visit Covino. As a former police officer, you are
always interested in seeing how other agencies
operate(especially out of state)

15. The plaintiff admitted at her deposition that
despite her professed interest in "seeing how other
agencies operate" that she did not visit any other police
departments on this visit, including the towns surrounding
Revere including, Boston, Chelsea, Everett or Lynn.
(Ex.5,Plaintiff's deposition, Doc.No. 70-5 at pp.35-36) The
plaintiff never asked for a tour of the Revere Police
Station nor asked for any information about the functioning
of the Revere Police Department.(Ex.5,Plaintiff's

8

deposition,Doc.No.70-5 at p.72).

**Disputed.  On that trip plaintiff testified she also
visited the Salem Police Department and obtained a patch
and a coin.(Id.)**

16. The defendant alleged in his Affidavit in
support of the Abuse Prevention Order, as well as in his
Interrogatory Answer Number 2, that from the fall of 2015
until he applied for the restraining order on January
31,2017, that the plaintiff relentlessly pursued and
harassed him through excessive contact including
telephone,text,written letters,social media,as well as
driving from Virginia and showing up at his place of
work.(Ex.3,Defendant's Answer to Interrogatory Doc.No.70-3
at Number 2;and Ex.7,Abuse Prevention Order
Affidavit,Doc.No.70-7)

**Disputed as it is incomplete.  He also alleged in the
affidavit plaintiff sexually assaulted him, though he told
Virginia state police their intimate relations were
consensual.  He also told made the false statement to the
judge in the ex parte hearing to obtain the order that
plaintiff had come to his hometown and went to his place of
employment in December 2016 though she had not been in the
area since July 2016. This falsehood went on to be repeated
to her employer and to Virginia State Police and even found**

9

**its way into an affidavit for a search warrant before the determination not to prosecute was made.(Ex.7, Abuse Prevention Order Affidavit, Doc. 70-7; Ex 22, Abuse Prevention Order ex parte hearing official transcript, Doc.78-1 at pp.1-3; Ex.5, Radfar Deposition, Doc.70-5,pp.9-10).**

17. Among other things, the defendant alleged in his Affidavit in Support of Abuse Prevention Order that over Martin Luther King weekend of 2017, the plaintiff called him over 400 times, that the plaintiff called him over 100 times on January 28, 2017, that the defendant was forced to block over 100 different phone numbers from which the plaintiff contacted him, that the plaintiff spliced pictures of herself with pictures of him that he found on social media.(Ex.3,Defendant's Answer to Interrogatory, Doc.No.70-3 at Number 2, and Abuse Prevention Order Affidavit, Doc.No.70-7).

**Disputed only in the claims are denied by plaintiff and were not credited by the investigation of plaintiff, but undisputed that defendant made those claims.**

18. According to the defendant, "as a result of the plaintiff's aggressive stalking behavior, I called the plaintiff and told her I was going to call her police chief as I was gravely concerned about her mental well-being.

Several times in the past I told the plaintiff that I would
call her employer if she did not stop contacting me,
although I did not do so until she appeared at my place of
work and in my neighborhood.  I told the plaintiff to never
contact me again."(Ex.3, Defendant's Answer to
Interrogatory Doc.No.70-3 at Number 2)

**Disputed. Plaintiff testified nobody told her-not defendant
and employer did not notify her that he did until they
served her with the restraining order on January 31,
2017.(Ex.5, Radfar Deposition, Doc. 70-5, p.4)**

19. Paragraph 9 of hte plaintiff's Complaint
states,"Covino called Plaintiff's employer, making the same
false and misleading claims against her, and causing her
employer to suspend her, open and investigation and seek
criminal charges against Plaintiff"(Ex.1, Complaint,Doc.No.
70-1,p.3 at ¶9)

20. At her deposition, the plaintiff admitted that
she had no personnel (sic) knowledge of what defendant
Covino said to Lt. Ganley, the plaintiff's supervisor, when
Covino called the George Mason University Police and has no
informatiomn regarding what Covino forwarded to
Lt.Ganley(Ex.5,Plaintiff's deposition,Doc.No.70-5 at p.32-
33)

21. A week or two before applying for the Abuse

Prevention Order, Defendant Covino called the George Mason
University Public Safety Office and asked to speak to the
on-duty supervisor. (Ex.8,Lt. Ganley deposition,Doc.No.70-8
at p.28-29)

22. The defendant "very reluctantly called the
George Mason University Police and spoke with Lieutenant
David Ganley, the Executive Office for the George Mason
Police Department. Lt. Ganley informed [the defendant] that
this was not the first time the department had received
complaints regarding the plaintiff's issues with
infatuation that resulted in her stalking other men.
Lieutenant Ganley told [the defendant] that the department
would attempt to speak with the plaintiff about her
situation and would ask her to leave me
alone."(Ex.3,defendant's Answer to Interrogatory,Doc.No.70-
3 at Number 2)

**Disputed as to Defense characterization of "very
reluctantly" and to the extent Lt.Ganley's recollection
and defendant's multiple text messages with Ganley from
January-December 2017 that he   wilfully failed and refused
to provide but were provided by GMU demonstrate otherwise.
Undisputed that this was defendant's answer.**

12

## Claims of GMU Lt. David Ganley

23. Defendant Covino told Lt. Ganley that he had
a problem with one of their officers he had dated and
mentioned Officer Radfar by name, bringing up issues he had
with communications and some text messages she had sent and
photos she had left him and noted she had come up and
visited his police department a couple of times
(Ex.8,Lt.Ganley deposition,Doc.No.70-8 at p.29)
**Disputed as this is incomplete.  He expressly told Ganley,
as he told the District Court Judge, the false claim that
plaintiff had gone to his workplace and neighborhood where
he lives in December 2016.(Ex.8,Ganley Deposition, Doc.70-8
p.16).**

24. According to Lieutenant Ganley, "the gist of
it" was that Covino "wanted a clean break from her. Did not
want her contacting him, coming up there, or interfering
with his work or his family"(Ex.8,Lt.Ganley deposition,
Doc.No.70-8 at p.30)

25. Lt. Ganley told Covino "that behavior was
consistent with Officer Radfar in past relationships that
[he]had heard of."(Ex. 8 Lt. Ganley deposition, Doc.No.70-8
at p.31)

**Undisputed the witness said this, plaintiff disputes the**

13

375

**characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong
performance and his friendship with her.**

26. Lt. Ganley testified at his deposition that
he was aware of a past situation where the plaintiff had
been involved in a relationship with a Fairfax County
sheriff's deputy where there had been an accusation that
she had broken into his house and stole some
photographs.(Ex.8,Lt.Ganley deposition, Doc.No.70-8 at
pp.20-22)
**Undisputed the witness said this, plaintiff disputes the
characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong
solid work performance and his friendship with her.**

27. Lt. Ganley also testified to personal knowledge
he had with the plaintiff having been involved with a
married co-worker at George Mason University named Tom
Bacigalupi.(Ex.8,Lt.Ganley deposition,Doc.No.70-8 at pp.32-
36)
**Undisputed the witness said this, plaintiff disputes the
characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong
solid work performance and his friendship with her.**

14

28. Lt. Ganley testified that the relationship between the plaintiff and Bacigalupi "was just volatile from the beginning. There were lots of instances where they would break up,she would call him time and time and time--I mean, literally back to back. I was in the car with him one time traveling back from training at Virginia Beach back to Northern Virginia and she called his phone. He wasn't answering.She called his phone probably about 100 times just back to back to back. Every tine it would stop ringing, she would dial again and again. I saw this from both sides. When I was on her squad, I'd seen her sit in the conference room with the phone and just dial the number repeatedly.I'm assuming it was his number at the time. I'm not 100 percent sure, but that was probably who she was calling, and he wasn't answering.  This happened a lot."(Ex.8, Lt. Ganley deposition, Doc.No.70-8 at pp.33-34)

 **Undisputed the witness said this, plaintiff disputes the characterization and offers and avers it is wholly discrepant with the rest of his testimony about her strong solid work performance and his friendship with her**.

29. Lt. Ganley was also aware of a couple of other similar relationships involving the plaintiff including an additional relationship involving a trainer at

15

377

the plaintiff's gym that resulted in the Louden County
Sheriff's Office being called to the gym because of the
plaintiff's conduct(Ex.8,Lt.Ganley deposition,Doc.No.70-8
at p.35)

 **Undisputed the witness said this, plaintiff disputes the
characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong
solid work performance and his friendship with her.**

        30. Lt. Ganley was also aware that plaintiff had
been disciplined for improperly using the George Mason
University VCIN computer terminal for non-criminal justice
purposes.(Ex.8, Lt.Ganley deposition,Doc.No.70-8 at p.24)

 **Undisputed the witness said this, plaintiff disputes the
characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong
solid work performance and his friendship with her.**

        31. On that occasion,the plaintiff had used the
VCIN terminal to look up information about a person she was
dating in order to determine if the vehicle he owned was
registered in his name or his wife's name or both
names(Ex.8,Lt.Ganley deposition, Doc.70-8 at pp.26-27)
**Undisputed the witness said this, plaintiff disputes the
characterization and offers and avers it is wholly
discrepant with the rest of his testimony about her strong**

**solid work performance and his friendship with her.**

32. According to Covino, Lt. Ganley told him "there's really nothing you can do until she latches on to the next guy, because that's what she has been doing down here."(Ex.9,Covino deposition,Doc.No.70-9 at p.40)

33. After speaking on the phone with defendant Covino, Lt. Ganley spoke to the Associate Director of Human Resources at George Mason University and told her that they probably needed to get the plaintiff into counseling.(Ex.8,Lt.Ganley deposition, Doc.No.70-8 at p.37)

34. As a result of the phone call with Covino, Lt. Ganley reported his conversation to Chief Rowan, who was a new police chief at George Mason University at this time. (Ex.8,Lt. Ganley deposition, Doc.No. 70-8 at pp.38-39)

35. Lt. Ganley also told him as follows: "I also told him-I mean he was a new chief at the time, so I told him that with the department's history with Officer Radfar, it probably-it obviously needed to be investigated, but it would probably be more proper for another agency to investigate it because of my personal relationship with her, Tom's relationship with her. We all knew her, we're a small department. We all knew her, we were interlaced together, so it would probably be better to have an outside person who wasn't familiar with her to investigate the

17

instance"(Ex.8, Lt. Ganley deposition, Doc.No.70-8pp.39-40)

### **Claims of Carl Rowan, Jr.**

36. Chief Carl Rowan Jr., was the interim police chief at George Mason University at the time defendant Covino called and spoke to the supervisor in charge, Lt. Ganley. He was later appointed as Chief of Police on November 1, 2017.(Ex.10, Chief Rowan deposition,Doc.No.70-10 at pp.11-12)

37. Chief Rowan is a graduate of Clark University in Worcester in 1974, after which he began a law enforcement career with the United States Marshal's Service.(Ex.10, Chief Rowan deposition,Doc.No.70-10 at p.9)

38. Chief Rowan then attended Georgetown Law School where he graduated in 1978,before working with the Federal Bureau of Investigation as a Special Agent in the Metro Washington area.(Ex.10,Chief Rowan deposition, Doc.No. 70-10 at p.9)        39. Chief Rowan worked in the Office of General Counsel for the FBI before going into a private law practice for approximately five years.(Ex.10, Chief Rowan deposition, Doc.No.70-10 at pp.10-11)

40. Chief Rowan later left to become vice president of a multi-billion-dollar software company in California before returning to Washington D.C. to work

18

as Chief of Police for a highly specialized rail and transportation company.(Ex.10, Chief Rowan Deposition, Doc.No.70-10 at pp.11-12)

41. Chief Rowan then served as president of a global security company running the Washington D.C. office before starting with George Mason University in July of 2016. (Ex.10, Chief Rowan deposition, Doc.No,70-10 at pp.11-12)

42. In light of the consulting work Chief Rowan had done at that time, he consulted with Human Resources representatives to find out what had occurred at George Mason University in the past and learned that the plaintiff "had been a difficult individual to managed and that there were a number of prior incidents, disciplinary issues and performance issues."(Ex.10, Chief Rowan deposition, Doc.No.70-10 at p.14)

43. Chief Rowan testified at his deposition that he was not interested in whatever personality problems had existed in the past and that everyone was getting a clean slate with him. (Ex.10,Chief Rowan deposition, Doc.No.70-10 at pp.13-14)

44. Chief Rowan testified that before learning about the situaton involving the plaintiff and defendant Covino, that he had a prior "disturbing" interaction with the plaintiff. He testified as follows: "Sometime in late

19

2016, I believe it was, I had received I think it was three complaints about Officer Radfar being rude to people on campus. And I called her into my office to remind her of the benefit that she wa being given by giving her a clean slate, and I told her, you know, don't squander that opportunity, stop with the rudeness, be professional, and let's move forward. What transpired at that meeting was, at first, she was very matter of fact, asking,'Well can you give me more detail? I'm not sure what you're talking about' and kind of having a normal conversation. Then that stopped. And we went into what I'll call the waterworks phase, and it was crying and basically being the victim and 'why are people always attacking me' and kind of sobbing. And then that stopped on a dime. And then came statements like—I mean just glaring—'They've tried to beat me before, and I've beaten them every time, and I'm going to beat you too.' It was like three different personalities in that short period of time. I found that to be disturbing. And I spoke with the employer relations department because I was just disturbed by the experience. So that was sort of my introduction to difficult Sharon. I mean, during that same time period I actually wrote her a commendation letter for something that she had recommended, and we wound up implementing her idea. But there was a continuing problem

20

with the manner in which she treated people, and I found
her behavior in that meeting to be disturbing." (Ex.10,
Chief Rowan deposition, Doc.No.70-10 at pp.15-16)

45. Paragraph 10 of plaintiff's Complaint alleges
that "Covino relentlessly pursued criminal charges against
Plaintiff though he knew she had committed no crime and
those charges and claims were
false."(Ex.1,Complaint,Doc.No.70-1,p.3 at ¶10)

46. Sometime in approximately mid-January of 2017,
Chief Rowan learned "that there was a situation going on
where we had a complaint that Officer Radfar was engaged in
some harassment,slash,stalking of a police officer in
Massachusetts, and that there were-that her behavior
including making hundreds of phone calls to the officer of
a type that were just very disturbing, and we were being
asked to look into it and get the situation stopped." Chief
Rowan was "[n]ot particularly" suprised by the allegations.
(Ex.10, Chief Rowan deposition, Doc.No.70-10 at pp.20-21)

47. As a result of these allegations, Chief Rowan
requested that the George Mason University Police
Department set up a meeting with the Virginia State Police.
(Ex.10, Chief Rowan deposition, Doc.No.70-10 at pp.19-20)

48. At that meeting, Chief Rowan requested that a
criminal investigation be conducted into the plaintiff's

behavior.(Ex.10,Chief Rowan deposition, Doc.No.70-10 at
p.22)

    49. Chief Rowan was the person who requested the
criminal investigation and "[a]nd the reason I was there
was I wanted the state police to know that this is a
request coming from the top of the department, it wasn't
something frivolous, it wasn't something that we normally
do, and I wanted the state police to know that I was the
one who was requesting their assistance."(Ex.10, Chief
Rowan deposition, Doc.No.70-10 at p.22)

    50. Chief Rowan had no information from any
source that Defendant Covino had ever requested a criminal
investigation into his allegations, and Chief Rowan had no
memory of even talking to Defendant Covino at any
time.(Ex.10,Chief Rowan deposition, Doc.No.70-10 at p.22)
Disputed as this is irrelevant.

    51. Chief Rowan testified that the fact that
defendant was employed in law enforcement was not a driving
factor in seeking a criminal investigation. "[B]ased on the
allegation, I mean a criminal investigation would certainly
be something that we would look at before going the
administrative route."(Ex.10, Chief Rowan deposition,

Doc.No. 70-10 at pp.22-23)

52. Through discovery, the defendant obtained the
record of investigation into this matter from the Virginia
State Police. This record contains the following synopsis
from Special Agent William Kinnard from the January 26,
2017 meeting with the George Mason University Command Staff
that commenced at 3:00 pm and ended at 3:45 pm.: "Synopsis:
SA Kinnard met with GMU Chief Carl Rowan, Major Brian
Cozby, Captain Phil Surber, and Lieutenant Dave Ganley
regarding this complaint. Chief Rowan state he was
requesting a criminal investigation and stated the suspect,
one of his officers, MPO Sharon Radfar, did not need to be
a police officer. Lt. Ganley said there had been several
instances of similar behavior involving Radfar in the past.
The current complaint is that Radfar has been harassing and
possibly threatening a police officer in Boston since the
summer of 2015. Radfar and the other officer met at the
World Police and Fire Games and had a brief consensual
sexual relationship. All of he command group in attendance
concurred that Radfar was volatile and possibly manic in
her relationships. Lieutenant Ganley said that when she
finds out an investigation is ongoing she will likely
commit suicide. Chief Rowan confirmed that Radfar was on

23

385

medical leave for about 6 weeks and that she had not been notified or confronted with these allegations. He also confirmed that an Internal Affairs investigation had not commenced at this time. The meeting ended at approximately 15:45hrs."(Ex.11,Virgina State Police records, Doc.No.70-11 at p.16, emphasis added)

53. Paragraph 12 of the plaintiff's Complaint states "Covino falsely and maliciously accused Plaintiff of a crime he knew she did not commit. Acting under color of law, he drafted a Revere Police Department incident report making his false claims, listing himself as the victim, the reporting officer and the supervisor approving the report."(Ex.1, Complaint, Doc.No.70-1,pp.3-4 at ¶12)

54. On January 25, 2017 George Mason University Police Lt. David Ganley emailed defendant Covino to inform him that the George Mason University Police were looking to see if plaintiff had misused their VCIN/NCIC terminals to access Covino's personal information.  This email also contained the following paragraph:

"My Chief wanted me to ask if you would be willing to file a police report with your local department? I know that's a big ask but he wants to have something to

24

back up our investigation. Just so you know we are moving
quick on this and will be taking some actions soon. We are
working with our HR department to see what we can do to get
her some help to curb this behavior." (Ex.12, January
25,2017 email from Lt. Ganley to defendant Covino,
Doc.No.70-12, emphasis added.)

55.     On January 27, 2017 Virginia State Police
Special Agent William Kinnard emailed defendant Covino and
advised him that he had been assigned to investigate his
complaint against a sworn member of the George Mason
University Police Department. Special Agent Kinnard stated
that "these types of investigations require a high degree
of accurate documentation." Special Agent Kinnard requested
that Covino provide him with "any and all records,
documents, messages or transmissions" as well as
information about Covino's phone service carriers. (See,
Ex.13, January 27 2017 email, Doc.No.70-13)

56.     On January 29, 2017, in response to Lt.
Ganley's request, defendant Covino authored an internal "To
File" Revere Police Department report that outlined the
history of his relation with plaintiff Radfar form the
summer of 2015 through January 29, 2017. (Ex.11,January

25

29,2017 Revere Police Report contained in Virginia State
Police Records, Doc.No.70-11 at pp.41-43)

**Disputed.  In what he acknowledged at his deposition was a
police report that he wrote, that he discussed in advance
with Lt.Ganley, Covino listed himself as the investigating
officer, the victim and the supervisor.  He also included
an "Incident Report" cover sheet describing   plaintiff as
a "suspect" who had committed a crime. (Id., Ex.9, Covino
Deposition, Doc.70-9 pp.7-9).**

57. Chief Rowan testified at his deposition that he
never saw the internal police report authored by Covino
until he saw it as an exhibit at his deposition. (Ex.10,
Chief Rowan deposition, Doc.No.70-10 at p.34)
Disputed as this is irrelevant.  Also his testimony
indicates he reviewed a number of documents including
alleged text messages and voicemails, which were sent to
Virgina authorities by Defendant.

58. As a police officer for the City of Revere,
the defendant could only exercise powers within the City of
Revere. He had not police powers of arrest outside of the
City of Revere except to arrest on a warrant or based on
fresh and continued pursuit. M.G.L. c. 276§28 and M.G.L. c.
41§98A. The defendant had no law enforcement powers in the
State of Virginia.

**Disputed as irrelevant.**

59. Covino never took any steps to bring criminal charges against the plaintiff in Massachusetts.(Ex.14, 10/26/20 Affidavit of Joseph Covino, Doc.No.70-14,p.3 at ¶¶16 &21)
**Disputed. Listing plaintiff as a suspect who had committed a crime, identifying the statute he alleged she violated in the police "Incident Report" he drafted, was a step to bringing criminal charges against the plaintiff in Massachusetts.**

60. The defendant has asserted under oath that on January 28, 2017, that the plaintiff called him or texted him over one hundred times (Ex.3,Defendant's Answer to Interrogatory, Doc.No.70-3 at Number.2)
**Disputed as Virginia State Police determined plaintiff called defendant 575 over a year and a half and during that period, 162 times in the 10 months since he told her not to call him, he called her 256 times, 32 times after he told her not to call him.(Ex.11, Virginia State Police Record, 70-11 p.20). Undisputed that he made the claim.**

61. On January 31, 2017, the defendant Covino went to the Lynn District Court and applied for and was

27

389

granted an Abuse Prevention Order against Sharon
Radfar(Exhibit 6, Abuse Prevention Order, Doc.No.70-6)
**Disputed as it is incomplete.  The judge explained to
Defendant he did not have the authority to order
limitations on Plaintiff outside the Commonwealth of
Massachusetts, which the Defendant failed to tell the
various officials he sent the order to in Virginia. (Ex 22,
Ex Parte 209A Hearing Transcript, Doc 78-22,pp.7-8.)**

62. The defendant was in civilian clothes, off
duty and did not exercise any law enforcement
powers.(Ex.14,10/26/20 Affidavit of Joseph Covino, Doc.No.
70-14,p.3 at §18).
**Disputed in that he made sure to remind the judge of his
status as a law enforcement officer, telling him at the end
of the hearing, "We miss you in Chelsea.".(Ex 22,
Transcript of 209 Ex Parte Hearing, p.10).**

63. On the evening of January 31,2017 George Mason
University Police Officers and Louden County Sheriffs
served the Abuse Prevention Order on the plaintiff and
seized her firearms. (Ex.1,Complaint, Doc.No.70-1p.2 at §6)

64. On January 31, 2017, the plaintiff was given
a letter placing her on administrative leave per Virginia

28

State personnel policy. This letter also advised the
plaintiff that a confidential investigation conducted by an
external investigator would be conducted.(Ex.15,
Administrative Leave Letter, Doc.No. 70-15)

65. On that date, the plaintiff was also served
with a Cease & Desist/Trespass Order letter directing her
to stay off George Mason University Property and demanding
that she stop her harassing, intimidation and stalking
behavior against Mr. Joe Covino.(Ex.16, Cease & Desist
Letter, Doc.No.70-16)

66. At her deposition, the plaintiff admitted
that she needed a firearm to work as a police officer, and
that because of the active restraining order she could not
possess a firearm. (Ex.5,Plaintiff's deposition, Doc.No.70-
5 at p.51)

67. On February 15, 2017 plaintiff attended a
hearing in the Lynn District Court where where defendant
Covino did not contest the dismissal of the restraining
order (Ex.5, Plaintiff's deposition, Doc.No.70-5 at p.51)

68. The plaintiff admitted that with no
prohibition against her possessing a firearm, there was no

legal impediment to her working as a police officer.(Ex.5,
Plaintiff's deposition, Doc.No.70-5 at p.52)

69. On February 1, 2017, defendant Covino sent
Virginia State Police Special Agent Kinnard dozens of
emails and screen shots of text messages along with
voicemails from the plaintiff Radfar. Defendant Covino also
provided a detailed summary of the conduct of the plaintiff
that is set forth on page 14 of the documents produced by
the Virgina State Police under the caption "Synopsis". This
synopsis explained how Covino uploaded the text screen
shots and voicemails onto a flash drive and how he
completed a formal report that was going to be sent from
his police station by Detective Renee Kephart.  The
synopsis further details how defendant Covino had received
phone calls from the plaintiff from a "restricted"phone
number 454 times as well as how he had blocked dozens of
phone numbers from which he had received text
messages.(Ex.11, Virginia State Police records, Doc.No.70-
11 at pgs.14-15)

70. The screen shots of these text messages are
attached as Exhibit 17, Screen shots of text messages,
Doc.No.70-17. A review of these records indicates the

messages were sent from dozens of phone numbers.(See Ex 17, Screen shots of text messages, Doc.No.70-17)

71. This summary provided by defendant Covino detailed "The number that I've received the most calls/texts from is her personal cell phone:XXX-XXX-XXXX[plaintiff's number omitted from court filing](Until I blocked it) 90% of the calls are from "Restricted" but she leaves a voice mail most of the time and in them she admits calling me over and over as I won't 'pick up'. I usually block any number from her to make it more difficult or time consuming to use her calling card or scrambler application, but below is a partial list of numbers she has used: Calls to my phone since January 1st:'Restricted' 454 times. Other numbers called by Radfar in the past week: 918-416-0501(12x on January 30th)202-750-4020(2x on January 29)615-334-8902(14x on January 28th) 617-545-7373(27x on January 28th)671-337-5191(2x on Jannuary 17,20) Text Messages: January 30th,918-416-0501(19 Texts)January 29th 202-750-4020(2 Texts)XXX-XXX-XXXX(41 Texts from Radfar's cell # after unblocked)615-334-8902(65 Texts) January 28th 617-545-7373(15 Texts)January 22nd 617-903-5817(12 Texts)321-985-5923(4 Texts) 469-789-7461(4 Texts)631-317-1059(4 Texts)631-317-1059(4 Texts)929-200-3126(3 Texts)931-450-

4197(6 Texts)January 21st 617-431-3201(7 Texts)January 20th
412-206-9959 (8 Texts). (See Ex.11, Virginia State Police
records, p.14)


72. This same summary provided a list of twenty-
four different phone numbers from which Covino received
messages from the plaintiff who was using a texting app
called "WhatsAPP" between the dates of January 9, 2017 and
January 31, 2017.(Ex.11, Virginia State Police records,
Doc.No.70-11 at pp.14-15)


73. On February 28, 2017, Virginia State Police
Special Agent William E. Kinnard applied for and received a
search warrant to obtain a copy of Verizon Wireless
communications from defendant Covino's cellphone. (Ex.11,
Virginia State Police records, Doc.No.70-11 at pp.23-33)


74. On March 27, Virginia State Police Special
Agent William E. Kinnard delivered his case notes "to
Assistant Commonwealth Attorney Alex Reuda for review and
prosecutorial guidance." Special Agent Kinnard sent the
following email to Ms. Reuda stating: "Ms. Reuda, I dropped
off one manilla envelope at the front desk. The documents
are copies for you.  The thumb drive contains more texts
and voicemails but I will need the thumb drive back.

32

Analysis of the suspect phone records show: Suspect called victim at least 575 times over the affected period and at least 162 times since I can prove that the victim said 'do not call me anymore'(See text message of March 12, 2016). Victim called suspect at least 256 times and 32 times since he told her to stop calling him. I am interested if you would prosecute this case and if I have enough to charge her under 18.2-427. We can meet on Thursday but of you reach a decision before hand, please send a message. Many thanks, Bill."(Ex. 11, Virginia State Police Records, Doc70-11 at p. 11, emphasis added)

75. Code of Virginia §18.2-427 is a crime entitled "Use of profane, threatening or indecent language over public airways or by other methods." It is considered a Class 1 misdemeanor. (Ex.18, Code of Virginia §18.2-427, Doc.No. 70-18)

76. On March 28, 2017, Virginia Commonwealth Attorney Alex Reuda emailed Special Agent Kinnard the following: "Just finished reviewing all the materials. We do not have enough for telephone threats charges because I don't really see her making actual threats, it's all veiled. And the profanity doesn't fall under the legal

definition of obscene under the Virginia Code or case law.
Honestly, our best bet would be to potentially charge her
with stalking, but it would be a real stretch, because he
would have to be able to stay(sic) he has a reasonable fear
of bodily injury or death to himself or a family member.
Also, most of this behavior is occurring in Massachusetts.
She is traveling up there to stalk him, has shown up at his
work, says she is near his house and demands he meet her,
and is receiving all the phone calls and text messages
there.  Has he sought a protection order in the
Massachusetts courts or sought charges up there?  If we get
a misdemeanor warrant down here, there is no provision for
the court to pay for him to fly down here at the General
District Court level. Massachusetts has jurisdiction so it
seems a much better plan to have her charged up
there."(Ex.11, Virginia State Police records, Doc.No.70-11
at p.19).

        77. On March 29, 2017 Commonwealth Attorney Alex
Rueda wrote, in part, the following to Special Agent
Kinnard:"I did consider 18,2-429. We probably have enough
for that. However, I don't see much purpose in charging a
Class 3 misdemeanor when he would hav to fly down here on
his own dime to get her convicted of something that only

34

396

carries a fine. It seems to me that he ought to be pursuing
charges in Massachusetts, where most of the behavior
occurred and where he doesn't need to travel in order to
appear in court.  He also should probably get a permanent
protective order in Massachusetts. If he was eligible for a
temporary protective order, he ought to be able to apply
for a permanent one..."(Ex.11, Virginia State Police
records, Doc. No.70-11 at p.18)

78. On April 12, 2017, Virginia State Police
Special Agent Kinnard contacted the plaintiff.  The
plaintiff asked if she could call him back in five minutes.
Special Agent Kinnard was then contacted by plaintiff's
attorney who asked if they could meet the following
week.(Ex.11,Virginia State Police records, Doc.No.70-11 at
p.11)

79. According to plaintiff's deposition
testimony, the plaintiff and her attorney met with the
Virginia State Police and the plaintiff did not give any
statement to police.(Ex.5, Plaintiff's deposition,
Doc.No.70-5 at p.99)

80. On May 5, 2017, Virginia State Police Special
Agent Kinnard met with Assistant Commonwealth Attorney Alex

Reuda regarding his investigation."Reuda stated that she
had briefed the Commonwealth Attorney, Jim Plowman, and
they agreed that prosecution should not go forward. Rueda
suggested that Covino apply for a permanent protective
order against Radfar in Virginia. Also on this date, S.A.
Kinnard notified Lieutenant Ganley with a prosecution
decision."(Ex.11,Virginia State Police records, Doc.No.70-
11 at p.49)

    81. The affidavit in support of a search warrant
applied for by S.A. Kinnard references the plaintiff
"harassing online a Lorna Hoey who lives in Dublin, Ireland
because Radfar thinks that Covino is interested in Hoey
instead of her."(Ex.11,Virginia State Police records,
Doc.No.70-11 at p.30)

    82. The plaintiff was aware that Lorna Hoey was a
female hockey player from Ireland. The plaintiff did not
know if Covino and Hoey ever had a relationship
together.(Ex.5, Plaintiff's deposition, Doc.No.70-5 at
p.57)

    83. The plaintiff testified that she did not
recall leaving any voicemail messages on the defendant's
phone regarding Lorna Hoey.(Ex.5, Plaintiff's deposition,

Doc.No.70-5 at p.57)

84. The plaintiff left the following voicemail on
Covino's phone regarding Lorna Hoey:"To be more like Lorna?
Is that what you want? I can act like Lorna. I can be like
Lorna. I'll go get surgery so I can look like fucking
Lorna, because obviously that's what you want. So tell me,
what will it take" I'll do it. Tell me what it takes. You
want me to act like Lorna? You want me-you want my hair to
be like Lorna? I mean, what will it take? You want me to
get surgery to look like that? I'll go get it. Tell me what
it will fucking take."(Ex.5, Plaintiff's deposition,
Doc.No.70-5 at pp.78-79; and Ex.19, Voicemail Audio
Recordings, Doc.No.70-19)

85. The plaintiff also left the following
voicemail regarding Lorna Hoey:"Remember during my second
visit I told you you looked really good with long hair?
Well, I'm so glad that you kept that long hair, because it
really, truly looks good on you.  And the rugged look, I
mean, wow, I'm sure that is what Lorna likes, right, or
what it, Elaine? Or which one of your bitches? I'm glad you
did listen to what I told you about the long hair, and I
mean that looks-it makes you very hot.  If you have any

37

more problems, more bitches, like, you know."(Ex.5,
Plaintiff's deposition, Doc.No.70-5 at pp.64-65;annd Ex.19,
Voicemail Audio Recordings, Doc.No.70-19)

86. The plaintiff also left the following
voicemail on the . defendant's phone:"You have fucking time
to answer Lorna's phone, right? Chatting with her, are you?
I'm sure you can fucking pick up this one. I forgot, you're
fucking-you're fucking her right now, you're in love with
her, so I can see that she's right next to
you."(Ex.5,Plaintiff's deposition,Doc.No.70-5 at pp.67-68;
and Ex.19, Voicemail Audio Recordings, Doc.No. 70-19)

87. The plaintiff left a voicemail about the
defendant blocking her phone number, stating "Thanks for
blocking me, by the way. And this is very adult of you to
block me or not even give me closure or tell me why you
hate me this much. So at least you can have the decency to
tell my why you hate me so much and that you are unwilling
to speak to me or tell me what it is that I have done to
you."(Ex.5, Plaintiff's deposition, Doc.No.70-5 at pp.59-
60; and Ex.19, Voicemail Audio Recordings, Doc.No. 70-19)

88. Another voicemail said,"When you're ready to
have a real conversation like two fucking adults, let me

fucking know, and I don't mean by fucking text messages or
I don't mean by you yelling and screaming or fucking
putting me down. You want to keep fucking threatening me?
Go ahead."(Ex.5, Plaintiff's deposition, Doc.No. 70-5 at
pp. 60-61; Ex.19, Voicemail Audio Recordings, Doc.No.70-19)

89. All told, Defendant Covino turned over forty-
six recorded voicemails to the Virginia State Police.
(Ex.11, Virginia State Police report, Doc.No.70-11 at p.10;
Plaintiff's deposition, Doc.No.70-5 at p.58;Ex.19,
Voicemail Audio Recordings, Doc.No.70-19)

90. The plaintiff would not answer if she felt
the defendant would find the voicemails annoying or
obnoxious. (Ex.5, Plaintiff's deposition, Doc.No. 70-5 at
pp.68-69). She testified that she left the voicemails to
get him to "acknowledge" her phone calls. (Ex.5,
Plaintiff's deposition, Doc.No.70-5, at p.69)

91. During the course of the investigation,
George Mason University Police Chief Carl Rowan, Jr.
listened to dozens of the voicemails the plaintiff had left
for the defendant. Chief Rowan stated that he "found them
to be disturbing, threatening. It was, in the manner in
which they were delivered, it was—I hadn't heard anything

39

like that in my memory." (Ex.10, Chief Rowan deposition, Doc.No. 70-10 at pp.26-27)

92. Although Chief Rowan did not take an active role in the investigation or review the files, he was advised that the plaintiff had made hundreds of phone calls after she was told by defendant Covino not to contact him. (Ex.10, Chief Rowan deposition, Doc.No.70-10 at pp.27-28)

93. Once the George Mason University Police were advised of the outcome of the state police investigation, the George Mason University Police began looking at administrative issues related to the plaintiff's conduct. (Ex.10, Chief Rowan Deposition, Doc.No.70-10 at p.26)

94. As noted above in paragraphs 73-73; and in Ex.11, Virginia State Police records, Doc.70-11 at pp 14-15; and in defendant's Affidavit for Abuse Prevention Order (Ex.7, Doc.No. 70-7), the defendant received phone calls and text messages from plaintiff from dozens of different numbers after he blocked other numbers used by the plaintiff.

**Disputed. That claim was not credited by Virginia State Police, who found that defendant had received a total of**

40

**575 calls from plaintiff in a year and a half. (Id.)**

95. At her deposition, plaintiff at first denied using any other phone numbers to contact the defendant.(Ex.5, Plaintiff's deposition, Doc.No.70-5 at p.75)

96. Later, when confronted with multiple text messages send from different phone numbers including 617-545-7373, 703-593-9748,703-593-7655, 578-422-1981, 931-450-4197, 929-200-3126 to the defendant, all with content consistent with plaintiff's prior conduct including crude statements about Lorna Hoey, accusing the defendant of being hateful, accusing the defendant of ignoring her due to her Middle Eastern heritage, etc. the plaintiff repeatedly refused to deny that she sent those text messages.(Ex.5, Plaintiff's deposition, Doc.No.70-5 at pp.73-84)

97. When asked directly and repeatedly if plaintiff sent those text messages from the various phone numbers listed above, plaintiff repeatedly answered, "this is not my phone number and I don't recall sending that." The plaintiff refused to explicitly deny sending those text messages. (Ex.5, Plaintiff's deposition, Doc.No.70-5, at

41

p.75m lines 22-23, page 77, lines 1-2, page 78, lines 4-5, 12-13, page 79, lines 10-11, page 81, lines 20-21, page 82, lines 7-8, 21-22, page 83 lines 5-7, page 84 lines 5-6, line 24 to page 85 line 1)

98. In Interrogatory No. 8 the defendant specifically asked the plaintiff the reasons for the ending of her employment with the George Mason University Police Deparment. Interrogatory Number 8 to the plaintiff reads as follow: Please state the dates of your employment with the George Mason University Police Department, listing the date of your hire, your duties and responsibilities, your salary and wage information, the date of the end of your employment with the George Mason University Police Department, and the reasons provided for ending your employment with the George Mason University Police Department. (Ex.2, Plaintiff's Answer to Interrogatory, Doc.No.70-2 at Number 8, emphasis added)

99. The plaintiff answered Interrogatory No. 8 as follows: Hire Date: 1/23/2001; Suspension date:1/31/2017(they never allowed me to return); Final Termination Date: 2021; Title: Master Police Officer, $66,446 (last reported salary 2017); $31.945192 per

hour(REG) $47.917788 OT rate (REGX1.5); Missed many
promotions and salary increases of 17% between 2017-
present; Full time Sworn Police Officer with law
enforcement duties: responding to suspicious activities;
resolving complaints;investigating criminal and traffic
incidents; and providing first responder aid; responding to
accidents; interviewing and taking statements; making
arrests; testifying in court; and assisting other law
enforcement agencies and law enforcement
duties.(Ex.2,Plaintiff's Answer to Interrogatory ,
Doc.No.70-2, at Number 8)


(Statement of Facts 100-103 including Plaintiff
Responses IMPOUNDED pursuant to the Court's Orders of
February 22, 2022 and March 21, 2024.)

43

**Testimony from Plaintiff**

104. On December 3, 2017, a Brockton police officer named Jason Ford applied for and obtained an Abuse Prevention Order against the plaintiff in the Brockton District Court(Ex. 20, Sharon Radfar v. John Crowley, Chief of Police et al., USDC Docket No.20-cv-12151-RWZ, Complaint, Doc.No. 70-20, pp.203 at ¶8)

105. The plaintiff also alleged that this Abuse Prevention Order was obtained based upon "false and misleading, damaging and humiliating statements about the plaintiff."(Ex.20, Radfar v. Crowley et al, USDC Docket No. 20-cv-12151RWZ, Complaint, Doc.No. 70-20, p.3 at ¶8)

106. Jason Ford had also contacted the plaintiff's employer. (Ex.5, Plaintiff's deposition, Doc.No.70-5 at p.55)

107. The plaintif also alleged that this Abuse Prevention Order "contributed to the loss of her job."(Ex. 20, Radfar v. Crowley et al, USDC Docket No. 20-cv-12151-RWZ Complaint, Doc.No.70-20, p.5 at ¶16)

108. Unlike the Order obtained by the defendant Covino, the order obtained by Jason Ford was extended for a

46

year.(Ex.5, Plaintiff's deposition, Doc.No.70-5 at p.56)

**Disputed. Ford's order was vacated prior to the one year**

**expiration when he failed to appear on plaintiff's Motion**

**to Vacate the order.(Ex.5, Radfar Deposition, Doc.70-5,**

**pp.14-15).**

(Statements of Fact and Plaintiff responses

109-113 IMPOUNDED pursuant to this court's orders

of February 22, 2022 and March 21, 2024.)

47

114. On January 6, 2021, the plaintiff submitted a letter of resignation to the George Mason University Police Department effective on that date.(Ex.10, Chief Rowan deposition, Doc.No.70-10 at p.31; Ex.21, Letter of Resignation, Doc.No.70-21).

## Plaintiff's Statement of Material Facts

1. Defendant, a Revere Police Sergeant, drafted a police report in which he was the alleged "victim", falsely and maliciously claiming Plaintiff had committed crimes against  him, and wrongly listing himself as the reporting officer and the  supervisor, while stating the identity of the victim was  "confidential.", though he listed himself as the victim. He included a police department "Incident Report" naming plaintiff as the suspect who had committed the crime of "criminal harassment" prohibited by G.L. c. 265 §43A at the Revere Police Station in January 28, 2017.(Ex 11, Virginia State Police Record, Doc.No.70-11 p.34).

2. Defendant then appeared in the Lynn District Court *ex  parte* and by making false, misleading and scurrilous claims  against plaintiff while omitting information he knew to be  essential to the court's proper

50

evaluation of his claims he  convinced a judge to grant him

an Abuse Prevention Order pursuant to M.G.L. c. 209A

against Plaintiff, using his status as a police officer and

his relationship with the court to  wrongly credit his

false claims.  (Ex.22, Transcript of Ex Parte Hearing,

Doc.78-22, pp.1-11).


3. Though he alleged in the Lynn District Court

*ex parte*  proceeding hundreds of text messages and emails

and thousands of calls from Plaintiff,  he wrongfully and

misleadingly omitted the text messages, voicemails he had

sent to Plaintiff and the hundreds of phone calls he made

to her, dozens of which he made after he told her not to

contact him.  He omitted the fact that the communications

spanned the period of the parties' involvement dating back

to the summer of 2015.  He intentionally withheld that

information also from Virginia  investigators in his

campaign to subject Plaintiff to criminal  charges in that

state, and he also omitted that information in his

correspondence with her employer.


4. Defendant told the Lynn District Court on January

31, 2017 that plaintiff had traveled to Massachusetts to show up

at his workplace and otherwise harass him as recently as December

2016–a claim he also made to plaintiff's employers and Virginia criminal investigators–which was untrue and in fact plaintiff had not been in Massachusetts since a trip in which she visited a relative and did not see defendant in July 2016. (Ex 22 Transcript of 209A Hearing Doc.78-1, p.2; Ex. 5 Plaintiff's deposition, Doc.70-5 p10).

5. In the same ex-parte proceeding after which the court reluctantly granted him an Abuse Prevention Order (Ex.22 Transcript of 209A Hearing Doc. 78-1, p7) defendant told the court plaintiff had sexually assaulted him even as he portrayed their intimate relationship as consensual to plaintiff's employer and Virginia State Police S.A. Kinnard. (Ex.7 Abuse Prevention Order Affidavit Doc. 70-7).

6. Defendant edited the 212 pages of text message and social media screen shots he provided to VA authorities to exclude all but two of his texts: The version he provided at pp 147-148 that includes an exchange with his friend was omitted to delete the rest of his communication with his friend near the time of the restraining order, leaving out his "And?....that must have garnered a reaction...lol.."quips. Defendant also edited the dates out of all 212 messages. (Ex.17, Doc.70-17, pp.147-148; Ex. 23, Doc. 78-2, pp.1-3,).

7. Despite defendant's editing of the texts, after review of his submission of the documents that included 120 texts and 46

52

voicemails over a one-and-a-half year period they could ascertain were from plaintiff investigators and prosecutors determined there were no threats; and that while in that period plaintiff had made 575 calls to defendant, 162 after he told her not to call him again in March 2016, omitted from defendant's submission but unearthed when his phone records were suubpoenaed was the fact that he had called plaintiff 256 times in that period, 32 times after he told her not to contact him. (Ex 11. Doc.70-11 pp. 20,45, 48-49)

8. Defendant's interest plaintiff's life and career continued long after he last heard from her in January 2017, his Abuse Prevention Order was vacated on February 15, 2017 the first time she appeared for a hearing whereupon he declined to go forward, and the prosecution of plaintiff was finally abandoned by Virginia authorities in a letter dated May 14, 2017: two days later he texted Lt. Ganley telling him: he had seen plaintiff at Police Week in Washington D.C., his opinion about the race and other characteristics in commentary about her companions, and asking about her employment—and in addition these texts provided not during discovery as sought from defendant and not in any of his discovery supplementation but instead by George Mason University demonstrated he texted Ganley even months later, in December of 2017. (Ex 24, Doc. 78-3 -May 16, 2017 and Dec. 3, 2017 Text messages from Covino to Lt. Ganley provided by GMU.)

53

9. In December, 2017 Covino told Ganley that Jason Ford either was going to or had obtained restraining order against plaintiff. (Ex.8, Ganley Deposition, Doc.70-8,p.19).

10. On February 15, 2017, the day defendant's restraining order was vacated, Virginia State Police Detective William Kinnard received items provided by defendant from the Revere Police Department, including his police report. There is no indication that they were told the order was vacated that day, nor is there any indication in the record that notwithstanding Covino's multiple contacts with them that he ever informed them throughout the duration of the investigation that his restraining order was vacated back on February 15, 2017. (Ex 25, Virginia State Police Report dated February 15, 2017, Doc.No.78-4).

Respectfully submitted,
Sharon Radfar
By her Attorney
*/sElizabeth M.Clague*
Elizabeth M. Clague
Attorney At Law
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508)587-1191
Attyeclague@gmail.com
BBO#632341

CERTIFICATE OF SERVICE

I hereby certify I have made service of the within document through the ECF-CMF system.

*/sElizabeth M.Clague*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR )
    Plaintiff )
  )
v. )
  )
  )
CITY OF REVERE, and )
BRIAN M. ARRIGO, MAYOR; and )
JAMES GUIDO, CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED OFFICERS )
OF THE REVERE POLICE )
DEPARTMENT; INDIVIDUALLY AND )
IN THEIR OFFICIAL CAPACITIES AS )
MAYOR, CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
    Defendants )

## DEFENDANT JOSEPH I. COVINO'S  RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Now comes defendant, Joseph I. Covino, and provides the following responses to

Plaintiff's Statement of Material Facts of Record (Doc. No. 80 pp. 46-50)  pursuant to Fed. R.

Civ. P. Local Rule 56.1.

    1.    Defendant, a Revere Police Sergeant, drafted a police report in which he was the

alleged "victim", falsely and maliciously claiming Plaintiff had committed crimes against  him,

and wrongly listing himself as the reporting officer and the  supervisor, while stating the identity

of the victim was  "confidential.", though he listed himself as the victim. He included a police

department "Incident Report" naming plaintiff as the suspect who had committed the crime of

"criminal harassment" prohibited by G.L. c. 265 §43A at the Revere Police Station in January

28, 2017.(Ex 11, Virginia State Police Record, Doc.No.70-11 p.34).

413

**Response:**    **Disputed.  These allegations are specifically addressed with citations to the record at the Defendant's *Revised* State of Material Facts, Doc. No. 77 ¶¶ 53-59.**

2. Defendant then appeared in the Lynn District Court ex  parte and by making false, misleading and scurrilous claims  against plaintiff while omitting information he knew to be essential to the court's proper evaluation of his claims he convinced a judge to grant him an Abuse Prevention Order pursuant to M.G.L. c. 209A against Plaintiff, using his status as a police officer and his relationship with the court to wrongly credit his false claims. (Ex.22, Transcript of Ex Parte Hearing, Doc.78-22, pp.1-11).

**Response**    **Denied other than the fact that defendant Covino appeared in the Lynn District Court on January 31, 2017 and applied for an Abuse Prevention Order. The facts around this incident are contained in the Defendant's *Revised* State of Material Facts, Doc. No. 77 ¶¶ 60-67 with facts supporting the Abuse Prevention Order Affidavit (Doc. No. 70-7) and set forth in Defendant's *Revised* State of Material Facts, Doc. No. 77 ¶¶ 69-97.**

3. Though he alleged in the Lynn District Court ex parte proceeding hundreds of text messages and emails and thousands of calls from Plaintiff, he wrongfully and misleadingly omitted the text messages, voicemails he had sent to Plaintiff and the hundreds of phone calls he made to her, dozens of which he made after he told her not to contact him. He omitted the fact that the communications spanned the period of the parties' involvement dating back to the summer of 2015. He intentionally withheld that information also from Virginia investigators in his campaign to subject Plaintiff to criminal charges in that state, and he also omitted that information in his correspondence with her employer.

**Response**    **Disputed.**

4. Defendant told the Lynn District Court on January 31, 2017 that plaintiff had traveled to Massachusetts to show up at his workplace and otherwise harass him as recently as December 2016–a claim he also made to plaintiff's employers and Virginia criminal investigators–which was untrue and in fact plaintiff had not been in Massachusetts since a trip in which she visited a relative and did not see defendant in July 2016. (Ex 22 Transcript of 209A Hearing Doc.78-1, p.2; Ex. 5 Plaintiff's deposition, Doc.70-5 p10).

**Response**        **Disputed. All statements made at the time were made in good faith by defendant Covino.**

5. In the same ex-parte proceeding after which the court reluctantly granted him an Abuse Prevention Order (Ex.22 Transcript of 209A Hearing Doc. 78-1, p7) defendant told the court plaintiff had sexually assaulted him even as he portrayed their intimate relationship as consensual to plaintiff's employer and Virginia State Police S.A. Kinnard. (Ex.7 Abuse Prevention Order Affidavit Doc. 70-7).

**Response**        **Ex.7 Abuse Prevention Order Affidavit (Doc. 70-7) speaks for itself.**

6. Defendant edited the 212 pages of text message and social media screen shots he provided to VA authorities to exclude all but two of his texts: The version he provided at pp 147-148 that includes an exchange with his friend was omitted to delete the rest of his communication with his friend near the time of the restraining order, leaving out his "And?....that must have garnered a reaction...lol.."quips. Defendant also edited the dates out of all 212 messages. (Ex.17, Doc.70-17, pp.147-148; Ex. 23, Doc. 78-2, pp.1-3,).

**Response**        **Disputed.**

7. Despite defendant's editing of the texts, after review of his submission of the documents that included 120 texts and 46 voicemails over a one-and-a-half year period they

3

could ascertain were from plaintiff investigators and prosecutors determined there were no

threats; and that while in that period plaintiff had made 575 calls to defendant, 162 after he told

her not to call him again in March 2016, omitted from defendant's submission but unearthed

when his phone records were suubpoenaed (sic) was the fact that he had called plaintiff 256

times in that period, 32 times after he told her not to contact him. (Ex 11. Doc.70-11 pp. 20,45,

48-49)

      8. Defendant's interest plaintiff's life and career continued long after he last heard from

her in January 2017, his Abuse Prevention Order was vacated on February 15, 2017 the first time

she appeared for a hearing whereupon he declined to go forward, and the prosecution of plaintiff

was finally abandoned by Virginia authorities in a letter dated May 14, 2017: two days later he

texted Lt. Ganley telling him: he had seen plaintiff at Police Week in Washington D.C., his

opinion about the race and other characteristics in commentary about her companions, and

asking about her employment–and in addition these texts provided not during discovery as

sought from defendant and not in any of his discovery supplementation but instead by George

Mason University demonstrated he texted Ganley even months later, in December of 2017. (Ex

24, Doc. 78-3 -May 16, 2017 and Dec. 3, 2017 Text messages from Covino to Lt. Ganley

provided by GMU.)

      9. In December, 2017 Covino told Ganley that Jason Ford either was going to or had

obtained restraining order against plaintiff. (Ex.8, Ganley Deposition, Doc.70-8,p.19).

      10. On February 15, 2017, the day defendant's restraining order was vacated, Virginia

State Police Detective William Kinnard received items provided by defendant from the Revere

Police Department, including his police report. There is no indication that they were told the

order was vacated that day, nor is there any indication in the record that notwithstanding

Covino's multiple contacts with them that he ever informed them throughout the duration of the investigation that his restraining order was vacated back on February 15, 2017. (Ex 25, Virginia State Police Report dated February 15, 2017, Doc.No.78-4).

Respectfully submitted,
Defendant,
Joseph I. Covino,
By his Attorney,

*/s/ Kenneth H. Anderson*
Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA  02122
(617) 265-3900
kanderson@andersongoldman.com

Dated:  May 14, 2024

5

**CERTIFICATE OF SERVICE**

I hereby certify that this document, DEFENDANT JOSEPH I. COVINO'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 14, 2024.

*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.

UNITED STATES DISTRICT
COURT DISTRICT OF
MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

_____

SHARON RADFAR,                    )
          Plaintiff               )
                                  )
V.                                )
                                  )
CITY OF REVERE,and                )
BRIAN M. ARRIGO,                  )
     MAYOR; and                   )
JAMES GUIDO,                      )    **OPPOSITION IN**
     CHIEF OF POLICE; and         )    **RESPONSE TO DEFENSE 2nd MOTION**
SERGEANT JOSEPH I.COVINO; and )        **FOR SUMMARY JUDGMENT**
OTHER AS YET UNNAMED              )
OFFICERS OF THE                   )
REVERE POLICE DEPARTMENT;         )
INDIVIDUALLY AND IN THEIR         )
OFFICIAL CAPACITIES AS MAYOR      )
CHIEF OF POLICE AND               )
POLICE SERGEANT AND OFFICERS      )
OF THE CITY OF REVERE,            )
          Defendants              )

### i. Introduction and Procedural Posture

Plaintiff has sued alleging civil rights violations as well as a variety of common law intentional torts. The remaining Defendant, sued individually and in his official capacity, has filed a motion for summary judgment

Plaintiff herewith attaches her Uncontested Statement of Material Facts which includes her disputes of Defendant's Facts, and her Affidavit of Counsel with attached Exhibits 22-25.

1

## Argument

None of the more than 500 pages in defendant's exhibits refute the gravamen of plaintiff's claims against him: That but for his calculated and diligent efforts to marshal misleading and false claims he made against her, Plaintiff would not have been suddenly taken off the job never to return to duty four years before her resignation from the George Mason Police Department, twenty years after she was hired.  Prior to seeking "emergency" relief in the Chelsea District Court he had spent weeks discussing with her colleagues and preparing the police report he drafted, and as he did with that report he also prepared a package of trumped-up material he portrayed as evidence against her to be submitted and then distributed pursuant to the police department's typical handling of evidence in criminal prosecutions.[1]  All of these things were done under color of law. Also perpetrated under color of law was his effort to keep out of the police report, evidence package, record before the judge in the 209A proceeding, the Virginia State Police investigating and seeking to charge Plaintiff with crimes and her employer his hundreds of telephone calls and abusive threats toward her, the dozens of calls he made after telling her not to contact him, and that upon Plaintiff's appearance at her first

---

[1] Plaintiff's Undisputed Material Facts 2-4.

opportunity to be heard on the restraining order he declined to
proceed with the hearing and the order was vacated.[2] None of
those exhibits explain, but are instead intended to obscure, his
continuing outreach to one of Plaintiff's colleagues in May of
2017, to find out what her job status was, after he followed her
around at an event in her hometown and shared snide and race
weighted opinions of her companions.  Further, not only did
Defendant's misconduct individually and under color of law
interfere with Plaintiff's rights, but every important act he
persuaded others to take that immediately took her off the job
never to return to duty relied on his false and misleading claims
about Plaintiff and his omission of crucial information. In his
affidavit in support of the ex parte restraining order he
obtained he falsely claimed she had forced him into sexual
relations–while acknowledging the consensual nature of their
relations when he spoke with Virginia officials.  He told the
District Court judge in Massachusetts that she had travelled to
the Commonwealth to harass him eight weeks before the hearing in
November 2016, which was patently and demonstrably false.  He
lied to the judge in his allegations that she forced him to have
sex with her, as well as his claim that she threatened him by
saying "if I can't you no one will"; and when he gathered his
collection of text messages for the package of items he placed in

---

[2] Plaintiff's Undisputed Material Facts 4-6.

the police department evidence room, subsequently delivered by
another revere police officer to Virginia investigators, he
carefully omitted nearly all messages he sent to Plaintiff, as he
did in this litigation not only during discovery but also in his
exhibit attached to his Motion for summary judgment. This 212
page exhibit contains entirely undated, repeated and unverified
messages allegedly from Plaintiff and only two of the hundreds of
text messages sent by Covino to Radfar.  In the exhibit attached
to his Motion for Summary Judgment Defendant even edited out his
jocular responses to messages he received from a friend claiming
she had contacted him.[3] It was the Virginia authorities who after
repeatedly asking for his text messages to her had to resort to a
subpoena for all of the records, where they discovered for the
first time that Defendant had made more than 250 calls to
plaintiff, dozens after he told her never to contact her again.
It was not until this discovery and the decision by Virginia not
to prosecute Plaintiff that her employers learned about the calls
and messages from Defendant to Plaintiff.  Additionally, when
Defendant was specifically asked by Special Agent Kinnard about
the restraining order in Massachusetts and whether Plaintiff had
complied with it, Defendant wilfully failed and refused to tell
him it was no longer in effect but had been vacated two weeks
later the first time Plaintiff appeared at a hearing just prior

---

[3] Plaintiff's Undisputed Material Facts, 7.

to her exercising her right to be heard. Indeed Plaintiff's
employer and colleagues were never told the order was so quickly
vacated until after Virginia authorities decided not to prosecute
in May 2017. For months they pursued criminal charges and kept
her off duty without being told the order obtained by Defendant
that they had relied on in taking actions against had been
vacated. Once they were able to assemble a record that called
into question the false and misleading claims by Defendant,
Virginia investigators and prosecutors determined that none of
the messages alleged to have come from Plaintiff contained
threats of physical harm, and that though Defendant had hidden it
he had indeed contacted Plaintiff hundreds of times. Attached to
his Motion Defendant provides 212 pages of screen shots that edit
out his messages to Plaintiff, yet even the ones that she did
send while intemperate, embarassing and sometimes vulgar were not
threatening. His claims to the contrary were lies, intended to
ruin her life because she had the temerity to call out his
prejudice which his email to Lt. Ganley demonstrates was the
actual reason he trumped up false allegations of sexual assault
and threats in order to obtain a restraining order against her in
Massachusetts which he then forwarded to her employer and law
enforcement in her home state. His message months later to Lt.
Ganley demonstrates not only that he was never in fear of her,
but he maintained an interest in her employment and social life

evidencing the bad faith of his actions against her.[4]  This was
an ugly breakup where the evidence demonstrates conclusively he
went to her hometown, followed her and made inquiries in May of
2017, months after his restraining order was vacated but just
days after the criminal investigation of Plaintiff he had sparked
was officially closed. The record demonstrates Covino texting
Ganley even months after that, in December 2017.[5]

### (A)Defendant Is Not Entitled to Summary Judgment

Defendant asks the Court to credit his witness
testimony and  version of the factual constellation over the
disputed testimony  and evidence offered by Plaintiff in seeking
summary judgment. The current evidentiary record before the court
discloses the unavailability of summary judgment to Defendant,
demonstrating as it does that every one of the facts he asserts
is disputed.   Due to the defendant's recalcitrance the
evidentiary record has not been entirely established, and
plaintiff is entitled to remedies for defendant's continuing
discovery violations detailed at ECF-CMF 59-59-4 including
sanctions of limited further  discovery pursuant to Rule 59f.

To the extent that Defendant omitted material facts,

---

[4]Plaintiff's Undisputed Material Facts #8.

[5]Id.

there is a dispute and therefore several genuine issues to be
tried with respect to the material facts. *Celotex Corp. v.
Catrett* 477 U.S. 317, 325 (1986). Further, the Defendant has
failed to point out to the Court any portions of the record that
demonstrate the absence of a triable issue of material fact or
indeed of the basis for his motion. *Rivera Colon v. Mills*, 635
F.3d 9, 12 (1st Cir. 2011).  The evidence of the non-moving party
--here the Plaintiff--must be believed at the summary judgment
stage and all reasonable inferences must be drawn in the
non-moving party's favor. Defendant is hopeful that the Court
will credit his claims over plaintiff's and despite
despite evidence  contradicting them in the record and
further that the  Court ignores the evidence she has marshaled
despite the impermissible obstacles defendant has placed at every
point in this litigation with repeated violations of the rules of
this court and plaintiff's discovery rights–because this Court
would have to do so in order to allow his Motion.

An issue of fact is "genuine" if the  evidence is such
that a reasonable fact finder could find in favor of the
non-moving party. *Celotex v. Catrett*, 477 U.S. 317,  322-23
(1986): *Oliver v. Digital Equip. Corp.*, 846 F.2d 103. 105  (1st
Cir. 1988).  Plaintiff has specified which facts alleged by
defendant she disputes and has also in the attached Statement of
Facts, incorporated with additional Exhibits 22-25 as if fully

7

425

set forth herein, wherein she enumerates material facts which
have been omitted by defendant.  A review of the record in this
matter,"in the light most  favorable to the plaintiff, 'indulging
all reasonable inferences  in that party's favor'." requires
denial of defendants' motion.  _Mesnick v. General Elec. Co._, 950
F.2d 816, 822 (1st Cir.1991)(quoting Griggs-Ryan v. Smith, 904
F.2d 112, 115 (1st Cir. 1990), cert.denied, 112 S.Ct. 2965
(1992).

The roundly discredited statements and documents
proffered by Defendant along with the inadmissible hearsay and
other non-evidentiary offerings permeating his submission mandate
denial of the motion as does the he used his status as a police
officer and his relationship with the court to wrongly credit
credit his false claims.[6]  Two weeks prior to his ex parte court
appearance he emailed plaintiff's employer, making false
misleading, humiliating and otherwise defamatory claims against
her in an effort to deprive her of her job as a university police
officer.[7]

Though he alleged in the Lynn District Court _ex parte_
proceeding "thousands" of text messages, calls and emails from

---

[6]Ex.7, Defendant's Affidavit in Support of 209A Order, Doc.70-7.

[7] Defendant Uncontested Facts #7.

8

plaintiff, Virginia State Police discovered she had made 575 calls and sent 126 texts over a year and a half period. They also found he omitted the hundreds of calls he made to Plaintiff. He intentionally withheld that  information both from the Lynn District Court and from Virginia investigators in his campaign to subject Plaintiff to criminal charges in that state, and he also omitted that information in his correspondence with her employer—part of his deliberate scheme perpetrated to destroy her life two weeks before his *ex parte*, "emergency" court appearance.[8]

### (B) Defendant Violated Plaintiff's    Constitutional Rights Acting Under Color of Law

The misconduct plaintiff has established that  was perpetrated by the defendant squarely meets the definition  of behavior that "shocks the conscience".The United States Supreme Court has defined it at follows: "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998). The impact of entry of an Abuse Prevention Order pursuant to G.L. c. 209A is

---

[8]         Plaintiff's Statement of Uncontested Facts ##5 & 6.

significant limitations on interests that are
constitutionally protected. "Issuance of an order effects
entry of that order in the Commonwealth's criminal
records system, and the order can have an adverse effect
upon the defendant in any future c. 209A proceeding and
in certain future bail proceedings. [Note 3] Wooldridge
v. Hickey, 45 Mass. App. Ct. 637,638 (1998). The order
can also create criminal jeopardy specific to the
defendant and subject him or her to arrest without a
warrant. See Richardson v. Boston, 53 Mass. App. Ct. 201
, 203 (2001). "The judicial imprimatur on the 209A order
lends it significant weight. This is not just a filing in
court but a determination by the court." Commonwealth v.
Foreman, 52 Mass. App. Ct. 510 , 515 (2001). [Note 4]".
*Jones v. Gallagher*, 54
Mass.App.Ct.883,888(Mass.App.Ct.2002). In this case the
truncating of plaintiff's constitutional interests was
immediate: armed officers including her longtime
colleagues knocked on her door, notified her of immediate
suspension and prohibition on appearing at her workplace,
and seized her weapons.

Defendant's use of police power, mechanisms and
relationships against plaintiff to her extreme detriment

10

428

qualifies as misconduct that shocks the conscience. "The conscience-shocking standard provides relief where government officials have "abus[ed] [their] power, or employ[ed] it as an instrument of oppression," id. at 846 (quoting Collins, 503 U.S. at 126))" _McIntyre v. U.S._, 336 F. Supp. 2d 87, 108 (D. Mass. 2004). The late Judge Lindsey went on to explain the application of precedents:

> "Admittedly, the term conscience-shocking"  is far from self-defining. The Supreme Court has observed that "the measure of what is conscience shocking is no calibrated yard stick, [although] it does . . . 'poin[t] the way.'" County of Sacramento, 523 U.S. at 847 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). There are, however, some clear markers on the measuring stick... "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849. Official acts falling somewhere between these two benchmarks "may be actionable" depending on the circumstances. Id.                    As alleged in the complaint the conduct of Connolly in relation to the murder of McIntyre is conscience-shocking because it was "conduct intended to injure [McIntyre] in some way unjustifiable by any government interest."

_McIntyre v. U.S._, 336 F. Supp. 2d 87, 108-9 (D. Mass. 2004).

In the _McIntyre_ case misconduct by the govern- ment in telling mob figures about victim's cooperation

11

leading to his murder was found overcome causation hurdles to liability for conscious-shocking misconduct.Substantive due process violations under the 5th and 14th Amendments have also been found in malicious interference with property interests. See *Rubinovitz v. Rogato,* 60 F.3rd 906(1st Cir.1995)(Summary judgment reversed where local official influenced enforcement actions against plaintiffs that violated constitutional property and equal protection interests) Plaintiff's evidence has established the malicious and bad faith intent to injure her that states a claim that her rights to substantive due process were violated.

Defendant's conclusory claims despite evidence to the contrary that he did not act under color of law are unavailing: He used his police power and department resources against the plaintiff in drafting a police report including an "incident report" which, pursuant to his authority, accused her of a crime. He made much of his use of police evidence gathering procedures, placing materials in the Revere Police Department evidence room and then having a detective who was his friend transmit them to Virgina State Police in an effort to establish the impression that the use of regular police procedures,

12

professionalism and objectivity would lend credibility to his heavily edited and misleading submission in an effort to get plaintiff charged with a crime. His actions were taken under color of law."Thus, §1983 liability will reach those acting 'under color of law', that is, those 'who carry a badge of authority of a state and represent it in some capacity whether they act in accordance with the authority or misuse it'. Monroe v. Pape, 365 U.S. 167, 172, 81 S.Ct.473,476, 5 L.Ed. 2d 492(1961). This includes municipal corporations or state and local officials exercising the authority of the state, though private parties may also be sued." *Doyle v. Dukakis*, 634 F.Supp. 1441,1444(D.Mass.1986).

Plaintiff has satisfied the elements of a cause of action for malicious prosecution as a constitutional deprivation pursuant to 42. U.S.C.A. §1983 where defendant's misconduct in obtaining a 209A order led to the seizure of her weapons from her home, and the proceeding terminated in her favor when the order was vacated two weeks later. She has met the requirement that a plaintiff "if he can establish that: "the defendant (1) caused (2) a seizure ...pursuant to legal process unsupported by probable cause, and (3) criminal

proceedings terminated in plaintiff's favor." Evans, 703 F.3d at 647." _Hernandez-Cuevas v. Taylor_, (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012))723 F.3d 91, 101 (1st Cir. 2013). In order to trigger §1983 liability "must have imposed "some deprivation of liberty consistent with the concept of [a] 'seizure.'" Singer, 63 F.3d at 116. The crux of the inquiry is whether a "seizure" occurred" _Britton v. Maloney_, 196 F.3d 24, 28-29 (1st Cir. 1999).  Plaintiff has satisfied this requirement, where the 209A proceedings leading directly to the seizure of her property from her home and the criminal investigation in Virginia defendant sought to influence against her by providing false, misleading and incomplete information to investigators both terminated in her favor.

Plaintiff has established liability under the Massachusetts Civil Rights Act not only with defendant's §1983 violations but also offering evidence of his coercive and abusive interference with her rights. This clearly establishes her claim for violation of the Massachusetts Civil Rights Act, which does not require membership in any "protected class" but instead apply to "any person". Massachusetts Civil Rights Act, G.L. c. 12 §s 11H and 11I. An MCRA plaintiff is not required to

14

432

prove specific intent to threaten, intimidate or coerce
for the purpose of interfering with a secured right.
*Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93, 99-
100 (1987). As a remedial statute the Massachusetts Civil
Rights Act is entitled to liberal construction of its
terms.  *Sarvis et al v. Boston Safe Deposit & Trust Co.*,
47 Mass.App.Ct. 86, 97 (Mass.App.Ct.1999). See also
*Ayasli v. Armstrong*, 56 Mass.App.Ct. 740 (Mass.App.
Ct.2002)(Judge properly instructed jury that while
defendants' enforcement of easement did not violate
plaintiffs' civil rights their enforcement actions could
be used as evidence of their state of mind in order to
establish MCRA elements-damages of $211,000 and $160,000
in attorneys fees and costs affirmed]). Even acts that do
not by themselves violate the law can be evidence of a
defendant's state of mind in order to establish elements
of an MCRA violation. *Ayasli v. Armstrong*, 56
Mass.App.Ct. 740(Mass.App.Ct. 2002).

### (C) Plaintiff Has Established Defendant's Liability in Tort

As defendant's misdeeds in the Lynn District
Court were initiated and were advanced with an improper,
and malicious motive, he is liable for Abuse of Process.
With regard to any conduct by the Defendant that was

15

connected to his obtaining an *ex parte* order in the Lynn
District Court against Plaintiff, she has demonstrated
that not only was he never fearful of her as required
under G.L. c. 209A but the calculated nature of his
entreaty, planned for over a week and targeting her
although she had not been in the Commonwealth for six
months, his false statement to the judge that she was
there in recent weeks, and his discrepant statements and
use of the Massachusetts order to ruin her career and
seek out of state criminal charges against her was a
perversion of a process that was designed to protect
survivors of domestic violence. "An action for abuse of
process lies when an officer uses a lawful criminal
process to accomplish an unlawful purpose. Powers v.
Leno, 24 Mass. App. Ct. 381, 509 N.E.2d 46 (1987). It is
a distinct claim from false arrest and malicious
prosecution to the extent that it can be held to lie
regardless of whether there was probable cause or whether
the proceedings terminated in favor of the charged party.
Quaranto v. Silverman, 345 Mass. 423, 426, 187 N.E.2d 859
(1963); Carol v. Gillespie, 14 Mass. App. Ct. 12, 436
N.E.2d 431 (1982).

16

A variety of unlawful purposes were alleged in this case. As we have indicated in our discussions of the state claims of false arrest and malicious prosecution, the evidence, if taken in the light most favorable to the plaintiff, could have supported these theories. We therefore find that the common law claim of abuse of process should have been allowed to go to the jury." *Santiago v. Fenton*, 891 F.2d 373, 388 (1st Cir. 1989). Plaintiff has more than scaled the hurdle for her abuse of process claim, where "abuse of process may exist "regardless of whether there was probable cause or whether the proceedings terminated in favor of the charged party." Santiago v. Fenton, 891 F.2d 373, 388 (1st Cir. 1989); see Gutierrez, 437 Mass. at 408 ("probable cause is irrelevant to an abuse of process claim"); see also Fishman v. Brooks, 396 Mass. 643, 652 (1986) (proving "groundlessness of an action is not an essential element for an action for abuse of process").'Process' refers to 'the papers issued by a court to bring a party or property within its jurisdiction.' Jones, 369 Mass. at 390" *Khoury v. Goulding*, 21-cv-11036-LTS, 28 (D. Mass. Feb. 10, 2023).

17

435

The elements of abuse of process are " (1) '
process' was used; (2) for an ulterior or illegitimate
purpose; (3) resulting in damage." Vittands v. Sudduth,49
Mass.App.Ct. 401, 406, 730 N.E.2d 325 (2000). Instead of
a bright-line rule, the determination of whether the
petitioning activity is sufficient to support an abuse of
process claim is made on a case by case basis. Adams v.
Whitman,62 Mass.App.Ct. 850, 855, 822 N.E.2d 727 (2005)
(" Initiating process alone can at times be so coercive
and promoting of ulterior advantage that it supports an
abuse of process claim"). *Mantell v. P & J. v. Management
Corp.*, PLCV201300085, (Mass. Super. Sep. 22, 2013).

Defendant's use of his office to draft a police
report and a police department incident report accusing
plaintiff of committing a crime constituted malicious
prosecution of the plaintiff. "To succeed on a claim of
malice in a malicious prosecution action, Plaintiffs must
demonstrate that the Officers (1) "knew that there was no
probable cause for the prosecution" and (2) "personally
acted with an improper motive." See Beecy v. Pucciarelli,
387 Mass. 589, 593 (1982) (citations omitted)." *Renzullo
v. Town of Wakefield*, 20-cv-11961-DJC, 25 (D. Mass. Feb.
28, 2023). Defendant's drafting and distribution of an

"Incident Report" pursuant to his privilege as a police officer accusing defendant of a specific crime was done with such an improper motive, and here as in *Renzullo* where officers arrested the plaintiff not due to probable cause that he had committed a crime but because he "deliberately dodged service of a 209A", "there is a triable issue as to whether Defendants instituted proceedings ...with malice" *Renzullo v. Town of Wakefield*, 20-cv-11961-DJC, 25 (D. Mass. Feb. 28, 2023). Because defendant used his official advantages as a police officer to advance his claims against plaintiff to devastating effect, a malicious prosecution claim will lie.                    Additionally, though defendant's request for dismissal of the complaint on *Rooker-Feldman* doctrine grounds was rejected, he has again wrongly claimed plaintiff seeks this court's reversal of a lower court judgment that favors her position in asking again for summary judgment on those grounds. The *Rooker-Feldman* doctrine precludes federal court  reversal of judgments entered in state courts, and as such it is  wholly inapplicable here.  Plaintiff is not seeking any review of  a state court proceeding.  The *Rooker-Feldman* doctrine applies  only sparingly to a very

19

few cases. *Exxon Mobil Corp v. Saudi  Basic Industries Corp.*, 544 U.S. 280(2005).

Under the doctrine, a litigant is barred from appealing  in federal court a judgment entered in state court as it is the  Supreme Court that has sole jurisdiction over such appeal. *D. C.  Court of Appeals v. Feldman*, 460 U.S. 462(1983); *Rooker v.  Fidelity Trust*,263 U.S. 413(1923). The Abuse Prevention Proceeding in the Lynn District Court ended with a determination favorable to Plaintiff.

### (D) Sanctions Against the Defendant Are Warranted

Even after defendant twice submitted papers that so blatantly violate the rules of this Court such that they were stricken sua sponte the second time, the papers he did file violate this Court's orders of February 22, 2023 and March 21, 2024 by including material subject to this court's impoundment order. Undersigned counsel has been forced to impound portions of responsive Statement of Undisputed Facts pleading as a result.  The discovery violations detailed in Plaintiff's Opposition dated October 25, 2022 have never been remedied.  Defendant made no attempt to confer with

undersigned counsel prior to submission of his current

motion.(Affidavit of Counsel, Doc.79).

### **ii. Conclusion**

For the foregoing reasons Defendants' Motion

should be denied, he should be sanctioned for his

repeated violations of this Court's orders and

interference with Plaintiff's discovery rights with the

striking of his Motion for Summary judgment, entry of

adverse inferences against him, and other relief this

court determines meet and just.

### **Request for Oral Argument**

Pursuant to Federal Rule of Civil Procedure 56(d)
Plaintiff respectfully asserts oral argument is necessary
to  assist the Court in this matter and asks therefore
that a hearing  be scheduled.

Respectfully submitted,
Sharon Radfar
By her attorney
*/s Elizabeth M. Claque*
Attorney At Law
The Franklin Building
1106 Main Street
Brockton, MA 02301
(508)587-1191
Attyeclaque@gmail.com
BBO#632341


CERTIFICATE OF SERVICE


I hereby certify I have made service of the
within document   through the ECF-CMF system.

21

*/sElizabeth M.Clague*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER

SHARON RADFAR,           )
      Plaintiff       )
                     )
V.                     )
                     )
CITY OF REVERE, and   )
BRIAN M. ARRIGO,     )
     MAYOR; and      )
JAMES GUIDO,         )     **COMPLAINT**
     CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED   )
OFFICERS OF THE      )
REVERE POLICE DEPARTMENT; )
INDIVIDUALLY AND IN THEIR )
OFFICIAL CAPACITIES AS MAYOR )
CHIEF OF POLICE AND    )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE,  )
     Defendants     )

## Parties

1.    Sharon Radfar is a citizen of the United States.

2.    Brian M. Arrigo was at the time of the

transactions and occurrences alleged the Mayor of the City of

Revere.

3.    James Guido was at the time of the

transactions and occurrences alleged the Chief of the

1

Revere Police Department.

4.    Joseph I. Covino was time of the transactions and occurrences alleged a sergeant on the Revere Police Department who had a past involvement with the Plaintiff.

5.    The City of Revere is a municipal corporation; being a government entity organized under the laws of the Commonwealth of Massachusetts and subject to the duties and requirements imposed by the U.S. Constitution and applicable federal law.

## Facts

6.    On the evening of January 31, 2017 Plaintiff, a veteran George Mason University Master Police Officer in Virginia, had four uniformed officers seize her service weapons and hand her an Abuse Prevention Order obtained *ex parte* by Defendant Covino in the Lynn Massachusetts District Court and a letter from her employer suspending her pending an investigation of criminal charges alleged against her by Defendant Covino.

7.    Covino obtained the order by appearing in front of a judge and misrepresenting calls and messages the two had exchanged, failing to disclose pertinent information and making false and misleading claims alleging that Plaintiff had threatened him and placed him in imminent fear of physical harm

2

442

when she had in fact done nothing of the kind. He felt he deserved the order because she did not obey him when he ordered her not to come to the Commonwealth of Massachusetts.

8.    Covino, acting in concert and with the advice of unnamed Revere Police officers, filed a Complaint for Protection from Abuse and an affidavit both of which contained false and misleading claims about the Plaintiff.

9.    Covino called Plaintiff's employer, making the same false and misleading claims against her, and causing her employer to suspend her, open an investigation and seek criminal charges against Plaintiff.

10.    Covino relentlessly pursued criminal charges against Plaintiff though he knew she had committed no crime and those charges and claims were false.

11.    Covino's pursuit of the Plaintiff and his efforts to have her criminally charged and cause her to lose her job continued for months after the Lynn District Court vacated the Abuse Prevention Order against Plaintiff and ordered return of her weapons on the first date Plaintiff was given to be heard just two weeks after entry of the order *ex parte*.

12.    Covino falsely and maliciously accused Plaintiff of a crime he knew she did not commit. Acting under color of

3

law, he drafted a Revere Police Department incident report making his false claims, listing himself as the victim, the reporting officer and the supervisor approving the report.

13. Defendants knew well that Covino was wrongly engaged in efforts to have Plaintiff criminally charged, to cause the loss of her career and to destroy her life, and all knew Plaintiff was not the perpetrator of domestic violence or abuse of Covino. Defendants also knew of his lengthy history of misconduct and failed to train, discipline or in any manner properly supervise him.

14. Defendants' misconduct toward Plaintiff caused her the loss of her job.

15. Due to the misconduct by the Defendants Plaintiff's private telephone records were the subject of a search warrant in which a court within the jurisdiction where she was employed as a police officer received the smears that had been leveled against her.

16. Months later and despite Defendant Covino's best efforts, Virginia authorities declined to charge Plaintiff with any crime. She was not charged with any crime in the Commonwealth of Massachusetts. When she appeared for her first hearing on the restraining order, it was vacated.

4

17. Defendant Covino's campaign to destroy Plaintiff continued for months after the restraining order was vacated, and he made repeated false statements to Virginia investigators in an attempt to get her charged but failed and refused to let them know that his restraining order had been vacated.

18. Defendants treated Plaintiff differently from other similarly situated persons for impermissible reasons. Covino weaponized his official status as a police sergeant to exact revenge because Plaintiff had told him he was racist and due to his fury and bitterness that she would dare criticize him for his behavior toward her. All Defendants treated this woman of Iranian descent differently than they would have a man and a person of European descent due to their gender and national origin animus.

19. As a result of the Defendants' misconduct and violations of her Constitutional rights, Plaintiff has suffered severe injuries and losses including but not to limited trauma, loss of her position and her career as a police officer, humiliation and oppobrium in the law enforcement community, and great pain of body and mind that persists and interferes with her ability to carry on her regular activities to this day.

20. In addition, Plaintiff has suffered damage to her

5

445

ability to maximize her potential earnings, and has suffered substantial financial losses.

21. Defendants City of Revere, Arrigo, Guido and as yet unnamed officers all engaged in a custom and policy of failing to train and discipline officers in providing proper responses to domestic abuse and protection of constitutional rights.

22. Defendants City of Revere, Arrigo, Guido and as yet unnamed officers engaged in a custom and policy of protecting men who are members of the law enforcement fraternity from the consequences of violating the law.

23. Defendants City of Revere, Arrigo, Guido and as yet unnamed officers showed a deliberate indifference to the need for training, supervision, or discipline of Defendant Covino and Other Unnamed Officers.

## Jurisdiction

24. This action arises under U.S.C.A. Const.Amend. 1, U.S.C.A. Const.Amend. 4, U.S.C.A. Const.Amend. 5, U.S.C.A. Const.Amen. 8, U.S.C.A. Const.Amend. 14, 42 U.S.C.A. s. 1983, 42 U.S.C.A. s. 1985(2) and (3), 42 U.S.C.A. 1986, the Massachusetts Declaration of Rights, M.G.L.A. c. 12 s.11H-I, and

where a person alleges violations of her federal constitutional rights in transactions and occurrences taking place within this District.

### Claims for Relief

COUNT I.—EQUAL PROTECTION VIOLATIONS—Abuse of Authority Under Color of Law

25.    Plaintiff hereby realleges paragraphs 1-24 and and incorporate the same by reference as if fully set forth in this Count.

26.    Defendants owed Plaintiff a duty to enforce the protection of the laws equally pursuant to U.S.C.A. Const. Amend.5 and U.S.C.A. Const.Amend.14 guaranteeing persons equal protection of the laws and equal enjoyment of the privileges and immunities of citizenship.

27.    Defendants Covino and unnamed officers breached said duty by acting as agents to secure the vengeful private interests of Covino and all wrongfully acted under color of law. Defendants endeavored to assist Covino in obtaining an advantage over her in his civil proceedings initiated maliciously and as an abuse of process. As a result of Defendants' intentional, reckless and willful violations of Plaintiff's rights under the Constitution of the United States and the Massachusetts Declaration of Rights,

7

Plaintiff has sustained emotional distress due to the ordeal of being wrongly targeted and unlawfully harassed and falsely and maliciously accused of crimes she did not commit  As a result thereof Plaintiff continues to suffer great pain of body and mind. Plaintiff has been deprived of her lengthy career, has been deprived of her opportunity to assert her constitutional rights and deprived the enjoyment of her substantive constitutional rights, and Plaintiff has been and continues to be unable to carry on her normal activities.

COUNT II.-SELECTIVE PROSECUTION-Gender and National Origin

28.  Plaintiff hereby realleges paragraphs 1-27 and and incorporates the same by reference as if fully set forth in this Count.

29.  Covino and Other Unnamed Officers intentionally, wilfully, and recklessly and repeatedly wrongly accused Plaintiff of crimes, maliciously defamed her and abused process in a campaign to humiliate Plaintiff although they knew she committed no crime for the impermissible reasons of gender bias and national origin bias.

30.  Defendants' repeated selective enforcement of the law for the benefit of Covino and as his agents violated Plaintiff's rights to equal protection of the laws and the

8

448

privileges and immunities of citizenship enumerated in U.S.C.A. Const.Amend. 5 and U.S.C.A.Const.Amend.14.

### COUNT III.-DEFAMATION

31. Plaintiff hereby realleges paragraphs 1-20 and 29 and incorporates the same by reference as if fully set forth in this Count.

32. Defendants indicated to Plaintiff's employer and others that she had committed criminal acts.

33. Defendants knew Plaintiff had not violated any laws nor committed any crime.

34. Said conduct was defamatory per se.

35. Plaintiff suffered grievous injury to her reputation and loss of her ability to earn a living and great pain of mind and body that continues to this day as a result of Defendants' conduct. As a result Plaintiff has been unable to carry on her normal activities.

### COUNT IV.-MASSACHUSETTS CIVIL RIGHTS ACT

36. Plaintiff hereby realleges paragraphs 1-30 and and incorporates the same by reference as if fully set forth in this Count.

37. Defendants by their conduct deprived Plaintiff of her rights under the Massachusetts Declaration of Rights and

9

449

the United States constitution by means of intimidation and coercion. Defendants endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy.

38. Plaintiff is entitled to injunctive relief, damages, attorneys fees and other relief pursuant to M.G.L.A. c. 12 s.11H-I because Defendants engaged in said threats, coercion and intimidation under color of law in violation of said statute and 42 U.S.C.A.§ 1983.

COUNT V.-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

39. Plaintiff hereby realleges paragraphs 1-27 and and incorporates the same by reference as if fully set forth in this Count.

40. Defendants' acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon Plaintiff.

41. As a direct and proximate cause of said misconduct, Plaintiff suffered at the time and continues to suffer stomach disturbances, weight loss, nightmares, anxiety and a fear of police officers.

COUNT VI.-DELIBERATE INDIFFERENCE TO NEED FOR TRAINING

10

42.   Plaintiff hereby realleges paragraphs 1, 8, 12-41 and incorporates the same by reference as if fully set forth in this Count.

43.   Defendants City of Revere's, Arrigo's, Guido's and other unnamed officer's deliberate indifference to the need for training, supervision and discipline of Defendants Covino and Other Unnamed Officers caused the Plaintiff to suffer the grievous injuries described in this Complaint when said officers engaged in the misconduct alleged throughout this Complaint.

COUNT VII–CONSPIRACY TO VIOLATE CIVIL RIGHTS

44.   Plaintiff hereby realleges paragraphs 1-43 and and incorporates the same by reference as if fully set forth in this Count.

45. Plaintiff was intimidated, threatened and coerced not to offer testimony or assert her position in a case in which she was a witness and a party by the misconduct of two or more of the Defendants, and further two or more of the Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice in the Commonwealth of Massachusetts, with intent to deny to Plaintiff the equal protection of the laws.

46.   Defendants thereby conspired to deprive Plaintiff

11

of her constitutional rights in violation of 42 U.S.C.A. §1985(2) and (3).

47.   Plaintiff has suffered lasting emotional and physical harm and a continuing deprivation and damage to of her financial interests as a result.

COUNT VIII--REFUSAL TO PREVENT WRONGS COMMITTED AGAINST PLAINTIFF

48.   Plaintiff hereby realleges paragraphs 1-47 and and incorporates the same by reference as if fully set forth in this Count.

49. Defendants knew of the wrongs they each and severally were committing against Plaintiff.

50.   Said Defendants, knowing of and having the power to prevent or aid in the prevention of said wrongs, refused to do so.

51.   As a result of their refusal to prevent said wrongs, incurred liability pursuant to 42 U.S.C. §1986.

COUNT IX.-ABUSE OF PROCESS

52.   Plaintiff hereby realleges paragraphs 1-27 and incorporates them as if fully set forth herein.

53. Defendant Covino knew he was not entitled to an Abuse Prevention Order against Plaintiff and despite his

12

452

knowledge, falsely and maliciously filed a Complaint for
Protection from Abuse seeking such an order.

54.   Defendant advanced his knowingly false claims
with the ulterior motive of exacting revenge against Plaintiff
and destroying her career and her life.

55.   Said misconduct by Defendant Covino
caused Plaintiff incur legal fees and to suffer
humiliation, embarrassment, anguish and to cause her reputation
in the community and with her employer to suffer such that she
lost her job and her career.

## COUNT X-MALICIOUS PROSECUTION

56.   Plaintiff hereby realleges paragraphs 1-27; and
52-55 and incorporates them as if fully set forth herein.

57.   Defendant Covino acting under color of law drafted
and pursued criminal reports and paperwork consisting of his
knowingly false statements accusing Plaintiff of criminal acts.

58.   Defendant advanced said knowingly false claims
against Plaintiff with the ulterior motive of obtaining revenge
and destroying her career and her life.

59.   Said misconduct by Defendant Covino caused
Plaintiff to incur legal fees before Defendant's claims against

13

Plaintiff were rejected for lack of evidence. Further Plaintiff suffered humiliation, embarrassment, anguish that persists to this day.

### Demands for Judgment

Plaintiff respectfully demands a trial by jury on all issues to the full extent provided by law.

WHEREFORE Plaintiff, Sharon Radfar, prays for judgment:

1.    Granting Injunctive and Declaratory Relief;

2.    Awarding Plaintiff compensatory damages, with interest;

3.    Awarding Plaintiff punitive damages;

4.    Awarding Plaintiff her costs, including reasonable attorneys fees, pursuant to 42 U.S.C.A. s. 1983 and M.G.L.A. c.12 s.11I.

5.    Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

14

454

Dated: January 29, 2020

Sharon Radfar
By her attorney

S/Elizabeth M. Clague

_____

Elizabeth M. Clague
Attorney for the Plaintiff
The Kennedy Building
142 Main Street, Suite 304
Brockton, MA 02301
(508) 587-1191
BBO# 632341

15

455

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
DOCKET NUMBER
1:20-cv-10178IT

| | |
|---|---|
| SHARON RADFAR,<br>　　　Plaintiff<br><br>V.<br>CITY OF REVERE, and<br>BRIAN M. ARRIGO,<br>　　　MAYOR; and<br>JAMES GUIDO,<br>　　　CHIEF OF POLICE; and<br>SERGEANT JOSEPH I.COVINO; and<br>OTHER AS YET UNNAMED<br>OFFICERS OF THE<br>REVERE POLICE DEPARTMENT;<br>INDIVIDUALLY AND IN THEIR<br>OFFICIAL CAPACITIES AS MAYOR<br>CHIEF OF POLICE AND<br>POLICE SERGEANT AND OFFICERS<br>OF THE CITY OF REVERE,<br>　　　Defendants | **PLAINTIFF'S RESPONSES<br>TO DEFENDANT COVINO'S<br>FIRST INTERROGATORIES** |

NOW COMES THE PLAINTIFF and timely provides pursuant

an agreement between the parties the within responses to

interrogatories:

## Interrogatory Responses

INTERROGATORY NO. 1:

Please state your full name, residence, date of birth
and social security number.

RESPONSE:

Objection: This interrogatory is intended not to lead
to discoverable information but rather to harass, intimidate,

embarass and burden Plaintiff by requiring the disclosure of unnecessarily confidential, identifying information that carries a substantial risk it will be used to further injure Plaintiff. Without waiving and subject to said objection, Plaintiff in an effort to cooperated responds as follows:

Sharon Radfar



DOB:

SSN #: I will NOT disclose my SSN #.

INTERROGATORY NO. 2:

Please list the name, address, job title, salary of your current employment.

RESPONSE:

Objection: This interrogatory is intended not to lead to discoverable information but rather to harass, intimidate, embarrass and burden Plaintiff by requiring the disclosure of unnecessarily confidential, identifying information that carries a substantial risk it will be used to further injure Plaintiff. Without waiving and subject to said objection, Plaintiff in an effort to cooperated responds as follows:

I will not disclose the name of my current employer due to following reason(s). A) Signed an NDA. B) For my safety and fear of Joey Covino

I am unable to provide the address of my employer due to signing an NDA.

Title: Specialist.

Salary: $66,560

INTERROGATORY NO. 3:

Please describe in detail how, where and when you met the defendant, Joseph Covino.

RESPONSE:

June 26th 2015 in Reston, Virginia. We both took the
train from wiehle-Reston Metro Station, Reston, Virginia to RFK
Station Metro station. Upon arrival at our destination- Joey
Covino get off the train and waited for me to exit the train. He
started to make small talks. We continued to walk together
heading to RFK. We both were attending the World Police and Fire
Games Opening Ceremony.

### INTERROGATORY NO. 4:

Please describe in detail each and every trip you took to
the Greater Boston area to visit the defendant, Joseph Covino. For
each trip, please state the dates you were in Massachusetts, the
names, home addresses, and telephone numbers of the people who were
present with you, what you did and where you went with defendant
Joseph Covino during these trips, and whether defendant Joseph
Covino had knowledge and/or consent that you were coming to
Massachusetts.

### RESPONSE:

Objection.     Plaintiff rejects the premise of the
interrogatory which misstates the allegations, evidence and record
in the above-entitled matter. Without waiving and subject to said
objection in an effort to cooperate, plaintiff states:

First trip- On or about August 17th 2015. This trip was
not intended to visit Joey Covino. A friend and I had
planned a vacation to visit Greater Boston to celebrate
my birthday prior to knowing Joey Covino. However,
after Joey and I met in June of 2015 and while we
remained in touched, he had full knowledge of my trip.
He voluntarily offered to spend 3 days with me and show
me the area. He voluntarily offered to pick me up from
the airport. He picked me up from the airport in his
personal vehicle and while in his police uniform
working an overtime (on-the clock). He drove to the
fire station as he needed to utilize the bathroom.  We
left the fire station and met up with a co-worker of
his named "Ed". He then drove me to my hotel where he
told me to go check in. He then removed his police
uniform shirt and met me in the lobby. We then
proceeded to my room. Yes, he had full knowledge of my
trip. Joey took Amy and I to Old Sully's Bar and
another restaurant for dinner. I don't recall the name

of the restaurant. While Amy and I remained in Greater Boston. I never saw Joey Covino after the first night.

Amy Coots: Telephone #: 571-989-2891.

Hotel: Four Points by Sheraton Wakefield Boston Hotel & Conference Center

Second trip- On or about October 2015. He texted me and asked "Do you want to Fuck". We made plans for the dates that was good for him. He had full knowledge of this trip and witness to this conversation was my former Sgt who saw the text messages exchanged between Joey Covino and I. we didn't go in public (i.e restaurant or bars). The first night, I, went to visit Salem, MA by myself. The next day, Joey Covino visited me in my hotel. He had removed one of my room keys without my knowledge. He stayed for few hours and left. That was the last time, I ever saw Joey Covino in person.

Hotel: Four Points by Sheraton Wakefield Boston Hotel & Conference Center

Third Trip- on or about July of 2016- A short trip. This trip was not intended to see Joey Covino. I have a family member who resides in Greater Boston.

Hotel: Four Points by Sheraton Wakefield Boston Hotel & Conference Center. (Not sure)

INTERROGATORY NUMBER 5:

Please state all facts upon which you rely in paragraph 8 of your Complaint wherein you alleged that defendant, Joseph Covino acted in concert and with the advice of unnamed police officers in filing a Complaint for Protection from Abuse.

RESPONSE:

Objection. This interrogatory improperly calls for legal conclusions and analysis from the Plaintiff, who is not representing herself and is not an attorney. Subject to and without waiving this objection Plaintiff respectfully refers counsel to her within response to Interrogatory No. 6.

### INTERROGATORY NO. 6:

Please describe in detail all information you have pertaining to paragraph 9 in your Complaint when you allege that Defendant, Joseph Covino, called your employer and made false and misleading claims against you causing your employer to suspend you and open an investigation and seek criminal charges against you.

### RESPONSE:

Objection. This interrogatory improperly calls for legal conclusions and analysis from the Plaintiff, who is not representing herself and is not an attorney. Subject to and without waiving this objection Plaintiff in an attempt to cooperate fully respectfully further responds:

Based on Joey Covino's Testimony under oath in court on Jan 2017, Lynn District Court.

Based on an emails that Joey Covino sent to my command staff to the George Mason Police Department in 2017.

Based on communications that Joey Covino exchanged between himself and my agency (via cell phone, emails and other different methods) on personal level and after the RO was dismissed. He continued to remain in contact with them.

Based on VA State Police's Activity Report and Investigators Notes.

Based on Joey Covino's communication via phone, emails, post to the VA State Police.

Based on falsification of his police agency report.

INTERROGATORY NO. 7:

Please state all facts upon which you rely in alleging in paragraph 10 of your Complaint that defendant, Joseph Covino, "relentlessly pursued criminal charges" against you.

RESPONSE:

Plaintiff's objections and responses to Interrogatories Nos. 5 and 6 are hereby incorporated by reference an restated here in partial response to this interrogatory, and Plaintiff further responds:

> As a seasoned police supervisor (Joey Covino) has/had full knowledge of the law that did his alleged claims didn't meet the standards of the law. He manipulated the system and other police agency to open a criminal investigation knowing his statements were false and fabricated.

NTERROGATORY NO. 8:

Please state the dates of your employment with the George Mason University Police Department, listing the date of you hire, your duties and responsibilities, your salary and wage information, the date of the end of your employment with the George Mason University Police Department, and the reasons provided for ending your employment with George Mason University Police Department.

RESPONSE:

Hire Date: 1/23/2001

Suspension date: 1/31/2017 (they never allowed me to return)

Final Termination Date: 2021

Title: Master Police Officer

$66,446 Salary ( last reported 2017)

$31.945192 per hour (REG)

$47.917788 OT rate (REG X 1.5)

Missed many promotions and salary increase of 17% between (2017 to present).

Full time Sworn Police Officer with law enforcement
duties: responding to suspicious activities; resolving
complaints; investigating criminal and traffic
incidents; and providing first responder aid,
responding to accident, interviewing and taking
statements; making arrests; testifying in court; and
assisting other law enforcement agencies and law
enforcement duties.

INTERROGATORY NO. 9:

Please state all facts upon which you rely in paragraph
18 of your complaint where you allege that you were treated
differently by the defendant, Joseph Covino, because of your
Iranian descent.

RESPONSE:

Plaintiff's objections and responses to Interrogatories
Nos. 5 and 6 are hereby incorporated by reference an restated
here in partial response to this interrogatory, and Plaintiff
further responds:

On or about Jan 2017 the phone he verbally stated that
I am a "fat Iranian fuck". Furthermore, he was verbally
abusive and stated that I should take my service weapon
and blow up my head. And he hopes I get shot in the
face.

INTERROGATORY NO 10:

Please list your cell phone number and your cell phone
service provider during the years 2016-2017.

RESPONSE:

Sprint

703-400-7655

INTERROGATORY NO. 11.

If you ever contacted defendant Joseph Covino by a number
not listed in Interrogatory No. 10 by using an application or other
devise or method to change or disguise your phone number, please
state the name(s) of the application(s) or device(s) used by you,

the reason for altering/disguising your phone number, and the approximate number of times that you used these application(s).

    RESPONSE:

    The app that I sometimes use to stay connected to family/friends is "Whatsapp" that is attached to my telephone number that is listed on this interrogatory.

    I don't own any other phones. I don't keep track of how many times a day, month, and or year I use this free app that is available to all.

    I don't' recall contacting him with any other number(s) but my own phone.

INTERROGATORY NO. 12

    Did you create a fake social media account in the name of Lorna Hoey on either Facebook or Instagram? If so, please state the reason(s) for so doing and your knowledge of Lorna Hoey.

    RESPONSE:

    No.

    The only limited knowledge of Lorna Hoey that I may have had was through Conversations with Joey Covino.

INTERROGATORY NO. 13:

    Please state the purpose of your physically going to the defendant Joseph Covino's place of employment at the Revere Police Department.

    RESPONSE:

    The police department is open to public. While I was in Boston in summer of 2016- I stopped by once to visit the station/visit Covino. As a former police officer, you are always interested in seeing how other agencies operate (especially out of state).

INTERROGATORY NO. 14:

If, as a result of any of the claims you have made in your Complaint, you sought any medical, psychological, or mental health counseling, please state the following:

    a. The name of any medical, psychological, or mental health provider:

    b. The dates of any such treatment;

    c. The purpose of said treatment; and

    d. The cost for such treatment.

RESPONSE:

Starting Jan 31, 2017 to present- I have experienced physical stress to my body, anxiety, loss of hair, weight gain, depression, break outs and PTSD, chronic pain, his verbal abuse has left detrimental scar.

Once, my employer suspended/terminated me, I lost my health insurance through work. I had to seek help from churches, student interns, and groups that were assisting abused/battered individuals.

INTERROGATORY NO 15:

If any individuals other than defendant, Joseph Covino, and Jason Ford, have obtained Abuse Prevention Orders against you, please list the other individuals who have sought Abuse Prevention Orders against you, the dates of said order and the courts from which these orders were issued.

RESPONSE:

No other individuals has ever obtained RO against me.

Signed this $8/9/2421$ under pain and penalties of
perjury:

Sharon Radfar

Objections by:
/sElizabeth M. Claque
Plaintiff's Attorney
Elizabeth M. Clague
Attorney At Law
The Kennedy Building
142 Main Street, Ste. 304
Brockton, MA 02301
(508) 587-1191
FAX (508) 587-0992
Attyeclague@gmail.com

## CERTIFICATE OF SERVICE

I, Elizabeth M. Clague, Counsel for the Plaintiff, hereby
certify I have made service of the within document by regular
and electronic mail to counsel for the defendants.

August 9, 2021                    /s Elizabeth M. Clague

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:20-cv-10178-IT

SHARON RADFAR )
Plaintiff )
)
)
v. )
)
CITY OF REVERE, and )
BRIAN M. ARRIGO, MAYOR; and )
JAMES GUIDO, CHIEF OF POLICE; and )
SERGEANT JOSEPH I. COVINO; and )
OTHER AS YET UNNAMED OFFICERS )
OF THE REVERE POLICE )
DEPARTMENT; INDIVIDUALLY AND )
IN THEIR OFFICIAL CAPACITIES AS )
MAYOR, CHIEF OF POLICE AND )
POLICE SERGEANT AND OFFICERS )
OF THE CITY OF REVERE, )
Defendants )
)

## DEFENDANT, SERGEANT JOSEPH I. COVINO'S, ANSWERS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

The defendant, Sergeant Joseph I. Covino, objects, generally, to the instructions
preceding the plaintiff's first set of Interrogatories to be answered by the defendant. The
defendant states that the answers provided herein conform with Rule 33 of the Federal Rules of
Civil Procedure. Subject to such objections and understandings, the defendant answers as
follows:

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please state your name, address, telephone number, occupation, title, and the date of any and
all promotions and/or disciplinary notices or actions from your current employer.

## ANSWER NO. 1

Objection. The defendant objects to providing his phone number and home address given the plaintiff's past documented history of harassment and unwanted contact with the defendant resulting in my applying for and receiving a restraining order. Without waiving this objection, I became employed as a student police officer with the City of Revere on January 30, 2005. I was hired as a patrol officer on June 29, 2005, and was later promoted to the rank of Sergeant on June 14, 2013. I was later promoted to the rank of Lieutenant on May 29, 2018. The only discipline that I am aware of was a 2008 complaint by a city meter-maid that was resolved with no admission of wrongdoing and that was expunged from my personnel file after a year.

## INTERROGATORY NO. 2

Please describe, as completely as possible, what occurred in the incidents alleged in the Plaintiff's complaint including what was said by and to the Plaintiff during and after the incidents and by whom.

## ANSWER NO. 2

Briefly, I met the plaintiff, Sharon Radfar, in late June of 2015 while I was competing with an ice hockey team at the World Police and Fire Games in Fairfax, Virginia. At the time, the plaintiff was employed as police officer at George Mason University. The plaintiff claimed to be a volunteer "Goodwill Representative" for the World Police and Fire Games. During this time, the plaintiff and I engaged in a romantic relationship.

After returning back to the Boston area after the World Police and Fire Games, the plaintiff and I communicated for several weeks via text messages and phone calls. During this time, the plaintiff became increasingly overbearing when I did not promptly return a text message or a phone call. Later that summer, the plaintiff flew from her home in Northern Virginia to Boston

467

to visit me. I picked her up at the airport and we went to Charlestown for lunch. Later that day while at dinner, the plaintiff became accusatory and inflammatory to the point where I returned her to her hotel and left. I ended our relationship that evening due to her behavior.

The plaintiff later contacted me and apologized. The plaintiff said she was upset because she didn't get to see Boston, a city that she said she wanted to visit with one of her female friends. I agreed that if the plaintiff ever came back to Boston, I would show the plaintiff and her friend around. On one occasion thereafter, the plaintiff came to Boston with a female friend who I now understand to be Amy Coots. The plaintiff again became rude, belligerent, with unprovoked accusations such that both myself and the plaintiff's female friend left the plaintiff at a hotel and went our separate ways. This occurred in the early fall of 2015, and this was the last time that I saw the plaintiff in person other than at a restraining order hearing in the Lynn District Court on February 15, 2017.

After leaving the plaintiff at her hotel in the early fall of 2015, I told the plaintiff in a phone conversation that I did not want to have any type of relationship with her and that I wanted her to stop contacting me. From the fall of 2015 until I applied for a restraining order in the Lynn District Court on January 31, 2017, the plaintiff relentlessly pursued me and threatened myself and my family if I would not see her. I blocked the plaintiff's phone number on my phone. The plaintiff thereafter repeatedly used an app that allowed her to text and call me from other phone numbers. At one point I had hundreds of blocked phone numbers on my cell phone because of the manner in which the plaintiff repeatedly called me using various phone numbers.

I also blocked the plaintiff on social media. The plaintiff made fake a social media accounts to follow me on social media. At one point, the plaintiff drove unannounced from her home in Northern Virginia to my place of employment at the Revere Police Department and dropped of a

468

note and pictures in a card for me at the front desk. I was not working and was not in the police station. On a different occasion, the plaintiff again drove to the Boston area unannounced and uninvited. The plaintiff texted me stating that she was up the street from my house and that she saw me outside mowing my lawn. The plaintiff also commented on how sweet my family looked. The plaintiff told me that if I did not come meet her up the street, that she would come to my home and "create a scene."

As the result of the plaintiff's aggressive stalking behavior, I called the plaintiff and told her I was going to call her police chief as I was gravely concerned about her mental well-being. Several times in the past I had told the plaintiff that I would call her employer if she did not stop contacting me, although I did not do so until she appeared at my place of work and in my neighborhood. I told the plaintiff never to contact me again. I very reluctantly called the George Mason University Police and spoke with Lieutenant David Ganley, the executive officer for the George Mason University Police Department. Lt. Ganley informed me that this was not the first time that the department had received complaints regarding the plaintiff's issues with infatuation that resulted in her stalking other men. Lieutenant Ganley told me that the department would attempt to speak with the plaintiff about her situation and would ask her to leave me alone.

After contacting the plaintiff's employer, the plaintiff called me over 100 times in a weekend. I began carrying my firearm off-duty out of fear for my safety as I was afraid the plaintiff would show up where I was and would attack me. On January 28, 2017 the plaintiff called or texted me over a hundred times. As a result of the plaintiff's escalating behavior, on January 29, 2017, I wrote an internal police report in the Revere police computer system to document the plaintiff's action since the summer of 2015. This internal police report was written "to file." It was not

469

written for any law enforcement purposes and was not sent to any Massachusetts law enforcement agencies.

On January 31, 2017, I petitioned to the Lynn District Court for the issuance of an Abuse Prevention Order under Mass. General Law chapter 209A against the plaintiff. To obtain this order I completed an Affidavit that outlined the plaintiff's behavior and the need for the order. A judge in the Lynn District Court approved of the Abuse Prevention Order and issued it through February 15, 2017, when a two-party hearing was to be held.

While petitioning the Lynn District Court on January 31, 2017, I was off-duty and in civilian clothes. I did not exercise any police powers in applying for the Abuse Prevention Order. On February 15, 2017, I attended the two-party hearing on the restraining order in the Lynn District Court. The plaintiff appeared with an attorney. After conversing with the plaintiffs' attorney, I was assured that the Abuse Prevention Order was "a definite wake-up call" to the plaintiff and I agreed to the Order being vacated on the condition that the plaintiff would no longer contact me. I agreed to vacate the Abuse Prevention Order so that the plaintiff's employment was not negatively impacted by her inability to possess a firearm.

On January 27, 2017 I received an e-mail from Lt. Ganley of the George Mason University Police Department stating "My chief has requested that the Virginia State police conduct" an "investigation" into the plaintiff. Lt. Ganley advised me that they were "going to handle this as a criminal investigation with the hope that at the end we can offer [Ms. Radfar] some assistance and have some leverage to get her into treatment." This e-mail provided contact information for Special Agent W.E. Kinnard of the Virginia State Police.

On approximately January 27, 2017, I received a voicemail and an e-mail from Special Agent W.E. Kinnard from the Virginia State Police who asked me questions regarding the plaintiff. I

did not instigate this investigation, and now know from records obtained by the Virginia State Police that the plaintiff's police chief had referred the matter to the Virginia State Police. Specifically, records obtained by the Virginia State Police state that "SA Kinnard met with GMU Police Chief Rowan, Major Brian Cozby, Captain Phil Surber, and Lieutenant Dave Ganley regarding this complaint. Chief Rowan stated he was requesting a criminal investigation and stated the suspect, one of his officers, MPO Sharon Radfar did not need to be a police officer. Lieutenant Ganley said there have been several instances of similar behavior involving Radfar in the past . . . . All of the command group in attendance concurred that Radfar was volatile and possibly manic in her relationships."

I returned the phone call from SA Kinnard. At the request of the Virginia State Police, I forwarded them a flash drive that contained phone message recordings, text messages, emails, as well as screen shots of doctored photographs sent to me by the plaintiff. I also provided them with the card/letter that the plaintiff delivered to the front desk of the Revere Police Department. According to the records obtained by the Virginia State Police, analysis of phone records showed that the plaintiff called me 162 times after the Virginia State Police could prove that I told her "do not call me anymore."

At no time did it take any law enforcement action against the plaintiff. At no time did I seek to get the plaintiff charged with any criminal activity.

All of the information that I provided to the Virginia State Police, as well as my e-mails between that I still have between myself and Lt. Ganley and Special Agent Kinnard were previously produced as part of my Initial Disclosures.

471

## INTERROGATORY NO. 3

Please identify any and all witnesses the Defendant intends to call at trial, including but not limited to experts, and state as to each person:

    a.    Name and address; and

    b.    subject matter on which each person is expected to testify; and

    c.    the substance of the facts and opinions to which each person is expected to testify.

## ANSWER NO. 3

I am advised by my attorney that no decision has been made regarding trial witnesses. This answer will be supplemented should this case proceed to trial.

## INTERROGATORY NO. 4

What Commonwealth of Virginia and George Mason University employees, officials or agents did you speak with in any manner between December 1, 2016 and June 30, 2017?

## ANSWER NO. 4

I spoke with Lt. David Ganley of the George Mason University Police and SA W.E. Kinnard of the Virginia State Police. Please see Interrogatory Answer No. 2 as if fully incorporated herein, as well as my Initial Disclosures.

## INTERROGATORY NO. 5

How many conversations with the individuals identified in Interrogatory #4 did you have between January 1, 2017 and April 30, 2017?

## ANSWER NO. 5

To the best of my memory I had between two and four conversations with Lt. David Ganley as well as a few e-mail conversations. I believe that I had approximately two phone conversations

with Special Agent W.E. Kinnard as well as a couple of e-mail conversations. Please see my Initial Disclosures.

## INTERROGATORY NO. 6

What did you say to each of the individuals in each of the conversations you have identified in responses 4 and 5?

## ANSWER NO. 6

Please see Integratory Answer No. 2. I asked Lt. Ganley for help in obtaining relief from abuse and unwanted contact by the plaintiff. I also sent him proof of the unwanted contact by the plaintiff. When I spoke with Special Agent W.E. Kinnard I answered the questions that he asked me about the plaintiff's persistent and relentless unwanted harassment of me. I also provided him with proof of the plaintiff's abuse which were produced as part of my Initial Disclosures.

## INTERROGATORY NO. 7

Please identify by date, time, person and what was said by you and anyone in any conversation you have had with Virginia State Police since January 1, 2017.

## ANSWER NO. 7

Please see Interrogatory Answer Nos. 2-6 as well as my Initial Disclosures.

## INTERROGATORY NO. 8

Identify by date filed, date closed if applicable and docket number any and all Commonwealth of Massachusetts civil and criminal cases to which you have been a party.

## ANSWER NO. 8

*Joseph Covino* v. *Case Realty Trust, et al.*, Suffolk Superior Court Docket No. 1184CV00617.

*Commonwealth* v. *Richard McCormick*, Essex Superior Court Docket No. 1277CR00852.

INTERROGATORY NO. 9

For each case identified in Interrogatory #8 please indicate the type of action, whether you were plaintiff or defendant, the general subject matter and the terms of resolution if applicable of each case.

ANSWER NO. 9

The *Case Realty Trust* case was a negligence/premises liability personal injury case against a landowner where I was injured while performing my police duties.

The criminal case against Richard McCormick was prosecution of a priest who had raped me. He was sentenced to an eight-to-ten year prison sentence.

Signed under the pains and penalties of perjury this _____ 2 9 _____ day of ___ November ___, 2021.

Joseph I. Covino

As to Objections:

Kenneth H. Anderson, Esq.
B.B.O. # 556844
Anderson, Goldman, Tobin & Pasciucco
50 Redfield Street
Boston, MA 02122
(617) 265-3900
kanderson@andersongoldman.com

Dated: November 29, 2021

474

## CERTIFICATE OF SERVICE

I hereby certify that on **11/29/21**, I served a copy of Defendant, Sergeant Joseph I. Covino's, Answers to Plaintiff's First Set Of Interrogatories via email and regular mail upon:

Elizabeth M. Clague, Esq.
The Franklin Building
1106 Main Street
Brockton, MA 02301

Kenneth H. Anderson, Esq.



hours .....

I'm here in ur state! Making few minutes to fucking see me face to face! I'm NOT asking u! So make it happen

I'm here in ur state!!!! Make few minutes to see me face to face! I'm NOT asking u ! Make it happen!!!!!!!!!!!!!!!

Don't make me come to ur place!!!

Type message      SEND

  

Case: 25-1068 Document: 00118284570 Page: 480 Date Filed: 07/03/2025 Entry ID: 6720421

 

**Sharon Fairfax**
(703)

Keep ignoring that I'm here...
I fucking will show up ...and
will make a scene !

Leave me alone. I don't want
any contact with you.. I do
not want to and will not see
you.



Mar 12

Fine! I will show up at ur
house ! 313 Lincoln Ave...
See ya

Mar 2

Don't fucking say I didn't
requested!

Type message                    SEND

  

477

**Sharon Fairfax**
(703)

Call it a bluff! Guess... U ll see

You've called me over 20 times in the past few hours. I am not going to answer. Please stop calling me and please delete my number as I do not wish to have any contact with you



I don't give a fuCK what you wish! Talk to me and I will stop !!! Or don't.. And I have show up! You choice!

Type message                    SEND

478

**Sharon Fairfax**
(703)

am not going to answer.
Please stop calling me and
please stop calling me and
please delete my number as I
do not wish to have any
contact with you

I don't give a fuCK what you
wish! Talk to me and I will
stop !!! Or don't.. And I have
show up! You choice!

LI"

I want my questions
answered NOw

Type message                    SEND



479

# In the Matter of:

*Radfar vs*

*City of Revere et. al.*

---

*Sharon Radfar*

*March 30, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



A MAGNA LEGAL SERVICES COMPANY

Page 3

```
 1        UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3
 4    ------------------------------x
 5    SHARON RADFAR,
 6         Plaintiff,
                              Civil Action No.
 7    vs.                     1:20-cv-10178-IT
 8    CITY OF REVERE, and BRIAN M.
      ARRIOO, MAYOR; and JAMES GUIDO,
 9    CHIEF OF POLICE; and SERGEANT
      JOSEPH L. COVINO; and OTHER AS
10    YET UNNAMED OFFICERS OF THE
      REVERE POLICE DEPARTMENT;
11    INDIVIDUALLY AND IN THEIR
      OFFICIAL CAPACITIES AS MAYOR,
12    CHIEF OF POLICE AND POLICE
      SERGEANT AND OFFICERS OF THE
13    CITY OF REVERE,
14         Defendants.
15    ------------------------------x
16
17         DEPOSITION OF SHARON RADFAR
18         Conducted Remotely
19         22908 Regent Terrace
20         Sterling, Virginia
21    Wednesday, March 30, 2022, 10:04 a.m.
22
23
24    Reporter: James A. Scally, RMR, CRR
```

Page 2

```
 1    APPEARANCES
 2
 3    LAW OFFICE OF ELIZABETH M. CLAGUE
 4    The Franklin Building
 5    1106 Main Street
 6    Brockton, Massachusetts 02301
 7    508-587-1191
 8    By: Elizabeth M. Clague, Esq.
 9    Counsel for the Plaintiff
10
11    ANDERSON, GOLDMAN, TOBIN & PASCIUCCO LLP
12    50 Redfield Street
13    Boston, Massachusetts 02122
14    617-265-3900
15    By: Kenneth H. Anderson, Esq.
16    Counsel for the Defendant Joseph L. Covino
17
18
19
20
21
22
23
24
```

Page 3

```
 1            INDEX
 2    WITNESS              EXAMINATION
 3    SHARON RADFAR
 4    (By Mr. Anderson)            6
      (By Ms. Clague)            103
 5    (By Mr. Anderson)          106
 6
 7
 8
 9
             EXHIBITS
10    NO.                       PAGE
11    Exhibit 1    Complaint           4
12    Exhibit 2    Complaint for protection from  4
                   abuse
13
      Exhibit 3    Plaintiff's Initial     4
14                 disclosures
15    Exhibit 4    Plaintiff's responses to   4
                   defendant Covino's first
16                 interrogatories
17    Exhibit 5    7/2/18 psychological      4
                   evaluation of fitness for
18                 duty
19    Exhibit 6    9/7/21 letter and attachments  4
20    Exhibit 7    1/6/21 resignation letter   4
21
22           (Exhibits were given to the court
             reporter to attach to the transcript.)
23
24
```

Page 4

```
 1        (Exhibits 1-7 premarked.)
 2        MR. ANDERSON: Elizabeth, regular
 3    stipulations, or normal stipulations,
 4    all objections, except form of
 5    question, reserved until time of trial;
 6    motions to strike reserved until trial
 7    of trial; and she can --
 8        MS. CLAGUE: Sure, form of the
 9    questions and privilege.
10        MR. ANDERSON: Okay. And read and
11    sign within 30 days, waive the notary
12    requirement?
13        MS. CLAGUE: Yes, thank you.
14        THE COURT REPORTER: This is James
15    A. Scally. I am a Registered Merit
16    Reporter, Certified Realtime Reporter,
17    and I am a Notary Public in the
18    Commonwealth of Massachusetts.
19        This deposition is being taken
20    remotely. This witness is appearing
21    remotely from 22908 Regent Terrace,
22    Sterling, Virginia.
23        The attorneys participating in
24    this proceeding acknowledge their
```

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

## Page 5

1  understanding that I am not physically
2  present in the proceeding room, nor am
3  I physically present with the witness
4  and that I will be reporting this
5  proceeding remotely. They further
6  acknowledge that, in lieu of an oath
7  administered in person, the witness
8  will verbally declare her testimony in
9  this matter under the pains and
10 penalties of perjury. The parties and
11 their counsel consent to this
12 arrangement and waive any objections to
13 this manner of proceeding.
14      Please indicate your agreement by
15 stating your name and your agreement on
16 the record, after which I will swear in
17 the witness and we may begin.
18      MS. CLAGUE: Elizabeth M. Clague
19 for the deponent. I agree.
20      MR. ANDERSON: Kenneth Anderson
21 for defendant Joseph Covino. Agreed.
22
23
24

## Page 6

1          SHARON RADFAR, having been
2  satisfactorily identified by the
3  production of her driver's license and
4  duly sworn by the Notary Public, was
5  examined and testified as follows in
6  answer to direct interrogatories:
7
8          EXAMINATION
9  BY MR. ANDERSON:
10 Q. Good morning, Ms. Radfar. My name's Ken
11 Anderson. I represent Joseph Covino in this suit
12 that you've brought against him.
13      Have you ever had your deposition taken
14 before?
15 A. No.
16 Q. Okay. Just a couple ground rules: First, if
17 I ask you a question and you don't understand it,
18 will you please let me know, and I'll try to rephrase
19 it in a way that you understand it?
20 A. Yes.
21 Q. Okay. Second, if you could wait until I
22 finish the question before you start to answer so
23 we're not talking over each other and Jim can get
24 down what we're saying.

## Page 7

1  A. Okay.
2  Q. Okay. And, third, you just have to answer in
3  words, yes, no, whatever. You can't go uh-huh; you
4  can't nod your head. It has to be something that the
5  court reporter can take down so we all understand
6  when we read this months from now what was -- what
7  actually happened today. Okay?
8  A. Okay.
9  Q. I'm going to ask you a couple questions about
10 preparing for the deposition, but anything I'm asking
11 you here, I don't want to know anything you discussed
12 with your lawyer. I'm not entitled to know that. So
13 don't mention any of that for me. But other than
14 communicating with your lawyer, have you done
15 anything to prepare for today's deposition?
16 A. I have not.
17 Q. You haven't reviewed any documents?
18 A. No, I have not.
19 Q. Reviewed any personal notes?
20 A. No; I have not.
21 Q. Reviewed any of the pleadings in this case?
22 A. No, I have not.
23 Q. Later yesterday afternoon, I emailed a number
24 of exhibits to your attorney that I think were just

## Page 8

1  probably forwarded to you maybe five or ten minutes
2  ago. Have you had the opportunity to review any of
3  those at all?
4  A. I have not.
5  Q. Okay. What I'm going to do -- if we were in
6  person, obviously, this would be easy; I could just
7  show them to you and we could review them, and we
8  could do it that way. But since you're in Virginia
9  and I'm in Boston, and I'm not that technical, when I
10 get to the documents, I'm just going to read them to
11 you and ask if you understand, and then I'm going to
12 ask you specific questions about them, okay?
13 A. Okay.
14 Q. So let me start off with what was marked as
15 Exhibit I, which is actually the complaint in this
16 lawsuit.
17 A. Okay.
18 Q. Have you -- have you seen this document in
19 the past?
20 A. Yes, I've seen it in the past.
21 Q. Did you review it before it was filed?
22 A. No, I did not.
23 Q. Okay. Have you reviewed it since it was
24 filed?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 9

1  A. I reviewed it with my attorney, like
2  verbally.
3  Q. Okay.
4        MS. CLAGUE: Again, I'm going to
5  move to strike that.
6  Q. When you reviewed it, was everything in
7  there, to your knowledge, truthful and accurate?
8  A. Yes.
9  Q. Was there anything that wasn't in there that
10 should have been in there? Were there omissions that
11 would have made things unfair or inaccurate or
12 untruthful?
13       MS. CLAGUE: Objection.
14       You may answer.
15 A. I don't believe so.
16 Q. Okay. Let me – I'm just going to read you
17 kind of sentence by sentence some things here, and
18 I'm going to ask you to comment on this.
19       In paragraph 6, it reads as follows: "On the
20 evening of January 31, 2017, Plaintiff, a veteran
21 George Mason University Master Police Officer in
22 Virginia, had four uniformed officers seize her
23 service weapons and hand her an Abuse Prevention
24 Order obtained ex parte by Defendant Covino in the

Page 10

1  Lynn District Court and a letter from her employer
2  suspending her pending an investigation of criminal
3  charges alleged against her by Defendant Covino."
4  Is that statement accurate? Is that what
5  happened on January 31st of 2017?
6  A. Yes, correct.
7  Q. And where were you on this evening? Were you
8  at your home?
9  A. Yes, I was.
10 Q. And were you aware somebody was coming to
11 your home to serve you with anything? Or how did
12 this unfold? What happened with this restraining
13 order served on you?
14 A. I was not aware of anything.
15 Q. At that time on January 31st of 2017, had
16 anybody at George Mason University advised you that
17 Joseph Covino had called down a week or two
18 beforehand and spoken to Lieutenant Ganley?
19 A. Nope.
20       MS. CLAGUE: Objection to the
21 form.
22       THE WITNESS: Sorry.
23 Q. And no one had reached out to you from your
24 employer telling you that you should stop contacting

Page 11

1  Joseph Covino?
2  A. No.
3  Q. Okay. So what happened on January 31st? You
4  were at home?
5  A. Yes, I was.
6  Q. And was – was there a knock on the door?
7  Did they ring the doorbell? Did you see them coming?
8  Just tell me what happened.
9  A. I heard a knock and a doorbell ring on the
10 door. I proceeded downstairs from the second floor
11 to where the door is. I opened the door, and I
12 encountered several Loudoun County deputy sheriff's
13 officers and two George Mason commanders.
14 Q. Did you know the Loudoun County officers?
15 A. I did not.
16 Q. And who were the George Mason officers?
17 A. It was Lieutenant Ganley and Detective
18 Bacigalupi.
19 Q. And it's fair to say you had been involved in
20 a lengthy relationship with Detective Bacigalupi
21 prior to this?
22 A. On and off, yes.
23 Q. The next paragraph of this complaint says,
24 "Covino obtained the order by appearing in front of a

Page 12

1  judge and misrepresenting calls and messages the two
2  had exchanged, failing to disclose pertinent
3  information, and making false and misleading claims
4  alleging that Plaintiff had threatened him and placed
5  him in imminent fear of physical harm when she had in
6  fact done nothing of the kind. He felt he deserved
7  the order because she did not obey him when he
8  ordered her not to come to the Commonwealth of
9  Massachusetts."
10       What do you allege Joseph Covino
11 misrepresented to the court in his restraining order
12 application?
13 A. Based on his testimony in court, all the
14 information he presented to the presiding judge on
15 that day, it was all misleading and false
16 information.
17 Q. So everything he said was misleading and
18 false?
19 A. To some extent, yes.
20 Q. Okay. Was there anything truthful in what he
21 said?
22 A. We had contacted each other back and forth.
23 Q. Okay. Had you ever contacted him after he
24 told you not to contact him?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 13

1   A. After January 31st, no.
2   Q. Okay. But before January 31st.
3   A. He was texting me, so we both were exchanging
4   text messages and phone calls.
5   Q. Okay. And he never told you not to contact
6   him?
7   A. He would tell me not to contact him, but he
8   would text me back and he would call me back.
9   Q. And were those texts or calls back to you
10  prompted by you repeatedly calling him and texting
11  him, saying, "If you'd just call me one last time,
12  I'll leave you alone"?
13          MS. CLAGUE: Objection.
14          You may answer.
15  A. I don't ever recall him telling me one last
16  time or anything like that. He would respond, and
17  based on his text messages, that required another
18  response, so it was just going back and forth between
19  each other.
20  Q. Okay. Well, I've got to ask you some more
21  questions about that later on.
22      It says, "He felt he deserved the order
23  because she did not obey him when he ordered her not
24  to come to the Commonwealth of Massachusetts."

Page 14

1       Did you come to his place of employment twice
2   without his knowledge or consent?
3           MS. CLAGUE: Objection.
4   A. No.
5           MS. CLAGUE: You may answer.
6           THE WITNESS: Okay. I think there
7       is a delay.
8           MS. CLAGUE: A little bit. You
9       know, I'm just saying "You may answer,"
10      but when I object, unless I instruct
11      you not to answer, just --
12          THE WITNESS: Got it.
13          MS. CLAGUE: -- ignore my
14      objection.
15          THE WITNESS: Okay.
16  A. I did not go to his place of employment
17  twice. I did not.
18  Q. Okay. So how many times have you -- did you
19  go to the Revere Police Station?
20  A. Once.
21  Q. And was that in July of 2016 or December of
22  2016?
23  A. I was never in Boston or Revere in December
24  of 2016. So it was on or about July 2016.

Page 15

1   Q. Okay. And when you went to the station on
2   that date, did he know that you were going to be at
3   the station?
4   A. I don't know.
5   Q. Okay.
6   A. I did not make any contact with him.
7   Q. So you didn't let him know that you were
8   going to be at the station?
9   A. I don't believe so.
10  Q. Okay. Is there any doubt in your mind about
11  that? You're not being 100 percent committal there.
12          MS. CLAGUE: Objection.
13          Go ahead.
14  A. I don't believe that -- I don't remember the
15  text message, so I don't believe so that I had let
16  him know.
17  Q. Now, the next paragraph of the complaint
18  says, "Covino, acting in concert and with the advice
19  of unnamed Revere Police officers, filed a Complaint
20  for Protection from Abuse and an affidavit, both of
21  which contained false and misleading claims about
22  Plaintiff."
23      Do you have any information to support the
24  claim that Covino acted in concert with other Revere

Page 16

1   Police officers?
2   A. I believe there was a detective involved.
3   Q. And do you know how that detective was
4   involved or the extent the detective was involved?
5   A. I don't.
6   Q. Paragraph 9 of the complaint says, "Covino
7   called Plaintiff's employer, making the same false
8   and misleading claims against her, and causing her
9   employer to suspend her, open an investigation, and
10  seek criminal charges against Plaintiff."
11      What false and misleading claims did Joseph
12  Covino make against you to your employer?
13  A. The email that I believe he sent them. I
14  wasn't privy to the conversations that he had with
15  Chief Rowan or Lieutenant Ganley. All the
16  information based on the attorney -- my previous
17  attorney, it was misleading, and it was not accurate
18  and true.
19  Q. Have you -- did you listen at all to the
20  deposition of Lieutenant Ganley when that was taken
21  back on January 18th?
22  A. Unfortunately, I did not.
23  Q. Okay. Have you read the transcripts of the
24  testimony of Lieutenant Ganley from January 18th of

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 17

1  2022?
2  A. No, I have not.
3  Q. Okay. If -- if I were to tell you that what
4  Lieutenant Ganley testified to in his deposition
5  about this conversation, on page 30 of his
6  deposition, he answered -- the question was, "Was he
7  asking for your assistance in getting her to stop
8  contacting him?"
9       And he answered on page 30, line 20, "Yeah, I
10 believe that was the gist of it. He wanted a clean
11 break from her, did not want her contacting him,
12 coming up there, or interfering with his work or his
13 family."
14      If that's what Covino told Lieutenant Ganley
15 when he called, would that be false or misleading?
16          MS. CLAGUE: Objection.
17          You may answer.
18 A. I can't confirm that because I never was
19 privy to the conversation that they both had. So I
20 can't tell you whether -- what information he -- he
21 presented to George and Lisa.
22 Q. Okay. But I'm telling you, if that's what
23 Lieutenant -- strike that.
24      If that's Lieutenant Ganley's memory of the

Page 18

1  conversation, that he wanted a clean break from you,
2  he did not want you contacting him, coming up there,
3  or interfering with his family, if that's what Covino
4  told Lieutenant Ganley, is that false or misleading?
5          MS. CLAGUE: Objection.
6  A. Certainly I believe it's misleading because I
7  never interfered with his family. I never went to
8  Boston after my last visit in July of 2016. I never
9  went to his place of employment or even his house.
10 So I think that some of the information that he was
11 presenting to George Mason was definitely misleading.
12 Q. Okay. What about the statement he wanted a
13 clean break from you?
14 A. I can't -- I can't -- Joey and I, we never
15 had that conversation, so I don't know what it was in
16 his mind to present that to Ganley. So I really
17 can't say what he meant by making that statement.
18 Q. Okay. Paragraph 10 of the complaint says,
19 "Covino relentlessly pursued criminal charges against
20 Plaintiff though he knew she had committed no crime
21 and those charges and claims were false."
22      What evidence do you have that Covino
23 relentlessly pursued criminal charges against you?
24          MS. CLAGUE: Objection.

Page 19

1       You may answer if you know.
2  A. Again, I was not privy to the conversation
3  Joey had with my commanders. But based on the
4  criminal charges, I can say that he had no evidence
5  to pursue any of that, and he definitely misled the
6  George Mason University Police Department with the
7  information that he provided.
8  Q. Okay. But what evidence do you have that he
9  pursued criminal charges against you?
10         MS. CLAGUE: Objection. Again,
11 and I'm going -- I'm going to object to
12 the form of the question here.
13 "Evidence" is a legal term. She's not
14 a lawyer.
15         MR. ANDERSON: Okay. Are you
16 telling her not to answer?
17         MS. CLAGUE: Yes, I'm going to
18 instruct her not to answer legal
19 questions.
20 BY MR. ANDERSON:
21 Q. What information do you have to support a
22 claim that Covino relentlessly pursued criminal
23 charges against you?
24 A. Certainly one of the supporting evidence

Page 20

1  would be that for December, that I was never in
2  Boston. He misled George Mason Police Department.
3  Q. Okay. But I'm asking about in pursuing
4  criminal charges. What information do you have that
5  he relentlessly pursued your criminal charges?
6  A. I think that the information he provided to
7  the state police. I don't know what information he
8  provided. I have not seen any documents that he has
9  provided to them.
10 Q. Have you reviewed the deposition transcript
11 of Chief Rowan at all?
12 A. No, I have not.
13 Q. Have you reviewed the documents produced by
14 the Virginia State Police pursuant to a subpoena?
15 A. I have not.
16 Q. Okay. If I were to just read a section here
17 from what's been marked as Exhibit 6 for your
18 deposition, it has "Exhibit 6" with a parentheses
19 "SR," and it was Exhibit 7 at the depositions of
20 Lieutenant Ganley and Chief Rowan. On page 48 of
21 that, there's a summary from Special Agent Kinnard
22 from the state police, and it says in the third
23 paragraph on page 48, it says, "At the behest of
24 Chief Rowan, the Virginia State Police initiated an

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Pages 17-20

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 21

1 investigation into this matter because Radford is a
2 sworn member and she has a history of past similar
3 behavior."
4 That indicates that this was at the behest of
5 Chief Rowan and not Covino, the criminal
6 investigation. Do you dispute that?
7 A. Certainly both of them colluded together.
8 Q. Do you have any information at all that
9 Covino even spoke with Chief Rowan before this
10 investigation was started?
11 MS. CLAGUE: Objection.
12 You may answer.
13 A. Based on previous attorney, I have been
14 advised that —
15 MS. CLAGUE: I'm going to stop you
16 right there. I don't want you to be
17 offering any information, and Attorney
18 Anderson doesn't want you to be
19 offering any information —
20 THE WITNESS: Okay.
21 MS. CLAGUE: — about
22 communications with attorneys. So all
23 of this is outside of communications
24 with attorneys.

Page 22

1 However, you know, with regard to
2 any emails or anything else that you've
3 seen independently, you can certainly
4 talk about them.
5 THE WITNESS: Right. Okay. Yes.
6 A. No, I have not seen anything independently.
7 Q. Okay. Now, paragraph 14 of your complaint
8 says, "Defendants' misconduct toward Plaintiff caused
9 her the loss of her job."
10 Is that truthful and accurate?
11 A. Yes, absolutely.
12 Q. Is it missing anything?
13 MS. CLAGUE: Objection.
14 A. Can you explain what you mean by that, if
15 it's missing anything?
16 Q. Is the answer full and complete?
17 A. I did lose my job because of Joey Covino,
18 yes.
19 Q. And are there any other reasons that you lost
20 your job?
21 A. I don't believe so.
22 Q. Your complaint doesn't reference anything
23 about fitness for duty evaluations. In your opinion,
24 do fitness for duty evaluations have anything related

Page 23

1 to your losing your job?
2 A. No, I don't believe so.
3 Q. Now, you did undergo three fitness for duty
4 evaluations; correct?
5 MS. CLAGUE: Objection.
6 A. Correct.
7 MS. CLAGUE: You may answer.
8 A. Yes.
9 Q. And the first one was at the request of your
10 employer?
11 A. Yes.
12 Q. And you saw a Dr. Ryan Shugarman,
13 S-h-u-g-a-r-m-a-n?
14 A. Yes.
15 Q. And it's fair to say that Dr. Shugarman wrote
16 a 30-page report that found you unfit for duty;
17 correct?
18 A. He wrote a report, yes.
19 Q. And what were the results of the report?
20 MS. CLAGUE: Objection.
21 A. He — as what you stated, he found me unfit
22 to return to duty.
23 Q. Okay. And then you went and you had another
24 fitness for duty evaluation by a Dr. Ronald Earl

Page 24

1 Smith —
2 A. Correct.
3 Q. — who was of your own choosing?
4 A. Yes, correct.
5 Q. And Dr. Smith disagreed with the findings of
6 Dr. Shugarman; correct?
7 A. I believe so, yes.
8 Q. And then it's fair to say that there was an
9 agreement between you and George Mason University
10 that there would be a third doctor that was mutually
11 agreed upon by both sides; correct?
12 A. That was agreed with the previous attorney.
13 Q. Okay. But your — your attorney, your
14 representative, agreed that you would have a third
15 fitness for duty evaluation with someone who both
16 parties agreed upon?
17 A. Yes.
18 Q. And that was a Dr. Halper, H-a-l-p-e-r?
19 A. Correct.
20 Q. And this is Exhibit 5 that I have here, Dr.
21 Halper's report. And you agree with me that Dr.
22 Halper's conclusion in the bottom of page 12 said,
23 "Given all of the information, history, testing, and
24 research available, Officer Radfar has demonstrated

Page 25

1 at this point that she cannot be trusted to maintain
2 good judgment or present to the community with the
3 integrity and reliability required of law enforcement
4 officers."
5 　　That was his finding; correct?
6 A. I did not see that report.
7 Q. You've never seen this report?
8 A. No, I have not.
9 Q. Are you aware that he diagnosed you with
10 "Delusional Disorder, mild but persistent, relevant
11 to interpersonal interactions and intent/motivation
12 of others' behaviors"?
13 　　MS. CLAGUE: Objection.
14 A. I'm sorry, you said "him." Are you talking
15 about Dr. Shugarman?
16 Q. No. I'm sorry. It's a her. It's Dr.
17 Elizabeth Halper. I'm sorry.
18 A. Okay.
19 Q. Are you aware that Dr. Halper diagnosed you
20 with "Delusional Disorder, mild but persistent,
21 relevant to interpersonal interactions and intent/
22 motivation of others' behaviors"?
23 A. No, I'm not.
24 　　MS. CLAGUE: Objection.

Page 26

1 A. No, I'm not.
2 Q. You're not aware of that?
3 A. No, I'm not.
4 Q. And are you aware that you were also
5 diagnosed as having narcissistic characteristics?
6 　　MS. CLAGUE: Objection.
7 A. No, I'm not.
8 Q. So it's your testimony that you never
9 reviewed the report of Dr. Halper?
10 A. Correct.
11 Q. Was this -- the contents of the report, was
12 this revealed to you by anybody?
13 　　MS. CLAGUE: Objection. And I'm
14 not going -- I'm going to instruct her
15 not to answer if it's -- to the extent
16 that there's any privileged information
17 that would be --
18 　　MR. ANDERSON: Well, I think if it
19 was her lawyer who told her -- I'm not
20 asking what the lawyer said. I'm just
21 asking "Did somebody tell you that this
22 was" --
23 　　MS. CLAGUE: Well, that's what he
24 told her. I mean that would be what he

Page 27

1 told her. That's privileged. You do
2 have a correspondence from her lawyer
3 as part of the disclosure that we got
4 from -- from George Mason.
5 　　MR. ANDERSON: Yeah.
6 　　MS. CLAGUE: And that -- I mean
7 that disclosure indicates another
8 evaluation after that one. But, you
9 know, what she and her lawyer said to
10 each other about these, there's no --
11 she's not going to be testifying about
12 that.
13 　　MR. ANDERSON: I know. But I'm
14 just asking if she heard the results
15 from anybody. Not what she was told,
16 but "Did a lawyer tell you the result?"
17 　　MS. CLAGUE: Well, judge -- not
18 judge. I'm sorry.
19 　　MR. ANDERSON: Come on, Elizabeth.
20 The findings are -- they're black and
21 white. It's a document.
22 　　MS. CLAGUE: There's nothing black
23 and white about them, and they're not a
24 diagnosis. We can -- you know, we'll

Page 28

1 have that conversation in front of a
2 judge. But for purposes of the
3 deposition, she's not going to be
4 disclosing privileged communications.
5 　　MR. ANDERSON: But I'm telling you
6 it's not privileged. I'm just asking
7 if she learned it from anybody. I'm
8 not asking what was said. I'm just
9 saying, "Did somebody tell you the
10 findings?"
11 　　MS. CLAGUE: But, again, to the --
12 　　MR. ANDERSON: Are you instructing
13 her --
14 　　MS. CLAGUE: I'm instructing her
15 not --
16 　　MR. ANDERSON: Let me ask the
17 question again and see if you object.
18 　　MS. CLAGUE: The objection is that
19 I'm instructing her not to disclose any
20 privileged communications.
21 　　MR. ANDERSON: Okay.
22 　　MS. CLAGUE: She can disclose
23 anything that's not privileged.
24 　　MR. ANDERSON: Okay.

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 29

1 BY MR. ANDERSON:
2 Q. Did anybody -- and I'm not asking you who --
3 tell you what the findings were from this evaluation
4 by Dr. Elizabeth Halper?
5 MS. CLAGUE: And --
6 A. No.
7 MS. CLAGUE: -- again, I'm going
8 to instruct you --
9 A. No. No.
10 MS. CLAGUE: -- not to answer.
11 MR. ANDERSON: Well, she already
12 answered.
13 MS. CLAGUE: Okay.
14 Q. So at some point you resigned from the George
15 Mason University Police Department; correct?
16 A. Yes.
17 Q. And was that resignation in any at all -- in
18 any way related to failing two fitness for duty
19 evaluations?
20 MS. CLAGUE: Objection.
21 You may answer.
22 A. Okay. It wasn't -- it was a part of the
23 settlement agreement. Again, it's -- I don't know
24 how to answer that question.

Page 30

1 Q. Okay. Well, going back to paragraph 14 of
2 the complaint, let me re-read it to you again. It
3 says, "Defendants' misconduct towards Plaintiff
4 caused her the loss of her job," okay?
5 I asked if that answer was full and complete,
6 and you said that it was; correct?
7 A. Yes.
8 Q. Okay. But you're telling me now that the
9 fact that you failed two fitness for duty evaluations
10 was part of the settlement agreement that resulted in
11 your resignation.
12 MS. CLAGUE: Objection. That's
13 not her testimony.
14 MR. ANDERSON: Well, that's the
15 question I'm asking her.
16 MS. CLAGUE: Okay.
17 THE WITNESS: Can I answer?
18 A. That was not my testimony, no.
19 Q. Okay. So what role, if any, did being found
20 unfit to carry a gun and badge have to do with you
21 resigning from the George Mason University Police
22 Department?
23 MS. CLAGUE: Objection.
24 A. I'm sorry. Can you rephrase that question?

Page 31

1 Q. What -- what impact, if any, did failing two
2 fitness for duty evaluations have to do with you
3 resigning from the George Mason Police Department?
4 MS. CLAGUE: Objection.
5 A. The fitness for duty, I -- I did not resign
6 because of that. Joey Covino contacted my employer
7 and provided false information and misleading
8 information to my employer. My resignation was not
9 solely based on the failure for fitness for duty
10 claims that George Mason is claiming.
11 Q. Was it based partly on fitness for duty
12 claims?
13 A. No.
14 Q. So it wasn't based at all on failing two
15 fitness for duty evaluations?
16 MS. CLAGUE: Objection. She asked
17 and answered. Could we move on?
18 MR. ANDERSON: No. I want an
19 answer to this question.
20 MS. CLAGUE: Except that she's
21 already given it.
22 Go ahead. You can answer again.
23 A. No.
24 Q. Now, paragraph 17 of your complaint, it

Page 32

1 reads, "Defendant Covino's campaign to destroy
2 Plaintiff continued for months after the restraining
3 order was vacated, and he made repeated false
4 statements to Virginia investigators in an attempt to
5 get her charged but failed and refused to let them
6 know that his restraining order had been vacated."
7 You call this Covino's campaign to destroy
8 you. Can you elaborate on that?
9 A. Well, in my opinion, that's what he did. He
10 contacted my employer and provided them false
11 information and misleading information, and he was
12 not truthful about any of his statements to my
13 agency. So, yes, that was his campaign to fire me or
14 get me in trouble with my employer.
15 Q. Okay. But you said you -- you have no
16 personal knowledge of what he said to Lieutenant
17 Ganley; correct?
18 A. I do not.
19 Q. You have no personal knowledge of what he
20 forwarded to Lieutenant Ganley; correct?
21 MS. CLAGUE: Objection.
22 A. I am aware that there was an email forwarded.
23 Q. And what was false and misleading in that
24 email?

Page 33

1    A. I just have the knowledge that there was an
2    email forwarded, but I've never read the contents of
3    it.
4    Q. So you haven't spoken to him; you haven't
5    read the email. What information do you have that he
6    made false and misleading statements to your
7    employer?
8    A. For example, he had told them that I was in
9    Boston in December of 2016. That's one prime
10   example.
11   Q. Okay. Any other examples?
12   A. That's the one thing that I can recall at
13   this point without -- not seeing the email, then I
14   won't be able to pinpoint it.
15   Q. Did you ever text him and state that you were
16   in Boston in December of 2016?
17   A. No.
18   Q. Let me go to what I have marked as Exhibit 2,
19   which is the Revere -- I mean the Lynn court
20   documents. And I'm just going to ask you some
21   questions specifically about the restraining order
22   affidavit completed by my client.
23        On the second page of what's marked as
24   Exhibit 2, and then in parentheses "SR" for the name

Page 34

1    Sharon Radfar, it says, "On or about" dates
2    stretching to January 30, 2017, "the Defendant," and
3    then this is in his handwriting, "has repeatedly
4    attempted to contact me by any means necessary, to
5    wit, telephone, text, written letters, social media,
6    driving from VA to MA and showing up in my
7    neighborhood or at my place of work."
8        Is that false or misleading?
9    A. Absolutely.
10   Q. You do agree that you did drive from Virginia
11   to Massachusetts and you went to his place of
12   employment; correct?
13   A. It was not intended to see Joey Covino, but I
14   was in the Boston area.
15   Q. Okay. And I know it's in one of your
16   interrogatory answers that I'm going to get to later,
17   but what were you doing in the Boston area in July of
18   2016?
19   A. I have a family member in Boston.
20   Q. And what's the name of that family member?
21   A. Last name? Same as mine, Radfar.
22   Q. And what's the first name?
23   A. Vahzad.
24   Q. Can you spell that for me?

Page 35

1    A. V-a -- let me -- it's V-a-h-z-a-d.
2    Q. V-a-h-z-a-d Radfar?
3    A. Correct.
4    Q. And where does that relative live?
5    A. In Plymouth County.
6    Q. And in July you came up to visit that
7    relative?
8    A. I was in there. I was -- again, I was in
9    Greater Boston to visit them, and I stopped by at
10   Revere Police Station as well.
11   Q. And when you went to the Revere Police
12   Station, did you know if Covino was working at that
13   time?
14   A. No, I did not.
15   Q. In your interrogatory answers, you mentioned
16   that you went there because you were curious about
17   how other police departments operate and you like to
18   see other police departments?
19   A. Yes.
20   Q. Okay. Did you visit any police departments
21   in Plymouth County when you were up here?
22   A. Not in Plymouth County; no.
23   Q. Did you visit any of the like surrounding
24   towns from Revere? Did you go to the Boston Police

Page 36

1    Station, Chelsea Police Station, Everett Police
2    Station, Lynn Police Station, to see how they worked?
3    A. No, I did not.
4    Q. Once you were at Covino's place of
5    employment, did you contact him and say that you were
6    going to come to his house?
7    A. I'm sorry. Can you repeat that?
8    Q. Did you contact him and say you were going to
9    come to his house?
10   A. No, I did not, or I have not.
11   Q. Did you drive by his house?
12   A. No, I have not and never have.
13   Q. You never made any comments about driving by
14   his house?
15   A. No.
16   Q. Going back to Exhibit 2, the next sentence --
17   I'm going to skip down a couple here. It says, "She
18   has called/texted over 400 times on MLK" -- meaning
19   Martin Luther King -- "weekend and called over 100
20   times on 1/28/17."
21        Is that accurate or inaccurate?
22   A. I believe it's inaccurate, yes. Inaccurate.
23   Q. Did you call or text him over Martin Luther
24   King weekend of 2017?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

### Page 37

1   A. I don't believe so. I don't -- what date
2   would that be?
3       Q. It's usually sometime like slightly after
4   mid-January. If you want, I can scroll on my
5   calendar on my phone here. I believe it would have
6   been the weekend of the January 14th, 15th, and 16th.
7       A. I don't believe so, because I had an
8   operation sometime in January, so.
9       Q. Okay. Now, not to get into your medical
10  information, but I think when there was a meeting
11  with George Mason Police and the Virginia State
12  Police -- in fact, let me -- let me find it. I think
13  they said you had been out on medical leave for about
14  six weeks. Does that sound consistent?
15      A. Yes.
16      Q. And was -- did that help you place any time
17  of surgery then?
18      A. Yes.
19      Q. Would that have been six weeks before that
20  first meeting between the Virginia State Police?
21      A. My surgery was sometime in January.
22      Q. Okay. But you have no evidence that it was
23  January 14th, 15th, or 16th?
24      A. I would have to look at the exact date from

### Page 38

1   my medical records.
2       Q. So you deny calling him 400 times over that
3   weekend or texting 400 times over that weekend?
4       A. Yes. I don't recall calling him.
5       Q. The next sentence in his affidavit says, "I
6   have blocked over 100 phone numbers in the past year
7   to avoid her."
8       Is that an accurate or inaccurate statement?
9       A. I don't know -- I -- that's -- that's a good
10  question for Joey. I don't know. I don't know if he
11  blocked me or not because I didn't contact him as
12  often.
13      Q. You would contact him either by your phone or
14  by WhatsApp; is that correct?
15      A. I have contacted him from my cellphone, and,
16  yes, I do have a WhatsApp.
17      Q. And do you -- have you ever used an app that
18  changes your phone number or disguises your phone
19  number when you text?
20      A. No, I have not.
21      Q. Have you ever done that to disguise your
22  number when you call?
23      A. No, I have not.
24      Q. If I told you that Covino has all these

### Page 39

1   different numbers where calls have come in from you
2   that's on page 14 of Exhibit 6, and there's probably
3   about 30 different numbers here, it's your testimony
4   under oath that you never used any other number to
5   contact him?
6       A. I've never used any other number but my own
7   phone number.
8       Q. Okay. And you never used any app on your
9   phone to change that number?
10      A. No.
11      Q. So if Covino said that he received calls from
12  918-416-0501, 202-750-4020, 615-334-8902 -- there's
13  too many of these to read here -- you deny ever doing
14  that, contacting him after he blocked your number,
15  using a different number?
16      A. Yes, I deny that.
17      Q. Next paragraph says, "She has shown up in my
18  neighborhood, uninvited or unannounced, and demanded
19  I come see her."
20      Is that a true statement?
21      A. That is a false statement.
22      Q. Do you know how close you were to his house
23  when you were in Revere?
24      A. I was never close to his house.

### Page 40

1       Q. It says, "She has threatened me with ruining
2   my life and has stated, 'If I can't have you, no one
3   will!'"
4       Is that true?
5       A. False. I've never made that comment.
6       Q. Okay. "Radfar has assumed the identities of
7   several people online in an attempt to follow/contact
8   me."
9       Did you ever create any different Facebook or
10  social media accounts in different names so you could
11  follow Covino?
12      A. No, I have not.
13      Q. "Radfar has befriended several LEO," meaning
14  law enforcement officers, "who are friends of mine
15  and are harassing them to get info about me."
16      Did you befriend any of his law enforcement
17  friends?
18      A. No, I have not.
19      Q. Someone by the names of Homsy, H-o-m-s-y?
20      A. Actually, the gentleman that you're referring
21  to, Mike Homs -- I don't know how to pronounce his
22  last name. He was the one who friended me on
23  Facebook in the law enforcement group.
24      Q. So I'm going to now ask you some questions

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

1  about what's been marked as Exhibit 4, which are
2  interrogatory answers. Do you remember completing
3  and signing interrogatories, which are a series of
4  written questions?
5  A. Yes.
6  Q. And on the last page here, I don't know if
7  you can see that.
8  A. Okay.
9  Q. That's your signature?
10  A. Yes.
11  Q. And you signed these on August 9th -- I'm
12  just telling you the date -- 2021, under the pains
13  and penalties of perjury?
14  A. I believe that was the date, yes. Yes.
15  Q. And after -- you signed these after reviewing
16  them?
17  A. Yes.
18  Q. And you wanted to make sure that they were
19  truthful and accurate?
20  A. Yes.
21  Q. Okay. Interrogatory 2, I asked "the name,
22  address, job title, and salary of your current
23  employment."
24  A. Uh-huh.

1  Q. Can you tell me where you're currently
2  employed?
3  A. Unfortunately, I'm not going to disclose
4  that.
5  Q. And why is that?
6  A. I fear for my safety because of Joey Covino,
7  what he has done in the past, and I have also signed
8  an NDA with my employer.
9  Q. And what's the basis of you having a fear of
10  Joseph Covino at this point?
11  A. The fear is that he's well capable of
12  contacting my current employer as what he did
13  previously.
14  Q. So it's fair to say any last contact you had
15  with him was when you were both in court on February
16  15th of 2017, when the restraining order was vacated;
17  correct?
18  A. I believe it was on 2/15, if I'm not
19  mistaken.
20  Q. What did I say?
21  A. You said 2017.
22  MS. CLAGUE: Okay.
23  Q. I thought -- I meant February 15th of 2017.
24  Okay. But the last time you saw him was in the Lynn

1  District Court?
2  A. Correct.
3  Q. So it's been over five years since he's --
4  you've physically been in the same space with him;
5  right?
6  A. I don't think it's been quite five years.
7  Q. It was February of 2017, five years would be
8  February of 2022, which we just passed.
9  A. Okay. Okay. Yes. That was the last time I
10  saw him, 2/15 of 2017.
11  Q. Okay. And since that time, he's made no
12  effort to contact you at all?
13  MS. CLAGUE: Objection.
14  If you know, you can answer.
15  A. I don't know.
16  Q. So what's your basis for claiming that he's
17  going to somehow contact your employer if you tell me
18  who it is?
19  A. Again, he's in an authoritative position. He
20  can at any point, any time he can contact my current
21  employer, provide false, misleading information, as
22  he has done so with George Mason University. Because
23  of that, I fear and I'm not comfortable to put this
24  on the record, where I work currently.

1  Q. Okay. I'm going to reserve on that one, and
2  we may be going to court over that if you're going to
3  refuse to tell me that.
4  MS. CLAGUE: That's fine. That's
5  fine. In light of the fact that your
6  counsel [sic] has refused to disclose
7  his address for what he claims are the
8  same reasons. I mean that's -- you
9  know, it seems to me -- I thought that
10  when we did supplement with her
11  earnings information that that put that
12  issue to bed. But if you want to bring
13  that in front of the judge, we can do
14  that.
15  MR. ANDERSON: I'm sorry. What
16  are you saying I'm withholding,
17  Elizabeth?
18  MS. CLAGUE: His residence, his
19  address. He withheld his address.
20  MR. ANDERSON: Did we not provide
21  his address?
22  MS. CLAGUE: Right.
23  MR. ANDERSON: I don't recall
24  not --

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 45

1  MS. CLAGUE: In his responses to
2  written discovery, he refused to
3  provide his address.
4  MR. ANDERSON: Yeah. I don't
5  remember. I'll double-check that. I
6  didn't -- I don't recall that. Okay.
7  MS. CLAGUE: And that might be
8  something we can work out.
9  BY MR. ANDERSON:
10 Q. So can you tell me what line of work you're
11 in?
12 A. I'm in a private -- I work for a private
13 company. I'm a specialist.
14 Q. I mean is it sales, marketing? Is it law
15 enforcement? Is it consulting? Is it -- are you a
16 math teacher? I mean can you tell me what field
17 you're in?
18 A. It definitely is not law enforcement. It's
19 non-law enforcement related. I'm definitely not a
20 teacher. I'm not a math tutor or anything like that.
21 I work -- it's in the security industry.
22 Q. And in your interrogatories, you say that
23 there was a nondisclosure agreement?
24 A. Yes.

Page 46

1  Q. And why were you asked to sign that, or why
2  is there a nondisclosure agreement?
3  A. That's what the company's policy is.
4  Q. And the policy is that you can't say where
5  you work?
6  A. Yes.
7  Q. And does -- do all your coworkers also have a
8  nondisclosure agreement that they can't say where
9  they work either?
10 MS. CLAGUE: Objection.
11 A. Yes.
12 MS. CLAGUE: You may answer.
13 A. Everyone signs the same -- once they join the
14 company, they sign the same nondisclosure agreement.
15 Q. Now, in your interrogatory answer 5, I asked
16 about your trips to Boston, and you mentioned a third
17 trip on or about July of 2016. You say, "A short
18 trip. This trip was not intended to see Joey Covino.
19 I have a family member who resides in Greater
20 Boston." And then you said your hotel was Four
21 Points by Sheraton Wakefield Boston Hotel &
22 Conference Center.
23 A. Yes.
24 Q. Is that accurate?

Page 47

1  A. Yes.
2  Q. So when you came to see your cousin or your
3  relative Vahzad Radfar, V-a-h-z-a-d Radfar, who lives
4  in Plymouth County, you stayed in Wakefield?
5  A. Yes.
6  Q. So you didn't stay with your relative?
7  A. No, I did not.
8  Q. And how much time did you spend with your
9  relative on that trip?
10 A. Maybe several hours.
11 Q. And was that at his house, or was that in
12 Boston, or where did you meet your relative?
13 A. I believe we went to a restaurant.
14 Q. And do you know where that restaurant was?
15 A. I don't.
16 Q. Do you know what kind of restaurant it was?
17 I mean was it a French, Italian, Middle Eastern,
18 Chinese, Mexican?
19 A. It was -- they serve all different kinds of
20 food. It definitely was not Chinese.
21 Q. And you don't know what city or town it was
22 in?
23 A. I don't. I'm not familiar with Boston.
24 Q. And Wakefield's north of Boston and Plymouth

Page 48

1  is south of Boston. If you came to see this
2  relative, is there any reason you didn't stay closer
3  to your relative?
4  MS. CLAGUE: Objection.
5  You may answer.
6  A. I -- I booked hotel based on my previous
7  stay, and I received a discount at that hotel, so the
8  price was right.
9  Q. Okay. But you never looked at a map to
10 realize that it was, you know, like 40 miles the
11 opposite direction?
12 A. No. Again, I'm not familiar with Boston, and
13 I don't know what cities that were available, no.
14 Q. Okay. And you don't have maps or Internet?
15 A. No. I do have maps and Internet.
16 Q. Okay. Now, you said it was a short trip.
17 How many nights did you stay in Wakefield?
18 A. I believe it was just one night.
19 Q. And how long of a drive is it from Northern
20 Virginia to Boston? It's about an eight-hour drive?
21 A. Sounds about right.
22 Q. So you drove up, you spent a couple hours
23 with the relative, you went to the Revere Police
24 Station, and then you drove back the next day?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 49

1    A. Yes.

2    Q. And have you seen that relative since that

3    time?

4    A. Yes.

5    Q. On interrogatory number 8 -- let me read it

6    to you.

7    A. Uh-huh.

8    Q. "Please state the dates of your employment

9    with the George Mason University Police Department,

10   listing the date of your hire, your duties and

11   responsibilities, your salary and wage information,

12   the date of the end of your employment with the

13   George Mason University Police Department, and the

14   reasons provided for ending your employment with

15   George Mason University Police Department."

16        In your answer, you never answered that part

17   about the reason provided for ending your employment

18   with George Mason University Police Department.

19        MS. CLAGUE: Objection.

20   Q. Why did you resign?

21   A. Again, the -- it was because of Joey Covino

22   contacted my employer.

23   Q. And it had nothing to do with the fact that

24   your chief had you do two fitness for duty

Page 50

1    evaluations and -- or three fitness for duty

2    evaluations and that Dr. Halper found that you

3    couldn't "be trusted to maintain good judgment or

4    present to the community with the integrity and

5    reliability required of law enforcement officers"?

6         MS. CLAGUE: Objection.

7    A. No, sir.

8    Q. That had nothing to do with the fact that you

9    resigned from your job?

10   A. Not -- no. It has nothing to do with fitness

11   for duty reports.

12   Q. Now, do you know somebody by the name of

13   Jason Ford?

14   A. Yes, I do.

15   Q. And how did you come to know Jason Ford?

16   A. Jason Ford was referred to me by an attorney,

17   again, that I was hiring for Joey Covino's case.

18   Q. When you say "for Joey Covino's case," are

19   you referring to the harassment prevention order

20   appeal hearing?

21   A. Yeah. Yes.

22   Q. Okay. Let me -- I'm going to get back to

23   Jason Ford.

24        When you went to court on February 15th of

Page 51

1    2017, it's fair to say that Joseph Covino allowed the

2    restraining order to be dismissed?

3         MS. CLAGUE: Objection.

4    A. I don't know "allowed," but he did not pursue

5    it.

6    Q. Okay. He didn't contest it?

7    A. Again, I had an attorney back then, so they

8    conversed, and that's all I know.

9    Q. Okay. Do you agree with me that if he was on

10   a crusade to destroy you that it would have been in

11   his best interest to try to keep that restraining

12   order going because that would have prevented you

13   from getting a department firearm back and getting

14   back to work?

15   A. I don't know if I would agree with that.

16   Q. Well, let me ask you -- I mean you worked in

17   law enforcement for 20 years?

18   A. Correct.

19   Q. And you agree with me that you need a firearm

20   to work as a police officer?

21   A. Absolutely.

22   Q. And if there's a restraining order against

23   you, that means you can't have a firearm; correct?

24   A. Correct.

Page 52

1    Q. And if there's not a restraining order

2    against you, there's no prohibition for you -- no

3    legal prohibition for you to work as a police officer

4    because you can have your gun; right?

5         MS. CLAGUE: Objection.

6    A. Correct, yes.

7    Q. And Covino didn't pursue it on February 15th.

8    He said, "I'm not going to pursue it. I'm going to

9    let it drop"; correct?

10        MS. CLAGUE: Objection.

11   A. I just think that he didn't pursue it because

12   he didn't want to have a trial.

13   Q. Okay. But if -- if he wanted to destroy you,

14   he would have fought to have that extended because

15   that would have made your employment a lot more

16   difficult?

17   A. I believe that he had already destroyed my

18   career by contacting George Mason Police Department

19   and by providing them with false information.

20   Q. Now, your attorney who went with you on that

21   date, you're telling me that he's the one who

22   referred you to Jason Ford?

23   A. I'm sorry. The audio was cutting you off.

24   Q. You didn't hear that?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 53

1    A. No. Your picture is frozen now.

2    Q. The attorney who went with you to the Lynn

3    District Court --

4        MR. ANDERSON: I'm getting a

5    message. Okay. I'm getting a message.

6    Okay. Am I back?

7        MS. CLAGUE: You're back.

8        MR. ANDERSON: I got a message

9    saying the Internet was unstable.

10   Q. So the attorney who went with you on February

11   15th, 2016, to the Lynn District Court is the one who

12   referred you to Jason Ford?

13   A. Yes.

14   Q. Okay. And when did you first meet Jason

15   Ford, or when did that relationship start?

16   A. I met -- physically I met Jason while -- on

17   April -- I believe it was April of 2017.

18   Q. And you -- you dated him through 2017? You

19   had some type of relationship with him?

20   A. We engaged -- it wasn't a relationship. I

21   don't call that a relationship. But we engaged in

22   interactions.

23   Q. Okay. And at some point, Jason Ford applied

24   for and received an abuse prevention order against

Page 54

1    you in the Brockton District Court?

2    A. Yes.

3    Q. And so this was still in 2017; correct?

4    A. Yes.

5    Q. And this was before you had your fitness for

6    duty evaluation by Dr. Halper?

7    A. What was before? I'm sorry. Can you repeat

8    that question?

9    Q. The restraining order that Jason Ford got

10   against you was before you had your fitness for duty

11   from Dr. Halper?

12   A. Yes.

13   Q. Okay. And if I told you the date for Dr.

14   Halper's report is July 2nd of 2018, I don't know if

15   you can see that.

16   A. I see that, yes.

17   Q. So six or seven months before that time, a

18   second individual gets an abuse prevention order

19   against you in Massachusetts; correct?

20   A. Yes.

21   Q. And in your lawsuit against Jason Ford, you

22   claim that his misconduct contributed to the loss of

23   your job?

24   A. Yes. As well.

Page 55

1    Q. And -- and in paragraph 16 of your lawsuit

2    against him, it specifically says, "Defendant's

3    misconduct towards Plaintiff contributed to the loss

4    of her job and further directly caused the

5    deprivation of other career opportunities to which

6    she was entitled."

7        How did Jason Ford bring about or contribute

8    to the loss of your job?

9    A. He also contacted my employer.

10   Q. And when he contacted your employer, do you

11   know what he said?

12   A. I don't.

13   Q. And when he got this restraining order

14   against you in December of 2017, what was your work

15   status?

16   A. I was still on leave from George Mason

17   University.

18   Q. So it was January 31st of 2017 that they

19   come, put you on leave, serve the restraining order;

20   correct?

21   A. Correct.

22   Q. The one Covino got?

23   A. Correct.

24   Q. Correct? I can't hear you.

Page 56

1    A. Yes. Yes, correct.

2    Q. And then at any time after that, did you ever

3    return to duty?

4    A. No, I did not.

5    Q. Now, on Jason Ford's case, when you came up

6    for the hearing on the -- on the restraining order,

7    we call it a ten-day date, but you get them ex parte,

8    and then they're supposed to give you within ten days

9    a hearing where there's both parties present. When

10   you came up to Brockton, he actually asked to have

11   that order extended; correct?

12   A. Yes.

13   Q. And his order, was it extended on that date?

14   A. It was extended.

15   Q. And how long was it extended for?

16   A. It was supposed to be extended for a year.

17   However, re-filed the motion, if I remember

18   correctly, and to -- vacated.

19   Q. And do you know how long into that year

20   period it was vacated?

21   A. I don't have the date in front of me, no.

22   Q. Okay. But you agree that when he got that

23   order, that would prohibit you from working as a

24   police officer, because you couldn't legally carry a

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 57

1 firearm; correct?
2 A. I was never allowed to return to work. So if
3 it wasn't because of Joey Covino's actions, Jason
4 Ford would have never -- I would have never met
5 Jason.
6 Q. Now, are you familiar with somebody by the
7 name of Lorna Hoey?
8 A. Who?
9 Q. Lorna Hoey?
10 A. I've heard the name.
11 Q. And what do you know about Lorna Hoey?
12 A. I don't know much.
13 Q. Well, tell me what you do know.
14 A. I just know she's a hockey player.
15 Q. Do you know where she's from?
16 A. I believe Ireland.
17 Q. Do you know if Joseph Covino had any
18 relationship with her?
19 A. I do not.
20 Q. Do you recall ever leaving any voicemails on
21 Joseph Covino's phone related to Lorna Hoey?
22 A. I don't.
23 Q. And, again, I asked you before if you
24 reviewed any documents from the Virginia State

Page 58

1 Police. You haven't reviewed any of those documents?
2 A. No, I have not.
3 Q. If I told you that there were 46 voice files
4 that the Virginia State Police had regarding calls
5 you made about Lorna Hoey, does that refresh your
6 memory at all?
7 A. I would have to listen to it in order for me
8 to answer that question.
9 Q. Okay. Well, I'm not going to play all -- all
10 46, but let me play you a couple of these, these
11 calls. Make sure you can hear it here.
12 (Audio file played as follows:
13 "To be more like Lorna? Is that
14 what you want? I can act like Lorna.
15 I can be like Lorna. I'll go get
16 surgery to look like fucking Lorna,
17 because obviously that's what you like
18 and that's what you want. So tell me,
19 what will it take? I'll do it. Tell
20 me what it takes. You want me to act
21 like Lorna? You want me -- you want my
22 hair to be like Lorna? I mean what
23 will it take? You want me to go get a
24 surgery to look like that? I'll go get

Page 59

1 it. Tell me what it will fucking
2 take.")
3 THE COURT REPORTER: Excuse me.
4 Just so you know, I can't hear that
5 good enough, I think, to record it
6 accurately.
7 MR. ANDERSON: Okay.
8 THE COURT REPORTER: You know, if
9 you want to play it, play it, but I
10 can't hear certain words.
11 MR. ANDERSON: Okay.
12 BY MR. ANDERSON:
13 Q. But were you able to hear that, Sharon, Ms.
14 Radfar?
15 A. I'm on the same page as the court reporter.
16 It's very hard to hear.
17 MS. CLAGUE: I couldn't hear it at
18 all. I mean -- I couldn't make out --
19 I heard that there was a voice.
20 MR. ANDERSON: Okay. Let me play
21 a different one, see if this is any ...
22 (Audio file played as follows:
23 "Thanks for blocking me, by the
24 way. And this is very adult of you to

Page 60

1 block me or not even give me a closure
2 or tell me what the hell I did to you
3 to hate me this much. So at least you
4 can have the decency to tell me why you
5 hate me so much that you are unwilling
6 to speak to me or tell me what is it
7 that I have done to you.")
8 MS. CLAGUE: That I heard.
9 THE COURT REPORTER: I would just
10 say, again, I'm not sure I heard every
11 word.
12 MR. ANDERSON: Okay.
13 BY MR. ANDERSON:
14 Q. Did you hear that, Ms. Radfar?
15 A. Yes, I did hear that one.
16 Q. Okay. And you agree that in that message,
17 you agree that Mr. Covino has blocked you, and you're
18 asking why he blocked you; correct?
19 A. Yes. But I never made any threats against
20 him.
21 Q. Okay. Let me -- let me play another
22 recording here.
23 (Audio file played as follows:
24 "When you're ready to have a real

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Pages 57-60

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 61

1    conversation like two fucking adults,
2    let me fucking know, and I don't mean
3    that by fucking text messages, or I
4    don't fucking mean by you yelling and
5    screaming or fucking putting me down.
6    All right? So let me know when you're
7    ready to fucking have a real
8    conversation. You want to keep fucking
9    threatening me? Go ahead.")
10   BY MR. ANDERSON:
11   Q. Okay. Did you hear that message?
12   A. Yes. I was able to hear that.
13   Q. Okay. And are you with me, that's your
14   voice?
15          MS. CLAGUE: I was able to hear
16   that too. Could the court reporter
17   transcribe it?
18          THE COURT REPORTER: You know,
19   again, I think there might have been just
20   been a couple words I missed, fewer
21   than --
22          MS. CLAGUE: Okay.
23          THE COURT REPORTER: -- the
24   last -- and if it's okay, in the

Page 62

1    transcript, I'll put basically
2    something to the effect, this is what I
3    heard.
4          MS. CLAGUE: Okay.
5          MR. ANDERSON: Okay.
6          MS. CLAGUE: For the last two,
7    correct? For this one and the one
8    before? Because I think we were able
9    to make out what the one before said as
10   well.
11         MR. ANDERSON: Okay. And I'm
12   going to go back on the first one, and
13   I'm going -- let me play it again,
14   because there's reference to this
15   individual Lorna Hoey and the plaintiff
16   wanting to have Lorna's face attached
17   to hers so she looks like Lorna and
18   whatnot. Let me try to put --
19         MS. CLAGUE: Let's just hear it.
20   Let's just hear it.
21         (Audio file played as follows:
22   "So what will it take? To be more
23   look like Lorna? Is that what you
24   want? I can act like Lorna. I can be

Page 63

1    like Lorna. I'll go get a surgery to
2    look like fucking Lorna, because
3    obviously that's what you like, that's
4    what you want. So tell me, what will
5    it take? I'll do it. Tell me what it
6    takes. You want me to act like Lorna?
7    You want me -- you want my hair to be
8    like Lorna? I mean what will it take?
9    Do you want me to go get a surgery to
10   look like that? I'll go get it. Tell
11   me what it will fucking take --")
12         MS. CLAGUE: I heard that.
13   (-- "to be just like Lorna.")
14         MS. CLAGUE: And, Mr. Scally, were
15   you able to make most of that out?
16         THE COURT REPORTER: Yes, I was.
17         MS. CLAGUE: Okay. And Sharon?
18   Okay.
19   BY MR. ANDERSON:
20   Q. Ms. Radfar, if I were to tell you that
21   there's about 30 --
22         THE COURT REPORTER: You're
23   breaking up.
24         MS. CLAGUE: Yeah. You --

Page 64

1    Q. -- voicemails where you make comments
2    about --
3          MR. ANDERSON: Am I back now?
4          MS. CLAGUE: Yes. You're still
5    frozen. I'm sorry.
6          MR. ANDERSON: Can you hear me
7    now?
8          MS. CLAGUE: Okay. There you are.
9          MR. ANDERSON: The Internet --
10   okay. I get this message again, my
11   Internet cable's not stable or
12   something.
13   BY MR. ANDERSON:
14   Q. If I were to tell you there are about 30
15   different voicemails where you're commenting on Lorna
16   Hoey, would you dispute that?
17         MS. CLAGUE: Objection.
18   A. Yeah. And I would have to listen to all 30
19   messages for me to respond to that.
20   Q. Okay. Let me just -- let me play a couple
21   more for you.
22         (Audio file played as follows:
23   "Remember during my second visit I
24   told you you looked really good with

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Pages 61–64

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

---

Page 65

1  long hair? Well, I'm so glad that you
2  kept that long hair, because it really,
3  truly looks good on you. And the
4  rugged look, I mean, wow, I'm sure
5  that's what Lorna likes, right, or what
6  was it, Elaine? Or which one of your
7  bitches? I'm glad that you did listen
8  to what I told you about the long hair,
9  and I mean that looks -- it makes you
10  very hot. If you have any more
11  problems, more bitches, like, you
12  know.")
13       MS. CLAGUE: So far we've heard
14  four voicemails, two of which mentioned
15  Lorna. Am I right about that?
16       MR. ANDERSON: That's correct.
17       THE COURT REPORTER: And just so
18  you know, again, I didn't hear several
19  of the words on that.
20       MR. ANDERSON: Okay. Just the
21  best you can do, Jim. I know it's not
22  that clear.
23       Let me just play a couple more. I
24  didn't -- I recorded them from the

Page 66

1  computer on to my phone so I could play
2  them here now. I didn't put all 46 on
3  here.
4       (Audio file played as follows:
5       "Did you get any of the messages
6  or not? Or are you just deleting?
7  Because I can leave all of -- all of
8  them all over again.")
9       MS. CLAGUE: I wasn't able to
10  understand that.
11       MR. ANDERSON: You want me to play
12  that one again?
13       MS. CLAGUE: No.
14       MR. ANDERSON: Did you get that,
15  Jim?
16       THE COURT REPORTER: I felt like I
17  got most of it.
18       MS. CLAGUE: Okay. Sharon, did
19  you hear it?
20       THE WITNESS: Just a little bit.
21  It was very brief.
22       MR. ANDERSON: Okay. I'll play it
23  again.
24       (Audio file played as follows:

Page 67

1       "Did you get any of the messages
2  or not? Or are you just deleting?
3  Because I can leave all of -- all of
4  them all over again."
5       MS. CLAGUE: I still couldn't
6  understand, but if you could, then ...
7       THE WITNESS: I heard it.
8       MR. ANDERSON: Okay. I'm going to
9  play another one.
10       MS. CLAGUE: For me, can you
11  repeat what you said in that?
12       THE WITNESS: Me?
13       MS. CLAGUE: Yes.
14       THE WITNESS: I believe that I
15  heard that "Did you get the messages or
16  do you delete them? If not, I can
17  leave it all over again."
18       MS. CLAGUE: Okay.
19       THE WITNESS: Something to that
20  effect.
21       MR. ANDERSON: Okay.
22       (Audio file played as follows:
23       "You have fucking time to answer
24  Lorna's phone, right? Chatting with

Page 68

1  her, are you? I'm sure you can fucking
2  pick up this one. I forgot you're
3  fucking -- you're fucking her right
4  now, you're in love with her, so I can
5  see she's right next to you, so.")
6  BY MR. ANDERSON:
7  Q. Did you hear that one?
8       MS. CLAGUE: Is there a question?
9       Okay. Go ahead.
10  Q. Did you understand that one?
11  A. Yes, I heard the voice recording, but I don't
12  know what the question is.
13  Q. Okay. Well, the question is if you -- that's
14  your voice on there; correct?
15  A. Yes.
16  Q. And did Mr. Covino ask you to call and leave
17  these messages about Lorna Hoey?
18  A. Did he ask me to leave -- no.
19  Q. Okay. Do you think he found these messages
20  enjoyable or funny?
21  A. I'm not sure. That's a question for him to
22  answer.
23  Q. Okay. Do you think it's likely that he found
24  them to be annoying and obnoxious?

---

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

1        MS. CLAGUE: Objection.
2        A. Again, that's a question for him to answer.
3    I -- I don't know what's in his mind.
4        Q. No. But my question is: What would you
5    expect him to find when you're leaving messages like
6    that?
7        MS. CLAGUE: Objection.
8        A. I don't think I do have any expectation.
9    Maybe just acknowledge.
10       Q. What do you mean by "acknowledge"?
11       A. Acknowledge the phone calls.
12       Q. Okay. So were you leaving that message to
13   get a response from him?
14       A. I believe so.
15       Q. Okay. And it's fair to say he wasn't
16   responding to these calls; correct?
17       A. No. He was responding.
18       Q. Okay. And how did he respond to that one?
19       A. I do recall him leaving two voicemails for
20   me.
21       Q. And what did he say in those voicemails?
22       A. He was very abusive on one of them, which he
23   told me that he was going to call me at two o'clock
24   in the morning, which he did call me at two o'clock

1    in the morning.
2        Q. Let me just play a couple more of these
3    recordings.
4        (Discussion off the record.)
5        (Audio file played as follows:
6        "Remember during my second visit I
7    told you you looked really good" --
8        MR. ANDERSON: I think I've
9    already played this one.
10       MS. CLAGUE: Yes.
11       MR. ANDERSON: Okay. Just bear
12   with me for a second here.
13       Do you mind if we take like a
14   five-minute break?
15       MS. CLAGUE: Sure.
16       (Recess: 11:17 a.m. to 11:27 a.m.)
17   BY MR. ANDERSON:
18       Q. Ms. Radfar, I'm going to ask you just a
19   couple more questions about your interrogatory
20   answers. Before I had asked you about your visit to
21   the Revere Police Department in July of 2016.
22   Interrogatory 13 reads as follows: "Please state the
23   purpose of your physically going to the defendant
24   Joseph Covino's place of employment at the Revere

1    Police Department."
2        A. Okay.
3        Q. And your answer was "The police department is
4    open to the public. While I was in Boston in the
5    summer of 2016, I stopped by once to visit the
6    station/visit Covino. As a former police officer,
7    you are always interested in seeing how other
8    agencies operate (especially out of state)."
9        Is that answer truthful?
10       A. Sounds about right, yes.
11       Q. It's accurate?
12       A. Yes.
13       Q. It's complete?
14       A. Yes.
15       Q. So you did stop by the station to visit the
16   station and visit Covino?
17       A. Yes.
18       Q. Okay. You did not know if he was going to be
19   working?
20       A. I did not.
21       Q. Did you call him or text him or contact him
22   to let him know that you were at the station?
23       A. No. I don't believe so.
24       Q. Did you contact him after you left the

1    station to say that you had been there?
2        A. I don't recall.
3        Q. Did you -- you said you were interested in
4    seeing how other agencies operate. Did you ask
5    anybody there for a tour or for any information about
6    how their department operated?
7        A. I did not see a lot of people in the lobby,
8    station, so I had a maybe two-seconds interaction
9    with someone in the records, and that's it.
10       Q. Okay. And can you name any other police
11   departments or agencies that you've gone to visit to
12   see how they operate?
13       A. I believe I went to Salem, Massachusetts, and
14   I purchased a patch and a coin.
15       Q. Okay. Did you leave anything at the police
16   station when you went?
17       A. Which police station?
18       Q. The Revere Police Station.
19       A. Yes, I did.
20       Q. And what was that?
21       A. It was a letter for Joey.
22       Q. Okay. And anything else in there?
23       A. I don't believe so. I don't recall.
24       Q. You don't recall if there were any

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 73

1  photographs in there?
2  A. No, I don't.
3  Q. If any nude photographs of you were in there?
4  A. Oh, absolutely not.
5  Q. And, again, let me -- this is interrogatory
6  number 11. It states, "If you ever contacted
7  defendant Joseph Covino by a number not listed in
8  Interrogatory No. 10" -- and in interrogatory 10 you
9  answered your number was 703-400-7655 -- "by using an
10 application or other device or method to change or
11 disguise your phone number, please state the name(s)
12 of the application(s) or device(s) used by you, the
13 reason for altering/disguising your phone number, and
14 the approximate number of times that you used these
15 application(s)."
16      Your response is "The app that I sometimes
17 use to stay connected to family/friends is 'WhatsApp'
18 that is attached to my telephone number that is
19 listed on this interrogatory. I don't own any other
20 phones. I don't keep track of how many times a day,
21 month, and/or year I use this free app that is
22 available to all. I don't recall contacting him with
23 any other number(s) but my own."
24      Is that accurate?

Page 74

1  A. Yes, sir.
2  Q. Now, as part of the disclosures in this case,
3  there was a stack of text messages that were sent
4  that's probably about 2 inches thick. Have you
5  reviewed any of these?
6  A. No, I have not.
7  Q. Okay. So let me ask you some questions about
8  some of these. This is a text message that came in
9  from the number 617-545-7373.
10 A. Okay. That's not my phone number.
11 Q. Okay. The message in part, part of it's cut
12 off, but let me read some of it. It says, "I wanted
13 nothing more than to be in your arms one last time.
14 Will you ever see me in the way I see you? What did
15 you judge me" -- or "Why did you judge me without
16 knowing? I am not wicked. The fault of mine is that
17 I care about you and love you, and that's why I'm
18 being punished!! I hope all those ppl in your life
19 know how blessed they are to be in your life and to
20 have love in your acknowledgement."
21      This was purportedly a text message that you
22 sent to Joseph Covino from this 617-545-7373 number.
23 Do you acknowledge sending that text message?
24 A. That is not my writing. So I don't -- that's

Page 75

1  not my telephone number, and also -- yeah, I don't.
2  Q. And you deny using any other numbers ever to
3  contact him?
4  A. Correct.
5  Q. So let me -- this is another one from the
6  number 703-593-9748.
7  A. Okay.
8  Q. And if I could read this one to you. "It all
9  makes sense now. It's shameful that you judge me
10 based on my origin or assumed I was Muslim and that's
11 why you don't want to know me or interact with me.
12 That's what you've said. I was nobody to you and I
13 wish you would die. I can provide you with my
14 (Judaism) certification if that will help change your
15 mind," and that's the end of the screenshot.
16      Do you recall sending this text message to
17 Joseph Covino?
18 A. I don't. Again, that's not my telephone
19 number. And --
20 Q. You agree with me --
21 A. -- I am Muslim, by the way.
22 Q. I'm sorry. What?
23 A. I said that was not my phone number, and I
24 don't recall that text, and I am Muslim, by the way.

Page 76

1  Q. Okay. And that was something that you said
2  in your complaint, that he treated you differently
3  because you were Muslim than if you were Caucasian or
4  some other race --
5  A. Yes.
6  Q. -- correct?
7      And I actually have the second page of that
8  text, so it continues. Let me just start with that
9  paragraph. "I can provide you with my (Judaism)
10 certification if that will help your mind or put your
11 heart at ease. It wasn't up to me where I was born.
12 So you judging and not having all the facts about me
13 is completely unfair. I know you only friends --
14 friend blondes, Italians" -- I'm sorry -- "blondes,
15 Americans, Italians, Irish, Aussies and consider them
16 to be your lifelong friends. I know that you hate me
17 because I'm Iranian and not part of your European
18 friends of yours. Guess my crime was being Iranian/
19 not Muslim."
20      Do you still deny sending this message to
21 him?
22 A. That is not my phone number, sir.
23 Q. I know it's not your phone number. My
24 question was: Do you deny sending that?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 77

1  A. I don't recall sending that text message.
2  And that's not my phone number. Anyone can generate
3  a text message and send it to anybody, as you are
4  aware.
5      Q. Okay. The third page of that one continues,
6  "I don't think a 47-year-old educated man would still
7  be so hateful still, because after all what will you
8  teach your kids? Hate!! Seems like you forgot where
9  you came from. You are old enough that you should
10  judge ppl only by how they treat their kids," and
11  then it continues.
12      You deny sending this message?
13      A. Again, I don't know what phone number that
14  came from, so.
15      Q. Okay. Well, the allegation here is that
16  you've used multiple phone numbers to contact him.
17      A. As I indicated earlier, my telephone number
18  that I listed in the response, that is my telephone
19  number, 703-400-7655.
20      Q. Okay. Well, this is one from 703-593-9748
21  that has a picture, appears Joseph Covino with a
22  blonde woman. That's the number on there. And it
23  says, "When you said you would be happy to see [sic]
24  hang myself, nice, yup, fucked her too! But she is

Page 78

1  pretty."
2      Do you deny sending this to Covino from this
3  703 number?
4      A. Again, that is not my telephone number, and I
5  don't recall sending that.
6      Q. Okay. But you're saying you don't recall.
7  There's a difference between saying "I don't recall"
8  and "I didn't flat out do it"?
9      A. That is not my telephone number, sir.
10      Q. Are you saying flat out you did not send that
11  message?
12      A. Again, I do not recall sending that, and that
13  is not my telephone number, sir.
14      Q. I know it's not your telephone number, but do
15  you deny sending that, yes or no?
16      A. I don't recall, sir.
17      Q. Okay. There's one from a 578-422-1981
18  number. Do you see that?
19      A. Okay. I see that on there.
20      Q. Okay. It says, "Hi Joey. I just want to
21  know what went wrong with us at the beginning?
22  Seriously, can you answer that? What really
23  happened? A guy who said liked me turned out having
24  hate for me after I told him I was Middle Eastern. I

Page 79

1  don't get it. Can you be an adult," and then on the
2  next page, "and explain to this stupid girl who is
3  not part of your gang (European/blonde, Irish,
4  Italian, Americans, Aussies). I'm trying to
5  understand as a human how hateful you have been
6  towards me. I mean you [sic] so many ppl on regular
7  basis. Do you always hate them as well as just me?
8  Yeah, you look much better next to all those ladies,
9  Irish, Italian, Aussies, Polish ppl."
10      Did you send this message to him from a
11  571-422-1981 number?
12      A. Again, that is not my telephone number, sir,
13  and I don't recall. But it appears that that is
14  the -- you just read a previous text message that it
15  had all of that. So maybe he just or somebody
16  printed the same information over and over. So I
17  don't ...
18              MS. CLAGUE: Your screen is -- I
19      think you're frozen again.
20              MR. ANDERSON: Okay. Can you hear
21      me now?
22              MS. CLAGUE: Yes.
23  BY MR. ANDERSON:
24      Q. Okay. This is a text message from -- it's in

Page 80

1  here Sharon Fairfax, 703-400-7655. That's your
2  number; correct?
3      A. Yes, that is my number.
4      Q. And the text -- one text message says, "Keep
5  ignoring that. I'm here. I fucking will show up ...
6  and will make a scene." This is on March 12th.
7      The next response says, "Leave me alone. I
8  don't want any contact with you. I don't want to see
9  you and will not see you." And in there there's a
10  picture of Joseph Covino. I don't know if you can
11  see that.
12      A. No. Can you bring it up?
13              MS. CLAGUE: Yeah, tilt it up a
14      little.
15      A. Bring it up a little bit. Bring it up.
16  Okay. Okay. I see that now.
17      Q. Okay. And then your response was "Fine. I
18  will show up at ur house! 313 Lincoln Ave ... see
19  ya." And then you responded, "Don't fucking say I
20  didn't request it."
21      Do you deny this one coming from your phone
22  number?
23      A. Can you show it in the camera view, please?
24  A little bit up. Okay. So the picture that you see

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 81

1  over there with Joey with an individual, that's --
2  that is his photo, and that is not from me. But that
3  is from my phone number, and, yes, I did send that
4  back in March.
5      Q. Okay. Here's one from a number 931-450-4197.
6  I don't know if you can see that.
7      A. I see the number.
8      Q. And it says, "Hate me as much as you want and
9  run your fucking whore turd ass Lorna. I know,
10  someday, I have to let you go from me because you
11  have hurt me to no end and I didn't even care. All
12  you wanted was to get in my pants, and you did. I
13  thought you had considered me a 'friend,' part of
14  your circle, the way you opened up to me, I thought I
15  meant something to you, I guess not. In your eyes I
16  was just another girl from your trips that you go on
17  and fucking leave behind."
18      Do you deny sending this message from the 931
19  number?
20      A. Again, that is not my telephone number, and I
21  don't recall sending that message.
22      Q. Okay. Here's one from a 929-200-3126 number.
23  Do you see that?
24      A. I see the number, yes.

Page 82

1      Q. Okay. And the text message says, "Hi. How's
2  your fucking ass GF Lorna? You must be happy to see
3  her ugly face every morning next to you. Guess
4  she'll be the new mommy to your son and daughter!"
5      Do you deny sending that to Joseph Covino
6  from that 929 number?
7      A. Again, that is not my telephone number, and I
8  don't recall sending that message.
9      Q. Okay. Do you agree with me that's consistent
10  with the voicemail messages insulting Lorna Hoey?
11          MS. CLAGUE: Objection.
12          You can answer.
13      A. I wasn't insulting Lorna. And there were no
14  threats in those voicemails.
15      Q. So you weren't insulting her when you called
16  her a fucking ugly ass girlfriend?
17      A. Again, was that in a voicemail or in the
18  text?
19      Q. No. This is in the text message right here I
20  just read.
21      A. Again, that is not my telephone number, 929-
22  200-3126. I don't recall sending that message.
23      Q. Okay. But you're not denying that you could
24  have sent it?

Page 83

1      A. Sir, I don't recall sending that message.
2  That is not my telephone number.
3      Q. Yeah. But you're not answering the question.
4  Is it possible you sent that number [sic]?
5      A. I answered the question, sir. That is not my
6  telephone number, and I don't recall sending that
7  message.
8          MS. CLAGUE: Next question,
9      please.
10      Q. That message continues on the next page. And
11  this is a response from Covino: "Apparently it's not
12  registering in your brain that I don't want to be
13  your friend and I don't want any contact with you.
14  It has nothing to do with anyone else except it's my
15  decision and my decision alone. I DO NOT have to
16  give you a reason. I DO NOT owe you any explanation
17  for it. It is what it is. Are you mentally unstable
18  that you can't see that? I've told you before, never
19  interrupt when I'm with my son, and yet you did it
20  again. My son, I want you to understand something,
21  this is the truth, Sharon, I have never had any type
22  of relationship with Lorna. None. You dreamt this
23  whole thing up in your head because you saw us
24  sitting together in a photo."

Page 84

1      Again, this conversation between Joseph
2  Covino and this number 929-200-3126 referring to
3  someone as Sharon, you deny that this is part of a
4  text chain that you were in?
5      A. Again, that is not my telephone number. I
6  don't recall sending that message. Is it possible
7  that Joey Covino was sending those text messages and
8  responding?
9      Q. Okay. What about this one from 918-416-0501?
10  Do you see that number?
11      A. Yes, I do see that number.
12      Q. And it says, "Just tell me the fucking
13  reason ... THE reason you didn't want to be friends
14  with, it's because you assume I'm Muslim? Are you
15  serious? Well, I know you are educated, smart,
16  served in the military, and a police officer. So you
17  should know that all those that live in the Middle
18  East are Muslims, right? So you are ashamed to be
19  known as the guy that speaks or is friends with ppl
20  of Middle East? Did you ever know Ireland, Italy,
21  never existed? You can't be this shallow."
22      And, again, this from this 918-416-0501
23  number?
24      A. Again, sir, that is not my telephone number.

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 85

1  I don't recall sending that text message.
2  Q. Now, you told me that you didn't review the
3  documents from the Virginia State Police
4  investigation?
5  A. I did not.
6  Q. Okay. Let me read you a paragraph from --
7  I'm just trying to get the right exhibit number,
8  because it was a different -- it's Exhibit 6 today;
9  it was Exhibit 7 for the Lieutenant Ganley and Chief
10 Rowan depositions. And this is on page 16 of that
11 document. And it's an entry from 1/26/17, which
12 would have been four days -- five days before the
13 restraining order was issued. And it's -- there's a
14 synopsis that's typed. It says, "SA Kinnard,"
15 Special Agent Kinnard, "met with GMU Police Chief
16 Carl Rowan, Major Brian Cozby," spelled
17 C-o-z-b-y, "Captain Phil Surber," S-u-r-b-e-r, "and
18 Lieutenant Dave Ganley," G-a-n-l-e-y, "regarding this
19 complaint. Chief Rowan stated he was requesting a
20 criminal investigation and stated the suspect, one of
21 his officers, MPO Sharon Radfar, did not need to be a
22 police officer. Lieutenant Ganley said there have
23 been several instances of similar behavior involving
24 Radfar in the past. The current complaint is that

Page 86

1  Radfar has been harassing and possibly threatening a
2  police officer in Boston since the summer of 2015.
3  Radfar and the other officer met at the World Police
4  and Fire Games and had a brief consensual sexual
5  relationship. All of the command group in attendance
6  concurred that Radfar was volatile and possibly manic
7  in her relationships. Lieutenant Ganley said that
8  when she finds out an investigation is ongoing, she
9  will likely commit suicide. Chief Rowan confirmed
10 that Radfar was on medical leave for about 6 weeks
11 and that she had not been notified or confronted with
12 the allegations. He also confirmed that an Internal
13 Affairs investigation had not commenced at this time.
14 The meeting ended at approximately 1545."
15     You have never seen that document; correct?
16 A. I have not.
17 Q. Okay. In here it starts out by saying that
18 Chief Rowan was requesting a criminal investigation.
19 You have no evidence to refute that, do you?
20     MS. CLAGUE: Objection. And I'm
21     going to object to the form. Again,
22     she's a lay witness. She's not
23     expected to know what evidence is.
24         MR. ANDERSON: She's been a police

Page 87

1      officer for 20 years, Elizabeth.
2          MS. CLAGUE: She's not an
3      attorney.
4          MR. ANDERSON: I know, but
5      evidence --
6          MS. CLAGUE: We've seen even in
7      this case police officers misusing
8      legal terminology. My client's not
9      going to do that.
10         MR. ANDERSON: Okay.
11 BY MR. ANDERSON:
12 Q. Do you have any information to refute this
13 statement that Chief Rowan was the one requesting the
14 criminal investigation?
15 A. Can you explain "refute"?
16 Q. I'll take that as you don't have any
17 information that that statement's untrue.
18         MS. CLAGUE: I'm going to object
19     to your testimony, counsel.
20         MR. ANDERSON: Okay.
21         MS. CLAGUE: That's not what she
22     said.
23 Q. Okay. Again, let me read the sentence.
24 "Chief Rowan stated he was requesting a criminal

Page 88

1  investigation and stated the suspect, one of his
2  officers, MPO Sharon Radfar did not need to be a
3  police officer."
4      Do you have any reason to believe that this
5  investigation was started by anybody other than Chief
6  Rowan?
7  A. It commenced because of the request of Joey
8  Covino.
9  Q. Okay. But Chief Rowan is the one who brought
10 it to the Virginia State Police, according to this
11 document.
12         MS. CLAGUE: Objection. Is there
13     a question?
14         MR. ANDERSON: Bear with me for a
15     second. I'm just trying to find ...
16     okay.
17 Q. In this document on page 11, partway through
18 there's a synopsis, again, by Special Agent Kinnard,
19 it says, "Case notes were delivered to Assistant
20 Commonwealth Attorney Alex Rueda," that's R-u-e-d-a,
21 "for review and prosecutorial guidance. The
22 following email was sent to Ms. Rueda after the
23 materials were delivered." And this is what the
24 email says: "Ms. Rueda, I dropped off one manila

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 89

1 envelope at the front desk. The documents are copies
2 for you. The thumb drive contains more texts and
3 voicemails but I will need that thumb drive back.
4 Analysis of the suspect phone records show: Suspect
5 called victim at least 575 times over the affected
6 period and at least 162 times since I can prove that
7 the victim said 'do not call me anymore' (See text
8 message of March 12, 2016). Victim called the
9 suspect at least 256 times and 32 times since he told
10 her to stop calling him. I am interested if you
11 would prosecute this case and if I have enough to
12 charge her under 18.2-427."
13    Q. Did you have any communication at all with
14 the Virginia State Police or the district attorney's
15 office in Virginia?
16    A. Detective Kinnard contacted me via cellphone.
17    Q. And is it fair to say you had a lawyer named
18 Ed Nuttall; is that his name?
19    A. Nuttall.
20    Q. Nuttall, N-u-t-t-a-l?
21    A. Correct.
22    Q. And you and your attorney refused to meet
23 with the Virginia State Police; correct?
24    A. Incorrect.

Page 90

1    Q. Did you meet with them?
2    A. Yes.
3    Q. Do you know when you met with them?
4    A. I don't have the date.
5    Q. Do you know how long you met with them for?
6    A. I believe the meeting, my previous attorney,
7 Ed Nuttall, and the detective met maybe roughly about
8 ten minutes.
9    Q. Now, do you have any information that then
10 Sergeant Covino tried to get any criminal charges
11 lodged against you in Massachusetts?
12    A. I'm sorry. Can you repeat that question?
13    Q. Do you have any information regarding whether
14 or not Sergeant Covino tried to have any criminal
15 charges pressed against you in Massachusetts?
16    A. I don't have any knowledge of that in
17 Massachusetts.
18    Q. Let me just read you something from page 49
19 of this document.
20       MS. CLAGUE: Do you have a date on
21 that? Or can you tell us what it is?
22       MR. ANDERSON: Yeah. The entry
23 here is going to say -- it says, "On
24 May 5, 2017, SA Kinnard met with ACA,"

Page 91

1 that's, I guess, Assistant Commonwealth
2 Attorney, "Rueda," again, R-u-e-d-a,
3 "regarding this investigation. Rueda
4 stated that she had briefed the
5 Commonwealth Attorney Jim Plowman,"
6 P-l-o-w-m-a-n, "and they agreed that
7 prosecution should not go forward.
8 Rueda suggested that Covino apply for a
9 permanent protective order against
10 Radfar in Virginia. Also on this date,
11 SA Kinnard notified Lieutenant Ganley
12 of the prosecution decision."
13    Q. To your knowledge, did Covino ever apply for
14 an order in Virginia against you?
15    A. In Virginia?
16    Q. Yes.
17    A. No. The only order that was issued was from
18 Massachusetts.
19    Q. Okay. So if -- if the attorney, assistant
20 commonwealth attorney down there, suggested he apply
21 for an order in Virginia, to your knowledge, that
22 never happened?
23    A. Correct.
24    Q. And you have no information or anything to

Page 92

1 lead you to believe that Covino tried to get you
2 prosecuted in Massachusetts?
3    A. I don't have a knowledge of that, in
4 Massachusetts.
5    Q. Now, have you ever brought a lawsuit against
6 George Mason University?
7       MS. CLAGUE: I'm going to object
8 right here only because she's bound --
9 as much as she'd love to answer these
10 questions, she's bound by an agreement,
11 and I don't want her to be accused of
12 breaching that.
13       George Mason, some of the, you
14 know, folks at George Mason don't mind
15 breaching the agreement on their end,
16 but she can't breach the agreement on
17 this end.
18       I'm a Massachusetts attorney, not
19 a Virginia attorney, so to an extent
20 I'm going to leave it to Ms. Radfar.
21 But I'm going to suggest that she can
22 only answer questions if she's sure
23 that it wouldn't violate the terms of
24 any agreement that she has with George

Page 93

1 Mason.
2      If it turns out that she can't
3 answer a question for those reasons,
4 I'm more than happy to go with you to
5 Eli, to the judge in this case, to get
6 some kind of relief for her so that she
7 can without being placed in jeopardy.
8      MR. ANDERSON: Well, I think the
9 first question is did she make a claim,
10 and I think, out of fairness to my
11 client, she's claiming this whole
12 reason for her termination is Covino,
13 and I think it's clear that there are
14 other things that we've found out here,
15 and I don't know how it ended with
16 this. And the first question, I guess,
17 is did she file a lawsuit. I'm not
18 asking what the settlement agreement
19 said, but was there one filed.
20      MS. CLAGUE: Well, again, I mean I
21 don't know whether -- I mean, Sharon,
22 you know your agreement. I don't. If
23 there's a term in there that says that
24 you can't disclose that, then, again,

Page 94

1 I'm going to ask that to be something
2 that we reserve and figure out how she
3 can give you that kind of answer.
4      You know, maybe it makes sense to
5 work backwards from her resignation. I
6 don't know. I mean there are documents
7 that George Mason has made, has -- have
8 provided us that maybe -- maybe answers
9 to those questions or maybe talking
10 about those would be helpful here.
11 Because that establishes certain things
12 that she hasn't disclosed. But she's
13 not going to violate any agreement that
14 she has with George Mason.
15      So, I don't know, Sharon, can you
16 answer that question without violating
17 that agreement?
18      THE WITNESS: I think this
19 question really puts me in a difficult
20 position. As what you stated, I'm
21 bound by that agreement not to release
22 any information as far as what
23 transpired, and if I do release any
24 information, I'm going to be held

Page 95

1 liable for that from George Mason's
2 side.
3      MS. CLAGUE: So let me suggest any
4 information that George Mason has
5 released is in a different category.
6 If it's something George Mason has
7 already disclosed, then you're --
8 you're not going to -- I can't imagine
9 that you'd have a problem with that.
10      So why don't you ask the question,
11 and you answer according to your
12 understanding of your agreement.
13      THE WITNESS: Okay. Can you --
14      MS. CLAGUE: Is there another
15 question?
16      You already answered the first
17 question.
18      Is there another question?
19 BY MR. ANDERSON:
20 **Q. Did you bring a lawsuit against George Mason?**
21      MR. ANDERSON: I just don't
22 think that this is -- I think I just
23 froze again. Did I freeze?
24      MS. CLAGUE: You did. But now

Page 96

1 you've unfrozen.
2      MR. ANDERSON: Okay. I got the
3 same thing again, "Your Internet
4 connection is unstable."
5      Obviously, I think she's put at
6 issue the reason why she left George
7 Mason by filing this lawsuit, and I
8 don't think it's fair for her to hide
9 behind some type of agreement that we
10 don't have access to and say this is
11 all Covino's fault when now we know
12 that there's her fitness for duties that
13 she's failed; there's a resignation;
14 there's a lot of stuff that wasn't
15 referenced in the complaint that we
16 didn't have. And now we're like
17 pulling teeth trying to find out this
18 stuff.
19      MS. CLAGUE: There's a resignation
20 that's five years later, and what her
21 testimony has been and what her case
22 has been is that it all began with
23 Covino. And, you know, you can dispute
24 that, you can argue that, but that

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 97

1   doesn't bring you anywhere near where
2   you think it does.
3           MR. ANDERSON: I'm not saying --
4           MS. CLAGUE: You're freezing
5   again.
6           THE WITNESS: Froze again.
7           (Discussion off the record.)
8           MR. ANDERSON: Am I back how?
9           MS. CLAGUE: Yes.
10          MR. ANDERSON: Okay.
11  BY MR. ANDERSON:
12      Q.  Are you not going to answer any questions
13  about your separation from George Mason University?
14          MS. CLAGUE: Except to the extent
15      that she can based on the information
16      that George Mason has provided.
17          So George Mason has given us these
18      three alleged fitness for duty things.
19      George Mason has given us a letter from
20      her attorney. We have her resignation
21      letter dated the end of January 2021.
22      So she can answer questions about
23      things -- or she can disclose
24      information that's already been

Page 98

1   disclosed by George Mason. I don't
2   know if that helps you.
3           And, again, I mean I know that
4   she'd like to be able to do it, but she
5   can't put herself in that kind of
6   jeopardy.
7           MR. ANDERSON: Well, what I
8   suggest, I think I'm almost done. If
9   we can just take maybe five minutes and
10  come back. It's 12:02, maybe come back
11  at 12:07.
12          MS. CLAGUE: Okay. Sure.
13          (Recess: 12:03 p.m. to 12:08 p.m.)
14          MR. ANDERSON: I just have just a
15  few more questions, probably less than
16  five minutes.
17  BY MR. ANDERSON:
18      Q.  On Exhibit 6, for us, Exhibit 7 for Ganley
19  and Rowan, it's the Virginia State Police records.
20  Just on page 49, there's kind of a summary of the
21  investigation, and let me just read it. It says, "On
22  April 12, 2017, SA Kinnard spoke with Radfar via
23  telephone. Radfar hastily ended the conversation and
24  15 minutes later SA Kinnard received a call from

Page 99

1   Radfar's attorney, Ed Nuttall." And I guess I
2   misspelled it before, N-u-t-t-a-l-l. "An appointment
3   with Nuttall was set for April 24, 2017, at 0800
4   hours."
5           And then it says, "On April 24" -- this is
6   the next entry. "On April 24, 2017, SA Kinnard met
7   with Radfar and Nuttall at his office. After a brief
8   consultation with Nuttall, he advised that Radfar
9   would not be making a statement or answering any
10  questions from SA Kinnard."
11      Is that accurate, based on your memory?
12      A.  I would say that some of the information, not
13  all, not the way they have explained it in that.
14      Q.  Okay. Did you -- did you make any statement
15  at all to the Virginia State Police?
16      A.  Again, myself and Ed Nuttall, we met with
17  State Police Detective Kinnard. My attorney was the
18  one who spoke to Detective Kinnard, not me.
19      Q.  Okay. So you didn't give any statement?
20      A.  No.
21      Q.  And then there's an entry that says, "On May
22  8, 2017, SA Kinnard notified Ed Nuttall by telephone
23  of the prosecution decision. On May 24, 2017, a
24  declination letter was sent to Loudoun Commonwealth

Page 100

1   Attorney confirmed that prosecution was declined."
2           So it looks like as of May 8th, there was a
3   decision not to go forward, and there was a formal
4   letter on May 24th of 2017. Did you ever receive
5   anything or were you advised that there was not going
6   to be a criminal prosecution of you?
7       A.  I received a text message from Ed Nuttall.
8           MS. CLAGUE: I'm going to move to
9       strike that. I'm sorry. That's a
10      communication from your attorney, so
11      I'm going to move to strike that. I
12      know Attorney Anderson doesn't want
13      that.
14          MR. ANDERSON: I do want it,
15      actually.
16      Q.  Were you advised --
17          MR. ANDERSON: It's not legal
18      advice if he's just saying that they're
19      not going to prosecute. I'm not trying
20      to get into any legal thought process
21      of the lawyer.
22          MS. CLAGUE: So maybe: At some
23      point did you learn that you weren't
24      going to be prosecuted?

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 101

1    THE WITNESS: At some point, yes.
2  BY MR. ANDERSON:
3    Q. Okay. And would it be sometime in the May
4  8th to May 24th of 2017 time frame?
5    A. I don't recall when I got the text message.
6    MS. CLAGUE: Again --
7    Q. Assuming that these -- these dates and times
8  are accurate, you know, mid-May sometime until late
9  May, your work status, is it fair to say, didn't
10  change in May or June or July or August or September,
11  October?
12    A. Can you clarify what you mean by that
13  question?
14    Q. Well, you were placed on administrative leave
15  back in late January; correct?
16    A. Correct.
17    Q. And once there was a decision not to
18  prosecute you, did you go back to work? Did your
19  work status change?
20    A. No.
21    Q. Okay. And it stayed the same all the way up
22  through into December, when Jason Ford got a
23  harassment prevention order against you?
24    A. I never went back. They never allowed me to

Page 102

1  go back.
2    MS. CLAGUE: You look frozen
3    again, counsel.
4    MR. ANDERSON: Okay. I was just
5    thinking.
6    Q. It's fair to say, again, the last contact --
7    MS. CLAGUE: You're breaking up,
8    sir. There you are.
9    MR. ANDERSON: Okay. Am I back
10    now?
11    MS. CLAGUE: Yes. I don't think
12    any of us heard any of that.
13    MR. ANDERSON: Okay.
14  BY MR. ANDERSON:
15    Q. So, again, fair to say the last time you had
16  any interaction or communication with Covino was mid-
17  February of 2017 in the Lynn District Court?
18    A. The last time, yes.
19    You're frozen again.
20    MR. ANDERSON: Okay. I don't have
21    any -- okay. I don't have any further
22    questions.
23    MS. CLAGUE: I've got just a
24    couple.

Page 103

1    EXAMINATION
2  BY MS. CLAGUE:
3    Q. Sharon, you testified that Joey Covino left
4  you voicemails that were very abusive, when you were
5  asked about certain voicemails that you left, in
6  which he indicated he was going to call you at 2:00
7  a.m. Did he say anything else in that voicemail that
8  makes you characterize it as abusive?
9    A. Yes, absolutely.
10    Q. And what was that?
11    A. Sorry. Just give me a minute, because every
12  time I replay that message, that -- the statements he
13  made, it makes me emotional on that.
14    I do recall him -- he was very abusive on the
15  phone, that at some point I even hung up the phone on
16  him. He called me back. One of the statements that
17  he made, he said that I was a fat fuck Iranian, that
18  he hopes that I get shot in my face with my service
19  weapon. He also said that if he ever sees me on the
20  street, he will walk away from me. But the statement
21  that he made was very emotional. And at that point,
22  I hung up the phone on him, and then he called me
23  back.
24    Q. And was this the call at 2:00 -- that he made

Page 104

1  at two o'clock in the morning that you testified
2  about earlier?
3    A. Yes.
4    Q. Okay. And do you know if Joey Covino ever
5  texted you from a telephone number other than the one
6  that began 617 and ends 3434?
7    A. I don't know his phone number right now by
8  heart. I don't know what that phone number is.
9    Q. Do you know if he texted you from more than
10  one telephone number?
11    A. I don't know. I can't --
12    Q. Okay. All right. At some point you were
13  aware that there was a search warrant for your
14  telephone records and Mr. Covino's telephone records
15  by -- obtained by the Virginia State Police; right?
16    A. Yes.
17    Q. And do you know why they obtained a phone --
18  a search warrant for Joey's phone records?
19    A. I believe he was not disclosing the
20  information, his phone records, to the state police,
21  and that's why they conducted a search warrant on
22  both of the phones.
23    Q. And --
24    MR. ANDERSON: Objection to that.

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

---

Page 105

1    MS. CLAGUE: Okay.
2    Q. And so -- and when those records came, they
3  demonstrated that he had made several calls to you
4  and that he had sent you several text messages;
5  correct?
6    A. Correct.
7    Q. And that was something that he hadn't
8  provided them; correct?
9    A. Correct.
10        MR. ANDERSON: Objection.
11        MS. CLAGUE: Okay.
12    Q. And you're aware also that he drafted a
13  police report in the Revere Police Department and
14  that he talked with Lieutenant Ganley about what
15  should go into that report; correct?
16    A. Correct.
17    Q. Okay. And so when you think about -- also,
18  were you -- do you know whether or not Joey ever
19  disclosed to Special Agent Kinnard of the Virginia
20  State Police that the restraining order had been
21  vacated back in February of 2017?
22        MR. ANDERSON: Objection.
23    A. I don't believe he ever disclosed that
24  information to them.

---

Page 106

1    Q. Okay. So -- so they found out -- they found
2  out some other way about the -- about the restraining
3  order being vacated and about the messages and phone
4  calls that he made to you; correct?
5    A. Correct.
6        MR. ANDERSON: Objection.
7        MS. CLAGUE: Okay. I have nothing
8  further.
9        MR. ANDERSON: Just a couple quick
10  follow-ups.
11
12        EXAMINATION
13  BY MR. ANDERSON:
14    Q. You just said that it's your understanding
15  that Joseph Covino didn't disclose the fact that the
16  restraining order was ended to the Virginia State
17  Police?
18    A. Correct.
19    Q. And what's your basis for saying that?
20    A. Based on the conversation that is a
21  privileged client-attorney conversation that I've
22  had.
23        MS. CLAGUE: Do you have any
24  other -- anything else? Do you have

---

Page 107

1  anything outside of -- I'm going to
2  move to strike that, obviously, because
3  it's privileged.
4        But do you have anything outside
5  of attorney-client privileged? And,
6  again, whether it's, you know, a
7  meeting that you had with your attorney
8  where somebody else was present or any
9  independent, any independent
10  information that you have?
11        THE WITNESS: If I recall
12  correctly, Thomas Bacigalupi was the
13  one who told me that George Mason never
14  knew that the order was vacated.
15        MS. CLAGUE: Okay.
16  BY MR. ANDERSON:
17    Q. Just one -- one last question. You talked
18  about a 2:00 a.m. phone call from my client or with
19  my client that you said was very emotional for you?
20    A. I'm sorry -- a.m.? What do you mean by that?
21    Q. Just a few minutes ago, your attorney asked
22  you about a phone call that you had at 2:00 in the
23  morning where he said he hoped you got shot with your
24  service revolver in the face and if he saw you in the

---

Page 108

1  street he would walk away from you?
2    A. Correct. Yes, I made that statement.
3    Q. Okay. And you said -- something in your
4  wording was you something "when I play this back."
5  Are you talking about playing that back in your
6  memory?
7    A. Correct.
8    Q. Okay. You don't have any -- do you have any
9  text messages, any records of any text messages
10  between yourself and Covino?
11    A. Covino called me on a phone, so no recordings
12  of that at two o'clock in the morning.
13    Q. Okay. But, otherwise, I mean do you have
14  any -- have you saved any text messages from him?
15  Have you saved any voicemails from him?
16    A. I have a couple voicemails from him from when
17  he left voicemails on my phone.
18        MR. ANDERSON: Okay. And, Betsy,
19  I don't think we ever were provided
20  with those.
21        MS. CLAGUE: I'll take a look and
22  see if we have them and happy to
23  provide them.
24        MR. ANDERSON: Okay.

---

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

Page 109

1    MS. CLAGUE: I don't think we do.
2    And if you'd look for them as
3    well, Sharon.
4    THE WITNESS: Yes.
5    MS. CLAGUE: Thank you.
6    And we can get them to you by the
7    beginning of next week.
8    MR. ANDERSON: Okay. Well, why
9    don't we end here, and then you and I
10   can talk, because I know we're supposed
11   to get back to the court with something
12   by April 15th.
13   MS. CLAGUE: Yeah. And also your
14   client was going to get us some
15   documents.
16   MR. ANDERSON: Yeah. There's
17   nothing there.
18   MS. CLAGUE: Well, we'll need
19   something with regard to that.
20   MR. ANDERSON: Okay.
21   MS. CLAGUE: Also, you know, if --
22   there are two ways. If you -- if you
23   want to -- with regard to questions
24   about matters that she can't testify to

Page 110

1    because of the -- you know, because of
2    an agreement, the agreement is
3    something that Eli could waive. So
4    either, you know, Eli Schlam saying
5    that "Answering this question, we
6    wouldn't consider it a breach of that
7    agreement," that's one way to get to
8    it. Or we could ask the judge to order
9    that she's not going to be considered
10   liable for answering such questions.
11   MR. ANDERSON: Okay.
12   MS. CLAGUE: So either way, one or
13   the other. Because I know she's
14   anxious to answer those questions.
15   MR. ANDERSON: Okay.
16   MS. CLAGUE: Very good. Thanks.
17   Sharon, we're done for today.
18   THE WITNESS: Okay. Thank you.
19   THE COURT REPORTER: Are the
20   parties ordering the transcript?
21   MS. CLAGUE: Yes. Yes, please.
22   MR. ANDERSON: Yes.
23   (Time noted: 12:21 p.m.)
24

Page 111

1    ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5    ERRATA SHEET DISTRIBUTION INFORMATION
6
7    The original of the Errata Sheet has been
8    delivered to Elizabeth M. Clague, Esquire.
9    When the Errata Sheet has been completed by the
10   deponent and signed, a copy thereof should be
11   delivered to each party of record and the ORIGINAL
12   forwarded to Kenneth H. Anderson, Esquire, to whom
13   the original deposition transcript was delivered.
14
15   INSTRUCTIONS TO DEPONENT
16
17   After reading this volume of your deposition,
18   please indicate any corrections or changes to your
19   testimony and the reasons therefor on the Errata
20   Sheet supplied to you and sign it. DO NOT make marks
21   or notations on the transcript volume itself. Add
22   additional sheets if necessary. Please refer to the
23   above instructions for Errata Sheet distribution
24   information.

Page 112

1    PLEASE ATTACH TO THE DEPOSITION OF SHARON RADFAR
2    CASE: SHARON RADFAR VS. CITY OF REVERE, ET AL
3    DATE TAKEN: MARCH 30, 2022
4    ERRATA SHEET
5    Please refer to Page 111 for Errata Sheet
6    instructions and distribution instructions.
7    PAGE LINE    CHANGE    REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   I have read the foregoing transcript of my
16   deposition, and except for any corrections or changes
17   noted above, I hereby subscribe to the transcript as
18   an accurate record of the statements made by me.
19
20   Executed this _____ day of _____, 2022.
21
22   _____
23   SHARON RADFAR
24

Page 113

1 COMMONWEALTH OF MASSACHUSETTS    SUFFOLK, SS.
2
3        I, JAMES A. SCALLY, RMR, CRR, a
   Certified Shorthand Reporter and Notary Public duly
4  commissioned and qualified in and for the
   Commonwealth of Massachusetts, do hereby certify that
5  there came before me via videoconference on the 30th
   day of March, 2022, at 10:04 a.m., the person
6  hereinbefore named, SHARON RADFAR, who provided
   satisfactory evidence of identification as prescribed
7  by Executive Order 455 (03-13) issued by the Governor
   of the Commonwealth of Massachusetts, was by me duly
8  sworn to testify to the truth and nothing but the
   truth of her knowledge concerning the matters in
9  controversy in this cause; that she was thereupon
   examined upon her oath, and her examination reduced
10 to typewriting under my direction; and that this is a
   true record of the testimony given by the witness to
11 the best of my ability.
        I further certify that I am neither
12 attorney or counsel for, nor related to or employed
   by, any of the parties to the action in which this
13 deposition is taken, and further, that I am not a
   relative or employee of any attorney or counsel
14 employed by the parties hereto or financially
   interested in the action.
15
16
   My Commission Expires: April 8, 2022
17
18        James A Scally
19
20        _____
          James A. Scally, RMR, CRR
21        CSR/Notary Public
22
23
24

**Exhibits**

Ex. 1(SR) -
Complaint
 3:11 8:15
Ex. 2(SR) -
Abuse Preven
tion Order
 3:12 33:18,24
 36:16
Ex. 3(SR) -
Plaintiff
s Initial Disclo
sures
 3:13
Ex. 4(SR) -
Plaintiff
s Responses to
Defendant'
s Interrogatori
es
 3:15 41:1
Ex. 5(SR) -
Psychological
Assessment &
Evaluation
 3:17 24:20
Ex. 6(SR) -
Virginia State
Police Record
 3:19 20:17,18
 39:2 85:8
 98:18
Ex. 7(SR) -
Resignation 1-
6-21
 3:20 20:19
 85:9 98:18

**0**

0800
 99:3

**1**

1
 8:15
1-7
 4:1
1/26/17
 85:11

1/28/17
 36:20
10
 18:18 73:8
100
 15:11 36:19
 38:6
11
 73:6 88:17
11:17
 70:16
11:27
 70:16
12
 24:22 89:8
 98:22
12:02
 98:10
12:03
 98:13
12:07
 98:11
12:08
 98:13
12:21
 110:23
12th
 80:6
13
 70:22
14
 22:7 30:1 39:2
14th
 37:6,23
15
 98:24
1545
 86:14
15th
 37:6,23 42:16,
 23 50:24 52:7
 53:11 109:12
16
 55:1 85:10
162
 89:6
16th
 37:6,23
17
 31:24
18.2-427
 89:12

18th
 16:21,24

**2**

2
 33:18,24
 36:16 41:21
 74:4
2/15
 42:18 43:10
20
 17:9 51:17
 87:1
200-3126
 82:22
2015
 86:2
2016
 14:21,22,24
 18:8 33:9,16
 34:18 46:17
 53:11 70:21
 71:5 89:8
2017
 9:20 10:5,15
 34:2 36:24
 42:16,21,23
 43:7,10 51:1
 53:17,18 54:3
 55:14,18
 90:24 98:22
 99:3,6,22,23
 100:4 101:4
 102:17 105:21
2018
 54:14
202-750-4020
 39:12
2021
 41:12 97:21
2022
 17:1 43:8
22908
 4:21
24
 99:3,5,6,23
24th
 100:4 101:4
256
 89:9
2:00
 103:6,24

107:18,22
2nd
 54:14

**3**

30
 4:11 17:5,9
 34:2 39:3
 63:21 64:14,
 18
30-page
 23:16
31
 9:20
313
 80:18
31st
 10:5,15 11:3
 13:1,2 55:18
32
 89:9
3434
 104:6

**4**

4
 41:1
40
 48:10
400
 36:18 38:2,3
46
 58:3,10 66:2
47-year-old
 77:6
48
 20:20,23
49
 90:18 98:20

**5**

5
 24:20 46:15
 90:24
571-422-1981
 79:11
575
 89:5
578-422-1981
 78:17

**6**

6
 9:19 20:17,18
 39:2 85:8
 86:10 98:18
615-334-8902
 39:12
617
 104:6
617-545-7373
 74:9,22

**7**

7
 20:19 85:9
 98:18
703
 78:3
703-400-7655
 73:9 77:19
 80:1
703-593-9748
 75:6 77:20

**8**

8
 49:5 99:22
8th
 100:2 101:4

**9**

9
 16:6
918-416-0501
 39:12 84:9,22
929
 82:6
929-
 82:21
929-200-3126
 81:22 84:2
931
 81:18
931-450-4197
 81:5
9th
 41:11

**A**

**a.m.**
70:16 103:7
107:18,20
**absolutely**
22:11 34:9
51:21 73:4
103:9
**abuse**
9:23 15:20
53:24 54:18
**abusive**
69:22 103:4,8,
14
**ACA**
90:24
**access**
96:10
**accounts**
40:10
**accurate**
9:7 10:4 16:17
22:10 36:21
38:8 41:19
46:24 71:11
73:24 99:11
101:8
**accurately**
59:6
**accused**
92:11
**acknowledge**
4:24 5:6 69:9,
10,11 74:23
**acknowledgem
ent**
74:20
**act**
58:14,20
62:24 63:6
**acted**
15:24
**acting**
15:18
**actions**
57:3
**address**
41:22 44:7,19,
21 45:3
**administered**
5:7

**administrative**
101:14
**adult**
59:24 79:1
**adults**
61:1
**advice**
15:18 100:18
**advised**
10:16 21:14
99:8 100:5,16
**Affairs**
86:13
**affected**
89:5
**affidavit**
15:20 33:22
38:5
**afternoon**
7:23
**agencies**
71:8 72:4,11
**agency**
32:13
**Agent**
20:21 85:15
88:18 105:19
**agree**
5:19 24:21
34:10 51:9,15,
19 56:22
60:16,17
75:20 82:9
**agreed**
5:21 24:11,12,
14,16 91:6
**agreement**
5:14,15 24:9
29:23 30:10
45:23 46:2,8,
14 92:10,15,
16,24 93:18,
22 94:13,17,
21 95:12 96:9
110:2,7
**ahead**
15:13 31:22
61:9 68:9
**Alex**
88:20
**allegation**
77:15

**allegations**
86:12
**allege**
12:10
**alleged**
10:3 97:18
**alleging**
12:4
**allowed**
51:1,4 57:2
101:24
**altering/
disguising**
73:13
**Americans**
76:15 79:4
**Analysis**
89:4
**and/or**
73:21
**Anderson**
4:2,10 5:20
6:9,11 19:15,
20 21:18
26:18 27:5,13,
19 28:5,12,16,
21,24 29:1,11
30:14 31:18
44:15,20,23
45:4,9 53:4,8
59:7,11,12,20
60:12,13
61:10 62:5,11
63:19 64:3,6,
9,13 65:16,20
66:11,14,22
67:8,21 68:6
70:8,11,17
79:20,23
86:24 87:4,10,
11,20 88:14
90:22 93:8
95:19,21 96:2
97:3,8,10,11
98:7,14,17
100:12,14,17
101:2 102:4,9,
13,14,20
104:24
105:10,22
106:6,9,13
107:16
108:18,24

109:8,16,20
110:11,15,22
**annoying**
68:24
**answering**
83:3 99:9
110:5,10
**answers**
34:16 35:15
41:2 70:20
94:8
**anxious**
110:14
**anymore**
89:7
**app**
38:17 39:8
73:16,21
**Apparently**
83:11
**appeal**
50:20
**appearing**
4:20 11:24
**appears**
77:21 79:13
**application**
12:12 73:10
**application(s)**
73:12,15
**applied**
53:23
**apply**
91:8,13,20
**appointment**
99:2
**approximate**
73:14
**approximately**
86:14
**April**
53:17 98:22
99:3,5,6
109:12
**area**
34:14,17
**argue**
96:24
**arms**
74:13
**arrangement**
5:12

**ashamed**
84:18
**ass**
81:9 82:2,16
**assistance**
17:7
**assistant**
88:19 91:1,19
**assume**
84:14
**assumed**
40:6 75:10
**Assuming**
101:7
**attached**
62:16 73:18
**attempt**
32:4 40:7
**attempted**
34:4
**attendance**
86:5
**attorney**
7:24 9:1
16:16,17
21:13,17
24:12,13
50:16 51:7
52:20 53:2,10
87:3 88:20
89:22 90:6
91:2,5,19,20
92:18,19
97:20 99:1,17
100:1,10,12
107:7,21
**attorney's**
89:14
**attorney-client**
107:5
**attorneys**
4:23 21:22,24
**audio**
52:23 58:12
59:22 60:23
62:21 64:22
66:4,24 67:22
70:5
**August**
41:11 101:10
**Aussies**
76:15 79:4,9

authoritative
43:19
Ave
80:18
avoid
38:7
aware
10:10,14 25:9,
19 26:2,4
32:22 77:4
104:13 105:12

**B**

Bacigalupi
11:18,20
107:12
back
12:22 13:8,9,
18 16:21 30:1
36:16 48:24
50:22 51:7,13,
14 53:6,7
62:12 64:3
81:4 89:3 97:8
98:10 101:15,
18,24 102:1,9
103:16,23
105:21 108:4,
5 109:11
backwards
94:5
badge
30:20
based
12:13 13:17
16:16 19:3
21:13 31:9,11,
14 48:6 75:10
97:15 99:11
106:20
basically
62:1
basis
42:9 43:16
79:7 106:19
bear
70:11 88:14
bed
44:12
befriend
40:16

befriended
40:13
began
96:22 104:6
begin
5:17
beginning
78:21 109:7
behavior
21:3 85:23
behaviors
25:12,22
behest
20:23 21:4
Betsy
108:18
bit
14:8 66:20
80:15,24
bitches
65:7,11
black
27:20,22
blessed
74:19
block
60:1
blocked
38:6,11 39:14
60:17,18
blocking
59:23
blonde
77:22
blondes
76:14
booked
48:6
born
76:11
Boston
8:9 14:23 18:8
20:2 33:9,16
34:14,17,19
35:9,24 46:16,
20,21 47:12,
23,24 48:1,12,
20 71:4 86:2
bottom
24:22
bound
92:8,10 94:21

brain
83:12
breach
92:16 110:6
breaching
92:12,15
break
17:11 18:1,13
70:14
breaking
63:23 102:7
Brian
85:16
briefed
91:4
bring
44:12 55:7
80:12,15
95:20 97:1
Brockton
54:1 56:10
brought
6:12 88:9 92:5

**C**

C-O-Z-B-Y
85:17
cable's
64:11
calendar
37:5
call
13:8,11 32:7
36:23 38:22
53:21 56:7
68:16 69:23,
24 71:21 89:7
98:24 103:6,
24 107:18,22
called
10:17 16:7
17:15 36:19
82:15 89:5,8
103:16,22
108:11
called/texted
36:18
calling
13:10 38:2,4
89:10
calls
12:1 13:4,9

39:1,11 58:4,
11 69:11,16
105:3 106:4
camera
80:23
campaign
32:1,7,13
capable
42:11
Captain
85:17
care
74:17 81:11
career
52:18 55:5
Carl
85:16
carry
30:20 56:24
case
7:21 50:17,18
56:5 74:2 87:7
88:19 89:11
93:5 96:21
category
95:5
Caucasian
76:3
caused
22:8 30:4 55:4
causing
16:8
cellphone
38:15 89:16
Center
46:22
certification
75:14 76:10
Certified
4:16
chain
84:4
change
39:9 73:10
75:14 101:10,
19
characteristics
26:5
characterize
103:8
charge
89:12

charged
32:5
charges
10:3 16:10
18:19,21,23
19:4,9,23
20:4,5 90:10,
15
Chatting
67:24
Chelsea
36:1
chief
16:15 20:11,
20,24 21:5,9
49:24 85:9,15,
19 86:9,18
87:13,24 88:5,
9
Chinese
47:18,20
choosing
24:3
circle
81:14
cities
48:13
city
47:21
Clague
4:8,13 5:18
9:4,13 10:20
13:13 14:3,5,
8,13 15:12
17:16 18:5,24
19:10,17
21:11,15,21
22:13 23:5,7,
20 25:13,24
26:6,13,23
27:6,17,22
28:11,14,18,
22 29:5,7,10,
13,20 30:12,
16,23 31:4,16,
20 32:21
42:22 43:13
44:4,18,22
45:1,7 46:10,
12 48:4 49:19
50:6 51:3
52:5,10 53:7
59:17 60:8

61:15,22 62:4,
6,19 63:12,14,
17,24 64:4,8,
17 65:13 66:9,
13,18 67:5,10,
13,18 68:8
69:1,7 70:10,
15 79:18,22
80:13 82:11
83:8 86:20
87:2,6,18,21
88:12 90:20
92:7 93:20
95:3,14,24
96:19 97:4,9,
14 98:12
100:8,22
101:6 102:2,7,
11,23 103:2
105:1,11
106:7,23
107:15 108:21
109:1,5,13,18,
21 110:12,16,
21
claim
15:24 19:22
54:22 93:9
claiming
31:10 43:16
93:11
claims
12:3 15:21
16:8,11 18:21
31:10,12 44:7
clarify
101:12
clean
17:10 18:1,13
clear
65:22 93:13
client
33:22 93:11
107:18,19
109:14
client's
87:8
client-attorney
106:21
close
39:22,24
closer
48:2

closure
60:1
coin
72:14
colluded
21:7
comfortable
43:23
command
86:5
commanders
11:13 19:3
commenced
86:13 88:7
comment
9:18 40:5
commenting
64:15
comments
36:13 64:1
commit
86:9
committal
15:11
committed
18:20
commonwealt
h
4:18 12:8
13:24 88:20
91:1,5,20
99:24
communicatin
g
7:14
communicatio
n
89:13 100:10
102:16
communicatio
ns
21:22,23 28:4,
20
community
25:2 50:4
company
45:13 46:14
company's
46:3
complaint
8:15 11:23
15:17,19 16:6

18:18 22:7,22
30:2 31:24
76:2 85:19,24
96:15
complete
22:16 30:5
71:13
completed
33:22
completely
76:13
completing
41:2
computer
66:1
concert
15:18,24
conclusion
24:22
concurred
86:6
conducted
104:21
Conference
46:22
confirm
17:18
confirmed
86:9,12 100:1
confronted
86:11
connected
73:17
connection
96:4
consensual
86:4
consent
5:11 14:2
considered
81:13 110:9
consistent
37:14 82:9
consultation
99:8
consulting
45:15
contact
12:24 13:5,7
15:6 34:4
36:5,8 38:11,
13 39:5 42:14

43:12,17,20
71:21,24 75:3
77:16 80:8
83:13 102:6
contacted
12:22,23 31:6
32:10 38:15
49:22 55:9,10
73:6 89:16
contacting
10:24 17:8,11
18:2 39:14
42:12 52:18
73:22
contained
15:21
contents
26:11 33:2
contest
51:6
continued
32:2
continues
76:8 77:5,11
83:10
contribute
55:7
contributed
54:22 55:3
conversation
17:5,19 18:1,
15 19:2 28:1
61:1,8 84:1
98:23 106:20,
21
conversations
16:14
conversed
51:8
copies
89:1
correct
10:6 23:4,6,17
24:2,4,6,11,19
25:5 26:10
29:15 30:6
32:17,20
34:12 35:3
38:14 42:17
43:2 51:18,23,
24 52:6,9
54:3,19 55:20,
21,23,24 56:1,

11 57:1 60:18
62:7 65:16
68:14 69:16
75:4 76:6 80:2
86:15 89:21,
23 91:23
101:15,16
105:5,6,8,9,
15,16 106:4,5,
18 108:2,7
correctly
56:18 107:12
correspondenc
e
27:2
counsel
5:11 44:6
87:19 102:3
County
11:12,14 35:5,
21,22 47:4
couple
6:16 7:9 36:17
48:22 58:10
61:20 64:20
65:23 70:2,19
102:24 106:9
108:16
court
4:14 7:5 10:1
12:11,13
33:19 42:15
43:1 44:2
50:24 53:3,11
54:1 59:3,8,15
60:9 61:16,18,
23 63:16,22
65:17 66:16
102:17 109:11
110:19
cousin
47:2
Covino
5:21 6:11 9:24
10:3,17 11:1,
24 12:10
15:18,24 16:6,
12 17:14 18:3,
19,22 19:22
21:5,9 22:17
31:6 34:13
35:12 38:24
39:11 40:11

42:6,10 46:18
49:21 51:1
52:7 55:22
57:17 60:17
68:16 71:6,16
73:7 74:22
75:17 77:21
78:2 80:10
82:5 83:11
84:2,7 88:8
90:10,14 91:8,
13 92:1 93:12
96:23 102:16
103:3 104:4
106:15
108:10,11

**Covino's**
32:1,7 36:4
50:17,18 57:3,
21 70:24
96:11 104:14

**coworkers**
46:7

**Cozby**
85:16

**create**
40:9

**crime**
18:20 76:18

**criminal**
10:2 16:10
18:19,23 19:4,
9,22 20:4,5
21:5 85:20
86:18 87:14,
24 90:10,14
100:6

**crusade**
51:10

**curious**
35:16

**current**
41:22 42:12
43:20 85:24

**cut**
74:11

**cutting**
52:23

---

**D**

**date**
15:2 37:1,24

**41:12,14**
49:10,12
52:21 54:13
56:7,13,21
90:4,20 91:10

**dated**
53:18 97:21

**dates**
34:1 49:8
101:7

**daughter**
82:4

**Dave**
85:18

**day**
12:15 48:24
73:20

**days**
4:11 56:8
85:12

**December**
14:21,23 20:1
33:9,16 55:14
101:22

**decency**
60:4

**decision**
83:15 91:12
99:23 100:3
101:17

**declare**
5:8

**declination**
99:24

**declined**
100:1

**defendant**
5:21 9:24 10:3
32:1 34:2
70:23 73:7

**Defendant's**
55:2

**Defendants'**
22:8 30:3

**delay**
14:7

**delete**
67:16

**deleting**
66:6 67:2

**delivered**
88:19,23

**Delusional**
25:10,20

**demanded**
39:18

**demonstrated**
24:24 105:3

**deny**
38:2 39:13,16
75:2 76:20,24
77:12 78:2,15
80:21 81:18
82:5 84:3

**denying**
82:23

**department**
19:6 20:2
29:15 30:22
31:3 49:9,13,
15,18 51:13
52:18 70:21
71:1,3 72:6
105:13

**departments**
35:17,18,20
72:11

**deponent**
5:19

**deposition**
4:19 6:13
7:10,15 16:20
17:4,6 20:10,
18 28:3

**depositions**
20:19 85:10

**deprivation**
55:5

**deputy**
11:12

**deserved**
12:6 13:22

**desk**
89:1

**destroy**
32:1,7 51:10
52:13

**destroyed**
52:17

**detective**
11:17,20 16:2,
3,4 89:16 90:7
99:17,18

**device**

**73:10**

**device(s)**
73:12

**diagnosed**
25:9,19 26:5

**diagnosis**
27:24

**die**
75:13

**difference**
78:7

**differently**
76:2

**difficult**
52:16 94:19

**direct**
6:6

**direction**
48:11

**directly**
55:4

**disagreed**
24:5

**disclose**
12:2 28:19,22
42:3 44:6
93:24 97:23
106:15

**disclosed**
94:12 95:7
98:1 105:19,
23

**disclosing**
28:4 104:19

**disclosure**
27:3,7

**disclosures**
74:2

**discount**
48:7

**discovery**
45:2

**discussed**
7:11

**discussion**
70:4 97:7

**disguise**
38:21 73:11

**disguises**
38:18

**dismissed**
51:2

**Disorder**
25:10,20

**dispute**
21:6 64:16
96:23

**district**
10:1 43:1
53:3,11 54:1
89:14 102:17

**doctor**
24:10

**document**
8:18 27:21
85:11 86:15
88:11,17
90:19

**documents**
7:17 8:10
20:8,13 33:20
57:24 58:1
85:3 89:1 94:6
109:15

**door**
11:6,10,11

**doorbell**
11:7,9

**double-check**
45:5

**doubt**
15:10

**downstairs**
11:10

**drafted**
105:12

**dreamt**
83:22

**drive**
34:10 36:11
48:19,20 89:2,
3

**driver's**
6:3

**driving**
34:6 36:13

**drop**
52:9

**dropped**
88:24

**drove**
48:22,24

**duly**
6:4

duties
49:10 96:12
duty
22:23,24 23:3,
16,22,24
24:15 29:18
30:9 31:2,5,9,
11,15 49:24
50:1,11 54:6,
10 56:3 97:18

**E**

Earl
23:24
earlier
77:17 104:2
earnings
44:11
ease
76:11
East
84:18,20
Eastern
47:17 78:24
easy
8:6
Ed
89:18 90:7
99:1,16,22
100:7
educated
77:6 84:15
effect
62:2 67:20
effort
43:12
eight-hour
48:20
elaborate
32:8
Elaine
65:6
Eli
93:5 110:3,4
Elizabeth
4:2 5:18 25:17
27:19 29:4
44:17 87:1
email
16:13 32:22,
24 33:2,5,13
88:22,24

emailed
7:23
emails
22:2
emotional
103:13,21
107:19
employed
42:2
employer
10:1,24 16:7,
9,12 23:10
31:6,8 32:10,
14 33:7 42:8,
12 43:17,21
49:22 55:9,10
employment
14:1,16 18:9
34:12 36:5
41:23 49:8,12,
14,17 52:15
70:24
encountered
11:12
end
49:12 75:15
81:11 92:15,
17 97:21
109:9
ended
86:14 93:15
98:23 106:16
ending
49:14,17
ends
104:6
enforcement
25:3 40:14,16,
23 45:15,18,
19 50:5 51:17
engaged
53:20,21
enjoyable
68:20
entitled
7:12 55:6
entry
85:11 90:22
99:6,21
envelope
89:1
establishes

94:11
European
76:17
european/
blonde
79:3
evaluation
23:24 24:15
27:8 29:3 54:6
evaluations
22:23,24 23:4
29:19 30:9
31:2,15 50:1,2
evening
9:20 10:7
Everett
36:1
evidence
18:22 19:4,8,
13,24 37:22
86:19,23 87:5
exact
37:24
EXAMINATI
ON
6:8 103:1
106:12
examined
6:5
examples
33:11
exchanged
12:2
exchanging
13:3
Excuse
59:3
exhibit
8:15 20:17,18,
19 24:20
33:18,24
36:16 39:2
41:1 85:7,8,9
98:18
exhibits
4:1 7:24
existed
84:21
expect
69:5
expectation
69:8

expected
86:23
explain
22:14 79:2
87:15
explained
99:13
explanation
83:16
extended
52:14 56:11,
13,14,15,16
extent
12:19 16:4
26:15 92:19
97:14
eyes
81:15

**F**

face
62:16 82:3
103:18 107:24
Facebook
40:9,23
fact
12:6 30:9
37:12 44:5
49:23 50:8
106:15
facts
76:12
failed
30:9 32:5
96:13
failing
12:2 29:18
31:1,14
failure
31:9
fair
11:19 23:15
24:8 42:14
51:1 69:15
89:17 96:8
101:9 102:6,
15
Fairfax
80:1
fairness
93:10

false
12:3,15,18
15:21 16:7,11
17:15 18:4,21
31:7 32:3,10,
23 33:6 34:8
39:21 40:5
43:21 52:19
familiar
47:23 48:12
57:6
family
17:13 18:3,7
34:19,20
46:19
family/friends
73:17
fat
103:17
fault
74:16 96:11
fear
12:5 42:6,9,11
43:23
February
42:15,23 43:7,
8 50:24 52:7
53:10 102:17
105:21
felt
12:6 13:22
66:16
fewer
61:20
field
45:16
figure
94:2
file
58:12 59:22
60:23 62:21
64:22 66:4,24
67:22 70:5
93:17
filed
8:21,24 15:19
93:19
files
58:3
filing
96:7
find

37:12 69:5
88:15 96:17
**finding**
25:5
**findings**
24:5 27:20
28:10 29:3
**finds**
86:8
**fine**
44:4,5 80:17
**finish**
6:22
**fire**
32:13 86:4
**firearm**
51:13,19,23
57:1
**fitness**
22:23,24 23:3,
24 24:15
29:18 30:9
31:2,5,9,11,15
49:24 50:1,10
54:5,10 96:12
97:18
**five-minute**
70:14
**flat**
78:8,10
**floor**
11:10
**folks**
92:14
**follow**
40:11
**follow-ups**
106:10
**follow/contact**
40:7
**food**
47:20
**Ford**
50:13,15,16,
23 52:22
53:12,15,23
54:9,21 55:7
57:4 101:22
**Ford's**
56:5
**forgot**
68:2 77:8

**form**
4:4,8 10:21
19:12 86:21
**formal**
100:3
**forward**
91:7 100:3
**forwarded**
8:1 32:20,22
33:2
**fought**
52:14
**found**
23:16,21
30:19 50:2
68:19,23
93:14 106:1
**frame**
101:4
**free**
73:21
**freeze**
95:23
**freezing**
97:4
**French**
47:17
**friend**
76:14 81:13
83:13
**friended**
40:22
**friends**
40:14,17
76:13,16,18
84:13,19
**front**
11:24 28:1
44:13 56:21
89:1
**froze**
95:23 97:6
**frozen**
53:1 64:5
79:19 102:2,
19
**fuck**
103:17
**fucked**
77:24
**fucking**
58:16 59:1

61:1,2,3,4,5,7,
8 63:2,11
67:23 68:1,3
80:5,19 81:9,
17 82:2,16
84:12
**full**
22:16 30:5
**funny**
68:20

**G**

**G-A-N-L-E-Y**
85:18
**Games**
86:4
**gang**
79:3
**Ganley**
10:18 11:17
16:15,20,24
17:4,14 18:4,
16 20:20
32:17,20 85:9,
18,22 86:7
91:11 98:18
105:14
**Ganley's**
17:24
**generate**
77:2
**gentleman**
40:20
**George**
9:21 10:16
11:13,16
17:21 18:11
19:6 20:2 24:9
27:4 29:14
30:21 31:3,10
37:11 43:22
49:9,13,15,18
52:18 55:16
92:6,13,14,24
94:7,14 95:1,
4,6,20 96:6
97:13,16,17,
19 98:1
107:13
**GF**
82:2

**girl**
79:2 81:16
**girlfriend**
82:16
**gist**
17:10
**give**
56:8 60:1
83:16 94:3
99:19 103:11
**glad**
65:1,7
**GMU**
85:15
**good**
6:10 25:2 38:9
50:3 59:5
64:24 65:3
70:7 110:16
**Greater**
35:9 46:19
**ground**
6:16
**group**
40:23 86:5
**guess**
76:18 81:15
82:3 91:1
93:16 99:1
**guidance**
88:21
**gun**
30:20 52:4
**guy**
78:23 84:19

**H**

**H-A-L-P-E-R**
24:18
**H-O-M-S-Y**
40:19
**hair**
58:22 63:7
65:1,2,8
**Halper**
24:18 25:17,
19 26:9 29:4
50:2 54:6,11
**Halper's**
24:21,22
54:14

**hand**
9:23
**handwriting**
34:3
**hang**
77:24
**happened**
7:7 10:5,12
11:3,8 78:23
91:22
**happy**
77:23 82:2
93:4 108:22
**harassing**
40:15 86:1
**harassment**
50:19 101:23
**hard**
59:16
**harm**
12:5
**hastily**
98:23
**hate**
60:3,5 76:16
77:8 78:24
79:7 81:8
**hateful**
77:7 79:5
**head**
7:4 83:23
**hear**
52:24 55:24
58:11 59:4,10,
13,16,17
60:14,15
61:11,12,15
62:19,20 64:6
65:18 66:19
68:7 79:20
**heard**
11:9 27:14
57:10 59:19
60:8,10 62:3
63:12 65:13
67:7,15 68:11
102:12
**hearing**
50:20 56:6,9
**heart**
76:11 104:8
**held**

| | | | | |
|---|---|---|---|---|
| 94:24 | hung | 94:22,24 95:4 | 49:5 70:19,22 | jeopardy |
| hell | 103:15,22 | 97:15,24 | 73:5,8,19 | 93:7 98:6 |
| 60:2 | hurt | 99:12 104:20 | interrupt | Jim |
| helpful | 81:11 | 105:24 107:10 | 83:19 | 6:23 65:21 |
| 94:10 | | initiated | investigation | 66:15 91:5 |
| helps | **I** | 20:24 | 10:2 16:9 | job |
| 98:2 | | instances | 21:1,6,10 | 22:9,17,20 |
| hide | identified | 85:23 | 85:4,20 86:8, | 23:1 30:4 |
| 96:8 | 6:2 | instruct | 13,18 87:14 | 41:22 50:9 |
| hire | identities | 14:10 19:18 | 88:1,5 91:3 | 54:23 55:4,8 |
| 49:10 | 40:6 | 26:14 29:8 | 98:21 | Joey |
| hiring | ignore | instructing | investigators | 18:14 19:3 |
| 50:17 | 14:13 | 28:12,14,19 | 32:4 | 22:17 31:6 |
| history | ignoring | insulting | involved | 34:13 38:10 |
| 21:2 24:23 | 80:5 | 82:10,13,15 | 11:19 16:2,4 | 42:6 46:18 |
| hockey | imagine | integrity | involving | 49:21 50:17, |
| 57:14 | 95:8 | 25:3 50:4 | 85:23 | 18 57:3 72:21 |
| Hoey | imminent | intended | Iranian | 78:20 81:1 |
| 57:7,9,11,21 | 12:5 | 34:13 46:18 | 76:17,18 | 84:7 88:7 |
| 58:5 62:15 | impact | intent | 103:17 | 103:3 104:4 |
| 64:16 68:17 | 31:1 | 25:21 | Ireland | 105:18 |
| 82:10 | inaccurate | intent/ | 57:16 84:20 | Joey's |
| home | 9:11 36:21,22 | motivation | Irish | 104:18 |
| 10:8,11 11:4 | 38:8 | 25:11 | 76:15 79:3,9 | join |
| Homs | inches | interact | issue | 46:13 |
| 40:21 | 74:4 | 75:11 | 44:12 96:6 | Joseph |
| Homsy | Incorrect | interaction | issued | 5:21 6:11 |
| 40:19 | 89:24 | 72:8 102:16 | 85:13 91:17 | 10:17 11:1 |
| hope | independent | interactions | Italian | 12:10 16:11 |
| 74:18 | 107:9 | 25:11,21 | 47:17 79:4,9 | 42:10 51:1 |
| hoped | independently | 53:22 | Italians | 57:17,21 |
| 107:23 | 22:3,6 | interest | 76:14,15 | 70:24 73:7 |
| hopes | individual | 51:11 | Italy | 74:22 75:17 |
| 103:18 | 54:18 62:15 | interested | 84:20 | 77:21 80:10 |
| hot | 81:1 | 71:7 72:3 | | 82:5 84:1 |
| 65:10 | industry | 89:10 | **J** | 106:15 |
| hotel | 45:21 | interfered | | Judaism |
| 46:20,21 48:6, | info | 18:7 | James | 75:14 76:9 |
| 7 | 40:15 | interfering | 4:14 | judge |
| hours | information | 17:12 18:3 | January | 12:1,14 27:17, |
| 47:10 48:22 | 12:3,14,16 | Internal | 9:20 10:5,15 | 18 28:2 44:13 |
| 99:4 | 15:23 16:16 | 86:12 | 11:3 13:1,2 | 74:15 75:9 |
| house | 17:20 18:10 | Internet | 16:21,24 34:2 | 77:10 93:5 |
| 18:9 36:6,9, | 19:7,21 20:4, | 48:14,15 53:9 | 37:6,8,21,23 | 110:8 |
| 11,14 39:22, | 6,7 21:8,17,19 | 64:9,11 96:3 | 55:18 97:21 | judging |
| 24 47:11 | 24:23 26:16 | interpersonal | 101:15 | 76:12 |
| 80:18 | 31:7,8 32:11 | 25:11,21 | Jason | judgment |
| How's | 33:5 37:10 | interrogatories | 50:13,15,16, | 25:2 50:3 |
| 82:1 | 43:21 44:11 | 6:6 41:3 45:22 | 23 52:22 | July |
| human | 49:11 52:19 | interrogatory | 53:12,14,16, | 14:21,24 18:8 |
| 79:5 | 72:5 79:16 | 34:16 35:15 | 23 54:9,21 | 34:17 35:6 |
| | 87:12,17 90:9, | 41:2,21 46:15 | 55:7 56:5 | 46:17 54:14 |
| | 13 91:24 | | 57:3,5 101:22 | 70:21 101:10 |

June
101:10

**K**

Ken
6:10
Kenneth
5:20
kids
77:8,10
kind
9:17 12:6
47:16 93:6
94:3 98:5,20
kinds
47:19
King
36:19,24
Kinnard
20:21 85:14,
15 88:18
89:16 90:24
91:11 98:22,
24 99:6,10,17,
18,22 105:19
knew
18:20 107:14
knock
11:6,9
knowing
74:16
knowledge
9:7 14:2
32:16,19 33:1
90:16 91:13,
21 92:3

**L**

ladies
79:8
late
101:8,15
law
25:3 40:14,16,
23 45:14,18
50:5 51:17
lawsuit
8:16 54:21
55:1 92:5
93:17 95:20
96:7

lawyer
7:12,14 19:14
26:19,20 27:2,
9,16 89:17
100:21
lay
86:22
lead
92:1
learn
100:23
learned
28:7
leave
13:12 37:13
55:16,19 66:7
67:3,17 68:16,
18 72:15 80:7
81:17 86:10
92:20 101:14
leaving
57:20 69:5,12,
19
left
71:24 96:6
103:3,5
108:17
legal
19:13,18 52:3
87:8 100:17,
20
legally
56:24
lengthy
11:20
LEO
40:13
letter
10:1 72:21
97:19,21
99:24 100:4
letters
34:5
liable
95:1 110:10
license
6:3
lieu
5:6
Lieutenant
10:18 11:17
16:15,20,24

17:4,14,23,24
18:4 20:20
32:16,20 85:9,
18,22 86:7
91:11 105:14
life
40:2 74:18,19
lifelong
76:16
light
44:5
likes
65:5
Lincoln
80:18
Lisa
17:21
listed
73:7,19 77:18
listen
16:19 58:7
64:18 65:7
listing
49:10
live
35:4 84:17
lives
47:3
lobby
72:7
lodged
90:11
long
48:19 56:15,
19 65:1,2,8
90:5
looked
48:9 64:24
70:7
Lorna
57:7,9,11,21
58:5,13,14,15,
16,21,22
62:15,17,23,
24 63:1,2,6,8,
13 64:15 65:5,
15 68:17 81:9
82:2,10,13
83:22
Lorna's
62:16 67:24
lose

22:17
losing
23:1
loss
22:9 30:4
54:22 55:3,8
lost
22:19
lot
52:15 72:7
96:14
Loudoun
11:12,14
99:24
love
68:4 74:17,20
92:9
Luther
36:19,23
Lynn
10:1 33:19
36:2 42:24
53:2,11
102:17

**M**

MA
34:6
made
9:11 32:3 33:6
36:13 40:5
43:11 52:15
58:5 60:19
94:7 103:13,
17,21,24
105:3 106:4
108:2
maintain
25:1 50:3
Major
85:16
make
15:6 16:12
41:18 58:11
59:18 62:9
63:15 64:1
80:6 93:9
99:14
makes
65:9 75:9 94:4
103:8,13

making
12:3 16:7
18:17 99:9
man
77:6
manic
86:6
manila
88:24
manner
5:13
map
48:9
maps
48:14,15
March
80:6 81:4 89:8
marked
8:14 20:17
33:18,23 41:1
marketing
45:14
Martin
36:19,23
Mason
9:21 10:16
11:13,16
18:11 19:6
20:2 24:9 27:4
29:15 30:21
31:3,10 37:11
43:22 49:9,13,
15,18 52:18
55:16 92:6,13,
14 93:1 94:7,
14 95:4,6,20
96:7 97:13,16,
17,19 98:1
107:13
Mason's
95:1
Massachusetts
4:18 12:9
13:24 34:11
54:19 72:13
90:11,15,17
91:18 92:2,4,
18
Master
9:21
materials
88:23

math
  45:16,20
matter
  5:9 21:1
matters
  109:24
meaning
  36:18 40:13
means
  34:4 51:23
meant
  18:17 42:23
  81:15
media
  34:5 40:10
medical
  37:9,13 38:1
  86:10
meet
  47:12 53:14
  89:22 90:1
meeting
  37:10,20
  86:14 90:6
  107:7
member
  21:2 34:19,20
  46:19
memory
  17:24 58:6
  99:11 108:6
mentally
  83:17
mention
  7:13
mentioned
  35:15 46:16
  65:14
Merit
  4:15
message
  15:15 53:5,8
  60:16 61:11
  64:10 69:12
  74:8,11,21,23
  75:16 76:20
  77:1,3,12
  78:11 79:10,
  14,24 80:4
  81:18,21 82:1,
  8,19,22 83:1,
  7,10 84:6 85:1

89:8 100:7
101:5 103:12
messages
  12:1 13:4,17
  61:3 64:19
  66:5 67:1,15
  68:17,19 69:5
  74:3 82:10
  84:7 105:4
  106:3 108:9,
  14
met
  53:16 57:4
  85:15 86:3
  90:3,5,7,24
  99:6,16
method
  73:10
Mexican
  47:18
mid-
  102:16
mid-january
  37:4
mid-may
  101:8
Middle
  47:17 78:24
  84:17,20
Mike
  40:21
mild
  25:10,20
miles
  48:10
military
  84:16
mind
  15:10 18:16
  69:3 70:13
  75:15 76:10
  92:14
mine
  34:21 40:14
  74:16
minute
  103:11
minutes
  8:1 90:8 98:9,
  16,24 107:21
misconduct
  22:8 30:3

54:22 55:3
misleading
  12:3,15,17
  15:21 16:8,11,
  17 17:15 18:4,
  6,11 31:7
  32:11,23 33:6
  34:8 43:21
misled
  19:5 20:2
misrepresente
d
  12:11
misrepresentin
g
  12:1
missed
  61:20
missing
  22:12,15
misspelled
  99:2
mistaken
  42:19
misusing
  87:7
MLK
  36:18
mommy
  82:4
month
  73:21
months
  7:6 32:2 54:17
morning
  6:10 69:24
  70:1 82:3
  104:1 107:23
  108:12
motion
  56:17
motions
  4:6
motivation
  25:22
move
  9:5 31:17
  100:8,11
  107:2
MPO
  85:21 88:2

multiple
  77:16
Muslim
  75:10,21,24
  76:3,19 84:14
Muslims
  84:18
mutually
  24:10

**N**

N-U-T-T-A-L
  89:20
N-U-T-T-A-L-
L
  99:2
name's
  6:10
name(s)
  73:11
named
  89:17
names
  40:10,19
narcissistic
  26:5
NDA
  42:8
neighborhood
  34:7 39:18
nice
  77:24
night
  48:18
nights
  48:17
nod
  7:4
non-law
  45:19
nondisclosure
  45:23 46:2,8,
  14
normal
  4:3
north
  47:24
Northern
  48:19
notary
  4:11,17 6:4

noted
  110:23
notes
  7:19 88:19
notified
  86:11 91:11
  99:22
nude
  73:3
number
  7:23 38:18,19,
  22 39:4,6,7,9,
  14,15 49:5
  73:6,7,9,11,
  13,14,18 74:9,
  10,22 75:1,6,
  19,23 76:22,
  23 77:2,13,17,
  19,22 78:3,4,
  9,13,14,18
  79:11,12 80:2,
  3,22 81:3,5,7,
  19,20,22,24
  82:6,7,21
  83:2,4,6 84:2,
  5,10,11,23,24
  85:7 104:5,7,
  8,10
number(s)
  73:23
numbers
  38:6 39:1,3
  75:2 77:16
Nuttall
  89:18,19,20
  90:7 99:1,3,7,
  8,16,22 100:7

**O**

oath
  5:6 39:4
obey
  12:7 13:23
object
  14:10 19:11
  28:17 86:21
  87:18 92:7
objection
  9:13 10:20
  13:13 14:3,14
  15:12 17:16
  18:5,24 19:10

Case: 25-1068    Case: 1:20-cv-10178-WGY    Document 76-23    Filed: 04/09/24    Page 1 of 46    Filed 04/09/24    Page 741 of 46    Entry ID: 6720421

Radfar vs
City of Revere et. al.

Sharon Radfar
March 30, 2022

21:11 22:13
23:5,20 25:13,
24 26:6,13
28:18 29:20
30:12,23 31:4,
16 32:21
43:13 46:10
48:4 49:19
50:6 51:3
52:5,10 64:17
69:1,7 82:11
86:20 88:12
104:24
105:10,22
106:6

**objections**
4:4 5:12

**obnoxious**
68:24

**obtained**
9:24 11:24
104:15,17

**October**
101:11

**offering**
21:17,19

**office**
89:15 99:7

**officer**
9:21 24:24
51:20 52:3
56:24 71:6
84:16 85:22
86:2,3 87:1
88:3

**officers**
9:22 11:13,14,
16 15:19 16:1
25:4 40:14
50:5 85:21
87:7 88:2

**omissions**
9:10

**ongoing**
86:8

**online**
40:7

**open**
16:9 71:4

**opened**
11:11 81:14

**operate**
35:17 71:8

72:4,12
**operated**
72:6
**operation**
37:8
**opinion**
22:23 32:9
**opportunities**
55:5
**opportunity**
8:2
**opposite**
48:11
**order**
9:24 10:13
11:24 12:7,11
13:22 32:3,6
33:21 42:16
50:19 51:2,12,
22 52:1 53:24
54:9,18 55:13,
19 56:6,11,13,
23 58:7 85:13
91:9,14,17,21
101:23 105:20
106:3,16
107:14 110:8
**ordered**
12:8 13:23
**ordering**
110:20
**origin**
75:10
**others'**
25:12,22
**owe**
83:16

**P**

**P-L-O-W-M-
A-N**
91:6
**p.m.**
98:13 110:23
**pains**
5:9 41:12
**pants**
81:12
**paragraph**
9:19 11:23
15:17 16:6
18:18 20:23

22:7 30:1
31:24 39:17
55:1 76:9 85:6
**parentheses**
20:18 33:24
**part**
27:3 29:22
30:10 49:16
74:2,11 76:17
79:3 81:13
84:3
**parte**
9:24 56:7
**participating**
4:23
**parties**
5:10 24:16
56:9 110:20
**partly**
31:11
**partway**
88:17
**passed**
43:8
**past**
8:19,20 21:2
38:6 42:7
85:24
**patch**
72:14
**penalties**
5:10 41:13
**pending**
10:2
**people**
40:7 72:7
**percent**
15:11
**period**
56:20 89:6
**perjury**
5:10 41:13
**permanent**
91:9
**persistent**
25:10,20
**person**
5:7 8:6
**personal**
7:19 32:16,19
**pertinent**
12:2

**Phil**
85:17
**phone**
13:4 37:5
38:6,13,18
39:7,9 57:21
66:1 67:24
69:11 73:11,
13 74:10
75:23 76:22,
23 77:2,13,16
80:21 81:3
89:4 103:15,
22 104:7,8,17,
18,20 106:3
107:18,22
108:11,17
**phones**
73:20 104:22
**photo**
81:2 83:24
**photographs**
73:1,3
**physical**
12:5
**physically**
5:1,3 43:4
53:16 70:23
**pick**
68:2
**picture**
53:1 77:21
80:10,24
**pinpoint**
33:14
**place**
14:1,16 18:9
34:7,11 36:4
37:16 70:24
**plaintiff**
9:20 12:4
15:22 16:10
18:20 22:8
30:3 32:2 55:3
62:15
**Plaintiff's**
16:7
**play**
58:9,10 59:9,
20 60:21
62:13 64:20
65:23 66:1,11,
22 67:9 70:2

108:4
**played**
58:12 59:22
60:23 62:21
64:22 66:4,24
67:22 70:5,9
**player**
57:14
**playing**
108:5
**pleadings**
7:21
**Plowman**
91:5
**Plymouth**
35:5,21,22
47:4,24
**point**
25:1 29:14
33:13 42:10
43:20 53:23
100:23 101:1
103:15,21
104:12
**Points**
46:21
**police**
9:21 14:19
15:19 16:1
19:6 20:2,7,
14,22,24
29:15 30:21
31:3 35:10,11,
17,18,20,24
36:1,2 37:11,
12,20 48:23
49:9,13,15,18
51:20 52:3,18
56:24 58:1,4
70:21 71:1,3,6
72:10,15,17,
18 84:16 85:3,
15,22 86:2,3,
24 87:7 88:3,
10 89:14,23
98:19 99:15,
17 104:15,20
105:13,20
106:17
**policy**
46:3,4
**Polish**
79:9

| | | | | |
|---|---|---|---|---|
| position | privileged | 31:7 32:10 | 16 94:16,19 | reads |
| 43:19 94:20 | 26:16 27:1 | 49:14,17 94:8 | 95:10,15,17, | 9:19 32:1 |
| possibly | 28:4,6,20,23 | 97:16 105:8 | 18 101:13 | 70:22 |
| 86:1,6 | 106:21 107:3, | 108:19 | 107:17 110:5 | ready |
| ppl | 5 | providing | questions | 60:24 61:7 |
| 74:18 77:10 | privy | 52:19 | 4:9 7:9 8:12 | real |
| 79:6,9 84:19 | 16:14 17:19 | public | 13:21 19:19 | 60:24 61:7 |
| premarked | 19:2 | 4:17 6:4 71:4 | 33:21 40:24 | realize |
| 4:1 | problem | pulling | 41:4 70:19 | 48:10 |
| prepare | 95:9 | 96:17 | 74:7 92:10,22 | Realtime |
| 7:15 | problems | punished | 94:9 97:12,22 | 4:16 |
| preparing | 65:11 | 74:18 | 98:15 99:10 | reason |
| 7:10 | proceeded | purchased | 102:22 109:23 | 48:2 49:17 |
| present | 11:10 | 72:14 | 110:10,14 | 73:13 83:16 |
| 5:2,3 18:16 | proceeding | purportedly | quick | 84:13 88:4 |
| 25:2 50:4 56:9 | 4:24 5:2,5,13 | 74:21 | 106:9 | 93:12 96:6 |
| 107:8 | process | purpose | | reasons |
| presented | 100:20 | 70:23 | R | 22:19 44:8 |
| 12:14 17:21 | produced | purposes | R-U-E-D-A | 49:14 93:3 |
| presenting | 20:13 | 28:2 | 88:20 91:2 | recall |
| 18:11 | production | pursuant | race | 13:15 33:12 |
| presiding | 6:3 | 20:14 | 76:4 | 38:4 44:23 |
| 12:14 | prohibit | pursue | Radfar | 45:6 57:20 |
| pressed | 56:23 | 19:5 51:4 | 6:1,10 24:24 | 69:19 72:2,23, |
| 90:15 | prohibition | 52:7,8,11 | 34:1,21 35:2 | 24 73:22 |
| pretty | 52:2,3 | pursued | 40:6,13 47:3 | 75:16,24 77:1 |
| 78:1 | prompted | 18:19,23 19:9, | 59:14 60:14 | 78:5,6,7,12,16 |
| prevented | 13:10 | 22 20:5 | 63:20 70:18 | 79:13 81:21 |
| 51:12 | pronounce | pursuing | 85:21,24 86:1, | 82:8,22 83:1,6 |
| prevention | 40:21 | 20:3 | 3,6,10 88:2 | 84:6 85:1 |
| 9:23 50:19 | prosecute | put | 91:10 92:20 | 101:5 103:14 |
| 53:24 54:18 | 89:11 100:19 | 43:23 44:11 | 98:22,23 99:7, | 107:11 |
| 101:23 | 101:18 | 55:19 62:1,18 | 8 | receive |
| previous | prosecuted | 66:2 76:10 | Radfar's | 100:4 |
| 16:16 21:13 | 92:2 100:24 | 96:5 98:5 | 99:1 | received |
| 24:12 48:6 | prosecution | puts | Radford | 39:11 48:7 |
| 79:14 90:6 | 91:7,12 99:23 | 94:19 | 21:1 | 53:24 98:24 |
| previously | 100:1,6 | putting | re-filed | 100:7 |
| 42:13 | prosecutorial | 61:5 | 56:17 | recess |
| price | 88:21 | | re-read | 70:16 98:13 |
| 48:8 | Protection | Q | 30:2 | record |
| prime | 15:20 | | reached | 5:16 43:24 |
| 33:9 | protective | question | 10:23 | 59:5 70:4 97:7 |
| printed | 91:9 | 4:5 6:17,22 | read | recorded |
| 79:16 | prove | 17:6 19:12 | 4:10 7:6 8:10 | 65:24 |
| prior | 89:6 | 28:17 29:24 | 9:16 16:23 | recording |
| 11:21 | provide | 30:15,24 | 20:16 33:2,5 | 60:22 68:11 |
| private | 43:21 44:20 | 31:19 38:10 | 39:13 49:5 | recordings |
| 45:12 | 45:3 75:13 | 54:8 58:8 | 74:12 75:8 | 70:3 108:11 |
| privilege | 76:9 108:23 | 68:8,12,13,21 | 79:14 82:20 | records |
| 4:9 | provided | 69:2,4 76:24 | 85:6 87:23 | 38:1 72:9 89:4 |
| | 19:7 20:6,8,9 | 83:3,5,8 88:13 | 90:18 98:21 | 98:19 104:14, |
| | | 90:12 93:3,9, | | |

18,20 105:2
108:9
**reference**
22:22 62:14
**referenced**
96:15
**referred**
50:16 52:22
53:12
**referring**
40:20 50:19
84:2
**refresh**
58:5
**refuse**
44:3
**refused**
32:5 44:6 45:2
89:22
**refute**
86:19 87:12,
15
**regard**
22:1 109:19,
23
**Regent**
4:21
**Registered**
4:15
**registering**
83:12
**regular**
4:2 79:6
**related**
22:24 29:18
45:19 57:21
**relationship**
11:20 53:15,
19,20,21
57:18 83:22
86:5
**relationships**
86:7
**relative**
35:4,7 47:3,6,
9,12 48:2,3,23
49:2
**release**
94:21,23
**released**
95:5

**relentlessly**
18:19,23
19:22 20:5
**relevant**
25:10,21
**reliability**
25:3 50:5
**relief**
93:6
**remember**
15:14 41:2
45:5 56:17
64:23 70:6
**remotely**
4:20,21 5:5
**repeat**
36:7 54:7
67:11 90:12
**repeated**
32:3
**repeatedly**
13:10 34:3
**rephrase**
6:18 30:24
**replay**
103:12
**report**
23:16,18,19
24:21 25:6,7
26:9,11 54:14
105:13,15
**reporter**
4:14,16 7:5
59:3,8,15 60:9
61:16,18,23
63:16,22
65:17 66:16
110:19
**reporting**
5:4
**reports**
50:11
**represent**
6:11
**representative**
24:14
**request**
23:9 80:20
88:7
**requesting**
85:19 86:18
87:13,24

**required**
13:17 25:3
50:5
**requirement**
4:12
**research**
24:24
**reserve**
44:1 94:2
**reserved**
4:5,6
**residence**
44:18
**resides**
46:19
**resign**
31:5 49:20
**resignation**
29:17 30:11
31:8 94:5
96:13,19
97:20
**resigned**
29:14 50:9
**resigning**
30:21 31:3
**respond**
13:16 64:19
69:18
**responded**
80:19
**responding**
69:16,17 84:8
**response**
13:18 69:13
73:16 77:18
80:7,17 83:11
**responses**
45:1
**responsibilities**
49:11
**restaurant**
47:13,14,16
**restraining**
10:12 12:11
32:2,6 33:21
42:16 51:2,11,
22 52:1 54:9
55:13,19 56:6
85:13 105:20
106:2,16

**result**
27:16
**resulted**
30:10
**results**
23:19 27:14
**return**
23:22 56:3
57:2
**revealed**
26:12
**Revere**
14:19,23
15:19,24
33:19 35:10,
11,24 39:23
48:23 70:21,
24 72:18
105:13
**review**
8:2,7,21 85:2
88:21
**reviewed**
7:17,19,21
8:23 9:1,6
20:10,13 26:9
57:24 58:1
74:5
**reviewing**
41:15
**revolver**
107:24
**ring**
11:7,9
**role**
30:19
**Ronald**
23:24
**room**
5:2
**roughly**
90:7
**Rowan**
16:15 20:11,
20,24 21:5,9
85:10,16,19
86:9,18 87:13,
24 88:6,9
98:19
**Rueda**
88:20,22,24
91:2,3,8

**rugged**
65:4
**ruining**
40:1
**rules**
6:16
**run**
81:9
**Ryan**
23:12

**S**

**S-H-U-G-A-R-**
**M-A-N**
23:13
**S-U-R-B-E-R**
85:17
**SA**
85:14 90:24
91:11 98:22,
24 99:6,10,22
**safety**
42:6
**salary**
41:22 49:11
**Salem**
72:13
**sales**
45:14
**satisfactorily**
6:2
**saved**
108:14,15
**Scally**
4:15 63:14
**scene**
80:6
**Schlam**
110:4
**screaming**
61:5
**screen**
79:18
**screenshot**
75:15
**scroll**
37:4
**search**
104:13,18,21
**section**
20:16

| | | | | |
|---|---|---|---|---|
| security | Sharon | 16 79:12 83:1, | spoken | station/visit |
| 45:21 | 6:1 34:1 59:13 | 5 84:24 102:8 | 10:18 33:4 | 71:6 |
| seek | 63:17 66:18 | sitting | SR | status |
| 16:10 | 80:1 83:21 | 83:24 | 20:19 33:24 | 55:15 101:9, |
| sees | 84:3 85:21 | skip | stable | 19 |
| 103:19 | 88:2 93:21 | 36:17 | 64:11 | stay |
| seize | 94:15 103:3 | slightly | stack | 47:6 48:2,7,17 |
| 9:22 | 109:3 110:17 | 37:3 | 74:3 | 73:17 |
| send | she'd | smart | start | stayed |
| 77:3 78:10 | 92:9 98:4 | 84:15 | 6:22 8:14 | 47:4 101:21 |
| 79:10 81:3 | she'll | Smith | 53:15 76:8 | Sterling |
| sending | 82:4 | 24:1,5 | started | 4:22 |
| 74:23 75:16 | Sheraton | social | 21:10 88:5 | stipulations |
| 76:20,24 77:1, | 46:21 | 34:5 40:10 | starts | 4:3 |
| 12 78:2,5,12, | sheriff's | solely | 86:17 | stop |
| 15 81:18,21 | 11:12 | 31:9 | state | 10:24 17:7 |
| 82:5,8,22 | short | someday | 20:7,14,22,24 | 21:15 71:15 |
| 83:1,6 84:6,7 | 46:17 48:16 | 81:10 | 33:15 37:11, | 89:10 |
| 85:1 | shot | son | 20 49:8 57:24 | stopped |
| sense | 103:18 107:23 | 82:4 83:19,20 | 58:4 70:22 | 35:9 71:5 |
| 75:9 94:4 | show | sound | 71:8 73:11 | street |
| sentence | 8:7 80:5,18,23 | 37:14 | 85:3 88:10 | 103:20 108:1 |
| 9:17 36:16 | 89:4 | Sounds | 89:14,23 | stretching |
| 38:5 87:23 | showing | 48:21 71:10 | 98:19 99:15, | 34:2 |
| separation | 34:6 | south | 17 104:15,20 | strike |
| 97:13 | shown | 48:1 | 105:20 106:16 | 4:6 9:5 17:23 |
| September | 39:17 | space | stated | 100:9,11 |
| 101:10 | Shugarman | 43:4 | 23:21 40:2 | 107:2 |
| Sergeant | 23:12,15 24:6 | speak | 85:19,20 | stuff |
| 90:10,14 | 25:15 | 60:6 | 87:24 88:1 | 96:14,18 |
| series | sic | speaks | 91:4 94:20 | stupid |
| 41:3 | 44:6 77:23 | 84:19 | statement | 79:2 |
| serve | 79:6 83:4 | Special | 10:4 18:12,17 | subpoena |
| 10:11 47:19 | side | 20:21 85:15 | 38:8 39:20,21 | 20:14 |
| 55:19 | 95:2 | 88:18 105:19 | 87:13 99:9,14, | suggest |
| served | sides | specialist | 19 103:20 | 92:21 95:3 |
| 10:13 84:16 | 24:11 | 45:13 | 108:2 | 98:8 |
| service | sign | specific | statement's | suggested |
| 9:23 103:18 | 4:11 46:1,14 | 8:12 | 87:17 | 91:8,20 |
| 107:24 | signature | specifically | statements | suicide |
| set | 41:9 | 33:21 55:2 | 32:4,12 33:6 | 86:9 |
| 99:3 | signed | spell | 103:12,16 | suit |
| settlement | 41:11,15 42:7 | 34:24 | states | 6:11 |
| 29:23 30:10 | signing | spelled | 73:6 | summary |
| 93:18 | 41:3 | 85:16 | stating | 20:21 98:20 |
| sexual | signs | spend | 5:15 | summer |
| 86:4 | 46:13 | 47:8 | station | 71:5 86:2 |
| shallow | similar | spent | 14:19 15:1,3,8 | supplement |
| 84:21 | 21:2 85:23 | 48:22 | 35:10,12 36:1, | 44:10 |
| shameful | sir | spoke | 2 48:24 71:15, | support |
| 75:9 | 50:7 74:1 | 21:9 98:22 | 16,22 72:1,8, | 15:23 19:21 |
| | 76:22 78:9,13, | 99:18 | 16,17,18 | |

supporting
19:24
supposed
56:8,16
109:10
Surber
85:17
surgery
37:17,21
58:16,24 63:1,
9
surrounding
35:23
suspect
85:20 88:1
89:4,9
suspend
16:9
suspending
10:2
swear
5:16
sworn
6:4 21:2
synopsis
85:14 88:18

T

takes
58:20 63:6
talk
22:4 109:10
talked
105:14 107:17
talking
6:23 25:14
94:9 108:5
teach
77:8
teacher
45:16,20
technical
8:9
teeth
96:17
telephone
34:5 73:18
75:1,18 77:17,
18 78:4,9,13,
14 79:12
81:20 82:7,21
83:2,6 84:5,24

98:23 99:22
104:5,10,14
telling
10:24 13:15
17:22 19:16
28:5 30:8
41:12 52:21
ten
8:1 56:8 90:8
ten-day
56:7
term
19:13 93:23
termination
93:12
terminology
87:8
terms
92:23
Terrace
4:21
testified
6:5 17:4 103:3
104:1
testify
109:24
testifying
27:11
testimony
5:8 12:13
16:24 26:8
30:13,18 39:3
87:19 96:21
testing
24:23
text
13:4,8,17
15:15 33:15
34:5 36:23
38:19 61:3
71:21 74:3,8,
21,23 75:16,
24 76:8 77:1,3
79:14,24 80:4
82:1,18,19
84:4,7 85:1
89:7 100:7
101:5 105:4
108:9,14
texted
104:5,9
texting

13:3,10 38:3
texts
13:9 89:2
thick
74:4
thing
33:12 83:23
96:3
things
9:11,17 93:14
94:11 97:18,
23
thinking
102:5
Thomas
107:12
thought
42:23 44:9
81:13,14
100:20
threatened
12:4 40:1
threatening
61:9 86:1
threats
60:19 82:14
thumb
89:2,3
tilt
80:13
time
4:5 10:15
13:11,16
35:13 37:16
42:24 43:9,11,
20 47:8 49:3
54:17 56:2
67:23 74:13
86:13 101:4
102:15,18
103:12 110:23
times
14:18 36:18,
20 38:2,3
73:14,20 89:5,
6,9 101:7
title
41:22
today
7:7 85:8
110:17
today's

7:15
told
12:24 13:5
17:14 18:4
26:19,24 27:1,
15 33:8 38:24
54:13 58:3
64:24 65:8
69:23 70:7
78:24 83:18
85:2 89:9
107:13
tour
72:5
town
47:21
towns
35:24
track
73:20
transcribe
61:17
transcript
20:10 62:1
110:20
transcripts
16:23
transpired
94:23
treat
77:10
treated
76:2
trial
4:5,6,7 52:12
trip
46:17,18 47:9
48:16
trips
46:16 81:16
trouble
32:14
true
16:18 39:20
40:4
trusted
25:1 50:3
truth
83:21
truthful
9:7 12:20
22:10 32:12

41:19 71:9
turd
81:9
turned
78:23
turns
93:2
tutor
45:20
two-seconds
72:8
type
53:19 83:21
96:9
typed
85:14

U

ugly
82:3,16
uh-huh
7:3 41:24 49:7
unannounced
39:18
undergo
23:3
understand
6:17,19 7:5
8:11 66:10
67:6 68:10
79:5 83:20
understanding
5:1 95:12
106:14
unfair
9:11 76:13
unfit
23:16,21
30:20
unfold
10:12
unfrozen
96:1
uniformed
9:22
uninvited
39:18
University
9:21 10:16
19:6 24:9
29:15 30:21
43:22 49:9,13,

15,18 55:17
92:6 97:13
**unnamed**
15:19
**unstable**
53:9 83:17
96:4
**untrue**
87:17
**untruthful**
9:12
**unwilling**
60:5
**ur**
80:18

**V**

**V-A**
35:1
**V-A-H-Z-A-D**
35:1,2 47:3
**VA**
34:6
**vacated**
32:3,6 42:16
56:18,20
105:21 106:3
107:14
**Vahzad**
34:23 47:3
**verbally**
5:8 9:2
**veteran**
9:20
**victim**
89:5,7,8
**view**
80:23
**violate**
92:23 94:13
**violating**
94:16
**Virginia**
4:22 8:8 9:22
20:14,24 32:4
34:10 37:11,
20 48:20
57:24 58:4
85:3 88:10
89:14,15,23
91:10,14,15,
21 92:19

98:19 99:15
104:15 105:19
106:16
**visit**
18:8 35:6,9,
20,23 64:23
70:6,20 71:5,
15,16 72:11
**voice**
58:3 59:19
61:14 68:11,
14
**voicemail**
82:10,17
103:7
**voicemails**
57:20 64:1,15
65:14 69:19,
21 82:14 89:3
103:4,5
108:15,16,17
**volatile**
86:6

**W**

**wage**
49:11
**wait**
6:21
**waive**
4:11 5:12
110:3
**Wakefield**
46:21 47:4
48:17
**Wakefield's**
47:24
**walk**
103:20 108:1
**wanted**
17:10 18:1,12
41:18 52:13
74:12 81:12
**wanting**
62:16
**warrant**
104:13,18,21
**ways**
109:22
**weapon**
103:19

**weapons**
9:23
**week**
10:17 109:7
**weekend**
36:19,24 37:6
38:3
**weeks**
37:14,19
86:10
**whatnot**
62:18
**Whatsapp**
38:14,16
73:17
**white**
27:21,23
**whore**
81:9
**wicked**
74:16
**will!'**
40:3
**wit**
34:5
**withheld**
44:19
**withholding**
44:16
**woman**
77:22
**word**
60:11
**wording**
108:4
**words**
7:3 59:10
61:20 65:19
**work**
17:12 34:7
43:24 45:8,10,
12,21 46:5,9
51:14,20 52:3
55:14 57:2
94:5 101:9,18,
19
**worked**
36:2 51:16
**working**
35:12 56:23
71:19

**World**
86:3
**wow**
65:4
**writing**
74:24
**written**
34:5 41:4 45:2
**wrong**
78:21
**wrote**
23:15,18

**Y**

**ya**
80:19
**year**
38:6 56:16,19
73:21
**years**
43:3,6,7 51:17
87:1 96:20
**yelling**
61:4
**yesterday**
7:23
**yup**
77:24

| COMPLAINT FOR PROTECTION FROM ABUSE (G.L. c. 209A) Page 1 of 2 | COURT USE ONLY – DOCKET NO. 20171320104 | TRIAL COURT OF MASSACHUSETTS |

| A | ☐ BOSTON MUNICIPAL COURT | ☒ DISTRICT COURT | ☐ PROBATE & FAMILY COURT | ☐ SUPERIOR COURT | DIVISION |

**B**

Name of Plaintiff (person seeking protection)

Joseph Covino

Name of Defendant (person accused of abuse)

Sharon Radfar

Defendant's Alias, if any

**F**

X _____

Sex: ☐ M ☒ F

**C**

☒ I am 18 or older.
☐ I am under the age of 18, and

my _____ (relationship to Plaintiff) has filed this complaint for me.
☑ The Defendant is 18 or older.

**G**

The Defendant and Plaintiff:
☐ are currently married to each other
☐ were formerly married to each other
☐ are not married but we are related to each other by blood or marriage; specifically, the Defendant is my _____

☐ are the parents of one or more children
☐ are not related but live in the same household
☐ were formerly members of the same household
☑ are or were in a dating or engagement relationship.

**D**

To my knowledge, the Defendant possesses the following guns, ammunition, firearms identification card, and/or license to carry: LEO, at least a pistol

**E**

Are there any prior or pending court actions in any state or country involving the Plaintiff and the Defendant for divorce, annulment, separate support, legal separation or abuse prevention? ☒ No ☐ Yes If Yes, give Court, type of case, date, and (if available) docket no.

**H**

Does the Plaintiff have any children under the age of 18?
☒ Yes
If Yes, the Plaintiff shall complete the appropriate parts of Page 2.

**I**

On or about (dates) 4/23/17, 4/28/17 7/6/16 ~ 2/15/16 I suffered abuse when the Defendant:
☐ attempted to cause me physical harm ☑ placed me in fear of imminent serious physical harm
☐ caused me physical harm ☑ caused me to engage in sexual relations by force, threat or duress

**THEREFORE, I ASK THE COURT:**

☑ 1. to order the Defendant to stop abusing me by harming, threatening or attempting to harm me physically, or placing me in fear of imminent serious physical harm, or by using force, threat or duress to make me engage in sexual relations.

☑ 2. to order the Defendant not to contact me, unless authorized to do so by the Court.

☑ 3a. to order the Defendant to leave and remain away from my residence: See Plaintiff Confidential Information Form. If this is an apartment building or other multiple family dwelling, check here ☐

☑ 3b. to order the Defendant to leave and remain away from my workplace: See Plaintiff Confidential Information Form.

☐ 3c. to order the Defendant to leave and remain away from my school: See Plaintiff Confidential Information Form.

☑ 4a. to order that my residential address not appear on the order.

☑ 4b. to order that my workplace address not appear on the order.

☐ 4c. to order that my school address not appear on the order.

☐ 5. to order the Defendant to pay me $_____ in compensation for the following losses suffered as a direct result of the abuse:

**J**

☐ 6. to order the Defendant, who has a legal obligation to do so, to pay temporary support to me.

☐ 7. to order the relief requested on Page 2 of this Complaint pertaining to my minor child or children.

☒ 8. to order the following: Abuse thru 3-d party, Social media, Not to Follow, Friend Social

☒ 9. to order the relief I have requested, except for temporary support for me and/or my child(ren) and for compensation for losses suffered, without advance notice to the Defendant because there is a substantial likelihood of immediate danger of abuse. I understand that if the Court issues such a temporary Order, the Court will schedule a hearing within 10 court business days to determine whether such a temporary Order should be continued, and I must appear in Court on that day if I wish the Order to be continued.

| DATE 01/31/17 | PLAINTIFF'S SIGNATURE X _____ | Please complete affidavit on reverse of this page |

This is a request for a civil order to protect the Plaintiff from future abuse. The actions of the Defendant may also constitute a crime subject to criminal penalties. For information about filing a criminal complaint, you can talk with the District Attorney's Office for the location where the alleged abuse occurred.

PA-1 (06/16)

COURT COPY

526

| **AFFIDAVIT** | Describe in detail the most recent incidents of abuse. The Judge requires as much information possible, such as what happened, each person's actions, the dates, locations, any injuries, and any medical or other services sought. Also describe any history of abuse, with as much of the above detail as possible. Note: Unless the Court allows a motion to impound, this affidavit will be public record, including any names or specific addresses included in the affidavit. |
|---|---|

On or about 01/4/16 – 01/30/2017 ; the Defendant _Has_ _repeatedly attempted to contact_ _me by any means necessary, to wit telephone, text, written letters, social_ _media, driving from VA to MA and showing up in my neighborhood or at_ _my place of work. Redfar has use threats to force me into sexual relations_ _with her on multiple occasions being successful on one attempt while in Boston._ _She has called/texted over 400x on MLK weekend and called over_ _100x on 01/24/17 I have blocked over 600 phone numbers in the past_ _year to avoid her. She uses an app that shows other #'s._ _She has shown up in my neighborhood, uninvited or announced and_ _demanded I come see her. She has threatened me with ruining my_ _life and has stated "If I can't have you, no one will!"_ _Redfar has assumed the identities of several people on line in an_ _attempt to follow/contact me. She solicits pictures of herself to pics_ _she finds online of me. Redfar has befriended several LEO's who_ _are friends of mine and of harassing them to get into about me._ _She verbally abuses me 100's of times per day, accusing me of_ _not acknowledging her because I am resistive to her middle_ _eastern descent. Her messages have become increasingly threatening_ _and unstable as of the last week. Because of her repeated_ _actions/threats, I am in absolute fear of grave danger_ _from Redfar that I continuously carry a firearm for fear she_ _will appear unannounced and armed._

If more space is needed, attach additional pages and check this box: ☐

I declare under penalty of perjury that all statements of fact made above, including those provided on P.1, Section E and P.2, Sections A and B of the Complaint form regarding prior and pending court actions, and in any additional pages attached, are true to the best of my knowledge.

| DATE SIGNED | PLAINTIFF'S SIGNATURE |
|---|---|
| 1/31/17 | X |

| WITNESSED BY | PRINTED NAME OF WITNESS | TITLE OF WITNESS |
|---|---|---|
| X | | |

I have transcribed the above affidavit for the Plaintiff

_____  _____
Signature                          Print Name

☐ Court Certified Interpreter
☐ Court Screened Interpreter
☐ Other _____
☐ Remote Translation Via Telephone/Video

| ABUSE PREVENTION ORDER (G.L. c. 209A) Page 1 of 2 | DOCKET NO. 2017 13R0104 | TRIAL COURT OF MASSACHUSETTS |
|---|---|---|

**Plaintiff's Name**
Joseph Covino

Name & Address Of Court
Lynn District Court
580 Essex Street
Lynn, MA 01901

**Defendant's Name & Address**
Sharon Radfar

**Alias, if any**

| Date of Birth | Sex ☐ M | Place of Birth |
|---|---|---|

SS # (Last four digits only)    Daytime Ph # (   )

Cell Phone # (   )

## VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE punishable by imprisonment or fine or both.

**A. THE COURT HAS ISSUED THE FOLLOWING ORDERS TO THE DEFENDANT:** (only those items checked shall apply)

☑ This Order was issued without advance notice because the Court determined that there is a substantial likelihood of immediate danger of abuse.

☐ This Order was communicated by telephone from the Judge named below to: Police Dept._____ Police Officer_____

☑ 1. YOU ARE ORDERED NOT TO ABUSE THE PLAINTIFF by harming, threatening or attempting to harm the Plaintiff physically or by placing the Plaintiff in fear of imminent serious physical harm, or by using force, threat or duress to make the Plaintiff engage in sexual relations.

☑ 2. YOU ARE ORDERED NOT TO CONTACT THE PLAINTIFF, in person, by telephone, in writing, electronically or otherwise, either directly or through someone else, and to stay at least _100_ yards from the Plaintiff even if the Plaintiff seems to allow or request contact. The only exceptions to this order are: a) contact as permitted in Sections 8, 9, 10 and 11 below; or b) by sending the Plaintiff, by mail, by sheriff or by other authorized officer, copies of papers filed with the court when that is required by statute or court rule. Including social media + Fullest party contact

☑ 3. YOU ARE ORDERED TO IMMEDIATELY LEAVE AND STAY AWAY FROM THE PLAINTIFF'S RESIDENCE, except as permitted in Sections 8 and 10 below, located at _3751 Lincoln Ave, Saugus MA_ or wherever else you may have reason to know the Plaintiff may reside. The Court also ORDERS you (a) to surrender any keys to that residence to the Police; (b) not to damage any belongings of the Plaintiff or any other occupant; (c) not to shut off or cause to be shut off any utilities or mail delivery to the Plaintiff; and (d) not to interfere in any way with the Plaintiff's right to possess that residence, except by appropriate legal proceedings.

☐ If this box is checked, the Court also ORDERS you to immediately leave and remain away from the entire apartment building or other multiple family dwelling in which the Plaintiff's residence is located.

☑ 4a. YOU ARE ORDERED TO STAY AWAY FROM THE PLAINTIFF'S WORKPLACE located at _Revere Pd. ca_

☐ 4b. YOU ARE ORDERED TO STAY AWAY FROM THE PLAINTIFF'S SCHOOL located at _____

☐ 5a. THE COURT ORDERS that the Plaintiff's residential address not appear on the order.

☐ 5b. THE COURT ORDERS that the Plaintiff's workplace address not appear on the order.

☐ 5c. THE COURT ORDERS that the Plaintiff's school address not appear on the order.

☐ 6. CUSTODY OF THE FOLLOWING CHILDREN IS AWARDED TO THE PLAINTIFF:

| N A M E | | A G E | | N A M E | | A G E |
|---|---|---|---|---|---|---|
| | | | | | | |

☐ 7. YOU ARE ORDERED NOT TO CONTACT THE CHILDREN LISTED ABOVE OR ANY CHILDREN IN THE PLAINTIFF'S CUSTODY LISTED BELOW, either in person, by telephone, in writing, electronically or otherwise, either directly or through someone else, and to stay at least _____ yards away from them unless you receive written permission from the Court to do otherwise.

☐ You are also ordered to stay away from the following school(s), day care(s), other: _____

| N A M E | | A G E | | N A M E | | A G E |
|---|---|---|---|---|---|---|
| | | | | | | |

☐ 8. VISITATION WITH THE CHILDREN LISTED IN SECTION 6 IS PERMITTED ONLY AS FOLLOWS (may be ordered by Probate and Family Court only):

☐ Visitation is only allowed if supervised and in the presence of _____ (name) at the following times _____

☐ Transportation of children to and from this visitation is to be done by _____ to be paid for by _____ (name) (third party), and not by you.

☐ You may only contact the Plaintiff to arrange this visitation. Contact may be made only by ☐ phone, ☐ e-mail, ☐ text, ☐ other _____

☐ 9. YOU ARE ORDERED TO PAY SUPPORT IN THE FOLLOWING MANNER:

☐ $_____ child support per _____ (week/month) by income withholding through the Department of Revenue. Defendant shall send payments to DOR at P.O. Box 55144, Boston, MA 02205-5144 until employer deductions begin.

☐ $_____ child support per _____ (week/month) directly to the Plaintiff by mailing payments to _____

☐ $_____ support for the Plaintiff per _____ (week/month) directly to the Plaintiff by mailing payments to _____

☐ Other orders: _____

☐ 10. YOU MAY PICK UP YOUR PERSONAL BELONGINGS in the company of police at a time agreed to by the Plaintiff.

☐ 11. YOU ARE ORDERED TO COMPENSATE THE PLAINTIFF for $_____ in losses suffered as a direct result of the abuse, to be paid in full on or before _____, 20___ ☐ by mailing directly to the Plaintiff ☐ through the Probation Office of this Court.

☑ 12. THERE IS A SUBSTANTIAL LIKELIHOOD OF IMMEDIATE DANGER OF ABUSE. YOU ARE ORDERED TO IMMEDIATELY SURRENDER to the _Calldon County VA_ Police Department or to the police officer serving this order all guns, ammunition, gun licenses and FID cards. Your license to carry a gun, if any, and your FID card, if any, are suspended immediately.

- You must immediately surrender the items listed above, and also comply with all other Orders in this case.
- Subject to certain exceptions, purchase and/or possession of a firearm and/or ammunition while this order is in effect is a federal crime. 18 U.S.C. §§ 922(g)(8) and 925.

☐ 13. ON THE NEXT SCHEDULED HEARING DATE, the Court will hear testimony and other evidence regarding Section 9 of this order, which involves support for the Plaintiff and/or the minor children. You are hereby ordered to bring with you to the next scheduled hearing date any financial records in your possession (including your most recent tax return and your last four paystubs) that provide evidence of your current income.

☐ 14. YOU ARE ALSO ORDERED _____

FA-2 (1/13)

COURT COPY

528

| ABUSE PREVENTION ORDER (G.L. c. 209A) Page 2 of 2 | DOCKET NO. 201713R0104 | TRIAL COURT OF MASSACHUSETTS |
|---|---|---|

☐ 15. Police reports are on file at the _____ Police Department.

☐ 16. OUTSTANDING WARRANTS FOR THE DEFENDANT'S ARREST: _____ (DOCKET #s) _____ (PCF #) _____ to _____

☐ 17. An imminent threat of bodily injury exists to the Plaintiff. Notice issued to _____ Police Department(s) by ☐ telephone ☐ other _____

**B. NOTICE TO LAW ENFORCEMENT**

☒ 1. An appropriate law enforcement officer shall serve upon the Defendant in hand a copy of the Complaint and a certified copy of this Order (and Summons), and make return of service to this Court. If this box is checked ☐, the following alternative service may instead be made, but only if the officer is unable to deliver such copies in hand to the Defendant: _____

☒ 2. Defendant Information Form accompanies this Order.

☐ 3. Defendant has been served in hand by the Court's designee: Name _____ Date _____

| DATE OF ORDER 1-31-17 | TIME OF ORDER ☐ A.M. -358 ☒ P.M. | EXPIRATION DATE OF ORDER 2-15-17 at 4 P.M. | SIGNATURE OF JUDGE [signature] PRINT/TYPE NAME OF JUDGE |
|---|---|---|---|

The above and any subsequent Orders expire on the expiration dates indicated. Hearings on whether to continue and/or modify Orders will be held on dates and times indicated. In the event the Court is closed on the date the Order is to expire, the Order shall remain in full force and effect and the Hearing shall be continued until the next Court business date.

NEXT HEARING DATE: 2-15-17 at 9 ☒ A.M. ☐ P.M. Courtroom 1

☐ **C. MODIFICATION/EXTENSION**

☐ This order was issued after a hearing at which the Plaintiff ☐ appeared ☐ did not appear and the Defendant ☐ appeared ☐ did not appear. The Court has ORDERED that the prior order issued _____, 20_____ be MODIFIED as follows:

☐ The expiration date of this order has been EXTENDED (See Below) ☐ OTHER MODIFICATION(S) _____

☐ Firearm surrender order continued. The items surrendered under paragraph 12 will NOT be returned since doing so would present a likelihood of abuse to the Plaintiff.

| DATE OF THIS MODIFICATION: | EXPIRATION DATE OF ORDER: at 4 P.M. | SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE |
|---|---|---|
| TIME OF MODIFICATION: ☐ A.M. ☐ P.M. | NEXT HEARING DATE: _____ at _____ ☐ A.M. ☐ P.M. Courtroom _____ | |

☐ **D. MODIFICATION/EXTENSION**

☐ This order was issued after a hearing at which the Plaintiff ☐ appeared ☐ did not appear and the Defendant ☐ appeared ☐ did not appear. The Court has ORDERED that the prior order issued _____, 20_____ be MODIFIED as follows::

☐ The expiration date of this order has been EXTENDED (See Below) ☐ OTHER MODIFICATION(S) _____

☐ Firearm surrender order continued. The items surrendered under paragraph 12 will NOT be returned since doing so would present a likelihood of abuse to the Plaintiff.

| DATE OF THIS MODIFICATION: | EXPIRATION DATE OF ORDER: at 4 P.M. | SIGNATURE OF JUDGE PRINT/TYPE NAME OF JUDGE |
|---|---|---|
| TIME OF MODIFICATION: ☐ A.M. ☐ P.M. | NEXT HEARING DATE: _____ at _____ ☐ A.M. ☐ P.M. Courtroom _____ | |

☒ **E. PRIOR COURT ORDER TERMINATED** Both parties present, Defendant

This Court's prior Order is terminated. Law enforcement agencies shall destroy all records of such Order.

☒ TERMINATED AT PLAINTIFF'S REQUEST. may have the return of all weapons surrendered

| SIGNATURE OF JUDGE [signature] PRINT/TYPE NAME OF JUDGE ELLEN FLATLEY | DATE OF ORDER 2/15/17 | TIME OF ORDER 9:22 ☒ A.M. ☐ P.M. |
|---|---|---|

| WITNESS - FIRST OR CHIEF JUSTICE | A true copy, attest (Asst.) Clerk-Magistrate/ (Asst.) Register of Probate |
|---|---|

FA-2A (5/15)

COURT COPY

| APPEARANCE OF COUNSEL | Trial Court of Massachusetts District Court Department |
|---|---|

CASE NAME:

Joseph Corvino

v.   Sharon Radfar

DOCKET NUMBER: 201713RO104

Lynn   ☑ DISTRICT COURT

To the Clerk-Magistrate:

Please enter my appearance as attorney for _____ Sharon Radfar

In the above numbered court action.

LYNN DISTRICT COURT
2017 APR 12 P 1:00

| ATTORNEY NAME | | | B.B.O. NUMBER (Required) | | | | | |
|---|---|---|---|---|---|---|---|---|
| Brian McLaughlin Esq. | | | 6 | 7 | 7 | 3 | 4 | 5 |

| ATTORNEY FIRM | TELEPHONE NUMBER |
|---|---|
| McLaughlin Law LLC | 617-236-5847 |

| STREET ADDRESS | | | |
|---|---|---|---|
| 745 Boylston Street, Suite 209 | | | |

| CITY / TOWN | STATE | ZIP CODE | |
|---|---|---|---|
| Boston | MA | 02116 | |

X _____
SIGNATURE OF ATTORNEY

April 12, 2017
DATE

http://trialcourtweb.jud.state.ma.us/courtsandjudges/courts/districtcourt/formsfordownload.html   DC-CR-19 (6/06)

COMMONWEALTH OF MASSACHUSETTS
Trial Court of the Commonwealth

DISTRICT COURT DEPARTMENT
CIVIL SESSION
ESSEX, ss.                                              LYNN DIVISION



DOCKET NO. 2017-13-RO-104

NOTICE OF APPEARANCE

Please enter my appearance as counsel for the Defendant in the above-captioned matter with

regard to the two-party [209A] hearing scheduled for February 15, 2017 at 9:00 am.

Respectfully submitted,

Philip L. Amel
Law Office of Philip L. Amel
355 Providence Highway
Suite 100
Westwood, MA 02090-1909
(781)493-6490
B.B.O. No. 566736

Dated: February 7, 2017

D20:1-413.DOC

531

# DEFENDANT INFORMATION FORM
### AS PROVIDED BY PLAINTIFF
G.L. c. 209A or G.L. c. 258E

**DOCKET NO.** *(for court use only)*  17132o1o4

**Massachusetts Trial Court**

This information is requested to help police to identify and locate the Defendant in order to serve the Defendant with a copy of any restraining Order that is issued. Please provide as much information as possible.

| DEFENDANT'S NAME | DATE OF BIRTH |
|---|---|
| Sharon Radfar | |

| OTHER NAMES USED BY DEFENDANT, IF ANY | PLACE OF BIRTH |
|---|---|
| LCF: 5414729 | N/A |

| MOTHER'S MAIDEN NAME (FIRST & LAST) | FATHER'S NAME (FIRST & LAST) | SOCIAL SECURITY NO. |
|---|---|---|
| N/A | N/A | N/A |

| SEX | RACE | EYES | HAIR | HEIGHT | WEIGHT | PHOTO AVAILABLE? *(very helpful for ID)* |
|---|---|---|---|---|---|---|
| ☐ MALE ☒ FEMALE | W/Middle Eastern | Brn | Blk | ~5'1" | ~120 | ☐ YES ☒ NO |

| BUILD | OTHER PHYSICAL CHARACTERISTICS *(beard, glasses, scars, tattoos, complexion, hairstyle)* |
|---|---|
| | |

| DEFENDANT'S HOME ADDRESS (NO., STREET, CITY, STATE, ZIP) | DEFENDANT'S HOME TELEPHONE NO. |
|---|---|
| ~~redacted~~ | ~~redacted~~ |

| APT NO. | FLOOR NO. | NAME ON DOOR/MAILBOX | DOES DEFENDANT UNDERSTAND ENGLISH? ☒ YES ☐ NO |
|---|---|---|---|
| N/A | N/A | N/A | IF NOT, WHAT LANGUAGES? |

| DEFENDANT'S EMPLOYER/WORKPLACE | WORK TELEPHONE NO. |
|---|---|
| George Mason University Police Dept | 703-993-2810 |

| WORK ADDRESS (NO., STREET, CITY, STATE, ZIP) | TITLE |
|---|---|
| 4400 University Dr. MSN 3D3, Fairfax, VA 22030 | Police Officer |

| DEPARTMENT | WORK HOURS |
|---|---|
| Public Safety | |

| OTHER PLACES DEFENDANT MAY BE FOUND *(friends, bars, relatives, hangouts)* | BEST PLACE TO FIND DEFENDANT |
|---|---|
| N/A | W/A |

| MOTOR VEHICLE LICENSE PLATE | YEAR | MAKE | MODEL | COLOR | BEST TIMES TO FIND DEFENDANT |
|---|---|---|---|---|---|
| n/a | n/a | n/a | n/a | n/a | Days/night |

DOES DEFENDANT HAVE: *(describe very briefly)*

A history of violence toward police officers? ☒ NO ☐ YES

A history of using/abusing drugs or alcohol? ☐ NO ☒ YES What kind? Alcohol

Access to guns, a license to carry, or possess a gun? ☐ NO ☒ YES What kind? Service weapon

Psychiatric/emotional problems? ☐ NO ☒ YES What kind? stalking

ANY OTHER INFORMATION WHICH MIGHT BE HELPFUL IN LOCATING THE DEFENDANT

| DATE SIGNED | PRINT PLAINTIFF'S NAME | PLAINTIFF'S SIGNATURE |
|---|---|---|
| 01/31/17 | Joseph covmo | x |

FA/HA-5 (5/10)

01-31-17; 08:59PM; From:
JAN-31-2017  11:44 . From LYNDON PK          781FR87300

To:917815867310    : 5712583371          #  1/  4
                    T=917099092R13        Page 1/4

*George Mason Univ.*

# The Commonwealth of Massachusetts

## District Court Department of the Trial Court

### Lynn Division

580 Essex Street, Lynn, MA 01901 (781) 598-5200

FAX-781-586-7310

#### RETURN OF SERVICE

Defendant's Name ___Sharon Radford___

Docket Number ___2017 13 20 104___

I Certify that I have served a copy of this order upon the Defendant named in this order by:

___X___ Delivering a copy in hand to the Defendant,

_____ Leaving a copy at the Defendant's last and usual address as shown in this order,

_____ Other (Please specify)

OR!

_____ I was unable to make service because: _____

Signature of Officer Making Service

Date and Time of Service    ___1/31/2017    1823 hours___

Printed Name of Officer making service    ___Keefer J.  #3157___

Title/Rank    ___Deputy___

Department    ___LCSO___

**AFFIDAVIT**

Describe in detail the most recent incidents of abuse. The Judge requires as much information possible, such as what happened, each person's actions, the dates, locations, any injuries, and any medical or other services sought. Also describe any history of abuse, with as much of the above detail as possible. Note: Unless the Court allows a motion to impound, this affidavit will be public record, including any names or specific addresses included in the affidavit.

On or about 01/04/16 - 01/31/2017 , the Defendant _Has repeatedly attempted to contact me by any means necessary, to wit telephone, text, unther letters, social media, driving from VA to MA and showing up in my neighborhood or at my place of work. Radfor has use threats to force me into sexual relations with her on multiple occasions being successful on one attempt while in Boston. She has called / texted over 100x on MLK weekend and called over 100x on 01/21/17. I have blocked over 100 phone numbers in the past year to avoid her. She uses an app that shows other #'s. She has shown up in my neighborhood, uninvited or announced and demanded I come see her. She has threatened me with ruining my life and has stated, "If I can't have you, no one will!". Radfor has assumed the identities of several people on line in an attempt to follow/contact me. She sellers pictures of herself to pics she finds online of me. Radfar has befriended several LEO's who are friends of mine and use harassing them to get into about me. She verbally abusive me 100's of times per day, accusing me of not acknowledging her because I am resistive to her middle eastern descent. Her messages have become increasingly threatening and unstable as of the last week. Because of her repeated actions/threats, I am in absolute fear of grave danger from Radfar that I continuosly carry a firearm for fear she

If more space is needed, attach additional pages and check this box: □

will appear unannounced and armed.

I declare under penalty of perjury that all statements of fact made above, including those provided on P.1, Section E and P.2, Sections A and B of the Complaint form regarding prior and pending court actions, and in any additional pages attached, are true to the best of my knowledge.

| DATE SIGNED | PLAINTIFF'S SIGNATURE |
|---|---|
| 1/31/17 | X |

| WITNESSED BY | PRINTED NAME OF WITNESS | TITLE OF WITNESS |
|---|---|---|
| X | | |

I have transcribed the above affidavit for the Plaintiff

Signature _____  Print Name _____

□ Court Certified Interpreter
□ Court Screened Interpreter
□ Other _____
□ Remote Translation Via Telephone/Video

534